# EXHIBIT A




FILED

JUN 19 2020

JAMES M. KIM, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: T. Thomason, Deputy

Veronica Gonzales
36 Rustic Way
San Rafael, California 94901
Plaintiff in Propria Persona
415-717-2111

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF MARIN, SAN RAFAEL COURTHOUSE

| | |
|---|---|
| VERONICA GONZALES, | Case No. CIV 2001401 |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | 1. **NEGLIGENT MISREPRESENTATION** |
| JP MORGAN CHASE BANK N.A.; | 2. **INTENTIONAL MISREPRESENTATION 1** |
| U.S. BANK NATIONAL ASSOCIATION, AS | 3. **INTENTIONAL MISREPRESENTATION 2** |
| TRUSTEE, SUCCESSOR IN INTEREST TO | 4. **BREACH OF CONTRACT** |
| WACHOVIA BANK, NATIONAL | 5. **CANCELLATION OF INSTRUMENTS** |
| ASSOCIATION, AS TRUSTEE FOR MSSTR | **and DECLARATORY RELIEF** |
| 2004-1; | 6. **WRONGFUL FORECLOSURE** |
| WELLS FARGO BANK, N.A.; | 7. **CONVERSION** |
| QUALITY LOAN SERVICE CORPORATION; | 8. **QUIET TITLE** |
| NORTHWEST TRUSTEE SERVICES. INC.; | |
| JULIET BERNAL; | |
| and DOES 1 through 20, | |
| Defendants | |

Plaintiff VERONICA GONZALES ("GONZALES" or "Plaintiff") hereby complains against

Defendants, and each of them, and alleges as follows.

1.     Plaintiff GONZALES was and is, at all times relevant to the facts herein, an individual and

resident of the County of Marin, in the State of California.  Plaintiff is a real party in interest and has the

right to sue pursuant to CCP §367.

1
VERIFIED COMPLAINT

## I.   JURISDICTION AND VENUE

2.   Plaintiff alleges she has all legal and equitable interest in, and is currently in possession of the real property made subject of this action is commonly known as and located at street address 36 Rustic Way, San Rafael, Marin County, California 94901, ("PROPERTY") with the Assessor's Parcel Number of 010-101-38, with legal description as follows:

> PARCEL ONE:
>     BEGINNING at a point on the Southeasterly line of the cul-de-sac, known as Rustic Way, as said cul-de-sac is described in the Deed to the City of San Rafael, recorded March 17, 1955 in Book 929 of Official Records. at Page 29, Marin County Records, said point being the Southwesterly corner of that certain parcel of land described in the Deed from Marin Title Guaranty Company, a corporation, to Gregory S. Lyon, et ux. recorded January 16, 1962 in Book 1533 of Official Records, at Page 354, Marin County Records, thence leaving said line of Rustic Way and running thence along the Southwesterly boundary line of said Lyon parcel South 54° 03' East 141.868 feet to the most Southerly corner thereof; thence leaving said Southwesterly boundary line and running South 56° 57' 40" West 144.627 feet; thence North 47° 45' West 118.56 feet to a point on the Easterly line of Rustic Way hereinabove referred to, thence along said line of Rustic Way on a curve to the left with a radius of 140 feet for a distance of 77. 756 feet, thence North 29° 18' 40" East 12.14 feet, thence on a curve to the right with a radius of 20 feet for a distance of 18.158 feet, thence on a curve to the left with a radius of 45 feet a distance of 20.99 feet to the point of beginning.

> PARCEL TWO:
>     AN EASEMENT for driveway purposes over the following described parcel:
> BEGINNING at a point on the Southwesterly line of the hereinabove described parcel, said point being distant thereon South 47° 45' East 10.00 feet from the most Westerly corner thereof; thence along said Southwesterly line North 47° 45' West 10.00 feet to the most Westerly corner of the hereinabove described parcel; thence Southwesterly along the Southeasterly line of Rustic Way 15.00 feet to a point, thence leaving said line of Rustic Way and running Easterly in a straight line to the point of beginning.
>     APN: 010-101-38

3.   This Court has subject matter jurisdiction over this matter and venue is proper since the PROPERTY is located in Marin County.

## II.   PARTIES

4.   GONZALES is informed and believes and based thereon alleges that Defendant JP MORGAN CHASE BANK N.A. and its agents in control ("CHASE BANK") was at all times relevant to the facts herein, a national association, bound by the laws of the State of California by doing business in Marin County, State of California.

2

5.     GONZALES is informed and believes and based thereon alleges that Defendant U.S. BANK NATIONAL ASSOCIATION and its agents in control ("U.S. BANK") was at all times relevant to the facts herein, a national association, bound by the laws of the State of California by doing business in Marin County, State of California.  U.S. BANK claims to be the trustee, Successor in Interest to Wachovia Bank, National Association, as Trustee for MSSTR 2004-1, a trust.

6.     GONZALES is informed and believes and based thereon alleges that Defendant MSSTR 2004-1 trust ("MSSTR") is **NONEXISTENT**.  U.S. BANK cannot be a valid trustee of a trust that does not exist (MSSTR).  Subsequently, U.S. BANK cannot be a real party in interest to defend any lawsuit as trustee of MSSTR that does not exist.  Therefore, neither U.S. BANK nor MSSTR has standing to defend any action or initiate an unlawful detainer action as a plaintiff.  Additionally, MSSTR has no authority to transact business in the State of California.

7.     GONZALES is informed and believes and based thereon alleges that Defendant WELLS FARGO BANK, N.A. and its agents in control ("WELLS FARGO") was at all times relevant to the facts herein, a national association, bound by the laws of the State of California by doing business in Marin County, State of California.

8.     GONZALES is informed and believes and based thereon alleges that Defendant QUALITY LOAN SERVICE CORPORATION and its agents in control ("QUALITY"), was at all times relevant to the facts herein, a domestic corporation, bound by the laws of the State of California, doing business in Marin County.

9.     GONZALES is informed and believes and based thereon alleges that Defendant JULIET BERNAL, as an employee, agent, and Assistant Secretary of QUALITY, was at all times relevant to the facts herein, bound by the laws of the State of California, doing business in Marin County.

10.     GONZALES is informed and believes and based thereon alleges that Defendant NORTHWEST TRUSTEE SERVICES. INC. and its agents in control ("NORTHWEST") was at all times relevant to the facts herein, a foreign Washington corporation, (currently FTB forfeited, apparently since 2018), bound by the laws of the State of California, doing business in Marin County.

11.     GONZALES is informed and believes and based thereon alleges that WELLS FARGO HOME MORTGAGE, INC. and its agents in control ("WFHM") was at all times relevant to the facts

herein, a domestic corporation bound by the laws of the State of California, doing business in Marin County. On or about May 4, 2004, WFHM appears to have merged out into Defendant WELLS FARGO with WFHM being the non-surviving entity and ceasing to exist, with WELLS FARGO being the surviving entity and taking over all assets and liabilities of WFHM.

12.   The true names and capacities, whether individual, corporate, partnership, associate, or otherwise of Defendants DOES 1 through 20, are unknown to Plaintiff who sue each Doe Defendant by such fictitious names. Plaintiff is informed and believes and based thereon alleges each of the Defendants designated herein as a fictitiously named Defendant is, and in some manner, was responsible for the events and happenings referred to herein, either contractually or tortuously, claim some right, title, estate, lien, or interest in the property described below adverse to Plaintiff's title and that each of them is responsible in some manner for the wrongful conduct alleged, and that each of their claims constitute a cloud on Plaintiff's title to that property. When Plaintiff ascertains the true names and capacities of DOES 1 through 20, Plaintiff will amend this Complaint accordingly.

13.   All Defendants mentioned by name, including DOES 1 through 20, will be collectively known herein as "Defendants", and this, of course, also includes the nonexistent MSSTR.

14.   All Defendants, together with WFHM and all their successors, assigns, and agents will be collectively known herein as "ALL PARTIES".

15.   GONZALES is informed and believes and based thereon alleges that ALL PARTIES and each of them, are, and at all times herein mentioned were, the agents, joint ventures, officers, members, representatives, servants, consultants, trustees, or employees of their co-Defendants, and in committing the acts herein alleged, were acting within the scope of such affiliation with the knowledge, permission, consent or subsequent ratification of their co-Defendants.

16.   ALL PARTIES herein purposefully directed their activities in Marin County and caused events to occur in Marin County out of which this action arises and which form the basis of this action.

17.   ALL PARTIES should have been duly licensed to do business in the State of California, are entities that regularly conduct business within this judicial district within California, or are nonexistent and since Plaintiff lives in this judicial district, sues all non-existent entities here out of necessity.

VERIFIED COMPLAINT

**III.**   **Tolling of Statutes of Limitations by Misrepresentation or Fraudulent Concealment**

18.   The Maxim of Law at Civil Code § 3539 states, "Time does not confirm a void act."

19.   Any applicable statues of limitations have been tolled by the Defendants' active, knowing, and continuing concealment or misrepresentation of the facts alleged herein, and their creation of void acts and instruments.  By virtue of the Defendants' concealment and misrepresentation to Plaintiff of numerous transactions over many years, Plaintiff could not and did not discover Defendants' actions. Nevertheless, through Defendants' continuing concealment and failure to stop their actions and repent to Plaintiff, applicable statute of limitations have been tolled.

20.   Additionally, Defendants should be enjoined from relying on any statutes of limitation. Defendants owed Plaintiff a duty of full and fair disclosure, but knowingly failed to honor and discharge such duty.  Defendants' conduct is not barred by any statutes of limitation because the Defendants' conduct constitutes an ongoing violation of Plaintiff's rights, which continues to exist. Any allegations against any successors and/or assigns to WFHM as the original party, rests upon its own conduct after any such assignment, appointment, gift, and/or purchase and not the conduct of WFHM or any prior party.

21.   The Defendants and/or their attorneys fabricated false testimony, declarations, affidavits, endorsements, and notarized acknowledgements to record false assignments, substitutions of trustee, notices, and deeds that purported to transfer deeds, deeds of trust, promissory notes, liens, the rights to monies due thereunder, and the PROPERTY that were obtained in a manner constituting theft, and each of them knew that each act occurred.

22.   The Defendants concealed material facts known to them but unknown to Plaintiff regarding payments, notices, assignments, transfers, late fees, accounts, endorsement, trusts, deposits, and charges with the intent to defraud Plaintiff.

23.   The Defendants made the above-referenced misrepresentations, concealments, and non-disclosures with knowledge of each, intending to induce the unsuspecting Plaintiff's reliance upon that, which resulted in damages and losses to Plaintiff.  Plaintiff was unaware of the true facts.  Had Plaintiff known the true facts long ago, Plaintiff would not have had to initiate this action.

24.   As a result of the Defendants' fraudulent conduct, Plaintiff has suffered general and special damages, and compensatory damages, in an amount according to proof. Additionally, Defendants acted with malice, fraud, and/or oppression and, thus, Plaintiff is entitled to an award of punitive damages.

25.   GONZALES states that the facts within every allegation made and every element alleged for all causes of action herein, were discovered during October of 2019.

## IV.   GENERAL ALLEGATIONS OF MATERIAL FACTS

26.   While parts in this Complaint are visually separated by headings for the convenience of the reader, as in the heading directly above, the headings do not interrupt the incorporation by reference of every allegation made throughout this Complaint into all causes of action and other paragraphs and sections. Plaintiff re-alleges and incorporates by reference the allegations of every paragraph in this Complaint as though fully set forth herein and included into every paragraph in every cause of action in this Complaint, with or without this repetitive statement.

27.   Some exhibit number/letters may be unused and are reserved for future use. Each exhibit referenced herein has a true and correct copy attached hereto and incorporated herein by reference. To save paper and not belabor the court, some exhibits may be excerpts of a full document and/or display arrows or highlights to guide the reader, but all exhibits maintain the true information and context of the contents thereof and do not mislead. A few of the exhibits may have minor redactions because Plaintiff could not obtain an unredacted copy to date, but Plaintiff reserves the right to replace a redacted exhibit with an unredacted or better copy to improve and reveal all facts, never to obscure.

28.   Plaintiff alleges that many of the recorded documents pertaining to the PROPERTY are void and each affects and voids subsequently recorded documents that rely on prior void documents for supporting authority and foundation for Defendants to precede with a nonjudicial foreclosure.

29.   GONZALES alleges that CHASE BANK currently claims to be the ostensible owner of the PROPERTY after submitting a winning bid at a trustee foreclosure auction of a lien on the PROPERTY and that CHASE BANK is perpetrating a fraud upon Plaintiff by colluding with ALL PARTIES by using void documents to attempt to seize Plaintiff's home (the PROPERTY) and evict her in an

6

Unlawful Detainer ("UD") action, pending in this courthouse at case number **CIV1901923**, titled: *JP MORGAN CHASE BANK N.A., ITS ASSIGNEES AND/OR SUCCESSORS v. VERONICA GONZALES.*

### A. Recorded Documents Affecting the PROPERTY

30.   The basis of Plaintiff's title and right to possession is a "Grant Deed" dated September 27, 1996 and recorded in the Official Records of Marin County Recorder's Office ("M. RECORDER"), instrument # 96-054256 [See **Exhibit 1**] executed by the grantor, granting Plaintiff exclusive possession of and title to the PROPERTY.

31.   On or about October 26, 2001, a document titled "Deed of Trust" ("DoT₃") [See **Exhibit 2**] was executed and issued by GONZALES. By November 21, 2001, said **DoT₃** was recorded in M. RECORDER as Document No. 2001-0078369. Printed to the right of the title is "4346783...", which is the account number assigned to GONZALES for this transaction, in which her promissory note is believed to have been deposited for credit in the full, face amount of the promissory note.

32.   On or about October 26, 2001, a valuable, negotiable instrument called the "**NOTE₂**" was executed and issued by GONZALES with an actual cash value equal to its face value of 600,000 dollars because it has a real financial value of 600,000 dollars in commerce. This negotiable instrument was only loaned and never gifted by GONZALES, to be held as a security deposit by the holder, and to be returned to Plaintiff when the **DoT₃** was no longer enforceable. The **DoT₃** references this **NOTE₂**. [See **Exhibit 2**, page 2, definition (E)]. Unfortunately, GONZALES does not have a copy of said **NOTE₂**, but did, in fact, execute and issue said **NOTE₂** to WFHM to hold for her benefit and return.

33.   By June 20, 2006, a document titled "Limited Power of Attorney" ("**LPOA 2006**") [See **Exhibit 4**] was recorded as Document No. 2006-0038789 in the M. RECORDER.

34.   By February 21, 2011, a bogus document titled "Assignment of Deed of Trust" ("**Assignment 2011**") [See **Exhibit 5**] purportedly assigned the **DoT₃** to U.S. BANK as trustee for the **NONEXISTENT** MSSTR; this would be impossible as MSSTR does not exist and cannot be the beneficiary. Said document was recorded in the M. RECORDER as Document No. 2011-0015555.

35.   By July 9, 2018, a bogus document titled "Notice of Default and Election to Sell under Deed of Trust" ("**NOD**") [See **Exhibit 7**] was purportedly signed by QUALITY, as agent for U.S. BANK, as alleged

trustee for nonexistent MSSTR (still not the beneficiary).   Said document was recorded in the M. RECORDER as Document No. 2018-0024544.

36.   By February 25, 2019, a bogus document titled "Notice of Trustee's Sale" ("**NTS**") [See **Exhibit 8**] was purportedly signed by QUALITY.  Said document was recorded in the M. RECORDER as Document No. 2019-0005575.

37.   By May 1, 2019, a bogus document titled "Trustee's Deed Upon Sale" ("**TDUS**") [See **Exhibit 9**] was purportedly signed by QUALITY.  Said document was recorded in the M. RECORDER as Document No. 2019-0014975.  Unfortunately, Plaintiff's copy has minor redactions.

**B.  A Lost Note Endorsed in Blank cannot be Enforced without Presentment**

38.   A promissory note is a negotiable instrument governed by the California Commercial Code in Article 3.  Com. Code § 3301 provides that a negotiable instrument may be enforced by "Person entitled to enforce" the negotiable instrument who is basically, a) the holder, b) a person in possession, and, c) a person not in possession, yet entitled to enforce it under certain circumstances.  A promissory note and a check are basically the same when endorsed <u>in blank</u>, and possession alone is all that is needed to enforce it, deposit it, cash it, or to transfer it again by delivery and an optional endorsement in blank.  This is standard practice between financial institutions using negotiable instruments for <u>paying</u> and <u>depositing</u> the face value on the instrument, either with a check or a promissory note, such as Plaintiff's "**NOTE₂**.

39.   To endorse a negotiable instrument "in blank", the endorser/assignor typically stamps on the back, "Pay to the order of _____", and leaves the line blank.  Upon delivery and receipt, the assignee, acceptor, or payee stamps their bank's own name on the line.  See **Exhibit 6** for a true and correct example with eight endorsements, including one that was cancelled, "in blank".  No allonge is allowed for endorsements when there is available space on the back of the instrument, such as in **Exhibit 6**.

40.   Com. Code § 3205(b) states, "If an indorsement is made by the holder of an instrument and it is not a special indorsement, it is a "blank indorsement."  "When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed."

41.   GONZALES alleges that her **NOTE₂** has always been endorsed in blank by every actual assignor for negotiation and delivery to other actual assignees or payees.  As a bearer instrument, it is only enforceable by the holder or possessor upon presentation.  GONZALES alleges that her **NOTE₂** has been intentionally destroyed by securitization or sold and that there is no such holder identified in any recorded instrument that can produce and enforce her **NOTE₂** or the alleged obligation thereon.

42.   GONZALES alleges that no Defendant possesses or holds her **NOTE₂** to have standing to enforce it and therefore, all Defendants lack standing to sustain a nonjudicial foreclosure.  The only way to settle this is for her <u>original</u> **NOTE₂** to be produced with all proper endorsements on the back.

43.   GONZALES alleges that the <u>original</u> **NOTE₂** does not exist and that ALL PARTIES cannot produce the actual, <u>original</u> **NOTE₂** to provide to the court to identify the true creditor.  The Maxim of Law at Civil Code § 3530 states, "That which does not appear to exist is to be regarded as if it did not exist."  The court must accept that Plaintiff's **NOTE₂** does not exist, unless the original is produced.

## C. Deeds of Trust are Unenforceable when Separated from the Note.

44.   GONZALES alleges MSSTR did not receive the **DoT₃** or the **NOTE₂** and was never the holder of both at the same time.

45.   The bogus **Assignment 2011** claimed to assign the **DoT₃**, but **not together** with the **NOTE₂**.  This made **DoT₃** become <u>unenforceable</u> and forever separated from the **NOTE₂**, losing any power of sale or enforcement the assignee may have attempted to exercise.  The **NOTE₂** cannot be subsequently rejoined with the **DoT₃** with any subsequent force or effect to authorize any subsequent power of sale.

46.   GONZALES alleges the **DoT₃** is <u>unenforceable</u> because it was separated from the **NOTE₂**.

47.   While deeds of trust like the **DoT₃** are transferred by valid assignments, promissory notes, like Plaintiff's **NOTE₂** are legally transferred <u>only</u> by <u>endorsement</u> and delivery.  No Defendant can claim the **NOTE₂** is still traveling with the **DoT₃**, without admissible proof.  GONZALES demands that the actual holder of the <u>original</u> **NOTE₂** produce it, if it exists, and show every required endorsement on the back.  An allonge for endorsements is invalid when there is room for endorsements on the face or back of the **NOTE₂**.

48.   GONZALES alleges the **NOTE₂** is not properly endorsed to exactly match **Assignment 2011**

or any other purported, recorded assignments and transfers.

49.    GONZALES alleges that there are no endorsements on the **NOTE₂** from any of the alleged assignors <u>directly</u> to their alleged assignees as claimed in any recorded assignment in this action and no Defendant or party can or will produce the original **NOTE₂** to prove any legal transfer of the **NOTE₂** occurred together with the **DoT₃** to make the power of sale from the **DoT₃** enforceable.

50.    GONZALES alleges that **Assignment 2011** is <u>void, not merely voidable</u> because U.S. BANK and nonexistent MSSTR cannot legally nor technically be the beneficiary of the **NOTE₂** or **DoT₃**.

51.    GONZALES alleges that ALL PARTIES will claim that after a diligent search, the **NOTE₂** has been lost or destroyed and cannot be found.  GONZALES alleges that Defendants, after claiming they lost GONZALES's valuable **NOTE₂**, owes GONZALES the total face value of the **NOTE₂** as an offset regardless of losing her valuable, negotiable instrument, which she issued and still owns.  It is the same scenario if they lost GONZALES's 600,000 dollar deposit in her bank account.  If it's missing, Defendants must replace it.  Not having the **NOTE₂** makes the **DoT₃** <u>unenforceable</u>.  Even though Defendants and banks keep track of every cent, they normally claim that they have *no idea* what happened to a 600,000 dollar **NOTE₂** on deposit because it just vanished.  This sad excuse screams fraud with every "lost note affidavit".  Every bank misplaced a 600,000 dollar deposit and no one knows what happened to it.  Defendants become liable.

52.    GONZALES alleges that neither WFHM nor Defendants ever told Plaintiff that her **NOTE₂** was secretly deposited into account number 4346783, which is the account number shown on the **DoT₃**.

### D. Fatal Defects and Bad Acts by ALL PARTIES.

53.    GONZALES alleges and will show below, that since **Assignment 2011** is <u>void, not merely voidable</u>, and since the **NOD** is <u>void, not merely voidable</u>, and since **NTS** is <u>void, not merely voidable</u>, GONZALES also alleges that the **TDUS** is <u>void, not merely voidable</u> because it relied on all these preceding foundational void documents for validity.

> "[1]-A home loan borrower had standing to bring an allegation that an assignment of a deed of trust was void and thus that a nonjudicial foreclosure under Civ. Code, § 2924, was wrongful; [2]-A borrower has standing to claim a nonjudicial foreclosure was wrongful because an assignment by which the foreclosing entity purportedly took a beneficial interest was not merely

10

voidable but void, depriving the foreclosing party of any legitimate authority to order a trustee's sale;" - *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919.

We conclude a home loan borrower has standing to claim a nonjudicial foreclosure was wrongful because an assignment by which the foreclosing party purportedly took a beneficial interest in the deed of trust was not merely voidable but void, depriving the foreclosing party of any legitimate authority to order a trustee's sale." - *Yvanova v. New Century Mortgage Corp. supra* 62 Cal.4th at 942.

54.   GONZALES alleges that the PROPERTY was not sold in compliance with Civil Code §§ 2923.5 or § 2924 et seq. under a power of sale contained in the **DoT₃**, therefore, the **TDUS** is void.

55.   GONZALES alleges that the **TDUS** has not been duly perfected, particularly because the **NOD** is **fatally defective** and void, as shown below.

56.   GONZALES alleges that MSSTR had no authority to foreclose without holding the **NOTE₂** and that the entire nonjudicial foreclosure process by QUALITY was not conducted in compliance with the Civil Code.  Therefore, CHASE BANK does not have duly perfected title.

57.   GONZALES alleges that she is and she remains the only legal and equitable owner of and is entitled to possession of the PROPERTY.

58.   GONZALES alleges that at the alleged foreclosure sale in 2019, nonexistent MSSTR could never be the true beneficiary because since it did not exist, MSSTR was incapable of holding the **NOTE₂** by endorsement and was incapable of holding the **DoT₃** by assignment.

59.   GONZALES alleges that there are no documents to support any legally valid foreclosure sale by QUALITY nor any legally valid transfer of the PROPERTY to MSSTR by the collusive acts of QUALITY and ALL PARTIES.  This case will show a wrongful foreclosure involving ALL PARTIES.

60.   GONZALES alleges that the foreclosure sale was conducted by one with no right to do so.

61.   GONZALES alleges that the foreclosure sale caused harm and prejudice to GONZALES.

62.   GONZALES alleges that there was no entity entitled to foreclose the **DoT₃**.

63.   GONZALES alleges that by their own admissions and notices, no Defendant ever legally foreclosed the PROPERTY.

64.   GONZALES alleges that she has legal authority and standing to state that the nonjudicial foreclosure for her PROPERTY was wrongful if even one assignment, by which the foreclosing party

11

purportedly took a beneficial interest in the **DoT₃**, was not merely voidable but void, depriving the foreclosing party of any legitimate authority to order a trustee's sale. See *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 942-943. Under *Yvanova*, GONZALES has standing to challenge any assignment as void because success on the merits would prove the purported beneficiary is not, in fact, the mortgagee and therefore lacks any right to foreclose on the mortgage. 62 Cal.4th at pp. 935-936.

65.   GONZALES alleges that the void, recorded documents were the cause-in-fact of her injury, and prejudiced her.

66.   GONZALES alleges that the fraud intentionally perpetrated upon her by ALL PARTIES aiding, abetting, and conspiring together to support that **NONEXISTENT** MSSTR were the cause-in-fact of GONZALES's injury, and prejudiced her.

67.   GONZALES alleges that she does not owe money, "to the world at large but to a particular person or institution, and only the person or institution entitled to payment may enforce the debt by foreclosing on the security." See *Yvanova, supra,* 62 Cal.4th at p.938.

68.   GONZALES alleges that pursuant to *Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, since she alleged the foreclosure was void and not merely voidable, tender is not required to state a cause of action for quiet title or for cancellation of instruments because the preceding void foundational documents were void.

69.   GONZALES alleges that since **Assignment 2011** is void, not merely voidable, and since the **NOD** is void, not merely voidable, GONZALES also alleges that the **NTS** is void, not merely voidable because it relied on all these preceding foundational void documents for validity.

70.   GONZALES alleges that QUALITY did not have lawful authority to initiate the foreclosure auction/sale.

**E.   The Initial Three Documents – Definitions of English Words and Legal Expressions**

71.   On or before October 26, 2001, GONZALES entered into a transaction she believed was valid. The transaction gave rise to multiple agreements. The agreements consisted of three main documents, which were prepared by WFHM and offered to GONZALES for approval and signature. The first document, which shall hereinafter be named "**Application₁**", consisted of several pages titled/named

"Uniform Residential Loan Application", with the phrase "Fannie Mae Form 1003" in the footer.

72. The **Application₁, NOTE₂,** and **DoT₃** shall collectively be known as the "**Initial 3 Documents**".

73. The **Initial 3 Documents** are contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction. They are to be taken together and each clause and every definition helps to interpret the other. All definitions on the **DoT₃** shall be used on the **Initial 3 Documents** and every document thereafter, including any and all purported assignments, substitutions of trustees, **NOD, NTS,** and **TDUS** created and proffered by ALL PARTIES and all subsequent parties and agents. See Civil Code §§ 1641 & 1642.

1641. The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.

1642. Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.

74. These **Initial 3 Documents** were contracts offered to GONZALES on a "take it or leave it" basis drafted entirely by WFHM or it agents. Nonetheless, to the extent that the language is subject to any ambiguity, it is a well-settled principle of contract law (i.e. *contra proferentum*) that any ambiguous term in the contract should be construed against the drafter. This doctrine is greatly applicable in this situation where a sophisticated financial institution, which frequently engages in (deceitful) transactions, enters into a standardized contract of adhesion with the less sophisticated GONZALES. Where there is a conflict between the ambiguities, the conflict must be resolved in favor of GONZALES.

California Civil Code §1654: "In cases of uncertainty ... the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist".

75. The Maxim of Law at Civil Code § 3542, states, "Interpretation must be reasonable."

76. On page 1 of **DoT₃**, it begins with "DEFINITIONS   Words used in multiple sections of this document are defined below...". The **DoT₃** defines new legal expressions and creates new, secondary names for nouns that already have names (aliases), which are used throughout the **Initial 3 Documents** and every document thereafter related to the PROPERTY.

77. In the **Initial 3 Documents** and every other document proffered by ALL PARTIES, every

13

word or term has only one meaning; either the English meaning or the special meaning (legal expression) given to it by WFHM in the **DoT₃**, which entirely and absolutely replaces the common English meaning. (see California Civil Code §1644)  Each clause and every definition helps to interpret the other.

California Civil Code §1644: "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or **unless a special meaning is given to them by usage**, in which case the latter must be followed." *(emphasis added)*

78.   The **DoT₃** defines new, legal expressions with special meaning that are not English words. These legal expressions include: "Security Instrument", "Borrower", "Lender", "Trustee", "Note", and "Loan".  <u>**Every**</u> time these legal expressions are used, were used, and will be used in recorded or legal documents, and in this and other court actions, they are not English words.

79.   The following English words - security instrument, borrower, lender, trustee, note, and loan - do not exist in the **Initial 3 Documents** or in any other document offered by ALL PARTIES:  If they appear, they are always non-English legal expressions.

80.   When these new legal expressions are used within this court case and all related court cases, Plaintiff will attempt to write them in **bold** with a subscript number attached, like **this₄**, to indicate a non-English, legal expression.  ALL PARTIES use these legal expressions spelled with letters identical to common English words, with a completely different meaning than its English word clone.  These legal expressions will be shown by Plaintiff as: **Security Instrument₄, Borrower₄, Lender₄, Trustee₄, NOTE₂,** and **Loan₄.**  The most abusive legal expression used is **Loan₄.**

**DoT₃** DEFINITION page 2: (G) "Loan" means the <u>**debt**</u> evidenced by the Note..." *(emphasis added)*

81.   GONZALES was given a WFHM **Loan₄**, which is clearly defined (in English) to be a **debt**. Therefore, using simple English substitution, GONZALES was given a DEBT (only) by WFHM, **nothing was ever loaned** by WFHM, yet WFHM conned GONZALES to *promise to pay this debt.*

82.   In a valid contract, no party gets something for nothing.  ALL PARTIES cannot be damaged in any way for the failure of GONZALES to perform on a void, inequitable, alleged debt obligation.

**F. GONZALES has Already Tendered 600,000 dollars of Commercial Paper to Defendants.**

83. GONZALES alleges that WFHM created an account with the number 4346783 [see **Exhibit 1**, page 1] for the purpose of a deposit / transaction account and a debt collection account. This account was used during the Federal Reserve System's multiple expansion process when WFHM accepted GONZALES's **NOTE₂** in exchange for placing 600,000 dollars of credit into this deposit / transaction account. The 600,000 dollars of deposit credits constituted new additions to the total deposits of the banking system and belong to GONZALES. By being a member of the Federal Reserve System, WFHM did not have to expend any effort to create these 600,000 dollars of credit - it was nearly free to WFHM, and therefore, Defendants and agents cannot be damaged for any failure of GONZALES to pay something that was created from nothing that belonged to her. WFHM or its agents removed the **DoT₃** and **NOTE₂** from the active escrow first and sold or exchanged them for the credit that returned into the escrow account without informing GONZALES where her funding came from.

84. GONZALES alleges that WFHM created an account with the number 4346783 for the purpose of a debt collection account, as there was no loan and therefore, no loan repayment necessary.

85. GONZALES alleges that Defendants are not a holder of her valuable, <u>original</u> **NOTE₂**; all they may have is a copy. As an analogy, if a party claims to hold GONZALES's hundred dollar Federal Reserve note, it is not equitable to return only a copy or a "reconveyance" of the hundred dollar note to GONZALES and call it even; <u>the party must return the original note, because it remains a valuable, negotiable instrument</u>.

86. Defendants have no further need for the **NOTE₂** since they claim to hold a valid **TDUS** and claim title to the PROPERTY. GONZALES requires that Defendants return her original **NOTE₂** to her forthwith because any alleged "Loan" they allegedly gave has been satisfied again by taking the PROPERTY. If the **NOTE₂** is not returned to her, it would cause serious harm to GONZALES as an obligation still earning money in commerce for some other party and GONZALES is entitled to that money.

87. GONZALES alleges the **NOTE₂** is a valuable, negotiable instrument, is a security deposit to be returned to her, is commercial paper (which is used in every banking transaction), is a loan of 600,000 dollars to WFHM, and it is still outstanding, due, and payable to GONZALES. GONZALES alleges that

1 ALL PARTIES are responsible for RE-paying GONZALES this 600,000 dollars if Defendants cannot
2 produce the original **NOTE2** to return to GONZALES.

3     88.   ALL notes are valuable, negotiable instruments and, like Federal Reserve notes, have a face
4 value and can be deposited for that face value by a financial institution, such as WFHM and WELLS
5 FARGO. GONZALES's **NOTE2** was owned and issued by GONZALES and endorsed so WFHM
6 could deposit its 600,000 dollar value as a credit. **This was GONZALES's tender**, loaned to WFHM.

7     89.   GONZALES alleges that her valuable, negotiable instrument, **NOTE2** that she executed and
8 issued is a security deposit. 100 years ago before the 1933 gold theft by banks and the securitization of
9 commercial paper, notes were always returned. GONZALES alleges that a true, moral creditor would
10 hold this security deposit **and return** it upon full performance, payment, or discharge as believed to be
11 required in the **DoT3**. GONZALES alleges that instead of holding the **NOTE2**, WFHM sold it and/or
12 deposited it for credit from the sale into transaction account 4346783. GONZALES still owns this
13 **NOTE2** as the issuer and the entire deposit account value. GONZALES did not give or sell this **NOTE2**
14 to WFHM. WFHM did not compensate GONZALES for taking this **NOTE2** and hiding its existence and
15 its full, true value as money. GONZALES does not know the actual creditor who holds this genuine
16 **NOTE2** or claims the deposit account, but GONZALES demands the return of this valuable security,
17 which is a security deposit, and all additional monies in the account and generated by the account.

18     "(I)n the case of original mortgages and **Promissory notes, they are not merely exhibits but**
19     **instruments which must be surrendered prior to the issuance of a judgment.** The judgment
    takes the place of the Promissory note. **Surrendering the note is essential** so that it cannot
20     thereafter be negotiated." - *Perry v. Fairbanks Capital Corp.,* 888 So. 2d 725, 726 (Fla. 5th DCA
    2004) *(emphasis added).*
21

22     90.   The **NOTE2** was to be held as a security deposit in the event that WFHM was not re-paid for
23 an alleged loan *of its own money* that it was to give to GONZALES, but WFHM never loaned its money.
24 WFHM only deceptively created a debt without any loan or consideration and took GONZALES's
25 valuable **NOTE2**, which must still be produced and returned to GONZALES. If the **DoT3** was valid, it
26 states that the trustee has title to the PROPERTY, and therefore, the trustee acts as the landlord and
27 GONZALES must be the tenant. When a foreclosure occurs, there is a transfer of title to the landlord's
28 successor in interest who must have been holding the tenant's security deposit to foreclose, but must

maintain it for eventual return to the tenant after leaving the rental (PROPERTY). Since U.S. Bank claims to be that landlord's successor in interest, it must be holding GONZALES's security deposit (the value of her **NOTE₂**), which must be returned to GONZALES after foreclosure, pursuant to Civil Code §1950.5(l), plus twice the amount of the security as a penalty for any bad faith claim or retention after 21 days.

91. Pursuant to Comm. Code §3203(a) "An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." The only way to transfer and enforce a promissory note is by delivery. Although the **DoT₃** was allegedly assigned, the **NOTE₂** also needed to transfer with it. However, the genuine **NOTE₂** has never been produced to prove a transfer by endorsement. GONZALES alleges that the genuine, original **NOTE₂** has never been properly endorsed to match with the alleged assignments and it has never been properly transferred to any party that is alleging to be a holder of the **NOTE₂** and an alleged creditor of GONZALES. Defendants do NOT hold, control, know the whereabouts of, and cannot produce the original **NOTE₂**. Therefore, the **DoT₃** is unenforceable because the **NOTE₂** is **gone forever**.

92. GONZALES alleges that no one holds or knows who holds the genuine **DoT₃** or the genuine **NOTE₂** that contain GONZALES's wet-ink signatures that would give a beneficiary the right to foreclose. GONZALES alleges that the genuine **DoT₃** and the genuine **NOTE₂** have been destroyed and do not exist and are therefore, unenforceable because there is no creditor in possession as a holder in due course. GONZALES alleges that the genuine **DoT₃** and the genuine **NOTE₂** have not been accidentally lost after a diligent search; no party can produce them. When is the last time a bank lost or destroyed a deposit? In this case, the deposit has been hidden.

93. GONZALES alleges that the **NOTE₂** is a negotiable instrument and therefore was used as money. The **NOTE₂** is still GONZALES's property and is still GONZALES's money. It is a valuable deposit of collateral used as a temporary security deposit that must be returned to GONZALES. GONZALES alleges that after she executed and issued the **DoT₃** and the **NOTE₂** on or about October 26, 2001, that WFHM or other parties removed the **NOTE₂** from escrow that was controlling the transaction between GONZALES and WFHM. However, WFHM first took the **DoT₃** and the **NOTE₂**, deposited or sold them, and created new money that did not previously exist, without using any of its labor or money

to do so. New money was created and deposited into the escrow account. This was accomplished using the Federal Reserve Bank's Multiple Expansion Process, where new money is created that did not exist before that instant, money which WFHM did not have to labor for, pay for, earn, or get from bank depositors. The proceeds of this money-creation transaction were then returned to escrow after the collection of GONZALES's **DoT₃** and **NOTE₂**. GONZALES alleges that any proceeds produced by WFHM were in the form of credit or bookkeeping entries, which were erroneously accounted for on par with money of exchange, or money that GONZALES was supposed to labor for.

> "A **promissory note, negotiable in form**...We are convinced that if a promise to pay of a solvent obligor is unconditional and assignable, not subject to set-offs, and is of a kind that is frequently transferred to lenders or investors at a discount not substantially greater than the generally prevailing premium for the use of money, **such promise is the equivalent of cash**..." *Cowden v. C.I.R.* (1961) 289 F.2d 20. *(emphasis added)*.

94.   GONZALES was never compensated for GONZALES's valuable security, the promissory **NOTE₂**, negotiable in form, which is the equivalent of cash, that was taken and hidden by WFHM and therefore, its full face value is still due and owed to GONZALES, plus interest and all other sums of money that Defendants have benefitted by the uncompensated taking (**conversion and unjust enrichment**), and now is due and owing from Defendants that are supposed to be holding said valuable security. Nevertheless, it is alleged that Defendants do not hold and cannot or will not produce the **NOTE₂** and will not offer to pay GONZALES its face value.

95.   Since GONZALES's negotiable **NOTE₂** created new money that did not exist before, the imaginary loan that was never created by WFHM was never needed, as all the credit GONZALES used was created from GONZALES's own deposit of her **NOTE₂** - she received *credit* from her own deposit and ALL PARTIES are due nothing because they paid nothing and risked nothing.

96.   WFHM never loaned anything to GONZALES. In fact, GONZALES loaned money to WFHM with the **NOTE₂** and WFHM entered GONZALES's **NOTE₂** on its books as its liability of 600,000 dollars, just as if GONZALES had deposited cash into WFHM's account. WFHM was obligated to give this valuable **NOTE₂** deposit account back to GONZALES. This obligation to return the **NOTE₂** deposit account now falls on Defendants. The funds created by the **NOTE₂** were sufficient to satisfy the seller of the PROPERTY when the seller granted GONZALES possession of the PROPERTY.

97.   WFHM is or was an inseparable part of and is under the authority to transact financial business from the Federal Reserve System. The Federal Reserve System published uncomplicated, **undisputed** booklets to explain how it creates new money out of thin air, FOR FREE, without any financial institution expending anything to create it, while demanding that some person commits his labor and/or earnings, typically for thirty years, to pay for this instant money creation "service". This is involuntary servitude. While one type of free, non-labor money was created by WFHM, it originally demanded, and now Defendants demand that any debt created this way is to only be paid by labor-backed money, which is inequitable. This is the equivalent of WFHM printing a picture of a Ferrari for GONZALES and then requiring that GONZALES return a real, working Ferrari automobile to WFHM.

98.   From **Modern Money Mechanics**, published by the Federal Reserve Bank of Chicago in 1961 [see **Exhibit 13**] and updated in 1992 *(emphasis added to all)*:

"Confidence in these forms of money [paper currency and demand deposits] seems also to be tied in some way to the fact that there are assets on the books of the Government and the banks equal to the amount of money outstanding, even though most of these assets themselves are no more than pieces of paper (such as customers' promissory notes) and it is well understood that money is not redeemable in them." - page 3

"Then, bankers discovered that they could make loans merely by giving their promises to pay (bank notes). In this way, **banks began to create money**." - page 4

  "Deposits are the modern counterpart of bank notes. **It was a small step from printing notes to making book entries to the credit of borrowers, which could be spent by the use of checks [thereby "printing" their own money*].**" - page 4 [*additional verbiage in the 1992 edition]

"How the multiple expansion process works ...
Of course, they do not really make loans out of the money they receive as deposits. If they did this, they would be acting just like financial intermediaries and no additional money would be created. What they do when they make loans is to accept promissory notes in exchange for credits they make to the borrowers' deposit accounts. Loans (assets) and deposits (liabilities) both rise by $850,000. Reserves are unchanged by the loan transactions. But the deposit credits constitute new additions to the total deposits of the banking system." - page 6. ($850,000 was an example of a 15% reserve requirement on $1,000,000)

99.   Therefore, the facts published by the Federal Reserve Bank of Chicago prove that GONZALES's **NOTE₂** was 1) no more than a piece of paper, 2) a promissory note, and 3) an asset. The facts prove that banks began printing and giving paper IOU's to customers, backed by nothing, in the form of bank notes or promises to pay, and called them "Loans". The facts prove that banks print their

own money for free, meaning that Defendants <u>have no damages to reclaim</u>. The facts prove that banks do NOT use existing deposits for "loans". The facts prove that GONZALES's **NOTE₂** was **exchanged** for 600,000 dollars of credit, which was a <u>dollar for dollar</u> **exchange** of paper for credit and not a loan.

100. From **I bet you thought...**, published by the Federal Reserve Bank of New York in 1977 [see **Exhibit 14**], *(emphasis added to all)*:

> "**Money doesn't have to** be intrinsically valuable (valuable in itself), **be issued by a government** or be in any special form." - page 5.

> "Commercial banks **create** checkbook **money whenever they grant a loan, simply** by adding new deposit dollars to accounts on their books **in exchange for a borrower's IOU**." - page 19.

> "**Money multiplication, rather than currency deposits**, accounts for most of our $230 billion of checkbook money." - page 19.

> "**Commercial banks lend by creating new checkbook deposits**. Savings banks and similar thrift institutions simply pay out existing funds left by depositors." - page 25.

101. Therefore, the <u>facts</u> published by the Federal Reserve Bank of New York prove 1) that GONZALES's **NOTE₂** was money because it did NOT have to be issued by any government, 2) the creation of 600,000 dollars of credit was <u>simple</u> for WFHM to do, 3) money multiplication is not the same as money from deposits, and 4) savings banks lend <u>deposits</u> and commercial banks "lend" by creating *new* checkbook deposits. WFHM is NOT a savings bank. WFHM cannot lend deposits. The facts prove that WFHM created new credits in a simple task and did not loan, give away, nor risk any of WFHM's or Defendants' current assets.

102. From **Debt - Jekyll and Hyde**, appearing in <u>Business Conditions</u>, Nov. 1953, page 4, published by the Federal Reserve Bank of Chicago [see **Exhibit 15**], *(emphasis added)*:

> "Debts are assets" - page 6

> "In the case of commercial banks and most other financial institutions **almost all assets consist of pieces of paper** which are evidence that someone has borrowed from them on a short- or a long-term basis - **notes**, bonds, mortgages.." - pages 6,7

> The banking system is the mechanism that accomplishes this "money creation." - page 8.

> "When a bank makes a loan or buys a security, however, it is a different story. **The bank accepts its customer's note** or security and in **exchange** gives him an **equivalent** increase in his deposit account. **Nobody else loses a deposit**. Consequently, the total of cash and deposits - the money

supply - is increased. **Money has been created**."- pages 8,9.

"As this chain of action grows and spreads through the entire banking system, more and more "new" deposits are "created." - page 11 *(quotation marks in original)*

"Mathematically this permits the banking system as a whole, in meeting borrowers' demands for credit, to create about 4 dollars more of deposit money for each dollar of cash reserves." - page 11.

103. Therefore, the facts published by the Federal Reserve Bank of Chicago prove that GONZALES's **NOTE₂**: 1) is both a debt and an asset, 2) GONZALES's **NOTE₂** is a piece of paper, a note, and an asset, and 3) GONZALES's **NOTE₂** was **exchanged** with an **equivalent** increase in GONZALES's deposit account with WFHM, that being 600,000 dollars into account 4346783. This account and deposit were hidden and not disclosed to GONZALES. The facts prove that WFHM created a deposit of 600,000 dollars for the **exchange** of GONZALES's **NOTE₂**, but WFHM kept both the **NOTE₂ AND** the 600,000 dollars in account 4346783. GONZALES received NOTHING from WFHM. This is **conversion**.

104. The last quote above from page 11 is direct evidence that <u>Defendants have no damages</u>. This means that if WFHM had one dollar on deposit, it was authorized to create credit of four more dollars of "Loans". If WFHM would actually "Loan" out the one dollar, it could also "Loan" out another four dollars that do not exist. How can WFHM be damaged if any of the four nonexistent "dollars" were actually "Loaned" to GONZALES who failed to repay nonexistent "dollars" to WFHM? There is an 80% chance that GONZALES could have received imaginary dollars from WFHM that never existed. How can ALL PARTIES be damaged? They cannot but the insist on foreclosing on all five dollars "Loaned".

105. From **Your Money and the Federal Reserve System**, published by the Federal Reserve Bank of Minneapolis in 1940 [see **Exhibit 16**]:

"The **promissory notes, securities and other valuable paper that these agencies receive when they make loans,** are turned over to the Reserve Banks for safekeeping. The Banks accept payment on these loans from the borrowers and **return the security when loans are paid**." - page 21 *(emphasis added)*

106. Therefore, the **facts** published by the Federal Reserve Bank of Minneapolis prove that GONZALES's **NOTE₂** is, 1) recognized as **valuable** paper, 2) is held by some holder for safekeeping, 3) is called a security, and 4) shall be **returned** to GONZALES when some "loan" is paid. The facts prove

that if GONZALES's **NOTE₂** is not returned to GONZALES, then WFHM must give GONZALES 600,000 dollars in some valuable form to GONZALES that is usable by GONZALES. Any "Loan" is paid upon taking the PROPERTY instead.

107. From **Points of Interest**, published by the Federal Reserve Bank of Chicago in 2000 [see **Exhibit 17**], *(emphasis added):*

> "Banks **create deposits by making loans**. Rather than handing cash to borrowers, banks **simply** increase balances in borrowers' checking accounts. Borrowers can then draw checks to pay for goods and services. **This creation of checking accounts through loans is just as much a deposit as one we might make by pushing a ten-dollar bill through the teller's window.** With all of the nation's banks able to increase the supply of credit in this fashion, credit could conceivably expand without limit." - page 7.

108. Therefore, the **facts** published by the Federal Reserve Bank of Chicago prove that the account created through the issuance of GONZALES's **NOTE₂** is just as much a deposit as one GONZALES might make by pushing 600,000 dollars in bills or bank notes or Federal Reserve notes through the bank teller's window. These **facts** prove that GONZALES's **NOTE₂** was used by WFHM as a qualified, sufficient, valuable, and cash deposit of 600,000 dollars.

109. Since the money that that WFHM purportedly "loaned" to GONZALES was not the prior property of WFHM and did not exist until WFHM took and deposited GONZALES's **NOTE₂** into a secret transaction account for the purposes of creating the money or credit **as an exchange**, the debt also known as **Loan₄** is without genuine consideration and is unenforceable. WFHM created the illusion through semantic deception that it lent *its* money, but WFHM did not possess the money nor lend its money to GONZALES.

110. In GONZALES's **NOTE₂**, WFHM wrote that GONZALES is obligated to pay WFHM six hundred thousand "dollars", plus interest. Since ALL money is created by banks as debt during a "loan", and WFHM ONLY created the initial 600,000 "dollars" without any additional interest, this interest that WFHM is demanding was NEVER created and does NOT exist. WFHM did NOT create the interest for GONZALES to pay to WFHM. WFHM only created the 600,000 "dollars" of credit and no interest. Therefore, WFHM knew that GONZALES's **NOTE₂** was impossible to satisfy from the inducement from the impossibility of paying interest that was NEVER created and does not exist. This impossibility creates

a void contract and voids the **DoT**₃ and any purported obligation that it allegedly secures.

111. The Maxim of Law at Civil Code § 3531 states, "The law never requires impossibilities."

### G. Tender has been Made for all Causes of Action for

### Cancellation of Instruments, Wrongful Foreclosure, and to Quiet Title

112. GONZALES alleges that the entire foreclosure sale was void, not merely voidable, thus, she was excused from tendering or tender is not required to sustain causes of action for cancellation of instruments, wrongful foreclosure, or to quiet title.

113. Nevertheless, GONZALES *has* tendered 600,000 dollars to WFHM by issuing her **NOTE**₂ on October 26, 2001 as a loan and security deposit to discharge and satisfy every newly created, alleged debt for the full amount of the underlying, secured indebtedness in case of a default.

114. GONZALES's 600,000 dollar **NOTE**₂ paid for the PROPERTY and was the only consideration tendered to another party during her purchase of the PROPERTY.

115. WFHM gave no consideration to Plaintiff and lent no money to Plaintiff.

116. Either the **NOTE**₂ paid for the PROPERTY or it paid for any default.

117. Defendants cannot take both the **NOTE**₂ and the PROPERTY; they must return one.

118. GONZALES tendered her 600,000 dollar **NOTE**₂ to WFHM and successor landlords.

119. GONZALES's **NOTE**₂ was valuable, otherwise, the **DoT**₃ at ¶20 would never have stated, "Sale of Note… The Note … can be sold one or more times without prior notice to Borrower." No one *sells* something that has no value to a financially sophisticated buyer. If GONZALES's **NOTE**₂ *was* sold, then GONZALES is owed the money from the sale; it was her security deposit to be returned to her.

### SUMMARY

120. GONZALES alleges that she cannot acquire the PROPERTY for free, because her **NOTE**₂ already paid for it. Does CHASE BANK deserve the PROPERTY for free instead, because that is what ALL PARTIES are trying to do? Technically and legally, GONZALES created, issued, and tendered all the money for the PROPERTY herself, because that is the system of credit and debt that we are stuck

with today.  The commercial paper system exists since the banks stole every last gold and silver coin of their depositors' lawful money from their vaults in 1933 and 1974 and never returned any of it.  They took that gold and silver for FREE.  In the transaction, GONZALES gave valuable consideration, her autograph on the negotiable instrument that she created (**NOTE₂**), in <u>EXCHANGE</u> for the PROPERTY and truly owns the PROPERTY, fully paid.  ALL PARTIES and their attorneys have been living off GONZALES and millions of other victims, sucking away her labor as money by creating non-English legal expressions.  Now, they are trying to lien and suck away the PROPERTY from GONZALES as the final insult.  This is happening with the simple effort of computers, paper, ink, and fancy bookkeeping without the Defendants expending any labor, without paying GONZALES her deposit (**NOTE₂**), and without giving any valuable consideration in the beginning.

121.   If Defendants prevail in this case, then GONZALES will be harmed and will continue to be plundered the rest of her life for the private benefit of ALL PARTIES, who created this entire paper money swindle decades ago, first stealing the gold and then the silver from all the people for nothing, and now creating and hiding behind legal-language, deceptive contracts, and the "legal" system to plunder homes and promissory notes.  It is the most unconscionable legal plunder created in the entire history of the world.  Banks conspired to create the system of financial slavery on a global scale, harvesting the labor of millions of people, including GONZALES.  The only reason that things are the way they are is that the millions of people have not yet been made aware of the injustice happening to them by the supplanting of non-English legal expressions for English words in basically every "contract".

### FIRST CAUSE OF ACTION
**Negligent Misrepresentation**
**(Against All Defendants and DOES 1-20)**

122.  GONZALES re-alleges and incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

123.  On or about May 4, 2004, WFHM appears to have merged into WELLS FARGO, with WELLS FARGO being the surviving entity and WFHM ceasing to exist.  Afterwards, GONZALES alleges that WELLS FARGO took over the position of WFHM to allegedly appear to control the **DoT₃** and the **NOTE₂**.

124. GONZALES alleges that by recording **LPOA 2006 [Exhibit 4]**, "Wells Fargo Bank N.A., made, constituted and appointed", certain <u>precisely named</u> persons as, "…its true and lawful attorney in fact for, and in its name, place and stead, and for its use and benefit, for every act customarily and reasonably necessary and appropriate for … The execution, acknowledgment, recording and delivery of … Deeds and <u>assignment</u> of beneficial interest to the investor on mortgage loans in which Wells Fargo Bank N.A. is the beneficiary of record of the Mortgage…". *(emphasis added)*.

125. **LPOA 2006** specifically appointed "<u>Becky Baker</u>" of Northwest Trustee Services, Inc., 3535 Factoria Blvd., Suite 200, Bellevue, WA 98006 to be its attorney in fact. This document did not appoint "<u>Rebecca A. Baker</u>" as an attorney in fact and therefore, "<u>Rebecca A. Baker</u>" had no powers to act.

126. **LPOA 2006** specifically states, "This limited power of attorney shall be effective from the date of execution hereof until December 31, 2009 or such time as Wells Fargo Bank N.A. or its successor revokes it in writing."

127. It is clearly and legally obvious that **LPOA 2006** shall be effective <u>only until</u> December 31, 2009. What would happen if, instead, Wells Fargo Bank N.A. or its successor revoked it in writing on December 31, 2014, five years after it was first revoked? Would it be assumed that after it expired on December 31, 2009 that a subsequent/future revocation on December 31, 2014 would enable the **LPOA 2006** to be effective and operating after December 31, 2009 as if it was never revoked? This fails to make sense and is ludicrous. This additional *revocation in writing* can ONLY <u>shorten</u> the limited power of attorney, not extend it; once revoked, always revoked. It either expired on December 31, 2009 <u>or earlier</u>. That is the date when every attorney in fact listed therein lost all power to act and execute an assignment, if not otherwise revoked sooner. Therefore, <u>every</u> assignment executed by using this **LPOA 2006** after December 31, 2009 is not authorized and void on its face.

128. On or about February 21, 2011, **Assignment 2011 [Exhibit 5]** purportedly assigned the **DoT₃** to U.S. BANK as trustee for the nonexistent MSSTR.

129. The authorizing signature block states, "Wells Fargo Bank, NA, as successor by merger to Wells Fargo Home Mortgage, Inc., by Northwest Trustee Services, Inc., as Attorney In Fact recorded 6/20/06 as Inst. 2006-0038789. By Rebecca A. Baker, Assistant Vice President". This, in fact, used Inst. 2006-0038789, which *is* **LPOA 2006**, for its sole authority to execute and record **Assignment 2011**.

130. Fatal flaw number 1 - **Assignment 2011** was allegedly notarized February 21, 2011 and has two conflicting "Effective date[s]" of February 21, 2011 and December 1, 2010. However, **LPOA 2006** was revoked on December 31, 2009, which revoked all authority, before either effective date, for any attorney in fact listed therein to execute and record **Assignment 2011**. Therefore, **Assignment 2011** is void.

131. Fatal flaw number 2 - "Rebecca A. Baker" was never named as an attorney-in-fact listed on **LPOA 2006**, so again, **Assignment 2011** is void.

132. Fatal flaw number 3 - Defendant MSSTR does not exist, so again, **Assignment 2011** is void because nonexistent MSSTR cannot hold assets, including real property allegedly assigned to it.

133. GONZALES alleges that afterwards, NORTHWEST and Defendants, U.S. BANK, MSSTR, and QUALITY made false representations with other recorded documents, including the **NOD, NTS,** and **TDUS**, which were all based upon **Assignment 2011**.

134. In a concerted effort through an entire nonjudicial foreclosure auction, ALL PARTIES represented to GONZALES that the facts within the **Assignment 2011** were true as foundational support for subsequent steps. GONZALES relied on those representations.

135. GONZALES is informed and believes and based thereon alleges that NORTHWEST has perpetrated a fraud upon Plaintiff by aiding, abetting, and conspiring with U.S. BANK and the nonexistent MSSTR, falsely acting as an attorney in fact when it had no authority to do so.

136. Defendants' representations were false.

137. Defendants had no reasonable grounds for believing the representations were true when they made the representations without regard for the truth. It is alleged that they knew because when they realized that the printed backdating was not sufficient, they increased the backdate by writing upon **LPOA 2006**, without realizing that it was still after all power of attorney had expired the year before.

138. Defendants intended that GONZALES rely on the misrepresentations.

139. GONZALES reasonably relied on Defendants' misrepresentations.

140. GONZALES was harmed.

141. GONZALES's reliance on Defendants' misrepresentations was a substantial factor in causing her harm.

1 | 142. Defendants' misrepresentations negatively affected GONZALES life and her PROPERTY.

2 | 143. GONZALES would not have been harmed without Defendants' misrepresentations.

3 | 144. Such acts were despicable and constitute malice, fraud and/or oppression within the meaning
4 | of Civil Code § 3294. Plaintiff requests an assessment of punitive damages against Defendants, in an
5 | amount to be determined at time of trial.

6 |
7 |
## SECOND CAUSE OF ACTION
### Intentional Misrepresentation
### (Against All Defendants and DOES 1-20)

8 | 145. GONZALES re-alleges and incorporates by reference the allegations of all prior paragraphs
9 | as though fully set forth herein.

10 | 146. GONZALES alleges that the **NOD** was required to include a declaration before it was
11 | authorized to be recorded. Attached to the **NOD [Exhibit 7]** at page 4 and recorded with it is a paper
12 | titled "Declaration of Compliance (California Civil Code Section 2923.55(c)", however, it is *not* a
13 | required declaration. Civil Code § 2923.55(a)(1) prohibits any notice of default from being recorded
14 | until a declaration, required by Civil Code § 2923.55(b), is included and recorded with the notice of
15 | default. Declarations are set forth in Code Civ. Proc. § 2015.5 and require declarations to be made
16 | under penalty of perjury.

17 | 147. The paper purporting to be a declaration in the **NOD [Exhibit 7, p.4]** in title only is not made
18 | under penalty of perjury and is not a declaration under CCP § 2015.5. Therefore, the **NOD** was never
19 | authorized to be recorded without a declaration and because of this failure to include a declaration with
20 | the recorded **NOD**, the entire nonjudicial foreclosure process has not been made in compliance with
21 | Civil § 2924 and Defendant CHASE BANK cannot prove duly perfected title.

22 | 148. In the case of *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th
23 | 931, the Supreme Court of California stated that, "Nevertheless, the transcripts [of testimony before a
24 | grand jury given under oath] are of the same nature as a declaration in that the testimony is given under
25 | penalty of perjury." *Ibid.* at 934. "… reliability stems from the oath-taking procedures required for
26 | affidavits, or the execution under penalty of California perjury laws required by declarations." *Ibid.* at
27 | 935. "… a court may consider statements that are the equivalent of affidavits and declarations because
28 | they were made under oath or penalty of perjury in California." *Ibid.* "… a declaration must be signed

1    and recite that the person making it certifies it to be true under penalty of perjury." *Ibid*. at 941.  "This

2    analysis is sound. The statutory scheme already permits consideration of affidavit equivalents. (§ 2015.5.)

3    As *Kulshrestha* noted, the important aspect of such evidence is that it be made under penalty of

4    California's perjury laws. (See *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, at

5    pp. 610–618.)" *Sweetwater* at 943.  "… reliability stems from the oath-taking procedures required for

6    affidavits, or the execution under penalty of California perjury laws required by declarations. (Cf.

7    *Kulshrestha, supra,* 33 Cal.4th 601, 606.)" *Sweetwater* at 944.

8    149.  Additionally, the Judicial Council of California supplies form MC-030 "Declaration" to use

9    in all courts.  Preprinted thereon at the bottom is the statement that it is made under penalty of perjury.

10   This is a standard for all declarations and MC-030 is a standard form.

11   150.  Since the **NOD** page 4 paper titled, "Declaration of Compliance (California Civil Code Section

12   2923.55(c)" is *not* a declaration, pursuant to Civil Code § 2923.55(a)(1), the entire **NOD** was <u>prohibited</u>

13   from being recorded without an attached <u>declaration under penalty of perjury</u>, therefore, the **NOD** is void.

14   It specifically prevents the signer from assuming any legal penalty for making false statements.

15   151.  The **NOD** is **<u>fatally defective</u>** in that there is no required declaration attached in order to be

16   legally recorded.  Therefore, there can be no commencement of the foreclosure process and Defendant

17   CHASE BANK cannot prove a sale in compliance with Civil § 2924 or duly perfected title.  The **<u>fatally</u>**

18   **<u>defective</u> NOD** prohibited the first step to initiate a nonjudicial foreclosure process in California against

19   GONZALES and her PROPERTY.

20   152.  Defendants' representations were false;

21   153.  Defendants knew that the representations were false and continued to support them and that

22   they made and supported the representations recklessly and without regard for the truth.

23   154.  Defendants intended that GONZALES rely on the misrepresentations.

24   155.  GONZALES reasonably relied on Defendants' misrepresentations.

25   156.  GONZALES was harmed.

26   157.  GONZALES's reliance on Defendants' misrepresentations was a substantial factor in

27   causing her harm.

28   158.  Defendants' misrepresentations negatively affected GONZALES life and her PROPERTY.

159. GONZALES would not have been harmed without Defendants' misrepresentations.

160. Such acts were despicable and constitute malice, fraud and/or oppression within the meaning of Civil Code § 3294. Plaintiff requests an assessment of punitive damages against Defendants, in an amount to be determined at time of trial.

### THIRD CAUSE OF ACTION
**Intentional Misrepresentation**
**(Against All Defendants and DOES 1-20)**

161. GONZALES re-alleges and incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

162. GONZALES is informed and believes and based thereon alleges that the purported trust MSSTR 2004-1 **does not exist**. As such, U.S. BANK has intentionally misrepresented that it is or ever was the trustee for MSSTR. U.S. BANK *cannot, not* know that there is no trust named "MSSTR 2004-1" as U.S. BANK has never had any interaction with the nonexistent trust, nor has it had any contacts to speak with or meet with the nonexistent trust. This is clearly intentional misrepresentation and/or fraud.

163. It is claimed by the acts of ALL PARTIES that **MSSTR 2004-1** is supposed to be holding instruments and possibly securities, including Plaintiff's **DoT3** and valuable **NOTE2**. ALL PARTIES represent that **MSSTR** can assign, sell, foreclose, and do other acts, as if **MSSTR** existed. A nonexistent trust has no ability to hold any assets.

164. Probate § 15202 states, "A trust is created only if there is trust property." There is no evidence that **MSSTR** holds Plaintiff's **DoT3** or valuable **NOTE2**.

165. After a diligent search was conducted, no existence has been found of the alleged trust named "MSSTR 2004-1". First, using a Bloomberg financial terminal, of which there is no greater tool for searching and investigating financial matters, a search for "MSSTR" found it did not exist. From the U.S. Securities and Exchange Commission ("SEC") website, searches for "MSSTR", "MSSTR 2004", and "2004" found MSSTR also did not exist. The SEC search for "MSSTR" is included at **Exhibit 10**, with nothing found. The SEC search for companies beginning with "MS" is included at **Exhibit 11** and produced 420 entries, for which MSSTR was found *not* to exist. The SEC search for companies belong

·1  to SIC code[1] 6189 representing Asset-Backed Securities produced 11,745 results. **Exhibit 12** shows

2  sequential items 7861 to 7940 listed alphabetically, showing that MSSTR does not exist. From the

3  Delaware Secretary of State ("SOS"), searches for "2004" and "MSSTR" found MSSTR did not exist.

4  From the Minnesota SOS, searches for "MSSTR 2004" and "MSSTR" found MSSTR did not exist.

5  From the New York SOS, searches for "MSSTR 2004" and "MSSTR" found MSSTR did not exist.

6  166. A Maxim of Law at Civil Code § 3530 states, "That which does not appear to exist is to be

7  regarded as if it did not exist." The court must accept that MSSTR does not exist and has no standing.

8  Therefore, U.S. BANK also has no standing to have any involvement with the PROPERTY.

9  167. GONZALES alleges that afterwards, Defendants made false representations about MSSTR

10  and the authority to record and the enforceability of other recorded documents, including the **TDUS**.

11  168. Defendants represented to GONZALES that the facts within the **NOD** were true.

12  169. GONZALES alleges that her reliance on Defendants' representation that MSSTR exists and/or

13  is a beneficiary with authority is a substantial factor in causing her harm.

14  170. Defendants' representations were false;

15  171. Defendants knew that the representations were false and continued to support them and that

16  they made and supported the representations recklessly and without regard for the truth.

17  172. Defendants intended that GONZALES rely on the misrepresentations.

18  173. GONZALES reasonably relied on Defendants' misrepresentations.

19  174. GONZALES was harmed.

20  175. GONZALES's reliance on Defendants' misrepresentations was a substantial factor in

21  causing her harm.

22  176. Defendants' misrepresentations negatively affected GONZALES life and her PROPERTY.

23  177. GONZALES would not have been harmed without Defendants' misrepresentations.

24  178. Such acts were despicable and constitute malice, fraud and/or oppression within the meaning

25  of Civil Code § 3294. Plaintiff requests an assessment of punitive damages against Defendants, in an

26  amount to be determined at time of trial.

27

28  [1] SIC codes (Standard Industrial Classification) are four-digit codes that categorize the industries that companies belong to based on their business activities. SIC 6189 is for Asset-Backed Securities.

30

VERIFIED COMPLAINT

## FOURTH CAUSE OF ACTION
### Breach of Contract
### (Against All Defendants and DOES 1-20)

179. GONZALES re-alleges and incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

180. GONZALES alleges that all Defendants are, in some way, connected with or successors in interest to WFHM. This is because all Defendants continue to use the initial WFHM contract, which were Plaintiff's initial "Loan (sic) Application", her **NOTE₂**, and the **DoT₃**. Defendants claim to be beneficiaries, buyers, successors, assignees, and/or trustees of these initial WFHM contracts. ALL PARTIES have begun to execute and/or sell these contracts, however wrongfully, by authorizing and creating additional follow-up contractual documents, including, but not limited to: **Assignment 2011**, **NOD**, **NTS**, and the **TDUS**. The **NTS** was a follow-up contract with GONZALES that arose from the three contracts above.

181. All Defendants had constructive notice of language contained in the **DoT₃** in section 22, "Acceleration; Remedies", at the third paragraph, that, "The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein".

182. Section 22 of the **DoT₃**, beginning at ¶2 on page 16 or 18, states "Acceleration; Remedies", at the second paragraph states that, "If Lender invokes the power of sale...to cause the Property to be sold." It states, "*If*". Lender *may* or *may not* invoke *this* power of sale of the PROPERTY. GONZALES alleges that Defendants have NOT invoked any power of sale of the PROPERTY. GONZALES alleges that by clear and concise language in the recorded **NTS**, Defendants *have instead* invoked their power to sell a lien on the PROPERTY, not the PROPERTY itself.

183. At all times relevant, GONZALES has the right to rebut the statutory presumption provided for by Civil Code § 2924(c) relating to the recital language contained in the **TDUS**.

184. GONZALES rebuts all statutory compliance with Civil Code § 2924(c) and the recitals contained in the **TDUS**. Defendants and CHASE BANK cannot be deemed a bona fide purchaser for value because they have not complied with Civil Code § 2924 et seq.

185. If it even had any authority to do so, U.S. BANK invoked a power to sell a lien on the PROPERTY without selling the PROPERTY itself. This is commonly done in financial and mortgage

31

marketplaces amongst note holders and lien holders when discounting 2nd deeds of trust (junior liens) by selling only the lienholder's position, in which the buyer can begin collecting payments.  Selling positions is also similar to selling stocks, options, and futures, where companies are not transferred by buying and selling stocks, etc.

186. QUALITY drafted and issued its **NTS** and gave public notice of a pending sale or auction.

187. A legal sale or auction of any real or personal property possessed, owned, or occupied by another requires a proper, legal notice describing the property being sold with particularity.  If one intends to publically sell property possessed by another, the notice of sale is a legally binding contract of what is for sale, so one needs to issue a notice describing the exact property for sale or auction, or all participant bidders are damaged for not having full disclosure what was advertised for sale.

188. The **NTS** was a follow-up contract that stated in unambiguous and specific language to CHASE BANK and GONZALES, all the legalities for a nonjudicial foreclosure auction, including the following language specifically written in **Exhibit 8**:

189. The **NTS** states at page one that, "A public auction sale ... will be held by duly appointed trustee.  The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, ...', and so forth.  **NOWHERE** on page one did the **NTS** state that any *real* property <u>was being auctioned</u> or sold by using any clear English sentence.  The NTS placed many words and street addresses thereon, but failed to create a legally, binding effect to sell real property written in clear English.  The **NTS** never stated such in any clear language.

190. To the extent that the language of a contract, document, or notice is subject to any ambiguity, it is a well-settled principle of contract law (i.e. *contra proferentum*) that any ambiguous term in the contract will be construed against the drafter (QUALITY) and in accordance with the reasonable expectations and intentions of GONZALES when she entered into the contract.  This doctrine is greatly applicable in this situation where a sophisticated financial institution (QUALITY), which frequently engages in these (fraudulent and deceitful) transactions, enters into a standardized contract of adhesion with the less sophisticated GONZALES.  <u>Where there is a conflict between the ambiguities, the conflict must be resolved in favor of GONZALES.</u>

California Civil Code §1654: "In cases of uncertainty ... the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist".

191. The Maxim of Law at Civil Code § 3542, states, "Interpretation must be reasonable."

192. The **NTS** page one failed to state or describe what was being sold, but it *is* clearly stated on page two where the **NTS** states: "**NOTICE TO POTENTIAL BIDDERS**: If you are considering bidding on this <u>property lien</u>, you should understand that there are <u>risks</u> involved in bidding at a trustee auction. **<u>You will be bidding on a lien, not on the property itself.</u>** Placing the highest bid at a trustee auction **<u>does not automatically entitle you to free and clear ownership of the property</u>**. You should also be aware that **<u>the lien being auctioned off</u>** may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, <u>before you can</u> receive clear title to the property. ..." (*emphasis added*).

193. At all times relevant, prior to bidding at the said Trustee's Sale, CHASE BANK had constructive notice of certain language and all terms contained in the **NTS**, specifically, "**<u>You will be bidding on a lien, not on the property itself.</u>**" (*emphasis added*).

194. The **NTS** states that the trustee would <u>NOT</u> be selling or auctioning the PROPERTY.

195. The "**NOTICE TO POTENTIAL BIDDERS**" was in **bold** to give CHASE BANK and GONZALES amplified, full disclosure, drawing attention to the utmost important notice, letting CHASE BANK understand what it was bidding on, and gave notice that it was <u>bidding on a lien</u> and <u>NOT</u> on the PROPERTY itself. Nothing could be clearer.

196. GONZALES understood this same statement that her PROPERTY was NOT being sold, so she decided to not bid on the lien. This was QUALITY's contract with GONZALES that was breached.

197. There is no evidence that CHASE BANK has placed a bid on, won an auction for, paid for, or acquired ownership of the PROPERTY.

198. After allegedly placing the winning bid to purchase the property <u>lien</u> and not the PROPERTY itself, CHASE BANK won the bid and then owned the lien to the PROPERTY.

199. Nevertheless, this is only true if and only if said sale was proven to have been conducted by a duly authorized trustee in full compliance with Civil § 2924 et seq.

200. After placing the winning bid to purchase the property <u>lien</u> and <u>not</u> the PROPERTY itself, CHASE BANK now owns only a <u>lien</u> on the PROPERTY, may now be entitled to monthly payments from the lien, but did not obtain any right to title or possession in Plaintiff's PROPERTY.

201. At best, CHASE BANK purchased the property lien to the PROPERTY and became the new lienholder. CHASE BANK can exercise the right of foreclosure on the property lien to the PROPERTY and auction his newly acquired property lien to another successful bidder at another auction to sell the same lien (trustee's sale).

202. CHASE BANK has no interest or title in the PROPERTY, as it did not bid on nor purchase the PROPERTY nor the title to the PROPERTY. Subsequently, CHASE BANK has no right to foreclose or sell the PROPERTY because it did not bid on or purchase such, nor acquire those rights.

203. CHASE BANK bid on and purchased a property <u>lien</u> knowing the risks by the clear language in the **NTS** that stated, "If you are considering bidding on this property lien, you should understand that **there are risks involved in bidding at a trustee auction**." (*emphasis added*). These risks include what to do after you bid on and purchase a property lien.

204. <u>Nowhere</u> in the **NTS** is there any language that the PROPERTY is being auctioned or sold or that the successful bidder *will* gain title to the PROPERTY.

205. In fact, the **NTS** language **clearly** states that "You will be bidding on a **lien**, not on the property itself.", and that you are **NOT** entitled "to free and clear ownership of the [PROPERTY]." (*emphasis added*).

206. The **NTS** also states "If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to **the lien being auctioned off**, before you **can** receive clear title." The steps to "free and clear ownership of the [PROPERTY]" are not specified in the **NTS**. The **NTS** does *not* state that it will *not* involve additionally paying Plaintiff for the PROPERTY.

207. Nowhere does the **NTS** give an indication to QUALITY how to subsequently issue a deed to CHASE BANK for the property <u>lien</u> it just purchased.

208. QUALITY was aware that placing the highest bid on the lien being sold did not automatically entitle CHASE BANK to obtain free and clear ownership of the PROPERTY.

209. The **TDUS** states, "This conveyance is made in compliance with the terms and provisions of

VERIFIED COMPLAINT

1 | the Deed of Trust …". This claim is false; there are no terms and provisions in the **DoT₃** for selling or
2 | for the conveyance of a property <u>lien</u>.

3 | 210. QUALITY did not invoke the power of sale <u>of the PROPERTY</u> as authorized in the **DoT₃** in
4 | section 22. Instead, QUALITY sold only a lien. But QUALITY then <u>fraudulently</u> conveyed Plaintiff's
5 | PROPERTY to the winning bidder of the property <u>lien</u>. This is where the **money laundering** occurred
6 | in this nonjudicial foreclosure scam by QUALITY and CHASE BANK. The **TDUS** failed to mention
7 | or transfer the property <u>lien</u> that CHASE BANK bid on and purchased as the winning bidder.
8 | Subsequently, CHASE BANK did nothing to purchase the PROPERTY from Plaintiff by tendering any
9 | payment to Plaintiff.

10 | 211. The **TDUS** was signed by Defendant JULIET BERNAL as Assistant Secretary of
11 | QUALITY. She knows or should have known that only the property <u>lien</u> was bid on, purchased, and
12 | sold, so that only the property <u>lien</u> was to be transferred to CHASE BANK. However, Defendant
13 | JULIET BERNAL was negligent and breached the NTS contract and instead, executed the **TDUS** to
14 | erroneously cause Plaintiff's entire PROPERTY to purportedly appear to be transferred to CHASE
15 | BANK, without authority, and then subsequently recorded the **TDUS** into the M. RECORDER.

16 | 212. Prior to the Trustee's Sale, CHASE BANK had constructive notice that the property <u>lien</u> was
17 | being sold. Therefore, there has been *no* sale of the PROPERTY in compliance with Civil Code § 2924
18 | and title to the PROPERTY could not subsequently have been duly perfected by CHASE BANK.

19 | 213. The **TDUS** erroneously claims to give title of the PROPERTY to CHASE BANK (which the
20 | **NTS** so clearly stated was NOT being sold) rather than giving title to the property <u>lien</u> to CHASE
21 | BANK (which the **NTS** so clearly stated *was* being sold). Plaintiff has been damaged. Title to
22 | Plaintiff's PROPERTY has been slandered and clouded.

23 | 214. The **TDUS** is fraudulent as recorded. Only title to the lien may have been perfected with
24 | notice of such, recorded. Title to the PROPERTY was never acquired by CHASE BANK, as the high
25 | bidder and owner of the lien.

26 | 215. Since the **TDUS** fails to state that the property <u>lien</u> was sold and transferred to CHASE
27 | BANK, only title to the property <u>lien</u> may have been perfected and not title to the PROPERTY, which
28 | was never acquired by CHASE BANK, as the bidder and owner of the property <u>lien</u>.

216. The **TDUS** falsely states that the PROPERTY was purchased by CHASE BANK.

217. The **TDUS** fails to state that the property lien was sold and transferred to CHASE BANK.

218. Since the PROPERTY was never auctioned, never bid on, never sold to or purchased by CHASE BANK, the PROPERTY also could not have ever been "sold" in accordance with Civil Code § 2924. Therefore, title to the PROPERTY has not been duly perfected in the name of the CHASE BANK.

219. The statutes for non-judicial foreclosures must be strictly construed and therefore, so must all documents associated with such non-judicial foreclosures. CHASE BANK is bound by their exact words.

220. CHASE BANK had proper notice it was bidding on and purchased a lien and not the property. Plaintiff alleged that the lien that sold was subsequently discharged by recording a notice of reconveyance. Therefore, the lien that CHASE BANK purchased has been discharged and satisfied.

221. The **TDUS** is void as a matter of law as it was executed with unclean hands and was never the intent of the trustee's notice to the public in general or to the Trustor, GONZALES. The trustee sold a lien, NOT the property, therefore, the TDUS is void because it misstates the facts of what was sold to Defendant.

222. CHASE BANK purchased a lien.

223. CHASE BANK never purchased the PROPERTY.

224. CHASE BANK has no claim on the PROPERTY, even though the **TDUS** erroneously states that it did.

225. There is no basis to support the **TDUS**. It is a sham and must be cancelled.

226. If CHASE BANK wants to make any claim, it must foreclose on its lien that it now owns, which is, unfortunately, paid off, discharged, and reconveyed.

227. CHASE BANK has never had and does not have any claims against the PROPERTY.

228. Therefore, cancel the void **TDUS** as it is clouding title to the PROPERTY, causing harm.

229. GONZALES is informed and believes and based thereon alleges that Defendant QUALITY and has also perpetrated a fraud upon Plaintiff by aiding, abetting, and conspiring with U.S. BANK and the nonexistent MSSTR by acting as trustee and auctioning off a property lien at a foreclosure auction.

1  QUALITY then created the void **TDUS** and instead of transferring the property lien advertised,

2  auctioned, and sold, committed a form of money laundering and hid the fact of the lien sale and instead,

3  falsely caused to be recorded a transfer deed of the PROPERTY, instead of just the lien, in violation of

4  Civil Code §§ 2888 & 2889, which state: .

5  
6  
7  
8
> Civil Code § 2888. Notwithstanding an agreement to the contrary, a lien, or a contract for a lien, transfers no title to the property subject to the lien. (Enacted 1872.)
> Civil Code § 2889. All contracts for the forfeiture of property subject to a lien, in satisfaction of the obligation secured thereby, and all contracts in restraint of the right of redemption from a lien, are void. (Enacted 1872.)

9  230. GONZALES and QUALITY entered into a **NTS** contract.

10  231. GONZALES did all, or substantially all, of the significant things that the contract required

11  her to do, which was read the contract and either bid on the property lien or don't bid.

12  232. GONZALES was excused from having to bid on the property lien at the Trustee's auction.

13  233. The **NTS** contract stated that GONZALES' PROPERTY was safe from sale at the auction

14  and was not being auctioned or sold.

15  234. QUALITY failed to do something that the **NTS** contract required it to do, which was

16  transfer the property lien that it advertised for sale, and no more.

17  235. QUALITY did something that the **NTS** contract prohibited it from doing by recording

18  documents into the M. RECORDER purporting to transfer Plaintiff's PROPERTY.

19  236. GONZALES was harmed.

20  237. QUALITY's breach of the **NTS** contract was a substantial factor in causing GONZALES's

21  harm.

22  238. The breached contract that ALL PARTIES continue to enforce is a substantial factor in

23  causing GONZALES's harm.

24

25  **FIFTH CAUSE OF ACTION**
**Cancellation of Instruments and Declaratory Relief**
26  **(Against All Defendants and DOES 1-20)**

27  239. GONZALES re-alleges and incorporates by reference the allegations of all prior paragraphs

28  as though fully set forth herein.

240. GONZALES has alleged hereinabove that she was excused from tendering. With that said, GONZALES has also alleged and shown that she tendered the amount of the secured indebtedness.

241. GONZALES alleges that Defendants made false representations within the **Assignment 2011, NOD, NTS,** and **TDUS** (collectively named "**Void Documents**"). Defendants knew or should have known the representations in the **Void Documents** were false.

242. Each of the **Void Documents** consists of misrepresentations and deceit. Each void document, except the first, relies on earlier misrepresentations and deceit in other void documents for its existence and foundation, including the **TDUS**.

243. Defendants knew or should have known they had no authority to create, enforce, or allow the **Void Documents** to be recorded or to remain in the chain of title for the PROPERTY and should have issued their rescissions to be executed and recorded long before now, but have failed to do so.

244. There is a reasonable apprehension that unless the instruments - the **Void Documents** - are canceled, their existence in the chain of title to the PROPERTY will cause serious harm and injury to GONZALES in that they cloud title. If GONZALES was to try to sell her PROPERTY, neither she nor her buyer would be able to acquire title insurance for the PROPERTY. Consequently, title to the PROPERTY remains clouded by the **Void Documents**, and until they are canceled, they will continue to impair and impede title to the PROPERTY and cause harm to GONZALES with expenditures of time and money in seeking to clear the title of these **Void Documents**. If the **Void Documents** are left outstanding, GONZALES will be damaged and cause her serious injury. Defendants may try to advance their groundless Unlawful Detainer action against GONZALES, pending in another court, and irreparably harm her with additional expenditures of time and money in seeking to clear title of the **Void Documents**.

245. Accordingly, GONZALES requests that the Court issue a judgment and order cancelling, removing, expunging, and/or voiding all recorded **Void Documents** from the M. RECORDER records.

246. Accordingly, GONZALES requests that the Court issue a judgment and order staying or dismissing any pending Unlawful Detainer action against GONZALES and/or the PROPERTY.

247. If the recorded **Void Documents** are left outstanding, they will cause serious injury to GONZALES, who, because of Defendants, may lose her PROPERTY to a purchaser for value _with_ notice of the invalidity the recorded **Void Documents**.

248. Accordingly, GONZALES requests that the Court issue a judgment and order the Defendants to return the original **NOTE₂** to GONZALES, or the face value thereof if the original **NOTE₂** is not returned within thirty days.

249. GONZALES has no idea of who has actual custody of any of the **Void Documents** or if any originals still exist.

250. Plaintiff alleges that the following **Void Documents** recorded in the M. RECORDER are subject to cancellation pursuant to Civil § 3412 for all the reasons given in the above causes of action:

    a.  The **Assignment 2011,** recorded at No. 2011-0015555 **[Exhibit 5]**.

    b.  The **NOD**, recorded at No. 2018-0024544 **[Exhibit 7]**.

    c.  The **NTS**, recorded at No. 2019-0005575 **[Exhibit 8]**.

    d.  The **TDUS**, recorded at No. 2019-0014975 **[Exhibit 9]**.

251. If the **Void Documents** are left outstanding, Plaintiff may be damaged beyond repair.

252. A statement of the facts constituting an instrument's invalidity constitutes a sufficient allegation of a cause of action for cancellation of a void or voidable instrument under Civ. Code § 3412. See *Zakaessian v. Zakaessian* (1945) 70 Cal.App.2d 721, 725.

253. As a proximate result of Defendants' recordation of the aforesaid instruments (**Void Documents**), Plaintiff has suffered loss, damage, and harm, and is likely to continue to suffer loss, damage, and harm unless the aforesaid instruments are cancelled.

254. Wherefore Plaintiffs are entitled to relief by a judgment pursuant to Civil Code § 3412 declaring the said alleged aforesaid **Void Documents** to be void ab initio, and commanding the M. RECORDER to enter a cancellation of said instruments, indicating each has been declared void ab initio.

### SIXTH CAUSE OF ACTION
### Wrongful Foreclosure
### (Against All Defendants and DOES 1-20)

255. GONZALES re-alleges and incorporates by reference the allegations of all prior paragraphs as though fully set forth herein

256. GONZALES has alleged that she was excused from tendering. With that said, GONZALES has also alleged and shown that she tendered the amount of the secured indebtedness.

257. QUALITY caused an illegal, fraudulent, or willfully oppressive transfer of real property by using some claimed power of sale. This is one of the elements in wrongful foreclosure cause of action. Nevertheless, QUALITY caused a sale of a real property lien pursuant to a *private* power of sale of a lien, but then QUALITY caused an illegal, fraudulent, or willfully oppressive **TDUS** to be recorded, which did not express the true facts of the sale/auction.

258. GONZALES was prejudiced or harmed.

259. GONZALES offers to restore all true consideration furnished by Defendants since her **NOTE₂** was issued, on the condition that Defendants return her **NOTE₂** or the full value thereof, together with all tax deductions, interest, proceeds, insurance reimbursements, and benefits obtained. In the alternative, Defendants may return double the face value of her **NOTE₂** for refusing to timely return it as her security deposit, and provide a certified accounting under oath showing every financial transaction beginning with where GONZALES's **NOTE₂** went, the parties involved step by step, their current contact information and availability for depositions, return the **Void Documents** to the court for cancellation, and disavow all alleged interest in the PROPERTY.

260. GONZALES alleges that any debt allegedly created by WFHM on October 26, 2001 (and allegedly assigned to Defendants), when GONZALES executed the **DoT₃**, was fully discharged and satisfied when she issued and tendered her valuable **NOTE₂** for 600,000 dollars as a loan to WFHM.

261. GONZALES alleges that the **Void Documents** are void and were the foundation for a wrongful foreclosure of the PROPERTY. The **Void Documents** have failed to provide a foundation to conduct a non-judicial foreclosure in compliance with the Civil Code.

262. The **NOD** is void. Defendants **NOD** was recorded without a **required** declaration, voiding it. It fails to comply with Civil Code §2923.55(a)(1), which prohibits recording any Notice of Default required by Civil Code §2923.55(b) unless a declaration made under penalty of perjury, pursuant to Code Civ. Proc. §2015.5 was included and recorded with the Notice of Default. The **NOD** [Exhibit 7, p.4] has no declaration made under penalty of perjury. The **NOD** is **fatally defective** in that there is no valid declaration. Therefore, there can be no commencement of the foreclosure process and Defendant cannot prove a sale in compliance with Civil Code § 2924 or duly perfected title.

263. QUALITY conducted the wrongful foreclosure as the alleged trustee.

264. The trustee under a deed of trust who conducts an illegal, fraudulent or willfully oppressive sale of property may be liable to the borrower for wrongful foreclosure. See *Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, 1062 [162 Cal.Rptr.3d 382]; *Munger v. Moore* (1970) 11 Cal.App.3d 1, 7 [89 Cal.Rptr. 323]. A foreclosure initiated by one with no authority to do so is wrongful for purposes of such an action. See *Barrionuevo v. Chase Bank, N.A.,* (N.D.Cal. 2012) 885 F.Supp.2d 964, 973-974; *Ohlendorf v. American Home Mortgage Servicing* (E.D.Cal. 2010) 279 F.R.D. 575, 582-583.

265. Defendants caused an illegal, fraudulent, and willfully oppressive sale of the PROPERTY without a power of sale in a deed of trust by using the **NTS** and **TDUS** with a bait and switch.

266. GONZALES was prejudiced and harmed.

267. Such acts were despicable and constitute malice, fraud and/or oppression within the meaning of Civil Code § 3294. Plaintiff requests an assessment of punitive damages against Defendants, in an amount to be determined at time of trial.

## SEVENTH CAUSE OF ACTION
### Conversion
### (Against All Defendants and DOES 1-20)

268. GONZALES re-alleges and incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

269. GONZALES states that it is a *fact* that she fully executed and tendered 600,000 dollars to WFHM by issuing her **NOTE$_2$** on October 26, 2001 to fully discharge any debt allegedly created.

270. GONZALES alleges that the **NOTE$_2$** is worth 600,000 dollars or more.

271. GONZALES alleges her **NOTE$_2$** is a negotiable instrument and valuable commercial paper, common to every banking deposit. It is a security deposit and thus technically a loan of and valued at 600,000 dollars, first to WFHM, and then allegedly to ALL PARTIES. It is still owned by GONZALES to be returned to her if and when the alleged true loan by WFHM that was never loaned to GONZALES was satisfied or found to be unnecessary after taking the PROPERTY through a valid foreclosure auction.

272. GONZALES alleges her **NOTE₂** was never a gift. All new money is created this way and no party but GONZALES is entitled to it and its proceeds.

273. U.S. Bank substantially interfered with GONZALES's **NOTE₂** by knowingly, intentionally, and secretly taking possession of GONZALES's **NOTE₂**. QUALITY was required to possess GONZALES's **NOTE₂** to conduct a valid foreclosure sale. ALL PARTIES prevented GONZALES from having access to her **NOTE₂**. Defendants refused to return GONZALES's **NOTE₂** worth 600,000 dollars and in additions, also wants to take the PROPERTY. This is clearly unjust enrichment.

274. If the **NOTE₂** came into the hands of a bona fide transferee for value, it would render Plaintiff liable to pay money or sustain some other loss. Therefore, the judgment should protect the Plaintiff by ordering, as an alternative to surrender and cancellation of the instrument, that the Plaintiff recover from the Defendants damages equal to the monetary value of the possible loss, such as the amount of a promissory note. See *Loud v. Luse* (1931) 214 Cal. 10, 13. GONZALES demands the full value of the **NOTE₂**, or 600,000 dollars.

275. The court may grant any monetary relief necessary to do complete equity between the parties. See *Wright v. Rogers* (1959) 172 Cal.App.2d 349, 367-368.

276. GONZALES still owns her **NOTE₂** and never sold her note. No party has paid GONZALES for her **NOTE₂**.

277. QUALITY substantially interfered with GONZALES' **NOTE₂** by knowingly or intentionally refusing to return her **NOTE₂** after GONZALES demanded its return or after a foreclosure auction, where QUALITY was paid at least the full amount of Plaintiff's **NOTE₂** from the auction.

278. GONZALES did not consent to this act by Defendants, failing to return Plaintiff's **NOTE₂**.

279. GONZALES was harmed by this act by Defendants.

280. Defendants' conduct regarding their willful failure to return her **NOTE₂** was a substantial factor in causing GONZALES' harm.

281. QUALITY substantially interfered with GONZALES' PROPERTY by knowingly or intentionally creating and then illegally recorded a fraudulent **TDUS** that was unauthorized with errors.

282. GONZALES did not consent to this act by QUALITY.

283. GONZALES was harmed by this act by QUALITY.

284. QUALITY's conduct regarding fraudulently recording a **TDUS** to attempt to illegally transfer title of her PROPERTY to CHASE BANK were substantial factors in causing GONZALES' harm.

285. GONZALES did not consent to the conversion, theft, and non-return of her **NOTE₂**.

286. GONZALES was harmed.

287. Defendants' conduct was a substantial factor in causing GONZALES harm.

288. Such acts were despicable and constitute malice, fraud and/or oppression within the meaning of Civil Code § 3294. Plaintiff requests an assessment of punitive damages against Defendants, in an amount to be determined at time of trial.

### EIGHTH CAUSE OF ACTION
#### For Quiet Title
#### (Against All Defendants and DOES 1-20)

289. GONZALES re-alleges and incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

290. GONZALES has alleged that she was excused from tendering. With that said, GONZALES has also alleged and shown that she tendered the amount of the secured indebtedness.

291. GONZALES alleges that ALL PARTIES claim some right, title, estate, lien, or interest in the PROPERTY adverse to Plaintiff's title. Each of them is responsible in some manner for the wrongful conduct alleged; and that their claims, and each of them, constitute a cloud on Plaintiff's title to the PROPERTY.

292. GONZALES claims total ownership interest in the PROPERTY adverse to the ownership interest claimed by Defendants. GONZALES's claimed ownership interest in the PROPERTY is both legal and equitable in nature.

293. GONZALES' claim to the PROPERTY is averse to that of Defendants as GONZALES disputes Defendants' title to the PROPERTY as wrongfully obtained by fraud, misrepresentation, breach of fiduciary duties owed to GONZALES, and violation of the foreclosure statutes, making the **TDUS** void.

294. GONZALES names all persons unknown claiming right, title, or interest in the PROPERTY, and any cloud on Plaintiff's title to the PROPERTY as Doe Defendants in this action. The claims of

each unknown Defendants are without any right, and these Defendants have no right, title, estate, lien, or interest in the PROPERTY.

295. GONZALES is currently seized of the PROPERTY.

296. The title of Plaintiff as to which a determination is sought and the basis of her title is her "Grant Deed" dated September 27, 1996 and recorded in M. RECORDER. [See **Exhibit 1**].

297. The adverse claims to the title of Plaintiff against which a determination is sought is the **TDUS** [See **Exhibit 9**].

298. GONZALES seeks to have the court issue a judgment quieting title as of the date that the Complaint in this case was filed.

299. Plaintiff is further entitled to equitable relief by a judicial decree and order declaring Plaintiff to be the title owner of record.

300. Plaintiff seeks to quiet title against the claims of Defendants. Defendants have no right to title, interest, or possession in the PROPERTY and no right to entertain any rights of ownership including the right to foreclosure, demanding possession, or filing cases for unlawful detainer. It would be illegal and with unclean hands.

301. Such acts were despicable and constitute malice, fraud and/or oppression within the meaning of Civil Code § 3294. Plaintiff requests an assessment of punitive damages against Defendants, in an amount to be determined at time of trial.


### V.   <u>CONCLUSION</u>

302. U.S. BANK intentionally misrepresented that it is or ever was the trustee for MSSTR, which does not exist, cannot hold assets or produce witnesses, and is not SEC regulated to hold securities.

303. Nonexistent MSSTR could never be the true beneficiary to foreclose.

304. Nonexistent MSSTR had no ability to hold or own assets, including Plaintiff's **DoT3** or **NOTE2**. MSSTR is without standing and CHASE BANK cannot be a real party in interest in any action, including this action and the pending UD action mentioned, *supra*.

305. Because of the void **NOD** lacking a required declaration, QUALITY did not have lawful authority to initiate the foreclosure auction/sale by recording the void **NOD**.

306. **Assignment 2011** is <u>void</u> because **LPOA 2006** was already revoked.

307. Since **Assignment 2011** is void, not merely voidable, and the **NOD** is void, not merely voidable, they caused the **NTS** to be void, not merely voidable, and caused the **TDUS** to be void, not merely voidable.

308. QUALITY failed to transfer the PROPERTY by recording the void **TDUS**, because CHASE BANK only purchased a property <u>lien</u> and never the PROPERTY. Title to the PROPERTY was never acquired by CHASE BANK as the bidder and owner of the property <u>lien</u>.

309. QUALITY has failed to satisfy all the strict statutory requirements for a nonjudicial trustee foreclosure auction and Plaintiff's PROPERTY was <u>never</u> sold, and certainly not sold in compliance with Civil Code §§ 2923.5 or 2924 et seq.

310. Defendants have failed to strictly comply with Civil Code §2924 et seq. to conduct a nonjudicial foreclosure auction of her PROPERTY.

311. CHASE BANK has not acquired duly perfected title to the PROPERTY.

312. GONZALES is and remains the only legal and equitable owner of and is entitled to sole possession of her PROPERTY.

313. The Maxim of Law at Civil Code § 3520 states, "No one should suffer by the act of another."

## **PRAYER**

**WHEREFORE**, Plaintiff GONZALES prays for judgment against all Defendants as follows:

<u>**As to the First Cause of Action for Negligent Misrepresentation:**</u>

1. General damages of 1,000,000 dollars for negligently misrepresenting that it had authority to execute and record the void **Assignment 2011**.

<u>**As to the Second Cause of Action for Intentional Misrepresentation:**</u>

2. General damages of 1,000,000 dollars for negligently misrepresenting that the required declaration under penalty of perjury was not needed to be attached before the void **NOD** could be legally recorded.

**As to the Third Cause of Action for Intentional Misrepresentation:**

3.   General damages of 1,000,000 dollars for U.S. BANK intentionally misrepresenting that it is or ever was the trustee for MSSTR, the purported trust that has never existed.

**As to the Fourth Cause of Action for Breach of Contract:**

4.   General damages of 1,000,000 dollars for QUALITY for breaching the **NTS** and then recording the void **TDUS**, fraudulently claiming that CHASE BANK somehow bid on and purchased the PROPERTY , when it only auctioned and sold a property lien and never the PROPERTY itself.

**As to the Fifth Cause of Action for Cancellation of Instruments and Declaratory Relief:**

5.   General damages of 1,000,000 dollars for Defendants recording the **Void Documents**.

6.   For a declaration that the following recorded instruments are void and for an ORDER directed to the Marin County Recorder's Office to cancel, remove, and expunge these recorded **Void Documents** from its Official Records so that they no longer cloud the title of the PROPERTY.  The list of **Void Documents** to be cancelled are as follows:

a)   Void **Assignment 2011,** Document No. 2011-0015555. **[Exhibit 5].**

b)   Void **NOD**, Document No. 2018-0024544. **[Exhibit 7].**

c)   Void **NTS**, Document No. 2019-0005575. **[Exhibit 8].**

d)   Void **TDUS**, Document No. 2019-0014975. **[Exhibit 9].**

7.   For a Declaratory ORDER that Defendants delivers the purported void instruments forthwith to the clerk of the court for cancellation;

**As to the Sixth Cause of Action for Wrongful Foreclosure:**

8.   General damages of 1,000,000 dollars for wrongful foreclosure of her PROPERTY;

9.   For a judicial decree that the nonjudicial foreclosure of the PROPERTY was wrongful.

10. For an ORDER restoring Plaintiff to sole possession of the PROPERTY immediately.

**As to the Seventh Cause of Action for Conversion:**

11. General damages of 600,000 dollars for retention and conversion of Plaintiff's **NOTE2**;

12. For an ORDER for Defendants to deliver the original **NOTE2** to Plaintiff, or damages equal to twice the face value of the promissory note, which is 600,000 dollars times two.

13. General damages of twice 600,000 dollars for the landlord's successor in interest's, CHASE BANK's, failure to return GONZALES's security deposit (her **NOTE₂**) pursuant to Civil § 1950.5(l);

**As to the Eighth Cause of Action for Quiet Title:**

14. For a determination of the title of the PROPERTY against all adverse claims and judgment to quiet the title immediately declaring GONZALES to be the sole, legal owner of the PROPERTY with exclusive right to possession and that Defendants, ALL PARTIES, and/or their assigns and all adverse claimants have no rights, title, interests, possession, or liens in or against the PROPERTY.

15. For a judgment that ALL PARTIES and/or their assigns are permanently enjoined from claiming any right, title, interest, lien, debt, obligation, or estate in the PROPERTY or any part of it.

16. For an ORDER to restore Plaintiff to sole, complete, and immediate possession of the PROPERTY, within three days, without further legal proceedings.

17. For a determination of the title of the Plaintiff against the adverse claims pursuant to Code Civil Proc. § 761.020.

18. The date which the determination is sought is the date this complaint was filed.

**As to All Causes of Action:**

19. Compensatory damages provided by law including, but not limited to Civil Code § 3300;

20. For equitable injunctive, and/or declaratory relief as the Court may deem just and proper;

21. For a judgment and order dismissing all pending Unlawful Detainer actions against GONZALES and/or the PROPERTY, and specifically dismissing pending UD case # **CIV1901923**.

22. For a judgment and order that all damages are to be paid in the full amounts to Plaintiff and/or her assigns within thirty days after judgment is filed, without income taxes withheld.

23. For reasonable attorney's fees and/or the cost of Plaintiff's time and labor, including hiring outside help who are not members of the special class of members of the Bar Association, which would be discriminatory to not also pay such equivalent labor costs to Plaintiff and her outside help, equivalent to $400 per hour, and the time expended, which will be submitted at trial.

24. Punitive damages of 5,000,000 dollars or in an amount to be determined at time of trial for the misrepresentations that were despicable and constitutes malice, fraud and/or oppression within the meaning of Civil Code § 3294;

25. For pre-judgment and post-judgment interest provided by law including, but not limited to California Civil Code § 3291;

26. For additional damages as the Court may deem just and proper;

Respectfully submitted.

DATED: June 18, 2020

Veronica Gonzales,
Plaintiff in Propria Persona

## VERIFICATION

I, VERONICA GONZALES, the undersigned, declare and state as follows:

1.   I am the Plaintiff in the within action. I make this declaration of my own personal knowledge, except as to facts which I am informed and believe are true.

2.   I have read the foregoing document and know the contents thereof, including all exhibits. The matters stated therein are true of my own personal knowledge, except as to matters alleged upon information and belief, as to which I believe the same to be true.

3.   If called upon to testify, I could and would testify competently thereto

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed in Marin County, California.

DATED: June 18, 2020

Veronica Gonzales,
Plaintiff in Propria Persona

VERIFIED COMPLAINT

Branch :ORC,User :OR19          Comment:                                    Station Id :MQZX

MARIN COUNTY OFFICIAL RECORDS

RECORDING REQUESTED BY
**CALIFORNIA LAND TITLE CO. OF MARIN**

When Recorded Mail to, and Unless Otherwise Shown Below,
Mail Tax Statements To:

Veronica A. Gonzales

36 Rustic Way
San Rafael, Ca. 94901

Escrow or Title No. 209122    -JB

**96-054256**

| | |
|---|---|
| Rec Fee | 13.00 |
| DTT | 994.50 |
| Check | 1007.50 |

Recorded
Official Records
County of
MARIN
JOAN C THAYER
Recorder
1:40pm  4-Oct-96          MM   3

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
DOCUMENTARY TRANSFER TAX is $ 994.50  COMB                      Parcel No. 10-101-38
( X )  computed on full value of property conveyed, or                    Tax Code Area 8-000
(   )  computed on full value less value of liens and encumbrances
        remaining at time of sale
(   )  unincorporated area      ( X )  City of San Rafael,

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

David E. Patton and Wanda J. Patton, or their Successors, as Trustee of The
Patton Family Trust dated October 5, 1992

hereby GRANT(S) to

Veronica A. Gonzales, an unmarried woman

the following described real property in the State of California, City of San Rafael,
County of Marin

AS PER DESCRIPTION ATTACHED HERETO

STATE OF CALIFORNIA Virginia )
COUNTY OF Virginia Beach )SS

On October 1, 1996 before me, the undersigned, a
Notary Public in and for said County and State, personally appeared

David E. Patton, Trustee

Wanda J. Patton, Trustee
personally know to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies) and that by his
/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

Signature _____ SHERRY A. FURBEE
My Commission Expires 1/31/98

Dated September 27, 1996

_David E. Patton_
David E. Patton, Trustee

_Wanda J. Patton_
Wanda J. Patton, Trustee

MAIL TAX STATEMENTS TO PARTY SHOWN ON FOLLOWING LINE; IF NO PARTY IS SHOWN, MAIL AS DIRECTED ABOVE

NAME                        STREET ADDRESS                    CITY & STATE

Branch :ORC,User :OR19                         Comment:                                    Station Id :MQZX

MARIN COUNTY OFFICIAL RECORDS

## DESCRIPTION

ALL THAT CERTAIN real property situate in the City of San Rafael, County of Marin, State of California, described below as follows:

PARCEL ONE:

BEGINNING at a point on the Southeasterly line of the cul-de-sac, known as Rustic Way, as said cul-de-sac is described in the Deed to the City of San Rafael, recorded March 17, 1955 in Book 929 of Official Records at Page 29, Marin County Records, said point being the Southwesterly corner of that certain parcel of land described in the Deed from Marin Title Guaranty Company, a corporation, to Gregory S. Lyon, et ux, recorded January 16, 1962 in Book 1533 of Official Records at Page 354, Marin County Records, thence leaving said line of Rustic Way and running thence along the Southwesterly boundary line of said Lyon parcel South 54° 03' East 141.868 feet to the most Southerly corner thereof; thence leaving said Southwesterly boundary line and running South 56° 57' 40" West 144.627 feet; thence North 47° 45' West 118.56 feet to a point on the Easterly line of Rustic Way hereinabove referred to, thence along said line of Rustic Way on a curve to the left with a radius of 140 feet for a distance of 77.756 feet, thence North 29° 18' 40" East 12.14 feet, thence on a curve to the right with a radius of 20 feet for a distance of 18.158 feet, thence on a curve to the left with a radius of 45 feet a distance of 20.99 feet to the point of beginning.

PARCEL TWO:

AN EASEMENT for driveway purposes over the following described parcel:

BEGINNING at a point on the Southwesterly line of the hereinabove described parcel, said point being distant thereon South 47° 45' East 10.00 feet from the most Westerly corner thereof; thence along said Southwesterly line North 47° 45' West 10.00 feet to the most Westerly corner of the hereinabove described parcel; thence Southwesterly along the Southwesterly line of Rustic Way 15.00 feet to a point, thence leaving said line of Rustic Way and running Easterly in a straight line to the point of beginning.

Exhibit 1 p.2

MARIN COUNTY OFFICIAL RECORDS

ILLEGIBLE NOTARY SEAL DECLARATION

GOVERNMENT CODE 27361.7

I certify under penalty of perjury that the notary seal on the document to which this
statement is attached reads as follows:

Name of Notary:___SHERRY A. FORBES_____

Commission Number:___N/A_____

Date Commission Expires____10/31/98_____

Place of Execution of this Declaration__SAN RAFAEL, CALIFORNIA_____

Date____10/4/96_____

CALIFORNIA LAND TITLE COMPANY OF MARIN

Jennifer A. Craig

Recorded at the request of:
First American Title Co.
Title Order 5-215970sb
Southland Title-Escrow #LM3579LB
Recording Requested By:

**WELLS FARGO HOME MORTGAGE, INC.**
**5000 S.W.MEADOWS RD. #190**
**LAKE OSWEGO, OR  97035**

Return To:
**WELLS FARGO HOME MORTGAGE, INC.**
**FINAL DOCUMENTS X4701-024**
**3601 MINNESOTA DRIVE**
**BLOOMINGTON, MN  55435-5284**
Prepared By:
**MICHELLE L. GOLDNER**
**WELLS FARGO HOME MORTGAGE, INC.**
**5000 S.W.MEADOWS RD. #190**
**LAKE OSWEGO, OR  97035**

**2001-0078369**

| Recorded | | REC FEE | 61.00 |
| Official Records | | | |
| County Of | | | |
| Marin | | | |
| JOAN C. THAYER | | | |
| Recorder | | | |
| | | | |
| 08:00AM 21-Nov-2001 | | in Page 1 of 19 | |

AP#010-101-38

## DEED OF TRUST

4346783MEX

[Space Above This Line For Recording Data]

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are
defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used
in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated OCTOBER 26, 2001
together with all Riders to this document.
**(B) "Borrower"** is
VERONICA A. GONZALES, AN UNMARRIED WOMAN

THIS IS CERTIFIED TO BE A TRUE COPY OF THE RECORDS
OF THE MARIN COUNTY RECORDER
DATE ISSUED

AUG - 2 2012
BY _____ DEPUTY

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is WELLS FARGO HOME MORTGAGE, INC.

Lender is a **Corporation**
organized and existing under the laws of  **THE STATE OF CALIFORNIA**

Lender's address is
**P. O. BOX 5137, DES MOINES, IA 50306-5137**
Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is FIDELITY NATIONAL TITLE INSURANCE COMPANY.

(E) "Note " means the promissory note signed by Borrower and dated OCTOBER 26, 2001 .
The Note states that Borrower owes Lender SIX HUNDRED THOUSAND AND NO/100
(Dollars)
(U.S. $ .....600,000.00 ...........) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than **NOVEMBER 1, 2031** .
(F) "Property" means the property that is described below under the heading "Transfer of
Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges
and late charges due under the Note, and all sums due under this Security Instrument, plus
interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower.
The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider ☐ Biweekly Payment Rider ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an
electronic terminal, telephonic instrument, computer, or magnetic tape so as to order,
instruct, or authorize a financial institution to debit or credit an account. Such term includes,
but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers
initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation
or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et
seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be
amended from time to time, or any additional or successor legislation or regulation that

SCA02   Rev 12/18/00          Page 2 of 18          Initials:          FORM 3005   1/01

Exhibit 2 p.2

governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's convenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| **County** | of | **MARIN** | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**LEGAL DESCRIPTION IS ATTACHED HERETO AS SCHEDULE "A" AND MADE A PART HEREOF.**

Parcel ID Number:
**36 RUSTIC WAY**
**SAN RAFAEL**
("Property Address"):

which currently has the address of
[Street]
[City] , California, 94901 [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

SCA03   Rev 11/09/00          Page 3 of 18          Initials:          FORM 3005   1/01

Exhibit 2 p.3

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

SCA04    Rev 11/09/00              Page 4 of 18        Initials: ___        FORM 3005    1/01

Exhibit 2 p.4

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be

SCA05   Rev 11/09/00                  Page 5 of 18        Initials _____        FORM 3005   1/01

Exhibit 2 p.5

required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination

Exhibit 2 p.6

or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In

Exhibit 2 p.7

either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or

Exhibit 2 p.8

(c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Exhibit 2 p.9

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exhange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Exhibit 2 p.10

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by

Exhibit 2 p.11

this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly

Exhibit 2 p.12

requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Exhibit 2 p.13

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.

Exhibit 2 p.14

The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or

SCA15   Rev 10/13/00          Page 15 of 18          Initials:          FORM 3005   1/01

Exhibit 2 p.15

before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Exhibit 2 p.16

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____                 _____ (Seal)
                                                 VERONICA A. GONZALES          Borrower

Exhibit 2 p.17

State of California,                                           ss:

County of MARIN

On November 5, 2001 before me, Kelli Reid, Notary Public
                                                     personally appeared

**VERONICA A. GONZALES, AN UNMARRIED WOMAN**

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.

_Kelli Reid_ _____ (Seal)

OFFICIAL SEAL
KELLI REID
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1169919
SONOMA COUNTY
My Commission Exp. Jan. 14, 2002

SCA18   Rev 10/17/00          Page 18 of 18      Initials          FORM 3005   1/01

Exhibit 2 p.18



SCHEDULE "1"

# DESCRIPTION

All that certain real property situate in the City of San Rafael, County of Marin, State of California, described as follows:

## PARCEL ONE:

BEGINNING at a point on the Southeasterly line of the cul de sac, known as Rustic Way, as said cul-de-sac is described in the Deed to the City of San Rafael, recorded March 17, 1955 in Book 929 of Official Records, at Page 29, Marin County Records, said point being the Southwesterly corner of that certain parcel of land described in the Deed from Marin Title Guaranty Company, a corporation, to Gregory S. Lyon, et ux, recorded January 16, 1962 in Book 1533 of Official Records, at Page 354, Marin County Records, thence leaving said line of Rustic Way and running thence along the Southwesterly boundary line of said Lyon parcel South 54° 03' East 141.868 feet to the most Southerly corner thereof; thence leaving said Southwesterly boundary line and running South 56° 57' 40" West 144.627 feet; thence North 47° 45' West 118.56 feet to a point on the Easterly line of Rustic Way hereinabove referred to, thence along said line of Rustic Way on a curve to the left with a radius of 140 feet for a distance of 77.756 feet, thence North 29° 18' 40" East 12.14 feet, thence on a curve to the right with a radius of 20 feet for a distance of 18.158 feet, thence on a curve to the left with a radius of 45 feet a distance of 20.99 feet to the point of beginning.

## PARCEL TWO:

AN EASEMENT for driveway purposes over the following described parcel:

BEGINNING at a point on the Southwesterly line of the hereinabove described parcel, said point being distant thereon South 47° 45' East 10.00 feet from the most Westerly corner thereof; thence along said Southwesterly line North 47° 45' West 10.00 feet to the most Westerly corner of the hereinabove described parcel; thence Southwesterly along the Southeasterly line of Rustic Way 15.00 feet to a point, thence leaving said line of Rustic Way and running Easterly in a straight line to the point of beginning.

Exhibit 2 p.19

RECORDING REQUESTED BY:
TITLE COURT SERVICE
After Recording, Return To:

2006-0038789

| Recorded<br>Official Records<br>County of<br>Marin<br>JOAN C. THAYER<br>Assessor-Recorder | REC FEE | 18.00 |
| | | |

Northwest Trustee Services, Inc.
505 N. Tustin Avenue, Suite 243
Santa Ana, CA 92705

012:23PM 20-Jun-2006   Page 1 of 2

3009837

## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That Wells Fargo Bank N.A., has made, constituted and appointed, and by these presents does make, constitute and appoint Stephen D. Routh and Lance E. Olsen of Routh Crabtree Olsen, PS, 3535 Factoria Blvd., Suite 200, Bellevue, WA 98006; Stephen D. Routh, Richard L. Crabtree and Richard N. Ulstrom of Routh Crabtree, apc, 3510 Spenard Road, Suite 200, Anchorage, AK 99503; Jeff Stenman, Kathy Taggart, Vonnie McElligott, Todd Hendricks, and Becky Baker of Northwest Trustee Services, Inc., 3535 Factoria Blvd., Suite 200, Bellevue, WA 98006; and Cathe Cole, Lupe Tabita and Michelle Floyd of Northwest Trustee Services, Inc., 505 N. Tustin Avenue, Suite 243, Santa Ana, CA 92705, individually and not jointly, its true and lawful attorney in fact for, and in its name, place and stead, and for its use and benefit, for every act customarily and reasonably necessary and appropriate for:

The execution, acknowledgment, recording and delivery of beneficiary's Non Military Affidavit, Notice of Default (Washington), Notice of Default and Election to Sell (Oregon), Beneficiary's Declaration of Default (Alaska), Verifications of Debt, and Appointments and/or Substitutions of Trustee wherein the above-named principal is the original or substituted beneficiary or servicing agent for the beneficiary, Deeds to the Secretary of Veterans Affairs, Secretary of Housing and Urban Development, Deeds to Federal National Mortgage Association, and Deeds to Federal Home Loan Mortgage Corporation, to convey properties in which the Mortgage foreclosed secured a loan guaranteed or insured by the department of Veterans Affairs or Department of Housing and Urban Development, Deeds and assignment of beneficial interest to the investor on mortgage loans in which Wells Fargo Bank N.A. is the beneficiary of record of the Mortgage, post sale real property conveyance deeds to Federal National Mortgage Association or Federal Home Loan Mortgage Corporation, and any bond necessary to effect or support legal action to gain possession of any real property to which Wells Fargo Bank N.A. has lawful ownership or claim to possession after a foreclosure.

Giving and granting unto said attorney-in-fact full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done to accomplish the foregoing as the principal above-named might or could do as if personally present, with full powers of substitution and reservation, hereby confirming and ratifying all that the principal's attorney in fact shall lawfully do or cause to be done by virtue of these presents. The undersigned fully acknowledges and understands that said attorney-in-fact is being granted authority to appoint himself or a business in which he has a pecuniary interest as trustee to conduct foreclosures for Wells Fargo Bank N.A. on a for profit basis and has consulted independent counsel regarding same.

By exercise of this limited power, the attorney(s)-in-fact shall indemnify Wells Fargo Bank N.A. from all claims, demands, suits, penalties or actions, and from all attendant losses, costs and expenses for any claims against, or losses or liability of Wells Fargo Bank N.A. for any cause to the extent the same arise out of, or result from, default in the performance of, or the negligent performance of, or willful misconduct regarding any obligation of the attorney(s)-in-fact under this power.

This limited power of attorney shall be effective from the date of execution hereof until December 31, 2009 or such time as Wells Fargo Bank N.A. or its successor revokes it in writing.

THIS IS CERTIFIED TO BE A TRUE COPY OF THE RECORDS
OF THE MARIN COUNTY RECORDER
DATE ISSUED

DEC 0 3 2019

BY _____ DEPUTY

Exhibit 4 p.1

13

IN WITNESS WHEREOF, Rachael Hendrickson-Browder has hereunto set his/her hand and seal this 11th day of, May, 2006.

Wells Fargo Bank, N.A.

Signed:

Printed name:        Rachael Hendrickson-Browder

Title:               Vice President Loan Documentation

| STATE OF | IOWA | ) |
|----------|------|---|
| COUNTY OF | POLK | ) ss. |
|          |      | ) |

This is to certify that on the 11th day of, May, 2006, before me, a notary public in and for the State of IOWA, personally appeared Rachael Hendrickson-Browder, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this day that s/he, being informed of the contents thereof, s/he executed the foregoing document as Vice President Loan Documentation of Wells Fargo Bank N.A., voluntarily for and as the act of said corporation, acting in said capacity, as aforesaid.

Given under my hand this 11th day of, May, 2006.

ANNE NELSON
Commission Number 716748
My Commission Expires
May 23, 2008

Notary public in and for:
My commission expires:

2

Exhibit 4 p.2

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

2011-0015555

| Recorded | REC FEE | 18.00 |
| Official Records | |
| County of | |
| Marin | |
| RICHARD N. BENSON | |
| Assessor-Recorder | |
| County Clerk | |
| | RS |
| 09:29AM 21-Mar-2011 | Page 1 of 1 |

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO:

Wells Fargo Home Mortgage
3476 Stateview Blvd.
MAC # X7801-014
Ft Mill, SC  29715

File No. 7023.90962     Title Order 100737816-CA-BFI     MIN No.

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to U.S. Bank National Association, as successor Trustee to Wachovia Bank, National Association, as Trustee for MSSTR 2004-1

all beneficial interest under that certain Deed of Trust dated 10/26/01, executed by Veronica A. Gonzales, an unmarried woman to Fidelity National Title Insurance Company, as Trustee; and recorded 11/21/01, as Instrument No. 2001-0078369 of Official Records in the County Recorder of MARIN County, California.

Property Address: 36 RUSTIC WAY SAN RAFAEL, CA 94901

TOGETHER with the right to have reconveyed, in whole or in part the real property described therein. *Effective date as of 12/1/10*

Effective date: 2/21/11

Wells Fargo Bank, NA, as successor by merger to Wells Fargo Home Mortgage, Inc., by Northwest Trustee Services, Inc., as Attorney In Fact recorded 6/20/06 as Inst. 2006-0038789

*[signature]*

By: Rebecca A. Baker, Assistant Vice President

STATE OF WASHINGTON          )
                                                      )ss
COUNTY OF KING                      )

     I certify that I know or have satisfactory evidence that Rebecca A. Baker is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the Attorney In Fact of Wells Fargo Bank, N.A. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: 2/21/11

*[notary seal: JESSICA LYNN CLIFTON, NOTARY PUBLIC, MARCH 7, 2011, STATE OF WASHINGTON]*

*[signature]*
Notary Public in and for the State of Washington
Residing at Federal Way
My appointment expires 3/7/2011

⑤

Exhibit 5 p.1

SUP/rw #10443

**State of Texas** | **Deed of Trust Note**

FHA #493-443132-7-748

$ 40,150.00 | Houston , Texas.
August 11 , 19 88

For value received, the undersigned promise(s) to pay to the order of
UNION STATE MORTGAGE CORPORATION

the sum of

FORTY THOUSAND ONE HUNDRED FIFTY AND NO/100--------- Dollars ($ 40,150.00

with interest at the rate of        ten                       per centum ( 10.00 %) per
annum on the unpaid balance, interest payable monthly as it accrues, both principal and interest to be paid at the office
of   UNION STATE MORTGAGE CORPORATION
in   Houston, Texas                                                                                    ,
in monthly installments of   THREE HUNDRED FIFTY TWO AND 35/100-----------------
Dollars ($ 352.35    ) each, including interest, one on the first day of each month hereafter commencing on the first day
of  October      , 1988 and continuing until the principal and interest are fully paid, except that the final payment of
principal and interest, if not sooner paid, shall be due and payable on the first day of  September, 2018     ,

If default be made in the payment of any installment under this note, and if the default is not made good prior to the due date
of the next such installment, at the option of the holder, this note shall become immediately due and payable without notice and
the lien given to secure its payment may be foreclosed. Failure to exercise this option shall not constitute a waiver of the right
to exercise in the event of any subsequent default. All past due installments of principal and interst shall bear interest from maturity
at the above rate. If this note is placed in the hands of an attorney for collection, or is collected through the Probate Court or
the Bankruptcy Court or through other legal proceeding, the undersigned promise(s) to pay reasonable attorney's fees.

The undersigned and all endorsers, and all persons liable or to become liable on this note, waive demand, protest and notice
of demand, protest and nonpayment and consent to any and all renewals or extensions in the time of payment hereof.

This note is secured by Deed of Trust of even date herewith, executed by the undersigned to
        SAM U. PRUITT,                          Trustee(s), conveying property as follows:

        Lot 23, in Block 7, of RUSHWOOD, SECTION 2, an addition
        in Harris County, Texas, according to the map or plat
        thereof, recorded in Volume 218, Page 103 of the Map
        Records of Harris County, Texas.

| 2323 Union Mill Road | |
| --- | --- |
| (Address) | OSCAR DAVIS, JR. |
| Houston, Texas   77067 | |
| (Address) | ANGELA L. DAVIS |
| (Address) | |
| (Address) | |

This form is used in connection with deeds of trust insured under the one-to-four family provisions of the National Housing Act.

Previous Editions are Obsolete                                              HUD-89181 (4-84 Edition)
                                                                                24 CFR 203.17(a)
                                                                                Reprinted 8-85

VMP-1 (TX) (8801)          VMP MORTGAGE FORMS • (313)293-8100 • (800)521-7291

Exhibit 6 p.1

WITHOUT RECOURSE PAY
TO THE ORDER OF
STERLING MORTGAGE CORPORATION

UNION STATE MORTGAGE CORPORATION

KATHERINE LEUNG
PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF
GREENWICH CAPITAL MORTGAGE, INC

STERLING MORTGAGE CORPORATION

BY _Emily J. Saxton_
Emily J. Saxton, Assistant Vice President

WITHOUT RECOURSE
PAY TO THE ORDER OF:
FOSTER MORTGAGE CORPORATION

Greenwich Capital Mortgage, Inc.

BY _Mary C. Lawshe_

MARY C. LAWSHE, VICE PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF:

CANCELLED

FOSTER MORTGAGE CORPORATION

By _____
Frances Flinn
Assistant Vice-President

Pay to the order of
Foster Mortgage Corporation,
a Louisana Corporation, without recourse.

Jelmer, Inc. (formerly Foster Mortgage
Corporation, a Texas Corporation)

By: _____
Diane S. Owens, Vice President

Pay to the order of
NationsBanc Mortgage Corporation,
without recourse.

Foster Mortgage Corporation,
a Louisana Corporation

By: _____
Eldon L. Youngblood, Vice President

PAY TO THE ORDER OF
MidFirst Bank

WITHOUT RECOURSE
NationsBanc Mortgage Corporation

By _____
DANIEL F. HELLAMS
SR. VICE PRESIDENT

PAID TO THE ORDER OF

WITHOUT RECOURSE
MidFirst Bank

_Suzanne M. Haumesser_
Suzanne M. Haumesser
Vice President

Exhibit 6 p.2

**1**

WITHOUT RECOURSE PAY
TO THE ORDER OF
**2** STERLING MORTGAGE CORPORATION

**1** UNION STATE MORTGAGE CORPORATION

*Katherine L*

KATHERINE LEUNG
PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF
**3** GREENWICH CAPITAL MORTGAGE, INC

STERLING MORTGAGE CORPORATION

BY *Emily J. Saxton*
Emily J. Saxton, Assistant Vice President

WITHOUT RECOURSE
PAY TO THE ORDER OF:
**4** FOSTER MORTGAGE CORPORATION

Greenwich Capital Mortgage, Inc.
BY *Mary C Lawshe*
MARY C. LAWSHE, VICE PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF.

CANCELLED

FOSTER MORTGAGE CORPORATION
By *Frances Flinn*
Frances Flinn
Assistant Vice-President

**5** Pay to the order of
Foster Mortgage Corporation,
a Louisana Corporation, without recourse.

Jelmer, Inc. (formerly Foster Mortgage
Corporation, a Texas Corporation)
By: *Diane S. Owens*
Diane S. Owens, Vice President

**6** Pay to the order of
NationsBanc Mortgage Corporation,
without recourse.

Foster Mortgage Corporation,
a Louisana Corporation
By: *Eldon L. Youngblood*
Eldon L. Youngblood, Vice President

PAY TO THE ORDER OF
**7** MidFirst Bank

WITHOUT RECOURSE
NationsBanc Mortgage Corporation
By *Daniel F. Hellams*
DANIEL F. HELLAMS
SR. VICE PRESIDENT

PAID TO THE ORDER OF

WITHOUT RECOURSE
MidFirst Bank
*Suzanne M. Haumesser*
Suzanne M. Haumesser
Vice President

**Already stamped and
ready for the next bank.**

Exhibit 6 p.3

2018-0024544

| | | |
|---|---|---|
| Recorded | REC FEE | 23.00 |
| Official Records | | |
| County of | SB2 HOUSING | 75.00 |
| Marin | DA FRAUD FEE | 10.00 |
| RICHARD N. BENSON | | |
| Assessor-Recorder | | |
| County Clerk | | |
| | MM | |
| 02:28PM 10-Jul-2018 | Page 1 of 4 | |

APN No.: 010-101-38

Recording requested by:
Quality Loan Service Corp

When recorded mail to:
Quality Loan Service Corporation
411 Ivy Street
San Diego, CA 92101

TS No.: CA-17-797674-BF
Order No.: 8737232
Property Address: 36 RUSTIC WAY, SAN RAFAEL, CA 94901

Space above this line for Recorder's use

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL
## UNDER DEED OF TRUST

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED TO THE
COPY PROVIDED TO THE MORTGAGOR OR TRUSTOR (Pursuant to Cal. Civ. Code § 2923.3)
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE
BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY
COURT ACTION,** and you may have the legal right to bring your account in good standing
by paying all of your past due payments plus permitted costs and expenses within the time
permitted by law for reinstatement of your account, which is normally five business days prior to
the date set for the sale of your property. No sale date may be set until approximately 90 days
from the date this Notice of Default may be recorded (which date of recordation appears on this
notice). This amount is **$444,292.88 as of 7/9/2018** and will increase until your account becomes
current.

While your property is in foreclosure, you still must pay other obligations (such as
insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make
future payments on the loan, pay taxes on the property, provide insurance on the property, or pay
other obligations as required in the note and deed of trust or mortgage, the beneficiary or
mortgagee may insist that you do so in order to reinstate your account in good standing. In
addition, the beneficiary or mortgagee may require as a condition of reinstatement that you
provide reliable written evidence that you paid all senior liens, property taxes, and hazard
insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization
of the entire amount you must pay. You may not have to pay the entire unpaid portion of your
account, even though full payment was demanded, but you must pay all amounts in default at the
time payment is made. However, you and your beneficiary or mortgagee may mutually agree in
writing prior to the time the notice of sale is posted (which may not be earlier than three-months

Exhibit 7 p.1

TS No.: **CA-17-797674-BF**

after this Notice of Default is recorded) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**U.S. Bank National Association, as Trustee, successor in interest to Wachovia Bank, National Association, as Trustee for MSSTR 2004-1)
C/O Quality Loan Service Corporation
411 Ivy Street
San Diego, CA 92101
619-645-7711**

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That the undersigned is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated **10/26/2001**, executed by **VERONICA A. GONZALES, AN UNMARRIED WOMAN**, as Trustor, to secure certain obligations in favor of **WELLS FARGO HOME MORTGAGE, INC.**, as beneficiary, recorded **11/21/2001** as Instrument No. **2001-0078369**, of Official Records in the Office of the Recorder of **MARIN** County, **California** describing land therein: **as more fully described in said Deed of Trust.**

Said obligations including **1** NOTE(S) FOR THE ORIGINAL sum of **$600,000.00**, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the beneficiary; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

> **The installments of principal and interest which became due on 9/1/2010, and all subsequent installments of principal and interest through the date of this Notice, plus amounts that are due for late charges, delinquent property taxes, insurance premiums, advances made on senior liens, taxes and/or insurance, trustee's fees, and any attorney fees and court costs arising from or associated with the beneficiaries efforts to protect and preserve its security, all of which must be paid as a condition of reinstatement, including all sums that shall accrue through reinstatement or pay-off. Nothing in this notice shall be construed as a waiver of any fees owing to the Beneficiary under the Deed of Trust pursuant to the terms of the loan documents.**

Exhibit 7 p.2

TS No.: **CA-17-797674-BF**

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Pursuant to the attached Declaration, the mortgage servicer declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code § 2923.55 or § 2923.5, or is otherwise exempt from the requirements of § 2923.55 and §2923.5.

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holders right's against the real property only.

**QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Dated: 7/9/18

**Quality Loan Service Corp., Trustee**

By: Ariel Cadillo, Assistant Secretary

Exhibit 7 p.3

# DECLARATION OF COMPLIANCE

*(California Civil Code Section 2923.55(c))*

Borrower(s):   VERONICA A GONZALES

Property Address:   36 RUSTIC WAY
SAN RAFAEL CA 94901

The undersigned, as an authorized agent or employee of the mortgage servicer named below, declares that:

1. ☒ The mortgage servicer has contacted the borrower pursuant to California Civil Code §2923.55(b)(2) to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure". Thirty (30) days, or more, have passed since the initial contact was made.

2. ☐ The mortgage servicer has exercised due diligence to contact the borrower pursuant to California Civil Code §2923.55(f) to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure". Thirty (30) days, or more, have passed since these due diligence efforts were satisfied.

3. ☐ No contact was required by the mortgage servicer because the individual(s) identified above did not meet the definition of "borrower" pursuant to subdivision (c) of California Civil Code §2920.5.

4. ☐ The requirements of California Civil Code §2923.55 do not apply because the loan is not secured by a first lien mortgage or deed of trust on "owner-occupied" residential real property as defined by California Civil Code §2924.15(a).

I certify that this declaration is accurate, complete and supported by competent and reliable evidence which the mortgage servicer has reviewed to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information.

Wells Fargo Bank, N.A.

By:       *Laura Rodriguez (signature)*
Name:     Laura Rodriguez
Title:    VP Loan Documentation
Date:     4/29/16

053_CA_V3

Exhibit 7 p.4

2019-0005575

| Recorded | | REC FEE | 17.00 |
| Official Records | | | |
| County of | | SB2 HOUSING | 75.00 |
| Marin | | DA FRAUD FEE | 10.00 |
| SHELLY SCOTT | | | |
| Assessor-Recorder | | | |
| County Clerk | | AO | |
| 12:31PM 26-Feb-2019 | | Page 1 of 2 | |

Recording requested by:
Quality Loan Service Corp.

When recorded mail to:
Quality Loan Service Corporation
2763 Camino Del Rio South
San Diego, CA 92108

TS No. CA-17-797674-BF                              SPACE ABOVE THIS LINE FOR RECORDER'S USE
Order No.: 8737232

## NOTICE OF TRUSTEE'S SALE

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED TO THE
COPY PROVIDED TO THE MORTGAGOR OR TRUSTOR (Pursuant to Cal. Civ. Code 2923.3)
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 10/26/2001. UNLESS YOU TAKE
ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED
AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD
CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn
by state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings
association, or savings bank specified in Section 5102 to the Financial Code and authorized to do business in this
state, will be held by duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or
implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by
the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the
Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the
initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on
the day of sale.

**BENEFICIARY MAY ELECT TO BID LESS THAN THE TOTAL AMOUNT DUE.**

| | |
|---|---|
| Trustor(s): | **VERONICA A. GONZALES, AN UNMARRIED WOMAN** |
| Recorded: | **11/21/2001 as Instrument No. 2001-0078369** of Official Records in the office of the Recorder of MARIN County, California; |

Date of Sale:   **3/27/2019 at 1:00 PM**
Place of Sale:   **At the San Rafael City Hall, 1400 5th Avenue, San Rafael, CA 94901. Outside at the
Southwest Corner of the City Hall**
Amount of unpaid balance and other charges: **$920,435.46**
The purported property address is:   **36 RUSTIC WAY, SAN RAFAEL, CA 94901**
Assessor's Parcel No.: **010-101-38**

Exhibit 8 p.1

TS No.: **CA-17-797674-BF**

**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call 800-280-2832 for information regarding the trustee's sale or visit this Internet Web site http://www.qualityloan.com, using the file number assigned to this foreclosure by the Trustee: **CA-17-797674-BF.** Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.

If the sale is set aside for any reason, including if the Trustee is unable to convey title, the Purchaser at the sale shall be entitled only to a return of the monies paid to the Trustee. This shall be the Purchaser's sole and exclusive remedy. The purchaser shall have no further recourse against the Trustor, the Trustee, the Beneficiary, the Beneficiary's Agent, or the Beneficiary's Attorney.

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holders right's against the real property only.

**QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Date: 2/25/2019

**Quality Loan Service Corporation**
**2763 Camino Del Rio South**
**San Diego, CA 92108**
**619-645-7711 For NON SALE information only**
**Sale Line: 800-280-2832**
**Or Login to: http://www.qualityloan.com**
**Reinstatement Line: (866) 645-7711 Ext 5318**

_____

Quality Loan Service Corp. by: Ronald Alonzo, Assistant Secretary

Exhibit 8 p.2

|||||||||||||||||||||||||||||||||||||

## (2019-0014975)

| Recorded | | REC FEE | 20.00 |
|---|---|---|---|
| Official Records | | TAX | 3195.55 |
| County of | | NORF | 20.00 |
| Marin | | SURVEY MONUME | 10.00 |
| SHELLY SCOTT | | | |
| Assessor-Recorder | | | |
| County Clerk | | | |
| | | MH | |
| 02:41PM 03-May-2019 | | Page 1 of 3 | |

Recording requested by:

**First American Mortgage Solutions**
When recorded mail to:

JP Morgan Chase Bank, N. A.
3415 Vision Dr.
Columbus, OH 43219

Forward tax statements to the address given above

TS No.: ▓▓▓▓▓▓▓
Order No.: ▓▓▓▓▓

Space above this line for recorders use

## Trustee's Deed Upon Sale

A.P.N.: 010-101-38

### THE UNDERSIGNED GRANTOR DECLARES:

The grantee herein WASNT the foreclosing beneficiary.

| | |
|---|---|
| The amount of the unpaid debt together with costs was: | $917,791.66 |
| The amount paid by the grantee at the trustee sale was: | $1,030,100.00 |
| The documentary transfer tax is: County: $1,133.55 City: $2,062.00 | $3,195.55 |

Said property is in the City of: SAN RAFAEL, County of MARIN

QUALITY LOAN SERVICE CORPORATION as Trustee, (whereas so designated in the Deed of Trust hereunder more particularly described or as duly appointed Trustee) does hereby GRANT and CONVEY to:

JP Morgan Chase Bank N. A.

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of MARIN, State of California, described as follows:

PARCEL ONE: BEGINNING AT A POINT ON THE SOUTHEASTERLY LINE OF THE CUL-DE-SAC, KNOWN AS RUSTIC WAY, AS SAID CUL-DE-SAC IS DESCRIBED IN THE DEED TO THE CITY OF SAN RAFAEL, RECORDED MARCH 17, 1955 IN BOOK 929 OF OFFICIAL RECORDS, AT PAGE 29, MARIN COUNTY RECORDS, SAID POINT BEING THE SOUTHWESTERLY CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN THE DEED FROM MARIN TITLE GUARANTY COMPANY, A CORPORATION, TO GREGORY S. LYON, ET UX, RECORDED JANUARY 16, 1962 IN BOOK 1533 OF OFFICIAL RECORDS, AT PAGE 354, MARIN COUNTY RECORDS, THENCE LEAVING SAID LINE OF RUSTIC WAY AND RUNNING THENCE ALONG THE SOUTHWESTERLY BOUNDARY LINE OF SAID LYON PARCEL SOUTH 54° 03' EAST 141.868 FEET TO THE MOST SOUTHERLY CORNER THEREOF; THENCE LEAVING SAID SOUTHWESTERLY BOUNDARY LINE AND RUNNING SOUTH 56° 57' 40" WEST 144.627 FEET; THENCE NORTH 47° 45' WEST 118.56 FEET TO A POINT ON THE EASTERLY LINE OF RUSTIC WAY HEREINABOVE REFERRED TO, THENCE

# Exhibit 1

Exhibit 9 p.1

ALONG SAID LINE OF RUSTIC WAY ON A CURVE TO THE LEFT WITH A RADIUS OF 140 FEET FOR A DISTANCE OF 77.756 FEET, THENCE NORTH 29° 18' 40" EAST 12.14 FEET, THENCE ON A CURVE TO THE RIGHT WITH A RADIUS OF 20 FEET FOR A DISTANCE OF 18.158 FEET, THENCE ON A CURVE TO THE LEFT WITH A RADIUS OF 45 FEET A DISTANCE OF 20.99 FEET TO THE POINT OF BEGINNING. PARCEL TWO: AN EASEMENT FOR DRIVEWAY PURPOSES OVER THE FOLLOWING DESCRIBED PARCEL: BEGINNING AT A POINT ON THE SOUTHWESTERLY LINE OF THE HEREINABOVE DESCRIBED PARCEL, SAID POINT BEING DISTANT THEREON SOUTH 47° 45' EAST 10.00 FEET FROM THE MOST WESTERLY CORNER THEREOF; THENCE ALONG SAID SOUTHWESTERLY LINE NORTH 47° 45' WEST 10.00 FEET TO THE MOST WESTERLY CORNER OF THE HEREINABOVE DESCRIBED PARCEL; THENCE SOUTHWESTERLY ALONG THE SOUTHEASTERLY LINE OF RUSTIC WAY 15.00 FEET TO A POINT, THENCE LEAVING SAID LINE OF RUSTIC WAY AND RUNNING EASTERLY IN A STRAIGHT LINE TO THE POINT OF BEGINNING.

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by VERONICA A. GONZALES, AN UNMARRIED WOMAN, as trustor, dated 10/26/2001, and recorded on 11/21/2001 as Instrument No. 2001-0078369   of Official Records in the office of the Recorder of MARIN, California, under the authority and powers vested in the Trustee designated in the Deed of Trust or as the duly appointed trustee, default having occurred under the Deed of Trust pursuant to the Notice of Breach and Election to Sell under the Deed of Trust recorded on 7/10/2018, instrument no 2018-0024544, of Official records. The Trustee of record at the relevant time having complied with all applicable statutory requirements of the State of California and performed all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten/thirty days after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person entitled to notice in compliance with California Civil Code 2924b.

Default occurred as set forth in a Notice of Default and Election to Sell which was recorded in the office of the Recorder of said County.

All requirements of law regarding the mailing of copies of notices or the publication of a copy of the Notice of Default or the personal delivery of the copy of the Notice of Default and the posting and publication of copies of the Notice of Sale have been complied with.

FATICO submits this document for recordation as a courtesy for physical convenience only. FATICO has not examined this document for its validity, sufficiency, or effect, if any, upon title to the real property described herein.

Exhibit 9 p.2

Said property was sold by said Trustee at public auction on 3/27/2019 at the place named in the Notice of Sale, in the County of MARIN, California, in which the property is situated.  Grantee, being the highest bidder at such sale, became the purchaser of said property and paid therefore to said trustee the amount being $1,038,100.00 in lawful money of the United States, or by the satisfaction, pro tanto, of the obligations then secured by said Deed of Trust.

## QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

TS No.:

Date:  5/1/2019

QUALITY LOAN SERVICE CORPORATION

By: Juliet Bernal, Assistant Secretary

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of: California)

County of: San Diego)

On **MAY 0 1 2019** before me, **Katherine A. Davis** a notary public, personally appeared Juliet Bernal , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under *PENALTY OF PERJURY* under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.          (Seal)

Signature

Katherine A. Davis

KATHERINE A. DAVIS
Notary Public - California
San Diego County
Commission # 2269219
My Comm. Expires Dec 29, 2022

Exhibit 9 p.3



## Company Name ❓

(MSSTR)

**Search Match Options**

⭘ Starts with   or   ⦿ Contains

**File Number**

*To search by file number, company name must be left blank.*

**State**

**Country**

**Standard Industry Classification** ❓

**Ownership Forms 3, 4, and 5.**

⭘ Include  ⦿ Exclude ⭘ Only

[ Less Options ▲ ]   SEARCH

### Fast Search ❓

*Ticker or CIK*                              SEARCH

Ticker symbol or CIK is the fastest way to find company filings.

**Company Filing Search Tips**
If your search is "John Smith" and you didn't get the results you expected, please try "Smith John."

## Guides

### How to Research Public Companies

Learn how to quickly research a company's operations and financial information with EDGAR search tools.

Exhibit 10 p.1

**Form Types**
Review reference versions of EDGAR forms filed by companies, funds, and individuals.

## Search Tools

**CIK Lookup Tool**
Look up the central index key (CIK) of an EDGAR filer. Searching by CIK is the most accurate way to view filings.

**Save Your Search**
Want to get updates on new filings? Learn how to save your search by subscribing to EDGAR RSS feeds.

3/3/2020



Home | Latest Filings | Previous Page

U.S. Securities and Exchange Commission

**EDGAR Search Results**

Search the Next-Generation
EDGAR System

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

No matching companies. 

*https://www.sec.gov/cgi-bin/browse-edgar*

Home | Search the Next-Generation EDGAR System | Previous Page          Modified 07/18/2014

Exhibit 10 p.3

## Company Name ❓

MS

**Search Match Options**
◉ Starts with   or   ○ Contains

**File Number**

*To search by file number, company name must be left blank.*

**State**

**Country**

**Standard Industry Classification** ❓

**Ownership Forms 3, 4, and 5.**
○ Include  ◉ Exclude  ○ Only

[ Less Options ▲ ]   SEARCH

### Fast Search ❓

*Ticker or CIK*    SEARCH

Ticker symbol or CIK is the fastest way to find company filings.

**Company Filing Search Tips**
If your search is "John Smith" and you didn't get the results you expected, please try "Smith John."

## Guides

### How to Research Public Companies

Learn how to quickly research a company's operations and financial information with EDGAR search tools.

Exhibit 11 p.1

3/3/2020

**Form Types**

Review reference versions of EDGAR forms filed by companies, funds, and individuals.

## Search Tools

**CIK Lookup Tool**

Look up the central index key (CIK) of an EDGAR filer. Searching by CIK is the most accurate way to view filings.

**Save Your Search**

Want to get updates on new filings? Learn how to save your search by subscribing to EDGAR RSS feeds.

Exhibit 11 p.2



Home | Latest Filings | Previous Page

U.S. Securities and Exchange Commission

## EDGAR Search Results

Search the Next-Generation
EDGAR System

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

Companies with names matching "MS"
*Click on CIK to view company filings*

Items 381 - 420

| CIK | Company | State/Country |
|-----|---------|---------------|
| 0001454370 | MSRE MEZZ MORTGAGE REIT B LLC | NY |
| 0001230221 | MSREF II INC | NY |
| 0000930592 | MSREF II INC /ADV | NY |
| 0001230226 | MSREF III INC | NY |
| 0001230229 | MSREF IV LLC | NY |
| 0001128256 | MSREF IV LLC /ADV | NY |
| 0001315814 | MSREF V LLC | NY |
| 0001559486 | MSREF VII Global Greenwich Co-Investment, L.P. | NY |
| 0001608458 | North Haven Real Estate Fund VIII Global-F, L.P. | NY |
| 0001608498 | North Haven Real Estate Fund VIII Global-T, L.P. | NY |
| 0001608459 | North Haven Real Estate Fund VIII Global-TE, L.P. | NY |
| 0001418294 | MSRESS III Manager, L.L.C. | NY |
| 0001418293 | MSRESS III, Inc. | NY |
| 0001026424 | MSS GROUP INC | CO |
| 0001692358 | MSS GROWTH & INCOME FUND, LLC | TX |
| 0001745107 | MSS Holdco, LLC | CA |
| 0001368578 | MSS Series Trust | OH |
| 0001178307 | MSSB FINANCIAL LLC | |
| 0001503234 | MSSB Real Estate Debt Onshore Feeder I LP | NY |
| 0001528575 | MSSB TPG Specialty Lending Offshore Feeder Fund Ltd. | NY |
| 0001527270 | MSSB TPG Specialty Lending Onshore Feeder Fund | NY |
| 0001801060 | MSSDF REIT LLC | NY |
| 0001712851 | MSSG Trust 2017-237P | NY |
| | SIC: 6189 - ASSET-BACKED SECURITIES | |
| 0001094746 | MSSI LLC | NY |
| 0001450494 | MSSI LLC | TX |
| 0001051385 | MST ENTERPRISES INC | IL |
| 0001617970 | MST Global Master Fund | C3 |
| 0001617968 | MST Global Offshore Fund | C3 |
| 0001636668 | MStar Holding Corp | CA |
| 0001394335 | MSTATION CORP | CA |
| 0001183080 | MSTG SOLUTIONS INC | CA |
| | SIC: 7389 - SERVICES-BUSINESS SERVICES, NEC | |
| 0001372305 | MSTI Holdings, Inc. | NJ |
| | SIC: 4841 - CABLE & OTHER PAY TELEVISION SERVICES | |
| 0001646769 | MSU Aspen Venture, LLC | CA |
| 0000798952 | MSU DEVICES INC | TX |
| | SIC: 3674 - SEMICONDUCTORS & RELATED DEVICES | |
| 0001500675 | MSV LifeLock II LP | MA |
| 0001500676 | MSV LifeLock LP | MA |
| 0001453288 | MSV SPECIAL OPPORTUNITIES FUND (GP) LLC | MA |
| 0001552237 | MSV Special Opportunities Fund II LP | MA |
| 0001660759 | MSV Special Opportunities Fund III LP | MA |
| 0001453287 | MSV SPECIAL OPPORTUNITIES FUND LP | MA |

Previous 40    Next 40

*https://www.sec.gov/cgi-bin/browse-edgar*

3/4/2020 EDGAR Search Results



Home | Latest Filings | Previous Page

U.S. Securities and Exchange Commission

# EDGAR Search Results

Search the Next-Generation
EDGAR System

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*



**Companies for SIC 6189 - ASSET-BACKED SECURITIES**
*Click on CIK to view company filings*

(Items 7861 - 7940)

| CIK | Company | State/Country |
|---|---|---|
| 0001279642 | MS STRUCTURED SATURNS SERIES 2003-11 | NY |
| 0001279643 | MS STRUCTURED SATURNS SERIES 2003-12 | NY |
| 0001279657 | MS STRUCTURED SATURNS SERIES 2003-13 | NY |
| 0001279645 | MS STRUCTURED SATURNS SERIES 2003-14 | NY |
| 0001279651 | MS STRUCTURED SATURNS SERIES 2003-15 | NY |
| 0001279644 | MS STRUCTURED SATURNS SERIES 2003-16 | NY |
| 0001279666 | MS STRUCTURED SATURNS SERIES 2003-17 | NY |
| 0001279661 | MS STRUCTURED SATURNS SERIES 2003-2 | NY |
| 0001279669 | MS STRUCTURED SATURNS SERIES 2003-3 | NY |
| 0001279662 | MS STRUCTURED SATURNS SERIES 2003-4 | NY |
| 0001279668 | MS STRUCTURED SATURNS SERIES 2003-5 | NY |
| 0001279667 | MS STRUCTURED SATURNS SERIES 2003-6 | NY |
| 0001279659 | MS STRUCTURED SATURNS SERIES 2003-7 | NY |
| 0001279658 | MS STRUCTURED SATURNS SERIES 2003-8 | NY |
| 0001279664 | MS STRUCTURED SATURNS SERIES 2003-9 | NY |
| 0001279639 | MS STRUCTURED SATURNS SERIES 2004-1 | NY |
| 0001278892 | MS STRUCTURED SATURNS SERIES 2004-2 | NY |
| 0001280976 | MS STRUCTURED SATURNS SERIES 2004-3 | NY |
| 0001282730 | MS STRUCTURED SATURNS SERIES 2004-4 | NY |
| 0001283238 | MS STRUCTURED SATURNS SERIES 2004-5 | NY |
| 0001286865 | MS STRUCTURED SATURNS SERIES 2004-6 | NY |
| 0001288756 | MS STRUCTURED SATURNS SERIES 2004-7 | NY |
| 0001311437 | MS STRUCTURED SATURNS SERIES 2005-1 | NY |
| 0001315571 | MS STRUCTURED SATURNS SERIES 2005-2 | NY |
| 0001346096 | MS STRUCTURED SATURNS SERIES 2005-3 | NY |
| 0001353166 | MS Structured SATURNS Series 2006-1 | NY |
| 0001369688 | MS Structured SATURNS Series 2006-2 | NY |
| 0001389936 | MS Structured SATURNS Series 2007-1 | NY |
| 0001502101 | MS Structured Step Up Callable Trust Units Series 2010-02 (BAC) | NY |
| 0001504994 | MS Structured Step Up Callable Trust Units Series 2010-03 (Alcoa) | NY |
| 0001507565 | MS Structured Step Up Callable Trust Units Series 2010-05 (GS) | NY |
| 0001291700 | MS STRUCTURED TILES 2004-A | NY |
| 0001346757 | MS STRUCTURED TILES SERIES 2005-1 | NY |
| 0001349577 | MS STRUCTURED TILES SERIES 2006-1 | NY |
| 0001350512 | MSAC 2006-NC1 | NY |
| 0001361992 | MSAC Trust 2006-HE3 | NY |
| 0001247426 | MSC MORTGAGE PASS THROUGH CERTIFICATES SERIES 2003-AR3 | IL |
| 0001390787 | MSCC HELOC Trust 2007-1 | NY |
| 0001144429 | MSDW STRUCTURED SATURNS SERIES 2001-5 | NY |

Exhibit 12 p.1

| | |
|---|---|
| 0001183945 MSDWCC HELOC TRUST 2002-1 | NY |
| 0001337663 MSM 2005-5AR | NY |
| 0001357083 MSM 2006-4SL | NY |
| 0001712851 MSSG Trust 2017-237P | NY |
| 0001261680 MSW ENERGY FINANCE CO INC | NY |
| 0001271466 MULTI-CLASS MORTGAGE PASS-THROUGH CERT SERIES 2003-12 | IL |
| 0001257361 MULTI-CLASS MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2003-9 | IL |
| 0001310084 NAAC Alternative Loan Trust, Series 2004 - AP3 | NY |
| 0001310080 NAAC Alternative Loan Trust, Series 2004-AR3 | NY |
| 0001312671 NAAC Alternative Loan Trust, Series 2004-AR4 | NY |
| 0001319055 NAAC Alternative Loan Trust, Series 2005 - AP1 | NY |
| 0001319304 NAAC Alternative Loan Trust, Series 2005 - AR1 | NY |
| 0001325179 NAAC Alternative Loan Trust, Series 2005 - AR2 | NY |
| 0001328520 NAAC Alternative Loan Trust, Series 2005-WF1 | NY |
| 0001169006 NATIONAL CITY AUTO RECEIVABLES TRUST 2002-A | OH |
| 0001280871 NATIONAL CITY AUTO RECEIVABLES TRUST 2004-A | OH |
| 0000934841 NATIONAL CITY BANK OF MICHIGAN / ILLINOIS | OH |
| 0001332961 National City Credit Card Master Note Trust | OH |
| 0000934843 NATIONAL CITY CREDIT CARD MASTER TRUST | OH |
| 0001425796 National City Mortgage Capital Trust 2008-1 | OH |
| 0001223029 NATIONAL COLLEGIATE FUNDING LLC | MA |
| 0001290641 National Collegiate Student Loan Trust 2004-1 | MA |
| 0001305287 National Collegiate Student Loan Trust 2004-2 | MA |
| 0001317703 National Collegiate Student Loan Trust 2005-1 | MA |
| 0001327893 National Collegiate Student Loan Trust 2005-2 | MA |
| 0001338373 National Collegiate Student Loan Trust 2005-3 | MA |
| 0001352760 National Collegiate Student Loan Trust 2006-1 | MA |
| 0001363799 National Collegiate Student Loan Trust 2006-2 | MA |
| 0001374067 National Collegiate Student Loan Trust 2006-3 | MA |
| 0001380108 National Collegiate Student Loan Trust 2006-4 | MA |
| 0001389749 National Collegiate Student Loan Trust 2007-1 | MA |
| 0001399721 National Collegiate Student Loan Trust 2007-2 | MA |
| 0001411476 National Collegiate Student Loan Trust 2007-3 | MA |
| 0001411991 National Collegiate Student Loan Trust 2007-4 | MA |
| 0001010495 NATIONAL COLLEGIATE TRUST 1996-S1 | DE |
| 0001027548 NATIONAL COLLEGIATE TRUST 1996-S2 | DE |
| 0001035358 NATIONAL COLLEGIATE TRUST 1997 S1 | DE |
| 0001049975 NATIONAL COLLEGIATE TRUST 1997-S2 | DE |
| 0001005405 NATIONAL FINANCIAL AUTO FUNDING TRUST | FL |
| 0001113413 NATIONAL FINANCIAL SECURITIES CORP | VA |
| 0001138543 NATIONAL GLOBAL MBS MANAGER INC | FL |

Previous 80 | Next 80

*https://www.sec.gov/cgi-bin/browse-edgar*



# Modern Money Mechanics

# A WORKBOOK ON

# FEDERAL RESERVE BANK OF CHICAGO

# Modern Money Mechanics ●

Money is such a routine part of everyday living that its creation and acceptance are ordinarily taken for granted. Although a user may, upon reflection, sense that money must come into being automatically as a result of economic activity or, perhaps, as an outgrowth of some Government operation, just how this happens all too often remains a mystery.

This workbook is designed to help provide an understanding of the mechanics of money creation. While the process is not a simple one, it is hoped that the careful reader will gain a clearer picture of the fundamental nature of money and how the money system in the United States works.

## What is money?

If money is viewed simply as a tool used to facilitate transactions, only those media that are readily accepted in exchange for goods, services and other assets need to be considered. Many things—from stones to cigarettes—have served this monetary function through the ages. Today, in the United States, there are only two kinds of money in use in significant amounts —currency (paper money and coins in the pockets and purses of the public) and demand deposits (checking accounts in commercial banks).

The amount of currency in use at any time depends solely on the public's preferences. Since

currency and demand deposits are freely convertible into each other at the option of the holder, both are money to an equal degree. However, for specific transactions, one form may be more convenient than the other. When a depositor "cashes" a check, he reduces the amount of deposits and increases the amount of currency in circulation. Conversely, when more currency is in circulation than is needed, some is returned to the banks in exchange for deposits. Currency held in bank vaults is not a part of the money supply available for spending by the nonbank public.

While currency is used for a great variety of small transactions, most of the dollar volume of money payments in our economy is made by check. Eighty per cent, or $112 billion, of the $140 billion total money supply at the beginning of 1961 was in the form of demand deposits.

## What makes money valuable?

Neither paper currency nor deposits have value as a commodity. Intrinsically, a dollar bill is just a piece of paper. Deposits are merely book entries. Coins do have some intrinsic value as metal, but considerably less than their face amount.

What, then, makes these instruments— checks, paper money and coins—acceptable at face value in payment of all debts and for other

2

Exhibit 13

UNIVERSITY OF OREGON LIBRARY
EUGENE, OREGON

monetary uses? Mainly, it is the confidence people have that they will be able to exchange such money for real goods and services whenever they choose to do so. This is partly a matter of law; currency has been designated "legal tender" by the Government. Paper currency is a liability of the Government, and demand deposits are liabilities of the commercial banks which stand ready to convert such deposits into currency or transfer their ownership at the request of depositors. Confidence in these forms of money seems also to be tied in some way to the fact that there are assets on the books of the Government and the banks equal to the amount of money outstanding, even though most of these assets themselves are no more than pieces of paper (such as customers' promissory notes) and it is well understood that money is not redeemable in them.

But the real source of money's value is neither its commodity content nor what people think stands behind it. Commodities or services are more or less valuable because there are more or less of them relative to the amounts people want. Money, like anything else, derives its value from its scarcity in relation to its usefulness. Money's usefulness is its unique ability to command other goods and services and to permit a holder to be constantly ready to do so. How much is needed depends on the total volume of transactions in the economy at any given time and the amount of money individuals and businesses want to keep on hand to take care of unexpected or future transactions.

In order to keep the value of money stable, it is essential that the **quantity** be controlled. Money's value can be measured only in terms of what it will buy. Therefore, changes in its value vary inversely with the general level of prices. If the volume of money rises faster (assuming a constant rate of use) than the production of real goods and services grows under the limitations of time and physical facilities, prices will rise because there is more money per unit of goods. Such a development would reduce the

value of money even though the monetary unit were backed by and redeemable in the soundest assets imaginable. But if, on the other hand, growth in the supply of money does not keep pace with the economy's current production, either prices will fall or, more likely, some resources and production facilities will be less than fully employed.

Just how large the stock of money needs to be in order to handle the work of the economy without exerting undue influence on the price level depends on how intensively the supply is being used. All demand deposits and currency are a part of somebody's spendable funds at any given time, moving from one owner to another as transactions take place. Some holders spend money quickly after they get it, making these dollars available for other uses. Others, however, hold dollars for longer periods. Obviously, when dollars move into hands where they do little or no work more of them are needed to accomplish any given volume of transactions.

## Who is responsible for the creation of money?

Changes in the quantity of money may originate with actions of the Federal Reserve System (the central bank), the commercial banks or the public, but the major control rests with the central bank.

The actual process of money creation takes place in the commercial banks. As noted earlier, the demand liabilities of commercial banks are money. They are book entries which result from the crediting of deposits of currency and checks and the proceeds of loans and investments to customers' accounts. Banks can build up deposits by increasing loans and investments so long as they keep enough currency on hand to redeem whatever amounts the holders of deposits want to convert into currency.

This unique attribute of the banking business was discovered several centuries ago. At one

Exhibit 13

**3**

time bankers were merely middlemen. They made a profit by accepting gold and coins brought to them for safekeeping and lending them to borrowers. But they soon found that the receipts they issued to depositors were being used as a means of payment. These receipts were acceptable as money since whoever held them could go to the banker and exchange them for metallic money.

Then, bankers discovered that they could make loans merely by giving borrowers their promises to pay (bank notes). In this way banks began to create money. More notes could be issued than the gold and coin on hand because only a portion of the notes outstanding would be presented for payment at any one time. Enough metallic money had to be kept on hand, of course, to redeem whatever volume of notes was presented for payment.

Deposits are the modern counterpart of bank notes. It was a small step from printing notes to making book entries to the credit of borrowers which could be spent by the use of checks.

### What limits the amount of money banks can create?

If deposit money can be created so easily, what is to prevent banks from making too much, i.e., more than is needed to handle the volume of transactions resulting from optimum use of the nation's productive resources at stable prices? Like its predecessor, the modern bank must keep a considerable amount of currency (or balances with the central bank) on hand. It must be prepared to convert deposit money into currency for those depositors who request currency. It must make remittance on checks written by depositors and presented for payment by other banks (settle adverse clearings). Finally, a member bank* must maintain legal reserves equal to some prescribed percentage of deposits.

How do operating needs and legal requirements affect the amount of deposits that the commercial banking system can create? The public's demand for currency varies greatly, but generally follows a seasonal pattern which is quite predictable. The effects of these swings are usually offset by central bank action and are thus prevented from causing large temporary fluctuations in the quantity of money. Moreover, for all banks taken together, there is no net drain of funds through clearings. A check drawn on one bank will normally be deposited to the credit of another account in the same or another bank. The main factor, therefore, which limits the ability of the banking system to increase demand deposits by expanding loans and investments is the reserves that banks must hold against deposits.

Growth of deposits can continue only to the point where existing reserves are just sufficient to satisfy legal requirements. If reserves of 20 per cent are required, for example, total deposits can expand only until they are five times as large as reserves. Ten million dollars of "excess" reserves, i.e., reserves in excess of the 20 per cent requirement, could support up to $50 million of additional deposits. The lower the percentage requirement, the greater the expansion power of each reserve dollar. It is this "fractional-reserve system" that sets the potentials and the limits to money creation.

### What are bank reserves?

Currency held in member bank vaults may be counted as legal reserves. The major part of member bank reserves, however, is in the form of deposits (reserve balances) at the Federal Reserve Banks. A bank can always obtain re-

*Throughout this booklet, for reasons of simplicity, all commercial banks are assumed to be members of the Federal Reserve System.

Exhibit 13

serve balances by sending currency to the Reserve Bank and can obtain currency by drawing on its reserve balance. Because either can be used to support a much larger volume of ordinary bank deposits, currency and member bank reserve balances together are often referred to as "high-powered money."

For individual banks, reserve balances serve as clearing accounts. Member banks may increase their reserve balances by depositing checks, as well as currency. Banks may draw down these balances by writing checks on them or by authorizing a debit to them in payment for currency or remittance for customers' checks.

Despite the fact that reserve accounts are used as working balances, over every reserve period (one week for city banks and two weeks for country banks) each bank must maintain average reserve balances and vault cash which together are equal to the percentage of its deposit liabilities required by law.

### Where do bank reserves come from?

Changes in bank reserves reflect the net effect of a number of factors discussed later in this booklet. But the essential point from the standpoint of money creation is that the reserves of commercial banks are, for the most part, liabilities of the Federal Reserve Banks and that their volume is largely determined by actions of the Federal Reserve System. Thus, the Reserve System, through its ability to vary both the total volume of reserves and the required ratio of reserves to deposit liabilities, influences the amount of bank assets and deposits. One of the major responsibilities of the Federal Reserve System is to provide a sufficient but not excessive amount of reserves to permit deposit expansion at a rate that will serve the needs of a growing economy while maintaining reasonable price stability. Such actions take into consideration, of course, any changes in the pace at which money is being used.

But a given increase in bank reserves does not necessarily cause an expansion in the money supply equal to the theoretical potential as determined by the legal ratio of reserves to demand deposits. What happens to the money supply will vary, depending upon the reaction of the commercial banks and the public. A number of leakages may occur. How many reserves will be drained into the public's currency holdings? To what extent will the increase in the reserve base remain unused as excess reserves? Which banks will gain the reserves? How much will be absorbed by time deposits against which, though they are not money, banks must also hold reserves? The answers to these questions hold the explanation as to why deposit changes may be smaller than expected or may develop only with a considerable time lag.

In the succeeding pages, the way in which various transactions change the quantity of money is described and illustrated. The basic working tool employed is the "T" account, which provides a simple means of tracing, step by step, the effects of these transactions on bank balance sheets. Changes in asset items are entered on the left half of the "T" and changes in liabilities on the right half. For any one transaction, of course, there must be at least two entries in order to maintain the balance between assets and liabilities.

The illustrations are grouped into three sections: (1) How bank deposits can respond to reserve changes originating from Federal Reserve actions or other sources; (2) how the public's demand for currency and other factors, such as gold inflow or outflow, affect bank reserves; and (3) how equal changes in bank reserves may sometimes result in widely different effects on the supply of money.

Exhibit 13

5

# Bank Deposits—How They Expand or Contract

Let us assume that expansion in the money supply is desired. One way the central bank can initiate such an expansion is through purchases of securities in the open market, thus adding to the reserves of member banks. Such purchases (and sales) are called "open market operations."

How do open market purchases add to bank reserves and deposits? The Federal Reserve System, through its New York office, buys $1,000,000 of Treasury bills from a Government securities dealer in New York. The Federal Reserve Bank pays for the securities with a check issued on itself (and signed by one of its officers). The dealer deposits this check in his account with a commercial bank (Bank A) which sends it for collection and immediate credit to its reserve account at the Federal Reserve Bank of New York. The Federal Reserve System has added $1,000,000 of securities to its assets which it has paid for in effect by creating member bank reserves. On the commercial bank's books these reserves are matched by $1,000,000 of additional demand deposits (money) which did not exist before. [See illustration (1).]

## How the multiple expansion process works

If the process ended here, there would be no "multiple" expansion, i.e., deposits and bank reserves have changed by the same amount. However, member banks are required to maintain reserves equal to only a fraction of their deposits. Reserves in excess of this amount may be used to increase earning assets—loans and investments. Under current regulations, banks in large cities are required to have a higher percentage of reserves against demand deposits than are banks in smaller communities, but the average for all member banks is about 15 per cent. Assuming, for simplicity, a uniform 15 per cent reserve ratio and further assuming that all commercial banks attempt to remain fully invested, we can now trace the process of expansion in demand deposits which can take place on the basis of the additional reserves provided as a result of the Federal

Reserve System's purchase of securities.

The expansion process may or may not begin with Bank A, depending on what the dealer does with the money he received from the sale of securities. If he immediately writes checks for $1,000,000 and all of them are deposited in other banks, Bank A loses both deposits and reserves and shows no net change as a result of the System's open market purchase. However, other banks have received them. Most likely, part of the deposits will remain with Bank A and a part will be shifted to a number of other banks as the dealer's checks clear.

It does not really matter where this money is at any given time. The important fact is that these deposits do not disappear. They are in some deposit accounts at all times. All banks together have $1,000,000 of deposits and reserves that they did not have before. However, they are not required to keep $1,000,000 of reserves against the $1,000,000 of deposits. All they need to retain, under a 15 per cent reserve requirement, is $150,000. The remainder, $850,000, is "excess reserves." This amount can be loaned or invested. [See illustration (2).]

If business is active, these banks will probably have opportunities to loan the $850,000. Of course, they do not really make loans out of the money they receive as deposits. If they did this, they would be acting just like financial intermediaries and no additional money would be created. What they do when they make loans is to accept promissory notes in exchange for credits they make to the borrowers' deposit accounts. Loans (assets) and deposits (liabilities) both rise by $850,000. Reserves are unchanged by the loan transactions. But the deposit credits constitute new additions to the total deposits of the banking system. [See illustration (3).]

This is the beginning of the deposit expansion process. In the first stage of the process total loans and deposits of the commercial banks rise by an amount equal to the excess reserves existing before any loans were made

Exhibit 13

# Deposit Expansion

*The amounts in the following illustrations are in thousands of dollars.*

(1) When the Federal Reserve Bank purchases Government securities, the reserve deposit of a member bank is credited. This happens because the seller of the securities deposits the check he receives in payment in his bank (Bank A), and the bank forwards this check to its Reserve Bank for credit to its reserve account.

**FEDERAL RESERVE BANK**

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| U. S. Government securities. | +1,000 | Member bank reserve deposits:<br>Bank A   +1,000 | |

**COMMERCIAL BANK A**

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Reserves with F. R. Bank | +1,000 | Customer deposit | +1,000 |

This "customer" deposit is likely to be transferred in part to other banks and quickly loses its identity amid the huge inter-bank flow of deposits.

(2) Some banks now have "excess" reserves on the basis of which deposit expansion can take place.

| | |
|---|---|
| Total reserves gained from new deposits.................. | 1,000 |
| Required against new deposits (at 15%)................... | 150 |
| Excess reserves ....................................... | 850 |

## Expansion—Stage 1

(3) Expansion takes place only if the banks which hold these excess reserves increase their loans or investments. Loans are made by crediting the borrower's deposit account, i.e., by creating additional deposit money.

**STAGE 1 BANKS**

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Loans | +850 | Borrower deposits | +850 |

Exhibit 13

7.

## Expansion—Stage 2

(6) Expansion continues as the banks which have the excess reserves increase their loans by that amount, crediting borrowers' deposits—creating still more money—in the process.

### STAGE 2 BANKS

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Loans | +722 | Borrower deposits | +722 |

*Now the banking system's assets and liabilities have risen by a total of 2,572.*

### ALL COMMERCIAL BANKS

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Reserves with F. R. Bank | +1,000 | Deposits: Initial | +1,000 |
| Loans: | | Stage 1 | +850 |
| Stage 1 | +850 | Stage 2 | +722 |
| Stage 2 | +722 | | |
| Total | +2,572 | Total | +2,572 |

(7) But there are still 614 of excess reserves in the banking system.

| | | |
|---|---|---|
| Total reserves gained from initial deposits | | 1,000 |
| Required against initial deposits | 150 | |
| Required against Stage 1 deposits | 128 | |
| Required against Stage 2 deposits | 108 | 386 |
| Excess reserves | | 614 |

to Stage 3 banks

(8) As borrowers make payments, these reserves will be further dispersed, and the process can continue through many more stages, in progressively smaller increments, until the entire 1,000 of reserves has been absorbed by deposit growth. As is apparent from the summary table on page 11, more than four-fifths of the expansion potential is reached after the first ten stages.

It should be understood that the stages of expansion do not occur simultaneously. Because some banks use their reserves incompletely or only after a considerable time lag, the process is in fact continuous. Expansion, moreover, may never reach its theoretical limits.

10

Exhibit 13

Case 4:20-cv-05494-KAW   Document 1-1   Filed 08/07/20   Page 103 of 202



Additional copies of this Workbook are available upon request to:

Research Department
Federal Reserve Bank of Chicago
P.O. Box 834
Chicago 90, Illinois

MAY 1961

Exhibit 13
PRINTED IN U.S.A.



**Money is simply coin and paper currency.**
Money is any generally accepted medium of exchange, not simply coin and paper currency. Money doesn't have to be intrinsically valuable (valuable in itself), be issued by a government or be in any special form. In our past, items ranging from iron nails and dried codfish to gun powder and tobacco have served as money.

Anything people generally accept in exchange for items of value is money. Money also is a standard for measuring value and a means of storing purchasing power for future use. Any item that has these three traits is money.

Americans accept three types of money — coin issued by the Treasury, paper currency issued by Federal Reserve Banks, and checkbook balances (demand deposits) at banks.

In analyzing economic activity, many economists take a much broader view of money and include other money-like items immediately available to the public for spending, such as passbook savings and other funds deposited for specific time periods.

Demand deposits are the nation's most common form of money, comprising about three-quarters of all money in circulation. This checkbook money is bookkeeping money created mainly by the nation's commercial banks. Americans prefer using checkbook money because it performs as a more efficient medium of exchange than coin or currency for many transactions. Check writers have with one blank check the potential for spending small or large amounts. Since each check must be signed before funds are transferred, checkbook money cannot easily be stolen. In addition, cancelled checks provide written proof of payments. Since we prize convenience, safety and recordkeeping, it's no wonder that checkbook money is preferred.

Checkbook money works because people are confident in the strength, safety and prudence of the American banking system. Their confidence has been bolstered by Government regulation of commercial banks and Government deposit insurance. The check clearing and collection system of the Federal Reserve, the nation's central bank, has also made checkbook money highly acceptable by speeding checking account transfers nationwide.

We've been big check users for quite awhile. The move began in the post Civil War era, when bank deposits became the dominant form of money held. Today, if all payment transactions were counted, including those for stock, bond and real estate purchases, the dollar volume of check spending to coin and paper currency spending would be enormous.

Only about 3 percent of our money is in coins, and for every 10 cents in small change we keep, we hold about a dollar in paper money. As a nation, we hold only about $80 billion of cash, compared with $230 billion of checkbook money.

Exhibit 14 p. 5

ERIC

## Checkbook money is "created" by currency deposits.

Commercial banks create checkbook money whenever they grant a loan, simply by adding new deposit dollars to accounts on their books in exchange for a borrower's IOU

Money creation bookkeeping isn't gimmickry. Far from it. Banks are creating money based on a borrower's promise to repay (the IOU), which, in turn, is often secured or backed by valuable items the borrower owns (collateral)

Someone obtaining an auto loan, for example, might use the new car as collateral. A home improvement loan might be secured by the value of the house being improved. Business loans may be secured by physical assets, such as machines, factories and inventories, or may be "unsecured," backed only by the company's earnings record and expectations or general credit worthiness

Banks create money by "monetizing" the private debts of businesses and individuals. That is, they create amounts of money against the value of those IOUs

To create money, however, banks must have "excess" reserves, funds exceeding those they are legally required to hold. Banks belonging to the Federal Reserve System must abide by the System's requirements. Banks that aren't members are subject to the reserve requirements of the state that chartered them.

Even without legal rules, prudent banking dictates that some "required" reserves be held. Bankers know that, on any given day, they will have to pay out coin and currency to people cashing personal checks. They also know that they will have to transfer reserve balances as checks drawn against accounts they hold are presented for payment by other banks. Meeting these routine transactions requires that banks hold some reserve funds.

If a bank has excess reserves, it can create an amount of money equal to that excess; it can grant a loan. Borrowers write checks against their new deposits. When these checks are deposited at other banks, those banks collect payment from the borrower's bank. Bankers know that when other banks present borrowers' checks for payment, they will have to transfer reserves on a dollar-for-dollar basis

If a bank creates an amount greater than its excess reserves, it also would lose some required reserves and face temporary violation of requirement rules. Prolonged violation of requirement rules subjects banks to penalties. So they tend to match lending to excess reserves. A bank short of required reserves usually will borrow from another bank. Member banks can also borrow from the Federal Reserve

As newly created checkbook dollars move from bank to bank, banks gaining excess reserves can make additional loans. As a group, banks are capable of creating money in a multiple way. Currently, our banking system theoretically can generate a sevenfold increase in total money creation with a given amount of excess reserves.

Money multiplication, rather than currency deposits, accounts for most of our $230 billion of checkbook money. Banks hold only about $34 billion in reserves. Only $8 billion of that total is cash, the remaining reserves are deposit balances at Federal Reserve Banks. Reserves are the base on which the banking system has generated the bulk of the nation's checkbook money.



Exhibit 14 p. 19

**All banks are the same.**

"Savings" and "commercial" banks differ in many respects. First, they have different corporate forms. Savings banks are "mutually" owned by depositors, not stockholders. They are run by nonsalaried boards of trustees, not corporate directors. Earnings aren't paid to private owners as dividends but distributed to depositors as interest on savings.

Savings banks collect individuals' savings and channel those funds mainly into home mortgages. Commercial banks take demand deposits and make profits by lending and investing.

The ability of thrift institutions to lend money for mortgages is linked to depositors' savings behavior. Many people deposit money in thrift institutions because they offer a good interest return on savings. However, when interest rates rise in the nation's credit markets, better returns often can be obtained by putting savings elsewhere. Fewer deposits mean fewer mortgages, and fewer mortgages generally lead to less home building and more unemployment in the construction trades. In addition, many industries that depend on a strong housing market, such as furniture and appliance makers, also suffer from reduced sales.

In the 1960s, Congress established a further distinction between savings banks and commercial banks by allowing thrift institutions to pay savings depositors a rate above the ceiling imposed on commercial banks. This small rate differential was designed to keep thrift deposit inflows strong enough to buttress the mortgage and housing markets.

One critical difference between savings and commercial banks traditionally has been in the way they lend money. Commercial banks lend by creating new checkbook deposits. Savings banks and similar thrift institutions simply pay out existing funds left by depositors.

In recent years, many states, particularly in the Northeast, have changed their laws to lift restrictions confining thrift institution operations mainly to accepting savings deposits and granting mortgages. Thrifts in more than 20 states can now provide some form of checkbook-type account.

Most of these accounts, however, don't hold newly created checkbook money, but rather the savings that depositors have transferred into them to pay bills. These accounts comprise only a fraction of the nation's total checkbook deposits.

If thrift institutions obtain broader powers to make loans other than long-term mortgages, they undoubtedly would begin creating money in much the same way as their commercial bank counterparts, by adding new deposit dollars to checking accounts. For now, most thrift institutions pay out loans with special checks against funds on hand, or funds deposited at a commercial bank, not by creating new demand deposits.

Exhibit 14 p.**25**

ERIC

Public Information Department
Federal Reserve Bank of New York
33 Liberty Street
New York. New York 10045

ERIC

Exhibit 14 p.

# Debt—Jekyll and Hyde

*While debt creates problems both for the borrower and for the economy as a whole, it plays a vital role in transferring idle savings to those seeking use of investment funds.*

DEBT, in common with most everything else in the economic world, involves many puzzling and often unpleasant paradoxes. The big puzzler is this: high and rising indebtedness poses obvious threats both to the individuals in debt and to the over-all economy; yet, experience over the years indicates that periods of great prosperity are times in which debt is large and climbing and that apparently the more rapidly debt rises the more prosperous is the period. Little wonder that in all ages and to most men, debt has been a "two-faced worrisome thing."

Solving the debt puzzle is partly a matter of semantics. The emotional content of the word "debt" is quite different from that associated with the word "credit." But the economic transaction referred to is the same—to use credit is to incur debt, and in prosperous times increasing amounts of credit are not so seemingly paradoxical.

Not all of the obstacles to solving the puzzle can be dispelled, however, by changing over to a word with a less foreboding connotation. The real catch lies in understanding the function of debt —we might better say credit at this point —in a capitalistic economy. Answers to the questions, "What is it?", "Where is it?", and "Why does it exist?" are a prerequisite to informed discussion of the influences which debt wields in our changing society.

## What is debt?

Everyone knows what debt is when he owes it, but many do not recognize the debts of others when they own them. For example, few depositors regard their credits at the bank as bankers' debts, though one may be sure that bankers do. A catalog of debt will insure that

we recognize it in its unfamiliar as well as familiar forms. Beyond this, listing kinds of debts will suggest the relationships involved in debt and some of its characteristics.

### —to consumers

As individuals we are familiar with mortgages on our homes, with instalment debts for the purchase of automobiles, refrigerators, and other household goods, with charge accounts owed to retail merchants, and with personal loans to carry us over periods of unexpectedly large expenditure. In this listing we see some debt that extends over a very long period of

*Total debt—who owes it?*



Exhibit 15

and local—borrowing is a different proposition. They can largely determine their own income via the taxes they impose and set their expenditures, not to gain profits or personal satisfaction, but to further general public welfare.

The overwhelming bulk of the Federal Government's borrowing has always been to bridge gaps between its tax collections and its expenditures, rather than to buy particular public services or projects or to increase the Government's future income. State and local government agencies, on the other hand, borrow mainly for specific capital outlay projects—highways, schools, and other public structures.

The chief vehicle for governmental borrowing is the sale of securities, of both short and distant maturities. There are the familiar U. S. savings bonds, which make up a sizable chunk of the total Federal debt. Other government securities come in assorted combinations of "payable on demand," "payable at maturity, or when called," "payable only to owner of record," and "payable to holder" whoever that might be. The typically high standing and attractive combinations of terms for these securities have found them many homes—in portfolios of corporations, financial institutions, pension and trust funds, as well as in the safety deposit boxes of individuals and small businesses.

### —to financial institutions

The one remaining large group of debtors is the nation's collection of specialized financial institutions. This may come as a bit of a surprise, for they have just been referred to as important lenders to borrowing consumers, businesses, and governments. But the fact remains that our financial institutions flout Polonius' advice, "Neither a borrower nor a lender be," for they are both, in equal degree. Their role is that of middleman, accepting the savings and in turn lending out these funds to others seeking money to build plants, buy consumer goods, or otherwise acquire desired assets.

Various savings institutions receive funds from a customer under a promise to return

them, upon request and subject to various conditions. Banks, insurance companies, and, in effect, savings and loan associations are therefore in debt to their account and policy holders. In effect, they have "borrowed" the deposits of account owners and the funds used to accumulate insurance policy reserves.

The "borrowing" which financial institutions do is unusual in several respects. For one thing, almost all the debt incurred has no fixed maturity, but is repaid in practice upon demand. Few other debtors would be willing to undertake such an awesome obligation. For another, financial institutions "go in debt" more or less involuntarily, whenever and for whatever amounts their account and policy holders may offer. Moreover, many times an institution will both borrow and lend to the same individual, as happens when a bank makes a loan to one of its depositors. Finally, financial institutions pay for their borrowing privilege in different ways—sometimes with interest or dividends, but often with special types of service and protection. The attractiveness to creditors of financial institution debt is apparent, for such intermediaries are popular recipients of "loans" from individuals and organizations the country over.

### Debts are assets

Double-entry bookkeeping is at the root of the simplest of the paradoxes inherently associated with debt—the fact that while debt is a claim on the assets and earning capacity of those in debt, it is simultaneously a part of their creditors' worldly goods. For every buyer there must be a seller, and similarly for every liability entered on someone's balance sheet, whether that balance sheet actually exists on paper or only in a figurative sense, someone else has an asset of equal value.

For example, such debts as a U. S. savings bond, or a bank account, or a corporate bond are as much assets to their owners as is currency or tangible property. In the case of commercial banks and most other financial institutions, almost all assets consist of pieces

Exhibit 15



## Long-term debt makes up over 40 per cent of total debt

**Short-term debt** includes such borrowings as:

| | |
|---|---|
| consumers | *instalment credit; personal loans; policy loans; charge accounts* |
| businesses | *bank loans; accounts payable* |
| governments | *Treasury bills, certificates, and notes; state and local government warrants; U. S. savings bonds (if cashed before maturity); accounts payable* |
| financial institutions | *borrowings from Federal Reserve Banks and from Federal Home Loan Banks* |

**Deposit-type debt** includes such "borrowings" as:

| | |
|---|---|
| financial institutions | *bank deposits; savings and loan association shares; cash value of life insurance policies; dividends left with life insurance companies* |

**Tax-liabilities** include such "borrowings" as:

| | |
|---|---|
| businesses | *accrued corporate income tax* |

**Long-term debt** includes such borrowings as:

| | |
|---|---|
| consumers | *residential mortgages* |
| businesses | *railroad, public utility, and industrial bonds and notes; mortgages on rental housing and farm real estate* |
| governments | *Federal, state, and local government bonds; U. S. savings bonds (when held to maturity)* |

of paper which are evidence that someone has borrowed from them on a short- or a long-term basis—notes, bonds, mortgages.

Our dynamic expanding economy is based on the continuous production of more and new kinds of goods and services. This process requires a high rate of investment and, in turn, large savings—savings that are promptly channeled into productive and profitable uses.

Sometimes the saver and investor are one and the same—as, for example, when an individual uses his savings to pay for the construction of a house, or a business finances its plant and equipment expenditures with its retained earnings. This procedure was typical of the days when most Americans were farmers or small businessmen, reinvesting in their farms and businesses any earnings over and above those

needed to support their families.

Today, however, most of us are employees, not proprietors, and much, though by no means all, investment is made by individuals and firms without enough ready cash to finance expansion of their production facilities. Thus, the accumulation of personal savings and the expenditure of these funds for investment purposes are frequently separate and distinct processes, performed by separate and distinct persons or groups. Thus, it is essential to have convenient, well-established ways of transferring unspent funds of savers to businesses, governments, or individuals seeking the use of funds.

### The transfer function of debt

In this country, savings can be put to work in a number of ways. Savings in the form of

7

Exhibit 15

cash balances in checking accounts may be exchanged for stock (equity shares) in business concerns. In this way savers become part owners of the business and share in its earnings and losses after prior claims have been met. Or they may directly lend their accumulated funds to others, in return for interest and the borrower's promise to repay the debt sometime in the future. That is, savers exchange their cash or bank deposits for a less liquid debt asset that yields an income, but must ordinarily be reconverted into cash or a checking account balance before it can be spent or reinvested.

Most often, savings indirectly find their way into investors' hands, with banks and other financial institutions acting as middlemen between the savers and users of investment funds. All of these methods of putting savings to work, aside from the purchase of stock, involve the creation of debt and are vital branches of the economy's "transport system" for savings.

## Less risk

In a system such as ours today, it is inevitable that debt totals be relatively substantial. To the average saver, debt is in many respects a more attractive repository for his funds than are riskier, though possibly more rewarding, equities. The majority of savers place a high premium on keeping their savings safe, liquid, and conveniently available. Only the debts of others can have these attributes in high degree, and only certain forms of debt at that.

A number of debt vehicles tailored to these saver desires have been developed over the years. The most common are the host of financial institutions which dot our economic landscape. They specialize in making promises to repay funds left with them, in exact dollar amount, immediately upon request. To insure their ability to deliver on such promises, they in turn must invest funds received in assets readily disposable at or near par value, which for the most part means high-grade debt obligations of businesses, governments, and individuals. Such prudence is their prime safe-

guard for the funds entrusted to them, although it is supported by a number of additional protective arrangements, such as the spreading of funds over a wide number of undertakings, the maintenance of an equity cushion to absorb debt defaults, governmental supervision of operations, and governmental insurance and guarantees of some loans held by institutions as well as a large share of their deposit liabilities.

Thus, both individual savers and the financial middlemen to whom they may entrust a portion of their savings are desirous of keeping much of their funds under the protective cover which debt affords. In these circumstances, users of funds, who may have to seek out money wherever it can be found, will naturally be inclined to accommodate such desires by offering debt rather than equities. Those who need outside funds often find it easier and cheaper to obtain them through channels of debt, either directly from savers or indirectly through financial intermediaries.

## Debt and money

Debt can do more than simply transport idle funds to places where they are desired. It is also the means by which entirely new funds are created, funds that may be required for a prosperous, expanding economy.

The banking system is the mechanism that accomplishes this "money creation." Today, most purchases are paid for by checks drawn on bank demand deposits. Practically, therefore, demand deposits have become accepted as money. But they are also bank debts, liabilities of a bank to its depositors. How do these bank deposit liabilities arise? Usually they are incurred when a depositor brings in cash or a check on another bank which the recipient bank can collect in cash. The deposit of the customer at the recipient bank is upped, but the public's total holdings of cash and deposits in other banks are reduced by a like amount. The nation's total money supply remains unchanged.

When a bank makes a loan or buys a security, however, it is a different story. The bank

Exhibit 15

# *Debt in the consumer balance sheet*



## Assets | Liabilities and Net Worth

**Debt of others**
*due from:*

other consumers

businesses
    corporate bonds and
    mortgages

governments
    Federal

    state – local

financial institutions

    commercial bank deposits

    mutual savings deposits
    and savings and loan
    shares

    cash value of
    life insurance policies

**Total debt assets  $340 billion**
+

cash, business equities, tangible personal
property, and real estate

## Total Consumers' assets

**Consumers' debt**
*due to:*

other consumers

businesses

Federal Government
    (FNMA mortgages)

financial institutions
    commercial banks
    mutual savings banks
    and savings and loan
    associations
    life insurance companies

*Instalment credit and residential mortgages*

**$90 billion  Total liabilities**
+

consumers' net worth

## Total Consumers' liabilities and net worth

**=**

accepts its customer's note or security and in exchange gives him an equivalent increase in his deposit account. Nobody else loses a deposit. Consequently, the total of cash and deposits—the money supply—is increased. Money has been created.

If this were all there was to the process, of course, everybody would be getting into the banking business. Actually, the operations of our far-flung banking system siphon away the fruits of money creation from any individual bank. Few people borrow money to keep it idle. Usually a borrower will quickly write checks on his new deposit to make some intended payments. In the normal course of events, the persons he pays will redeposit these checks in their own banks. This sort of transfer is even more rapid when the bank buys a security, for the seller typically requests immediate transfer of the funds to his own bank. In

9

Exhibit 15

either case, the newly created deposit has not disappeared, but it has shifted from the original bank to others. When this happens, the original bank must be able to lay its hands on cash or its equivalent to pay out to the other banks. As a practical matter, therefore, any one bank cannot afford to add to its loans and investments (creating new deposits in the process) by an amount greater than its excess holdings of cash reserves.

What cash is "excess" depends upon a number of factors. Generally speaking, a bank need keep cash equal to only a moderate fraction of the deposits made by customers with cash or checks on other banks for usually, as one such deposit is drawn down, some other customer is bringing in additional funds for deposit. Thus, if a bank receives a big bulge of cash and checks for deposit, it may safely regard a sizable portion of the funds so received as "excess"

## *Debt in the business balance sheet*



| Assets | Liabilities and Net Worth |
|---|---|
| **Debt of others** *due from:* | **Businesses' debt** *due to:* |
| consumers | consumers — corporate bonds and mortgages |
| other businesses | other businesses |
| Federal Government | Federal Government — accrued corporate tax liabilities |
| financial institutions — *deposits at* { commercial banks / mutual savings banks } | financial institutions — commercial banks, mutual savings banks, life insurance companies } *business loans, mortgages, and bonds* |
| Total debt assets  **$180 billion** | **$250 billion**  Total liabilities |
| **+** | **+** |
| business plant and equipment, farm land and equipment, inventories, and equity in other businesses | business and farm net worth |
| **Total Business (and farm) assets** | **=** | **Total Business (and farm) liabilities and net worth** |

Exhibit 15

and make loans and create new deposits in a comparable amount. Once those created deposits shift to other banks and the lending bank transfers its excess cash resources in payment, its ability to create new money is exhausted. But this is not true for those banks receiving that transferred cash and deposit. They similarly need keep as cash reserves only a fraction of the funds placed with them, and they too can lend the remainder, creating new deposits in the process. As this chain of action grows and spreads through the entire banking system, more and more "new" deposits are "created."

The maximum amount of this deposit expansion is determined by the portion of deposited funds which is kept as cash reserves. At present, national and state authorities require banks to maintain reserves equal to about one-fifth of their demand deposits. Mathematically this permits the banking system as a whole, in meeting borrowers' demands for credit, to create about 4 dollars more of deposit money for each dollar of cash reserves. That the overwhelming bulk of our money supply consists of bank deposits rather than hard cash or paper currency attests to the importance of this process.

The volume of money in the economy and the speed with which it changes hands has an obvious influence on the tempo of economic activity. A money supply which is constricted by scarcity of the reserves which the banking system needs to create deposits may make it impossible to finance some projects. An easily expansible money supply, on the other hand, can encourage a larger volume of business, higher prices for the same volume, or both.

### Dangers —— real . . .

While moderate injections of new money are helpful lubricants for an expanding economy, it is easy to flood the economic mechanism and bring about an inflationary situation. Bank deposit creation can proceed as long as banks have more than enough cash reserves to meet legal requirements and have opportunities to add to their loans and investments. Such addi-

tional debt assets may arise from new borrowing requests or they can be drawn from the existing pool of loans and investments held by non-bank investors. These processes, and particularly the latter, are commonly called "monetizing" debt—that is, selling it to banks in exchange for new bank deposits, thus increasing the money supply. Obviously, the possibilities for debt monetization are greater, the larger the stock of debt which the economy accumulates. The problem of Federal debt monetization has been particularly acute since the end of World War II, because of the huge increase in Federal obligations necessary to finance the war. Only in the past few years has it been brought under control—partly because other developments eased active inflationary pressures and partly because the Federal Reserve System became free to use its various powers to limit the reserves available to banks.

But the threat of inflation is not the only dilemma raised by a large and rising debt in a prosperous period. Another is the fact that under these conditions a substantial share of business—many house, auto, and appliance sales and much of the inventory build-up—is facilitated by the fact that it is easy to borrow money to finance these purchases. The issue is, can we sustain prosperity without constantly increasing dosages of credit, which threaten inflationary outbursts? Then, too, what if the boom fades? Since people do not find it easy or sound to borrow in bad times, sales on credit may slump badly. Meanwhile, existence of old debts will make a recession a period of net debt repayment, narrowing the spendable remainder of incomes. To what levels will spending on current production drop under these influences? Part of the answer to these crucial questions depends upon how well debtors and creditors can manage their present debt positions in adversity, part on how well agencies responsible for maintaining stability can do their jobs.

### . . . or fanciful

The fact that debt is so necessary to our

11

Exhibit 15

Exhibit "16"



# Your MONEY

## And the Federal Reserve System



**4. AFTER THESE U. S. ARMY AVIATORS,** as well as all other Government employees, cash their checks, Federal Reserve Banks redeem them with money deposited by the United States Treasury.

**5. THE SECOND DISTRICT** Federal Reserve Bank, located in New York City, acts as agent for the Government in the exchange of money between the United States and foreign countries.





ceives from taxes and borrowing. Most U. S. bonds are issued for the Treasury by the Reserve Banks, and the money received from purchasers is credited to the Treasury's checking account. The Reserve Banks handle all matters in regard to these bonds, paying interest coupons and redeeming bonds as they come due.

The RFC and other Government lending agencies also keep the Reserve Banks busy. The promissory notes, securities and other valuable paper that these agencies receive when they make loans, are turned over to the Reserve Banks for safe-keeping. The Banks accept payment on these loans from the borrowers and return the security when loans are paid.

The Federal Reserve System also handles the Government's financial dealings with foreign countries. The Reserve Bank of New York has been selected to look after all transactions of this type because of its convenient location in the world's leading financial center.

This country of ours is a huge place and the Capitol City is a great distance from most points. If all financial relations between the Government and the public were centered in Washington, D. C., it would be a severe handicap. Instead, the Government has the services of 12 regional Reserve Banks and their several branches, to put it in close touch with citizens everywhere.



**6. WHEN THE GOVERNMENT** borrows money to build warships or airplanes, or to meet other obligations, its bonds are issued, exchanged and redeemed through the Reserve Banks.

**7. THE GOVERNMENT SPENDS** its income in thousands of ways — to support American Indians, for public buildings, pensions, civil service. Its Reserve Bank account runs into billions.





Issued by

# THE FEDERAL RESERVE BANK

of Minneapolis



Points of Interest is one of a series
of essays adapted from articles in
*On Reserve,* a newsletter for economic
educators published by the Federal
Reserve Bank of Chicago. The original
article was written by Keith Feiler
and revised by Tim Schilling.

For additional copies of this essay —
or for information about other Federal
Reserve publications on money and
banking, the financial system, the
economy, consumer credit, and
other related topics — contact:

**Public Information Center**
**Federal Reserve Bank of Chicago**
**P.O. Box 834**
**Chicago, IL 60690-0834**
**Tel. (312) 322-5111**
**www.frbchi.org**

Exhibit 17



Most of us keep our savings in financial institutions like insurance companies and brokerage houses, and in depository institutions such as banks, savings and loan associations, credit unions, and mutual savings banks. These financial institutions then pool the savings and make them available to people who want to borrow.

This process is called financial intermediation. This process of bringing together borrowers and lenders/savers is one of the most important roles that financial institutions perform.

## Banks and Deposit Creation

Depository institutions, which for simplicity we will call banks, are different from other financial institutions because they offer transaction accounts and make loans by lending deposits. This deposit creation activity, essentially creating money, affects interest rates because these deposits are part of savings, the source of the supply of credit.

Banks create deposits by making loans. Rather than handing cash to borrowers, banks simply increase balances in borrowers' checking accounts. Borrowers can then draw checks to pay for goods and services. This creation of checking accounts through loans is just as much a deposit as one we might make by pushing a ten-dollar bill through the teller's window.

With all of the nation's banks able to increase the supply of credit in this fashion, credit could conceivably expand without limit. Preventing such uncontrolled expansion is one of the jobs of the Federal Reserve System (the Fed), our central bank and monetary authority. The Fed has the responsibility of monitoring and influencing the total supply of money and credit.

## The General Level of Rates

The general level of interest rates is determined by the interaction of the supply and demand for credit.

Exhibit 17   7

Federal Reserve Bank of Chicago
230 South LaSalle Street
Chicago, IL 60604-1413
Phone: 312-322-5111
Fax: 312-322-5515
Web: http://www.frbchi.org

October 2000   30m
Exhibit 17

## MARIN COUNTY SUPERIOR COURT
P.O. Box 4988
San Rafael, CA 94913-4988

| PLAINTIFF: Gonzales | CASE NO. CIV **2 0 0 1 4 0 1** |
|---|---|
| vs. | **NOTICE OF CASE MANAGEMENT CONFERENCE** |
| DEFENDANT: J.P. Morgan Chase Bank, et al | **(CIVIL)** (Pursuant to Government Code Section 68600 et seq.) |

*Pursuant to Local Rule 1.3, the plaintiff must serve a copy of this Notice of Case Management Conference, a blank Case Management Statement (Judicial Council Form CM-110), a blank Notice of Settlement of Entire Case (Judicial Council Form CM-200), and an Alternative Dispute Resolution (ADR) Informational Notice (CV006) together with the complaint on all parties.*

This case is assigned for all purposes to Judge _____ **JAMES CHOU** _____ in Courtroom B.

1. The parties/counsel to this action shall comply with the filing and service deadlines in Local Rule 1.5 and California Rule of Court 3.110, or appear at the Order to Show Cause hearing on the dates set forth below:

    Failure to File Proof of Service _____ / ____ / ____ – 8:30/ 9:00 A.M.

    Failure to Answer _____ / ____ / ____ – 8:30/ 9:00 A.M.

2. Parties must appear for Case Management Conference on ___ 11/16/20 ___ 8:30/ 9:00 A.M.

3. The parties must be familiar with the case and be fully prepared to discuss the suitability of the case for binding or non-binding arbitration, mediation, or neutral case evaluation. **Counsel must discuss ADR options with their clients prior to attending the Case Management Conference** and should be prepared to discuss with the court their authority to participate in ADR.

4. Case Management Conference Statements must be filed with the court and served on all parties <u>at least 15 calendar days</u> before the Case Management Conference. **(Late filing may result in the issuance of sanctions.)**

*Distribution: Original - Court File; Canary - Plaintiff*

<div align="center">

**MARIN COUNTY SUPERIOR COURT**
3501 Civic Center Drive
P.O. Box 4988
San Rafael, CA 94913-4988
(415) 444-7040

</div>



<div align="center">

**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATIONAL NOTICE**
(California Rule of Court 3.221)

</div>

**The plaintiff must serve a copy of this notice with the complaint on all parties to this case.**

Alternative Dispute Resolution (ADR) is a way of solving legal disputes without going to trial. Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case.

## ADVANTAGES OF ADR

**Save Time**
A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

**Save Money**
When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

**Increase Control Over the Process and the Outcome**
In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

**Preserve Relationships**
ADR can be a less adversarial way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

**Increase Satisfaction**
In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

---

## DISADVANTAGES OF ADR

If the case is resolved using ADR, the parties forgo their right to a public trial and they do not receive a decision by a judge or jury. If the case is not resolved using ADR and it proceeds to trial, the overall costs of the case may increase.

## TYPES OF ADR

### Mediation

In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

### Settlement Conferences

Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

### Arbitration

In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

### Neutral Evaluation

In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

## LOCAL ADR PROGRAMS

For a Directory of Mediators and Arbitrators or information about the Modest Means Mediation Program, contact the Marin County Bar Association (MCBA) by calling (415) 499-1314 or emailing *info@marinbar.org*. Additional information is also available on the MCBA website: *www.marinbar.org*.

## STIPULATION TO USE ADR

If all parties in the action agree to participate in ADR, a *Stipulation to Use Alternative Dispute Resolution Process (CV002)* may be filed with the court. This form is available at *www.marincourt.org* or in the Clerk's Office.

Please note, **you are required to complete and submit the *Notice of Settlement of Entire Case (Judicial Council Form CM-200)* within 10 days of the resolution of your case.**

**- DO NOT FILE WITH THE COURT-**

CIV-050

**-UNLESS YOU ARE APPLYING FOR A DEFAULT JUDGMENT UNDER CODE OF CIVIL PROCEDURE § 585 -**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and address)*:   TELEPHONE NO.:  415-717-2111<br>Veronica Gonzales<br>36 Rustic Way<br>San Rafael, California  94901<br><br><br>ATTORNEY FOR *(Name)*:  VERONICA·GONZALES - Party Without Attorney | **FOR COURT USE ONLY** |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN<br>STREET ADDRESS:  3501 Civic Center Drive<br>MAILING ADDRESS:  3501 Civic Center Drive<br>CITY AND ZIP CODE:     San Rafael  94903<br>BRANCH NAME:  San Rafael Courthouse, Marin Superior Court | |
| Plaintiff:  VERONICA GONZALES<br>Defendant:  JP MORGAN CHASE BANK N.A., et al. | |
| **STATEMENT OF DAMAGES**<br>**(Personal Injury or Wrongful Death)** | CASE NUMBER:<br>CIV2001401 |

To *(name of one defendant only)*:  JP MORGAN CHASE BANK N.A.
Plaintiff *(name of one plaintiff only)*: VERONICA GONZALES
seeks damages in the above-entitled action, as follows:

AMOUNT

1.  **General damages**
    a. ☐  Pain, suffering, and inconvenience ........................................................................ $ _____
    b. ☐  Emotional distress. ............................................................................................... $ _____
    c. ☐  Loss of consortium ............................................................................................... $ _____
    d. ☐  Loss of society and companionship *(wrongful death actions only)* ..................... $ _____
    e. ☐  Other *(specify)*: _____ $ _____
    f. ☐  Other *(specify)*: _____ $ _____
    g. ☐  Continued on Attachment 1.g.

2.  **Special damages**
    a. ☐  Medical expenses *(to date)* ............................................................................... $ _____
    b. ☐  Future medical expenses *(present value)* .......................................................... $ _____
    c. ☐  Loss of earnings *(to date)* ................................................................................. $ _____
    d. ☐  Loss of future earning capacity *(present value)* ................................................ $ _____
    e. ☐  Property damage ................................................................................................. $ _____
    f. ☐  Funeral expenses *(wrongful death actions only)* ............................................... $ _____
    g. ☐  Future contributions *(present value) (wrongful death actions only)* ................... $ _____
    h. ☐  Value of personal service, advice, or training *(wrongful death actions only)* ...... $ _____
    i. ☐  Other *(specify)*: _____ $ _____
    j. ☐  Other *(specify)*: _____ $ _____
    k. ☐  Continued on Attachment 2.k.

3.  ☒  **Punitive damages:** Plaintiff reserves the right to seek punitive damages in the amount of *(specify)*   $ 6,000,000.00
        when pursuing a judgment in the suit filed against you.

Date:  July 9, 2020

VERONICA GONZALES
_____
(TYPE OR PRINT NAME)

▶ *(signature)*
_____
(SIGNATURE OF PLAINTIFF OR ATTORNEY FOR PLAINTIFF)

(Proof of service on reverse)

Page 1 of 2

Form Adopted for Mandatory Use<br>Judicial Council of California<br>CIV-050 [Rev. January 1, 2007]

**STATEMENT OF DAMAGES**
**(Personal Injury or Wrongful Death)**

Code of Civil Procedure, §§ 425.11, 425.115<br>www.courtinfo.ca.gov

CIV-050

| Plaintiff: VERONICA GONZALES<br>Defendant: JP MORGAN CHASE BANK N.A., et al. | CASE NUMBER:<br>CIV2001401 |
|---|---|

**PROOF OF SERVICE**

*(After having the other party served as described below, with any of the documents identified in item 1, have the person who served the documents complete this Proof of Service. Plaintiff cannot serve these papers.)*

1. I served the
   a. [ **x** ] Statement of Damages   [ ] Other   *(specify):*
   b. on *(name):* JP MORGAN CHASE BANK N.A., c/o C T Corporation System (C0168406)
   c. by serving [ ] defendant   [ **x** ] other   *(name and title or relationship to person served):* C0168406 as Registered Agent
   d. [ **x** ] by delivery   [ ] at home   [ **x** ] at business
      (1) date: July 9, 2020
      (2) time:   12:05 pm
      (3) address: 818 West Seventh Street, Suite 930, Los Angeles CA 90017
   e. [ **x** ] by mailing
      (1) date: July 9, 2020
      (2) place: San Rafael, California

2. Manner of service *(check proper box):*
   a. [ ] **Personal service.** By personally delivering copies. (CCP § 415.10)
   b. [ ] **Substituted service on corporation, unincorporated association (including partnership), or public entity.** By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left. (CCP § 415.20(a))
   c. [ ] **Substituted service on natural person, minor, conservatee, or candidate.** By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of the office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left. (CCP § 415.20(b)) **(Attach separate declaration or affidavit stating acts relied on to establish reasonable diligence in first attempting personal service.)**
   d. [ **x** ] **Mail and acknowledgment service.** By mailing (by first-class mail or airmail, postage prepaid) copies to the person served, together with two copies of the form of notice and acknowledgment and a return envelope, postage prepaid, addressed to the sender. (CCP § 415.30) **(Attach completed acknowledgment of receipt.)**
   e. [ ] **Certified or registered mail service.** By mailing to an address outside California (by first-class mail, postage prepaid, requiring a return receipt) copies to the person served. (CCP § 415.40) **(Attach signed return receipt or other evidence of actual delivery to the person served.)**
   f. [ ] Other *(specify code section):*
      [ ] additional page is attached.

3. At the time of service I was at least 18 years of age and not a party to this action.
4. Fee for service: $
5. Person serving:
   a. [ ] California sheriff. marshal. or constable
   b. [ ] Registered California process server
   c. [ ] Employee or independent contractor of a registered California process server
   d. [ **x** ] Not a registered California process server
   e. [ ] Exempt from registration under Bus. & Prof. Code § 22350(b)

   f. Name, address and telephone number and, if applicable, county of registration and number:
   Mariko Heenan
   385 Irwin Street
   San Rafael, California 94901
   415-297-4182

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

*(For California sheriff, marshal, or constable use only)*
I certify that the foregoing is true and correct.

Date: July 9, 2020

▶ _____
      (SIGNATURE)

Date: _____

▶ _____
      (SIGNATURE)

| CIV-050 [Rev. January 1, 2007] | **PROOF OF SERVICE**<br>**(Statement of Damages)** | Page 2 of 2<br>Code of Civil Procedure §§ 425.11, 425.115 |
|---|---|---|

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Veronica Gonzales<br>36 Rustic Way<br>San Rafael, California 94901 | |

TELEPHONE NO.:                         FAX NO. *(Optional):*

E-MAIL ADDRESS *(Optional):*

ATTORNEY FOR *(Name):* VERONICA GONZALES - Party Without Attorney

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **MARIN**
STREET ADDRESS: 3501 Civic Center Drive
MAILING ADDRESS: 3501 Civic Center Drive
CITY AND ZIP CODE: San Rafael  94903
BRANCH NAME: San Rafael Courthouse, Marin Superior Court

| PLAINTIFF/PETITIONER: VERONICA GONZALES | CASE NUMBER:<br>CIV2001401 |
|---|---|
| DEFENDANT/RESPONDENT: JP MORGAN CHASE BANK N.A., et al. | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. [x] summons

   b. [x] complaint

   c. [x] Alternative Dispute Resolution (ADR) package

   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*

   e. [ ] cross-complaint

   f. [x] other *(specify documents):* SUM-200(A), CIV-050 SoD, Notice of CMC, Motion to Consolidate Case & supporting papers.

3. a. Party served *(specify name of party as shown on documents served):*
   JP MORGAN CHASE BANK N.A.

   b. [x] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   C T Corporation System (C0168406); c/o: Amanda Garcia, Vivian Imperial, Gladys Aguilera

4. Address where the party was served:
   818 West Seventh Street, Suite 930, Los Angeles CA 90017

5. I served the party *(check proper box)*

   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party   (1) on *(date):*                                        (2) at *(time):*

   b. [x] **by substituted service.** on *(date):* 7/9/20          at *(time):* 12:05 PM left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*         from *(city):*         or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

**PROOF OF SERVICE OF SUMMONS**     Code of Civil Procedure, § 417.10

POS-010

| | |
|---|---|
| PLAINTIFF/PETITIONER: VERONICA GONZALES<br>DEFENDANT/RESPONDENT: JP MORGAN CHASE BANK N.A., et al. | CASE NUMBER:<br>CIV2001401 |

5. c. ☒ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):* July 9, 2020        (2) from *(city):* San Rafael

    (3) ☒ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*) (Code Civ. Proc., § 415.30.)*

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☒ **by other means** *(specify means of service and authorizing code section):*<br>    #5.c. was sent via USPS First Class mail with Certified receipt # 7019 2970 0001 8782 0300<br>    (Code Civ. Proc. § 415.30)

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

  a. ☐ as an individual defendant.

  b. ☐ as the person sued under the fictitious name of *(specify):*

  c. ☐ as occupant.

  d. ☒ On behalf of *(specify):* JP MORGAN CHASE BANK N.A.<br>    under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☒ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

  a. Name: Mariko Heenan

  b. Address: 385 Irwin Street, San Rafael, California  94901

  c. Telephone number: 415-297-4182

  d. **The fee for service was:** $ 0

  e. I am:

    (1) ☒ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☐ a registered California process server:

        ☐ owner    ☐ employee    ☐ independent contractor.

      (ii)  Registration No.:

      (iii)  County:

8. ☒ **I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

    **or**

9. ☐ **I am a California sheriff or marshal and I certify that the foregoing is true and correct.**

Date: July 9, 2020

Mariko Heenan
    ▶

_____    _____
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)    (SIGNATURE)

Case 4:20-cv-05494-KAW   Document 1-1   Filed 08/07/20   Page 130 of 202

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: | FOR COURT USE ONLY |
|---|---|---|
| NAME: Veronica Gonzales | | |
| FIRM NAME: | | |
| STREET ADDRESS: 36 Rustic Way | | |
| CITY: San Rafael    STATE: CA    ZIP CODE: 94901 | | |
| TELEPHONE NO.: 415-717-2111    FAX NO. : | | |
| E-MAIL ADDRESS: | | |
| ATTORNEY FOR (Name):  VERONICA GONZALES - Party Without Attorney | | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN
STREET ADDRESS:  3501 Civic Center Drive
MAILING ADDRESS:  3501 Civic Center Drive
CITY AND ZIP CODE:      San Rafael  94903
BRANCH NAME:  San Rafael Courthouse, Marin Superior Court

Plaintiff/Petitioner:  VERONICA GONZALES

Defendant/Respondent:  JP MORGAN CHASE BANK N.A., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV2001401 |
|---|---|

TO (insert name of party being served): JP MORGAN CHASE BANK N.A.

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:  July 9, 2020

Mariko Heenan
(TYPE OR PRINT NAME)

(SIGNATURE OF SENDER--MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of (to be completed by sender before mailing):

1. [ x ]  A copy of the summons and of the complaint.
2. [ x ]  Other (specify):
   SUM-200(A) Additional Parties Attachment to Summons;
   CIV-050 Statement of Damages (for Personal Injury);
   Alternative Dispute Resolution (ADR) package;
   Notice of Case Management Conference (with judge/courtroom assignment);
   Motion to Consolidate Case & supporting papers & Exhibits.

(To be completed by recipient):

Date this form is signed: _____

_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

_____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: | FOR COURT USE ONLY |
|---|---|---|
| NAME: Veronica Gonzales | | |
| FIRM NAME: | | |
| STREET ADDRESS: 36 Rustic Way | | |
| CITY: San Rafael    STATE: CA    ZIP CODE: 94901 | | |
| TELEPHONE NO.: 415-717-2111    FAX NO. : | | |
| E-MAIL ADDRESS: | | |
| ATTORNEY FOR (Name):   VERONICA GONZALES - Party Without Attorney | | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN
STREET ADDRESS:  3501 Civic Center Drive
MAILING ADDRESS:  3501 Civic Center Drive
CITY AND ZIP CODE:      San Rafael  94903
BRANCH NAME:  San Rafael Courthouse, Marin Superior Court

Plaintiff/Petitioner:  VERONICA GONZALES

Defendant/Respondent:  JP MORGAN CHASE BANK N.A., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV2001401 |
|---|---|

TO (insert name of party being served):  JP MORGAN CHASE BANK N.A.

---

## NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing:  July 9, 2020

Mariko Heenan
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER--MUST NOT BE A PARTY IN THIS CASE)

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of (to be completed by sender before mailing):

1.  [ x ]  A copy of the summons and of the complaint.
2.  [ x ]  Other (specify):
      SUM-200(A) Additional Parties Attachment to Summons;
      CIV-050 Statement of Damages (for Personal Injury);
      Alternative Dispute Resolution (ADR) package;
      Notice of Case Management Conference (with judge/courtroom assignment);
      Motion to Consolidate Case & supporting papers & Exhibits.

(To be completed by recipient):

Date this form is signed: _____

_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
JP MORGAN CHASE BANK N.A., et al.
        (Additional Parties Attachment form is attached.)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

VERONICA GONZALES



FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

FILED

JUN 1 9 2020

JAMES M. KIM, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: T. Thomason, Deputy

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>San Rafael Courthouse, Marin Superior Court<br>3501 Civic Center Drive. San Rafael, CA 94903 | CASE NUMBER: *(Número del Caso):*<br>C I V  2 0 0 1 4 0 1 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):* JAMES M. KIM

Veronica Gonzales, 36 Rustic Way, San Rafael, California 94901.

| DATE:<br>*(Fecha)* | JUN 1 9 2020 | 415 · 717 - 2111 | Clerk, by<br>*(Secretario)* | T. THOMASON | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*

   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER |
|---|---|
| GONZALES v. JP MORGAN CHASE BANK N.A., et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR IN INTEREST TO WACHOVIA BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR MSSTR 2004-1;

WELLS FARGO BANK, N.A.;

QUALITY LOAN SERVICE CORPORATION;

NORTHWEST TRUSTEE SERVICES, INC.;

JULIET BERNAL;

and DOES 1 through 20

Page   1   of   1

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Veronica Gonzales
36 Rustic Way
San Rafael, California 94901
Plaintiff in Propria Persona
415-717-2111



FILED

JUL 0 7 2020

JAMES M. KIM, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: Q Roary, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF MARIN, SAN RAFAEL COURTHOUSE

| | |
|---|---|
| VERONICA GONZALES,<br><br>Plaintiff,<br><br>v.<br><br>JP MORGAN CHASE BANK N.A.;<br>U.S. BANK NATIONAL ASSOCIATION, AS<br>TRUSTEE, SUCCESSOR IN INTEREST TO<br>WACHOVIA BANK, NATIONAL<br>ASSOCIATION, AS TRUSTEE FOR MSSTR<br>2004-1;<br>WELLS FARGO BANK, N.A.;<br>QUALITY LOAN SERVICE CORPORATION;<br>NORTHWEST TRUSTEE SERVICES. INC.;<br>JULIET BERNAL;<br>and DOES 1 through 20,<br><br>Defendants | **Case No.: CIV2001401**<br><br>**NOTICE OF MOTION AND<br>MOTION TO CONSOLIDATE CASES -<br>UNLIMITED CIVIL CASE NO. CIV2001401<br>WITH LIMITED CIVIL CASE NO. CIV1901923;<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES**<br><br>**Hearing Date: SEP 3 0 2020**<br>**Hearing Time:  1:30ᵖᵐ**<br><br>Assigned for all Purposes to:<br>Judge: Hon. James T. Chou, Courtroom B<br><br>[Complaint filed:  June 19, 2020]<br>[CMC Hearing:   November 6, 2020, 9:00 a.m.]<br>[Trial Date:      Not Set.] |
| JP MORGAN CHASE BANK N.A.,<br>ITS ASSIGNEES AND/OR SUCCESSORS,<br>Plaintiff,<br><br>vs.<br><br>VERONICA GONZALES,<br>and DOES 1 – 10, inclusive,<br><br>Defendant(s). | **Case No. CIV1901923**<br><br>**Limited Civil Case, less than $10,000**<br><br>Assigned for all Purposes to:<br>Judge: Hon. James T. Chou, Courtroom B<br><br>[Complaint filed:  May 20, 2019]<br>[CMC Hearing:   July 15, 2020]<br>[Trial Date:      Vacated] |

1

Notice of Motion and Motion to Consolidate Cases; Memorandum of Points and Authorities

1  NOTICE IS HEREBY GIVEN that on the above-noticed date and time, or as soon thereafter as

2  the matter may be heard, in Courtroom B of the above-entitled Court, located at 3501 Civic Center

3  Drive, San Rafael, California, 94903, Plaintiff VERONICA GONZALES will, and hereby does, move

4  under Code Civ. Proc. § 1048(a) for an order consolidating Limited Case No. CIV1901923 with this

5  Unlimited Case No. CIV2001401 with the same court.

6  The Motion is brought under Code Civ. Proc. § 1048 and California Rules of Court, Rule 3.350,

7  Consolidation of cases, and is made on the grounds that these cases: (1) Generally involve the same

8  parties, are based on the same or similar claims, and have common questions of law and facts, (2) arise

9  from the same or substantially identical transactions, incidents, or events (a "foreclosure") requiring the

10  determination of the same or substantially identical questions of law or fact, and the operative pleadings

11  contain common parties and common allegations, (3) involve claims against, title to, possession of, or

12  damages to the same property, (4) are likely for other reasons to require substantial duplication of

13  judicial resources if heard by different judges and consolidation will promote the efficient utilization of

14  judicial resources and possibly eliminate the limited civil action, (5) the records for these actions will

15  contain many of the same documents, (6) consolidation will avoid duplicative and inconsistent rulings,

16  orders or judgments, (7) consolidation will avoid unnecessary costs and will serve the interests of

17  economy and convenience, (8) consolidation will reduce the risk of prejudice to the parties and

18  economic burden on the parties and third parties, and (9) consolidation will promote discovery in which

19  it will be determined whether or not Plaintiff in the Limited Civil case even has standing to sue.

20

21  The parties named in this Unlimited Case No. CIV2001401 are as follows:

22  • Plaintiff VERONICA GONZALES is currently appearing without an attorney and is in the

23  process of serving all Defendants through their registered agents for service of process.

24  • Defendant JP MORGAN CHASE BANK N.A has not appeared.

25  • Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR IN

26  INTEREST TO WACHOVIA BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR

27  MSSTR 2004-1 has not appeared.

28  • Defendant WELLS FARGO BANK, N.A. has not appeared.

2

1     •    Defendant QUALITY LOAN SERVICE CORPORATION has not appeared.

2     •    Defendant NORTHWEST TRUSTEE SERVICES. INC. has not appeared.

3     •    Defendant JULIET BERNAL has not appeared.

4

5    The parties named in Limited Case No. CIV1901923 are as follows:

6     •    Plaintiff JP MORGAN CHASE BANK N.A., ITS ASSIGNEES AND/OR SUCCESSORS has

7          appeared through attorney Ashley Hennessee of McCarthy & Holthus, LLP.

8     •    Defendant VERONICA GONZALES has appeared and is currently without an attorney.

9

10      This motion will be based upon this Notice, the attached Motion and Memorandum of Points and

11   Authorities, the Declaration of Plaintiff VERONICA GONZALES (and Defendant in the Limited

12   Case), the files and records in these actions, public records, any reply, or additional papers that may be

13   filed associated in support of this motion, and any further evidence and oral arguments that the Court

14   may receive at or before the hearing.

15      Pursuant to California Rules of Court, Rule 3.300(h)(1)(B) for Related cases, since these two

16   related cases include both unlimited and limited civil cases, it appears that it is up to Hon. James T.

17   Chou of Courtroom B who is hearing the unlimited civil case to determine whether the cases should be

18   ordered related, consolidated, and assigned to Courtroom B.

19

20      Therefore, consolidation of the cases is requested for all purposes.

21

22   DATED: July 6, 2020

23

24                                 Veronica Gonzales,
                                 Plaintiff in Propria Persona

25

26

27

28

Notice of Motion and Motion to Consolidate Cases; Memorandum of Points and Authorities

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   STATEMENT OF FACTS

Plaintiff in this unlimited civil action, VERONICA GONZALES ("GONZALES"), files this Motion and Memorandum to contest an Unlawful Detainer action filed against GONZALES involving her home in the civil limited court ("UD Court") as Case No. CIV1901923.  GONZALES' real property has a common mailing address is 36 Rustic Way, San Rafael, California 94901, with the Marin County Assessor's Parcel Number of 010-101-38 ("PROPERTY").  GONZALES' title to real property is at issue in both cases, but exceeds the jurisdictional limitations of the limited UD Court.  She wishes to correct the record and facts of both cases, instead of the accepting the false acts by other parties.

On October 26, 2001, GONZALES executed a document titled "Deed of Trust" ("**DoT₃**") with WELLS FARGO HOME MORTGAGE, INC. [See **Exhibit 2**].  On or about May 4, 2004, WELLS FARGO HOME MORTGAGE, INC. appears to have merged out into Defendant WELLS FARGO BANK, N.A. ("WELLS FARGO") with the latter WELLS FARGO being the only surviving entity.

On February 21, 2011, a bogus document titled "Assignment of Deed of Trust" ("**Assignment 2011**") [See **Exhibit 5**] was executed and subsequently recorded without authority by Defendant NORTHWEST TRUSTEE SERVICES. INC. ("NORTHWEST"), after its authority was revoked to act as the attorney-in-fact for WELLS FARGO, to assign the **DoT₃** to U.S. BANK NATIONAL ASSOCIATION ("U.S. BANK"), AS TRUSTEE, SUCCESSOR IN INTEREST TO WACHOVIA BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR MSSTR 2004-1.  The alleged trust "MSSTR 2004-1" ("MSSTR") does not even exist and NORTHWEST had no authority to execute or record **Assignment 2011**.

One July 9, 2018, a bogus document titled "Notice of Default and Election to Sell under Deed of Trust" ("**NOD**") [See **Exhibit 7**] was executed by QUALITY LOAN SERVICE CORPORATION ("QUALITY"), as agent for U.S. BANK as trustee for nonexistent MSSTR.

On February 25, 2019, a document titled "Notice of Trustee's Sale" ("**NTS**") [See **Exhibit 8**] was executed by QUALITY and subsequently recorded, which gave explicit and repetitive notice to all bidders that QUALITY was going to hold a foreclosure auction and sell to the highest bidder, only a lien

---

4

1    on the PROPERTY and specifically stated several times that it was <u>not</u> selling or auctioning off the

2    PROPERTY itself. The Notice was clear and unambiguous.

3        By May 1, 2019, QUALITY allegedly held a trustee's sale/auction and sold a <u>lien</u> on the

4    PROPERTY to Defendant JP MORGAN CHASE BANK N.A., ITS ASSIGNEES AND/OR

5    SUCCESSORS ("CHASE BANK"), purportedly being the highest bidder.

6        Subsequently and without authority, on May 3, 2019, QUALITY recorded a "Trustee's Deed

7    Upon Sale" ("**TDUS**") [See **Exhibit 9**] that incorrectly purported to transfer the PROPERTY itself to

8    CHASE BANK. This was in direct contradiction of the "Notice of Trustee Sale" recorded by

9    QUALITY explicitly stating that the PROPERTY was _**not**_ being auctioned or sold and that instead,

10   QUALITY explicitly advertised and clearly stated it was selling the <u>lien</u> on the PROPERTY, and not

11   the PROPERTY itself, which was explicitly bid on by CHASE BANK.

12       This fraudulent act is only one act supporting the foundation of this action to contradict CHASE

13   BANK's claim of entitlement to GONZALES' PROPERTY.

14       Subsequently, CHASE BANK filed a UD action, the case to be consolidated herein, falsely

15   claiming ownership of GONZALES' PROPERTY, which it never bid on and never bought. CHASE

16   BANK bought a <u>lien</u>.

17       Subsequently, GONZALES filed this case with several causes of action, including for wrongful

18   foreclosure and to quiet her title to the PROPERTY as the sole owner. GONZALES is in the process of

19   serving all interested parties.

20       The Fourth District Court of Appeal stated in *Asuncion v. Superior Court of San Diego County*

21   (1980) 108 Cal.App.3d 141, 144, in pertinent part, "It is generally recognized the summary unlawful

22   detainer action is not a suitable vehicle to try complicated ownership issues...", which this case is about.

23

24                              **II.   INTRODUCTION**

25       In the Verified Complaint in this case, there are eight causes of action, including for Negligent

26   Misrepresentation, Intentional Misrepresentation #1, Intentional Misrepresentation #2, Breach of

27   Contract, Cancellation of Instruments and Declaratory Relief, Wrongful Foreclosure, Conversion, &

28   Quiet Title.

There are too many obvious errors in the nonjudicial foreclosure process to claim innocence. The errors appear to be intentional, fraudulent acts or misdeeds to steal the PROPERTY without completing all legal requirements. Defendants herein wants the courts to close its eyes and overlook the evidence that proves that **no** actual, legal, valid, authorized foreclosure sale of the PROPERTY ever occurred to transfer any rights, title, interest, or possession to the PROPERTY to CHASE BANK.

QUALITY failed to follow statutory requirements pursuant to Civil §2924 et seq. *before* recording the **NOD**. Until it met those requirements, QUALITY did not have authority to initiate any foreclosure.

**Assignment 2011** and every instrument subsequently recorded in the PROPERTY's chain of title are void and QUALITY used these void instruments when it held the alleged foreclosure sale.

Nevertheless, QUALITY still recorded the NTS as notice to GONZALES and the public it was going to hold a foreclosure auction and sell to the highest bidder, a lien on the PROPERTY. The **NTS** stated that GONZALES' PROPERTY was specifically *not* being sold.

After the sale, QUALITY then recorded the void **TDUS**, thereupon falsely claiming that it was authorized to transfer GONZALES' PROPERTY, which was specifically never for sale and never sold.

The void instruments recorded against the PROPERTY have no authority to transfer any rights, title, privileges, interests, or possession of the PROPERTY to CHASE BANK or any other party.

CHASE BANK does not own the PROPERTY. CHASE BANK owns a lien.

### III.   POINTS AND AUTHORITIES

Stated above are only a few allegations that must be heard in the unlimited civil action. GONZALES' Complaint has sufficient allegations to sustain multiple causes of action. The Complaint contains true, factual, and provable allegations.

Trial courts have broad discretion to consolidate related cases that involve "common questions of law or fact." See Code Civ. Proc. § 1048.

Consolidation does not alter the parties' rights; rather, its purpose "is merely to promote trial convenience and economy by avoiding duplication of procedure, particularly in the proof of issues common to both actions." *Estate of Baker* (1982) 131 Cal.App.3d 471, 485.

1    Relevant factors for consolidation, therefore, include: the predominance of common legal or

2  factual issues; overlap in evidence and witnesses; the convenience of parties and attorneys; the relative

3  advancement of the actions; and judicial efficiency. See *Todd-Stenberg v. Dalkon Shield Claimants*

4  *Trust* (1996) 48 Cal.App.4th 976, 979-80; *Estate of Baker* (1982) 131 Cal.App.3d 471, 485; see also

5  Michael P. Thomas, Cal. Civ. Ctrm. Handbook & Desktop Ref. § 14:47 (2012 ed.). Not only does each

6  of these factors tilt in favor of consolidation in the present case, but consolidation provides the

7  opportunity for complete and final relief at the end of a unified trial, as opposed to sending the parties

8  back to square one when the first trial is completed.

9

10    **A.  QUALITY had NO Authority to Transfer the PROPERTY.**

11    The **Assignment 2011** purportedly assigned the **DoT₃** to U.S. BANK as trustee for the nonexistent

12  MSSTR; this would be impossible as NORTHWEST had its authority revoked to act as the attorney-in-

13  fact for WELLS FARGO to execute **Assignment 2011** and MSSTR does not exist and cannot be the

14  beneficiary.

15    "We conclude … an allegation that the assignment was void … will support an action
16    for wrongful foreclosure." - *Yvanova v. New Century Mortgage Corp.* (2016) 62
     Cal.4th 919, 923.
17

18    "We conclude a home loan borrower has standing to claim a nonjudicial foreclosure
     was wrongful because an assignment by which the foreclosing party purportedly took
19    a beneficial interest in the deed of trust was not merely voidable but void, depriving
     the foreclosing party of any legitimate authority to order a trustee's sale." - *Yvanova*
20    *v. New Century Mortgage Corp. supra* 62 Cal.4th at 942.

21

22    U.S. BANK cannot be the trustee of nonexistent MSSTR. Any assignment or substitution of trustee

23  issued in this alleged capacity are void – not merely voidable.

24    The **NOD** was purportedly signed by QUALITY as trustee, for U.S. BANK, as alleged trustee for

25  nonexistent MSSTR. In addition, the **NOD** was required to include a declaration before it was authorized

26  to be recorded. Civil Code § 2923.55(a)(1) prohibits any notice of default from being recorded until a

27  declaration, required by Civil Code § 2923.55(b), is included and recorded with the notice of default.

28  Attached to the **NOD** [**Exhibit 7**] at page 4 and recorded with it, is a paper titled "Declaration of

Notice of Motion and Motion to Consolidate Cases; Memorandum of Points and Authorities

Compliance (California Civil Code Section 2923.55(c)", however, it is *not* the required declaration. Declarations are set forth in Code Civ. Proc. § 2015.5, which requires written declarations to be made under penalty of perjury.  There are no other types of "declarations" codified in California statutes outside Code Civ. Proc. § 2015.5 and the word "declaration" has not been given multiple meanings.  In fact, the history of § 2015.5 is clearly stated in *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal. 4th 601, at HN5, as follows:

> "Since 1872, an affidavit has been defined as "a written declaration under [*oral*] oath," Cal. Code Civ. Proc. § 2003, taken before "any officer authorized to administer oaths." Cal. Code Civ. Proc. § 2012; Cal. Code Civ. Proc. §§ 2013-2014, 2093. As with **live** testimony, the oath-taking procedures for affidavits **help prevent perjury**. In **1957**, the legislature enacted Cal. Code Civ. Proc. § 2015.5, **authorizing declarations under penalty of perjury**.  [*It **authorized** **written** (unsworn) declarations **only** under penalty of perjury. Other **written** declarations were not authorized.*] Lawmakers expressed concern that the [*oral*] oath-and-affidavit procedure was both cumbersome and widely ignored. Declarations serve as a more streamlined means of ensuring that the witness understands the grave responsibility he has assumed with respect to the truth. Thus, with certain exceptions, § 2015.5 allows use of "unsworn" [*written, not oral*] declarations made [*only*] under penalty of perjury whenever state law "requires or permits" facts to be evidenced by affidavits or other "sworn" statements. A <u>valid declaration</u> has the same "force and effect" as an affidavit administered under oath." (*emphasis and [comments] added*)

IV.    Since 1957, unsworn, written declarations were defined in CCP § 2015.5.  When the legislature wrote Civil Code § 2923.55(b), they used the word "declaration" without needing to clarify or redefine it.  It had been clearly understood for over sixty years, without confusion, that written declarations are required to be made under penalty of perjury.  The legislature did not enact Civil Code § 2923.55(b) to include a simple *statement* or *attachment*; they required a <u>declaration</u>, of which there is only one kind.

The paper titled "declaration" attached to the **NOD** [**Exhibit 7, p.4**] was not made under penalty of perjury and is not a declaration authorized under CCP § 2015.5 or any other statute and is, therefore, void.  The **NOD** was <u>never authorized to be recorded</u> without a legally sufficient declaration and because of this failure to include an actual declaration with the recorded **NOD**, the entire nonjudicial foreclosure process has <u>not</u> been made in compliance with Civil § 2924 and Defendant CHASE BANK cannot prove duly perfected title.  Defendant CHASE BANK had constructive notice of the defective NOD by virtue of its recordation in the official records of the County of Marin and, therefore, had actual notice of the defect.

1    The Supreme Court of California stated in the case of *Sweetwater Union High School Dist. v.*

2    *Gilbane Building Co.* (2019) 6 Cal.5th 931, the following:

3         "Nevertheless, the transcripts [of testimony before a grand jury given under oath] are of the same
          nature as a declaration in that the testimony is given under penalty of perjury." *Id.* at 934.

4

5         "... reliability stems from the oath-taking procedures required for affidavits, or the execution
          under penalty of California perjury laws required by declarations." *Id.* at 935.

6
          "... a court may consider statements that are the equivalent of affidavits and declarations
7         because they were made under oath or penalty of perjury in California." *Id.*

8         "... a declaration must be signed and recite that the person making it certifies it to be true under
          penalty of perjury." *Id.* at 941.

9
          "This analysis is sound. The statutory scheme already permits consideration of affidavit
10        equivalents. (§ 2015.5.) As *Kulshrestha* noted, the important aspect of such evidence is that it be
          made under penalty of California's perjury laws. (See *Kulshrestha v. First Union Commercial*
11        *Corp.* (2004) 33 Cal.4th 601, at pp. 610–618.)" *Sweetwater* at 943.

12
          "... reliability stems from the oath-taking procedures required for affidavits, or the execution
13        under penalty of California perjury laws required by declarations. (Cf. *Kulshrestha, supra,* 33
          Cal.4th 601, 606.)" *Sweetwater* at 944.
14
15        The **NOD** is **fatally defective** in that there is no legally sufficient declaration attached as required

16   by Civil § 2923.5 in order to be recorded.  Therefore, there can be no commencement of the foreclosure

17   process and Defendant CHASE BANK cannot prove a sale in compliance with Civil § 2924 or duly

18   perfected title.  The **fatally defective** NOD prohibited the first step to initiate a nonjudicial foreclosure

19   process against GONZALES and her PROPERTY.

20        Nevertheless, the void **NOD** was recorded, without authority.

21        Subsequently, the void **NTS** was recorded, without authority.

22        Subsequently, a void **TDUS** was recorded, without authority.  The entire foreclosure process is void.

23        Every recorded document in this foreclosure scheme relied on every preceding void document for

24   validity.  The entire strict foreclosure process was void from the beginning, first and foremost, because

25   MSSTR does not exist and has no standing to be a beneficiary or hold deeds of trust or notes.

26        The PROPERTY was not sold in compliance with Civil Code §§ 2923.5 or 2924 et seq. under a

27   power of sale.

28        The **TDUS** has not been duly perfected and therefore, the pending unlawful detainer action is void

                                                   9

1 | and brought in bad faith by Defendant CHASE BANK and should be dismissed with prejudice *sua sponte.*

2 | **Duly perfected title** is defined in *Kessler v. Bridge* (1958) 161 Cal.App.2d Supp. 837 at 841 as:

3
4
5
6
7
8 |
"Title is duly perfected when all steps have been taken to make it perfect, i.e., to convey to the purchaser that which he has purchased, valid and good beyond all reasonable doubt. (*Hocking v. Title Ins. & Trust Co.* (1951), 37 Cal.2d 644, 649 [234 P.2d 625, 40 A.L.R.2d 1238]), which includes good record title (*Gwin v. Calegaris* (1903), 139 Cal. 384 [73 P. 851]), but is not limited to good record title, as between the parties to the transaction. The term "duly" implies that all of those elements necessary to a valid sale exist, else there would not be a sale at all. ... If there is want of performance or want of true consent the title cannot be said to be perfected. (Civ. Code, §§ 1567- 1589.) The court in an unlawful detainer under Code of Civil Procedure, section 1161a, subdivision (4), has jurisdiction to determine the validity of such defenses."

9 | Defendant CHASE BANK has willfully clouded GONZALES's title to the PROPERTY without

10 | authority.  The chain of title has been clouded by Defendants.

11 | The entire non-judicial foreclosure process of the PROPERTY by QUALITY was not conducted in

12 | compliance with the Civil Code and is therefore, void.  There are no documents to support any legally

13 | valid foreclosure sale by QUALITY nor any legally valid transfer of the PROPERTY to CHASE BANK.

14 | This unlimited civil case will prove a wrongful foreclosure has occurred by the collusive acts of many.

15

16 | **B.  Common Legal and Factual Issues Predominate Across the Two Cases and**

17 | **Make Consolidation the Appropriate Case-Management Tool.**

18 | In terms of the substantive legal claims presented, the two cases for consolidation overlap

19 | substantially.

20 | The UD Court case is a summary method for recovery of possession of the PROPERTY.  There

21 | must be a landlord/tenant relationship between the plaintiff and the defendant. See *Marvell v. Marina*

22 | *Pizzeria* (1984) 155 Cal.App.3d Supp. 1, 5, 7-12.

23 | The purchaser of property is not a lessor or the successor in interest of the lessor when the seller

24 | has reserved lessor's rights as part of the sale. *Commonwealth Memorial, Inc. v. Telophase Society of*

25 | *America* (1976) 63 Cal.App.3d 867, 871.

26 | GONZALES' title is at issue in both cases and GONZALES recently filed her Unlimited Civil case

27 | and is attempting to serve all parties as quickly as possible, while being unrepresented by legal counsel.

28

## C. Consolidation will Promote the Interest of Judicial Economy.

Consolidating the cases would also generate numerous other practical benefits. First, consolidation would eliminate the need for duplicative discovery processes. Discovery in the two cases, and the burdens associated with discovery, will overlap substantially.

Consolidation would not create any further delays; it would greatly reduce them. The goal of consolidation is to eliminate the burden already placed upon the courts.

The Court has express authority under the Code of Civil Procedure to consolidate actions where common questions of law or fact exist among two or more cases. Specifically, Code of Civil Procedure § 1048(a) provides:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

"Under the statute and the case law, there are thus two types of consolidation: a consolidation for purposes of trial only, where the two actions remain otherwise separate; and a complete consolidation or consolidation for all purposes, where the two actions are merged into a single proceeding under one case number and result in only one verdict or set of findings and one judgment." - *Hamilton v. Asbestos Corp.* (2000) 22 Cal.4th 1127, 1147. "Complete consolidation is correct where no doubts exists as to the applicability of the various findings to each of the consolidated cases or where the plaintiff could have joined together originally to bring the action." See Kiesel, Lichtman, Matthai, Seabolt, *Cal. Pretrial Civ. Proc.* (Matthew Bender Prac. Guide 2007) 32.08[4], p. 32-24, citing *Page v. Bakersfield Uniform & Towel Supply Co.* (1966) 239 Cal.App.2d 762, 772, & *Jaffe v. Albertson Co.* (1966) 243 Cal.App.2d 592, 606-607.

In this case, complete consolidation of the two cases is appropriate given that both cases pertain to similar facts and directly arise from and relate to common questions of law.

Because both cases arise from common questions of law or facts, which involve the same or substantially identical transactions, incidents, or events, and because GONZALES's rights are directly affected by Judgments and Orders in both cases, complete consolidation of both cases are warranted. The main issue is that of title, which cannot be adjudicated in the limited civil UD court.

11

1

2 **D.   Consolidation Factors Weigh In Favor of Consolidation**

3      To determine whether consolidation is appropriate, the Court should consider the following factors:

4 1) timeliness of the motion, 2) complexity of the actions, and/or 3) prejudice to any party. (See Weil &

5 Brown, *Cal. Prac. Guide: Civil Procedure Before Trial* (The Rutter Group 2011)  12:362, p. 12(1)-66.)

6

7 **E.   Consolidation Motion is Timely and Brought Without Delay**

8      Foremost, there is no statutory deadline to bring a motion to consolidate, and a motion brought at

9 any time during the proceedings is essentially timely to ensure that neither Parties are prejudiced or

10 delayed, and to promote judicial economy.

11      Consolidation at this point would not adversely affect either action and would instead avoid

12 duplicative and inconsistent rulings, orders or judgments, unnecessary costs, and will serve the interests

13 of economy and convenience.

14      In these cases, however, since the Plaintiff GONZALES' rights are directly related to and affected

15 by the Judgments and Orders in both cases, and because the main issue in both cases is whether CHASE

16 BANK in the UD Court case has any right, title or interest to GONZALES' PROPERTY or possession

17 thereof, consolidation would not confuse the jury or judge.

18      Actions may be consolidated at the Court's discretion whenever it can be done without prejudicing

19 the rights of any party. (See *Strickler Co. v. Eisner* (1935) 5 Cal.App.2d 441, 444).  The fact that the

20 evidence in either case does not preclude consolidation nor prejudice either party. (See *Jud Whitehead*

21 *Heater Co. v. Ohler* (1952) 111 Cal.App.2d 861, 867).  Rather, all parties would be greatly benefitted by

22 having both actions consolidated in that GONZALES will not be subject to potentially two different,

23 inconsistent instructions from the two courts.

24      Plaintiff in the UD Court case will not be prejudiced in either case, especially when the evidence

25 will prove that only GONZALES owns the PROPERTY and the UD case was brought in bad faith.

26      Because the witnesses, evidence, and practices of Plaintiffs and Defendants in both *cases* are

27 intimately related, consolidation of the actions would promote convenience for the parties and conserve

28 judicial resources as a whole.  Therefore, all of these factors weigh in favor of consolidation and are

12

1 | conducive for expedition of both cases.

2

3 | **V.    CONCLUSION**

4 | For the above stated reasons, GONZALES requests an Order consolidating the Cases identified

5 | herein.

6

7 | Respectfully submitted.

8 | DATED: July 6, 2020

9 | _____

10 | Veronica Gonzales,
   | Plaintiff in Propria Persona

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of Motion and Motion to Consolidate Cases; Memorandum of Points and Authorities

Veronica Gonzales
36 Rustic Way
San Rafael, California  94901
Plaintiff in Propria Persona
415-717-2111



**FILED**

JUL 0 7 2020

JAMES M. KIM, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
*By: Q Roary, Deputy*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF MARIN, SAN RAFAEL COURTHOUSE

| | |
|---|---|
| VERONICA GONZALES, | **Case No.: CIV2001401** |
| Plaintiff, | **DECLARATION OF VERONICA GONZALES IN SUPPORT OF PLAINTIFF'S MOTION TO CONSOLIDATE CASES** |
| v. | |
| JP MORGAN CHASE BANK N.A.; U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR IN INTEREST TO WACHOVIA BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR MSSTR 2004-1; WELLS FARGO BANK, N.A.; QUALITY LOAN SERVICE CORPORATION; NORTHWEST TRUSTEE SERVICES. INC.; JULIET BERNAL; and DOES 1 through 20, | **Hearing Date: SEP 3 0 2020** **Hearing Time:  1:30pm** Assigned for all Purposes to: Judge: Hon. James T. Chou, Courtroom B [Complaint filed:  June 19, 2020] [CMC Hearing:   November 6, 2020, 9:00 a.m.] [Trial Date:     Not Set.] |
| Defendants | |
| JP MORGAN CHASE BANK N.A., ITS ASSIGNEES AND/OR SUCCESSORS, Plaintiff, | **Case No. CIV1901923** **Limited Civil Case, less than $10,000** |
| vs. | |
| VERONICA GONZALES, and DOES 1 – 10, inclusive, | Assigned for all Purposes to: Judge: Hon. James T. Chou, Courtroom B |
| Defendant(s). | [Complaint filed:  May 20, 2019] [CMC Hearing:    July 15, 2020] [Trial Date:      Vacated] |

DECLARATION of VERONICA GONZALES in Support of Plaintiff's Motion to CONSOLIDATE Cases

## DECLARATION OF VERONICA GONZALES

I, VERONICA GONZALES, in propria persona, am the Plaintiff in this matter and declare that the following statements are true and correct to the best of my knowledge and belief, except as to the matters which are therein stated upon my information and belief, and as to those matters, I believe it to be true. I understand these statements are made for use as evidence in court and if called to testify, I am competent to testify to the following based upon firsthand knowledge.

1. The title and ownership to my home with the common mailing address of 36 Rustic Way, San Rafael, Marin County, California 94901 and Assessor's Parcel Number of 010-101-38 (hereinafter "PROPERTY") is at issue. Defendants have clouded the title. All recorded documents and instruments regarding this PROPERTY are recorded into the Official Records of the Marin County Recorder's Office.

2. Some exhibit numbers/letters may be unused and are reserved for future use. Each exhibit referenced herein has a true and correct copy attached hereto and incorporated herein by reference. To save paper and not belabor the court, some exhibits may be excerpts of a full document and/or display arrows or highlights to guide the reader, but all exhibits maintain the true information and context of the contents thereof and do not mislead. A few of the exhibits may have minor redactions because Plaintiff could not obtain an unredacted copy to date, but Plaintiff reserves the right to replace exhibits with better or unredacted copies to improve and reveal all facts and never to obscure.

3. I have complex issues of title to my real property in excess of the jurisdictional limit of the limited civil court with supporting documents available to prove my case in this unlimited civil venue.

4. Attached at **Exhibit 1** is a true and correct copy of my <u>Grant Deed</u>, giving me title to the PROPERTY, dated September 27, 1996 and recorded October 4, 1996.

5. Attached at **Exhibit 2** is a true and correct copy of a document titled "<u>Deed of Trust</u>", dated October 26, 2001 and subsequently recorded on November 21, 2001.

6. On or about October 26, 2001, I executed and issued a valuable, negotiable instrument, my promissory note ("note") with an actual cash value equal to its face value of 600,000 dollars. It has a real financial value of 600,000 dollars in commerce. I never gifted my note to anyone. I only loaned my note to be held as a security deposit by the holder. My note was always expected to be returned to

1  me when it was no longer needed as collateral or enforceable during the time when I was either

2  obligated to repay a true loan of money or if my PROPERTY was taken by legal methods by the holder

3  of my note.  There has never been any agreement whereby I agreed to give the value of my note to

4  anyone.  Wherever my note is being held, if it even exists anymore in its original form, or if my note

5  has been converted, sold, hidden, lost, or destroyed, it was issued by me for my benefit and its face

6  value and all proceeds earned and benefitted therefrom must be returned to me.

7       7.    Attached at **Exhibit 4** is a true and correct copy of a document titled "Limited Power of

8  Attorney", dated May 11, 2006 and subsequently recorded on June 20, 2006.  It is evident that it states

9  that it is only effective until December 31, 2009.

10      8.    Attached at **Exhibit 6** is a true and correct copy of a negotiable instrument titled "Deed of

11  Trust Note", dated August 11, 1988, worth 40,150 dollars, and subsequently, without recourse, paid to

12  the order of and endorsed in blank over to more than eight different banks just like a check, paid and

13  deposited just like money.  This note was returned to the issuer after it was no longer used as collateral.

14  I can produce the original at trial if necessary.

15      9.    I discovered that the chain of title for my PROPERTY contains several falsified records,

16  which need to be cancelled, including all of the following exhibits:

17     10.    Attached at **Exhibit 5** is a true and correct copy of a document titled "Assignment of Deed

18  of Trust", dated February 21, 2011 and subsequently recorded on March 21, 2011.

19     · 11.    Attached at **Exhibit 7** is a true and correct copy of a document titled "Important Notice

20  Notice of Default and Election to Sell  Under Deed of Trust", dated July 9, 2018 and subsequently

21  recorded on July 10, 2018.  A declaration was required before recording.  Page 4 is not a declaration.

22     12.    Attached at **Exhibit 8** is a true and correct copy of a document titled "Notice of Trustee's

23  Sale", dated February 25, 2019 and subsequently recorded on February 26, 2019.  I understood this

24  notice to mean that my PROPERTY was not going to be sold.

25     13.    Attached at **Exhibit 9** is a true and correct copy of a document titled "Trustee's Deed Upon

26  Sale", dated May 1, 2019 and subsequently recorded on May 3, 2019.  Unfortunately, my copy has

27  minor redactions, which I did not make.  I understood this notice to mean that my PROPERTY was sold

28  instead of a lien on my PROPERTY that was told to me.

<div align="center">3</div>

DECLARATION of VERONICA GONZALES in Support of Plaintiff's Motion to CONSOLIDATE Cases

14.   Attached at **Exhibit 10** is a true and correct copy of a screenshot from the U.S. Securities and Exchange Commission ("SEC") website in search of the alleged trust named "MSSTR 2004-1". (See https://www.sec.gov/edgar/searchedgar/legacy/companysearch.html).   I simply searched for "MSSTR", "MSSTR 2004", and "2004".  MSSTR was found not to exist.

15.   Attached at **Exhibit 11** is a true and correct copy of another screenshot from the SEC website. I searched for trusts beginning with "MS".  It produced 454 entries, for which MSSTR was found not to exist, which should have appeared alphabetically between "MSSI" and "MST Enterprises".

16.   Attached at **Exhibit 12** is a true and correct copy of more screenshots from the SEC website in search of trusts that belong to SIC code 6189, representing Asset-Backed Securities.  This produced 11,745 results.  The screenshots show Items 7861 to 7940 listed alphabetically, showing that MSSTR does not exist.  If it existed, it should have appeared between items "MSSG" and "MSW".

17.   I searched the Delaware Secretary of State ("SOS") for "2004" and "MSSTR".  I did not find MSSTR.  (See https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx).

18.   I searched the Minnesota SOS for "2004" and "MSSTR".  I did not find MSSTR. (See https://mblsportal.sos.state.mn.us/Business/Search).

19.   I searched the New York SOS for "2004" and "MSSTR".  I did not find MSSTR. (See https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_SEARCH_ENTRY).

20.   Consolidation of these two actions will conserve judicial resources, reduce costs and delays resulting from multiple trials and administrative records, and avoid the risk of inconsistent judgments.

21.   Consolidation will not complicate either action's trial because the common issues of law and facts predominate.

22.   Consolidation will not result in undue delay because neither case has a certified administrative record.

23.   Title is at issue, which can only be tried in the civil unlimited case.

24.   Allowing the plaintiff in the Unlawful Detainer case to obtain a writ of possession and evict me from my home when I can prove in this action that the moving party therein has failed to obtain valid, legal title or any rights to my PROPERTY would be a misuse of this judicial system for that plaintiff's fraudulent gain and would cause irreparable damage to me without cause or a remedy.

DECLARATION of VERONICA GONZALES in Support of Plaintiff's Motion to CONSOLIDATE Cases

1

2       I declare under penalty of perjury under the laws of the State of California that the foregoing is

3   true and correct.

4

5   DATED: July 4, 2020

6   _____

7        VERONICA GONZALES

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION of VERONICA GONZALES in Support of Plaintiff's Motion to CONSOLIDATE Cases

# EXHIBITS

Branch :ORC,User :OR19                    Comment:                              Station Id :MQZX

MARIN COUNTY OFFICIAL RECORDS

RECORDING REQUESTED BY
**CALIFORNIA LAND TITLE CO. OF MARIN**

When Recorded Mail to, and Unless Otherwise Shown Below,
Mail Tax Statement To:

Veronica A. Gonzales

36 Rustic Way
San Rafael, Ca.  94901

Escrow or Title No. 209122    -JB

**96—054256**

Rec Fee      13.00
DTT         994.50
Check      1007.50

Recorded
Official Records
County of
MARIN
JOAN C THAYER
Recorder
1:40pm  4-Oct-96

MM   3

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
DOCUMENTARY TRANSFER TAX is $ 994.50   COMO
( X )  computed on full value of property conveyed, or
(  )  computed on full value less value of liens and encumbrances
      remaining at time of sale
(  )  unincorporated area     ( X )  City of San Rafael,

Parcel No. 10-101-38
Tax Code Area  8-000

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

David B. Patton and Wanda J. Patton, or their Successors, as Trustee of The
Patton Family Trust dated October 5, 1992

hereby GRANT(S) to

Veronica A. Gonzales,  an unmarried woman

the following described real property in the State of California, City of San Rafael,
County of Marin

AS PER DESCRIPTION ATTACHED HERETO

STATE OF CALIFORNIA Virginia
City
COUNTY OF Virginia Beach   }SS

On October 1, 1996    before me, the undersigned, a
Notary Public in and for said County and State, personally appeared,

David B. Patton, Trustee

Wanda J. Patton, Trustee
personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies) and that by his
/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument

WITNESS my hand and official seal

Signature     Sherry A. Forbes

By Comission expires 1/31/99

Dated September 27, 1996

David B. Patton, Trustee

Wanda J. Patton, Trustee

MAIL TAX STATEMENTS TO PARTY SHOWN ON FOLLOWING LINE: IF NO PARTY IS SHOWN, MAIL AS DIRECTED ABOVE

NAME                    STREET ADDRESS                CITY & STATE

Exhibit 1 p.1

Branch :ORC,User :OR19                    Comment:                         Station Id :MQZX

MARIN COUNTY OFFICIAL RECORDS

### DESCRIPTION

ALL THAT CERTAIN real property situate in the City of San Rafael, County of Marin, State of California, described below as follows:

PARCEL ONE:

BEGINNING at a point on the Southeasterly line of the cul-de-sac, known as Rustic Way, as said cul-de-sac is described in the Deed to the City of San Rafael, recorded March 17, 1955 in Book 929 of Official Records at Page 29, Marin County Records, said point being the Southwesterly corner of that certain parcel of land described in the Deed from Marin Title Guaranty Company, a corporation, to Gregory S. Lyon, et ux, recorded January 16, 1962 in Book 1533 of Official Records at Page 354, Marin County Records, thence leaving said line of Rustic Way and running thence along the Southwesterly boundary line of said Lyon parcel South 54° 03' East 141.868 feet to the most Southerly corner thereof; thence leaving said Southwesterly boundary line and running South 56° 57' 40" West 144.627 feet; thence North 47° 45' West 118.56 feet to a point on the Easterly Line of Rustic Way hereinabove referred to, thence along said line of Rustic Way on a curve to the left with a radius of 140 feet for a distance of 77.756 feet, thence North 29° 18' 40" East 12.14 feet, thence on a curve to the right with a radius of 20 feet for a distance of 18.158 feet, thence on a curve to the left with a radius of 45 feet a distance of 20.99 feet to the point of beginning.

PARCEL TWO:

AN EASEMENT for driveway purposes over the following described parcel:

BEGINNING at a point on the Southwesterly line of the hereinabove described parcel, said point being distant thereon South 47° 45' East 10.00 feet from the most Westerly corner thereof; thence along said Southwesterly line North 47° 45' West 10.00 feet to the most Westerly corner of the hereinabove described parcel; thence Southwesterly along the Southwesterly line of Rustic Way 15.00 feet to a point, thence leaving said line of Rustic Way and running Easterly in a straight line to the point of beginning.

Exhibit 1 p.2

Branch :ORC,User :OR19                    Comment:                    Station Id :MQZX

MARIN COUNTY OFFICIAL RECORDS

ILLEGIBLE NOTARY SEAL DECLARATION

GOVERNMENT CODE 27361.7

I certify under penalty of perjury that the notary seal on the document to which this
statement is attached reads as follows:

Name of Notary:_____SHERRY A. FORBES_____

Commission Number:___N/A_____

Date Commission Expires____10/31/98_____

Place of Execution of this Declaration__SAN RAFAEL, CALIFORNIA_____

Date____10/4/96_____

CALIFORNIA LAND TITLE COMPANY OF MARIN

Jennifer A. Craig

Recorded at the request of:
First American Title Co.
Title Order 5-215970sb
Southland Title-Escrow #LM3579LB
Recording Requested By:

**WELLS FARGO HOME MORTGAGE, INC.**
**5000 S.W.MEADOWS RD. #190**
**LAKE OSWEGO, OR  97035**

Return To:
**WELLS FARGO HOME MORTGAGE, INC.**
**FINAL DOCUMENTS X4701-024**
**3601 MINNESOTA DRIVE**
**BLOOMINGTON, MN  55435-5284**
Prepared By:
**MICHELLE L. GOLDNER**
**WELLS FARGO HOME MORTGAGE, INC.**
**5000 S.W.MEADOWS RD. #190**
**LAKE OSWEGO, OR  97035**

/9

**2001-0078369**

| Recorded | REC FEE | 61.00 |
| Official Records | | |
| County Of | | |
| Marin | | |
| JOAN C. THAYER | | |
| Recorder | | |
| | in | |
| 08:00AM 21-Nov-2001 | Page 1 of 19 | |

AP#010-101-38 ————————(Space Above This Line For Recording Data)————————

# DEED OF TRUST

4346783MEX

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are
defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used
in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **OCTOBER 26, 2001**
together with all Riders to this document.
(B) "Borrower" is
**VERONICA A. GONZALES, AN UNMARRIED WOMAN**

THIS IS CERTIFIED TO BE A TRUE COPY OF THE RECORDS
OF THE MARIN COUNTY RECORDER
DATE ISSUED

AUG – 2 2012

BY _____ DEPUTY

Borrower is the trustor under this Security Instrument.
(C) "Lender" is  **WELLS FARGO HOME MORTGAGE, INC.**

Lender is a  **Corporation**
organized and existing under the laws of  **THE STATE OF CALIFORNIA**

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Page 1 of 18          Initials: ___

FORM 3005    1/01
SCA01    Rev 11/09/00

Exhibit 2 p.1

Lender's address is
P. O. BOX 5137, DES MOINES, IA 50306-5137
Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is FIDELITY NATIONAL TITLE INSURANCE COMPANY

(E) "Note " means the promissory note signed by Borrower and dated OCTOBER 26, 2001 .
The Note states that Borrower owes Lender SIX HUNDRED THOUSAND AND NO/100
<div style="text-align:right">Dollars</div>

(U.S. $ ......600,000.00..........) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than   NOVEMBER 1, 2031
(F) "Property" means the property that is described below under the heading "Transfer of
Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges
and late charges due under the Note, and all sums due under this Security Instrument, plus
interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower.
The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider ☐ Biweekly Payment Rider ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an
electronic terminal, telephonic instrument, computer, or magnetic tape so as to order,
instruct, or authorize a financial institution to debit or credit an account. Such term includes,
but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers
initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation
or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et
seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be
amended from time to time, or any additional or successor legislation or regulation that

<div style="text-align:right">Exhibit 2 p.2</div>

governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's convenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| **County** | of | **MARIN** | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**LEGAL DESCRIPTION IS ATTACHED HERETO AS SCHEDULE "A" AND MADE A PART HEREOF.**

Parcel ID Number:                                                        which currently has the address of
**36 RUSTIC WAY**                                                                                    [Street]
**SAN RAFAEL**                            [City] , California        **94901**        [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

   THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

SCA03    Rev 11/09/00          Page 3 of 18          Initials:          FORM 3006    1/01

Exhibit 2 p.3

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Exhibit 2 p.4

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be

SCA05   Rev 11/09/00              Page 5 of 18    .      Initials              FORM 3005    1/01

Exhibit 2 p.5

required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination

Exhibit 2 p.6

or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In

SCA07   Rev 11/09/00                Page 7 of 18                Initials:                FORM 3005   1/01

Exhibit 2 p.7

either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or

SCA06   Rev 09/22/00          Page 8 of 18          Initials          FORM 3005   1/01

Exhibit 2 p.8

(c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Exhibit 2 p.9

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exhange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

SCA10    Rev 03/22/00                  Page 10 of 18              Initials _____         FORM 3005    1/01

Exhibit 2 p.10

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by

Exhibit 2 p.11

this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly

Exhibit 2 p.12

requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Exhibit 2 p.13

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.

Exhibit 2 p.14

The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or**

Exhibit 2 p.15

before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Exhibit 2 p.16

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                             VERONICA A. GONZALES        Borrower


_____



SCA17   Rev 12/27/00              Page 17 of 18         Initials: VG        FORM 3005   1/01

Exhibit 2 p.17

State of California.                                              ss:

County of MARIN

On November 5, 2001 before me, Kelli Reid, Notary Public

                                                    personally appeared

**VERONICA A. GONZALES, AN UNMARRIED WOMAN**

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

OFFICIAL SEAL
KELLI REID
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1189919
SONOMA COUNTY
My Commission Exp. Jan. 18, 2002

SCA18   Rev 10/17/00              Page 18 of 18       Initials              FORM 3005   1/01

Exhibit 2 p.18



SCHEDULE "A"

## DESCRIPTION

All that certain real property situate in the City of San Rafael, County of Marin, State of California, described as follows:

## PARCEL ONE:

BEGINNING at a point on the Southeasterly line of the cul-de-sac, known as Rustic Way, as said cul-de-sac is described in the Deed to the City of San Rafael, recorded March 17, 1955 in Book 929 of Official Records, at Page 29, Marin County Records, said point being the Southwesterly corner of that certain parcel of land described in the Deed from Marin Title Guaranty Company, a corporation, to Gregory S. Lyon, et ux, recorded January 16, 1962 in Book 1533 of Official Records, at Page 354, Marin County Records, thence leaving said line of Rustic Way and running thence along the Southwesterly boundary line of said Lyon parcel South 54° 03' East 141.868 feet to the most Southerly corner thereof; thence leaving said Southwesterly boundary line and running South 56° 57' 40" West 144.627 feet; thence North 47° 45' West 118.56 feet to a point on the Easterly line of Rustic Way hereinabove referred to, thence along said line of Rustic Way on a curve to the left with a radius of 140 feet for a distance of 77.756 feet, thence North 29° 18' 40" East 12.14 feet, thence on a curve to the right with a radius of 20 feet for a distance of 18.158 feet, thence on a curve to the left with a radius of 45 feet a distance of 20.99 feet to the point of beginning.

## PARCEL TWO:

AN EASEMENT for driveway purposes over the following described parcel:

BEGINNING at a point on the Southwesterly line of the hereinabove described parcel, said point being distant thereon South 47° 45' East 10.00 feet from the most Westerly corner thereof; thence along said Southwesterly line North 47° 45' West 10.00 feet to the most Westerly corner of the hereinabove described parcel; thence Southwesterly along the Southeasterly line of Rustic Way 15.00 feet to a point, thence leaving said line of Rustic Way and running Easterly in a straight line to the point of beginning.

Exhibit 2 p.19

2006-0038789

RECORDING REQUESTED BY:
TITLE COURT SERVICE
After Recording, Return To:

Northwest Trustee Services, Inc.
505 N. Tustin Avenue, Suite 243
Santa Ana, CA 92705

3009837

| Recorded | | REC FEE | 18.88 |
| Official Records | | | |
| County of | | | |
| Marin | | | |
| JOAN C. THAYER | | | |
| Assessor-Recorder | | | |
| | | DW | |
| 012:23PM 20-Jun-2006 | | Page 1 of 2 | |

## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That Wells Fargo Bank N.A., has made, constituted and appointed, and by these presents does make, constitute and appoint Stephen D. Routh and Lance E. Olsen of Routh Crabtree Olsen, PS, 3535 Factoria Blvd., Suite 200, Bellevue, WA 98006; Stephen D. Routh, Richard L. Crabtree and Richard N. Ullstrom of Routh Crabtree, apc, 3510 Spenard Road, Suite 200, Anchorage, AK 99503; Jeff Stenman, Kathy Taggart, Vonnie McElligott, Todd Hendricks, and Becky Baker of Northwest Trustee Services, Inc., 3535 Factoria Blvd., Suite 200, Bellevue, WA 98006; and Cathe Cole, Lupe Tabita and Michelle Floyd of Northwest Trustee Services, Inc., 505 N. Tustin Avenue, Suite 243, Santa Ana, CA 92705, individually and not jointly, its true and lawful attorney in fact for, and in its name, place and stead, and for its use and benefit, for every act customarily and reasonably necessary and appropriate for:

The execution, acknowledgment, recording and delivery of beneficiary's Non Military Affidavit, Notice of Default (Washington), Notice of Default and Election to Sell (Oregon), Beneficiary's Declaration of Default (Alaska), Verifications of Debt, and Appointments and/or Substitutions of Trustee wherein the above-named principal is the original or substituted beneficiary or servicing agent for the beneficiary, Deeds to the Secretary of Veterans Affairs, Secretary of Housing and Urban Development, Deeds to Federal National Mortgage Association, and Deeds to Federal Home Loan Mortgage Corporation, to convey properties in which the Mortgage foreclosed secured a loan guaranteed or insured by the department of Veterans Affairs or Department of Housing and Urban Development, Deeds and assignment of beneficial interest to the investor on mortgage loans in which Wells Fargo Bank N.A. is the beneficiary of record of the Mortgage, post sale real property conveyance deeds to Federal National Mortgage Association or Federal Home Loan Mortgage Corporation, and any bond necessary to effect or support legal action to gain possession of any real property to which Wells Fargo Bank N.A. has lawful ownership or claim to possession after · a foreclosure.

Giving and granting unto said attorney-in-fact full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done to accomplish the foregoing as the principal above-named might or could do as if personally present, with full powers of substitution and reservation, hereby confirming and ratifying all that the principal's attorney in fact shall lawfully do or cause to be done by virtue of these presents. The undersigned fully acknowledges and understands that said attorney-in-fact is being granted authority to appoint himself or a business in which he has a pecuniary interest as trustee to conduct foreclosures for Wells Fargo Bank N.A. on a for profit basis and has consulted independent counsel regarding same.

By exercise of this limited power, the attorney(s)-in-fact shall indemnify Wells Fargo Bank N.A. from all claims, demands, suits, penalties or actions, and from all attendant losses, costs and expenses for any claims against, or losses or liability of Wells Fargo Bank N.A. for any cause to the extent the same arise out of, or result from, default in the performance of, or the negligent performance of, or willful misconduct regarding any obligation of the attorney(s)-in-fact under this power.

This limited power of attorney shall be effective from the date of execution hereof until December 31, 2009 or such time as Wells Fargo Bank N.A. or its successor revokes it in writing.

THIS IS CERTIFIED TO BE A TRUE COPY OF THE RECORDS
OF THE MARIN COUNTY RECORDER
DATE ISSUED

DEC 0 3 2019

BY _____ DEPUTY

Exhibit 4 p.1

13

IN WITNESS WHEREOF, Rachael Hendrickson-Browder has hereunto set his/her hand and seal this 11th day of, May, 2006.

Wells Fargo Bank N.A.

Signed:

Printed name:   Rachael Hendrickson-Browder

Title:   Vice President Loan Documentation

STATE OF   **IOWA**     )
                        ) ss.
COUNTY OF  **POLK**     )

This is to certify that on the 11th day of, May, 2006, before me, a notary public in and for the State of IOWA, personally appeared Rachael Hendrickson-Browder, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this day that s/he, being informed of the contents thereof, s/he executed the foregoing document as Vice President Loan Documentation of Wells Fargo Bank N.A., voluntarily for and as the act of said corporation, acting in said capacity, as aforesaid.

Given under my hand this 11th day of, May, 2006.

ANNE NELSON
Commission Number 716749
My Commission Expires
May 23, 2008

Notary public in and for:
My commission expires:

**2**

Exhibit 4 p.2

2011-0015555

| Recorded | REC FEE | 18.00 |
Official Records
County of
Marin
RICHARD N. BENSON
Assessor-Recorder
County Clerk
| RS
09:29AM 21-Mar-2011 | Page 1 of 1

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO:

Wells Fargo Home Mortgage
3476 Stateview Blvd.
MAC # X7801-014
Ft Mill, SC  29715

---

File No. 7023.90962        Title Order 100737816-CA-BFI        MIN No.

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to
**U.S. Bank National Association, as successor Trustee to Wachovia Bank,
National Association, as Trustee for MSSTR 2004-1**

all beneficial interest under that certain Deed of Trust dated **10/26/01**, executed by
**Veronica A. Gonzales, an unmarried woman to Fidelity National Title Insurance
Company**, as Trustee; and recorded 11/21/01, as Instrument No. 2001-0078369 of
Official Records in the County Recorder of MARIN County, California.

Property Address: 36 RUSTIC WAY SAN RAFAEL, CA 94901

TOGETHER with the right to have reconveyed, in whole or in part the real property
described therein. Effective date as of 12/1/10

Effective date: 2/21/11          **Wells Fargo Bank, NA, as successor by
merger to Wells Fargo Home Mortgage, Inc.,
by Northwest Trustee Services, Inc., as Attorney
In Fact recorded 6/20/06 as Inst. 2006-0038789**

By: Rebecca A. Baker, Assistant Vice President:

STATE OF WASHINGTON          )
                             )ss
COUNTY OF KING               )

    I certify that I know or have satisfactory evidence that Rebecca A. Baker is the person who appeared before
me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to
execute the instrument and acknowledged it as the Attorney In Fact of Wells Fargo Bank, N.A. to be the free and
voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: 2/21/11

Notary Public in and for the State of Washington
Residing
at Federal Way
My appointment expires 3/7/2011

Exhibit 5 p.1

**State of Texas**

# Deed of Trust Note

FHA #493-443132-7-748

$ 40,150.00                                         Houston              , Texas.
                                                   August 11            , 19 88

For value received, the undersigned promise(s) to pay to the order of ~~PAID IN FULL~~
UNION STATE MORTGAGE CORPORATION

the sum of

FORTY THOUSAND ONE HUNDRED FIFTY AND NO/100--------- Dollars ($ 40,150.00

with interest at the rate of      ten                              per centum (   10.00 %) per
annum on the unpaid balance, interest payable monthly as it accrues, both principal and interest to be paid at the office
of     UNION STATE MORTGAGE CORPORATION
in     Houston, Texas
in monthly installments of      THREE HUNDRED FIFTY TWO AND 35/100-----------------
Dollars ($ 352.35    ) each, including interest, one on the first day of each month hereafter commencing on the first day
of   October     , 19 88 and continuing until the principal and interest are fully paid, except that the final payment of
principal and interest, if not sooner paid, shall be due and payable on the first day of    September, 2018

If default be made in the payment of any installment under this note, and if the default is not made good prior to the due date
of the next such installment, at the option of the holder, this note shall become immediately due and payable without notice and
the lien given to secure its payment may be foreclosed. Failure to exercise this option shall not constitute a waiver of the right
to exercise in the event of any subsequent default. All past due installments of principal and interst shall bear interest from maturity
at the above rate. If this note is placed in the hands of an attorney for collection, or is collected through the Probate Court or
the Bankruptcy Court or through other legal proceeding, the undersigned promise(s) to pay reasonable attorney's fees.

The undersigned and all endorsers, and all persons liable or to become liable on this note, waive demand, protest and notice
of demand, protest and nonpayment and consent to any and all renewals or extensions in the time of payment hereof.

This note is secured by Deed of Trust of even date herewith, executed by the undersigned to
          SAM U. PRUITT,                                  Trustee(s), conveying property as follows:

          Lot 23, in Block 7, of RUSHWOOD, SECTION 2, an addition
          in Harris County, Texas, according to the map or plat
          thereof, recorded in Volume 218, Page 103 of the Map
          Records of Harris County, Texas.


  2323 Union Mill Road
        (Address)
  Houston, Texas  77067                OSCAR DAVIS, JR.
        (Address)

        (Address)                      ANGELA L. DAVIS

        (Address)

This form is used in connection with deeds of trust insured under the one-to-four family provisions of the National Housing Act.

Previous Editions are Obsolete

HUD-99181 (4-84 Edition)
24 CFR 203.17(a)
Reprinted 6-85

VMP-1 (TX) (8801)          VMP MORTGAGE FORMS • (313)293-8100 • (800)521-7291

Exhibit 6 p.1

WITHOUT RECOURSE PAY
TO THE ORDER OF
STERLING MORTGAGE CORPORATION

UNION STATE MORTGAGE CORPORATION

_Katherine L_

KATHERINE LEUNG
PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF
GREENWICH CAPITAL MORTGAGE, INC

STERLING MORTGAGE CORPORATION

BY _Emily J. Saxton_, Assistant Vice President

WITHOUT RECOURSE
PAY TO THE ORDER OF:
FOSTER MORTGAGE CORPORATION

Greenwich Capital Mortgage, Inc.

BY _Mary C. Lawshe_

MARY C. LAWSHE, VICE PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF.

CANCELLED

FOSTER MORTGAGE CORPORATION

By _____
Frances Flinn
Assistant Vice-President

Pay to the order of
Foster Mortgage Corporation,
a Louisiana Corporation, without recourse,

Jalmer, Inc. (formerly Foster Mortgage
Corporation, a Texas Corporation)

By: _Diane S. Owens_
Diane S. Owens, Vice President

Pay to the order of
NationsBanc Mortgage Corporation,
without recourse.

Foster Mortgage Corporation,
a Louisiana Corporation

By: _Eileen L. Youngblood_
Eileen L. Youngblood, Vice President

PAY TO THE ORDER OF
**MidFirst Bank**

WITHOUT RECOURSE
NationsBanc Mortgage Corporation

By _Daniel F. Hellams_
DANIEL F. HELLAMS
SR. VICE PRESIDENT

PAID TO THE ORDER OF

WITHOUT RECOURSE
MidFirst Bank

_Suzanne M. Haumesser_
Suzanne M. Haumesser
Vice President

Exhibit 6 p.2

WITHOUT RECOURSE PAY
TO THE ORDER OF
**2** STERLING MORTGAGE CORPORATION

**1**   UNION STATE MORTGAGE CORPORATION

*Katherine L*

KATHERINE LEUNG
PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF
**3** GREENWICH CAPITAL MORTGAGE, INC

STERLING MORTGAGE CORPORATION

BY *Emily J. Saxton*
Emily J. Saxton, Assistant Vice President

WITHOUT RECOURSE
PAY TO THE ORDER OF:
**4** FOSTER MORTGAGE CORPORATION

Greenwich Capital Mortgage, Inc.

BY *Mary C. Lawshe*
MARY C. LAWSHE, VICE PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF

**CANCELLED**

FOSTER MORTGAGE CORPORATION

By *Frances Flinn*
Frances Flinn
Assistant Vice-President

Pay to the order of
**5** Foster Mortgage Corporation,
a Louisana Corporation, without recourse.

Jelmor, Inc. (formerly Foster Mortgage
Corporation, a Texas Corporation)

By: *Diane S. Owens*
Diane S. Owens, Vice President

Pay to the order of
**6** NationsBanc Mortgage Corporation,
without recourse.

Foster Mortgage Corporation,
a Louisana Corporation

By: *Eldon L. Youngblood*
Eldon L. Youngblood, Vice President

PAY TO THE ORDER OF
**7** MidFirst Bank

WITHOUT RECOURSE

NationsBanc Mortgage Corporation

By *Daniel F. Hellams*
DANIEL F. HELLAMS
SR. VICE PRESIDENT

PAID TO THE ORDER OF

WITHOUT RECOURSE
MidFirst Bank

*Suzanne M. Haumesser*
Suzanne M. Haumesser
Vice President

**Already stamped and
ready for the next bank.**

Exhibit 6 p.3

2018-0024544

| | Recorded | | REC FEE | 23.00 |
| | Official Records | | | |
| | County of | | SB2 HOUSING | 75.00 |
| | Marin | | DA FRAUD FEE | 10.00 |
| | RICHARD N. BENSON | | | |
| | Assessor-Recorder | | | |
| | County Clerk | | | |
| | | | MM | |
| | 02:28PM 10-Jul-2018 | | Page 1 of 4 | |

APN No.: 010-101-38
Recording requested by:
Quality Loan Service Corp

When recorded mail to:
Quality Loan Service Corporation
411 Ivy Street
San Diego, CA 92101

TS No.: CA-17-797674-BF
Order No.: 8737232
Property Address: 36 RUSTIC WAY, SAN RAFAEL, CA 94901

Space above this line for Recorder's use

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL
## UNDER DEED OF TRUST

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED TO THE
COPY PROVIDED TO THE MORTGAGOR OR TRUSTOR (Pursuant to Cal. Civ. Code § 2923.3)
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE
BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY
COURT ACTION,** and you may have the legal right to bring your account in good standing
by paying all of your past due payments plus permitted costs and expenses within the time
permitted by law for reinstatement of your account, which is normally five business days prior to
the date set for the sale of your property. No sale date may be set until approximately 90 days
from the date this Notice of Default may be recorded (which date of recordation appears on this
notice). This amount is **$444,292.88** as of 7/9/2018 and will increase until your account becomes
current.

While your property is in foreclosure, you still must pay other obligations (such as
insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make
future payments on the loan, pay taxes on the property, provide insurance on the property, or pay
other obligations as required in the note and deed of trust or mortgage, the beneficiary or
mortgagee may insist that you do so in order to reinstate your account in good standing. In
addition, the beneficiary or mortgagee may require as a condition of reinstatement that you
provide reliable written evidence that you paid all senior liens, property taxes, and hazard
insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization
of the entire amount you must pay. You may not have to pay the entire unpaid portion of your
account, even though full payment was demanded, but you must pay all amounts in default at the
time payment is made. However, you and your beneficiary or mortgagee may mutually agree in
writing prior to the time the notice of sale is posted (which may not be earlier than three-months

Exhibit 7 p.1

TS No.: **CA-17-797674-BF**

after this Notice of Default is recorded) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**U.S. Bank National Association, as Trustee, successor in interest to Wachovia Bank, National Association, as Trustee for MSSTR 2004-1**
**C/O Quality Loan Service Corporation**
**411 Ivy Street**
**San Diego, CA 92101**
**619-645-7711**

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That the undersigned is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated **10/26/2001**, executed by **VERONICA A. GONZALES, AN UNMARRIED WOMAN**, as Trustor, to secure certain obligations in favor of **WELLS FARGO HOME MORTGAGE, INC.**, as beneficiary, recorded **11/21/2001**, as Instrument No. **2001-0078369**, of Official Records in the Office of the Recorder of **MARIN** County, **California** describing land therein: **as more fully described in said Deed of Trust.**

Said obligations including 1 NOTE(S) FOR THE ORIGINAL sum of **$600,000.00**, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the beneficiary; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

**The installments of principal and interest which became due on 9/1/2010, and all subsequent installments of principal and interest through the date of this Notice, plus amounts that are due for late charges, delinquent property taxes, insurance premiums, advances made on senior liens, taxes and/or insurance, trustee's fees, and any attorney fees and court costs arising from or associated with the beneficiaries efforts to protect and preserve its security, all of which must be paid as a condition of reinstatement, including all sums that shall accrue through reinstatement or pay-off. Nothing in this notice shall be construed as a waiver of any fees owing to the Beneficiary under the Deed of Trust pursuant to the terms of the loan documents.**

Exhibit 7 p.2

TS No.: **CA-17-797674-BF**

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Pursuant to the attached Declaration, the mortgage servicer declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code § 2923.55 or § 2923.5, or is otherwise exempt from the requirements of § 2923.55 and §2923.5.

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holders right's against the real property only.

**QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Dated: 7/9/18

**Quality Loan Service Corp., Trustee**

By:  Ariel Castillo, Assistant Secretary

Exhibit 7 p.3

# DECLARATION OF COMPLIANCE

*(California Civil Code Section 2923.55(c))*

Borrower(s):   VERONICA A GONZALES

Property Address:   36 RUSTIC WAY
SAN RAFAEL CA 94901

The undersigned, as an authorized agent or employee of the mortgage servicer named below, declares that:

1. ☒ The mortgage servicer has contacted the borrower pursuant to California Civil Code §2923.55(b)(2) to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure". Thirty (30) days, or more, have passed since the initial contact was made.

2. ☐ The mortgage servicer has exercised due diligence to contact the borrower pursuant to California Civil Code §2923.55(f) to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure". Thirty (30) days, or more, have passed since these due diligence efforts were satisfied.

3. ☐ No contact was required by the mortgage servicer because the individual(s) identified above did not meet the definition of "borrower" pursuant to subdivision (c) of California Civil Code §2920.5.

4. ☐ The requirements of California Civil Code §2923.55 do not apply because the loan is not secured by a first lien mortgage or deed of trust on "owner-occupied" residential real property as defined by California Civil Code §2924.15(a).

I certify that this declaration is accurate, complete and supported by competent and reliable evidence which the mortgage servicer has reviewed to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information.

Wells Fargo Bank, N.A.

By:
Name:   Laura Rodriguez
Title:   VP Loan Documentation
Date:   4/29/16

053_CA_V3

Exhibit 7 p.4

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

## 2019-0005575

| | |
|---|---|
| Recorded | REC FEE 17.00 |
| Official Records | |
| County of | SB2 HOUSING 75.00 |
| Marin | DA FRAUD FEE 10.00 |
| SHELLY SCOTT | |
| Assessor-Recorder | |
| County Clerk | |
| | AO |
| 12:31PM 26-Feb-2019 | Page 1 of 2 |

Recording requested by:
Quality Loan Service Corp.

When recorded mail to:
Quality Loan Service Corporation
2763 Camino Del Rio South
San Diego, CA 92108

---

TS No. **CA-17-797674-BF**
Order No.: **8737232**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# NOTICE OF TRUSTEE'S SALE

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED TO THE
COPY PROVIDED TO THE MORTGAGOR OR TRUSTOR (Pursuant to Cal. Civ. Code 2923.3)
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 10/26/2001. UNLESS YOU TAKE
ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED
AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD
CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn
by state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings
association, or savings bank specified in Section 5102 to the Financial Code and authorized to do business in this
state, will be held by duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or
implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by
the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the
Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the
initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on
the day of sale.

**BENEFICIARY MAY ELECT TO BID LESS THAN THE TOTAL AMOUNT DUE.**

| | |
|---|---|
| Trustor(s): | **VERONICA A. GONZALES, AN UNMARRIED WOMAN** |
| Recorded: | 11/21/2001 as Instrument No. 2001-0078369 of Official Records in the office of the |
| | Recorder of **MARIN** County, California; |

Date of Sale: **3/27/2019 at 1:00 PM**
Place of Sale: **At the San Rafael City Hall, 1400 5th Avenue, San Rafael, CA 94901. Outside at the
Southwest Corner of the City Hall**
Amount of unpaid balance and other charges: **$920,435.46**
The purported property address is: **36 RUSTIC WAY, SAN RAFAEL, CA 94901**
Assessor's Parcel No.: **010-101-38**

Exhibit 8 p.1

TS No.: **CA-17-797674-BF**

**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call 800-280-2832 for information regarding the trustee's sale or visit this Internet Web site http://www.qualityloan.com, using the file number assigned to this foreclosure by the Trustee: CA-17-797674-BF. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.

If the sale is set aside for any reason, including if the Trustee is unable to convey title, the Purchaser at the sale shall be entitled only to a return of the monies paid to the Trustee. This shall be the Purchaser's sole and exclusive remedy. The purchaser shall have no further recourse against the Trustor, the Trustee, the Beneficiary, the Beneficiary's Agent, or the Beneficiary's Attorney.

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holders right's against the real property only.

**QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Date: **2/25/2019**

**Quality Loan Service Corporation**
**2763 Camino Del Rio South**
**San Diego, CA 92108**
**619-645-7711 For NON SALE information only**
**Sale Line: 800-280-2832**
**Or Login to: http://www.qualityloan.com**
**Reinstatement Line: (866) 645-7711 Ext 5318**

Quality Loan Service Corp. by: Ronald Alonzo, Assistant Secretary

Exhibit 8 p.2

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

## 2019-0014975

| | | | |
|---|---|---|---|
| Recorded | | REC FEE | 20.00 |
| Official Records | | TAX | 3195.55 |
| County of | | MORF | 20.00 |
| Marin | | SURVEY MONUME | 10.00 |
| SHELLY SCOTT | | | |
| Assessor-Recorder | | | |
| County Clerk | | | |
| | | MH | |
| 02:41PM 03-May-2019 | | Page 1 of 3 | |

Recording requested by:

**First American Mortgage Solutions**
When recorded mail to:

JP Morgan Chase Bank, N. A.
3415 Vision Dr.
Columbus, OH 43219

Forward tax statements to the address given above

TS No.: ██████████
Order No.: ██████████

Space above this line for recorders use

## Trustee's Deed Upon Sale

A.P.N.: 010-101-38

### THE UNDERSIGNED GRANTOR DECLARES:

The grantee herein WASNT the foreclosing beneficiary.

| | |
|---|---|
| The amount of the unpaid debt together with costs was: | $917,791.66 |
| The amount paid by the grantee at the trustee sale was: | $1,030,100.00 |
| The documentary transfer tax is: County: $1,133.55 City: $2,062.00 | $3,195.55 |

Said property is in the City of:  SAN RAFAEL, County of MARIN

**QUALITY LOAN SERVICE CORPORATION**  as Trustee, (whereas so designated in the Deed of Trust hereunder more particularly described or as duly appointed Trustee) does hereby GRANT and CONVEY to:

**JP Morgan Chase Bank N. A.**

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of  MARIN, State of California, described as follows:

PARCEL ONE:BEGINNING AT A POINT ON THE SOUTHEASTERLY LINE OF THE CUL-DE-SAC, KNOWN AS RUSTIC WAY, AS SAID CUL-DE-SAC IS DESCRIBED IN THE DEED TO THE CITY OF SAN RAFAEL, RECORDED MARCH 17, 1955 IN BOOK 929 OF OFFICIAL RECORDS, AT PAGE 29, MARIN COUNTY RECORDS, SAID POINT BEING THE SOUTHWESTERLY CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN THE DEED FROM MARIN TITLE GUARANTY COMPANY, A CORPORATION, TO GREGORY S. LYON, ET UX, RECORDED JANUARY 16, 1962 IN BOOK 1533 OF OFFICIAL RECORDS, AT PAGE 354, MARIN COUNTY RECORDS, THENCE LEAVING SAID LINE OF RUSTIC WAY AND RUNNING THENCE ALONG THE SOUTHWESTERLY BOUNDARY LINE OF SAID LYON PARCEL SOUTH 54° 03' EAST 141.868 FEET TO THE MOST SOUTHERLY CORNER THEREOF; THENCE LEAVING SAID SOUTHWESTERLY BOUNDARY LINE AND RUNNING SOUTH 56° 57' 40" WEST 144.627 FEET; THENCE NORTH 47° 45' WEST 118.56 FEET TO A POINT ON THE EASTERLY LINE OF RUSTIC WAY HEREINABOVE REFERRED TO, THENCE

# Exhibit 1

Exhibit 9 p.1

ALONG SAID LINE OF RUSTIC WAY ON A CURVE TO THE LEFT WITH A RADIUS OF 140 FEET FOR A DISTANCE OF 77.756 FEET, THENCE NORTH 29° 18' 40" EAST 12.14 FEET, THENCE ON A CURVE TO THE RIGHT WITH A RADIUS OF 20 FEET FOR A DISTANCE OF 18.158 FEET, THENCE ON A CURVE TO THE LEFT WITH A RADIUS OF 45 FEET A DISTANCE OF 20.99 FEET TO THE POINT OF BEGINNING. PARCEL TWO: AN EASEMENT FOR DRIVEWAY PURPOSES OVER THE FOLLOWING DESCRIBED PARCEL: BEGINNING AT A POINT ON THE SOUTHWESTERLY LINE OF THE HEREINABOVE DESCRIBED PARCEL, SAID POINT BEING DISTANT THEREON SOUTH 47° 45' EAST 10.00 FEET FROM THE MOST WESTERLY CORNER THEREOF; THENCE ALONG SAID SOUTHWESTERLY LINE NORTH 47° 45' WEST 10.00 FEET TO THE MOST WESTERLY CORNER OF THE HEREINABOVE DESCRIBED PARCEL; THENCE SOUTHWESTERLY ALONG THE SOUTHEASTERLY LINE OF RUSTIC WAY 15.00 FEET TO A POINT, THENCE LEAVING SAID LINE OF RUSTIC WAY AND RUNNING EASTERLY IN A STRAIGHT LINE TO THE POINT OF BEGINNING.

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by VERONICA A. GONZALES, AN UNMARRIED WOMAN, as trustor, dated 10/26/2001, and recorded on 11/21/2001 as Instrument No. 2001-0078369    of Official Records in the office of the Recorder of MARIN, California, under the authority and powers vested in the Trustee designated in the Deed of Trust or as the duly appointed trustee, default having occurred under the Deed of Trust pursuant to the Notice of Breach and Election to Sell under the Deed of Trust recorded on 7/10/2018, instrument no 2018-0024544, of Official records. The Trustee of record at the relevant time having complied with all applicable statutory requirements of the State of California and performed all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten/thirty days after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person entitled to notice in compliance with California Civil Code 2924b.

Default occurred as set forth in a Notice of Default and Election to Sell which was recorded in the office of the Recorder of said County.

All requirements of law regarding the mailing of copies of notices or the publication of a copy of the Notice of Default or the personal delivery of the copy of the Notice of Default and the posting and publication of copies of the Notice of Sale have been complied with.

FATICO submits this document for recordation as a courtesy for physical convenience only. FATICO has not examined this document for its validity, sufficiency, or effect, if any, upon title to the real property described herein.

Exhibit 9 p.2

Said property was sold by said Trustee at public auction on 3/27/2019 at the place named in the Notice of Sale, in the County of MARIN, California, in which the property is situated. Grantee, being the highest bidder at such sale, became the purchaser of said property and paid therefore to said trustee the amount being $1,030,100.00 in lawful money of the United States, or by the satisfaction, pro tanto, of the obligations then secured by said Deed of Trust.

### QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

TS No.:

Date: 5/1/2019

**QUALITY LOAN SERVICE CORPORATION**

By: Juliet Bernal, Assistant Secretary

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of: Callfornia

County of: San Diego

On **MAY 0 1 2019** before me, **Katherine A. Davis** a notary public, personally appeared Juliet Bernal, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under *PENALTY OF PERJURY* under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.            (Seal)

Signature

Katherine A. Davis

KATHERINE A. DAVIS
Notary Public - California
San Diego County
Commission # 2269219
My Comm. Expires Dec 29, 2022

Exhibit 9 p.3

· 3/3/2020

## Company Name ❷

MSSTR

**Search Match Options**

○ **Starts with**   or   ⦿ **Contains**

**File Number**

*To search by file number, company name must be left blank.*

**State**

**Country**

**Standard Industry Classification** ❷

**Ownership Forms 3, 4, and 5.**
○ **Include** ⦿ **Exclude** ○ **Only**

[ Less Options ▲ ]   SEARCH

### Fast Search ❷

*Ticker or CIK*   SEARCH

Ticker symbol or CIK is the fastest way to find company filings.

**Company Filing Search Tips**
If your search is "John Smith"
and you didn't get the results
you expected, please try "Smith
John."

## Guides

### How to Research Public Companies
Learn how to quickly research a company's operations and financial information with EDGAR
search tools.

Exhibit 10 p.1

1/2

### Form Types

Review reference versions of EDGAR forms filed by companies, funds, and individuals.

## Search Tools

### CIK Lookup Tool

Look up the central index key (CIK) of an EDGAR filer. Searching by CIK is the most accurate way to view filings.

### Save Your Search 📶

Want to get updates on new filings? Learn how to save your search by subscribing to EDGAR RSS feeds.

Exhibit 10 p.2



Home | Latest Filings | Previous Page

U.S. Securities and Exchange Commission

## EDGAR Search Results

Search the Next-Generation
EDGAR System

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

No matching companies.   

*https://www.sec.gov/cgi-bin/browse-edgar*

Home | Search the Next-Generation EDGAR System | Previous Page                    Modified 07/18/2014

## Company Name ❷

| MS |
|---|

**Search Match Options**

◉ **Starts with**   or   ○ **Contains**

**File Number**

| |
|---|

*To search by file number, company name must be left blank.*

**State**

| |
|---|

**Country**

| |
|---|

**Standard Industry Classification** ❷

| |
|---|

**Ownership Forms 3, 4, and 5.**

◎ **Include** ◉ **Exclude** ○ **Only**

| Less Options ▲ |   SEARCH

### Fast Search ❷

| *Ticker or CIK* |   SEARCH

Ticker symbol or CIK is the fastest way to find company filings.

**Company Filing Search Tips**
If your search is "John Smith"
and you didn't get the results
you expected, please try "Smith
John."

## Guides

**How to Research Public Companies**
Learn how to quickly research a company's operations and financial information with EDGAR
search tools.

Exhibit 11 p.1

### Form Types
Review reference versions of EDGAR forms filed by companies, funds, and individuals.

## Search Tools

### CIK Lookup Tool
Look up the central index key (CIK) of an EDGAR filer. Searching by CIK is the most accurate way to view filings.

### Save Your Search 🔖
Want to get updates on new filings? Learn how to save your search by subscribing to EDGAR RSS feeds.

Home | Latest Filings | Previous Page

## U.S. Securities and Exchange Commission

## EDGAR Search Results

Search the Next-Generation
EDGAR System   .

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

**Companies with names matching "MS"**
*Click on CIK to view company filings*



Items 381 - 420

| CIK | Company | State/Country |
|---|---|---|
| 0001454370 | MSRE MEZZ MORTGAGE REIT B LLC | NY |
| 0001230221 | MSREF II INC | NY |
| 0000930592 | MSREF II INC /ADV | NY |
| 0001230226 | MSREF III INC | NY |
| 0001230229 | MSREF IV LLC | NY |
| 0001128256 | MSREF IV LLC /ADV | NY |
| 0001315814 | MSREF V LLC | NY |
| 0001559486 | MSREF VII Global Greenwich Co-Investment, L.P. | NY |
| 0001608458 | North Haven Real Estate Fund VIII Global-F, L.P. | NY |
| 0001608498 | North Haven Real Estate Fund VIII Global-T, L.P. | NY |
| 0001608459 | North Haven Real Estate Fund VIII Global-TE, L.P. | NY |
| 0001418294 | MSRESS III Manager, L.L.C. | NY |
| 0001418293 | MSRESS III, Inc. | NY |
| 0001026424 | MSS GROUP INC | CO |
| 0001692358 | MSS GROWTH & INCOME FUND, LLC | TX |
| 0001745107 | MSS Holdco, LLC | CA |
| 0001368578 | MSS Series Trust | OH |
| 0001178307 | MSSB FINANCIAL LLC | |
| 0001503234 | MSSB Real Estate Debt Onshore Feeder I LP | NY |
| 0001528575 | MSSB TPG Specialty Lending Offshore Feeder Fund Ltd. | NY |
| 0001527270 | MSSB TPG Specialty Lending Onshore Feeder Fund | NY |
| 0001801060 | MSSDF REIT LLC | NY |
| 0001712851 | MSSG Trust 2017-237P | NY |
| | SIC: 6189 - ASSET-BACKED SECURITIES | |
| 0001094746 | MSSI LLC | NY |
| 0001450494 | MSSI LLC | TX |
| 0001051385 | MST ENTERPRISES INC | IL |
| 0001617970 | MST Global Master Fund | C3 |
| 0001617968 | MST Global Offshore Fund | C3 |
| 0001636668 | MStar Holding Corp | CA |
| 0001394335 | MSTATION CORP | CA |
| 0001183080 | MSTG SOLUTIONS INC | CA |
| | SIC: 7389 - SERVICES-BUSINESS SERVICES, NEC | |
| 0001372305 | MSTI Holdings, Inc. | NJ |
| | SIC: 4841 - CABLE & OTHER PAY TELEVISION SERVICES | |
| 0001646769 | MSU Aspen Venture, LLC | CA |
| 0000798952 | MSU DEVICES INC | TX |
| | SIC: 3674 - SEMICONDUCTORS & RELATED DEVICES | |
| 0001500675 | MSV LifeLock II LP | MA |
| 0001500676 | MSV LifeLock LP | MA |
| 0001453288 | MSV SPECIAL OPPORTUNITIES FUND (GP) LLC | MA |
| 0001552237 | MSV Special Opportunities Fund II LP | MA |
| 0001660759 | MSV Special Opportunities Fund III LP | MA |
| 0001453287 | MSV SPECIAL OPPORTUNITIES FUND LP | MA |

Previous 40 | Next 40

*https://www.sec.gov/cgi-bin/browse-edgar*

Home | Latest Filings | Previous Page

**U.S. Securities and Exchange Commission**

## EDGAR Search Results

Search the Next-Generation
EDGAR System

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

### Companies for SIC 6189 - ASSET-BACKED SECURITIES
*Click on CIK to view company filings*



Items 7861 - 7940

| CIK | Company | State/Country |
|---|---|---|
| 0001279642 | MS STRUCTURED SATURNS SERIES 2003-11 | NY |
| 0001279643 | MS STRUCTURED SATURNS SERIES 2003-12 | NY |
| 0001279657 | MS STRUCTURED SATURNS SERIES 2003-13 | NY |
| 0001279645 | MS STRUCTURED SATURNS SERIES 2003-14 | NY |
| 0001279651 | MS STRUCTURED SATURNS SERIES 2003-15 | NY |
| 0001279644 | MS STRUCTURED SATURNS SERIES 2003-16 | NY |
| 0001279666 | MS STRUCTURED SATURNS SERIES 2003-17 | NY |
| 0001279661 | MS STRUCTURED SATURNS SERIES 2003-2 | NY |
| 0001279669 | MS STRUCTURED SATURNS SERIES 2003-3 | NY |
| 0001279662 | MS STRUCTURED SATURNS SERIES 2003-4 | NY |
| 0001279668 | MS STRUCTURED SATURNS SERIES 2003-5 | NY |
| 0001279667 | MS STRUCTURED SATURNS SERIES 2003-6 | NY |
| 0001279659 | MS STRUCTURED SATURNS SERIES 2003-7 | NY |
| 0001279658 | MS STRUCTURED SATURNS SERIES 2003-8 | NY |
| 0001279664 | MS STRUCTURED SATURNS SERIES 2003-9 | NY |
| 0001279639 | MS STRUCTURED SATURNS SERIES 2004-1 | NY |
| 0001278892 | MS STRUCTURED SATURNS SERIES 2004-2 | NY |
| 0001280976 | MS STRUCTURED SATURNS SERIES 2004-3 | NY |
| 0001282730 | MS STRUCTURED SATURNS SERIES 2004-4 | NY |
| 0001283238 | MS STRUCTURED SATURNS SERIES 2004-5 | NY |
| 0001286865 | MS STRUCTURED SATURNS SERIES 2004-6 | NY |
| 0001288756 | MS STRUCTURED SATURNS SERIES 2004-7 | NY |
| 0001311437 | MS STRUCTURED SATURNS SERIES 2005-1 | NY |
| 0001315571 | MS STRUCTURED SATURNS SERIES 2005-2 | NY |
| 0001346096 | MS STRUCTURED SATURNS SERIES 2005-3 | NY |
| 0001353166 | MS Structured SATURNS Series 2006-1 | NY |
| 0001369688 | MS Structured SATURNS Series 2006-2 | NY |
| 0001389936 | MS Structured SATURNS Series 2007-1 | NY |
| 0001502101 | MS Structured Step Up Callable Trust Units Series 2010-02 (BAC) | NY |
| 0001504994 | MS Structured Step Up Callable Trust Units Series 2010-03 (Alcoa) | NY |
| 0001507565 | MS Structured Step Up Callable Trust Units Series 2010-05 (GS) | NY |
| 0001291700 | MS STRUCTURED TILES 2004-A | NY |
| 0001346757 | MS STRUCTURED TILES SERIES 2005-1 | NY |
| 0001349577 | MS STRUCTURED TILES SERIES 2006-1 | NY |
| 0001350512 | MSAC 2006-NC1 | NY |
| 0001361992 | MSAC Trust 2006-HE3 | NY |
| 0001247426 | MSC MORTGAGE PASS THROUGH CERTIFICATES SERIES 2003-AR3 | IL |
| 0001390787 | MSCC HELOC Trust 2007-1 | NY |
| 0001144429 | MSDW STRUCTURED SATURNS SERIES 2001-5 | NY |

Exhibit 12 p.1

- 3/4/2029

| | |
|---|---|
| 0001183945 MSDWCC HELOC TRUST 2002-1 | NY |
| 0001337663 MSM 2005-5AR | NY |
| 0001357083 MSM 2006-4SL | NY |
| 0001712851 MSSG Trust 2017-237P | NY |
| 0001261680 MSW ENERGY FINANCE CO INC | NY |
| 0001271466 MULTI-CLASS MORTGAGE PASS-THROUGH CERT SERIES 2003-12 | IL |
| 0001257361 MULTI-CLASS MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2003-9 | IL |
| 0001310084 NAAC Alternative Loan Trust, Series 2004 - AP3 | NY |
| 0001310080 NAAC Alternative Loan Trust, Series 2004-AR3 | NY |
| 0001312671 NAAC Alternative Loan Trust, Series 2004-AR4 | NY |
| 0001319055 NAAC Alternative Loan Trust, Series 2005 - AP1 | NY |
| 0001319304 NAAC Alternative Loan Trust, Series 2005 - AR1 | NY |
| 0001325179 NAAC Alternative Loan Trust, Series 2005 - AR2 | NY |
| 0001328520 NAAC Alternative Loan Trust, Series 2005-WF1 | NY |
| 0001169006 NATIONAL CITY AUTO RECEIVABLES TRUST 2002-A | OH |
| 0001280871 NATIONAL CITY AUTO RECEIVABLES TRUST 2004-A | OH |
| 0000934841 NATIONAL CITY BANK OF MICHIGAN / ILLINOIS | OH |
| 0001332961 National City Credit Card Master Note Trust | OH |
| 0000934843 NATIONAL CITY CREDIT CARD MASTER TRUST | OH |
| 0001425796 National City Mortgage Capital Trust 2008-1 | OH |
| 0001223029 NATIONAL COLLEGIATE FUNDING LLC | MA |
| 0001290641 National Collegiate Student Loan Trust 2004-1 | MA |
| 0001305287 National Collegiate Student Loan Trust 2004-2 | MA |
| 0001317703 National Collegiate Student Loan Trust 2005-1 | MA |
| 0001327893 National Collegiate Student Loan Trust 2005-2 | MA |
| 0001338373 National Collegiate Student Loan Trust 2005-3 | MA |
| 0001352760 National Collegiate Student Loan Trust 2006-1 | MA |
| 0001363799 National Collegiate Student Loan Trust 2006-2 | MA |
| 0001374067 National Collegiate Student Loan Trust 2006-3 | MA |
| 0001380108 National Collegiate Student Loan Trust 2006-4 | MA |
| 0001389749 National Collegiate Student Loan Trust 2007-1 | MA |
| 0001399721 National Collegiate Student Loan Trust 2007-2 | MA |
| 0001411476 National Collegiate Student Loan Trust 2007-3 | MA |
| 0001411991 National Collegiate Student Loan Trust 2007-4 | MA |
| 0001010495 NATIONAL COLLEGIATE TRUST 1996-S1 | DE |
| 0001027548 NATIONAL COLLEGIATE TRUST 1996-S2 | DE |
| 0001035358 NATIONAL COLLEGIATE TRUST 1997 S1 | DE |
| 0001049975 NATIONAL COLLEGIATE TRUST 1997-S2 | DE |
| 0001005405 NATIONAL FINANCIAL AUTO FUNDING TRUST | FL |
| 0001113413 NATIONAL FINANCIAL SECURITIES CORP | VA |
| 0001138543 NATIONAL GLOBAL MBS MANAGER INC | FL |

Previous 80 | Next 80

Home | Search the Next-Generation EDGAR System | Previous Page

Modified 07/18/2014

Exhibit 12 p.2

2/2

# EXHIBITS END

1   Veronica Gonzales
    36 Rustic Way
2   San Rafael, California  94901
    Plaintiff in Propria Persona
3   415-717-2111

4

5

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               COUNTY OF MARIN, SAN RAFAEL COURTHOUSE

10

11  VERONICA GONZALES,                    Case No.:  CIV2001401

12                Plaintiff,              [PROPOSED]
                                         **ORDER TO CONSOLIDATE CASES**
13         v.

14  JP MORGAN CHASE BANK N.A.;           Hearing Date: **SEP 3 0 2020**
    U.S. BANK NATIONAL ASSOCIATION, AS   Hearing Time:  **1:30pm**
15  TRUSTEE, SUCCESSOR IN INTEREST TO
    WACHOVIA BANK, NATIONAL              Assigned for all Purposes to:
16  ASSOCIATION, AS TRUSTEE FOR MSSTR    Judge: Hon. James T. Chou, Courtroom B
    2004-1;
17  WELLS FARGO BANK, N.A.;              [Complaint filed:   June 19, 2020]
    QUALITY LOAN SERVICE CORPORATION;    [CMC Hearing:   November 6, 2020, 9:00 a.m.]
18  NORTHWEST TRUSTEE SERVICES. INC.;    [Trial Date:     Not Set.]
    JULIET BERNAL;
19  and DOES 1 through 20,

20
                  Defendants
21  ――――――――――――――――――――――――――――――――――――――――――――――――
    JP MORGAN CHASE BANK N.A.,           Case No. CIV1901923
22  ITS ASSIGNEES AND/OR SUCCESSORS,
                  Plaintiff,             **Limited Civil Case, less than $10,000**
23         vs.

24  VERONICA GONZALES,                   Assigned for all Purposes to:
25  and DOES 1 – 10, inclusive,          Judge: Hon. James T. Chou, Courtroom B

26            Defendant(s).              [Complaint filed:  May 20, 2019]
                                         [CMC Hearing:   July 15, 2020]
27                                       [Trial Date:    Vacated]

28
                                 1
                  ORDER TO CONSOLIDATE CASES

1 │ TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2 │     The Motion of Plaintiff VERONICA GONZALES for an order consolidating the above-entitled

3 │ cases into one action came on for hearing by the court this date. Plaintiff appeared and Defendants

4 │ appeared by counsel.

5 │     Upon proof made to the satisfaction of the court that Plaintiff's Motion ought to be granted,

6 │     **IT IS ORDERED** that limited civil, unlawful detainer Case No. **CIV1901923** be, and hereby is,

7 │ consolidated with and into unlimited civil Lead Case No. **CIV2001401** for all purposes and that only

8 │ one set of findings of fact and conclusions of law, if any, and only one judgment may be made herein.

9 │ A copy of this order shall be filed in both actions but all further pleadings shall be filed only in the Lead

10 │ Case.

11 │     IT IS FURTHER ORDERED that the Consolidated unlawful detainer Case allow discovery to

12 │ proceed at the schedules, timelines, and deadlines allowed in the unlimited civil Lead Case and that all

13 │ parties participate in good faith.

14 │     _____ IT IS FURTHER ORDERED that _____

15 │ _____

16 │ _____

17 │ _____

18 │ _____

19 │ _____.

20 │

21 │ DATED: _____, 2020

22 │

23 │                               Hon. James T. Chou, Judge

24 │

25 │

26 │

27 │

28 │

2

ORDER TO CONSOLIDATE CASES

1  | Veronica Gonzales
2  | 36 Rustic Way
   | San Rafael, California 94901
3  | Plaintiff in Propria Persona
   | 415-717-2111
4
5
6
7
8  |              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9  |              COUNTY OF MARIN, SAN RAFAEL COURTHOUSE
10

| | |
|---|---|
| 11 VERONICA GONZALES, | **Case No.: CIV2001401** |
| 12       Plaintiff, | |
| 13      v. | |
| 14 JP MORGAN CHASE BANK N.A.; | **PROOF OF SERVICE** |
| 15 U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR IN INTEREST TO | |
| 16 WACHOVIA BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR MSSTR | |
| 17 2004-1; WELLS FARGO BANK, N.A.; | Assigned for all Purposes to: |
| 18 QUALITY LOAN SERVICE CORPORATION; | Judge: Hon. James T. Chou, Courtroom B |
| 19 NORTHWEST TRUSTEE SERVICES. INC.; JULIET BERNAL; | [Complaint filed:  June 19, 2020] [CMC Hearing:    November 6, 2020, 9:00 a.m.] |
| 20 and DOES 1 through 20, | [Trial Date:     Not Set.] |
| 21      Defendants | |
| 22 JP MORGAN CHASE BANK N.A., ITS ASSIGNEES AND/OR SUCCESSORS, | **Case No. CIV1901923** |
| 23      Plaintiff,      vs. | **Limited Civil Case, less than $10,000** |
| 24 VERONICA GONZALES, | Assigned for all Purposes to: |
| 25 and DOES 1 – 10, inclusive, | Judge: Hon. James T. Chou, Courtroom B |
| 26      Defendant(s). | [Complaint filed:  May 20, 2019] [CMC Hearing:    July 15, 2020] |
| 27 | [Trial Date:     Vacated] |
| 28 | |

## PROOF OF SERVICE

I reside in Marin County. I am over the age of 18 and not a party to the case. My residence or business address is <u>385 Irwin Street, San Rafael, California 94901</u>. On the date indicated below, I served a true and correct copy of the following documents:

- Notice of Motion and Motion to Consolidate Cases: Unlimited Civil Case No. Civ2001401 with Limited Civil Case No. Civ1901923
- Memorandum of Points and Authorities
- Declaration of Veronica Gonzales; Exhibits
- [Proposed] Order to Consolidate Cases

on the interested parties below:

| | |
|---|---|
| C T Corporation System (C0168406)<br>818 West Seventh Street, Suite 930<br>Los Angeles, CA 90017 | Agent for Service of Process for Defendant<br><u>JP Morgan Chase Bank N.A.</u> |
| C T Corporation System (C0168406)<br>4400 Easton Commons Way, Suite 125<br>Columbus OH 43219 | Agent for Service of Process for Defendant<br><u>U.S. Bank National Association</u>, as Trustee,<br>Successor in Interest to Wachovia Bank, National<br>Association, as Trustee for <u>MSSTR 2004-1</u> |
| CSC - Lawyers Incorporating Service (C1592199)<br>2710 Gateway Oaks Drive, Suite 150N<br>Sacramento, CA 95833 | Agent for Service of Process for Defendant<br><u>Wells Fargo Bank, N.A.</u> |
| Bounlet Louvan<br>2763 Camino Del Rio South<br>San Diego CA 92108 | Agent for Service of Process for Defendant<br><u>Quality Loan Service Corporation</u> |
| Bounlet Louvan<br>2763 Camino Del Rio South<br>San Diego CA 92108 | <u>Juliet Bernal</u>, Asst. Secy, at place of business<br>To Quality Loan Service Corporation<br>c/o Agent for Service of Process for Defendant |
| CSC - Lawyers Incorporating Service (C1592199)<br>2710 Gateway Oaks Drive, Suite 150N<br>Sacramento, CA 95833 | Agent for Service of Process for Defendant<br><u>Northwest Trustee Services. Inc.</u> |
| Ashley Hennessee, Esq. / 619-243-3960<br>McCarthy & Holthus, LLP<br>411 Ivy Street, San Diego, CA 92101 | Attorney in consolidated case for Plaintiff<br><u>JP Morgan Chase Bank N.A.,</u><br>its assignees and/or successors |

☒ **By United States Mail** (CCP §§ 416.10, 416.30, 415.20(b), 415.30 & 1013a) by enclosing said documents in a sealed envelope or package to each addressee and placing each envelope for collection and mailing with the United States Postal Service, with postage thereon fully prepaid.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 9, 2020.

Signature: _____
Printed Name: Mariko Heenan