# EXHIBIT 1

B1 (Official Form 1) (04/13)

| United States Bankruptcy Court<br>Northern District of California | Voluntary Petition |
|---|---|

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Gonzales, Veronica A** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) /Complete EIN<br>(if more than one, state all): ▮ | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) /Complete EIN<br>(if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>**36 Rustic Way**<br>**San Rafael, CA**<br>ZIPCODE **94901-1118** | Street Address of Joint Debtor (No. & Street, City, State & Zip Code):<br>ZIPCODE |
| County of Residence or of the Principal Place of Business:<br>**Marin** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address)<br>ZIPCODE | Mailing Address of Joint Debtor (if different from street address):<br>ZIPCODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>ZIPCODE | |

**Type of Debtor**
(Form of Organization)
(Check **one** box.)

- [✓] Individual (includes Joint Debtors)
  *See Exhibit D on page 2 of this form.*
- [ ] Corporation (includes LLC and LLP)
- [ ] Partnership
- [ ] Other (If debtor is not one of the above entities, check this box and state type of entity below.)

**Chapter 15 Debtor**
Country of debtor's center of main interests:

Each country in which a foreign proceeding by, regarding, or against debtor is pending:

**Nature of Business**
(Check **one** box.)

- [ ] Health Care Business
- [ ] Single Asset Real Estate as defined in 11 U.S.C. § 101(51B)
- [ ] Railroad
- [ ] Stockbroker
- [ ] Commodity Broker
- [ ] Clearing Bank
- [ ] Other

**Tax-Exempt Entity**
(Check box, if applicable.)

- [ ] Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code).

**Chapter of Bankruptcy Code Under Which the Petition is Filed** (Check **one** box.)

- [ ] Chapter 7
- [ ] Chapter 9
- [ ] Chapter 11
- [ ] Chapter 12
- [✓] Chapter 13
- [ ] Chapter 15 Petition for Recognition of a Foreign Main Proceeding
- [ ] Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding

**Nature of Debts**
(Check one box.)

- [✓] Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."
- [ ] Debts are primarily business debts.

**Filing Fee** (Check one box)

- [✓] Full Filing Fee attached
- [ ] Filing Fee to be paid in installments (Applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.
- [ ] Filing Fee waiver requested (Applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

**Chapter 11 Debtors**

Check one box:
- [ ] Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
- [ ] Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

Check if:
- [ ] Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,490,925 *(amount subject to adjustment on 4/01/16 and every three years thereafter).*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Check all applicable boxes:
- [ ] A plan is being filed with this petition
- [ ] Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

**Statistical/Administrative Information**

- [ ] Debtor estimates that funds will be available for distribution to unsecured creditors.
- [✓] Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

Estimated Number of Creditors

| [✓] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
|---|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | Over 100,000 |

Estimated Assets

| [ ] | [ ] | [ ] | [✓] | [ ] | [ ] | [ ] | [ ] | [ ] |
|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,000 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

Estimated Liabilities

| [ ] | [ ] | [ ] | [✓] | [ ] | [ ] | [ ] | [ ] | [ ] |
|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,000 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

B1 (Official Form 1) (04/13)                                                                                                            Page 2

| **Voluntary Petition** *(This page must be completed and filed in every case)* | Name of Debtor(s): **Gonzales, Veronica A** |
|---|---|

### All Prior Bankruptcy Case Filed Within Last 8 Years (If more than two, attach additional sheet)

| Location Where Filed:**None** | Case Number: | Date Filed: |
|---|---|---|
| Location Where Filed: | Case Number: | Date Filed: |

### Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet)

| Name of Debtor: **None** | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

| **Exhibit A** (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐ Exhibit A is attached and made a part of this petition. | **Exhibit B** (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by 11 U.S.C. § 342(b).<br><br>X **/s/ Tyson Takeuchi**                                  **5/07/14**<br>    Signature of Attorney for Debtor(s)                        Date |
|---|---|

### Exhibit C

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.

☑ No

### Exhibit D

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

    ☑ Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

    ☐ Exhibit D also completed and signed by the joint debtor is attached a made a part of this petition.

### Information Regarding the Debtor - Venue
(Check any applicable box.)

    ☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

    ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

    ☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

### Certification by a Debtor Who Resides as a Tenant of Residential Property
(Check all applicable boxes.)

☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐ Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐ Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

B1 (Official Form 1) (04/13)                                                                                           Page 3

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>**Gonzales, Veronica A** |
|---|---|

<div align="center">

**Signatures**

</div>

| **Signature(s) of Debtor(s) (Individual/Joint)** | **Signature of a Foreign Representative** |
|---|---|

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under Chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X **/s/ Veronica A Gonzales**
Signature of Debtor                                    **Veronica A Gonzales**

X _____
Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

**May  7, 2014**
Date

**Signature of a Foreign Representative**

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only **one** box.)

☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.

☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
Signature of Foreign Representative

_____
Printed Name of Foreign Representative

_____
Date

| **Signature of Attorney*** | **Signature of Non-Attorney Petition Preparer** |
|---|---|

**Signature of Attorney***

X **/s/ Tyson Takeuchi**
Signature of Attorney for Debtor(s)

**Tyson Takeuchi 177419**
**Law Offices Of Tyson Takeuchi**
**1100 Wilshire Blvd Ste 2606**
**Los Angeles, CA  90017-1916**
**(213) 637-1566  Fax: (888) 977-6310**
**ty@tysonfirm.com**

**May  7, 2014**
Date

*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

**Signature of Non-Attorney Petition Preparer**

I declare under penalty of perjury that: 1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; 2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h) and 342(b); and 3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.

_____
Printed Name and title, if any,  of Bankruptcy Petition Preparer

_____
Social Security Number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)

_____
Address

X _____
Signature

_____
Date

Signature of Bankruptcy Petition Preparer or officer, principal, responsible person, or partner whose social security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.*

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

_____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

B1D (Official Form 1, Exhibit D) (12/09)

# United States Bankruptcy Court
## Northern District of California

IN RE:                                              Case No. _____

**Gonzales, Veronica A**                            Chapter **13**
_____
Debtor(s)

## EXHIBIT D - INDIVIDUAL DEBTOR'S STATEMENT OF COMPLIANCE
## CREDIT COUNSELING REQUIREMENT

**Warning: You must be able to check truthfully one of the five statements regarding credit counseling listed below. If you cannot do so, you are not eligible to file a bankruptcy case, and the court can dismiss any case you do file. If that happens, you will lose whatever filing fee you paid, and your creditors will be able to resume collection activities against you. If your case is dismissed and you file another bankruptcy case later, you may be required to pay a second filing fee and you may have to take extra steps to stop creditors' collection activities.**

*Every individual debtor must file this Exhibit D. If a joint petition is filed, each spouse must complete and file a separate Exhibit D. Check one of the five statements below and attach any documents as directed.*

☑ 1. Within the 180 days **before the filing of my bankruptcy case**, I received a briefing from a credit counseling agency approved by the United States trustee or bankruptcy administrator that outlined the opportunities for available credit counseling and assisted me in performing a related budget analysis, and I have a certificate from the agency describing the services provided to me. *Attach a copy of the certificate and a copy of any debt repayment plan developed through the agency.*

☐ 2. Within the 180 days **before the filing of my bankruptcy case**, I received a briefing from a credit counseling agency approved by the United States trustee or bankruptcy administrator that outlined the opportunities for available credit counseling and assisted me in performing a related budget analysis, but I do not have a certificate from the agency describing the services provided to me. *You must file a copy of a certificate from the agency describing the services provided to you and a copy of any debt repayment plan developed through the agency no later than 14 days after your bankruptcy case is filed.*

☐ 3. I certify that I requested credit counseling services from an approved agency but was unable to obtain the services during the seven days from the time I made my request, and the following exigent circumstances merit a temporary waiver of the credit counseling requirement so I can file my bankruptcy case now. *[Summarize exigent circumstances here.]*

**If your certification is satisfactory to the court, you must still obtain the credit counseling briefing within the first 30 days after you file your bankruptcy petition and promptly file a certificate from the agency that provided the counseling, together with a copy of any debt management plan developed through the agency. Failure to fulfill these requirements may result in dismissal of your case. Any extension of the 30-day deadline can be granted only for cause and is limited to a maximum of 15 days. Your case may also be dismissed if the court is not satisfied with your reasons for filing your bankruptcy case without first receiving a credit counseling briefing.**

☐ 4. I am not required to receive a credit counseling briefing because of: *[Check the applicable statement.] [Must be accompanied by a motion for determination by the court.]*

  ☐ Incapacity. (Defined in 11 U.S.C. § 109(h)(4) as impaired by reason of mental illness or mental deficiency so as to be incapable of realizing and making rational decisions with respect to financial responsibilities.);

  ☐ Disability. (Defined in 11 U.S.C. § 109(h)(4) as physically impaired to the extent of being unable, after reasonable effort, to participate in a credit counseling briefing in person, by telephone, or through the Internet.);

  ☐ Active military duty in a military combat zone.

☐ 5. The United States trustee or bankruptcy administrator has determined that the credit counseling requirement of 11 U.S.C. § 109(h) does not apply in this district.

**I certify under penalty of perjury that the information provided above is true and correct.**

Signature of Debtor: **/s/ Veronica A Gonzales** _____

Date: **May  7, 2014** _____

**United States Bankruptcy Court**
**Northern District of California**

IN RE:                                                                    Case No. _____

Gonzales, Veronica A _____   Chapter **13** _____
                          Debtor(s)

## CREDITOR MATRIX COVER SHEET

I declare that the attached Creditor Mailing Matrix, consisting of _____ **2** sheets, contains the correct, complete and current names and addresses of all priority, secured and unsecured creditors listed in debtor's filing and that this matrix conforms with the Clerk's promulgated requirements.

DATED: **May  7, 2014**


*/s/ Tyson Takeuchi* _____
Signature of Debtor's Attorney or Pro Per Debtor

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

Allied Collection Services
8550 Balboa Blvd Ste 232
Northridge, CA  91325-5806

American Express
PO Box 981537
El Paso, TX  79998-1537

Bank Of America
PO Box 982235
El Paso, TX  79998-2235

Bank Of America
PO Box 982235
El Paso, TX  79998

Chase
Po Box 24696
Columbus, OH  43224

Equifax Information Services, LLC
PO Box 740256
Atlanta, GA  30374-0256

Experian
NCAC
PO Box 9556
Allen, TX  75013-9556

Experian
Profile Maintenance
PO Box 9558
Allen, TX  75013-9558

Franchise Tax Board
Personal Bankruptcy MS A340
PO Box 2952
Sacramento, CA  95812-2952


Gecrb/Home Design Nahfa
Po Box 965036
Orlando, FL  32896


Home Depot / Citibank
Po Box 6497
Sioux Falls, SD  57117


Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA  19101-7346


Trans Union Corporation
Attn: Public Records Department
555 W Adams St
Chicago, IL  60661-3719


Transunion Consumer Relations
PO Box 2000
Crum Lynne, PA  19022-0000


Union Adjustment
3214 W Burbank Blvd
Burbank, CA  91505-2201


Wells Fargo Home Mtg
Po Box 10335
Des Moines, IA  50306

# EXHIBIT 2

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

Northern District of California

Case number (*If known*): _____

Chapter you are filing under:
- ☐ Chapter 7
- ☐ Chapter 11
- ☐ Chapter 12
- ☑ Chapter 13

☐ Check if this is an amended filing

## Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy          12/15

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

| Part 1: | Identify Yourself |
|---------|-------------------|

|   | | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| **1.** | **Your full name** | | |
| | Write the name that is on your government-issued picture identification (for example, your driver's license or passport). | Veronica | |
| | | First name | First name |
| | | Ann | |
| | | Middle name | Middle name |
| | Bring your picture identification to your meeting with the trustee. | Gonzales | |
| | | Last name | Last name |
| | | | |
| | | Suffix (Sr., Jr., II, III) | Suffix (Sr., Jr., II, III) |
| **2.** | **All other names you have used in the last 8 years** | First name | First name |
| | Include your married or maiden names. | Middle name | Middle name |
| | | Last name | Last name |
| | | First name | First name |
| | | Middle name | Middle name |
| | | Last name | Last name |
| **3.** | **Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx – xx – ▉▉▉▉ <br> OR <br> 9 xx – xx – ___ ___ ___ ___ | xxx – xx – ___ ___ ___ ___ <br> OR <br> 9 xx – xx – ___ ___ ___ ___ |

Debtor 1    Veronica   Ann    Gonzales

First Name    Middle Name    Last Name

Case number (if known) _____

| | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **4. Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years** <br><br> Include trade names and *doing business as* names | ☑ I have not used any business names or EINs. <br><br> Business name _____ <br><br> Business name _____ <br><br> EIN __ __ – __ __ __ __ __ __ __ <br><br> EIN __ __ – __ __ __ __ __ __ __ | ☐ I have not used any business names or EINs. <br><br> Business name _____ <br><br> Business name _____ <br><br> EIN __ __ – __ __ __ __ __ __ __ <br><br> EIN __ __ – __ __ __ __ __ __ __ |
| **5. Where you live** | 36 Rustic Way <br> Number    Street <br><br> San Rafael            CA   94901 <br> City            State   ZIP Code <br><br> Marin <br> County <br><br> **If your mailing address is different from the one above, fill it in here.** Note that the court will send any notices to you at this mailing address. <br><br> Number    Street <br><br> P.O. Box <br><br> City            State   ZIP Code | If Debtor 2 lives at a different address: <br><br> Number    Street <br><br> City            State   ZIP Code <br><br> County <br><br> **If Debtor 2's mailing address is different from yours, fill it in here.** Note that the court will send any notices to this mailing address. <br><br> Number    Street <br><br> P.O. Box <br><br> City            State   ZIP Code |
| **6. Why you are choosing *this district* to file for bankruptcy** | Check one: <br><br> ☑ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district. <br><br> ☐ I have another reason. Explain. (See 28 U.S.C. § 1408.) <br> _____ <br> _____ <br> _____ | Check one: <br><br> ☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district. <br><br> ☐ I have another reason. Explain. (See 28 U.S.C. § 1408.) <br> _____ <br> _____ <br> _____ |

Debtor 1    <u>Veronica   Ann     Gonzales</u>

First Name    Middle Name     Last Name        Case number *(if known)* _____

---

**Part 2:**    **Tell the Court About Your Bankruptcy Case**

**7. The chapter of the Bankruptcy Code you are choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy* (Form 2010)). Also, go to the top of page 1 and check the appropriate box.

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

☐ Chapter 13

**8. How you will pay the fee**

☐ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9. Have you filed for bankruptcy within the last 8 years?**

☐ No

☐ Yes.   District _____ When _____ Case number _____
                                   MM / DD / YYYY

        District _____ When _____ Case number _____
                                     MM / DD / YYYY

        District _____ When _____ Case number _____
                                     MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

☐ No

☐ Yes.   Debtor _____ Relationship to you _____

        District _____ When _____ Case number, if known _____
                                     MM / DD / YYYY

        Debtor _____ Relationship to you _____

        District _____ When _____ Case number, if known _____
                                     MM / DD / YYYY

**11. Do you rent your residence?**

☐ No.   Go to line 12.

☐ Yes.   Has your landlord obtained an eviction judgment against you and do you want to stay in your residence?

        ☐ No. Go to line 12.

        ☐ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it with this bankruptcy petition.

---

Debtor 1    Veronica  Ann    Gonzales                                    Case number (if known)_____
            First Name   Middle Name    Last Name

---

**Part 3:**   **Report About Any Businesses You Own as a Sole Proprietor**

---

12. **Are you a sole proprietor of any full- or part-time business?**

    A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

    If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

☐ No. Go to Part 4.

☐ Yes. Name and location of business

_____
Name of business, if any

_____
Number     Street

_____

_____
City                              State    ZIP Code

*Check the appropriate box to describe your business:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ None of the above

13. **Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

    For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines.* If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ No.  I am not filing under Chapter 11.

☐ No.  I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes. I am filing under Chapter 11 and I am a small business debtor according to the definition in the Bankruptcy Code.

---

**Part 4:**   **Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention**

---

14. **Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

    *For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

☐ No

☐ Yes.  What is the hazard?     _____

                                _____

        If immediate attention is needed, why is it needed?  _____

                                _____

        Where is the property?  _____
                                Number     Street

                                _____
                                City                    State    ZIP Code

---

Official Form 101                    **Voluntary Petition for Individuals Filing for Bankruptcy**                    page 4

Debtor 1  __Veronica__ __Ann__ __Gonzales__  
First Name    Middle Name    Last Name

Case number (if known)_____

---

<span style="background:black;color:white">Part 5:</span> **Explain Your Efforts to Receive a Briefing About Credit Counseling**

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

**Incapacity.** I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

**Disability.** My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

**Active duty.** I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

**Incapacity.** I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

**Disability.** My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

**Active duty.** I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

---

Debtor 1 ___Veronica__ __Ann__ ____Gonzales_____        Case number (if known)_____
    First Name    Middle Name    Last Name

## Part 6:  Answer These Questions for Reporting Purposes

**16. What kind of debts do you have?**

16a. **Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☐ No. Go to line 16b.
☒ Yes. Go to line 17.

16b. **Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.
☐ Yes. Go to line 17.

16c. State the type of debts you owe that are not consumer debts or business debts.

_____

**17. Are you filing under Chapter 7?**

**Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?**

☐ No. I am not filing under Chapter 7. Go to line 18.

☐ Yes. I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

    ☐ No
    ☐ Yes

**18. How many creditors do you estimate that you owe?**

☒ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

**19. How much do you estimate your assets to be worth?**

☒ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

**20. How much do you estimate your liabilities to be?**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☒ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

## Part 7:  Sign Below

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

☐ _____        ☐ _____
    Signature of Debtor 1                       Signature of Debtor 2

Executed on __9 / 19 / 2016__        Executed on _____
    MM / DD / YYYY                           MM / DD / YYYY

Debtor 1    Veronica   Ann      Gonzales _____      Case number (if known)_____
         First Name    Middle Name      Last Name

**For your attorney, if you are represented by one**

**If you are not represented by an attorney, you do not need to file this page.**

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible.  I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

☐ _____      Date    _____
Signature of Attorney for Debtor                          MM   /   DD  / YYYY


_____
Printed name

_____
Firm name

_____
Number    Street

_____

_____
City                                          State      ZIP Code


Contact phone _____      Email address _____


_____
Bar number                                    State

| Debtor 1 | Veronica  Ann       Gonzales | | Case number (if known)_____ |
|---|---|---|---|
| | First Name    Middle Name    Last Name | | |

**For you if you are filing this bankruptcy without an attorney**

**If you are represented by an attorney, you do not need to file this page.**

The law allows you, as an individual, to represent yourself in bankruptcy court, but **you should understand that many people find it extremely difficult to represent themselves successfully. Because bankruptcy has long-term financial and legal consequences, you are strongly urged to hire a qualified attorney.**

To be successful, you must correctly file and handle your bankruptcy case. The rules are very technical, and a mistake or inaction may affect your rights. For example, your case may be dismissed because you did not file a required document, pay a fee on time, attend a meeting or hearing, or cooperate with the court, case trustee, U.S. trustee, bankruptcy administrator, or audit firm if your case is selected for audit. If that happens, you could lose your right to file another case, or you may lose protections, including the benefit of the automatic stay.

You must list all your property and debts in the schedules that you are required to file with the court. Even if you plan to pay a particular debt outside of your bankruptcy, you must list that debt in your schedules. If you do not list a debt, the debt may not be discharged. If you do not list property or properly claim it as exempt, you may not be able to keep the property. The judge can also deny you a discharge of all your debts if you do something dishonest in your bankruptcy case, such as destroying or hiding property, falsifying records, or lying. Individual bankruptcy cases are randomly audited to determine if debtors have been accurate, truthful, and complete. **Bankruptcy fraud is a serious crime; you could be fined and imprisoned.**

If you decide to file without an attorney, the court expects you to follow the rules as if you had hired an attorney. The court will not treat you differently because you are filing for yourself. To be successful, you must be familiar with the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the local rules of the court in which your case is filed. You must also be familiar with any state exemption laws that apply.

Are you aware that filing for bankruptcy is a serious action with long-term financial and legal consequences?

☐ No
☑ Yes

Are you aware that bankruptcy fraud is a serious crime and that if your bankruptcy forms are inaccurate or incomplete, you could be fined or imprisoned?

☐ No
☑ Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out your bankruptcy forms?

☑ No
☐ Yes. Name of Person_____.
       Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

By signing here, I acknowledge that I understand the risks involved in filing without an attorney. I have read and understood this notice, and I am aware that filing a bankruptcy case without an attorney may cause me to lose my rights or property if I do not properly handle the case.

| ✗ _signature_ | ✗ _____ |
|---|---|
| Signature of Debtor 1 | Signature of Debtor 2 |
| Date  9/19/2016 | Date |
| MM / DD / YYYY | MM / DD / YYYY |
| Contact phone _____ | Contact phone _____ |
| Cell phone ████████ | Cell phone _____ |
| Email address _____ | Email address _____ |

Voluntary Petition for Individuals Filing for Bankruptcy

Wells Fargo Home Mortgage

P.O. Box 10335

Des Moines, IA 50306-0335

# EXHIBIT 3

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

Northern District of California

Case number *(If known):* _____

Chapter you are filing under:
- ☐ Chapter 7
- ☐ Chapter 11
- ☐ Chapter 12
- ☑ Chapter 13

☐ Check if this is an amended filing

## Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy    12/15

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be yes if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

| Part 1: | Identify Yourself |
|---|---|

|   | | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| 1. | **Your full name** | | |
| | Write the name that is on your government-issued picture identification (for example, your driver's license or passport). | Veronica<br>First name | First name |
| | | Ann<br>Middle name | Middle name |
| | Bring your picture identification to your meeting with the trustee. | Gonzales<br>Last name | Last name |
| | | Suffix (Sr., Jr., II, III) | Suffix (Sr., Jr., II, III) |
| 2. | **All other names you have used in the last 8 years**<br><br>Include your married or maiden names. | First name | First name |
| | | Middle name | Middle name |
| | | Last name | Last name |
| | | First name | First name |
| | | Middle name | Middle name |
| | | Last name | Last name |
| 3. | **Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx – xx – ███████<br>OR<br>9 xx – xx – ___ ___ ___ ___ | xxx – xx – ___ ___ ___ ___<br>OR<br>9 xx – xx – ___ ___ ___ ___ |

Debtor 1  **Veronica  Ann     Gonzales**
First Name   Middle Name   Last Name                    Case number *(if known)* _____

|  | **About Debtor 1:** | **About Debtor 2 (Spouse Only in a Joint Case):** |
|---|---|---|
| **4. Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years** <br> Include trade names and *doing business as* names | ☑ I have not used any business names or EINs. <br><br> _____ <br> Business name <br><br> _____ <br> Business name <br><br> EIN __ __ - __ __ __ __ __ __ __ <br><br> EIN __ __ - __ __ __ __ __ __ __ | ☐ I have not used any business names or EINs. <br><br> _____ <br> Business name <br><br> _____ <br> Business name <br><br> EIN __ __ - __ __ __ __ __ __ __ <br><br> EIN __ __ - __ __ __ __ __ __ __ |

**5. Where you live**

| | |
|---|---|
| **36 Rustic Way** <br> Number     Street <br><br> _____ <br><br> **San Rafael**              **CA**    **94901** <br> City                    State    ZIP Code <br> **Marin** <br> County <br><br> If your mailing address is different from the one above, fill it in here. Note that the court will send any notices to you at this mailing address. <br><br> _____ <br> Number     Street <br><br> _____ <br> P.O. Box <br><br> _____ <br> City                    State    ZIP Code | **If Debtor 2 lives at a different address:** <br><br> _____ <br> Number     Street <br><br> _____ <br><br> _____ <br> City                    State    ZIP Code <br> _____ <br> County <br><br> If Debtor 2's mailing address is different from yours, fill it in here. Note that the court will send any notices to this mailing address. <br><br> _____ <br> Number     Street <br><br> _____ <br> P.O. Box <br><br> _____ <br> City                    State    ZIP Code |

**6. Why you are choosing *this district* to file for bankruptcy**

| | |
|---|---|
| *Check one:* <br><br> ☑ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district. <br><br> ☐ I have another reason. Explain. (See 28 U.S.C. § 1408.) <br><br> _____ <br> _____ <br> _____ | *Check one:* <br><br> ☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district. <br><br> ☐ I have another reason. Explain. (See 28 U.S.C. § 1408.) <br><br> _____ <br> _____ <br> _____ |

Debtor 1   Veronica  Ann   Gonzales _____   Case number (if known) _____
  First Name   Middle Name   Last Name

---

**Part 2:   Tell the Court About Your Bankruptcy Case**

---

**7.  The chapter of the Bankruptcy Code you are choosing to file under**

Check one. (For a brief description of each, see Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)). Also, go to the top of page 1 and check the appropriate box.

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

☑ Chapter 13

---

**8.  How you will pay the fee**

☑ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the Application for Individuals to Pay The Filing Fee in Installments (Official Form 103A).

☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the Application to Have the Chapter 7 Filing Fee Waived (Official Form 103B) and file it with your petition.

---

**9.  Have you filed for bankruptcy within the last 8 years?**

☐ No

☑ Yes.  District  Northern _____  When  09/19/2017 ____  Case number  16-31010 _____
                                                 MM / DD / YYYY

          District _____  When _____  Case number _____
                                                 MM / DD / YYYY

          District _____  When _____  Case number _____
                                                 MM / DD / YYYY

---

**10.  Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

☑ No

☐ Yes.  Debtor _____  Relationship to you _____

          District _____  When _____  Case number, if known _____
                                    MM / DD / YYYY

          Debtor _____  Relationship to you _____

          District _____  When _____  Case number, if known _____
                                    MM / DD / YYYY

---

**11.  Do you rent your residence?**

☑ No.  Go to line 12.

☐ Yes.  Has your landlord obtained an eviction judgment against you and do you want to stay in your residence?

          ☐ No. Go to line 12.

          ☐ Yes. Fill out Initial Statement About an Eviction Judgment Against You (Form 101A) and file it with this bankruptcy petition.

---

Debtor 1   **Veronica  Ann    Gonzales**                    Case number *(if known)*_____
          First Name   Middle Name   Last Name

---

**Part 3:    Report About Any Businesses You Own as a Sole Proprietor**

**12. Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

☑ No. Go to Part 4.

☐ Yes. Name and location of business

_____
Name of business, if any

_____
Number     Street

_____

_____
City                                        State      ZIP Code

*Check the appropriate box to describe your business:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines. If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).*

☑ No.  I am not filing under Chapter 11.

☐ No.  I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes. I am filing under Chapter 11 and I am a small business debtor according to the definition in the Bankruptcy Code.

---

**Part 4:    Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention**

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

☑ No

☐ Yes.  What is the hazard?    _____

_____

If immediate attention is needed, why is it needed?  _____

_____

Where is the property?    _____
                          Number        Street

_____

_____
City                                        State      ZIP Code

---

Official Form 101                Voluntary Petition for Individuals Filing for Bankruptcy                page 4

Debtor 1    **Veronica  Ann   Gonzales**
            First Name    Middle Name    Last Name

Case number *(if known)* _____

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**

*You must check one:*

☑ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**  I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**  My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**  I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**  I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**  My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**  I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Debtor 1    **Veronica   Ann     Gonzales**    Case number (if known)_____
            First Name   Middle Name   Last Name

---

**Part 6:    Answer These Questions for Reporting Purposes**

**16. What kind of debts do you have?**

**16a. Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☐ No. Go to line 16b.
☑ Yes. Go to line 17.

**16b. Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.
☐ Yes. Go to line 17.

16c. State the type of debts you owe that are not consumer debts or business debts.

_____

---

**17. Are you filing under Chapter 7?**

☑ No. I am not filing under Chapter 7. Go to line 18.

**Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?**

☐ Yes. I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

☐ No
☐ Yes

---

**18. How many creditors do you estimate that you owe?**

☑ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

---

**19. How much do you estimate your assets to be worth?**

☑ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

**20. How much do you estimate your liabilities to be?**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☑ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

**Part 7:    Sign Below**

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

✗ _____    ✗ _____
Signature of Debtor 1                      Signature of Debtor 2

Executed on __4_/_17_/_2017__              Executed on _____
              MM / DD / YYYY                            MM / DD / YYYY

Debtor 1   Veronica  Ann   Gonzales
           First Name    Middle Name    Last Name

Case number (if known)_____

---

**For you if you are filing this bankruptcy without an attorney**

**If you are represented by an attorney, you do not need to file this page.**

The law allows you, as an individual, to represent yourself in bankruptcy court, but **you should understand that many people find it extremely difficult to represent themselves successfully. Because bankruptcy has long-term financial and legal consequences, you are strongly urged to hire a qualified attorney.**

To be successful, you must correctly file and handle your bankruptcy case. The rules are very technical, and a mistake or inaction may affect your rights. For example, your case may be dismissed because you did not file a required document, pay a fee on time, attend a meeting or hearing, or cooperate with the court, case trustee, U.S. trustee, bankruptcy administrator, or audit firm if your case is selected for audit. If that happens, you could lose your right to file another case, or you may lose protections, including the benefit of the automatic stay.

You must list all your property and debts in the schedules that you are required to file with the court. Even if you plan to pay a particular debt outside of your bankruptcy, you must list that debt in your schedules. If you do not list a debt, the debt may not be discharged. If you do not list property or properly claim it as exempt, you may not be able to keep the property. The judge can also deny you a discharge of all your debts if you do something dishonest in your bankruptcy case, such as destroying or hiding property, falsifying records, or lying. Individual bankruptcy cases are randomly audited to determine if debtors have been accurate, truthful, and complete. **Bankruptcy fraud is a serious crime; you could be fined and imprisoned.**

If you decide to file without an attorney, the court expects you to follow the rules as if you had hired an attorney. The court will not treat you differently because you are filing for yourself. To be successful, you must be familiar with the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the local rules of the court in which your case is filed. You must also be familiar with any state exemption laws that apply.

Are you aware that filing for bankruptcy is a serious action with long-term financial and legal consequences?

☐ No
☑ Yes

Are you aware that bankruptcy fraud is a serious crime and that if your bankruptcy forms are inaccurate or incomplete, you could be fined or imprisoned?

☐ No
☑ Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out your bankruptcy forms?
☑ No
☐ Yes. Name of Person_____.
    Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

By signing here, I acknowledge that I understand the risks involved in filing without an attorney. I have read and understood this notice, and I am aware that filing a bankruptcy case without an attorney may cause me to lose my rights or property if I do not properly handle the case.

| | |
|---|---|
| ✗ _signature_ | ✗ _____ |
| Signature of Debtor 1 | Signature of Debtor 2 |
| Date  4/17/2017 | Date _____ |
|      MM / DD / YYYY |      MM / DD / YYYY |
| Contact phone ████████ | Contact phone _____ |
| Cell phone  Same | Cell phone _____ |
| Email address ████████ | Email address _____ |

Print      Save As...      Add Attachment                                    Reset

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA

In re: Veronica Ann Gonzales   Case No.:

_____ Debtor(s)   /

### CREDITOR MATRIX COVER SHEET

I declare that the attached Creditor Mailing Matrix, consisting of ____ sheets, contains the correct, complete and current names and addresses of all priority, secured and unsecured creditors listed in debtor's filing and that this matrix conforms with the Clerk's promulgated requirements.

DATED:   4 | 17 | 2017

_____
Signature of Debtor's Attorney or Pro Per Debtor

# CREDITOR MATRIX

Veronica Ann Gonzalez
36 Rustic Way
San Rafael, CA 94901


United States Bankruptcy Court
Northern District of California
Phillip Burton United States Courthouse

450 Golden Gate Avenue
San Francisco, CA 94102

US Bank National Association
220 S. 6th Street
Minneapolis. MN 55402

Northwest Trustee Services
1241 E. Dyer Road, Suite 250
Santa Ana, CA 92705



4/17/2017

Wells Fargo Home Mortgage

P.O. Box 10335

Des Moines, IA 50306-0335

# EXHIBIT 4

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

NORTHERN DISTRICT OF CALIFORNIA

Case number *(if known)*

Chapter you are filing under:

■ Chapter 7
☐ Chapter 11
☐ Chapter 12
☐ Chapter 13

☐ Check if this an amended filing

Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy

12/15

The bankruptcy forms use you and Debtor 1 to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use you to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be yes if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

## Part 1:   Identify Yourself

| | | |
|---|---|---|
| **1. Your full name** | | |
| Write the name that is on your government-issued picture identification (for example, your driver's license or passport). | Veronica | First name |
| | First name | |
| | A. | |
| | Middle name | Middle name |
| Bring your picture identification to your meeting with the trustee. | Gonzales | |
| | Last name and Suffix (Sr., Jr., II, III) | Last name and Suffix (Sr., Jr., II, III) |

| | |
|---|---|
| **2. All other names you have used in the last 8 years** | |
| Include your married or maiden names. | |

| | |
|---|---|
| **3. Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | |

Debtor 1   **Veronica A. Gonzales**                                      Case number *(if known)* _____

| | |
|---|---|

**4.** **Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years**

Include trade names and *doing business as* names

■ I have not used any business name or EINs.                    ☐ I have not used any business name or EINs.

Business name(s)                                                Business name(s)
_____                                 _____

EINs                                                            EINs
_____                                 _____

**5.** **Where you live**

36 Rustic Way
San Rafael, CA 94901
Number, Street, City, State & ZIP Code                          Number, Street, City, State & ZIP Code

Marin
County                                                          County

If your mailing address is different from the one above, fill it in here. Note that the court will send any notices to you at this mailing address.

_____
Number, P.O. Box, Street, City, State & ZIP Code

**If Debtor 2 lives at a different address:**

_____
Number, Street, City, State & ZIP Code

_____
County

If Debtor 2's mailing address is different from yours, fill it in here. Note that the court will send any notices to this mailing address.

_____
Number, P.O. Box, Street, City, State & ZIP Code

**6.** **Why you are choosing *this district* to file for bankruptcy**

*Check one:*

■ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.

☐ I have another reason.
Explain. (See 28 U.S.C. § 1408.)

*Check one:*

☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.

☐ I have another reason.
Explain. (See 28 U.S.C. § 1408.)

Debtor 1   Veronica A. Gonzales _____   Case number *(if known)* _____

**Part 2:   Tell the Court About Your Bankruptcy Case**

7. **The chapter of the Bankruptcy Code you are choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy* (Form 2010)). Also, go to the top of page 1 and check the appropriate box.

■ Chapter 7
☐ Chapter 11
☐ Chapter 12
☐ Chapter 13

8. **How you will pay the fee**

■ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

9. **Have you filed for bankruptcy within the last 8 years?**

☐ No.
■ Yes.

| | District | | When | Case number |
|---|---|---|---|---|
| | District | Northern District of California (San Francisco) | When 4/17/17 | Case number 3:17-bk-30359 |
| | District | Northern District of California (San Francisco) | When 9/19/16 | Case number 3:16-bk-31010 |
| | District | Northern District of California (San Francisco) | When 5/07/14 | Case number 3:14-bk-30710 |

10. **Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

■ No
☐ Yes.

| | Debtor _____ | | Relationship to you _____ |
|---|---|---|---|
| | District _____ | When _____ | Case number, if known _____ |
| | Debtor _____ | | Relationship to you _____ |
| | District _____ | When _____ | Case number, if known _____ |

11. **Do you rent your residence?**

■ No.   Go to line 12.
☐ Yes.   Has your landlord obtained an eviction judgment against you and do you want to stay in your residence?

☐ No. Go to line 12.

☐ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it with this bankruptcy petition.

Case: 17-30533   Doc# 1   Filed: 05/31/17   Entered: 05/31/17 11:58:08   Page 3 of 9

Debtor 1   Veronica A. Gonzales                          Case number *(if known)* _____

| Part 3: | Report About Any Businesses You Own as a Sole Proprietor |
|---|---|

**12. Are you a sole proprietor of any full- or part-time business?**

☑ No.   Go to Part 4.

☐ Yes.   Name and location of business

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

Name of business, if any

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

Number, Street, City, State & ZIP Code

*Check the appropriate box to describe your business:*

☐   Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐   Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐   Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐   Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐   None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines. If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. 1116(1)(B).*

☑ No.   I am not filing under Chapter 11.

☐ No.   I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes.   I am filing under Chapter 11 and I am a small business debtor according to the definition in the Bankruptcy Code.

| Part 4: | Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention |
|---|---|

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

☑ No.

☐ Yes.   What is the hazard?   _____

If immediate attention is needed, why is it needed?   _____

Where is the property?   _____

Number, Street, City, State & Zip Code

Debtor 1   **Veronica A. Gonzales**                                                        Case number *(if known)* _____

**Part 5:   Explain Your Efforts to Receive a Briefing About Credit Counseling**

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

| *You must check one:* | *You must check one:* |
|---|---|
| ☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.<br><br>Attach a copy of the certificate and the payment plan, if any, that you developed with the agency. | ☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.<br><br>Attach a copy of the certificate and the payment plan, if any, that you developed with the agency. |
| ☑ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.<br><br>Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any. | ☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.<br><br>Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any. |
| ☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.<br><br>To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.<br><br>Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy. If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.<br><br>Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days. | ☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.<br><br>To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.<br><br>Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.<br><br>If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.<br><br>Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days. |
| ☐ I am not required to receive a briefing about credit counseling because of:<br><br>☐ **Incapacity.**<br>I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.<br><br>☐ **Disability.**<br>My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the Internet, even after I reasonably tried to do so.<br><br>☐ **Active duty.**<br>I am currently on active military duty in a military combat zone.<br><br>If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court. | ☐ I am not required to receive a briefing about credit counseling because of:<br><br>☐ **Incapacity.**<br>I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.<br><br>☐ **Disability.**<br>My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.<br><br>☐ **Active duty.**<br>I am currently on active military duty in a military combat zone.<br><br>If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court. |

Debtor 1   Veronica A. Gonzales                                          Case number *(if known)* _____

**16. What kind of debts do you have?**

**16a.** Are your debts primarily consumer debts? *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☐ No. Go to line 16b.

■ Yes. Go to line 17.

**16b.** Are your debts primarily business debts? *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.

☐ Yes. Go to line 17.

**16c.** State the type of debts you owe that are not consumer debts or business debts

_____

**17. Are you filing under Chapter 7?**

☐ No.   I am not filing under Chapter 7. Go to line 18.

Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?

■ Yes.   I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

■ No

☐ Yes

**18. How many Creditors do you estimate that you owe?**

| | | |
|---|---|---|
| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**19. How much do you estimate your assets to be worth?**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ■ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**20. How much do you estimate your liabilities to be?**

| | | |
|---|---|---|
| ■ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**Part 7:   Sign Below**

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

_Veronica A. Gonzales_                                  _____
Signature of Debtor 1                                   Signature of Debtor 2

Executed on  5 / 31 / 2017                              Executed on  _____
             MM / DD / YYYY                                          MM / DD / YYYY

Debtor 1   **Veronica A. Gonzales** _____   Case number *(if known)* _____

| | |
|---|---|
| **For you if you are filing this bankruptcy without an attorney** | The law allows you, as an individual, to represent yourself in bankruptcy court, but you should understand that many people find it extremely difficult to represent themselves successfully. Because bankruptcy has long-term financial and legal consequences, you are strongly urged to hire a qualified attorney. |
| **If you are represented by an attorney, you do not need to file this page.** | To be successful, you must correctly file and handle your bankruptcy case. The rules are very technical, and a mistake or inaction may affect your rights. For example, your case may be dismissed because you did not file a required document, pay a fee on time, attend a meeting or hearing, or cooperate with the court, case trustee, U.S. trustee, bankruptcy administrator, or audit firm if your case is selected for audit. If that happens, you could lose your right to file another case, or you may lose protections, including the benefit of the automatic stay. |

You must list all your property and debts in the schedules that you are required to file with the court. Even if you plan to pay a particular debt outside of your bankruptcy, you must list that debt in your schedules. If you do not list a debt, the debt may not be discharged. If you do not list property or properly claim it as exempt, you may not be able to keep the property. The judge can also deny you a discharge of all your debts if you do something dishonest in your bankruptcy case, such as destroying or hiding property, falsifying records, or lying. Individual bankruptcy cases are randomly audited to determine if debtors have been accurate, truthful, and complete. **Bankruptcy fraud is a serious crime; you could be fined and imprisoned.**

If you decide to file without an attorney, the court expects you to follow the rules as if you had hired an attorney. The court will not treat you differently because you are filing for yourself. To be successful, you must be familiar with the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the local rules of the court in which your case is filed. You must also be familiar with any state exemption laws that apply.

Are you aware that filing for bankruptcy is a serious action with long-term financial and legal consequences?

☐ No
■ Yes

Are you aware that bankruptcy fraud is a serious crime and that if your bankruptcy forms are inaccurate or incomplete, you could be fined or imprisoned?

☐ No
■ Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out your bankruptcy forms?

■ No
☐ Yes   Name of Person _____
        Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

By signing here, I acknowledge that I understand the risks involved in filing without an attorney. I have read and understood this notice, and I am aware that filing a bankruptcy case without an attorney may cause me to lose my rights or property if I do not properly handle the case.

**Veronica A. Gonzales** _____        _____
Signature of Debtor 1                                   Signature of Debtor 2

Date   **5/31/2017**                                    Date _____
       MM / DD / YYYY                                        MM / DD / YYYY
Contact phone ██████████                                Contact phone _____
Cell phone _____                              Cell phone _____
Email address _____                           Email address _____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA

In re                                               Case No.

**Veronica A. Gonzales**

_____ Debtor(s). _____ /

### CREDITOR MATRIX COVER SHEET

I declare that the attached Creditor Mailing Matrix, consisting of __1__ sheets, contains the correct, complete and current names and addresses of all priority, secured and unsecured creditors listed in debtor's filing and that this matrix conforms with the Clerk's promulgated requirements.

DATED:

_____
Signature of Debtor's Attorney or Pro Per Debtor

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                Best Case Bankruptcy

Wells Fargo
420 Montgomery Street
San Francisco, CA 94104

# EXHIBIT 5

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

NORTHERN DISTRICT OF CALIFORNIA

Case number *(if known)*  **17-30533**

Chapter you are filing under:

☑ Chapter 7
☐ Chapter 11
☐ Chapter 12
☐ Chapter 13

☐ Check if this an amended filing

Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy    12/15

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be yes if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

## Part 1:  Identify Yourself

|  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **1. Your full name** Write the name that is on your government-issued picture identification (for example, your driver's license or passport). Bring your picture identification to your meeting with the trustee. | **Veronica** <br> First name <br><br> **A** <br> Middle name <br><br> **Gonzales** <br> Last name and Suffix (Sr., Jr., II, III) | First name <br><br><br> Middle name <br><br><br> Last name and Suffix (Sr., Jr., II, III) |
| **2. All other names you have used in the last 8 years** Include your married or maiden names. |  |  |
| **3. Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | ███████ |  |

Debtor 1   **Veronica A Gonzales**          Case number *(if known)*   **17-30533**

|  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|

**4.** **Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years**

Include trade names and *doing business as* names

☐ I have not used any business name or EINs.

**Physician Assistant and Surgical Services**
_____
Business name(s)

**51-0678505**
_____
EINs
**Note: The Debtor does not know whether this EIN has been used in the past 8 years or whether it remains active.  It had been used in the past at some point.**

☐ I have not used any business name or EINs.

_____
Business name(s)

_____
EINs

**5.** **Where you live**

**36 Rustic Way**
**San Rafael, CA 94901**
_____
Number, Street, City, State & ZIP Code

**Marin**
_____
County

**If your mailing address is different from the one above, fill it in here.** Note that the court will send any notices to you at this mailing address.

_____
Number, P.O. Box, Street, City, State & ZIP Code

**If Debtor 2 lives at a different address:**

_____
Number, Street, City, State & ZIP Code

_____
County

**If Debtor 2's mailing address is different from yours, fill it in here.**  Note that the court will send any notices to this mailing address.

_____
Number, P.O. Box, Street, City, State & ZIP Code

**6.** **Why you are choosing *this district* to file for bankruptcy**

*Check one:*

☑ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.

☐ I have another reason.
Explain. (See 28 U.S.C. § 1408.)

*Check one:*

☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.

☐ I have another reason.
Explain. (See 28 U.S.C. § 1408.)

Case: 17-30533   Doc# 55   Filed: 10/23/17   Entered: 10/23/17 17:26:02   Page 2 of
70

Debtor 1 __Veronica A Gonzales__    Case number *(if known)* __17-30533__

| Part 2: | Tell the Court About Your Bankruptcy Case |
|---|---|

**7.** **The chapter of the Bankruptcy Code you are choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)).* Also, go to the top of page 1 and check the appropriate box.

- ☑ Chapter 7
- ☐ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13

**8.** **How you will pay the fee**

- ☑ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

- ☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

- ☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments. If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9.** **Have you filed for bankruptcy within the last 8 years?**

- ☐ No.
- ☑ Yes.

| | District | | When | | Case number | |
|---|---|---|---|---|---|---|
| | Northern District of California | When | 4/17/17 | Case number | 17-30539 |
| | Northern District of California | When | 9/19/16 | Case number | 16-31010 |
| | Northern District of California | When | 5/07/14 | Case number | 14-30710 |

**10.** **Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

- ☑ No
- ☐ Yes.

| Debtor | | Relationship to you | |
|---|---|---|---|
| District | When | Case number, if known | |
| Debtor | | Relationship to you | |
| District | When | Case number, if known | |

**11.** **Do you rent your residence?**

- ☑ No.   Go to line 12.
- ☐ Yes.   Has your landlord obtained an eviction judgment against you and do you want to stay in your residence?
  - ☐ No. Go to line 12.
  - ☐ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it with this bankruptcy petition.

Case: 17-30533   Doc# 55   Filed: 10/23/17   Entered: 10/23/17 17:26:02   Page 3 of 70

Debtor 1   **Veronica A Gonzales**                                    Case number *(if known)*   **17-30533**

---

| **Part 3:** | **Report About Any Businesses You Own as a Sole Proprietor** |

**12.** **Are you a sole proprietor of any full- or part-time business?**

☑ No.   Go to Part 4.

☐ Yes.   Name and location of business

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

_____
Name of business, if any

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

_____
Number, Street, City, State & ZIP Code

*Check the appropriate box to describe your business:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ None of the above

**13.** **Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines. If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. 1116(1)(B).*

☑ No.   I am not filing under Chapter 11.

☐ No.   I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes.   I am filing under Chapter 11 and I am a small business debtor according to the definition in the Bankruptcy Code.

---

| **Part 4:** | **Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention** |

**14.** **Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

☑ No.

☐ Yes.

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

What is the hazard?   _____

If immediate attention is needed, why is it needed?   _____

Where is the property?   _____

_____
Number, Street, City, State & Zip Code

Debtor 1   **Veronica A Gonzales**

Case number *(if known)*   **17-30533**

| Part 5: | Explain Your Efforts to Receive a Briefing About Credit Counseling |

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy. If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Case: 17-30533   Doc# 55   Filed: 10/23/17   Entered: 10/23/17 17:26:02   Page 5 of
70

Debtor 1  **Veronica A Gonzales**                                    Case number *(if known)*    **17-30533**

| **Part 6:** | **Answer These Questions for Reporting Purposes** |
|---|---|

**16. What kind of debts do you have?**

16a. **Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☐ No. Go to line 16b.

☑ Yes. Go to line 17.

16b. **Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.

☐ Yes. Go to line 17.

16c. State the type of debts you owe that are not consumer debts or business debts

**17. Are you filing under Chapter 7?**

☐ No. I am not filing under Chapter 7. Go to line 18.

**Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?**

☑ Yes. I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

☐ No

☑ Yes

**18. How many Creditors do you estimate that you owe?**

☑ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than100,000

**19. How much do you estimate your assets to be worth?**

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☑ $1,000,001 - $10 million
☐ $10,000,001 - $50  million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

**20. How much do you estimate your liabilities to be?**

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☑ $1,000,001 - $10 million
☐ $10,000,001 - $50  million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

| **Part 7:** | **Sign Below** |
|---|---|

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**/s/ Veronica A Gonzales**

**Veronica A Gonzales**                                          Signature of Debtor 2
Signature of Debtor 1

Executed on   **October 15, 2017**                    Executed on   _____
              MM / DD / YYYY                                        MM / DD / YYYY

Official Form 101                **Voluntary Petition for Individuals Filing for Bankruptcy**                page 6

Debtor 1   **Veronica A Gonzales**                                          Case number *(if known)*   **17-30533**

---

**For your attorney, if you are represented by one**

**If you are not represented by an attorney, you do not need to file this page.**

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible.  I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

**/s/ Gregory A. Rougeau**                              Date   **October 15, 2017**
Signature of Attorney for Debtor                                MM / DD / YYYY

**Gregory A. Rougeau**
Printed name

**Brunetti Rougeau LLP**
Firm name

**400 Montgomery Street, Suite 1000**
**San Francisco, CA 94104**
Number, Street, City, State & ZIP Code

Contact phone   **(415) 992-8940**              Email address   **grougeau@brlawsf.com**

**194437**
Bar number & State

---

Official Form 101                 **Voluntary Petition for Individuals Filing for Bankruptcy**                 page 7

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Veronica A Gonzales** |
| | First Name        Middle Name        Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name        Middle Name        Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case number (if known) | **17-30533** |

☐ Check if this is an amended filing

## Official Form 106Sum
## Summary of Your Assets and Liabilities and Certain Statistical Information    12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Fill out all of your schedules first; then complete the information on this form. If you are filing amended schedules after you file your original forms, you must fill out a new *Summary* and check the box at the top of this page.

**Part 1:   Summarize Your Assets**

| | **Your assets** Value of what you own |
|---|---|
| 1. **Schedule A/B: Property** (Official Form 106A/B) | |
| 1a. Copy line 55, Total real estate, from Schedule A/B.......................................... | $          2,350,000.00 |
| 1b. Copy line 62, Total personal property, from Schedule A/B................................ | $             19,991.89 |
| 1c. Copy line 63, Total of all property on Schedule A/B......................................... | $          2,369,991.89 |

**Part 2:   Summarize Your Liabilities**

| | **Your liabilities** Amount you owe |
|---|---|
| 2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 106D) 2a. Copy the total you listed in Column A, *Amount of claim,* at the bottom of the last page of Part 1 of *Schedule D...* | $          1,494,896.32 |
| 3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 106E/F) 3a. Copy  the total claims from Part 1 (priority unsecured claims) from line 6e of *Schedule E/F...............................* | $                   0.00 |
| 3b. Copy  the total claims from Part 2 (nonpriority unsecured claims) from line 6j of *Schedule E/F............................* | $              2,808.85 |
| **Your total liabilities** | $          1,497,705.17 |

**Part 3:   Summarize Your Income and Expenses**

| | |
|---|---|
| 4. *Schedule I: Your Income* (Official Form 106I) Copy your combined monthly income from line 12 of *Schedule I.....................................................................* | $              6,611.41 |
| 5. *Schedule J: Your Expenses* (Official Form 106J) Copy your monthly expenses from line 22c of *Schedule J.......................................................................* | $              2,724.89 |

**Part 4:   Answer These Questions for Administrative and Statistical Records**

6. **Are you filing for bankruptcy under Chapters 7, 11, or 13?**

   ☐ No. You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

   ■ Yes

7. **What kind of debt do you have?**

   ■ **Your debts are primarily consumer debts.** *Consumer debts* are those "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Fill out lines 8-9g for statistical purposes. 28 U.S.C. § 159.

   ☐ **Your debts are not primarily consumer debts.** You have nothing to report on this part of the form. *Check this box* and submit this form to the court with your other schedules.

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Debtor 1   **Veronica A Gonzales**                          Case number *(if known)*   **17-30533**

8. **From the *Statement of Your Current Monthly Income*:** Copy your total current monthly income from Official Form 122A-1 Line 11; **OR**, Form 122B Line 11; **OR**, Form 122C-1 Line 14.

$ **6,731.46**

9. **Copy the following special categories of claims from Part 4, line 6 of *Schedule E/F*:**

| From Part 4 on *Schedule E/F*, copy the following: | Total claim |
|---|---|
| 9a. Domestic support obligations (Copy line 6a.) | $ 0.00 |
| 9b. Taxes and certain other debts you owe the government. (Copy line 6b.) | $ 0.00 |
| 9c. Claims for death or personal injury while you were intoxicated. (Copy line 6c.) | $ 0.00 |
| 9d. Student loans. (Copy line 6f.) | $ 0.00 |
| 9e. Obligations arising out of a separation agreement or divorce that you did not report as priority claims. (Copy line 6g.) | $ 0.00 |
| 9f. Debts to pension or profit-sharing plans, and other similar debts. (Copy line 6h.) | +$ 0.00 |
| 9g. **Total.** Add lines 9a through 9f. | $ 0.00 |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                                         Best Case Bankruptcy

**Fill in this information to identify your case and this filing:**

| | |
|---|---|
| Debtor 1 | **Veronica A Gonzales** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse, if filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case number | **17-30533** |

☐ Check if this is an amended filing

Official Form 106A/B

# Schedule A/B: Property

**12/15**

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:** Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.
☑ Yes. Where is the property?

**1.1**

| | | | |
|---|---|---|---|
| **36 Rustic Way** | | | |
| Street address, if available, or other description | | | |
| | | | |
| **San Rafael** | **CA** | **94901-0000** | |
| City | State | ZIP Code | |
| | | | |
| **Marin** | | | |
| County | | | |

**What is the property?** Check all that apply

☑ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$1,200,000.00** | **$1,200,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**Fee Simple Owner**

☐ **Check if this is community property** (see instructions)

Debtor 1  **Veronica A Gonzales**                                    Case number *(if known)*  **17-30533**

**1.2** **If you own or have more than one, list here:**

**8563 Beechwood Dr.**
Street address, if available, or other description

**Rancho Cucamonga**    **CA**    **91701-0000**
City                     State   ZIP Code

**San Bernardino**
County

**What is the property?** Check all that apply

- [x] Single-family home
- [ ] Duplex or multi-unit building
- [ ] Condominium or cooperative
- [ ] Manufactured or mobile home
- [ ] Land
- [ ] Investment property
- [ ] Timeshare
- [ ] Other _____

**Who has an interest in the property?** Check one

- [x] Debtor 1 only
- [ ] Debtor 2 only
- [ ] Debtor 1 and Debtor 2 only
- [ ] At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$775,000.00** | **$775,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**Fee Simple Owner**

- [ ] **Check if this is community property** (see instructions)

---

**1.3** **If you own or have more than one, list here:**

**1378 E. 9th Street**
Street address, if available, or other description

**Upland**    **CA**    **91786-0000**
City           State   ZIP Code

**San Bernardino**
County

**What is the property?** Check all that apply

- [ ] Single-family home
- [ ] Duplex or multi-unit building
- [ ] Condominium or cooperative
- [ ] Manufactured or mobile home
- [ ] Land
- [ ] Investment property
- [ ] Timeshare
- [ ] Other _____

**Who has an interest in the property?** Check one

- [x] Debtor 1 only
- [ ] Debtor 2 only
- [ ] Debtor 1 and Debtor 2 only
- [ ] At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$375,000.00** | **$375,000.00** |

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**Fee Simple Owner**

- [ ] **Check if this is community property** (see instructions)

---

2. **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here**............................................................=>

| **$2,350,000.00** |
|---|

**Part 2:** Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

---

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

Debtor 1    **Veronica A Gonzales**                                                    Case number *(if known)*    **17-30533**

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☐ No
☑ Yes

| | | | |
|---|---|---|---|
| 3.1 | Make: **Toyota** | **Who has an interest in the property?** Check one | Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.* |
| | Model: **Land Cruiser** | ☑ Debtor 1 only | |
| | Year: **1996** | ☐ Debtor 2 only | |
| | Approximate mileage: **244,000** | ☐ Debtor 1 and Debtor 2 only | **Current value of the entire property?** / **Current value of the portion you own?** |
| | Other information: | ☐ At least one of the debtors and another | |
| | This vehicle is not operating, as it requires repairs. | ☐ **Check if this is community property** (see instructions) | **$1,000.00** / **$1,000.00** |

| | | | |
|---|---|---|---|
| 3.2 | Make: **Mercedes Benz** | **Who has an interest in the property?** Check one | Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.* |
| | Model: **E320** | ☑ Debtor 1 only | |
| | Year: **1995** | ☐ Debtor 2 only | |
| | Approximate mileage: **95,500** | ☐ Debtor 1 and Debtor 2 only | **Current value of the entire property?** / **Current value of the portion you own?** |
| | Other information: | ☐ At least one of the debtors and another | |
| | This vehicle is not operating, due to repairs. | ☐ **Check if this is community property** (see instructions) | **$3,000.00** / **$3,000.00** |

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

☑ No
☐ Yes

5  Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here.........................................................=>    **$4,000.00**

**Part 3:** Describe Your Personal and Household Items

| Do you own or have any legal or equitable interest in any of the following items? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

6. **Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware

☐ No
☑ Yes.  Describe.....

| | |
|---|---|
| Miscellaneous household goods and furnishings; 36 Rustic Way San Rafael, CA 94901 | **$1,000.00** |

7. **Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games

☐ No
☑ Yes.  Describe.....

| | |
|---|---|
| Miscellaneous electronics: stereo, cell phone, VCR. 36 Rustic Way San Rafael, CA 94901 | **$500.00** |

8. **Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles

☑ No

Official Form 106A/B                          Schedule A/B: Property                                    page 3

Debtor 1   **Veronica A Gonzales**                                     Case number *(if known)*   17-30533

☐ Yes.  Describe.....

**9.  Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools;
   musical instruments
   ☐ No
   ☑ Yes.  Describe.....

| | |
|---|---|
| Pool table; skis.<br>36 Rustic Way<br>San Rafael, CA 94901 | $500.00 |

**10.  Firearms**
   *Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
   ☑ No
   ☐ Yes.  Describe.....

**11.  Clothes**
   *Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
   ☐ No
   ☑ Yes.  Describe.....

| | |
|---|---|
| Miscellaneous clothing.<br>36 Rustic Way<br>San Rafael, CA 94901 | $500.00 |

**12.  Jewelry**
   *Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
   ☐ No
   ☑ Yes.  Describe.....

| | |
|---|---|
| Costume jewelry.<br>36 Rustic Way<br>San Rafael, CA 94901 | $300.00 |

**13.  Non-farm animals**
   *Examples:* Dogs, cats, birds, horses
   ☐ No
   ☑ Yes.  Describe.....

| | |
|---|---|
| Fish.<br>36 Rustic Way<br>San Rafael, CA 94901 | $0.00 |

**14.  Any other personal and household items you did not already list, including any health aids you did not list**
   ☑ No
   ☐ Yes.  Give specific information.....

| | |
|---|---|
| 15.  Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here .................................................................................. | $2,800.00 |

**Part 4:   Describe Your Financial Assets**

| Do you own or have any legal or equitable interest in any of the following? | Current value of the portion you own?<br>Do not deduct secured claims or exemptions. |
|---|---|

**16.  Cash**
   *Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
   ☐ No
   ☑ Yes...................................................................................................................

| Debtor 1 | **Veronica A Gonzales** | | Case number *(if known)* | **17-30533** |

|  | **Cash.** |
|  | **36 Rustic Way** |
|  | **San Rafael,** |
|  | **CA 94901** | **$1,290.00** |

**17. Deposits of money**

*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.

☐ No
☑ Yes.......................

| | | Institution name: | |
| 17.1. | **Checking** | **Bank of America, N.A.**<br>**P.O. Box 15284**<br>**Wilmington, DE 19850**<br>**(Acct. 1193)** | **$5,840.00** |
| 17.2. | **Checking** | **Bank of America, N.A.**<br>**P.O. Box 15284**<br>**Wilmington, DE 19850**<br>**(Acct. 5363)** | **$349.00** |
| 17.3. | **Checking** | **Wells Fargo Bank, NA;**<br>**P.O. Box 6995**<br>**Portland, OR 97228-6995**<br>**(Acct. 8230)** | **$147.00** |
| 17.4. | **Savings** | **Redwood Credit Union;**<br>**P.O. Box 6104**<br>**Santa Rosa, CA 95406** | **$0.20** |

**18. Bonds, mutual funds, or publicly traded stocks**

*Examples:* Bond funds, investment accounts with brokerage firms, money market accounts

☑ No
☐ Yes.................     Institution or issuer name:

**19. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**

☐ No
☑ Yes.  Give specific information about them...................

| Name of entity: | % of ownership: | |
| **Absolute Real Estate Investments, Inc.** | **50** % | **Unknown** |

**20. Government and corporate bonds and other negotiable and non-negotiable instruments**

*Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
*Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.

☑ No
☐ Yes. Give specific information about them
Issuer name:

**21. Retirement or pension accounts**

*Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans

☐ No
☑ Yes. List each account separately.

| Type of account: | Institution name: | |
| **IRA** | **JP Morgan SEP IRA**<br>**J.P. Morgan Securities LLC**<br>**131 S. Dearborn Street IL1-0291 4th Fl.**<br>**Chicago, IL 60603-5506**<br>**(Acct. 4530)** | **$5,065.69** |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                                    Best Case Bankruptcy

Debtor 1  **Veronica A Gonzales**                                    Case number *(if known)*  **17-30533**

---

22. **Security deposits and prepayments**
    Your share of all unused deposits you have made so that you may continue service or use from a company
    *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
    ☑ No
    ☐ Yes. ....................                              Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
    ☑ No
    ☐ Yes............         Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
    26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
    ☑ No
    ☐ Yes............         Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
    ☑ No
    ☐ Yes.  Give specific information about them...

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
    *Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
    ☑ No
    ☐ Yes.  Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
    *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
    ☐ No
    ☑ Yes.  Give specific information about them...

    | | |
    |---|---|
    | Physician Assistant License<br>License No. 12489 | **Unknown** |

---

| **Money or property owed to you?** | **Current value of the portion you own?**<br>Do not deduct secured claims or exemptions. |
|---|---|

28. **Tax refunds owed to you**
    ☑ No
    ☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

    _____

29. **Family support**
    *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
    ☐ No
    ☑ Yes. Give specific information......

    | | | |
    |---|---|---|
    | The Debtor estimates that she is owed approximately $269,488.52 in past child support, from her former spouse,  Craig Raymond Gonzales. Mr. Gonzales' present address and his ability to make any payment to the Debtor are unknown; for that reason, the value of this property is unknown. | Child Support | **Unknown** |

---

30. **Other amounts someone owes you**
    *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security benefits; unpaid loans you made to someone else
    ☑ No
    ☐ Yes.  Give specific information..

31. **Interests in insurance policies**
    *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
    ☐ No
    ☑ Yes. Name the insurance company of each policy and list its value.

Official Form 106A/B                              Schedule A/B: Property                                          page 6

Debtor 1  **Veronica A Gonzales**                                    Case number *(if known)*  **17-30533**

| Company name: | Beneficiary: | Surrender or refund value: |
|---|---|---|
| **The Debtor maintains three property insurance policies with Farmers Insurance (c/o Heather Dickerson; 8540 Archibald Ave. #B; Rancho Cucamonga, CA 91730). No surrender value.** | Veronica A. Gonzales | $0.00 |

32. **Any interest in property that is due you from someone who has died**
   If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
   ☑ No
   ☐ Yes. Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
   *Examples:* Accidents, employment disputes, insurance claims, or rights to sue
   ☐ No
   ☑ Yes. Describe each claim.........

   | The Debtor has received counseling from firms to file Chapter 13 petitions in this district, and has potential claims against those firms for professional negligence, as the Chapter 13 petitions were dismissed. | Unknown |
   |---|---|

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
   ☑ No
   ☐ Yes. Describe each claim.........

35. **Any financial assets you did not already list**
   ☑ No
   ☐ Yes. Give specific information..

36. Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here..................................................................................................................................   **$12,691.89**

**Part 5:**  Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

37. **Do you own or have any legal or equitable interest in any business-related property?**
   ☐ No. Go to Part 6.
   ☑ Yes. Go to line 38.

   **Current value of the portion you own?**
   Do not deduct secured claims or exemptions.

38. **Accounts receivable or commissions you already earned**
   ☐ No
   ☑ Yes. Describe.....

   | The Debtor is a physician assistant. The Debtor estimates that she has approximately $100,000 in unbilled work in progress which may be realized once billed. Because she receives most payments from insurers who may reduce, discount, or contest the Debtor's invoices, the present value of the WIP is unknown. | Unknown |
   |---|---|

39. **Office equipment, furnishings, and supplies**
   *Examples:* Business-related computers, software, modems, printers, copiers, fax machines, rugs, telephones, desks, chairs, electronic devices
   ☐ No
   ☑ Yes. Describe.....

Official Form 106A/B                           Schedule A/B: Property                                       page 7

Debtor 1    __Veronica A Gonzales_____    Case number *(if known)*   __17-30533__

| Misc. office equipment (home office)<br>(computer/IPAD/printer/scanner etc.)<br>36 Rustic Way<br>San Rafael, CA 94901 | $500.00 |
|---|---|

**40. Machinery, fixtures, equipment, supplies you use in business, and tools of your trade**
☑ No
☐ Yes. Describe.....

**41. Inventory**
☑ No
☐ Yes. Describe.....

**42. Interests in partnerships or joint ventures**
☑ No
☐ Yes. Give specific information about them...................
        Name of entity:                % of ownership:

**43. Customer lists, mailing lists, or other compilations**
☑ No.
☐ **Do your lists include personally identifiable information** (as defined in 11 U.S.C. § 101(41A))?

     ☑ No
     ☐ Yes. Describe.....

**44. Any business-related property you did not already list**
☑ No
☐ Yes. Give specific information.........

**45.** **Add the dollar value of all of your entries from Part 5, including any entries for pages you have attached
for Part 5. Write that number here.....................................................................................................** | $500.00 |

| Part 6: | **Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.**<br>If you own or have an interest in farmland, list it in Part 1. |
|---|---|

**46. Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
☑ No. Go to Part 7.
☐ Yes. Go to line 47.

| Part 7: | **Describe All Property You Own or Have an Interest in That You Did Not List Above** |
|---|---|

**53. Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership
☑ No
☐ Yes. Give specific information.........

**54.** **Add the dollar value of all of your entries from Part 7. Write that number here** ...................................... | $0.00 |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com            Best Case Bankruptcy

| Debtor 1 | **Veronica A Gonzales** | Case number *(if known)* | **17-30533** |

| **Part 8:** | List the Totals of Each Part of this Form |

| 55. | **Part 1: Total real estate, line 2** ................................................................................................... | | **$2,350,000.00** |
| 56. | **Part 2: Total vehicles, line 5** | **$4,000.00** |
| 57. | **Part 3: Total personal and household items, line 15** | **$2,800.00** |
| 58. | **Part 4: Total financial assets, line 36** | **$12,691.89** |
| 59. | **Part 5: Total business-related property, line 45** | **$500.00** |
| 60. | **Part 6: Total farm- and fishing-related property, line 52** | **$0.00** |
| 61. | **Part 7: Total other property not listed, line 54** | + | **$0.00** |
| 62. | **Total personal property.** Add lines 56 through 61... | **$19,991.89** | Copy personal property total | **$19,991.89** |
| 63. | **Total of all property on Schedule A/B.** Add line 55 + line 62 | | **$2,369,991.89** |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com

Best Case Bankruptcy

Case: 17-30533    Doc# 55    Filed: 10/23/17    Entered: 10/23/17 17:26:02    Page 18 of 70

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Veronica A Gonzales** |
| | First Name    Middle Name    Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name    Middle Name    Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case number | **17-30533** |
| (if known) | |

☐ Check if this is an
   amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt

**4/16**

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

**Part 1:**  **Identify the Property You Claim as Exempt**

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ☐ You are claiming state and federal nonbankruptcy exemptions.  11 U.S.C. § 522(b)(3)

   ■ You are claiming federal exemptions.  11 U.S.C. § 522(b)(2)

2. **For any property you list on** *Schedule A/B* **that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **36 Rustic Way San Rafael, CA 94901 Marin County**<br>Line from *Schedule A/B*: **1.1** | $1,200,000.00 | ■ $26,800.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(1) |
| **1996 Toyota Land Cruiser 244,000 miles**<br> This vehicle is not operating, as it requires repairs.<br>Line from *Schedule A/B*: **3.1** | $1,000.00 | ■ $1,000.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(2) |
| **1995 Mercedes Benz E320 95,500 miles**<br> This vehicle is not operating, due to repairs.<br>Line from *Schedule A/B*: **3.2** | $3,000.00 | ■ $3,000.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(2) |
| **Miscellaneous household goods and furnishings;**<br>**36 Rustic Way**<br>**San Rafael, CA 94901**<br>Line from *Schedule A/B*: **6.1** | $1,000.00 | ■ $0.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(3) |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com

| Debtor 1 | **Veronica A Gonzales** | | Case number (if known) | 17-30533 |
| --- | --- | --- | --- | --- |

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
| --- | --- | --- | --- |
| **Miscellaneous electronics: stereo, cell phone, VCR.**<br>**36 Rustic Way**<br>**San Rafael, CA 94901**<br>Line from *Schedule A/B*: **7.1** | $500.00 | ☐ _____<br>■ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(3) |
| **Miscellaneous clothing.**<br>**36 Rustic Way**<br>**San Rafael, CA 94901**<br>Line from *Schedule A/B*: **11.1** | $500.00 | ■ $500.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(3) |
| **Costume jewelry.**<br>**36 Rustic Way**<br>**San Rafael, CA 94901**<br>Line from *Schedule A/B*: **12.1** | $300.00 | ■ $300.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(4) |
| **Fish.**<br>**36 Rustic Way**<br>**San Rafael, CA 94901**<br>Line from *Schedule A/B*: **13.1** | $0.00 | ■ $0.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(3) |
| **Cash.**<br>**36 Rustic Way**<br>**San Rafael, CA 94901**<br>Line from *Schedule A/B*: **16.1** | $1,290.00 | ■ $1,290.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **Checking: Bank of America, N.A.**<br>**P.O. Box 15284**<br>**Wilmington, DE 19850**<br>**(Acct. 1193)**<br>Line from *Schedule A/B*: **17.1** | $5,840.00 | ■ $0.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **Checking: Bank of America, N.A.**<br>**P.O. Box 15284**<br>**Wilmington, DE 19850**<br>**(Acct. 5363)**<br>Line from *Schedule A/B*: **17.2** | $349.00 | ■ $349.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **Checking: Wells Fargo Bank, NA;**<br>**P.O. Box 6995**<br>**Portland, OR 97228-6995**<br>**(Acct. 8230)**<br>Line from *Schedule A/B*: **17.3** | $147.00 | ■ $147.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **IRA: JP Morgan SEP IRA**<br>**J.P. Morgan Securities LLC**<br>**131 S. Dearborn Street IL1-0291 4th Fl.**<br>**Chicago, IL 60603-5506**<br>**(Acct. 4530)**<br>Line from *Schedule A/B*: **21.1** | $5,065.69 | ☐ _____<br>■ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(10)(E) |
| **Physician Assistant License**<br>**License No. 12489**<br>Line from *Schedule A/B*: **27.1** | Unknown | ☐ _____<br>■ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 695.060 |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com        Best Case Bankruptcy

| Debtor 1 | **Veronica A Gonzales** | Case number (if known) | **17-30533** |

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Child Support: The Debtor estimates that she is owed approximately $269,488.52 in past child support, from her former spouse,  Craig Raymond Gonzales.  Mr. Gonzales' present address and his ability to make any payment to the Debtor are unknown; for that re**<br>Line from *Schedule A/B*: **29.1** | **Unknown** | ☐ _____<br>■ 100% of fair market value, up to any applicable statutory limit | **11 U.S.C. § 522(d)(10)(D)** |
| **Misc. office equipment (home office) (computer/IPAD/printer/scanner etc.) 36 Rustic Way San Rafael, CA 94901**<br>Line from *Schedule A/B*: **39.1** | **$500.00** | ☐ _____<br>■ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 703.140(b)(6)** |

3. **Are you claiming a homestead exemption of more than $160,375?**
   (Subject to adjustment on 4/01/19 and every 3 years after that for cases filed on or after the date of adjustment.)

   ■ No

   ☐ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

       ☐ No

       ☐ Yes

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Veronica A Gonzales** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA | | |
| Case number | 17-30533 | | |
| (if known) | | | |

☐ Check if this is an amended filing

## Official Form 106D
## Schedule D: Creditors Who Have Claims Secured by Property      12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

**1. Do any creditors have claims secured by your property?**

☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

■ Yes. Fill in all of the information below.

### Part 1:   List All Secured Claims

**2. List all secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name.

| | **Column A**<br>Amount of claim<br>Do not deduct the value of collateral. | **Column B**<br>Value of collateral that supports this claim | **Column C**<br>Unsecured portion<br>If any |
|---|---|---|---|

**2.1  California Service Bureau, Inc.**
Creditor's Name

**3050 Fite Circle, Suite 107**
**Sacramento, CA 95827**
Number, Street, City, State & Zip Code

**Who owes the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim relates to a community debt**

Date debt was incurred   **12/30/11**

**Describe the property that secures the claim:**

**36 Rustic Way San Rafael, CA 94901 Marin County**

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
■ Disputed

**Nature of lien.** Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
■ Judgment lien from a lawsuit
☐ Other (including a right to offset) _____

Last 4 digits of account number _____

Column A: **$814.00**    Column B: **$1,200,000.00**    Column C: **$0.00**

---

**2.2  Internal Revenue Service**
Creditor's Name

_____
Number, Street, City, State & Zip Code

**Who owes the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim relates to a community debt**

**Describe the property that secures the claim:**

**36 Rustic Way San Rafael, CA 94901 Marin County**

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
■ Disputed

**Nature of lien.** Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
■ Other (including a right to offset)   **Federal tax lien**

Column A: **$62,524.00**    Column B: **$1,200,000.00**    Column C: **$0.00**

---

Debtor 1 **Veronica A Gonzales**　　　　　　　　　　　　　　　Case number (if know)　**17-30533**

First Name　　　Middle Name　　　Last Name

Date debt was incurred **12/31/03-12/31/11**　　Last 4 digits of account number _____

---

| 2.3 | **JP Morgan Chase Bank, NA** | | | **$249,944.91** | **$1,200,000.00** | **$0.00** |

Creditor's Name

Describe the property that secures the claim:

> **36 Rustic Way San Rafael, CA 94901 Marin County**

**P.O. Box 78052 Phoenix, AZ 85062**

Number, Street, City, State & Zip Code

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Who owes the debt?** Check one.

**Nature of lien.** Check all that apply.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

☐ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☐ Other (including a right to offset) _____

Date debt was incurred _____　　Last 4 digits of account number **4125**

---

| 2.4 | **JP Morgan Chase Bank, NA** | | | **$100,660.58** | **$775,000.00** | **$0.00** |

Creditor's Name

Describe the property that secures the claim:

> **8563 Beechwood Dr. Rancho Cucamonga, CA 91701  San Bernardino County**

**3415 Vision Dr. Columbus, OH 43219**

Number, Street, City, State & Zip Code

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Who owes the debt?** Check one.

**Nature of lien.** Check all that apply.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

■ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☐ Other (including a right to offset) _____

Date debt was incurred _____　　Last 4 digits of account number **9562**

---

| 2.5 | **JP Morgan Chase Bank, NA** | | | **$57,322.57** | **$775,000.00** | **$0.00** |

Creditor's Name

Describe the property that secures the claim:

> **8563 Beechwood Dr. Rancho Cucamonga, CA 91701  San Bernardino County**

**3415 Vision Dr. Columbus, OH 43219**

Number, Street, City, State & Zip Code

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Who owes the debt?** Check one.

**Nature of lien.** Check all that apply.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

■ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit

---

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com　　　　　　　　　　Best Case Bankruptcy

Debtor 1 **Veronica A Gonzales**

First Name    Middle Name    Last Name

Case number (if know) **17-30533**

☐ **Check if this claim relates to a community debt**

☐ Other (including a right to offset) _____

Date debt was incurred _____    Last 4 digits of account number **4372**

---

| 2.6 | **JP Morgan Chase Bank, NA** | Describe the property that secures the claim: | **$176,790.62** | **$375,000.00** | **$0.00** |
|---|---|---|---|---|---|

Creditor's Name

**1378 E. 9th Street Upland, CA 91786 San Bernardino County**

**3415 Vision Dr. Columbus, OH 43219**

Number, Street, City, State & Zip Code

As of the date you file, the claim is: Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Who owes the debt?** Check one.

Nature of lien. Check all that apply.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim relates to a community debt**

■ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☐ Other (including a right to offset) _____

Date debt was incurred _____    Last 4 digits of account number **4281**

---

| 2.7 | **Wells Fargo Home Mortgage** | Describe the property that secures the claim: | **$838,035.64** | **$1,200,000.00** | **$0.00** |
|---|---|---|---|---|---|

Creditor's Name

**36 Rustic Way San Rafael, CA 94901 Marin County**

**3476 Stateview Blvd. Fort Mill, SC 29715**

Number, Street, City, State & Zip Code

As of the date you file, the claim is: Check all that apply.

☐ Contingent
☐ Unliquidated
■ Disputed

**Who owes the debt?** Check one.

Nature of lien. Check all that apply.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim relates to a community debt**

■ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☐ Other (including a right to offset) _____

Date debt was incurred **10/26/2001**    Last 4 digits of account number **5876**

---

| 2.8 | **Wyatt Law Offices** | Describe the property that secures the claim: | **$8,804.00** | **$1,200,000.00** | **$0.00** |
|---|---|---|---|---|---|

Creditor's Name

**36 Rustic Way San Rafael, CA 94901 Marin County**

**642 Fifth Street Santa Rosa, CA 95404**

Number, Street, City, State & Zip Code

As of the date you file, the claim is: Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Who owes the debt?** Check one.

Nature of lien. Check all that apply.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
■ Judgment lien from a lawsuit

---

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com

Best Case Bankruptcy

Debtor 1   **Veronica A Gonzales**                                    Case number (*if know*)   **17-30533**
          First Name          Middle Name          Last Name

☐ **Check if this claim relates to a**        ☐ Other (including a right to offset)   _____
   **community debt**

**Date debt was incurred**   **05/21/14**        **Last 4 digits of account number**   _____

| | |
|---|---|
| **Add the dollar value of your entries in Column A on this page. Write that number here:** | **$1,494,896.32** |
| **If this is the last page of your form, add the dollar value totals from all pages. Write that number here:** | **$1,494,896.32** |

**Part 2:    List Others to Be Notified for a Debt That You Already Listed**

Use this page only if you have others to be notified about your bankruptcy for a debt that you already listed in Part 1. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the creditor in Part 1, and then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Part 1, list the additional creditors here. If you do not have additional persons to be notified for any debts in Part 1, do not fill out or submit this page.

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Veronica A Gonzales** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case number (if known) | 17-30533 |

☐ Check if this is an amended filing

## Official Form 106E/F
## Schedule E/F: Creditors Who Have Unsecured Claims                    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY claims and Part 2 for creditors with NONPRIORITY claims. List the other party to any executory contracts or unexpired leases that could result in a claim.  Also list executory contracts on Schedule A/B: Property (Official Form 106A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G). Do not include any creditors with partially secured claims that are listed in Schedule D: Creditors Who Have Claims Secured by Property. If more space is needed, copy the Part you need, fill it out, number the entries in the boxes on the left. Attach the Continuation Page to this page. If you have no information to report in a Part, do not file that Part. On the top of any additional pages, write your name and case number (if known).

### Part 1:    List All of Your PRIORITY Unsecured Claims

1.  **Do any creditors have priority unsecured claims against you?**
    ☐ No. Go to Part 2.
    ☐ Yes.

2.  **List all of your priority unsecured claims.** If a creditor has more than one priority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. If a claim has both priority and nonpriority amounts, list that claim here and show both priority and nonpriority amounts. As much as possible, list the claims in alphabetical order according to the creditor's name. If you have more than two priority unsecured claims, fill out the Continuation Page of Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.

    (For an explanation of each type of claim, see the instructions for this form in the instruction booklet.)

| | | | Total claim | Priority amount | Nonpriority amount |
|---|---|---|---|---|---|
| 2.1 | **Franchise Tax Board** | Last 4 digits of account number | Unknown | Unknown | Unknown |
| | Priority Creditor's Name | | | | |
| | **P.O. Box 1673** | When was the debt incurred? | | | |
| | **Sacramento, CA 95812** | | | | |
| | Number Street City State Zip Code | As of the date you file, the claim is: Check all that apply | | | |
| | **Who incurred the debt?** Check one. | ☐ Contingent | | | |
| | ■ Debtor 1 only | ■ Unliquidated | | | |
| | ☐ Debtor 2 only | ■ Disputed | | | |
| | ☐ Debtor 1 and Debtor 2 only | **Type of PRIORITY unsecured claim:** | | | |
| | ☐ At least one of the debtors and another | ☐ Domestic support obligations | | | |
| | ☐ Check if this claim is for a  community debt | ■ Taxes and certain other debts you owe the government | | | |
| | **Is the claim subject to offset?** | ☐ Claims for death or personal injury while you were intoxicated | | | |
| | ■ No | ☐ Other. Specify _____ | | | |
| | ☐ Yes | | | | |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                    53443                    Best Case Bankruptcy

Debtor 1   **Veronica A Gonzales**                                           Case number *(if know)*   **17-30533**

| 2.2 | **Internal Revenue Service** | Last 4 digits of account number | ___ ___ ___ ___ | **Unknown** | **Unknown** | **Unknown** |

Priority Creditor's Name

**Ogden, UT 84201-0030**

Number Street City State Zip Code

**Who incurred the debt? Check one.**

☑ Debtor 1 only

☐ Debtor 2 only

☐ Debtor 1 and Debtor 2 only

☐ At least one of the debtors and another

☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

☑ No

☐ Yes

When was the debt incurred?   _____

As of the date you file, the claim is: Check all that apply

☐ Contingent

☐ Unliquidated

☑ Disputed

Type of PRIORITY unsecured claim:

☐ Domestic support obligations

☑ Taxes and certain other debts you owe the government

☐ Claims for death or personal injury while you were intoxicated

☐ Other. Specify _____

---

| **Part 2:** | **List All of Your NONPRIORITY Unsecured Claims** |

3. **Do any creditors have nonpriority unsecured claims against you?**

☐ No. You have nothing to report in this part. Submit this form to the court with your other schedules.

☑ Yes.

4. **List all of your nonpriority unsecured claims in the alphabetical order of the creditor who holds each claim.** If a creditor has more than one nonpriority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. Do not list claims already included in Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.If you have more than three nonpriority unsecured claims fill out the Continuation Page of Part 2.

|  |  |  |  | Total claim |
|--|--|--|--|--|

| 4.1 | **American Express** | Last 4 digits of account number | **8001** | **$2,135.44** |

Nonpriority Creditor's Name

**BOX 0001**

**Los Angeles, CA 90096-8000**

Number Street City State Zip Code

**Who incurred the debt? Check one.**

☑ Debtor 1 only

☐ Debtor 2 only

☐ Debtor 1 and Debtor 2 only

☐ At least one of the debtors and another

☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

☑ No

☐ Yes

When was the debt incurred?   _____

As of the date you file, the claim is: Check all that apply

☐ Contingent

☐ Unliquidated

☐ Disputed

Type of NONPRIORITY unsecured claim:

☐ Student loans

☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

☐ Debts to pension or profit-sharing plans, and other similar debts

☑ Other. Specify   **Credit card debt.**

---

Debtor 1   **Veronica A Gonzales**                                      Case number (if known)   **17-30533**

| 4.2 | **Bank of America, NA** | Last 4 digits of account number | **0738** | **$673.41** |

Nonpriority Creditor's Name
**P.O. Box 15019**
**Wilmington, DE 19886**
Number Street City State ZIp Code

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ **Check if this claim is for a  community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

**When was the debt incurred?**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **Credit card debt.**

---

**Part 3:**   **List Others to Be Notified About a Debt That You Already Listed**

5. Use this page only if you have others to be notified about your bankruptcy, for a debt that you already listed in Parts 1 or 2. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the original creditor in Parts 1 or 2, then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Parts 1 or 2, list the additional creditors here. If you do not have additional persons to be notified for any debts in Parts 1 or 2, do not fill out or submit this page.

| Name and Address | On which entry in Part 1 or Part 2 did you list the original creditor? |
|---|---|
| **Franchise Tax Board** **Bankruptcy Unit** **P.O.Box 2952** **Sacramento, CA 95812** | Line **2.1** of (Check one): ■ Part 1: Creditors with Priority Unsecured Claims ☐ Part 2: Creditors with Nonpriority Unsecured Claims |
| | Last 4 digits of account number |
| **Internal Revenue Service** **Special Procedures Section** **1301 Clay St., Stop 1400S** **Oakland, CA 94612** | Line **2.2** of (Check one): ■ Part 1: Creditors with Priority Unsecured Claims ☐ Part 2: Creditors with Nonpriority Unsecured Claims |
| | Last 4 digits of account number |
| **Internal Revenue Service** **P.O. Box 7346** **Philadelphia, PA 19101-7346** | Line **2.2** of (Check one): ■ Part 1: Creditors with Priority Unsecured Claims ☐ Part 2: Creditors with Nonpriority Unsecured Claims |
| | Last 4 digits of account number |
| **Internal Revenue Service** **P.O. Box 105416** **Atlanta, GA 30348-5416** | Line **2.2** of (Check one): ■ Part 1: Creditors with Priority Unsecured Claims ☐ Part 2: Creditors with Nonpriority Unsecured Claims |
| | Last 4 digits of account number |

---

**Part 4:**   **Add the Amounts for Each Type of Unsecured Claim**

6. Total the amounts of certain types of unsecured claims. This information is for statistical reporting purposes only. 28 U.S.C. §159. Add the amounts for each type of unsecured claim.

|  | | | Total Claim |
|---|---|---|---|
| **Total claims from Part 1** | 6a. | **Domestic support obligations** | 6a. | $ 0.00 |
| | 6b. | **Taxes and certain other debts you owe the government** | 6b. | $ 0.00 |
| | 6c. | **Claims for death or personal injury while you were intoxicated** | 6c. | $ 0.00 |
| | 6d. | **Other.** Add all other priority unsecured claims. Write that amount here. | 6d. | $ 0.00 |
| | 6e. | **Total Priority.** Add lines 6a through 6d. | 6e. | $ 0.00 |

|  | | | Total Claim |
|---|---|---|---|
| | 6f. | **Student loans** | 6f. | $ 0.00 |

---

Debtor 1   **Veronica A Gonzales**                                     Case number (*if know*)   **17-30533**

| Total claims from Part 2 | | | | |
|---|---|---|---|---|
| | 6g. | **Obligations arising out of a separation agreement or divorce that you did not report as priority claims** | 6g. | $                    0.00 |
| | 6h. | **Debts to pension or profit-sharing plans, and other similar debts** | 6h. | $                    0.00 |
| | 6i. | **Other.** Add all other nonpriority unsecured claims. Write that amount here. | 6i. | $                2,808.85 |
| | 6j. | **Total Nonpriority.** Add lines 6f through 6i. | 6j. | $                2,808.85 |

---

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Veronica A Gonzales** |
| | First Name    Middle Name    Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name    Middle Name    Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case number | **17-30533** |
| (if known) | |

☐ Check if this is an
amended filing

---

## Official Form 106G
## Schedule G: Executory Contracts and Unexpired Leases          12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the additional page, fill it out, number the entries, and attach it to this page. On the top of any additional pages, write your name and case number (if known).

1.  **Do you have any executory contracts or unexpired leases?**
    ☐ No. Check this box and file this form with the court with your other schedules.  You have nothing else to report on this form.
    ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B:Property* (Official Form 106 A/B).

2.  **List separately each person or company with whom you have the contract or lease. Then state what each contract or lease is for (for example, rent, vehicle lease, cell phone).** See the instructions for this form in the instruction booklet for more examples of executory contracts and unexpired leases.

| Person or company with whom you have the contract or lease<br>Name, Number, Street, City, State and ZIP Code | State what the contract or lease is for |
|---|---|
| 2.1 **Farmers Insurance**<br>**c/o Heather Dickerson**<br>**8540 Archibald Ave. #B**<br>**Rancho Cucamonga, CA 91730** | **Debtor maintains three property insurance policies with Farmers Insurance.** |
| 2.2 **Hawes Real Estate & Property Management**<br>**846 W. Foothill Blvd.**<br>**Upland, CA 91786** | **Property management contract.** |
| 2.3 **Matthew McCloskey and Christina Shipe**<br>**1378 E. 9th Street**<br>**Upland, CA 91786** | **Residential real property lease (now month-to-month)** |
| 2.4 **Nicole Celeste Pankey**<br>**8563 Beechwood Dr.**<br>**Rancho Cucamonga, CA 91701** | **Residential real property lease.** |

---

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Veronica A Gonzales** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case number (if known) | 17-30533 |

☐ Check if this is an amended filing

## Official Form 106H
## Schedule H: Your Codebtors

12/15

Codebtors are people or entities who are also liable for any debts you may have. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, and number the entries in the boxes on the left. Attach the Additional Page to this page. On the top of any Additional Pages, write your name and case number (if known). Answer every question.

**1. Do you have any codebtors?** (If you are filing a joint case, do not list either spouse as a codebtor.)

■ No
☐ Yes

**2. Within the last 8 years, have you lived in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, and Wisconsin.)

■ No. Go to line 3.
☐ Yes. Did your spouse, former spouse, or legal equivalent live with you at the time?

**3. In Column 1, list all of your codebtors. Do not include your spouse as a codebtor if your spouse is filing with you. List the person shown in line 2 again as a codebtor only if that person is a guarantor or cosigner. Make sure you have listed the creditor on Schedule D (Official Form 106D), Schedule E/F (Official Form 106E/F), or Schedule G (Official Form 106G). Use Schedule D, Schedule E/F, or Schedule G to fill out Column 2.**

| *Column 1:* **Your codebtor**<br>Name, Number, Street, City, State and ZIP Code | *Column 2:* **The creditor to whom you owe the debt**<br>Check all schedules that apply: |
|---|---|
| 3.1 _____<br>Name<br><br>_____<br>Number   Street<br>City          State          ZIP Code | ☐ Schedule D, line _____<br>☐ Schedule E/F, line _____<br>☐ Schedule G, line _____ |
| 3.2 _____<br>Name<br><br>_____<br>Number   Street<br>City          State          ZIP Code | ☐ Schedule D, line _____<br>☐ Schedule E/F, line _____<br>☐ Schedule G, line _____ |

Fill in this information to identify your case:

Debtor 1 **Veronica A Gonzales**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: NORTHERN DISTRICT OF CALIFORNIA

Case number **17-30533**
(If known)

Check if this is:
☐ An amended filing
☐ A supplement showing postpetition chapter 13 income as of the following date:
_____
MM / DD/ YYYY

## Official Form 106I
# Schedule I: Your Income                                     12/15

Be as complete and accurate as possible. If two married people are filing together (Debtor 1 and Debtor 2), both are equally responsible for supplying correct information. If you are married and not filing jointly, and your spouse is living with you, include information about your spouse. If you are separated and your spouse is not filing with you, do not include information about your spouse. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:        Describe Employment

1. **Fill in your employment information.**

   If you have more than one job, attach a separate page with information about additional employers.

   Include part-time, seasonal, or self-employed work.

   Occupation may include student or homemaker, if it applies.

|  | Debtor 1 | Debtor 2 or non-filing spouse |
|---|---|---|
| **Employment status** | ■ Employed<br>☐ Not employed | ☐ Employed<br>☐ Not employed |
| **Occupation** | Physician Assistant | |
| **Employer's name** | Self-employed. | |
| **Employer's address** | 36 Rustic Way<br>San Rafael, CA 94901 | |
| **How long employed there?** | 23 years. | |

### Part 2:        Give Details About Monthly Income

Estimate monthly income as of the date you file this form. If you have nothing to report for any line, write $0 in the space. Include your non-filing spouse unless you are separated.

If you or your non-filing spouse have more than one employer, combine the information for all employers for that person on the lines below. If you need more space, attach a separate sheet to this form.

|  |  | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|
| 2. | **List monthly gross wages, salary, and commissions** (before all payroll deductions).  If not paid monthly, calculate what the monthly wage would be. | 2.  $    1,309.48 | $    N/A |
| 3. | **Estimate and list monthly overtime pay.** | 3.  +$    0.00 | +$    N/A |
| 4. | **Calculate gross income.**  Add line 2 + line 3. | 4.  $    1,309.48 | $    N/A |

| Debtor 1 | **Veronica A Gonzales** | Case number (*if known*) | **17-30533** |
|---|---|---|---|

|  |  |  | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
|  | Copy line 4 here | 4. | $ **1,309.48** | $ **N/A** |

5. **List all payroll deductions:**

|  |  |  | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 5a. | Tax, Medicare, and Social Security deductions | 5a. | $ **0.00** | $ **N/A** |
| 5b. | Mandatory contributions for retirement plans | 5b. | $ **0.00** | $ **N/A** |
| 5c. | Voluntary contributions for retirement plans | 5c. | $ **0.00** | $ **N/A** |
| 5d. | Required repayments of retirement fund loans | 5d. | $ **0.00** | $ **N/A** |
| 5e. | Insurance | 5e. | $ **0.00** | $ **N/A** |
| 5f. | Domestic support obligations | 5f. | $ **0.00** | $ **N/A** |
| 5g. | Union dues | 5g. | $ **0.00** | $ **N/A** |
| 5h. | Other deductions. Specify:  **Accounting services** | 5h.+ | $ **18.38** + | $ **N/A** |
|  | **Office supplies** |  | $ **9.80** | $ **N/A** |
|  | **Medical professional dues and education** |  | $ **49.58** | $ **N/A** |
| 6. | **Add the payroll deductions.**  Add lines 5a+5b+5c+5d+5e+5f+5g+5h. | 6. | $ **77.76** | $ **N/A** |
| 7. | **Calculate total monthly take-home pay.**  Subtract line 6 from line 4. | 7. | $ **1,231.72** | $ **N/A** |

8. **List all other income regularly received:**

| 8a. | **Net income from real property and from operating a business, profession, or farm**  Attach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income. | 8a. | $ **4,734.57** | $ **N/A** |
|---|---|---|---|---|
| 8b. | **Interest and dividends** | 8b. | $ **0.00** | $ **N/A** |
| 8c. | **Family support payments that you, a non-filing spouse, or a dependent regularly receive**  Include alimony, spousal support, child support, maintenance, divorce settlement, and property settlement. | 8c. | $ **574.58** | $ **N/A** |
| 8d. | **Unemployment compensation** | 8d. | $ **0.00** | $ **N/A** |
| 8e. | **Social Security** | 8e. | $ **0.00** | $ **N/A** |
| 8f. | **Other government assistance that you regularly receive**  Include cash assistance and the value (if known) of any non-cash assistance that you receive, such as food stamps (benefits under the Supplemental Nutrition Assistance Program) or housing subsidies.  Specify: | 8f. | $ **0.00** | $ **N/A** |
| 8g. | **Pension or retirement income** | 8g. | $ **0.00** | $ **N/A** |
| 8h. | **Other monthly income. Specify:**  **Interest income** | 8h.+ | $ **0.03** + | $ **N/A** |
|  | **Melaleuca** |  | $ **70.51** | $ **N/A** |

| 9. | **Add all other income.**  Add lines 8a+8b+8c+8d+8e+8f+8g+8h. | 9. | $ **5,379.69** | $ **N/A** |
|---|---|---|---|---|

| 10. | **Calculate monthly income.**  Add line 7 + line 9.  Add the entries in line 10 for Debtor 1 and Debtor 2 or non-filing spouse. | 10. | $ **6,611.41** + | $ **N/A** = | $ **6,611.41** |
|---|---|---|---|---|---|

11. **State all other regular contributions to the expenses that you list in *Schedule J.***
Include contributions from an unmarried partner, members of your household, your dependents, your roommates, and other friends or relatives.
Do not include any amounts already included in lines 2-10 or amounts that are not available to pay expenses listed in *Schedule J.*
Specify: ............................................................................................................... 11. +$ **0.00**

12. **Add the amount in the last column of line 10 to the amount in line 11.**  The result is the combined monthly income. Write that amount on the *Summary of Schedules* and *Statistical Summary of Certain Liabilities* and Related *Data*, if it applies

| 12. | $ **6,611.41** |
|---|---|
|  | **Combined monthly income** |

13. **Do you expect an increase or decrease within the year after you file this form?**
☐ No.
■ Yes. Explain:

| **The Debtor is self-employed, and her income varies from month-to-month.  The estimates provided in this Schedule are estimates, based upon the year preceding the commencement of the Chapter 7 case.** |
|---|

**Fill in this information to identify your case:**

Debtor 1 __**Veronica A Gonzales**__

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: __NORTHERN DISTRICT OF CALIFORNIA__

Case number __**17-30533**__
(If known)

Check if this is:

☐ An amended filing
☐ A supplement showing postpetition chapter 13 expenses as of the following date:

_____
MM / DD / YYYY

Official Form 106J
# Schedule J: Your Expenses
**12/15**

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach another sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

| Part 1: | Describe Your Household |
|---|---|

1. **Is this a joint case?**

   ■ No. Go to line 2.
   ☐ Yes. **Does Debtor 2 live in a separate household?**

      ☐ No
      ☐ Yes. Debtor 2 must file Official Form 106J-2, *Expenses for Separate Household* of Debtor 2.

2. **Do you have dependents?**   ■ No

   Do not list Debtor 1 and Debtor 2.     ☐ Yes.   Fill out this information for each dependent..............

   Do not state the dependents names.

| Dependent's relationship to Debtor 1 or Debtor 2 | Dependent's age | Does dependent live with you? |
|---|---|---|
| _____ | _____ | ☐ No  ☐ Yes |
| _____ | _____ | ☐ No  ☐ Yes |
| _____ | _____ | ☐ No  ☐ Yes |
| _____ | _____ | ☐ No  ☐ Yes |

3. **Do your expenses include expenses of people other than yourself and your dependents?**   ■ No   ☐ Yes

| Part 2: | Estimate Your Ongoing Monthly Expenses |
|---|---|

Estimate your expenses as of your bankruptcy filing date unless you are using this form as a supplement in a Chapter 13 case to report expenses as of a date after the bankruptcy is filed. If this is a supplemental *Schedule J,* check the box at the top of the form and fill in the applicable date.

Include expenses paid for with non-cash government assistance if you know the value of such assistance and have included it on *Schedule I: Your Income* (Official Form 106I.)

| | **Your expenses** |
|---|---|

4. **The rental or home ownership expenses for your residence.** Include first mortgage payments and any rent for the ground or lot.   4. $ _____ **0.00**

   If not included in line 4:

   4a.  Real estate taxes                                                  4a. $ _____ **0.00**
   4b.  Property, homeowner's, or renter's insurance                       4b. $ _____ **0.00**
   4c.  Home maintenance, repair, and upkeep expenses                      4c. $ _____ **0.00**
   4d.  Homeowner's association or condominium dues                        4d. $ _____ **0.00**
5. **Additional mortgage payments for your residence,** such as home equity loans   5. $ _____ **808.00**

Debtor 1  **Veronica A Gonzales** _____     Case number (if known)    **17-30533**

| | | | | |
|---|---|---|---|---|
| 6. | **Utilities:** | | | |
| | 6a. | Electricity, heat, natural gas | 6a. $ | **150.00** |
| | 6b. | Water, sewer, garbage collection | 6b. $ | **70.00** |
| | 6c. | Telephone, cell phone, Internet, satellite, and cable services | 6c. $ | **100.00** |
| | 6d. | Other. Specify: | 6d. $ | **0.00** |
| 7. | **Food and housekeeping supplies** | | 7. $ | **600.00** |
| 8. | **Childcare and children's education costs** | | 8. $ | **0.00** |
| 9. | **Clothing, laundry, and dry cleaning** | | 9. $ | **10.00** |
| 10. | **Personal care products and services** | | 10. $ | **25.00** |
| 11. | **Medical and dental expenses** | | 11. $ | **0.00** |
| 12. | **Transportation.** Include gas, maintenance, bus or train fare. Do not include car payments. | | 12. $ | **505.54** |
| 13. | **Entertainment, clubs, recreation, newspapers, magazines, and books** | | 13. $ | **120.58** |
| 14. | **Charitable contributions and religious donations** | | 14. $ | **0.00** |
| 15. | **Insurance.** Do not include insurance deducted from your pay or included in lines 4 or 20. | | | |
| | 15a. | Life insurance | 15a. $ | **0.00** |
| | 15b. | Health insurance | 15b. $ | **0.00** |
| | 15c. | Vehicle insurance | 15c. $ | **259.86** |
| | 15d. | Other insurance. Specify:   **Dental Insurance** | 15d. $ | **42.00** |
| 16. | **Taxes.** Do not include taxes deducted from your pay or included in lines 4 or 20. Specify: | | 16. $ | **0.00** |
| 17. | **Installment or lease payments:** | | | |
| | 17a. | Car payments for Vehicle 1 | 17a. $ | **0.00** |
| | 17b. | Car payments for Vehicle 2 | 17b. $ | **0.00** |
| | 17c. | Other. Specify: | 17c. $ | **0.00** |
| | 17d. | Other. Specify: | 17d. $ | **0.00** |
| 18. | **Your payments of alimony, maintenance, and support that you did not report as deducted from your pay on line 5,** *Schedule I, Your Income* **(Official Form 106I).** | | 18. $ | **0.00** |
| 19. | **Other payments you make to support others who do not live with you.** Specify: | | 19. $ | **0.00** |
| 20. | **Other real property expenses not included in lines 4 or 5 of this form or on** *Schedule I: Your Income.* | | | |
| | 20a. | Mortgages on other property | 20a. $ | **0.00** |
| | 20b. | Real estate taxes | 20b. $ | **0.00** |
| | 20c. | Property, homeowner's, or renter's insurance | 20c. $ | **0.00** |
| | 20d. | Maintenance, repair, and upkeep expenses | 20d. $ | **33.91** |
| | 20e. | Homeowner's association or condominium dues | 20e. $ | **0.00** |
| 21. | **Other:** Specify: | | 21. +$ | **0.00** |

| | | | |
|---|---|---|---|
| 22. | **Calculate your monthly expenses** | | |
| | 22a. Add lines 4 through 21. | $ | **2,724.89** |
| | 22b. Copy line 22 (monthly expenses for Debtor 2), if any, from Official Form 106J-2 | $ | |
| | 22c. Add line 22a and 22b.  The result is your monthly expenses. | $ | **2,724.89** |
| 23. | **Calculate your monthly net income.** | | |
| | 23a. Copy line 12 *(your combined monthly income)* from Schedule I. | 23a. $ | **6,611.41** |
| | 23b. Copy your monthly expenses from line 22c above. | 23b. -$ | **2,724.89** |
| | 23c. Subtract your monthly expenses from your monthly income. The result is your *monthly net income.* | 23c. $ | **3,886.52** |

24. **Do you expect an increase or decrease in your expenses within the year after you file this form?**
For example, do you expect to finish paying for your car loan within the year or do you expect your mortgage payment to increase or decrease because of a modification to the terms of your mortgage?

■ No.

☐ Yes.  **Explain here: Debtor's payments on her primary mortgage are $4,745.22, but those payments have not been made in several years, as the Debtor was attempting negotiate a mortgage modification. The Debtor's primary secured lender has refused to take monthly payments from the Debtor.**

**Fill in this information to identify your case:**

Debtor 1  **Veronica A Gonzales**
First Name          Middle Name          Last Name

Debtor 2
(Spouse if, filing)  First Name          Middle Name          Last Name

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF CALIFORNIA

Case number   **17-30533**
(if known)

☐ Check if this is an
amended filing

Official Form 106Dec
# Declaration About an Individual Debtor's Schedules          12/15

If two married people are filing together, both are equally responsible for supplying correct information.

You must file this form whenever you file bankruptcy schedules or amended schedules. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Sign Below

**Did you pay or agree to pay someone who is NOT an attorney to help you fill out bankruptcy forms?**

☐ No
☑ Yes.  Name of person   See Note below.                 Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119)

**Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct.**

X  ***/s/ Veronica A Gonzales***                          X
**Veronica A Gonzales**                                    Signature of Debtor 2
Signature of Debtor 1

Date  **October 15, 2017**                                Date

**Note:  the Debtor commenced this Chapter 7 case *pro se*, but received advice to do so by a firm named Haven Legal Services ("Haven").  Prior to the commencement of the case, Haven prepared the Debtor's Voluntary Petition, emailed it to her, and advised her to file it.**

Official Form 106Dec                    Declaration About an Individual Debtor's Schedules

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Veronica A Gonzales** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case number (if known) | 17-30533 |

☐ Check if this is an amended filing

## Official Form 107
## Statement of Financial Affairs for Individuals Filing for Bankruptcy          4/16

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

**Part 1:      Give Details About Your Marital Status and Where You Lived Before**

1.  **What is your current marital status?**

    ☐ Married
    ☑ Not married

2.  **During the last 3 years, have you lived anywhere other than where you live now?**

    ☑ No
    ☐ Yes. List all of the places you lived in the last 3 years. Do not include where you live now.

| Debtor 1 Prior Address: | Dates Debtor 1 lived there | Debtor 2 Prior Address: | Dates Debtor 2 lived there |
|---|---|---|---|

3.  **Within the last 8 years, did you ever live with a spouse or legal equivalent in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin.)

    ☑ No
    ☐ Yes. Make sure you fill out *Schedule H: Your Codebtors* (Official Form 106H).

**Part 2      Explain the Sources of Your Income**

4.  **Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
    Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
    If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

    ☐ No
    ☑ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) |
| **From January 1 of current year until the date you filed for bankruptcy:** | ☐ Wages, commissions, bonuses, tips | **$9,863.44** | ☐ Wages, commissions, bonuses, tips | |
| | ☑ Operating a business | | ☐ Operating a business | |
| **For last calendar year:** **(January 1 to December 31, 2016 )** | ☐ Wages, commissions, bonuses, tips | **$8,393.00** | ☐ Wages, commissions, bonuses, tips | |
| | ☑ Operating a business | | ☐ Operating a business | |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Debtor 1   **Veronica A Gonzales**                                    Case number (*if known*)   **17-30533**

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) |
| **For the calendar year before that:**<br>**(January 1 to December 31, 2015 )** | ☐ Wages, commissions, bonuses, tips | **Unknown** | ☐ Wages, commissions, bonuses, tips | |
| | ☑ Operating a business | | ☐ Operating a business | |

5. **Did you receive any other income during this year or the two previous calendar years?**
   Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

   List each source and the gross income from each source separately. Do not include income that you listed in line 4.

   ☐ No
   ☑ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income**<br>Describe below. | **Gross income from each source**<br>(before deductions and exclusions) | **Sources of income**<br>Describe below. | **Gross income**<br>(before deductions and exclusions) |
| **From January 1 of current year until the date you filed for bankruptcy:** | **Rental income/property management** | **$23,224.12** | | |
| | **Child Support** | **$2,965.00** | | |
| **For last calendar year:**<br>**(January 1 to December 31, 2016 )** | **Rental income/property management** | **$9,093.00** | | |
| **For the calendar year before that:**<br>**(January 1 to December 31, 2015 )** | **Rental income/property management** | **Unknown** | | |

**Part 3:**   List Certain Payments You Made Before You Filed for Bankruptcy

6. **Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**

   ☐ No.   **Neither Debtor 1 nor Debtor 2 has primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

   During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $6,425* or more?

   ☐ No.   Go to line 7.
   ☐ Yes   List below each creditor to whom you paid a total of $6,425* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.
   * Subject to adjustment on 4/01/19 and every 3 years after that for cases filed on or after the date of adjustment.

   ☑ Yes.   **Debtor 1 or Debtor 2 or both have primarily consumer debts.**
   During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

   ☐ No.   Go to line 7.
   ☑ Yes   List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|
| | | | | |

Debtor 1   **Veronica A Gonzales**                                    Case number *(if known)*   **17-30533**

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|
| **See Attachment 6** | | | | ☐ Mortgage<br>☐ Car<br>☐ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |

7. **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
   *Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

☑ No
☐ Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|
| | | | | |

8. **Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**
   Include payments on debts guaranteed or cosigned by an insider.

☐ No
☑ Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment<br>Include creditor's name |
|---|---|---|---|---|
| **See Attachment 8.** | | | | |

| Part 4: | Identify Legal Actions, Repossessions, and Foreclosures |
|---|---|

9. **Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?**
   List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

☐ No
☑ Yes. Fill in the details.

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Pearlie Jane Sy Lee et al. v. Gonzales et al. Veronica A Gonzales**<br>**17 CV 000116** | **Breach of promissory note; breach of joint venture; foreclosure.** | **Napa County Superior Court**<br>**825 Brown Street**<br>**Napa, CA 94559** | ☑ Pending<br>☐ On appeal<br>☐ Concluded |

10. **Within 1 year before you filed for bankruptcy, was any of your property repossessed, foreclosed, garnished, attached, seized, or levied?**
    Check all that apply and fill in the details below.

☑ No. Go to line 11.
☐ Yes. Fill in the information below.

| Creditor Name and Address | Describe the Property<br><br>Explain what happened | Date | Value of the property |
|---|---|---|---|
| | | | |

| Debtor 1 | **Veronica A Gonzales** | Case number (*if known*) | **17-30533** |
|---|---|---|---|

11. **Within 90 days before you filed for bankruptcy, did any creditor, including a bank or financial institution, set off any amounts from your accounts or refuse to make a payment because you owed a debt?**

☑ No
☐ Yes. Fill in the details.

| Creditor Name and Address | Describe the action the creditor took | Date action was taken | Amount |
|---|---|---|---|

12. **Within 1 year before you filed for bankruptcy, was any of your property in the possession of an assignee for the benefit of creditors, a court-appointed receiver, a custodian, or another official?**

☑ No
☐ Yes

---

**Part 5:**   List Certain Gifts and Contributions

13. **Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?**

☐ No
☑ Yes. Fill in the details for each gift.

| Gifts with a total value of more than $600 per person | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|
| **Person to Whom You Gave the Gift and Address:** | | | |
| **See Attachment 13** | | | |

Person's relationship to you:

14. **Within 2 years before you filed for bankruptcy, did you give any gifts or contributions with a total value of more than $600 to any charity?**

☑ No
☐ Yes. Fill in the details for each gift or contribution.

| Gifts or contributions to charities that total more than $600 Charity's Name Address (Number, Street, City, State and ZIP Code) | Describe what you contributed | Dates you contributed | Value |
|---|---|---|---|

---

**Part 6:**   List Certain Losses

15. **Within 1 year before you filed for bankruptcy or since you filed for bankruptcy, did you lose anything because of theft, fire, other disaster, or gambling?**

☑ No
☐ Yes.  Fill in the details.

| Describe the property you lost and how the loss occurred | Describe any insurance coverage for the loss Include the amount that insurance has paid. List pending insurance claims on line 33 of *Schedule A/B: Property.* | Date of your loss | Value of property lost |
|---|---|---|---|

---

**Part 7:**   List Certain Payments or Transfers

16. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?**
Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

☑ No
☐ Yes. Fill in the details.

| Person Who Was Paid Address Email or website address Person Who Made the Payment, if Not You | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Debtor 1  **Veronica A Gonzales**                              Case number *(if known)*  **17-30533**

17. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?**
Do not include any payment or transfer that you listed on line 16.

☐ No
☑ Yes. Fill in the details.

| Person Who Was Paid Address | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| **See Attachment 17.** | | | |

18. **Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?**
Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.

☐ No
☑ Yes. Fill in the details.

| Person Who Received Transfer Address Person's relationship to you | Description and value of property transferred | Describe any property or payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|
| **See Attachments 8, 13, and 17.** | | | |

19. **Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?** (These are often called *asset-protection devices*.)

☑ No
☐ Yes. Fill in the details.

| Name of trust | Description and value of the property transferred | Date Transfer was made |
|---|---|---|

**Part 8:**  List of Certain Financial Accounts, Instruments, Safe Deposit Boxes, and Storage Units

20. **Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?**
Include checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, and other financial institutions.

☐ No
☑ **Yes. Fill in the details.**

| Name of Financial Institution and Address (Number, Street, City, State and ZIP Code) | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|
| **Wells Fargo Bank 901 Main Street Napa, CA 94559** | 1133 | Joint Savings | April 30, 2017 | $0.00 |

21. **Do you now have, or did you have within 1 year before you filed for bankruptcy, any safe deposit box or other depository for securities, cash, or other valuables?**

☑ No
☐ Yes. Fill in the details.

| Name of Financial Institution Address (Number, Street, City, State and ZIP Code) | Who else had access to it? Address (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                Best Case Bankruptcy

Debtor 1   **Veronica A Gonzales**                                   Case number *(if known)*   **17-30533**

22. **Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?**

☑ No
☐ Yes. Fill in the details.

| Name of Storage Facility<br>**Address** (Number, Street, City, State and ZIP Code) | Who else has or had access to it?<br>**Address** (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

**Part 9:**   **Identify Property You Hold or Control for Someone Else**

23. **Do you hold or control any property that someone else owns?** Include any property you borrowed from, are storing for, or hold in trust for someone.

☑ No
☐ Yes. Fill in the details.

| Owner's Name<br>**Address** (Number, Street, City, State and ZIP Code) | Where is the property?<br>(Number, Street, City, State and ZIP Code) | Describe the property | Value |
|---|---|---|---|

**Part 10:**   **Give Details About Environmental Information**

For the purpose of Part 10, the following definitions apply:

☑ *Environmental law* means any federal, state, or local statute or regulation concerning pollution, contamination, releases of hazardous or toxic substances, wastes, or material into the air, land, soil, surface water, groundwater, or other medium, including statutes or regulations controlling the cleanup of these substances, wastes, or material.

☑ *Site* means any location, facility, or property as defined under any environmental law, whether you now own, operate, or utilize it or used to own, operate, or utilize it, including disposal sites.

☑ *Hazardous material* means anything an environmental law defines as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, contaminant, or similar term.

Report all notices, releases, and proceedings that you know about, regardless of when they occurred.

24. **Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

25. **Have you notified any governmental unit of any release of hazardous material?**

☑ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

26. **Have you been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No
☐ Yes. Fill in the details.

| Case Title<br>Case Number | Court or agency<br>Name<br>**Address** (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|

**Part 11:**   **Give Details About Your Business or Connections to Any Business**

27. **Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?**

☑ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time

☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)

☐ A partner in a partnership

☑ An officer, director, or managing executive of a corporation

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                                                Best Case Bankruptcy

Debtor 1 **Veronica A Gonzales**     Case number *(if known)* **17-30533**

☑ **An owner of at least 5% of the voting or equity securities of a corporation**

☐ **No. None of the above applies.  Go to Part 12.**

☑ **Yes. Check all that apply above and fill in the details below for each business.**

| Business Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Describe the nature of the business<br><br>Name of accountant or bookkeeper | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|
| **Physician Assistant and Surgical Service<br>36 Rustic Way<br>San Rafael, CA 94901** | **Physician Assistant<br><br>Nicole Queeney<br>Small Business Tax, Inc.<br>1403 N Batavia St Ste 103<br>Orange CA 92867** | EIN:    **(Presently using Debtor's social<br>        security number)**<br>From-To<br>        **1994-Present** |
| **Absolute Real Estate Investments, Inc.<br>4705 S. Durango Dr. 100-A1<br>Las Vegas, NV 89147** | **Real Estate Investment/Development<br><br>Nicole Queeney<br>Small Business Tax, Inc.<br>1403 N Batavia St Ste 103<br>Orange CA 92867** | EIN:    **45-4302964**<br><br>From-To    **2011-Present** |

28. **Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties?**

☑ **No**
☐ **Yes. Fill in the details below.**

| Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Date Issued |
|---|---|
|  |  |

**Part 12:    Sign Below**

I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571

 **/s/ Veronica A Gonzales**
**Veronica A Gonzales**     **Signature of Debtor 2**
**Signature of Debtor 1**

Date  **October 22, 2017**          Date _____

**Did you attach additional pages to** *Your Statement of Financial Affairs for Individuals Filing for Bankruptcy* **(Official Form 107)?**
☐ No
☑ Yes

**Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?**
☐ No
☑ Yes. Name of Person _____. Attach the *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

**The Debtor commenced this Chapter 7 case** *pro se*, **but received advice to do so by a firm named Haven Legal services ("Haven").  Prior to the commencement of the case, Haven prepared the Debtor's Voluntary Petition, emailed it to her, and advised her to file it.**

Statement of Financial Affairs- Attachment 6

| Date | 90 days | Purpose | Amount |
|------|---------|---------|--------|
| 3/3/17-5/31/17 | Creditors pd > or = $600 | | |
| 05/11/2017 | JP Morgan Chase Bank, N.A.; P.O. Box 78052; Phoenix, AZ 85062 | Rustic Way credit line | (922.40) |
| 03/10/2017 | JP Morgan Chase Bank, N.A.; P.O. Box 78052; Phoenix, AZ 85062 | Rustic Way credit line | (868.00) |
| 04/11/2017 | JP Morgan Chase Bank, N.A.; P.O. Box 78052; Phoenix, AZ 85062 | Rustic Way credit line | (953.14) |
| 05/11/2017 | JP Morgan Chase Bank, N.A.; 3415 Vision Dr.; Columbus OH 43219 | Beechwood mortgage | (1,310.06) |
| 04/11/2017 | JP Morgan Chase Bank, N.A.; 3415 Vision Dr.; Columbus OH 43219 | Beechwood mortgage | (1,310.06) |
| 03/10/2017 | JP Morgan Chase Bank, N.A.; 3415 Vision Dr.; Columbus OH 43219 | Beechwood mortgage | (1,310.06) |
| 05/11/2017 | JP Morgan Chase Bank, N.A.; 3415 Vision Dr.; Columbus OH 43219 | Beechwood credit line | (258.66) |
| 04/11/2017 | JP Morgan Chase Bank, N.A.; 3415 Vision Dr.; Columbus OH 43219 | Beechwood credit line | (267.28) |
| 03/10/2017 | JP Morgan Chase Bank, N.A.; 3415 Vision Dr.; Columbus OH 43219 | Beechwood credit line | (158.74) |
| 05/11/2017 | JP Morgan Chase Bank, N.A.; 3415 Vision Dr.; Columbus OH 43219 | 9th Street credit line | (608.14) |
| 04/11/2017 | JP Morgan Chase Bank, N.A.; 3415 Vision Dr.; Columbus OH 43219 | 9th Street credit line | (628.42) |
| 03/10/2017 | JP Morgan Chase Bank, N.A.; 3415 Vision Dr.; Columbus OH 43219 | 9th Street credit line | (570.85) |
| 03/07/2017 | Mercury Insurance Co. | Car insurance | (268.00) |
| 04/06/2017 | Mercury Insurance Co. | Car insurance | (268.00) |
| 05/04/2017 | Mercury Insurance Co. | Car insurance | (277.72) |

Statement of Financial Affairs- Attachment 8

| 6/1/16 - 5/31/17 | 1 yr | | | |
|---|---|---|---|---|
| | Reason for payment | Relationship | Purpose | Amount |
| 05/31/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 05/02/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 03/30/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 03/01/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 01/31/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 12/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 11/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 11/01/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 09/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 08/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 08/01/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 06/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 06/01/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | Gift | ($80.44) |
| 05/15/2017 | Absolute Real Estate Investments, Inc.; 4705 S. Durango Dr.  100-A1, Las Vegas, NV 89147 | Insider corporation (50% equity owner; officer; director). | Loan | ($730.00) |
| 04/03/2017 | Absolute Real Estate Investments, Inc.; 4705 S. Durango Dr.  100-A1, Las Vegas, NV 89147 | Insider corporation (50% equity owner; officer; director). | Loan | ($1,550.00) |
| 03/09/2017 | Absolute Real Estate Investments, Inc.; 4705 S. Durango Dr.  100-A1, Las Vegas, NV 89147 | Insider corporation (50% equity owner; officer; director). | Loan | ($1,700.00) |
| 02/21/2017 | Absolute Real Estate Investments, Inc.; 4705 S. Durango Dr.  100-A1, Las Vegas, NV 89147 | Insider corporation (50% equity owner; officer; director). | Loan | ($116.00) |
| 02/14/2017 | Absolute Real Estate Investments, Inc.; 4705 S. Durango Dr.  100-A1, Las Vegas, NV 89147 | Insider corporation (50% equity owner; officer; director). | Loan | ($650.00) |
| 07/05/2016 | Absolute Real Estate Investments, Inc.; 4705 S. Durango Dr.  100-A1, Las Vegas, NV 89147 | Insider corporation (50% equity owner; officer; director). | Loan | ($1,000.00) |
| 10/31/2016 | Absolute Real Estate Investments, Inc.; 4705 S. Durango Dr.  100-A1, Las Vegas, NV 89147 | Refund- Beechwood mortgage. | Refund- Beechwood mortgage. | ($1,307.28) |
| 03/31/2017 | Absolute Real Estate Investments, Inc.; 4705 S. Durango Dr.  100-A1, Las Vegas, NV 89147 | Refund/repayment- erroneous payment | Repayment- erroneous payment | ($946.50) |

Statement of Financial Affairs- Attachment 13

| 6/1/15-5/31/17 | 2 yrs | | |
|---|---|---|---|
| Date | Gift  > or = $600 total per person | Relationship | Amount |
| 01/04/2016 | Shawn Gonzales; 1108 Anza St.; San Francisco, CA 94118 | Son | ($1,500.00) |
| 05/31/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 05/02/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 03/30/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 03/01/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 01/31/2017 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 12/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 11/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 11/01/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 09/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 08/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 08/01/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 06/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 06/01/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 05/02/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 03/30/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 03/01/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 02/01/2016 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 12/30/2015 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 12/01/2015 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 10/30/2015 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 09/30/2015 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 09/01/2015 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 07/30/2015 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 06/30/2015 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |
| 06/01/2015 | Susie Smith; 64 Honeyfield Lane; Peralta, NM 87042 | Mother | ($80.44) |

Statement of Financial Affairs- Attachment 17

| 6/1/16 - 5/31/17 | 1 year | |
|---|---|---|
| Date | Name of Firm | Amount |
| 05/31/2017 | Haven Legal Services; 2910 Inland Empire Blvd., Suite 116;  Ontario, CA 91764 | ($1,000.00) |
| 04/14/2017 | Newport Law Firm; 5121 Van Nuys Blvd., Suite 203A; Sherman Oaks, CA 91403 | ($2,000.00) |
| 12/28/2016 | Kettner Law APC; 2150 W. Washington St. Suite 104; San Diego, CA 92110 | ($499.00) |
| 11/29/2016 | Kettner Law APC; 2150 W. Washington St. Suite 104; San Diego, CA 92110 | ($499.00) |
| 10/28/2016 | Kettner Law APC; 2150 W. Washington St. Suite 104; San Diego, CA 92110 | ($499.00) |
| 09/29/2016 | Kettner Law APC; 2150 W. Washington St. Suite 104; San Diego, CA 92110 | ($499.00) |
| 09/06/2016 | Kettner Law APC; 2150 W. Washington St. Suite 104; San Diego, CA 92110 | ($1,000.00) |

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Veronica A Gonzales** |
| | First Name    Middle Name    Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name    Middle Name    Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF CALIFORNIA |
| Case number | **17-30533** |
| (if known) | |

☐ Check if this is an amended filing

## Official Form 108
# Statement of Intention for Individuals Filing Under Chapter 7    12/15

**If you are an individual filing under chapter 7, you must fill out this form if:**
- **creditors have claims secured by your property, or**
- **you have leased personal property and the lease has not expired.**

**You must file this form with the court within 30 days after you file your bankruptcy petition or by the date set for the meeting of creditors, whichever is earlier, unless the court extends the time for cause. You must also send copies to the creditors and lessors you list on the form**

**If two married people are filing together in a joint case, both are equally responsible for supplying correct information. Both debtors must sign and date the form.**

**Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known).**

**Part 1:    List Your Creditors Who Have Secured Claims**

1. **For any creditors that you listed in Part 1 of Schedule D: Creditors Who Have Claims Secured by Property (Official Form 106D), fill in the information below.**

| Identify the creditor and the property that is collateral | What do you intend to do with the property that secures a debt? | Did you claim the property as exempt on Schedule C? |
|---|---|---|
| Creditor's name: **California Service Bureau, Inc.** <br><br> Description of property securing debt: **36 Rustic Way San Rafael, CA 94901  Marin County** | ☐ Surrender the property. <br> ☐ Retain the property and redeem it. <br> ☐ Retain the property and enter into a *Reaffirmation Agreement.* <br> ■ Retain the property and [explain]: **Modification/refinancing** | ☐ No <br><br> ■ Yes |
| Creditor's name: **Internal Revenue Service** <br><br> Description of property securing debt: **36 Rustic Way San Rafael, CA 94901  Marin County** | ☐ Surrender the property. <br> ☐ Retain the property and redeem it. <br> ☐ Retain the property and enter into a *Reaffirmation Agreement.* <br> ■ Retain the property and [explain]: **Payment of tax debt** | ☐ No <br><br> ■ Yes |
| Creditor's name: **JP Morgan Chase Bank, NA** <br><br> Description of property: **36 Rustic Way San Rafael, CA 94901  Marin County** | ☐ Surrender the property. <br> ☐ Retain the property and redeem it. <br> ☐ Retain the property and enter into a *Reaffirmation Agreement.* <br> ■ Retain the property and [explain]: | ☐ No <br><br> ■ Yes |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

| Debtor 1 | **Veronica A Gonzales** | | Case number *(if known)* | **17-30533** |
|---|---|---|---|---|

securing debt:                    **Modification/refinancing.**

| | | | |
|---|---|---|---|
| Creditor's name: | **JP Morgan Chase Bank, NA** | ☐ Surrender the property.<br>☐ Retain the property and redeem it.<br>■ Retain the property and enter into a *Reaffirmation Agreement.*<br>☐ Retain the property and [explain]: | ■ No<br><br>☐ Yes |
| Description of property securing debt: | **8563 Beechwood Dr. Rancho Cucamonga, CA 91701  San Bernardino County** | | |

| | | | |
|---|---|---|---|
| Creditor's name: | **JP Morgan Chase Bank, NA** | ☐ Surrender the property.<br>☐ Retain the property and redeem it.<br>■ Retain the property and enter into a *Reaffirmation Agreement.*<br>☐ Retain the property and [explain]: | ■ No<br><br>☐ Yes |
| Description of property securing debt: | **8563 Beechwood Dr. Rancho Cucamonga, CA 91701  San Bernardino County** | | |

| | | | |
|---|---|---|---|
| Creditor's name: | **JP Morgan Chase Bank, NA** | ☐ Surrender the property.<br>☐ Retain the property and redeem it.<br>■ Retain the property and enter into a *Reaffirmation Agreement.*<br>☐ Retain the property and [explain]: | ■ No<br><br>☐ Yes |
| Description of property securing debt: | **1378 E. 9th Street Upland, CA 91786  San Bernardino County** | | |

| | | | |
|---|---|---|---|
| Creditor's name: | **Wells Fargo Home Mortgage** | ☐ Surrender the property.<br>☐ Retain the property and redeem it.<br>☐ Retain the property and enter into a *Reaffirmation Agreement.*<br>■ Retain the property and [explain]:<br>**Refinancing/mortgage modification intended.** | ☐ No<br><br>■ Yes |
| Description of property securing debt: | **36 Rustic Way San Rafael, CA 94901  Marin County** | | |

| | | | |
|---|---|---|---|
| Creditor's name: | **Wyatt Law Offices** | ☐ Surrender the property.<br>☐ Retain the property and redeem it.<br>☐ Retain the property and enter into a *Reaffirmation Agreement.*<br>■ Retain the property and [explain]:<br>**Modification/refinancing.** | ☐ No<br><br>■ Yes |
| Description of property securing debt: | **36 Rustic Way San Rafael, CA 94901  Marin County** | | |

**Part 2:    List Your Unexpired Personal Property Leases**

**For any unexpired personal property lease that you listed in Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G), fill in the information below. Do not list real estate leases. Unexpired leases are leases that are still in effect; the lease period has not yet ended. You may assume an unexpired personal property lease if the trustee does not assume it. 11 U.S.C. § 365(p)(2).**

| Describe your unexpired personal property leases | Will the lease be assumed? |
|---|---|
| Lessor's name:<br>Description of leased Property: | ☐ No<br><br>☐ Yes |
| Lessor's name: | ☐ No |

Debtor 1   **Veronica A Gonzales**      Case number *(if known)*   **17-30533**

Description of leased
Property:       ☐ Yes

Lessor's name:       ☐ No
Description of leased
Property:       ☐ Yes

Lessor's name:       ☐ No
Description of leased
Property:       ☐ Yes

Lessor's name:       ☐ No
Description of leased
Property:       ☐ Yes

Lessor's name:       ☐ No
Description of leased
Property:       ☐ Yes

Lessor's name:       ☐ No
Description of leased
Property:       ☐ Yes

**Part 3:**   **Sign Below**

Under penalty of perjury, I declare that I have indicated my intention about any property of my estate that secures a debt and any personal
property that is subject to an unexpired lease.

X   **/s/ Veronica A Gonzales**        X _____
    **Veronica A Gonzales**              Signature of Debtor 2
    Signature of Debtor 1

Date   **October 15, 2017**               Date _____

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Veronica A Gonzales** |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Northern District of California |
| Case number (if known) | **17-30533** |

Check one box only as directed in this form and in Form 122A-1Supp:

☐ 1. There is no presumption of abuse

■ 2. The calculation to determine if a presumption of abuse applies will be made under *Chapter 7 Means Test Calculation* (Official Form 122A-2).

☐ 3. The Means Test does not apply now because of qualified military service but it could apply later.

☐ Check if this is an amended filing

## Official Form 122A – 1
## Chapter 7 Statement of Your Current Monthly Income                    12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for being accurate. If more space is needed, attach a separate sheet to this form. Include the line number to which the additional information applies. On the top of any additional pages, write your name and case number (if known). If you believe that you are exempted from a presumption of abuse because you do not have primarily consumer debts or because of qualifying military service, complete and file *Statement of Exemption from Presumption of Abuse Under § 707(b)(2)* (Official Form 122A-1Supp) with this form.

**Part 1:        Calculate Your Current Monthly Income**

1. **What is your marital and filing status?** Check one only.

   ■ **Not married**. Fill out Column A, lines 2-11.

   ☐ **Married and your spouse is filing with you.** Fill out both Columns A and B, lines 2-11.

   ☐ **Married and your spouse is NOT filing with you.** You and your spouse are:

      ☐ **Living in the same household and are not legally separated.** Fill out both Columns A and B, lines 2-11.

      ☐ **Living separately or are legally separated.** Fill out Column A, lines 2-11; do not fill out Column B. By checking this box, you declare under penalty of perjury that you and your spouse are legally separated under nonbankruptcy law that applies or that you and your spouse are living apart for reasons that do not include evading the Means Test requirements. 11 U.S.C § 707(b)(7)(B).

Fill in the average monthly income that you received from all sources, derived during the 6 full months before you file this bankruptcy case. 11 U.S.C. § 101(10A). For example, if you are filing on September 15, the 6-month period would be March 1 through August 31. If the amount of your monthly income varied during the 6 months, add the income for all 6 months and divide the total by 6. Fill in the result. Do not include any income amount more than once. For example, if both spouses own the same rental property, put the income from that property in one column only. If you have nothing to report for any line, write $0 in the space.

| | | Column A<br>Debtor 1 | Column B<br>Debtor 2 or<br>non-filing spouse |
|---|---|---|---|
| 2. | **Your gross wages, salary, tips, bonuses, overtime, and commissions** (before all payroll deductions). | $ 141.01 | $ |
| 3. | **Alimony and maintenance payments.** Do not include payments from a spouse if Column B is filled in. | $ 588.33 | $ |
| 4. | **All amounts from any source which are regularly paid for household expenses of you or your dependents, including child support.** Include regular contributions from an unmarried partner, members of your household, your dependents, parents, and roommates. Include regular contributions from a spouse only if Column B is not filled in. Do not include payments you listed on line 3. | $ 0.00 | $ |
| 5. | **Net income from operating a business, profession, or farm** | | |

| | | Debtor 1 | | |
|---|---|---|---|---|
| | Gross receipts (before all deductions) | $ 2,753.00 | | |
| | Ordinary and necessary operating expenses | –$ 0.00 | | |
| | Net monthly income from a business, profession, or farm | $ 2,753.00 | Copy here -> $ 2,753.00 | $ |

6. **Net income from rental and other real property**

| | | Debtor 1 | | |
|---|---|---|---|---|
| | Gross receipts (before all deductions) | $ 3,249.11 | | |
| | Ordinary and necessary operating expenses | –$ 0.00 | | |
| | Net monthly income from rental or other real property | $ 3,249.11 | Copy here -> $ 3,249.11 | $ |

| 7. | **Interest, dividends, and royalties** | | $ 0.01 | $ |

| Debtor 1 | **Veronica A Gonzales** | Case number (*if known*) | **17-30533** |
|---|---|---|---|

|  |  | Column A<br>Debtor 1 | Column B<br>Debtor 2 or<br>non-filing spouse |
|---|---|---|---|

8. **Unemployment compensation**                                                       $ _____0.00    $ _____

   Do not enter the amount if you contend that the amount received was a benefit under
   the Social Security Act. Instead, list it here:

   For you                                                $ _____0.00

   For your spouse                                   $ _____

9. **Pension or retirement income.** Do not include any amount received that was a     $ _____0.00    $ _____
   benefit under the Social Security Act.

10. **Income from all other sources not listed above.** Specify the source and amount.
    Do not include any benefits received under the Social Security Act or payments
    received as a victim of a war crime, a crime against humanity, or international or
    domestic terrorism. If necessary, list other sources on a separate page and put the
    total below.

    . _____                                           $ _____0.00    $ _____
    _____                                              $ _____0.00    $ _____
    Total amounts from separate pages, if any.                                    + $ _____0.00    $ _____

11. **Calculate your total current monthly income.** Add lines 2 through 10 for      $  **6,731.46**  + $ _____  = $  **6,731.46**
    each column. Then add the total for Column A to the total for Column B.                                                          Total current monthly
                                                                                                                                    income

---

**Part 2:    Determine Whether the Means Test Applies to You**

12. **Calculate your current monthly income for the year.** Follow these steps:

    12a. Copy your total current monthly income from line 11 .................... Copy line 11 here=>   $  **6,731.46**

         Multiply by 12 (the number of months in a year)                                               **x  12**

    12b. The result is your annual income for this part of the form                            12b.  $  **80,777.52**

13. **Calculate the median family income that applies to you.** Follow these steps:

    Fill in the state in which you live.                    **CA**

    Fill in the number of people in your household.        **1**

    Fill in the median family income for your state and size of household.                     13.  $  **51,763.00**
    To find a list of applicable median income amounts, go online using the link specified in the separate instructions
    for this form. This list may also be available at the bankruptcy clerk's office.

14. **How do the lines compare?**

    14a. ☐   Line 12b is less than or equal to line 13. On the top of page 1, check box 1, *There is no presumption of abuse.*
             Go to Part 3.

    14b. ■   Line 12b is more than line 13. On the top of page 1, check box 2, *The presumption of abuse is determined by Form 122A-2.*
             Go to Part 3 and fill out Form 122A-2.

---

**Part 3:    Sign Below**

By signing here, I declare under penalty of perjury that the information on this statement and in any attachments is true and correct.

**X** **/s/ Veronica A Gonzales**
   **Veronica A Gonzales**
   Signature of Debtor 1

Date **October 22, 2017**
   MM / DD  / YYYY

If you checked line 14a, do NOT fill out or file Form 122A-2.

If you checked line 14b, fill out Form 122A-2 and file it with this form.

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                                      Best Case Bankruptcy

| Fill in this information to identify your case: |
|---|

**Debtor 1**  Veronica A Gonzales

**Debtor 2**
(Spouse, if filing)

United States Bankruptcy Court for the:   Northern District of California

**Case number**  17-30533
(if known)

| Check the appropriate box as directed in lines 40 or 42: |
|---|

According to the calculations required by this Statement:

■ 1. There is no presumption of abuse.

☐ 2. There is a presumption of abuse.

☐ Check if this is an amended filing

## Official Form 122A - 2
## Chapter 7 Means Test Calculation

04/16

To fill out this form, you will need your completed copy of *Chapter 7 Statement of Your Current Monthly Income* (Official Form 122A-1).

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for being accurate. If more space is needed, attach a separate sheet to this form, Include the line number to which additional information applies. On the top any additional pages, write your name and case number (if known).

| Part 1: | Determine Your Adjusted Income |
|---|---|

1.  **Copy your total current monthly income.** ............... Copy line 11 from Official Form 122A-1 here=>........  $ **6,731.46**

2.  **Did you fill out Column B in Part 1 of Form 122A-1?**
    ■ No.   Fill in $0 for the total on line 3.
    ☐ Yes.  Is your spouse Filing with you?
        ☐ No.        Go to line 3.
        ☐ Yes.       Fill in $0 for the total on line 3.

3.  **Adjust your current monthly income by subtracting any part of your spouse's income not used to pay for the household expenses of you or your dependents.** Follow these steps:

    On line 11, Column B of Form 122A–1, was any amount of the income you reported for your spouse NOT regularly used for the household expenses of you or your dependents?

    ■ No.   Fill in 0 for the total on line 3.
    ☐ Yes.  Fill in the information below:

    | State each purpose for which the income was used<br>For example, the income is used to pay your spouse's tax debt or to support other than you or your dependents. | Fill in the amount you are subtracting from your spouse's income |
    |---|---|
    | | $ |
    | | $ |
    | | $ |
    | **Total.** | $    **0.00** |

    Copy total here=>... - $    **0.00**

4.  **Adjust your current monthly income.**  Subtract line 3 from line 1.

    $    **6,731.46**

Debtor 1   **Veronica A Gonzales** _____   Case number (*if known*)   **17-30533** _____

| **Part 2:** | **Calculate Your Deductions from Your Income** |
|---|---|

**The Internal Revenue Service (IRS) issues National and Local Standards for certain expense amounts. Use these amounts to answer the questions in lines 6-15. To find the IRS standards, go online using the link specified in the separate instructions for this form. This information may also be available at the bankruptcy clerk's office.**

Deduct the expense amounts set out in lines 6-15 regardless of your actual expense. In later parts of the form, you will use some of your actual expenses if they are higher than the standards. Do not deduct any amounts that you subtracted fro your spouse's income in line 3 and do not deduct any operating expenses that you subtracted from in income in lines 5 and 6 of form 122A-1.

If your expenses differ from month to month, enter the average expense.

Whenever this part of the from refers to *you,* it means both you and your spouse if Column B of Form 122A-1 is filled in.

5.  **The number of people used in determining your deductions from income**

Fill in the number of people who could be claimed as exemptions on your federal income tax return, plus the number of any additional dependents whom you support. This number may be different from the number of people in your household.

| |
|---|
| **1** |

| **National Standards** | You must use the IRS National Standards to answer the questions in lines 6-7. |
|---|---|

6.  **Food, clothing, and other items:** Using the number of people you entered in line 5 and the IRS National Standards, fill in the dollar amount for food, clothing, and other items.          $ _____ **570.00**

7.  **Out-of-pocket health care allowance:** Using the number of people you entered in line 5 and the IRS National Standards, fill in the dollar amount for out-of-pocket health care. The number of people is split into two categories--people who are under 65 and people who are 65 or older--because older people have a higher IRS allowance for health care costs. If your actual expenses are higher than this IRS amount, you may deduct the additional amount on line 22.

| **People who are under 65 years of age** |
|---|

7a.   Out-of-pocket health care allowance per person      $ _____ **54**

7b.   Number of people who are under 65                         X _____ **1**

7c.   **Subtotal.** Multiply line 7a by line 7b.                    $ _____ **54.00**      Copy here=>   $ _____ **54.00**

| **People who are 65 years of age or older** |
|---|

7d.   Out-of-pocket health care allowance per person      $ _____ **130**

7e.   Number of people who are 65 or older                      X _____ **0**

7f.   **Subtotal.** Multiply line 7d by line 7e.                    $ _____ **0.00**      Copy here=>   +$ _____ **0.00**

7g.   **Total.** Add line 7c and line 7f ........................................   $ _____ **54.00**      Copy total here=>   $ _____ **54.00**

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

| Debtor 1 | **Veronica A Gonzales** | Case number (*if known*) | **17-30533** |

| **Local Standards** | You must use the IRS Local Standards to answer the questions in lines 8-15. |

**Based on information from the IRS, the U.S. Trustee Program has divided the IRS Local Standard for housing for bankruptcy purposes into two parts:**

- ■ **Housing and utilities - Insurance and operating expenses**
- ■ **Housing and utilities - Mortgage or rent expenses**

**To answer the questions in lines 8-9, use the U.S. Trustee Program chart.**

To find the chart, go online using the link specified in the separate instructions for this form.
This chart may also be available at the bankruptcy clerk's office.

8.   **Housing and utilities - Insurance and operating expenses:** Using the number of people you entered in line 5, fill in the dollar amount listed for your county for insurance and operating expenses. .......................................... $ _____**490.00**

9.   **Housing and utilities - Mortgage or rent expenses:**

9a.   Using the number of people you entered in line 5, fill in the dollar amount listed for your county for mortgage or rent expenses.................................... $ _____**2,560.00**

9b.   Total average monthly payment for all mortgages and other debts secured by your home.

To calculate the total average monthly payment, add all amounts that are contractually due to each secured creditor in the 60 months after you file for bankruptcy. Then divide by 60.

| Name of the creditor | Average monthly payment |
|---|---|
| **JP Morgan Chase Bank, NA** | $          **973.75** |
| Total average monthly payment | $          **973.75** |

Copy here=>   -$ _____**973.75**   Repeat this amount on line 33a.

9c.   Net mortgage or rent expense.

Subtract line 9b (*total average monthly payment*) from line 9a (*mortgage or rent expense*). If this amount is less than $0, enter $0. ........................ $ _____**1,586.25**   Copy here=> $ _____**1,586.25**

10.   **If you claim that the U.S. Trustee Program's division of the IRS Local Standard for housing is incorrect and affects the calculation of your monthly expenses, fill in any additional amount you claim.** $ _____**0.00**

Explain why: _____

11.   **Local transportation expenses:** Check the number of vehicles for which you claim an ownership or operating expense.

☐ 0. Go to line 14.

☐ 1. Go to line 12.

■ 2 or more. Go to line 12.

12.   **Vehicle operation expense:** Using the IRS Local Standards and the number of vehicles for which you claim the operating expenses, fill in the *Operating Costs* that apply for your Census region or metropolitan statistical area. $ _____**552.00**

Debtor 1 **Veronica A Gonzales**                                    Case number (*if known*)    **17-30533**

13.  **Vehicle ownership or lease expense:** Using the IRS Local Standards, calculate the net ownership or lease expense for each vehicle below. You may not claim the expense if you do not make any loan or lease payments on the vehicle.  In addition, you may not claim the expense for more than two vehicles.

| Vehicle 1 | Describe Vehicle 1: |
|---|---|

13a. Ownership or leasing costs using IRS Local Standard............................................    $    **0.00**

13b. Average monthly payment for all debts secured by Vehicle 1.

Do not include costs for leased vehicles.

To calculate the average monthly payment here and on line 13e, add all amounts that are contractually due to each secured creditor in the 60 months after you filed for bankruptcy. Then divide by 60.

| Name of each creditor for Vehicle 1 | Average monthly payment |
|---|---|
| **-NONE-** | $ |

Total Average Monthly Payment    $    **0.00**    Copy here =>    -$    **0.00**    Repeat this amount on line 33b.

13c. Net Vehicle 1 ownership or lease expense
     Subtract line 13b from line 13a. if this amount is less than $0, enter $0.    $    **0.00**    **Copy net Vehicle 1 expense here =>** $    **0.00**

| Vehicle 2 | Describe Vehicle 2: |
|---|---|

13d. Ownership or leasing costs using IRS Local Standard...................................................    $    **0.00**

13e. Average monthly payment for all debts secured by Vehicle 2. Do not include costs for leased vehicles.

| Name of each creditor for Vehicle 2 | Average monthly payment |
|---|---|
| **-NONE-** | $ |

Total Average Monthly Payment    $    **0.00**    Copy here =>    -$    **0.00**    Repeat this amount on line 33c.

13f. Net Vehicle 2 ownership or lease expense
     Subtract line 13e from line 13d. if this amount is less than $0, enter $0. ......................    $    **0.00**    **Copy net Vehicle 2 expense here =>** $    **0.00**

14.  **Public transportation expense:** If you claimed 0 vehicles in line 11, using the IRS Local Standards, fill in the *Public Transportation* expense allowance regardless of whether you use public transportation.    $    **0.00**

15.  **Additional public transportation expense:** If you claimed 1 or more vehicles in line 11 and if you claim that you may also deduct a public transportation expense, you may fill in what you believe is the appropriate expense, but you may not claim more than the IRS Local Standard for *Public Transportation*.    $    **173.00**

Case: 17-30533    Doc# 55    Filed: 10/23/17    Entered: 10/23/17 17:26:02    Page 56 of 70

Debtor 1  **Veronica A Gonzales**                                                      Case number (*if known*)   **17-30533**

| **Other Necessary Expenses** | In addition to the expense deductions listed above, you are allowed your monthly expenses for the following IRS categories. |
|---|---|

16. **Taxes:** The total monthly amount that you will actually owe for federal, state and local taxes, such as income taxes, self-employment taxes, social security taxes, and Medicare taxes. You may include the monthly amount withheld from your pay for these taxes. However, if you expect to receive a tax refund, you must divide the expected refund by 12 and subtract that number from the total monthly amount that is withheld to pay for taxes.

Do not include real estate, sales, or use taxes.                                                          $ _____ 0.00

17. **Involuntary deductions:** The total monthly payroll deductions that your job requires, such as retirement contributions, union dues, and uniform costs.

Do not include amounts that are not required by your job, such as voluntary 401(k) contributions or payroll savings.   $ _____ 0.00

18. **Life Insurance:** The total monthly premiums that you pay for your own term life insurance. If two married people are filing together, include payments that you make for your spouse's term life insurance. Do not include premiums for life insurance on your dependents, for a non-filing spouse's life insurance, or for any form of life insurance other than term.                                                                                            $ _____ 0.00

19. **Court-ordered payments:** The total monthly amount that you pay as required by the order of a court or administrative agency, such as spousal or child support payments.

Do not include payments on past due obligations for spousal or child support. You will list these obligations in line 35.   $ _____ 0.00

20. **Education:** The total monthly amount that you pay for education that is either required:
   ■ as a condition for your job, or
   ■ for your physically or mentally challenged dependent child if no public education is available for similar services.   $ _____ 0.00

21. **Childcare:** The total monthly amount that you pay for childcare, such as babysitting, daycare, nursery, and preschool.

Do not include payments for any elementary or secondary school education.                                  $ _____ 0.00

22. **Additional health care expenses, excluding insurance costs:** The monthly amount that you pay for health care that is required for the health and welfare of you or your dependents and that is not reimbursed by insurance or paid by a health savings account. Include only the amount that is more than the total entered in line 7.

Payments for health insurance or health savings accounts should be listed only in line 25.                  $ _____ 0.00

23. **Optional telephone and telephone services:** The total monthly amount that you pay for telecommunication services for you and your dependents, such as pagers, call waiting, caller identification, special long distance, or business cell phone service, to the extent necessary for your health and welfare or that of your dependents or for the production of income, if it is not reimbursed by your employer.

Do not include payments for basic home telephone, internet and cell phone service. Do not include self-employment expenses, such as those reported on line 5 of Official Form 122A-1, or any amount you previously deducted.   +$ _____ 0.00

24. **Add all of the expenses allowed under the IRS expense allowances.**
   Add lines 6 through 23.                                                                          $ ____ 3,425.25

Debtor 1    **Veronica A Gonzales**        Case number (*if known*)    **17-30533**

| **Additional Expense Deductions** | These are additional deductions allowed by the Means Test. |
|---|---|
| | *Note*: Do not include any expense allowances listed in lines 6-24. |

25. **Health insurance, disability insurance, and health savings account expenses.** The monthly expenses for health insurance, disability insurance, and health savings accounts that are reasonably necessary for yourself, your spouse, or your dependents.

| | | |
|---|---|---|
| Health insurance | $ | **63.52** |
| Disability insurance | $ | **0.00** |
| Health savings account | + $ | **0.00** |

Total       $ **63.52**    Copy total here=>      $ **63.52**

Do you actually spend this total amount?

☐   No. How much do you actually spend?      $
■   Yes

26. **Continued contributions to the care of household or family members.** The actual monthly expenses that you will continue to pay for the reasonable and necessary care and support of an elderly, chronically ill, or disabled member of your household or member of your immediate family who is unable to pay for such expenses. These expenses may include contributions to an account of a qualified ABLE program. 26 U.S.C.§ 529A(b).    $ **0.00**

27. **Protection against family violence.** The reasonably necessary monthly expenses that you incur to maintain the safety of you and your family under the Family Violence Prevention and Services Act or other federal laws that apply.

By law, the court must keep the nature of these expenses confidential.    $ **0.00**

28. **Additional home energy costs.** Your home energy costs are included in your insurance and operating expenses on line 8.

If you believe that you have home energy costs that are more than the home energy costs included in expenses on line 8, then fill in the excess amount of home energy costs.

You must give your case trustee documentation of your actual expenses, and you must show that the additional amount claimed is reasonable and necessary.    $ **0.00**

29. **Education expenses for dependent children who are younger than 18.** The monthly expenses (not more than $160.42* per child) that you pay for your dependent children who are younger than 18 years old to attend a private or public elementary or secondary school.

You must give your case trustee documentation of your actual expenses, and you must explain why the amount claimed is reasonable and necessary and not already accounted for in lines 6-23.

* Subject to adjustment on 4/01/19, and every 3 years after that for cases begun on or after the date of adjustment.    $ **0.00**

30. **Additional food and clothing expense.** The monthly amount by which your actual food and clothing expenses are higher than the combined food and clothing allowances in the IRS National Standards. That amount cannot be more than 5% of the food and clothing allowances in the IRS National Standards.

To find a chart showing the maximum additional allowance, go online using the link specified in the separate instructions for this form. This chart may also be available at the bankruptcy clerk's office.

You must show that the additional amount claimed is reasonable and necessary.    $ **19.00**

31. **Continuing charitable contributions.** The amount that you will continue to contribute in the form of cash or financial instruments to a religious or charitable organization. 26 U.S.C. § 170(c)(1)-(2).    + $ **0.00**

32. **Add all of the additional expense deductions.**
Add lines 25 through 31.    $ **82.52**

| Debtor 1 | **Veronica A Gonzales** | Case number (*if known*) | 17-30533 |

---

**Deductions for Debt Payment**

33. **For debts that are secured by an interest in property that you own, including home mortgages, vehicle loans, and other secured debt, fill in lines 33a through 33e.**

   To calculate the total average monthly payment, add all amounts that are contractually due to each secured creditor in the 60 months after you file for bankruptcy. Then divide by 60.

|  | | | Average monthly payment |
|---|---|---|---|
| | **Mortgages on your home:** | | |
| 33a. | Copy line 9b here | => $ | 973.75 |
| | **Loans on your first two vehicles:** | | |
| 33b. | Copy line 13b here | => $ | 0.00 |
| 33c. | Copy line 13e here | => $ | 0.00 |

33d.   List other secured debts:

| Name of each creditor for other secured debt | Identify property that secures the debt | Does payment include taxes or insurance? | | |
|---|---|---|---|---|
| JP Morgan Chase Bank, NA | 8563 Beechwood Dr. Rancho Cucamonga, CA 91701  San Bernardino County | ☐ No  ■ Yes | $ | 1,311.64 |
| JP Morgan Chase Bank, NA | 1378 E. 9th Street Upland, CA 91786 San Bernardino County | ☐ No  ■ Yes | $ | 608.14 |
| JP Morgan Chase Bank, NA | 8563 Beechwood Dr. Rancho Cucamonga, CA 91701  San Bernardino County | ☐ No  ■ Yes | $ | 258.66 |

33e.   Total average monthly payment. Add lines 33a through 33d ............... $ 3,152.19   Copy total here=> $ 3,152.19

34. **Are any debts that you listed in line 33 secured by your primary residence, a vehicle, or other property necessary for your support or the support of your dependents?**

   ■ No.   Go to line 35.
   ☐ Yes.   State any amount that you must pay to a creditor, in addition to the payments listed in line 33, to keep possession of your property (called the *cure amount*). Next, divide by 60 and fill in the information below.

| Name of the creditor | Identify property that secures the debt | Total cure amount | Monthly cure amount |
|---|---|---|---|
| -NONE- | | $ ÷ 60 = $ | |

   Total $ 0.00   Copy total here=> $ 0.00

35. **Do you owe any priority claims such as a priority tax, child support, or alimony - that are past due as of the filing date of your bankruptcy case?** 11 U.S.C. § 507.

   ■ No.   Go to line 36.
   ☐ Yes.   Fill in the total amount of all of these priority claims. Do not include current or ongoing priority claims, such as those you listed in line 19.

   Total amount of all past-due priority claims ............... $ 0.00   ÷ 60 = $ 0.00

| Debtor 1 | **Veronica A Gonzales** | Case number (*if known*) | **17-30533** |
|---|---|---|---|

36. **Are you eligible to file a case under Chapter 13?** 11 U.S.C. § 109(e).
    For more information, go online using the link for *Bankruptcy Basics* specified in the separate
    instructions for this form. *Bankruptcy Basics* may also be available at the bankruptcy clerk's office.

■ No.   Go to line 37.
□ Yes.  Fill in the following information.

    Projected monthly plan payment if you were filing under Chapter 13     $ _____

    Current multiplier for your district as stated on the list issued by the
    Administrative Office of the United States Courts (for districts in Alabama
    and North Carolina) or by the Executive Office for United States Trustees
    (for all other districts).      X _____

    To find a list of district multipliers that includes your district, go online using
    the link specified in the separate instructions for this form. This list may also
    be available at the bankruptcy clerk's office.

    Average monthly administrative expense if you were filing under Chapter 13    $ _____

    **Copy total here=>** $ _____

37. **Add all of the deductions for debt payment.**
    Add lines 33e through 36.      $     **3,152.19**

---

### Total Deductions from Income

38. **Add all of the allowed deductions.**

    Copy line 24, *All of the expenses allowed under IRS*
    *expense allowances*      $     **3,425.25**

    Copy line 32, *All of the additional expense deductions*      $     **82.52**

    Copy line 37, *All of the deductions for debt payment*      +$     **3,152.19**

    Total deductions      $     **6,659.96**      **Copy total here...........=>**      $     **6,659.96**

---

**Part 3:**      **Determine Whether There is a Presumption of Abuse**

39. **Calculate monthly disposable income for 60 months**

    39a. Copy line 4, *adjusted current monthly income*      $     **6,731.46**

    39b. Copy line 38, *Total deductions*      - $     **6,659.96**

    39c. Monthly disposable income. 11 U.S.C. § 707(b)(2).
    Subtract line 39b from line 39a      $     **71.50**      **Copy here=>** $     **71.50**

    For the next 60 months (5 years)      x 60

    39d. **Total.** Multiply line 39c by 60      39d.      $     **4,290.00**      **Copy here=>**      $     **4,290.00**

40. **Find out whether there is a presumption of abuse.** Check the box that applies:

■ **The line 39d is less than $7,700\*.** On the top of page 1 of this form, check box 1, *There is no presumption of abuse.* Go to Part 5.

□ **The line 39d is more than $12,850\*.** On the top of page 1 of this form, check box 2, *There is a presumption of abuse.* You may fill out
    Part 4 if you claim special circumstances. Go to Part 5.

□ **The line 39d is at least $7,700\*, but not more than $12,850\*.** Go to line 41.

\*Subject to adjustment on 4/01/19, and every 3 years after that for cases filed on or after the date of adjustment.

Case: 17-30533   Doc# 55   Filed: 10/23/17   Entered: 10/23/17 17:26:02   Page 60 of
70

Debtor 1   **Veronica A Gonzales**                                    Case number (*if known*)   **17-30533**

---

41.   41a.   **Fill in the amount of your total nonpriority unsecured debt.** If you filled out *A Summary of Your Assets and Liabilities and Certain Statistical Information Schedules* (Official Form 106Sum), you may refer to line 3b on that form.      $ _____

x      .25

41b.   **25% or your total nonpriority unsecured debt.** 11 U.S.C. § 707(b)(2)(A)(i)(I)

Multiply line 41a by 0.25.......................................................................      $ _____      **Copy here=>**      $ _____

42.   **Determine whether the income you have left over after subtracting all allowed deductions is enough to pay 25% of your unsecured, nonpriority debt.**
Check the box that applies:

☐   **Line 39d is less than line 41b.** On the top of page 1 of this form, check box 1, *There is no presumption of abuse.* Go to Part 5.

☐   **Line 39d is equal to or more than line 41b.** On the top of page 1 of this form, check box 2, *There is a presumption of abuse.* You may fill out Part 4 if you claim special circumstances. Then go to Part 5.

---

**Part 4:**   Give Details About Special Circumstances

---

43.   **Do you have any special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative?** 11 U.S.C. § 707(b)(2)(B).

■   No.   Go to Part 5.

☐   Yes. Fill in the following information. All figures should reflect your average monthly expense or income adjustment for each item. You may include expenses you listed in line 25.

You must give a detailed explanation of the special circumstances that make the expenses or income adjustments necessary and reasonable. You must also give your case trustee documentation of your actual expenses or income adjustments.

| Give a detailed explanation of the special circumstances | Average monthly expense or income adjustment |
|---|---|
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |

---

**Part 5:**   Sign Below

---

By signing here, I declare under penalty of perjury that the information on this statement and in any attachments is true and correct.

X   **/s/ Veronica A Gonzales**
**Veronica A Gonzales**
Signature of Debtor 1

Date   **October 22, 2017**
MM / DD / YYYY

---

# Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)

**This notice is for you if:**

**You are an individual filing for bankruptcy,** and

**Your debts are primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

**The types of bankruptcy that are available to individuals**

Individuals who meet the qualifications may file under one of four different chapters of Bankruptcy Code:

Chapter 7 - Liquidation

Chapter 11 - Reorganization

Chapter 12 - Voluntary repayment plan for family farmers or fishermen

Chapter 13 - Voluntary repayment plan for individuals with regular income

**You should have an attorney review your decision to file for bankruptcy and the choice of chapter.**

| Chapter 7: | Liquidation | |
|---|---|---|
| | $245 | filing fee |
| | $75 | administrative fee |
| + | $15 | trustee surcharge |
| | $335 | total fee |

Chapter 7 is for individuals who have financial difficulty preventing them from paying their debts and who are willing to allow their nonexempt property to be used to pay their creditors. The primary purpose of filing under chapter 7 is to have your debts discharged. The bankruptcy discharge relieves you after bankruptcy from having to pay many of your pre-bankruptcy debts. Exceptions exist for particular debts, and liens on property may still be enforced after discharge. For example, a creditor may have the right to foreclose a home mortgage or repossess an automobile.

However, if the court finds that you have committed certain kinds of improper conduct described in the Bankruptcy Code, the court may deny your discharge.

You should know that even if you file chapter 7 and you receive a discharge, some debts are not discharged under the law. Therefore, you may still be responsible to pay:

most taxes;

most student loans;

domestic support and property settlement obligations;

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                                               Best Case Bankruptcy

most fines, penalties, forfeitures, and criminal restitution obligations; and

certain debts that are not listed in your bankruptcy papers.

You may also be required to pay debts arising from:

fraud or theft;

fraud or defalcation while acting in breach of fiduciary capacity;

intentional injuries that you inflicted; and

death or personal injury caused by operating a motor vehicle, vessel, or aircraft while intoxicated from alcohol or drugs.

If your debts are primarily consumer debts, the court can dismiss your chapter 7 case if it finds that you have enough income to repay creditors a certain amount. You must file *Chapter 7 Statement of Your Current Monthly Income* (Official Form 122A–1) if you are an individual filing for bankruptcy under chapter 7. This form will determine your current monthly income and compare whether your income is more than the median income that applies in your state.

If your income is not above the median for your state, you will not have to complete the other chapter 7 form, the *Chapter 7 Means Test Calculation* (Official Form 122A–2).

If your income is above the median for your state, you must file a second form —the *Chapter 7 Means Test Calculation* (Official Form 122A–2). The calculations on the form— sometimes called the *Means Test*—deduct from your income living expenses and payments on certain debts to determine any amount available to pay unsecured creditors. If

your income is more than the median income for your state of residence and family size, depending on the results of the *Means Test*, the U.S. trustee, bankruptcy administrator, or creditors can file a motion to dismiss your case under § 707(b) of the Bankruptcy Code. If a motion is filed, the court will decide if your case should be dismissed. To avoid dismissal, you may choose to proceed under another chapter of the Bankruptcy Code.

If you are an individual filing for chapter 7 bankruptcy, the trustee may sell your property to pay your debts, subject to your right to exempt the property or a portion of the proceeds from the sale of the property. The property, and the proceeds from property that your bankruptcy trustee sells or liquidates that you are entitled to, is called *exempt property*. Exemptions may enable you to keep your home, a car, clothing, and household items or to receive some of the proceeds if the property is sold.

Exemptions are not automatic. To exempt property, you must list it on *Schedule C: The Property You Claim as Exempt* (Official Form 106C). If you do not list the property, the trustee may sell it and pay all of the proceeds to your creditors.

---

## Chapter 11: Reorganization

|   |   |   |
|---|---|---|
|   | $1,167 | filing fee |
| + | $550 | administrative fee |
|   | $1,717 | total fee |

Chapter 11 is often used for reorganizing a business, but is also available to individuals. The provisions of chapter 11 are too complicated to summarize briefly.

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                                            Best Case Bankruptcy

**Read These Important Warnings**

Because bankruptcy can have serious long-term financial and legal consequences, including loss of your property, you should hire an attorney and carefully consider all of your options before you file. Only an attorney can give you legal advice about what can happen as a result of filing for bankruptcy and what your options are. If you do file for bankruptcy, an attorney can help you fill out the forms properly and protect you, your family, your home, and your possessions.

Although the law allows you to represent yourself in bankruptcy court, you should understand that many people find it difficult to represent themselves successfully. The rules are technical, and a mistake or inaction may harm you. If you file without an attorney, you are still responsible for knowing and following all of the legal requirements.

You should not file for bankruptcy if you are not eligible to file or if you do not intend to file the necessary documents.

Bankruptcy fraud is a serious crime; you could be fined and imprisoned if you commit fraud in your bankruptcy case. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

## Chapter 12: Repayment plan for family farmers or fishermen

|   |   |   |
|---|---|---|
|   | $200 | filing fee |
| + | $75 | administrative fee |
|   | $275 | total fee |

Similar to chapter 13, chapter 12 permits family farmers and fishermen to repay their debts over a period of time using future earnings and to discharge some debts that are not paid.

## Chapter 13: Repayment plan for individuals with regular income

|   |   |   |
|---|---|---|
|   | $235 | filing fee |
| + | $75 | administrative fee |
|   | $310 | total fee |

Chapter 13 is for individuals who have regular income and would like to pay all or part of their debts in installments over a period of time and to discharge some debts that are not paid. You are eligible for chapter 13 only if your debts are not more than certain dollar amounts set forth in 11 U.S.C. § 109.

Under chapter 13, you must file with the court a plan to repay your creditors all or part of the money that you owe them, usually using your future earnings. If the court approves your plan, the court will allow you to repay your debts, as adjusted by the plan, within 3 years or 5 years, depending on your income and other factors.

After you make all the payments under your plan, many of your debts are discharged. The debts that are not discharged and that you may still be responsible to pay include:

- domestic support obligations,

- most student loans,

- certain taxes,

- debts for fraud or theft,

- debts for fraud or defalcation while acting in a fiduciary capacity,

- most criminal fines and restitution obligations,

- certain debts that are not listed in your bankruptcy papers,

- certain debts for acts that caused death or personal injury, and

- certain long-term secured debts.

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                         Best Case Bankruptcy

**Warning: File Your Forms on Time**

Section 521(a)(1) of the Bankruptcy Code requires that you promptly file detailed information about your creditors, assets, liabilities, income, expenses and general financial condition. The court may dismiss your bankruptcy case if you do not file this information within the deadlines set by the Bankruptcy Code, the Bankruptcy Rules, and the local rules of the court.

For more information about the documents and their deadlines, go to:
http://www.uscourts.gov/bkforms/bankruptcy_forms.html#procedure.

### Bankruptcy crimes have serious consequences

If you knowingly and fraudulently conceal assets or make a false oath or statement under penalty of perjury—either orally or in writing—in connection with a bankruptcy case, you may be fined, imprisoned, or both.

All information you supply in connection with a bankruptcy case is subject to examination by the Attorney General acting through the Office of the U.S. Trustee, the Office of the U.S. Attorney, and other offices and employees of the U.S. Department of Justice.

### Make sure the court has your mailing address

The bankruptcy court sends notices to the mailing address you list on *Voluntary Petition for Individuals Filing for Bankruptcy* (Official Form 101). To ensure that you receive information about your case, Bankruptcy Rule 4002 requires that you notify the court of any changes in your address.

A married couple may file a bankruptcy case together—called a *joint case*. If you file a joint case and each spouse lists the same mailing address on the bankruptcy petition, the bankruptcy court generally will mail you and your spouse one copy of each notice, unless you file a statement with the court asking that each spouse receive separate copies.

### Understand which services you could receive from credit counseling agencies

The law generally requires that you receive a credit counseling briefing from an approved credit counseling agency. 11 U.S.C. § 109(h). If you are filing a joint case, both spouses must receive the briefing. With limited exceptions, you must receive it within the 180 days **before** you file your bankruptcy petition. This briefing is usually conducted by telephone or on the Internet.

In addition, after filing a bankruptcy case, you generally must complete a financial management instructional course before you can receive a discharge. If you are filing a joint case, both spouses must complete the course.

You can obtain the list of agencies approved to provide both the briefing and the instructional course from: http://justice.gov/ust/eo/hapcpa/ccde/cc_approved.html.

In Alabama and North Carolina, go to: http://www.uscourts.gov/FederalCourts/Bankruptcy/BankruptcyResources/ApprovedCredit AndDebtCounselors.aspx.

If you do not have access to a computer, the clerk of the bankruptcy court may be able to help you obtain the list.

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                                   Best Case Bankruptcy

## United States Bankruptcy Court
### Northern District of California

In re  **Veronica A Gonzales**          Case No.   **17-30533**
                                Debtor(s)      Chapter   **7**

## STATEMENT RE PAYMENT ADVICES

☐      Attached are copies of all payment advices or other evidence of payment that I/we received from my/our employer(s) within the 60 days before the filing of this bankruptcy case. I/we have blocked out all but the last four digits of my/our social security number(s) wherever they appear on the attached copies.

■      I/We received no payment advices or other evidence of payment from my/our employer(s) within the 60 days before the filing of this bankruptcy case.

I/we declare under penalty of perjury that the above statement is true and correct to the best of my/our knowledge, information, and belief.

Date  **October 15, 2017**          Signature    **/s/ Veronica A Gonzales**
                                                 **Veronica A Gonzales**
                                               Debtor

Date  **October 15, 2017**          Signature    **/s/ Gregory A. Rougeau**
                                                 **Gregory A. Rougeau 194437**
                                               Attorney

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

In re                                                    Case No.    **17-30533**
     **Veronica A Gonzales**

_____    Debtor(s).    /

**CREDITOR MATRIX COVER SHEET**

I declare that the attached Creditor Mailing Matrix, consisting of   **3**   sheets, contains the correct, complete and current names and addresses of all priority, secured and unsecured creditors listed in debtor's filing and that this matrix conforms with the Clerk's promulgated requirements.

DATED: **October 15, 2017**

                                        **/s/ Gregory A. Rougeau**
                                        _____
                                        Signature of Debtor's Attorney or Pro Per Debtor

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

```
American Express
BOX 0001
Los Angeles, CA 90096-8000


Bank of America, NA
P.O. Box 15019
Wilmington, DE 19886


California Service Bureau, Inc.
3050 Fite Circle, Suite 107
Sacramento, CA 95827


California State Board of Equalization
Account Information Group, MIC:29
P.O. Box 942879
Sacramento, CA 94279-0029


Employment Development Dept.
Bankruptcy Unit- MIC 92E
P.O. Box 826880
Sacramento, CA 94280


Farmers Insurance
c/o Heather Dickerson
8540 Archibald Ave. #B
Rancho Cucamonga, CA 91730


Franchise Tax Board
P.O. Box 1673
Sacramento, CA 95812


Franchise Tax Board
Bankruptcy Unit
P.O.Box 2952
Sacramento, CA 95812
```

Hawes Real Estate & Property Management
846 W. Foothill Blvd.
Upland, CA 91786


Internal Revenue Service


Internal Revenue Service
Ogden, UT 84201-0030


Internal Revenue Service
Special Procedures Section
1301 Clay St., Stop 1400S
Oakland, CA 94612


Internal Revenue Service
P.O. Box 105416
Atlanta, GA 30348-5416


Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346


JP Morgan Chase Bank, NA
P.O. Box 78052
Phoenix, AZ 85062


JP Morgan Chase Bank, NA
3415 Vision Dr.
Columbus, OH 43219

Malcolm A. Mackenzie
Coombs & Dunlap, LLP
1211 Division Street
Napa, CA 94559


Marin County Tax Collector
3501 Civic Center Dr., Suite 202
San Rafael, CA 94903


Pearlie Jane Sy Lee
441 Marietta Dr.
San Francisco, CA 94127


Pixel Investment Properties, Inc.
4075 Durango Dr., Suite 111-58
Las Vegas, NV 89147


Secretary of State
State of California
1500 11th Street
Sacramento, CA 95814


Securities and Exchange Commission
Attn: Bankruptcy Counsel
5670 Wilshire Blvd., Floor 11
Los Angeles, CA 90036


Wells Fargo Home Mortgage
3476 Stateview Blvd.
Fort Mill, SC 29715


Wyatt Law Offices
642 Fifth Street
Santa Rosa, CA 95404

# EXHIBIT 6

DebtEd, MEANSU, FilingFeeDue, 727OBJ, DSCDNY, CLOSED

# U.S. Bankruptcy Court
## California Northern Bankruptcy Court (San Francisco)
## Bankruptcy Petition #: 17-30533

|  |  |
|---|---|
| | *Date filed:* 05/31/2017 |
| *Assigned to:* Judge Dennis Montali | *Date terminated:* 10/01/2019 |
| Chapter 7 | *341 meeting:* 08/07/2018 |
| Voluntary | *Deadline for objecting to discharge:* 08/28/2017 |
| Asset | *Deadline for financial mgmt. course:* 07/15/2017 |

*Debtor disposition:* Discharge Denied

**Debtor**
**Veronica A Gonzales**
36 Rustic Way
San Rafael, CA 94901
MARIN-CA
████████████
SSN / ITIN: ████████
Tax ID / EIN: ████████████
*dba* Physician Assistant and Surgical Services

represented by **Gregory A. Rougeau**
Brunetti Rougeau LLP
400 Montgomery St. #1000
San Francisco, CA 94104
(415) 992-8957
Fax : (415) 992-8940
Email: grougeau@brlawsf.com

**Malcolm Ruthven**
Law Offices of Malcom W. Ruthven
4040 Civic Center Dr. #200
San Rafael, CA 94903
(415) 342-4666
Email: mruthven@mruthvenlaw.com
*TERMINATED: 09/22/2017*

**Trustee**
**Andrea A. Wirum**
P.O. Box 1108
Lafayette, CA 94549
(415) 294-7710

represented by **Charles P. Maher**
Rincon Law, LLP
268 Bush St. #3335
San Francisco, CA 94104
(415)996-8280
Email: cmaher@rinconlawllp.com

**Andrea A. Wirum**
P.O. Box 1108
Lafayette, CA 94549
(415) 294-7710
Fax : (415)294-7710
Email: trustee@wirum.com

**U.S. Trustee**
**Office of the U.S. Trustee / SF**
Phillip J. Burton Federal Building
450 Golden Gate Ave. 5th Fl., #05-0153
San Francisco, CA 94102
(415)705-3333

| Filing Date | # | Docket Text |
|---|---|---|
| 05/31/2017 | [1](#)<br>(9 pgs) | Chapter 7 Voluntary Petition for Individuals. Fee Amount $335. Financial Management Certificate Due Prior to Discharge. Filed by Veronica A. Gonzales . Incomplete Filings due by 6/14/2017. Section 521 Filings due by 7/17/2017. Order Meeting of Creditors due by 6/14/2017. (cp) (Entered: 05/31/2017) |
| 05/31/2017 | | First Meeting of Creditors with 341(a) meeting to be held on 06/27/2017 at 09:30 AM at Office of the U.S. Trustee Office 450. Objections for Discharge due by 08/28/2017. (cp) (Entered: 05/31/2017) |
| 05/31/2017 | [2](#) | Statement of Social Security Number. Filed by Debtor Veronica A. Gonzales (cp) (Entered: 05/31/2017) |
| 05/31/2017 | | Receipt of Filing Fee for Chapter 7 Voluntary Petition. Amount 335.00 from Veronica A. Gonzales. Receipt Number 30063965. (admin) (Entered: 05/31/2017) |
| 06/01/2017 | | Notice of Debtor's Prior Filings for debtor Veronica A. Gonzales Case Number [14-30710](#), Chapter 13 filed in California Northern Bankruptcy Court on 05/07/2014 , Dismissed for Failure to File Information on 05/16/2014; Case Number [16-31010](#), Chapter 13 filed in California Northern Bankruptcy Court on 09/19/2016 , Dismissed for Failure to File Information on 10/05/2016; Case Number [17-30359](#), Chapter 13 filed in California Northern Bankruptcy Court on 04/17/2017.(Admin) (Entered: 06/01/2017) |
| 06/01/2017 | [3](#)<br>(2 pgs; 2 docs) | Order To File Required Documents and Notice Regarding Dismissal Non-Compliance (Documents) due by 6/15/2017 (cp) Modified on 6/1/2017 ERROR: Notice not generated due to missing information (dc). (Entered: 06/01/2017) |
| 06/01/2017 | [4](#)<br>(2 pgs; 2 docs) | Order To File Required Documents and Notice Regarding Dismissal Non-Compliance (Documents) due by 6/15/2017 (cp) (Entered: 06/01/2017) |
| 06/01/2017 | [5](#)<br>(4 pgs; 2 docs) | Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, and Deadlines (Generated) (cp) (Entered: 06/01/2017) |
| 06/03/2017 | [6](#)<br>(4 pgs) | BNC Certificate of Mailing - Meeting of Creditors. (RE: related document(s) [5](#) Generate 341 Notices). Notice Date 06/03/2017. (Admin.) (Entered: 06/03/2017) |
| 06/03/2017 | [7](#)<br>(2 pgs) | BNC Certificate of Mailing (RE: related document(s) [4](#) Order to File Missing Documents). Notice Date 06/03/2017. (Admin.) (Entered: 06/03/2017) |

| 06/06/2017 | 8 (2 pgs) | Request for Notice Filed by Creditor U.S. Bank National Association, as Trustee, successor in interest to Wachovia Bank, National Association, as Trustee for MSSTR 2004-1 (Kolbe, Jason) (Entered: 06/06/2017) |
|---|---|---|
| 06/16/2017 | 9 (2 pgs) | Document: *Request to Refrain from Dismissal*. Filed by Trustee Andrea A. Wirum (Wirum, Andrea) (Entered: 06/16/2017) |
| 06/16/2017 | 10 (2 pgs) | Certificate of Service (RE: related document(s)9 Document). Filed by Trustee Andrea A. Wirum (Wirum, Andrea) DEFECTIVE ENTRY: Case number on pdf does not match court records. Modified on 6/16/2017 (yw). (Entered: 06/16/2017) |
| 06/16/2017 | 11 (2 pgs) | Substitution of Attorney . Malcolm W. Ruthven added to the case. Filed by Debtor Veronica A. Gonzales (Ruthven, Malcolm) (Entered: 06/16/2017) |
| 06/19/2017 | 12 (2 pgs) | Motion to Extend Time Filed by Debtor Veronica A. Gonzales (Ruthven, Malcolm) (Entered: 06/19/2017) |
| 06/19/2017 | 13 (3 pgs; 2 docs) | Order Granting Motion to Extend Time for Completion of Filing (Related Doc # 12) Non-Compliance (Documents) due by 7/17/2017 for 4, (dmf) (Entered: 06/19/2017) |
| 06/27/2017 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 7/25/2017 at 10:00 AM at Office of the U.S. Trustee Office 450 Debtor absent. (Wirum, Andrea) (Entered: 06/27/2017) |
| 06/28/2017 | 14 | Order To Continue Hearing (RE: related document(s) 341 Meeting of Creditors Continued). (tp) NOTE: Clerk docketed in error please disregard. Modified on 6/28/2017 (tp). (Entered: 06/28/2017) |
| 06/29/2017 | 15 (56 pgs; 4 docs) | Motion for Relief from Stay Fee Amount $181,, Motion for Relief from Co-Debtor Stay Filed by Creditor U.S. Bank National Association (Attachments: # 1 Declaration # 2 Exhibit # 3 Certificate of Service) (Kolbe, Jason) (Entered: 06/29/2017) |
| 06/29/2017 | | Receipt of filing fee for Motion for Relief From Stay(17-30533) [motion,mrlfsty] ( 181.00). Receipt number 27645422, amount $ 181.00 (re: Doc# 15 Motion for Relief from Stay Fee Amount $181,) (U.S. Treasury) (Entered: 06/29/2017) |
| 06/29/2017 | 16 (2 pgs) | Notice of Hearing (RE: related document(s)15 Motion for Relief from Stay Fee Amount $181,, Motion for Relief from Co-Debtor Stay Filed by Creditor U.S. Bank National Association (Attachments: # 1 Declaration # 2 Exhibit # 3 |

| | | |
|---|---|---|
| | | Certificate of Service)). **Hearing scheduled for 7/27/2017 at 09:30 AM at San Francisco Courtroom 17 - Montali.** Filed by Creditor U.S. Bank National Association (Kolbe, Jason) (Entered: 06/29/2017) |
| 07/05/2017 | 17<br>(2 pgs) | Motion to Abandon *Real Property* Filed by Trustee Andrea A. Wirum (Wirum, Andrea) (Entered: 07/05/2017) |
| 07/05/2017 | 18<br>(2 pgs) | Notice of Abandonment of Property *Real Property*. Filed by Trustee Andrea A. Wirum (Wirum, Andrea) (Entered: 07/05/2017) |
| 07/05/2017 | 19<br>(3 pgs) | Certificate of Service *Notice of Abandonment* (RE: related document(s)18 Notice of Abandonment Property). Filed by Trustee Andrea A. Wirum (Wirum, Andrea). Related document(s) 17 Motion to Abandon *Real Property* filed by Trustee Andrea A. Wirum. (CORRECTIVE ENTRY: Clerk added link to document #17) Modified on 7/6/2017 (ka). (Entered: 07/05/2017) |
| 07/13/2017 | 20<br>(1 pg) | Motion to Extend Time *for Completion of Filing* Filed by Debtor Veronica A. Gonzales (Ruthven, Malcolm) (Entered: 07/13/2017) |
| 07/13/2017 | 21<br>(2 pgs) | Application to Employ Kokjer, Pierotti, Maiocco & Duck LLP as Accountant Filed by Trustee Andrea A. Wirum (Wirum, Andrea) (Entered: 07/13/2017) |
| 07/13/2017 | 22<br>(2 pgs) | Declaration of Richard Pierotti in Support of *Application to Employ* (RE: related document(s)21 Application to Employ). Filed by Trustee Andrea A. Wirum (Wirum, Andrea) (Entered: 07/13/2017) |
| 07/13/2017 | 23<br>(3 pgs; 2 docs) | Order Granting Motion to Extend Time for Completion of Filing. On June 16, 2017, the trustee filed a request that the court refrain from dismissing this case pending an investigation of circumstances surrounding its filing. {Dkt. No. 9}. It is hereby ORDERED that this case remain open until the court orders otherwise. Trustee should inform the court as soon as her investigation is complete. (Related Doc # 20) Non-Compliance (Documents) due by 7/31/2017 for 4. (wbk) (Entered: 07/13/2017) |
| 07/14/2017 | 24<br>(2 pgs) | Application to Employ Kokjer, Pierotti, Maiocco & Duck LLP as Accountant Filed by Trustee Andrea A. Wirum (Wirum, Andrea) CORRECTIVE ENTRY: Clerk modified the docket text to reflect the information in the PDF. Modified on 7/14/2017 (rdr). (Entered: 07/14/2017) |
| 07/14/2017 | 25<br>(2 pgs) | Certificate of Service (RE: related document(s)22 Declaration, 24 Corrected Application to Employ Kokjer, Pierotti, Maiocco |

| | | & Duck LLP as Accountant ). Filed by Trustee Accountant Richard L. Pierotti (Pierotti, Richard) (Entered: 07/14/2017) |
|---|---|---|
| 07/14/2017 | [26](2 pgs) | Order Authorizing Employment of Accountant (Kokjer, Pierotti, Maiocco and Duck LLP, Certified Public Accountants) (Related Doc # [24]) (wbk) (Entered: 07/14/2017) |
| 07/17/2017 | [27](2 pgs; 2 docs) | Notice of Deficiency of Financial Management Course Certificate Due Before Discharge (admin) (Entered: 07/17/2017) |
| 07/20/2017 | [28](2 pgs) | BNC Certificate of Mailing (RE: related document(s) [27] Notice of Deficiency Financial Management Course). Notice Date 07/20/2017. (Admin.) (Entered: 07/20/2017) |
| 07/25/2017 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 8/15/2017 at 10:00 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 07/25/2017) |
| 07/25/2017 | [29](38 pgs; 4 docs) | Objection (RE: related document(s) [15] Motion for Relief From Stay, Motion for Relief from Co-Debtor Stay). Filed by Debtor Veronica A. Gonzales (Attachments: # [1] Exhibit A # [2] Exhibit B # [3] Exhibit C) (Ruthven, Malcolm) (Entered: 07/25/2017) |
| 07/27/2017 | [30](2 pgs) | Motion to Extend Time *for Completion of Filing* Filed by Debtor Veronica A. Gonzales (Ruthven, Malcolm) (Entered: 07/27/2017) |
| 07/27/2017 | [31](2 pgs) | Brief/Memorandum in Opposition to *Motion to Extend Time* (RE: related document(s) [30] Motion to Extend Time). Filed by Trustee Andrea A. Wirum (Wirum, Andrea) (Entered: 07/27/2017) |
| 07/27/2017 | [32](1 pg) | Certificate of Service *Opposition to Ex Parte Motion to Extend* Filed by Trustee Andrea A. Wirum (Wirum, Andrea). Related document(s) [31] Opposition Brief/Memorandum filed by Trustee Andrea A. Wirum. CORRECTIVE ENTRY: Clerk added linkage to document #31. Modified on 7/28/2017 (ds). (Entered: 07/27/2017) |
| 07/27/2017 | [33](2 pgs) | Motion for Entry of Default (RE: related document(s) [17] Motion to Abandon filed by Trustee Andrea A. Wirum). Filed by Trustee Andrea A. Wirum (Wirum, Andrea) DEFECTIVE ENTRY: Incorrect event code selected. Modified on 7/28/2017 (ds). (Entered: 07/27/2017) |
| 07/27/2017 | [34](7 pgs) | Declaration of Andrea Wirum in Support of *Request for Order* (RE: related document(s) [18] Notice of Abandonment Property). Filed by Trustee Andrea A. Wirum (Wirum, Andrea). Related document(s) [17] Motion to Abandon *Real Property* filed by Trustee Andrea A. Wirum. CORRECTIVE ENTRY: Clerk |

| | | |
|---|---|---|
| | | added linkage to document #17. Modified on 7/28/2017 (ds). (Entered: 07/27/2017) |
| 07/27/2017 | | Hearing Held. The motion is granted. Counsel for the movant shall upload an order that no stay is in effect. (related document(s): 15 Motion for Relief From Stay filed by U.S. Bank National Association) (lp ) (Entered: 07/27/2017) |
| 07/28/2017 | 35 (2 pgs) | Order Denying Debtor's Third Motion to Extend Time to File Required Documents. All required documents due by 7/31/17. The case will remain open until the court orders otherwise. (Related Doc # 30) (dmf) (Entered: 07/28/2017) |
| 07/28/2017 | 36 (1 pg) | Order Confirming Abandonment of Real Property (Related Doc # 17) (dmf) (Entered: 07/28/2017) |
| 07/28/2017 | 38 (3 pgs) | Order Confirming That No Stay is in Effect Under 11 U.S.C §362(j) (Related Doc # 15) (dmf) (Entered: 07/31/2017) |
| 07/31/2017 | 37 (5 pgs; 2 docs) | Application to Employ Charles P. Maher of Rincon Law LLP as Attorney for Trustee Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Charles P. Maher) (Maher, Charles) (Entered: 07/31/2017) |
| 07/31/2017 | 39 (2 pgs) | Order Authorizing Employment of Counsel (Related Doc # 37) (wbk) (Entered: 07/31/2017) |
| 08/10/2017 | 40 (3 pgs) | Ex Parte Motion *(Ex Parte Application for Order Authorizing Trustee to Operate Business Under 11 U.S.C. § 721)* Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 08/10/2017) |
| 08/10/2017 | 41 (2 pgs) | Order Authorizing Trustee to Operate Business Under 11 U.S.C. § 721 (Related Doc # 40) (dmf) (Entered: 08/10/2017) |
| 08/16/2017 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 10/17/2017 at 10:00 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 08/16/2017) |
| 08/16/2017 | 42 (2 pgs) | Request for Notice Filed by Interested Party John Vos (Vos, John) (Entered: 08/16/2017) |
| 08/23/2017 | 43 (7 pgs; 2 docs) | Adversary case 17-03055. 41 (Objection / revocation of discharge - 727(c),(d),(e)) Complaint by Andrea A. Wirum against Veronica A. Gonzales. Fee Amount $350. (Attachments: # 1 AP Cover Sheet) (Maher, Charles) (Entered: 08/23/2017) |
| 08/24/2017 | 44 (6 pgs; 3 docs) | Application to Employ Nathan Genovese of RE/MAX and Mary Shannon Salazar of Sam Armstrong Realty, Inc. as Real |

| | | Estate Brokers for Trustee Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Nathan Genovese # 2 Declaration of Mary Shannon Salazar) (Maher, Charles) (Entered: 08/24/2017) |
|---|---|---|
| 08/25/2017 | 45 (2 pgs) | Order Authorizing Employment of Real Estate Brokers (Related Doc # 44) (wbk) (Entered: 08/25/2017) |
| 09/06/2017 | 46 (1 pg) | Trustee's Request for Notice of Possible Dividends . (Wirum, Andrea) (Entered: 09/06/2017) |
| 09/06/2017 | 47 (2 pgs; 2 docs) | Notice of Possible Dividends Proofs of Claims due by 12/05/2017(admin) (Entered: 09/06/2017) |
| 09/09/2017 | 48 (2 pgs) | BNC Certificate of Mailing - Notice of Possible Dividend. (RE: related document(s) 47 Notice of Possible Dividends). Notice Date 09/09/2017. (Admin.) (Entered: 09/09/2017) |
| 09/20/2017 | 49 (4 pgs) | Request for Notice Filed by Creditor JPMorgan Chase Bank, National Association, its assignees and/or successors (Jafarnia, Merdaud) (Entered: 09/20/2017) |
| 09/22/2017 | 50 (2 pgs) | Substitution of Attorney . Attorney Malcolm Ruthven terminated. Gregory A. Rougeau added to the case. Filed by Debtor Veronica A. Gonzales (Rougeau, Gregory) (Entered: 09/22/2017) |
| 10/02/2017 | 51 (3 pgs) | Motion for Sale of Property , Motion to Pay *(Motion to Sell Real Property Subject to Overbid and Pay Real Estate Commission)* Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 10/02/2017) |
| 10/02/2017 | 52 (2 pgs) | Notice and Opportunity for Hearing *(Notice of Sale of Real Property, Payment of Real Estate Commission, Opportunity for Overbid, and Opportunity for Hearing)* (RE: related document(s)51 Motion for Sale of Property , Motion to Pay *(Motion to Sell Real Property Subject to Overbid and Pay Real Estate Commission)* Filed by Trustee Andrea A. Wirum). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 10/02/2017) |
| 10/02/2017 | 53 (3 pgs) | Certificate of Service , Declaration *of Mailing* (RE: related document(s) 51 Motion for Sale of Property , Motion to Pay (Motion to Sell Real Property Subject to Overbid and Pay Real Estate Commission) 52 Opportunity for Hearing). Filed by Trustee Andrea A. Wirum (Maher, Charles)CORRECTIVE ENTRY: Clerk added linkage to document #51. Modified on 10/3/2017 (lub). (Entered: 10/02/2017) |
| 10/17/2017 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to |

| | | |
|---|---|---|
| | | be Held on 11/7/2017 at 10:00 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 10/17/2017) |
| 10/18/2017 | | Adversary Case Closed 3:17-ap-3055. (wbk) (Entered: 10/18/2017) |
| 10/23/2017 | [54](#) (2 pgs; 2 docs) | Notice of Order Denying Discharge (RE: related document(s) Flags Set-Reset to add Discharge Denied. Per Order signed on 10/3/17 in Adversary Proceeding No.: 17-3055-DM). (dc) (Entered: 10/23/2017) |
| 10/23/2017 | [55](#) (70 pgs) | Amended Voluntary Petition. Filed by Debtor Veronica A. Gonzales (Rougeau, Gregory) CORRECTIVE ENTRY: (1)Clerk modified debtor's name and estimated liabilities; (2) Clerk added dba and EIN and Statistical data to reflect PDF. DEFECTIVE ENTRY: Additional event code not selected and party filer to pay required fee for creditors added. Modified on 10/24/2017 (tp). (Entered: 10/23/2017) |
| 10/23/2017 | [56](#) (2 pgs) | Objection (RE: related document(s)[51](#) Motion for Sale of Property, Motion to Pay). Filed by Debtor Veronica A. Gonzales (Rougeau, Gregory) DEFECTIVE ENTRY: Additional event code not selected. Modified on 10/24/2017 (tp). (Entered: 10/23/2017) |
| 10/24/2017 | | Fee Due Amended Creditor Matrix (Fee) $ 31 (RE: related document(s)[55](#) Amended Voluntary Petition). (tp) (Entered: 10/24/2017) |
| 10/24/2017 | [57](#) (3 pgs; 2 docs) | Notice of Hearing *on Objection to Sale* (RE: related document(s) [56](#) Objection) ). **Hearing scheduled for 11/3/2017 at 10:00 AM at San Francisco Courtroom 17 - Montali.** Filed by Trustee Andrea A. Wirum (Attachments: # [1](#) Certificate of Service) (Maher, Charles). CORRECTIVE ENTRY: Clerk removed linkage from document #51. Modified on 10/25/2017 (klr). (Entered: 10/24/2017) |
| 10/25/2017 | [58](#) (1 pg) | Disclosure of Compensation of Attorney for Debtor in the Amount of $ 475. Filed by Interested Party John Vos (Vos, John) (Entered: 10/25/2017) |
| 10/25/2017 | [59](#) (2 pgs) | BNC Certificate of Mailing - Order Denying Discharge . (RE: related document(s) [54](#) Notice of Order). Notice Date 10/25/2017. (Admin.) (Entered: 10/25/2017) |
| 10/27/2017 | | Receipt of filing fee for Amended Creditor Matrix (Fee)(17-30533) ( 31.00). Receipt number 28024960, amount $ 31.00 (re: Doc# [55](#) Amended Voluntary Petition) (U.S. Treasury) (Entered: 10/27/2017) |
| 10/27/2017 | [60](#) (1 pg) | Notice Regarding *Continued Meeting Of Creditors* Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: |

| | | |
|---|---|---|
| | | 10/27/2017) |
| 10/28/2017 | [61](#)<br>(3 pgs) | Certificate of Service (RE: related document(s)[60](#) Notice). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 10/28/2017) |
| 10/30/2017 | [62](#)<br>(57 pgs; 4 docs) | Reply *to Objection to Sale* (RE: related document(s)[56](#) Objection). Filed by Trustee Andrea A. Wirum (Attachments: # [1](#) Declaration of Charles P. Maher # [2](#) Declaration of Joyce Roller # [3](#) Certificate of Service) (Maher, Charles) (Entered: 10/30/2017) |
| 11/02/2017 | [63](#)<br>(11 pgs; 2 docs) | Ex Parte Motion *For Order Setting New Claim Deadline* Filed by Trustee Andrea A. Wirum (Attachments: # [1](#) Declaration of Charles P. Maher) (Maher, Charles) (Entered: 11/02/2017) |
| 11/02/2017 | [64](#)<br>(2 pgs) | Supplemental Brief/Memorandum in support of *Objection To Trustee's Motion To sell Real Property* (RE: related document(s)[56](#) Objection). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) DEFECTIVE ENTRY: Additional event code not selected. Modified on 11/3/2017 (yw). (Entered: 11/02/2017) |
| 11/02/2017 | [65](#)<br>(30 pgs; 4 docs) | Declaration of Veronica A. Gonzales in Support of (RE: related document(s)[64](#) Support Brief/Memorandum). Filed by Debtor Veronica A Gonzales (Attachments: # [1](#) Exhibit A # [2](#) Exhibit B # [3](#) Exhibit C) (Rougeau, Gregory) (Entered: 11/02/2017) |
| 11/03/2017 | | Hearing held and continued. The Court orally shortens time for debtor to file a motion to convert to Chapter 11 or a motion to dismiss and set for hearing on 11/20/17 at 10:00 a.m. The notice of hearing should indicate that any opposition may be presented at the hearing. (related document(s): [51](#) Motion for Sale of Property filed by Andrea A. Wirum) **Hearing scheduled for 11/20/2017 at 10:00 AM at San Francisco Courtroom 17 - Montali.** (lp) (Entered: 11/03/2017) |
| 11/03/2017 | [66](#)<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 11/3/2017 10:34:16 AM ]. File Size [ 5520 KB ]. Run Time [ 00:23:00 ]. (admin). (Entered: 11/03/2017) |
| 11/06/2017 | [67](#)<br>(2 pgs) | Motion to Dismiss Case *Or, Alternatively, Convert Case To Chapter 11* Filed by Debtor Veronica A Gonzales (Rougeau, Gregory). DEFECTIVE ENTRIES: (1)Additional event code(s) not selected. (2)Party filer to pay required fee due. Modified on 11/8/2017 (klr). (Entered: 11/06/2017) |
| 11/06/2017 | [68](#)<br>(2 pgs) | Notice of Hearing (RE: related document(s)[67](#) Motion to Dismiss Case *Or, Alternatively, Convert Case To Chapter 11* Filed by Debtor Veronica A Gonzales). **Hearing scheduled for 11/20/2017 at 10:00 AM at San Francisco Courtroom 17 -** |

| | | **Montali.** Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 11/06/2017) |
|---|---|---|
| 11/06/2017 | [69](#) (10 pgs) | Debtor Veronica Gonzales' Motion To Dismiss Chapter 7 Case Or, Alternatively, Convert Chapter 7 Case To A Case Under Chapter 11. (RE: related document(s)[67](#) Motion to Dismiss Case). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory). DEFECTIVE ENTRY: Clerk modified the docket text to reflect the information contained in the PDF and incorrect event code selected. Modified on 11/7/2017 (klr). (Entered: 11/06/2017) |
| 11/06/2017 | [70](#) (21 pgs; 2 docs) | Declaration of Veronica A. Gonzales in Support of (RE: related document(s)[67](#) Motion to Dismiss Case). Filed by Debtor Veronica A Gonzales (Attachments: # [1](#) Exhibit A) (Rougeau, Gregory) (Entered: 11/06/2017) |
| 11/06/2017 | [71](#) (2 pgs) | Declaration of Nicole Queeney in Support of (RE: related document(s)[67](#) Motion to Dismiss Case). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 11/06/2017) |
| 11/07/2017 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued . 341(a) meeting to be held on 12/5/2017 at 10:00 AM Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 11/07/2017) |
| 11/08/2017 | | Fee Due Motion to Convert Case to Chapter 11 $ 922.00 (RE: related document(s)[67](#) Motion to Dismiss Case *Or, Alternatively, Convert Case To Chapter 11*). (klr) (Entered: 11/08/2017) |
| 11/14/2017 | [72](#) (15 pgs) | Objection (RE: related document(s)[67](#) Motion to Dismiss Case). Filed by Creditor Chad B. Wyatt (Wyatt, Chad) (Entered: 11/14/2017) |
| 11/14/2017 | | Receipt of filing fee for Motion to Convert Case to Chapter 11(17-30533) ( 922.00). Receipt number 28072032, amount $ 922.00 (re: Doc# [67](#) Motion to Dismiss Case *Or, Alternatively, Convert Case To Chapter 11*) (U.S. Treasury) (Entered: 11/14/2017) |
| 11/15/2017 | [73](#) (23 pgs; 4 docs) | Brief/Memorandum in Opposition to *Motion to Dismiss or Convert Case* (RE: related document(s)[67](#) Motion to Dismiss Case). Filed by Trustee Andrea A. Wirum (Attachments: # [1](#) Declaration of Andrea A. Wirum # [2](#) Declaration of Charles P. Maher # [3](#) Certificate of Service) (Maher, Charles) (Entered: 11/15/2017) |
| 11/19/2017 | [74](#) (3 pgs) | Certificate of Service (RE: related document(s)[67](#) Motion to Dismiss Case, [68](#) Notice of Hearing, [69](#) Memo of Points & Authorities, [70](#) Declaration, [71](#) Declaration). Filed by Debtor |

| | | |
|---|---|---|
| | | Veronica A Gonzales (Rougeau, Gregory) (Entered: 11/19/2017) |
| 11/20/2017 | | Hearing Held. The motion is denied for the reasons stated on the record. Mr. Maher will upload an order. (related document(s): 67 Motion to Dismiss Case filed by Veronica A Gonzales) (lp) (Entered: 11/20/2017) |
| 11/20/2017 | | Hearing Held. The motion is granted; Mr. Maher will upload an order. (related document(s): 51 Motion for Sale of Property filed by Andrea A. Wirum) (lp) (Entered: 11/20/2017) |
| 11/20/2017 | 75 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 11/20/2017 10:02:03 AM ]. File Size [ 7689 KB ]. Run Time [ 00:32:02 ]. (admin). (Entered: 11/20/2017) |
| 11/21/2017 | 76 (2 pgs) | Order Denying Motion to Dismiss or Convert Case (Related Doc # 67) (wbk) (Entered: 11/22/2017) |
| 11/21/2017 | 77 (2 pgs) | Order Authorizing Sale of Real Property (Related Doc # 51), Granting Motion To Pay (Related Doc # 51) (wbk) (Entered: 11/22/2017) |
| 11/27/2017 | 78 (6 pgs; 2 docs) | Ex Parte Motion *for Order Extending Operating Authority* Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Charles P. Maher) (Maher, Charles) (Entered: 11/27/2017) |
| 11/28/2017 | 79 (1 pg) | Order Extending Authority for Operation of Business (Related Doc # 78) (dmf) (Entered: 11/28/2017) |
| 11/30/2017 | 80 (3 pgs) | Request for Notice Filed by Creditor JPMORGAN CHASE BANK, N.A. (Lee, Alexander) (Entered: 11/30/2017) |
| 12/05/2017 | 81 (3 pgs) | Request for Notice Filed by Creditor JPMORGAN CHASE BANK, N.A. (Lee, Alexander) (Entered: 12/05/2017) |
| 12/05/2017 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 1/9/2018 at 10:30 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 12/05/2017) |
| 12/05/2017 | 82 (35 pgs) | Operating Report for Filing Period June 1, 2017 through September 30, 2017 *(Chapter 7 Operating Report)* Filed by Trustee Andrea A. Wirum (Pierotti, Richard) (Entered: 12/05/2017) |
| 12/05/2017 | 83 (31 pgs) | Operating Report for Filing Period October 2017 *(Chapter 7 Operating Report)* Filed by Trustee Andrea A. Wirum (Pierotti, Richard)DEFECTIVE ENTRY: PDF scanned |

| | | |
|---|---|---|
| | | sideways on pages 6-10. Modified on 12/6/2017 (aw). (Entered: 12/05/2017) |
| 12/19/2017 | 84 (4 pgs) | Trustee's Report of Sale *Upland, CA*. (Wirum, Andrea) (Entered: 12/19/2017) |
| 12/21/2017 | 85 (32 pgs) | Operating Report for Filing Period November 2017 *(Chapter 7 Operating Report)* Filed by Trustee Andrea A. Wirum (Pierotti, Richard) (Entered: 12/21/2017) |
| 12/22/2017 | 86 (13 pgs; 4 docs) | Motion for Sale of Property , Motion to Pay *(Motion to Sell Real Property Subject to Overbid and Pay Real Estate Commission)* Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Andrea A. Wirum # 2 Declaration of Joyce Roller # 3 Memorandum of Points and Authorities) (Maher, Charles) (Entered: 12/22/2017) |
| 12/22/2017 | 87 (2 pgs) | Notice and Opportunity for Hearing *(Notice of Sale of Real Property, Payment of Real Estate Commission, Opportunity for Overbid, and Opportunity for Hearing)* (RE: related document(s)86 Motion for Sale of Property , Motion to Pay *(Motion to Sell Real Property Subject to Overbid and Pay Real Estate Commission)* Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Andrea A. Wirum # 2 Declaration of Joyce Roller # 3 Memorandum of Points and Authorities)). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 12/22/2017) |
| 12/22/2017 | 88 (14 pgs; 4 docs) | Motion to Sell Property Free and Clear Under Section 363(f) *(Motion for Order Authorizing Sale of Real Property Free and Clear of Liens and Enforcing California Civil Code Section 2943)*.Fee Amount $181,. Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Charles P. Maher # 2 Declaration of Andrea A. Wirum # 3 Memorandum of Points and Authorities) (Maher, Charles) (Entered: 12/22/2017) |
| 12/22/2017 | | Receipt of filing fee for Motion to Sell Property Free and Clear Under 363(f)(17-30533) [motion,msellfc] ( 181.00). Receipt number 28184586, amount $ 181.00 (re: Doc# 88 Motion to Sell Property Free and Clear Under Section 363(f) *(Motion for Order Authorizing Sale of Real Property Free and Clear of Liens and Enforcing California Civil Code Section 2943)*.Fee Amount $181,.) (U.S. Treasury) (Entered: 12/22/2017) |
| 12/22/2017 | 89 (2 pgs) | Notice of Hearing *(Notice of Motion for Order Authorizing Sale of Real Property Free and Clear of Liens and for Order Enforcing California Civil Code Section 2943)* (RE: related document(s)88 Motion to Sell Property Free and Clear Under Section 363(f)*(Motion for Order Authorizing Sale of Real Property Free and Clear of Liens and Enforcing* |

| | | |
|---|---|---|
| | | *California Civil Code Section 2943).*Fee Amount $181,. Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Charles P. Maher # 2 Declaration of Andrea A. Wirum # 3 Memorandum of Points and Authorities)). **Hearing scheduled for 1/19/2018 at 10:00 AM at San Francisco Courtroom 17 - Montali.** Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 12/22/2017) |
| 12/22/2017 | 90 (3 pgs) | Certificate of Service (RE: related document(s)88 Motion to Sell Property Free and Clear Under 363(f), 89 Notice of Hearing). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 12/22/2017) |
| 12/22/2017 | 91 (3 pgs) | Certificate of Service , Declaration *of Mailing* (RE: related document(s)87 Opportunity for Hearing). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 12/22/2017) |
| 01/05/2018 | 92 (11 pgs) | Brief/Memorandum in Opposition to (RE: related document(s)86 Motion for Sale of Property, Motion to Pay, 88 Motion to Sell Property Free and Clear Under 363(f)). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 01/05/2018) |
| 01/05/2018 | 93 (37 pgs; 3 docs) | Declaration of Veronica A. Gonzales in Support of (RE: related document(s)92 Opposition Brief/Memorandum). Filed by Debtor Veronica A Gonzales (Attachments: # 1 Exhibit A- Part 1 # 2 Exhibit A- Part 2) (Rougeau, Gregory) (Entered: 01/05/2018) |
| 01/09/2018 | 94 (5 pgs; 2 docs) | Response *to Motion to Sell* (RE: related document(s)88 Motion to Sell Property Free and Clear Under 363(f)). Filed by Creditor JPMorgan Chase Bank, National Association, its assignees and/or successors (Attachments: # 1 Certificate of Service) (Jafarnia, Merdaud) DEFECTIVE ENTRY: Incorrect event code selected. Modified on 1/10/2018 (yw). (Entered: 01/09/2018) |
| 01/10/2018 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 1/30/2018 at 11:00 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 01/10/2018) |
| 01/10/2018 | | Hearing Set On (RE: related document(s) **Hearing scheduled for 1/19/2018 at 10:00 AM at San Francisco Courtroom 17 - Montali.** (lp). Related document(s) 86 Motion for Sale of Property filed by Trustee Andrea A. Wirum. CORRECTIVE ENTRY: Linkage corrected for document number 88 to document number 86. Modified on 1/10/2018 (lp). (Entered: 01/10/2018) |
| 01/12/2018 | 95 | Reply *(Trustee's Reply to Opposition of JPMorgan Chase* |

| | | |
|---|---|---|
| | (2 pgs) | *Bank)* (RE: related document(s)94 Response). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 01/12/2018) |
| 01/12/2018 | 96<br>(5 pgs) | Reply *Memorandum* (RE: related document(s)92 Opposition Brief/Memorandum). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 01/12/2018) |
| 01/12/2018 | 97<br>(2 pgs) | Declaration of Nathan Genovese (RE: related document(s)86 Motion for Sale of Property, Motion to Pay). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 01/12/2018) |
| 01/19/2018 | | Hearing Held. The motion is granted; Mr. Maher will upload an order. (related document(s): 88 Motion to Sell Property Free and Clear Under 363(f) filed by Andrea A. Wirum) (lp) (Entered: 01/19/2018) |
| 01/19/2018 | | Hearing held and continued (related document(s): 88 Motion to Sell Property Free and Clear Under 363(f) filed by Andrea A. Wirum) **Hearing scheduled for 02/02/2018 at 11:00 AM at San Francisco Courtroom 17 - Montali.** (lp) (Entered: 01/19/2018) |
| 01/19/2018 | 98<br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 1/19/2018 10:10:01 AM ]. File Size [ 7676 KB ]. Run Time [ 00:31:59 ]. (admin). (Entered: 01/19/2018) |
| 01/22/2018 | 99<br>(39 pgs) | Operating Report for Filing Period December 2017 *(Chapter 7 Operating Report)* Filed by Trustee Andrea A. Wirum (Pierotti, Richard) (Entered: 01/22/2018) |
| 01/30/2018 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 2/20/2018 at 10:30 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 01/30/2018) |
| 02/01/2018 | 100<br>(10 pgs) | Objection to Claim Number 1 by Claimant Franchise Tax Board Filed by Debtor Veronica A Gonzales. (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | 101<br>(2 pgs) | Notice and Opportunity for Hearing (RE: related document(s)100 Objection to Claim Number 1 by Claimant Franchise Tax Board Filed by Debtor Veronica A Gonzales.). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | 102<br>(48 pgs; 6 docs) | Declaration of Veronica Gonzales in Support of (RE: related document(s)100 Objection to Claim). Filed by Debtor Veronica A Gonzales (Attachments: # 1 Exhibit A- Part 1 # |

| | | |
|---|---|---|
| | | [2](#) Exhibit A- Part 2 # [3](#) Exhibit A- Part 3 # [4](#) Exhibit A- Part 4 # [5](#) Exhibit A- Part 5) (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | [103](#)<br>(2 pgs) | Certificate of Service (RE: related document(s)[100](#) Objection to Claim, [101](#) Opportunity for Hearing, [102](#) Declaration). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | [104](#)<br>(10 pgs) | Objection to Claim Number 2 by Claimant Internal Revenue Service Filed by Debtor Veronica A Gonzales. (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | [105](#)<br>(2 pgs) | Notice and Opportunity for Hearing (RE: related document(s)[104](#) Objection to Claim Number 2 by Claimant Internal Revenue Service Filed by Debtor Veronica A Gonzales.). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | [106](#)<br>(87 pgs; 8 docs) | Declaration of Veronica Gonzales in Support of (RE: related document(s)[104](#) Objection to Claim). Filed by Debtor Veronica A Gonzales (Attachments: # [1](#) Exhibit A- Part 1 # [2](#) Exhibit A- Part 2 # [3](#) Exhibit A- Part 2.5 # [4](#) Exhibit A- Part 3 # [5](#) Exhibit A- Part 3.5 # [6](#) Exhibit A- Part 4 # [7](#) Exhibit A- Part 5) (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | [107](#)<br>(2 pgs) | Certificate of Service (RE: related document(s)[104](#) Objection to Claim, [105](#) Opportunity for Hearing, [106](#) Declaration). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | [108](#)<br>(3 pgs) | Supplemental Statement of In Support Of Opposition To Sale Motion (RE: related document(s)[92](#) Opposition Brief/Memorandum). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | [109](#)<br>(3 pgs) | Declaration of Veronica Gonzales in Support of (RE: related document(s)[108](#) Statement). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/01/2018 | [110](#)<br>(2 pgs) | Declaration of Alan Schneider in Support of (RE: related document(s)[108](#) Statement). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/01/2018) |
| 02/02/2018 | | Hearing Held and Continued (related document(s): [88](#) Motion to Sell Property Free and Clear Under 363(f) filed by Andrea A. Wirum) **Hearing scheduled for 03/02/2018 at 11:30 AM at San Francisco Courtroom 17 – Montali.** (ls) (Entered: 02/02/2018) |
| 02/02/2018 | [111](#) | |

| | | |
|---|---|---|
| | (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 2/2/2018 11:01:07 AM ]. File Size [ 8544 KB ]. Run Time [ 00:35:36 ]. (admin). (Entered: 02/02/2018) |
| 02/07/2018 | [112](#)<br>(9 pgs) | Amended Objection to Claim Number 2 by Claimant Department of the Treasury- Internal Revenue Service Filed by Debtor Veronica A Gonzales. (Rougeau, Gregory) CORRECTIVE ENTRY: Clerk modified docket text to reflect PDF. Modified on 2/8/2018 (myt). (Entered: 02/07/2018) |
| 02/07/2018 | [113](#)<br>(2 pgs) | Amended Notice and Opportunity for Hearing (RE: related document(s)[112](#) Objection to Claim Number 2 by Claimant Department of the Treasury- Internal Revenue Service Filed by Debtor Veronica A Gonzales.). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/07/2018) |
| 02/07/2018 | [114](#)<br>(90 pgs; 9 docs) | Request To Take Judicial Notice (RE: related document(s)[112](#) Objection to Claim). Filed by Debtor Veronica A Gonzales (Attachments: # [1](#) Exhibit A- Part 1 # [2](#) Exhibit A- Part 2 # [3](#) Exhibit A- Part 3 # [4](#) Exhibit A- Part 4 # [5](#) Exhibit A- Part 5 # [6](#) Exhibit A- Part 6 # [7](#) Exhibit A- Part 7 # [8](#) Exhibit A- Part 8) (Rougeau, Gregory) (Entered: 02/07/2018) |
| 02/07/2018 | [115](#)<br>(3 pgs) | Certificate of Service (RE: related document(s)[112](#) Objection to Claim, [113](#) Opportunity for Hearing, [114](#) Request To Take Judicial Notice). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/07/2018) |
| 02/09/2018 | [116](#)<br>(10 pgs) | Objection to Claim Number 1 by Claimant Franchise Tax Board Filed by Debtor Veronica A Gonzales. (Rougeau, Gregory) (Entered: 02/09/2018) |
| 02/09/2018 | [117](#)<br>(2 pgs) | Notice and Opportunity for Hearing (RE: related document(s)[116](#) Objection to Claim Number 1 by Claimant Franchise Tax Board Filed by Debtor Veronica A Gonzales.). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/09/2018) |
| 02/09/2018 | [118](#)<br>(51 pgs; 7 docs) | Request To Take Judicial Notice (RE: related document(s)[116](#) Objection to Claim). Filed by Debtor Veronica A Gonzales (Attachments: # [1](#) Exhibit A- Part 1 # [2](#) Exhibit A- Part 2 # [3](#) Exhibit A- Part 3 # [4](#) Exhibit A- Part 4 # [5](#) Exhibit A- Part 5 # [6](#) Exhibit A- Part 6) (Rougeau, Gregory) (Entered: 02/09/2018) |
| 02/09/2018 | [119](#)<br>(2 pgs) | Certificate of Service (RE: related document(s)[116](#) Objection to Claim, [117](#) Opportunity for Hearing, [118](#) Request To Take Judicial Notice). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 02/09/2018) |

| 02/21/2018 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 3/13/2018 at 10:30 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 02/21/2018) |
| 02/21/2018 | [120](#) (41 pgs) | Operating Report for Filing Period January 2018 *(Chapter 7 Operating Report)* Filed by Trustee Andrea A. Wirum (Pierotti, Richard) (Entered: 02/21/2018) |
| 03/01/2018 | [121](#) (1 pg) | Withdrawal of Documents *(Notice Withdrawing Motion for Sale)* (RE: related document(s)[86](#) Motion for Sale of Property, Motion to Pay). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 03/01/2018) |
| 03/01/2018 | | Hearing Dropped. The hearing on 3/2/18 at 11:30 a.m. is taken off calendar per the Withdrawal (dkt #121) filed on 3/1/18. (related document(s): [88](#) Motion to Sell Property Free and Clear Under 363(f) filed by Andrea A. Wirum) (lp) (Entered: 03/01/2018) |
| 03/13/2018 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 4/3/2018 at 11:00 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 03/13/2018) |
| 03/20/2018 | [122](#) (2 pgs) | Request for Entry of Default Re: (RE: related document(s)[112](#) Objection to Claim). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 03/20/2018) |
| 03/20/2018 | [123](#) (115 pgs; 11 docs) | Declaration of Gregory A. Rougeau in Support of (RE: related document(s)[122](#) Request For Entry of Default). Filed by Debtor Veronica A Gonzales (Attachments: # [1](#) Exhibit A # [2](#) Exhibit B # [3](#) Exhibit C-Part 1 # [4](#) Exhibit C-Part 2 # [5](#) Exhibit C-Part3 # [6](#) Exhibit C-Part 4 # [7](#) Exhibit C-Part 5 # [8](#) Exhibit C-Part 6 # [9](#) Exhibit D # [10](#) Exhibit E) (Rougeau, Gregory) (Entered: 03/20/2018) |
| 03/20/2018 | [124](#) (3 pgs) | Certificate of Service (RE: related document(s)[122](#) Request For Entry of Default, [123](#) Declaration). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 03/20/2018) |
| 03/21/2018 | [125](#) (2 pgs) | Objection *Objection To Request For Entry Of Default* (RE: related document(s)[122](#) Request For Entry of Default). Filed by Creditor United States of America (Stier, Cynthia) (Entered: 03/21/2018) |
| 03/21/2018 | [126](#) (11 pgs; 3 docs) | Response *Response To Amended Objection To Claim* (RE: related document(s)[112](#) Objection to Claim). Filed by |

|  |  |  |
|---|---|---|
|  |  | Creditor United States of America (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Stier, Cynthia) (Entered: 03/21/2018) |
| 03/26/2018 | 127<br>(4 pgs; 2 docs) | Ex Parte Motion *for Order Extending Operating Authority* Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Charles P. Maher) (Maher, Charles) (Entered: 03/26/2018) |
| 03/27/2018 | 128<br>(1 pg) | Order Extending Authority for Operation of Business (Related Doc # 127) (lp) (Entered: 03/27/2018) |
| 04/02/2018 | 129<br>(2 pgs) | Reply (RE: related document(s)125 Objection). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 04/02/2018) |
| 04/04/2018 |  | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 4/24/2018 at 11:00 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 04/04/2018) |
| 04/09/2018 | 130<br>(4 pgs) | Motion for Sale of Property *(Motion for Authority to Sell Real Property)* Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 04/09/2018) |
| 04/09/2018 | 131<br>(2 pgs) | Notice and Opportunity for Hearing *(Notice of Trustee's Request for Authority to Sell Real Property)* (RE: related document(s)130 Motion for Sale of Property *(Motion for Authority to Sell Real Property)* Filed by Trustee Andrea A. Wirum). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 04/09/2018) |
| 04/09/2018 | 132<br>(3 pgs) | Certificate of Service , Declaration *of Mailing* (RE: related document(s)131 Opportunity for Hearing). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 04/09/2018) |
| 04/10/2018 | 133<br>(2 pgs) | Order Setting Status Conference on Objection to Claim No. 2 (RE: related document(s)112 Objection to Claim filed by Debtor Veronica A Gonzales). **Status Conference scheduled for 5/11/2018 at 11:00 AM at San Francisco Courtroom 17 - Montali.** (lp) (Entered: 04/11/2018) |
| 04/25/2018 |  | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 5/8/2018 at 11:30 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 04/25/2018) |
| 05/07/2018 | 134<br>(4 pgs) | Motion to Compromise and Abandon Real Property; Withdrawal of Notice of Sale (RE: related document(s)130 Motion for Sale of Property, 131 Opportunity for Hearing). Filed by Trustee Andrea A. Wirum (Maher, Charles) |

| | | CORRECTIVE ENTRIES: (1) Clerk modified the docket text to reflect the information contained in the PDF. (2) Clerk modified docket text. Modified on 5/9/2018 (cf). (Entered: 05/07/2018) |
|---|---|---|
| 05/07/2018 | [135](4 pgs) | Motion to Compromise and Abandon Real Property; Withdrawal of Notice of Sale Filed by Trustee Andrea A. Wirum (Maher, Charles) NOTE: This is a duplicate entry to document #134. Modified on 5/7/2018 (cf). (Entered: 05/07/2018) |
| 05/07/2018 | [136](2 pgs) | Notice and Opportunity for Hearing *(Notice of Compromise, Abandonment of Real Property, and Withdrawal of Notice of Sale)* (RE: related document(s)[134](https://...) Withdrawal of Documents (RE: related document(s)[130](https://...) Motion for Sale of Property, [131](https://...) Opportunity for Hearing). Filed by Trustee Andrea A. Wirum, [135](https://...) Application to Compromise Controversy with Veronica A. Gonzales , Motion to Abandon *(Motion to Compromise and Abandon Real Property; Withdrawal of Notice of Sale)* Filed by Trustee Andrea A. Wirum). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 05/07/2018) |
| 05/07/2018 | [137](3 pgs) | Certificate of Service , Declaration *of Mailing* (RE: related document(s)[136](https://...) Opportunity for Hearing). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 05/07/2018) |
| 05/09/2018 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 6/12/2018 at 11:00 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 05/09/2018) |
| 05/11/2018 | | Hearing held and continued (related document(s): [133](https://...) Order To Set Hearing) **Hearing scheduled for 07/27/2018 at 01:30 PM at San Francisco Courtroom 17 - Montali.** (lp) (Entered: 05/11/2018) |
| 05/11/2018 | [138](1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 5/11/2018 11:00:47 AM ]. File Size [ 1156 KB ]. Run Time [ 00:04:49 ]. (admin). (Entered: 05/11/2018) |
| 05/21/2018 | [139](3 pgs) | Stipulation, to Entry of Order Authorizing Use of Cash Collateral Filed by Creditor JPMORGAN CHASE BANK, N.A., Trustee Andrea A. Wirum. (Maher, Charles) (Entered: 05/21/2018) |
| 05/23/2018 | [140](1 pg) | Order Authorizing Use of Cash Collateral (RE: related document(s)[139](https://...) Stipulation for Miscellaneous Relief filed by Trustee Andrea A. Wirum, Creditor JPMORGAN CHASE BANK, N.A.). (lp) (Entered: 05/23/2018) |

| | | |
|---|---|---|
| 05/30/2018 | [141](#)<br>(9 pgs; 2 docs) | Request for Entry of Default Re: *(Request for Entry of Order)* (RE: related document(s)[134](#) Withdrawal of Document, [135](#) Application to Compromise Controversy, Motion to Abandon, [136](#) Opportunity for Hearing, [137](#) Certificate of Service, Declaration). Filed by Trustee Andrea A. Wirum (Attachments: # [1](#) Declaration of Charles P. Maher) (Maher, Charles) (Entered: 05/30/2018) |
| 06/01/2018 | [142](#)<br>(2 pgs) | Order Authorizing Compromise (Related Doc # [135](#)) (lp) (Entered: 06/01/2018) |
| 06/13/2018 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 6/26/2018 at 11:30 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 06/13/2018) |
| 06/14/2018 | [143](#)<br>(14 pgs; 3 docs) | Motion *for Order Authorizing Loan Modification Agreement* Filed by Creditor JPMorgan Chase Bank, National Association, its assignees and/or successors (Attachments: # [1](#) Exhibit # [2](#) Certificate of Service) (Jafarnia, Merdaud) (Entered: 06/14/2018) |
| 06/15/2018 | [144](#)<br>(4 pgs; 2 docs) | Objection *to Motion for Order Authorizing Loan Modification Agreement* (RE: related document(s)[143](#) Motion Miscellaneous Relief). Filed by Trustee Andrea A. Wirum (Attachments: # [1](#) Certificate of Service) (Maher, Charles) (Entered: 06/15/2018) |
| 06/27/2018 | [145](#)<br>(2 pgs) | Motion for Sale of Property , Motion to Pay *(Motion to Sell Real Property and Pay Administrative Expense)* Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 06/27/2018) |
| 06/27/2018 | [146](#)<br>(3 pgs) | Notice and Opportunity for Hearing *(Renewed Notice of Trustees Intent to Sell Real Property and Pay Administrative Expense)* (RE: related document(s)[145](#) Motion for Sale of Property , Motion to Pay *(Motion to Sell Real Property and Pay Administrative Expense)* Filed by Trustee Andrea A. Wirum). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 06/27/2018) |
| 06/27/2018 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 7/17/2018 at 10:30 AM at Office of the U.S. Trustee Office 450 Debtor absent. (Wirum, Andrea) (Entered: 06/27/2018) |
| 06/27/2018 | [147](#)<br>(3 pgs) | Certificate of Service , Declaration *of Mailing* (RE: related document(s)[146](#) Opportunity for Hearing). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 06/27/2018) |

| | | |
|---|---|---|
| 07/18/2018 | | Statement Adjourning Meeting of 341(a) Meeting of Creditors. Meeting of Creditors Continued. Next Meeting of Creditors to be Held on 8/7/2018 at 11:00 AM at Office of the U.S. Trustee Office 450 (Wirum, Andrea) (Entered: 07/18/2018) |
| 07/19/2018 | 148 (10 pgs; 2 docs) | Request for Entry of Default Re: *(Request for Entry of Order)* (RE: related document(s)145 Motion for Sale of Property, Motion to Pay, 146 Opportunity for Hearing, 147 Certificate of Service, Declaration). Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Charles P. Maher) (Maher, Charles) (Entered: 07/19/2018) |
| 07/20/2018 | 149 (2 pgs) | Order Authorizing Sale of Real Property and Payment of Administrative Expense (Related Doc # 145), Granting Motion To Pay (Related Doc # 145) (lp) (Entered: 07/20/2018) |
| 07/23/2018 | 150 (27 pgs; 4 docs) | Request for Entry of Default Re: *Motion for Order Authorizing Loan Modification Agreement* (RE: related document(s)143 Motion Miscellaneous Relief). Filed by Creditor JPMorgan, Chase Bank, National Association, its assignees and/or successors (Attachments: # 1 Declaration # 2 Exhibit # 3 Certificate of Service) (Jafarnia, Merdaud) (Entered: 07/23/2018) |
| 07/23/2018 | 151 (4 pgs; 2 docs) | Order Authorizing Debtor to Enter Loan Modification Agreement (Related Doc # 143) (lp) (Entered: 07/23/2018) |
| 07/24/2018 | 152 (4 pgs) | Withdrawal of Documents (RE: related document(s)150 Request For Entry of Default). Filed by Creditor JPMorgan Chase Bank, National Association, its assignees and/or successors (Jafarnia, Merdaud) (Entered: 07/24/2018) |
| 07/25/2018 | 153 (4 pgs) | BNC Certificate of Mailing (RE: related document(s) 151 Order on Motion for Miscellaneous Relief). Notice Date 07/25/2018. (Admin.) (Entered: 07/25/2018) |
| 07/27/2018 | | Hearing held and continued (related document(s): 133 Order To Set Hearing) **Hearing scheduled for 09/28/2018 at 01:30 PM at San Francisco Courtroom 17 – Montali.** (lp) (Entered: 07/27/2018) |
| 08/08/2018 | | Meeting of Creditors Held and Concluded (Wirum, Andrea) (Entered: 08/08/2018) |
| 08/21/2018 | 154 (1 pg) | Notice of Abandonment of Property . Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 08/21/2018) |
| 09/12/2018 | 155 (14 pgs; 3 docs) | Motion *for Order Authorizing Loan Modification Agreement* Filed by Creditor JPMorgan Chase Bank, National Association, its assignees and/or successors (Attachments: # |

| | | |
|---|---|---|
| | | [1](#) Exhibit # [2](#) Certificate of Service) (Jafarnia, Merdaud) **DEFECTIVE ENTRY: Incorrect event code selected.** Modified on 9/13/2018 (kl). (Entered: 09/12/2018) |
| 09/28/2018 | | Hearing Held. The debtor withdraws on the record the objection to the claim. The matter is taken off calendar. (related document(s): [133](#) Order To Set Hearing) (lp) (Entered: 09/28/2018) |
| 10/12/2018 | [156](#) (24 pgs; 4 docs) | Request for Entry of Default Re: *Motion for Order Authorizing Loan Modification Agreement* (RE: related document(s)[155](#) Motion Miscellaneous Relief. Filed by Creditor JPMorgan Chase Bank, National Association, its assignees and/or successors (Attachments: # [1](#) Declaration # [2](#) Exhibit # [3](#) Certificate of Service) (Jafarnia, Merdaud) (Entered: 10/12/2018) |
| 10/16/2018 | [157](#) (4 pgs; 2 docs) | Order Authorizing Debtor to Enter Loan Modification (Related Doc # [155](#)) (lp) (Entered: 10/16/2018) |
| 10/18/2018 | [158](#) (4 pgs) | BNC Certificate of Mailing (RE: related document(s) [157](#) Order on Motion for Miscellaneous Relief). Notice Date 10/18/2018. (Admin.) (Entered: 10/18/2018) |
| 10/22/2018 | [159](#) (3 pgs) | Notice of Change of Address *of Law Firm* Filed by Creditor JPMorgan Chase Bank, National Association, its assignees and/or successors (Jafarnia, Merdaud) (Entered: 10/22/2018) |
| 11/09/2018 | [160](#) (45 pgs; 2 docs) | Interim Application for Compensation *(First Interim Application of Rincon Law, LLP for Compensation and Expense Reimbursement as Counsel for Chapter 7 Trustee)* for Rincon Law LLP, Trustee's Attorney, Fee: $85,965, Expenses: $1,378.92. Filed by Trustee Attorney Rincon Law LLP (Attachments: # [1](#) Declaration) (Maher, Charles) (Entered: 11/09/2018) |
| 11/09/2018 | [161](#) (2 pgs) | Notice of Hearing *on Application for Compensation and Expense Reimbursement by Counsel for Trustee* (RE: related document(s)[160](#) Interim Application for Compensation *(First Interim Application of Rincon Law, LLP for Compensation and Expense Reimbursement as Counsel for Chapter 7 Trustee)* for Rincon Law LLP, Trustee's Attorney, Fee: $85,965, Expenses: $1,378.92. Filed by Trustee Attorney Rincon Law LLP (Attachments: # 1 Declaration)). **Hearing scheduled for 11/30/2018 at 09:30 AM at San Francisco Courtroom 17 - Montali.** Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 11/09/2018) |
| 11/09/2018 | [162](#) (3 pgs) | Certificate of Service , Declaration *of Mailing* (RE: related document(s)[161](#) Notice of Hearing). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 11/09/2018) |

| | | |
|---|---|---|
| 11/30/2018 | | Hearing Dropped. No appearances required. The application is allowed as filed; order to follow. (related document(s): 160 Application for Compensation filed by Rincon Law LLP) (lp) (Entered: 11/30/2018) |
| 12/03/2018 | 163 (2 pgs) | Order Approving Application For Interim Compensation and Expense Reimbursement (Related Doc # 160). fees awarded: $85965.00, expenses awarded: $1378.92 for Rincon Law LLP (lp) (Entered: 12/03/2018) |
| 12/14/2018 | 164 (2 pgs) | Motion to Pay *(Motion for Authority to Pay Income Tax)* Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 12/14/2018) |
| 12/14/2018 | 165 (1 pg) | Notice and Opportunity for Hearing *(Notice of Trustee's Intent to Pay Income Tax)* (RE: related document(s)164 Motion to Pay *(Motion for Authority to Pay Income Tax)* Filed by Trustee Andrea A. Wirum). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 12/14/2018) |
| 12/14/2018 | 166 (3 pgs) | Certificate of Service , Declaration *of Mailing* (RE: related document(s)165 Opportunity for Hearing). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 12/14/2018) |
| 12/18/2018 | 167 (22 pgs; 2 docs) | Application for Compensation for Richard L. Pierotti, Trustee's Accountant, Fee: $18,010.00, Expenses: $84.54. Filed by Trustee Accountant Richard L. Pierotti (Attachments: # 1 Certificate of Service) (Pierotti, Richard) (Entered: 12/18/2018) |
| 01/04/2019 | 168 (2 pgs) | Objection (RE: related document(s)164 Motion to Pay). Filed by Debtor Veronica A Gonzales (Rougeau, Gregory) (Entered: 01/04/2019) |
| 01/07/2019 | 169 (1 pg) | Notice of Hearing *on Objection to Payment of Tax Debt* (RE: related document(s)164 Motion to Pay *(Motion for Authority to Pay Income Tax)* Filed by Trustee Andrea A. Wirum, 168 Objection (RE: related document(s)164 Motion to Pay). Filed by Debtor Veronica A Gonzales). **Hearing scheduled for 1/18/2019 at 10:00 AM at San Francisco Courtroom 17 - Montali.** Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 01/07/2019) |
| 01/14/2019 | 170 (15 pgs; 3 docs) | Reply *(Trustee's Reply to Debtor's Limited Objection to the Payment of Income Tax Owed by the Bankruptcy Estate and her Apparent Objection to the Returns Themselves)* (RE: related document(s)168 Objection). Filed by Trustee Andrea A. Wirum (Attachments: # 1 Declaration of Charles P. Maher # 2 Declaration of Richard Pierotti) (Maher, Charles) (Entered: 01/14/2019) |
| 01/18/2019 | | Hearing Held. The motion is granted as of 2/11/19. The court |

|  |  |  |
|---|---|---|
|  |  | will sign an order at that time. Mr Maher to submit the order. (related document(s): 164 Motion to Pay filed by Andrea A. Wirum) (lp) (Entered: 01/18/2019) |
| 01/18/2019 | 171 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 1/18/2019 10:01:47 AM ]. File Size [ 2260 KB ]. Run Time [ 00:09:25 ]. (admin). (Entered: 01/18/2019) |
| 01/24/2019 | 172 (2 pgs) | Order Authorizing Payment of Income Tax (Related Doc # 164) (lp) (Entered: 01/24/2019) |
| 03/05/2019 | 173 (15 pgs; 2 docs) | Final Application for Compensation *(Second and Final Application of Rincon Law, LLP for Compensation and Expense Reimbursement as Counsel for Chapter 7 Trustee)* for Rincon Law LLP, Trustee's Attorney, Fee: $10,090, Expenses: $38.50. Filed by Trustee Attorney Rincon Law LLP (Attachments: # 1 Declaration of Charles P. Maher) (Maher, Charles) (Entered: 03/05/2019) |
| 06/07/2019 | 174 (12 pgs) | Chapter 7 Trustee's Final Report filed on behalf of Trustee. The United States Trustee has reviewed the Chapter 7 Trustee's Final Report. Filed by Trustee Andrea A. Wirum. (U.S. Trustee (RG)) (Entered: 06/07/2019) |
| 06/07/2019 | 175 (45 pgs) | Application for Compensation for Andrea A. Wirum, Trustee Chapter 7, Fee: $29,935.69, Expenses: $137.95. The UST has reviewed the Application for Compensation of the trustee and submitted to the U.S. Bankruptcy Court for filing. Filed by Trustee Andrea A. Wirum. (U.S. Trustee (RG)) (Entered: 06/07/2019) |
| 06/07/2019 | 176 (7 pgs; 2 docs) | Notice of Filing of Trustee's Final Report . Filed by Trustee Andrea A. Wirum. (U.S. Trustee (RG)) (Entered: 06/07/2019) |
| 06/07/2019 | 177 (2 pgs; 2 docs) | Notice of Hearing on Trustee's Final Application(s) for Compensation. **Final Meeting scheduled for 7/12/2019 at 10:30 AM at San Francisco Courtroom 17 - Montali.** Filed by Trustee Andrea A. Wirum. (U.S. Trustee (RG)) (Entered: 06/07/2019) |
| 06/12/2019 | 178 (2 pgs) | BNC Certificate of Mailing - PDF Document. (RE: related document(s) 177 Final Meeting Sched/Resched). Notice Date 06/12/2019. (Admin.) (Entered: 06/12/2019) |
| 06/12/2019 | 179 (7 pgs) | BNC Certificate of Mailing (RE: related document(s) 176 Notice of Final Report). Notice Date 06/12/2019. (Admin.) (Entered: 06/12/2019) |
| 07/08/2019 | 180 (3 pgs) | Declaration *of Charles P. Maher Regarding Reduction in Fee Request* (RE: related document(s)173 Application for |

| | | |
|---|---|---|
| | | Compensation). Filed by Trustee Andrea A. Wirum (Maher, Charles) (Entered: 07/08/2019) |
| 07/09/2019 | [181](#)<br>(6 pgs) | Declaration of Andrea Wirum in Support of *Reduction in Fee Request* (RE: related document(s)175 Application for Compensation). Filed by U.S. Trustee Office of the U.S. Trustee / SF (Wirum, Andrea) (Entered: 07/09/2019) |
| 07/12/2019 | | Hearing Held. There is no opposition. The applications are approved. Applicants to upload orders. (related document(s): 177 Final Meeting Sched/Resched filed by Andrea A. Wirum) (bg) (Entered: 07/12/2019) |
| 07/15/2019 | [182](#)<br>(1 pg) | Order Approving Trustee's Payment of Fees and Expenses (Related Doc # 175). fees awarded: $29850.43, expenses awarded: $137.95 for Andrea A. Wirum (lp) (Entered: 07/16/2019) |
| 07/15/2019 | [183](#)<br>(2 pgs) | Order Approving Final Compensation and Expense Reimbursement (Related Doc # 173). fees awarded: $8470.00, expenses awarded: $38.50 for Rincon Law LLP (lp) (Entered: 07/16/2019) |
| 07/17/2019 | [184](#)<br>(1 pg) | Order Authorizing Application For Compensation By Accountant (Related Doc # 167). fees awarded: $18010.00, expenses awarded: $84.54 for Richard L. Pierotti (lp) (Entered: 07/18/2019) |
| 09/17/2019 | [185](#)<br>(10 pgs) | Chapter 7 Trustee's Final Account, Certification that the Estate has been Fully Administered and Application of Trustee to be Discharged filed on behalf of Trustee, Andrea Wirum. The United States Trustee has reviewed the Final Account, Certification that the Estate has been Fully Administered and Application of Trustee to be Discharged. The United States Trustee does not object to the relief requested. Filed by Trustee Andrea A. Wirum. (Tamanaha, Donna (yw)) (Entered: 09/17/2019) |
| 10/01/2019 | [186](#)<br>(2 pgs; 2 docs) | Final Decree (myt) (Entered: 10/01/2019) |
| 10/01/2019 | | Bankruptcy Case Closed. (myt) (Entered: 10/01/2019) |
| 10/03/2019 | [187](#)<br>(2 pgs) | BNC Certificate of Mailing (RE: related document(s) 186 Final Decree). Notice Date 10/03/2019. (Admin.) (Entered: 10/03/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/21/2020 07:32:46 | | | |
| **PACER Login:** | dwtsea01:2541668:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 17-30533 Fil or Ent: filed From: 5/22/2000 To: 7/21/2020 Doc From: 0 Doc To: 99999999 Term: included Headers: included Format: html Page counts for documents: included |
| **Billable Pages:** | 18 | **Cost:** | 1.80 |

# EXHIBIT 7

Veronica A. Gonzales
In Pro Per
36 Rustic Way
San Rafael, California 94901
Telephone (415)717-2111
Email: vgonzpass@aol.com

Attorney for Plaintiff

FILED

MAY 7 - 2014

KIM TURNER, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: E. Chais, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF MARIN

CV 1401725

VERONICA A. GONZALES

        PLAINTIFF,

vs.

WELLS FARGO HOME MORTGAGE, INC.;
NORTHWEST TRUSTEE SERVICES, INC;
US BANK, N.A., AS SUCCESSOR
TRUSTEE TO WACHOVIA BANK, N.A, AS
TRUSTEE FOR MSSTR 2004-1; ALL
PERSONS UNKNOWN, CLAIMING ANY
LEGAL OR EQUITABLE RIGHT, TITLE,
ESTATE, LIEN, OR INTEREST IN THE
PROPERTY DESCRIBED IN THE
COMPLAINT ADVERSE TO PLAINTIFF'
TITLE, OR ANY CLOUD ON PLAINTIFF'
TITLE THERETO; and DOES 1-20,
INCLUSIVE,

        DEFENDANTS.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**PLAINTIFF' COMPLAINT FOR**

**(1) NEGLIGENCE;**
**(2) FRAUD;**
**(3) TO SET ASIDE TRUSTEE'S SALE;**
**(4) WRONGFUL FORECLOSURE;**
**(5) BREACH OF CONTRACT;**
**(6) BREACH OF THE IMPLIED**
**COVENANT OF GOOD FAITH AND**
**FAIR DEALING;**
**(7) UNJUST ENRICHMENT;**
**(8) VIOLATION OF CALIFORNIA**
**BUSINESS AND PROFESSIONS CODE**
**SECTIONS 17200 ET SEQ.;**
**(9) QUIET TITLE; AND**
**(10) SLANDER OF TITLE**

PLAINTIFFS' COMPLAINT

1

TO THIS HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

Plaintiff hereby allege as follows:

**PARTIES**

3.     Defendant Wells Fargo Home Mortgage, INC is, and at all times herein mentioned was, a Delaware limited liability company, organized and existed under the laws of the State of California, doing business in MARIN County, California.

4.     Defendant US BANK, N.A., AS SUCCESSOR TRUSTEE TO WACHOVIA BANK, N.A, AS TRUSTEE FOR MSSTR 2004-1 Without Recourse ("us bank") is, and at all times herein mentioned was, a business entity of unknown form, doing business in MARIN County, California.

5.     Defendant Northwest Trustee Services, Inc. is a California corporation with its principal place of business in Orange County, California.

6     "All Persons Unknown, Claiming Any Legal Or Equitable Right, Title, Estate, Lien, Or Interest In The Property Described In The Complaint Adverse To Plaintiff' Title, Or Any Cloud On Plaintiff' Title Thereto" are sued herein pursuant to California Code of Civil Procedure Section 762.020(a).

7.     Plaintiff do not know the true names and capacities of the defendants sued herein as DOES 1 through 20 ("DOE Defendants"), inclusive, and therefore sues said DOE Defendants by fictitious names. Plaintiff are informed and believe and based on such information and belief aver that each of the DOE Defendants is contractually, strictly, negligently, intentionally, vicariously liable and or otherwise legally responsible in some manner for the acts and omissions described herein. Plaintiff will amend this Complaint to set forth the true names and

Exhibit 10, Page 2 of 20

capacities of each DOE Defendant when same are ascertained.

8.   Plaintiff are informed and believe and based on such information and belief aver that Defendants WELLS FARGO HOME MORTGAGE, INC, Northwest Trustee Services, Inc. U.S. Bank and DOE Defendants 1 through 10, inclusive, and each of them, are and at all material times have been, the agents, servants or employees of each other, purporting to act within the scope of said agency, service or employment in performing the acts and omitting to act as averred herein. WELLS FARGO HOME MORTGAGE, INC, NORTHWEST TRUSTEE SERVICES, INC and US BANK, N.A., AS SUCCESSOR TRUSTEE TO WACHOVIA BANK, N.A, AS TRUSTEE FOR MSSTR 2004-1and DOE Defendants 6 through 10, inclusive, are hereinafter collectively referred to as the "Foreclosing Defendants."

9.   Each of the Defendants named herein are believed to, and are alleged to have been acting in concert with, as employee, agent, co-conspirator or member of a joint venture of, each of the other Defendants, and are therefore alleged to be jointly and severally liable for the claims set forth herein, except as otherwise alleged.

## GENERAL ALLEGATIONS

10.   Prior to October 26, 2001, Plaintiff purchased certain real property commonly known as 36 Rustic Way, San Rafael, CA 94901 (the "Subject Property").

11.   On or about October 26, 2001, Plaintiff refinanced the loan on the Subject Property through WELLS FARGO HOME MORTGAGE, INC. ("Wells") and executed a promissory note in favor of Wells.  The note was secured by a deed of trust with Wells Fargo Home Mortgage, INC as beneficiary.

12.   Plaintiff made each payment due on the new loan.

13.   On or about October 26, 2001, WELLS FARGO HOME MORTGAGE, INC acquired the servicing rights to Plaintiff' loan.

Exhibit 10, Page 3 of 20

14. However, around the winter of 2010, Plaintiff was notified by WELLS FARGO HOME MORTGAGE, INC that ("Wells") allegedly had not received Plaintiff' monthly mortgage payments for several months. Plaintiff advised Mr. Representative, a representative of WELLS FARGO HOME MORTGAGE, INC, that the payments had indeed been made on time. In response, Mr. Representative requested written verification of the payments.

15. On or around January 2011, Plaintiff faxed to WELLS FARGO HOME MORTGAGE, INC correspondence and copies of Plaintiff' bank confirmations showing the debits for the various payments that had been paid to Wells Fargo Home Mortgage, Inc..

16. In response, Mr. Representative contacted Plaintiff and stated that the bank confirmations were insufficient proof of payment and requested further verification. Plaintiff again faxed to Mr. Representative on or around late more transaction records showing the payments made all paid to WELLS FARGO HOME MORTGAGE, INC.

17. On or about June 2011, Plaintiff were contacted by a gentleman who identified himself as a representative of WELLS FARGO HOME MORTGAGE, INC named who was calling on behalf of Mr. Representative told Plaintiff that WELLS FARGO HOME MORTGAGE, INC had not been successful in locating Plaintiff's Payments, but that WELLS FARGO HOME MORTGAGE, INC was placing a waiver some payments as a show of good faith. He then stated he expected WELLS FARGO HOME MORTGAGE, INC to locate the payments soon.

18. Plaintiff made several telephone calls on a regular basis to check on the status of the payments. After a couple of months of receiving no correspondence, Plaintiff spoke with "e" of WELLS FARGO HOME MORTGAGE, INC. advised Plaintiff that their account was current and that a Notice of default was filed on the property. She then further advised that Plaintiff should be receiving a new accounting summary within the next few days.

19.     Months passed, when Plaintiff had not received the new accounting, Plaintiff contacted WELLS FARGO HOME MORTGAGE, INC inquiring about it.  Plaintiff spoke with "" another WELLS FARGO HOME MORTGAGE, INC representative.  stated that he knew nothing about the Payments, or a new accounting or any arrangements to waive any payments. He further stated that if WELLS FARGO HOME MORTGAGE, INC did not receive payment within the next 24 hours, WELLS FARGO HOME MORTGAGE, INC would foreclose on the Subject Property.  Plaintiff then made several calls to Mr. Representative to confirm the waivers but none of them returned Plaintiff' calls.  Plaintiff also called WELLS FARGO HOME MORTGAGE, INC's Vice President of Customer Service, , but she did not return Plaintiff' call either.

20.     Subsequently, in Mid 2011, Plaintiff received notice that a Notice of Default and Election to Sell Deed of Trust ("Notice") had been recorded on the Subject Property back in December of 2010.  The Notice was executed on December 01, 2010, and recorded on December 21, 2010.  However, Plaintiff was not familiar with the entities set forth therein. Specifically, the Notice stated that the Deed of Trust executed by Plaintiff "was to secure obligations in favor of Wells Fargo Home Mortgage, Inc., as Beneficiary. The Notice did not include a declaration pursuant to Civil Code Section 2923.5.  A true, correct and accurate copy of the Notice is required under the civil code 2923.5(a),2923.55(a).

21.     The Notice was wrongfully recorded by WELLS FARGO HOME MORTGAGE, INC. as Plaintiff were not in default with their payment obligations as they made (and provided proof of payments).  Moreover, the Notice was wrongful and improper because WELLS FARGO HOME MORTGAGE, INC..

22.     Prior to their receipt of the Notice, Plaintiff did not receive any telephone calls or written correspondence from WELLS FARGO HOME MORTGAGE, INC.

23.     In or about mid-late April 2011, Plaintiff received her first unrecorded Notice of Trustee's Sale in the mail and promptly gave it to Mr. Representative.  There was no signed declaration attached to the Notice of Trustee's Sale pursuant to Section 2923.5 by in which he testifies that he sent a letter to Plaintiff, attempted to contact Plaintiff by telephone at least 3 times and sent a certified letter notifying Plaintiff of the default.  The facts set forth in the declaration were not true.  Prior to receiving the Notice of Default, Plaintiff received no communication or contact, in writing or telephonically, from WELLS FARGO HOME MORTGAGE, INC.

24.     Based upon information and belief, on or about October 26, 2001, notwithstanding of the fact that, Northwest Trustee Services, Inc., it was not the trustee under the Deed of Trust. Northwest Trustee Services, Inc. moving forward with the public auction which will resulted in US Bank being granted and conveyed the Subject Property by Northwest Trustee Services, Inc., allegedly acting as the duly appointed Trustee under the Deed of Trust.

25.     Based upon information and belief, the first recorded Trustee's Sale was also invalid because it took place without anyone ever presenting the original note, or original and valid assignments of the note, to WELLS FARGO HOME MORTGAGE, INC.  The failure to do so resulted in invalid foreclosure proceedings.

26.     Based upon information and belief, at no time did WELLS FARGO HOME MORTGAGE, INC. know, in fact, who the actual Investor of the Deed of Trust was.  Further, Plaintiff are informed and belief that the beneficiary of the Deed of Trust NEVER provided a declaration to Northwest Trustee Services, Inc.. stating that Plaintiff were in default under the terms of the Deed of Trust and, accordingly, the recording of the Notice of Default and any subsequent documents relating to a non-judicial foreclosure were recorded in violation of California Civil Code section 2924(a)(1)(C).

Exhibit 10, Page 6 of 20

**FIRST CAUSE OF ACTION FOR**

**NEGLIGENCE**

**(AGAINST THE FORECLOSING DEFENDANTS)**

27.     Plaintiff incorporate herein by reference the allegations made in paragraphs 1 through 26, inclusive, as though fully set forth herein.

28.     At all times relevant herein, the Foreclosing Defendants, acting as Plaintiff' lender and loan servicer, had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and to discharge and fulfill the other incidents attendant to the maintenance, accounting and servicing of loan records, including, but not limited, accurate crediting of payments made by Plaintiff.

29.     In taking the actions alleged above, and in failing to take the actions as alleged above, the Foreclosing Defendants breached their duty of care and skill to Plaintiff in the servicing of Plaintiff' loan by, among other things, failing to properly and accurately credit payments made by Plaintiff toward the loan, preparing and filing false documents, and foreclosing on the Subject Property without having the legal authority and/or proper documentation to do so.

30.     As a direct and proximate result of the negligence and carelessness of the Foreclosing Defendants as set forth above, Plaintiff suffered general and special damages in an amount to be determined at trial.

Exhibit 10, Page 7 of 20

## SECOND CAUSE OF ACTION FOR

## FRAUD

## (AGAINST THE FORECLOSING DEFENDANTS)

31.    Plaintiff incorporate herein by reference the allegations made in paragraphs 1 through 30, inclusive, as though fully set forth herein.

32.    The Foreclosing Defendants engaged in a pattern and practice of defrauding Plaintiff in that, during the life of the mortgage loan, the Foreclosing Defendants failed to properly credit payments made and foreclosed on the Subject Property based on Plaintiff' alleged non-payment which they knew to be false.

33.    The Foreclosing Defendants had actual knowledge that the Plaintiff' account was not accurate but that the Foreclosing Defendants could use the inaccuracy to foreclose on the Subject Property which had substantial equity, to recover its excessive fees, charges and interest. Plaintiff made such payments and provided proof of the payments based on the improper, inaccurate, and fraudulent representations as to their account.  The Foreclosing Defendants also utilized amounts known to the Defendants to be inaccurate to determine the amount allegedly due and owing for purposes of foreclosure.

34.    Additionally, the Foreclosing Defendants concealed material facts known to them but not to Plaintiff regarding payments, notices, assignments, transfers, late fees and charges with the intent to defraud Plaintiff.

35.    The Foreclosing Defendants made the above-referenced false representations, concealments and non-disclosures with knowledge of the misrepresentations, intending to induce Plaintiff' reliance, which the unsuspecting Plaintiff justifiably relied upon, resulting in damage to their credit standing, costs and loss of their property.  Plaintiff were unaware of the true facts. Had Plaintiff known the true facts, Plaintiff, among other things, would not have

Exhibit 10, Page 8 of 20

1  maintained the Foreclosing Defendants as their lender, servicer and trustee (and their alleged

2  agents) and/or would have taken legal action immediately to save their house.

3      36.    As a result of the Foreclosing Defendants' fraudulent conduct, Plaintiff have

4  suffered compensatory, general and special damages in an amount to proof. Additionally, the

5  Foreclosing Defendants acted with malice, fraud and/or oppression and, thus, Plaintiff are

6  entitled to an award of punitive damages.

7
8                           **THIRD CAUSE OF ACTION**

9                          **TO SET ASIDE TRUSTEE'S SALE**

10                    **(AGAINST THE FORECLOSING DEFENDANTS)**

11     37.    Plaintiff incorporate herein by reference the allegations made in paragraphs 1

12  through 36, inclusive, as though fully set forth herein.

13     38.    The Foreclosing Defendants never had the legal authority to foreclose, i.e., the

14  authority to exercise the power of sale as an assignee of the Note and Deed of Trust, because the

15  Foreclosing Defendants' interest was never acknowledged and recorded in violation of Civil

16
17  Code § 2932.5, resulting in the non-judicial foreclosure sale being void ab initio.

18     39.    Moreover, the Foreclosing Defendants never had the legal authority to foreclose

19  because the instrument (Deed of Trust), which permitted foreclosure if the borrower was in

20  default, is void as it was improperly assigned and/or transferred to the Foreclosing Defendants

21  from the original Investor. The Plaintiff was in review for a loan modification during the

22  recordings of the Trustee sales thus far, which is a violation of civil codes 2923.5, 2923.55,

23  2923.6, 2924.11, 2924.18- "Dual Tracking". Therefore, the Deed of Trust could not provide a

24  basis for a foreclosure, and the non-judicial foreclosure is void ab initio.

25
26     40.    Accordingly, Plaintiff hereby request an order of this Court that the Trustee's

27
28

Sale was irregular in that it was legally void and conducted without any right or privilege by the Foreclosing Defendants.

## FOURTH CAUSE OF ACTION

## WRONGFUL FORECLOSURE

## (AGAINST THE FORECLOSING DEFENDANTS)

41.    Plaintiff incorporate herein by reference the allegations made in paragraphs 1 through 40, inclusive, as though fully set forth herein.

42.    Plaintiff are informed and believe and thereon allege that after the origination and funding of their loan, it was sold to investors as a "mortgage backed security" and that none of the Foreclosing Defendants in this action owned this loan, or the corresponding note.  Moreover, none of the Foreclosing Defendants in this action were lawfully appointed as trustee or had the original note assigned to them.  Accordingly, none of the Foreclosing Defendants in this action had the right to declare default, cause notices of default to be issued or recorded, or foreclose on Plaintiff' interest in the Subject Property.  The Foreclosing Defendant  US BANK, N.A., AS SUCCESSOR TRUSTEE TO WACHOVIA BANK, N.A, as trustee for MSSTR 2004-1 was not the note holder or a beneficiary at any time with regard to Plaintiff' loan.

43.    Plaintiff further allege on information and belief that none of the Foreclosing Defendants in this action are beneficiaries or representatives of the beneficiary and, if the Foreclosing Defendants allege otherwise, they do not have the original note to prove that they are in fact the party authorized to conduct the foreclosure.

44.    Plaintiff' further allege on information and belief that the loan was sold or transferred without notifying the Plaintiff in writing.  Therefore, the loan is void of legal rights to enforce it.

Exhibit 10, Page 10 of 20

45.     Additionally, The Foreclosing Defendants violated California Civil Code §2923.5(a), which requires a "mortgagee, beneficiary or authorized agent" to "contact the borrower or person by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. "Section 2923.5(b) requires a default notice to include a declaration "from the mortgagee, beneficiary, or authorized agent" of compliance with section 2923.5, including attempt "with due diligence to contact the borrower as required by this section."

46.     None of the Foreclosing Defendants contacted Plaintiff to discuss their financial situation.  Moreover, none of the Foreclosing Defendants explored options with Plaintiff to avoid foreclosure.  Additionally, none of the Foreclosing Defendants informed Plaintiff of the right to have a meeting within 14 days of said contact.  Accordingly, the Foreclosing Defendants did not fulfill their legal obligation to Plaintiff.

47.     Thus, the Foreclosing Defendants engaged in a fraudulent foreclosure of the Subject Property in that the Foreclosing Defendants did not have the legal authority to foreclose on the Subject Property and, alternatively, if they had the legal authority, they failed to comply with Civil Code Section 2923.5 and 2923.6.

48.     As a result of the above alleged wrongs, Plaintiff have suffered general and special damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION FOR

## BREACH OF CONTRACT

## (AGAINST THE FORECLOSING DEFENDANTS)

49.     Plaintiff incorporate herein by reference the allegations made in paragraphs 1 through 48, inclusive, as though fully set forth herein.

Exhibit 10, Page 11 of 20

50.     Plaintiff' original loan agreement set forth dates by which monthly principal and interest payments were due, and when late fees and other charges could be assessed.

51.     Alternatively, if the original note and deed of trust were properly assigned to Defendants, Defendants breached the note and deed of trust that Plaintiff signed in October 2001. The terms of the note required payments made by Plaintiff to be applied properly to the note.

52.     The Foreclosing Defendants breached the note and deed of trust by failing to apply the payments made by Plaintiff, to Plaintiff' loan, the result of which led to the Foreclosing Defendants eventually foreclosing on the Subject Property.

53.     As a proximate result of Defendants' breaches, Plaintiff have suffered compensatory damages in an amount to be proven at trial.


**SIXTH CAUSE OF ACTION FOR**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(AGAINST THE FORECLOSING DEFENDANTS)**

54.     Plaintiff incorporate herein by reference the allegations made in paragraphs 1 through 53, inclusive, as though fully set forth herein.

55.     Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. This implied covenant of good faith and fair dealing requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement. The covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to accomplish its purpose. This covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

Exhibit 10, Page 12 of 20

56.    Alternatively, if the note and deed of trust was validly and properly assigned to the Foreclosing Defendants, the Foreclosing Defendants did not act in good faith and did not deal fairly with Plaintiff in connection with the note and deed of trust when they refused to properly apply the payments to their loan and thereafter foreclosed on the Subject Property even though Plaintiff provided proof of payments for the allegedly skipped months and thereafter refused to resolve the mistake with Plaintiff in an equitable fashion.

57.    The Foreclosing Defendants enjoyed substantial discretionary power affecting the rights of Plaintiff during the events alleged in this Complaint. They were required to exercise such power in good faith.

58.    The Foreclosing Defendants engaged in such conduct to drive Plaintiff into foreclosure so that they could acquire the Subject Property with its large equity at a bargain basement price. These actions were a bad faith breach of the contract between Plaintiff and the Foreclosing Defendants which show that they had no intention of performing the contract, consisting of the original note and deed of trust, in good faith.

59.    As a result of the Foreclosing Defendants' breaches of this covenant, Plaintiff have suffered general and special damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION FOR**

**UNJUST ENRICHMENT**

**(AGAINST THE FORECLOSING DEFENDANTS)**

60.    Plaintiff incorporate herein by reference the allegations made in paragraphs 1 through 59, inclusive, as though fully set forth herein.

61.    By their wrongful acts and omissions, the Foreclosing Defendants have been unjustly enriched at the expense of Plaintiff, and thus Plaintiff have been unjustly deprived.

Exhibit 10, Page 13 of 20

62.     By reason of the foregoing, Plaintiff seek restitution from the Foreclosing Defendants, and an order of this Court disgorging all profits, benefits, and other compensation obtained by the Foreclosing Defendants from their wrongful conduct.

## EIGHTH CAUSE OF ACTION FOR

## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTIONS

## 17200 ET SEQ.

## (AGAINST THE FORECLOSING DEFENDANTS)

63.     Plaintiff incorporate herein by reference the allegations made in paragraphs 1 through 62, inclusive, as though fully set forth herein.

64.     California Business & Professions Code Section 17200, et seq., prohibits acts of unfair competition, which means and includes any "fraudulent business act or practice . . ." and conduct which is "likely to deceive" and is "fraudulent" within the meaning of Section 17200.

65.     As more fully described above, the Foreclosing Defendants' acts and practices are likely to deceive, constituting a fraudulent business act or practice.  This conduct is ongoing and continues to this date.

66.     Specifically, the Foreclosing Defendants engage in deceptive business practices with respect to mortgage loan servicing, assignments of notes and deeds of trust, foreclosure of residential properties and related matters by

(a)  Assessing improper or excessive late fees;

(b)  Improperly characterizing customers' accounts as being in default or delinquent status to generate unwarranted fees;

(c)  Instituting improper or premature foreclosure proceedings to generate unwarranted fees;

(d)  Misapplying or failing to apply customer payments;

Exhibit 10, Page 14 of 20

(e) Failing to provide adequate monthly statement information to customers regarding the status of their accounts, payments owed, and/or basis for fees assessed;

(f) Seeking to collect, and collecting, various improper fees, costs and charges, that are either not legally due under the mortgage contract or California law, or that are in excess of amounts legally due;

(g) Mishandling borrowers' mortgage payments and failing to timely or properly credit payments received, resulting in late charges, delinquencies or default;

(h) Treating borrowers as in default on their loans even though the borrowers have tendered timely and sufficient payments or have otherwise complied with mortgage requirements or California law;

(i) Failing to disclose the fees, costs and charges allowable under the mortgage contract;

(j) Ignoring grace periods;

(k) Executing and recording false and misleading documents; and

(l) Acting as beneficiaries and trustees without the legal authority to do so.

67. The Foreclosing Defendants fail to act in good faith as they take fees for services but do not render them competently and in compliance with applicable law.

68. Moreover, the Foreclosing Defendants engage in a uniform pattern and practice of unfair and overly-aggressive servicing that result in the assessment of unwarranted and unfair fees against California consumers, and premature default often resulting in unfair and illegal foreclosure proceedings. The scheme implemented by the Foreclosing Defendants is designed to defraud California consumers and enrich the Foreclosing Defendants.

69. The foregoing acts and practices have caused substantial harm to California consumers.

Exhibit 10, Page 15 of 20

70. As a direct and proximate cause of the unlawful, unfair and fraudulent acts and practices of the Foreclosing Defendants, Plaintiff and California consumers have suffered and will continue to suffer damages in the form of unfair and unwarranted late fees and other improper fees and charges.

71. By reason of the foregoing, the Foreclosing Defendants have been unjustly enriched and should be required to disgorge their illicit profits and/or make restitution to Plaintiff and other California consumers who have been harmed, and/or be enjoined from continuing in such practices pursuant to California Business & Professions Code Sections 17203 and 17204. Additionally, Plaintiff are therefore entitled to injunctive relief and attorney's fees as available under California Business and Professions Code Sec. 17200 and related sections.

**NINETH CAUSE OF ACTION FOR**

**QUIET TITLE**

**(AS TO DEFENDANTS US BANK; ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFF' TITLE, OR ANY CLOUD ON PLAINTIFF' TITLE THERETO; AND DOES 1 THROUGH 20)**

72. Plaintiff incorporate herein by reference the allegations made in paragraphs 1 through 71, inclusive, as though fully set forth herein.

73. Plaintiff are the equitable owners of the Subject Property which has the following legal description:

74. Plaintiff seek to quiet title against the claims of Defendants US Bank ; ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT

Exhibit 10, Page 16 of 20

ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD ON PLAINTIFF'S TITLE THERETO; and DOES 1 through 20 (collectively referred to herein as the "Title Defendants") as the Title Defendants hold themselves out as entitled to fee simple ownership of the Subject Property by and through their purchase of the property at the trustee's sale. In fact, the Title Defendants had no right to title or interest in the Subject Property and no right to entertain any rights of ownership including the right to foreclosure, offering the Subject Property for sale at a trustee's sale, demanding possession or filing cases for unlawful detainer. Nevertheless, the Title Defendants will proceeded with a non-judicial foreclosure sale, through NORTHWEST TRUSTEE SERVICES, INC. as alleged trustee, illegally and with unclean hands.

75. In October 2001, Plaintiff executed the Deed of Trust which listed the trustee as FIDELITY NATIONAL TITLE INSURANCE COMPANY. Later, NORTHWEST TRUSTEE SERVICES, INC. foreclosed on the Subject Property. At the time that WELLS FARGO HOME MORTGAGE, INC. signed the Notice of Default, NORTHWEST TRUSTEE SERVICES, INC. had not been substituted as the trustee in place of FIDELITY NATIONAL TITLE INSURANCE COMPANY. As the Notice of Default must be signed by the trustee, either original or substituted, and the beneficiary or trustee, either original or substituted, must comply with California Civil Code Section 2923.5, the trustee's sale is void because NORTHWEST TRUSTEE SERVICES, INC was not the trustee at the time that it signed the Notice of Default and allegedly complied with Section 2923.5. Thus, the trustee and beneficiary failed to follow the statutory rules for a valid foreclosure under the California Civil Code and it is, therefore, void.

76. Additionally, the trustee's sale is void because the requirements of Civil Code Section 2923.5 were not complied with by WELLS FARGO HOME MORTGAGE, INC. or any of the Foreclosing Defendants.

77.     Plaintiff seek to quiet title as of October 2001.  Plaintiff seeks a judicial declaration that the title to the Subject Property is vested in Plaintiff alone and that the Title Defendants and each of them be declared to have no interest estate, right, title or interest in the subject property and that the Title Defendants, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in the Subject Property subject to Plaintiff' rights.

### TENTH CAUSE OF ACTION FOR

### SLANDER OF TITLE

### (AGAINST THE FORECLOSING DEFENDANTS)

78.     Plaintiff incorporate herein by reference the allegations made in paragraphs 1 through 77, inclusive, as though fully set forth herein.

79.     Pursuant to, among others, California Civil Code section 2924(a)(1)(C), only the beneficiary of a Deed of Trust or a beneficiary's assignee or the agent of a beneficiary or its assignee may cause to be recorded against real property either a Notice of Default or a Notice of Trustee's Sale.

80.     NORTHWEST TRUSTEE SERVICES, INC., purportedly but falsely acting as either the trustee or the agent of the beneficiary of the Deed of Trust or the agent of US BANK, N.A., AS SUCCESSOR TRUSTEE TO WACHOVIA BANK, N.A, as trustee for MSSTR 2004-1, wrongfully and without privilege, caused a Notice of Default to be recorded against the Subject Property.

81.     Later, NORTHWEST TRUSTEE SERVICES, INC., again purportedly but falsely acting as either the trustee or the agent of the beneficiary of the Deed of Trust or the agent of US BANK, N.A., AS SUCCESSOR TRUSTEE TO WACHOVIA BANK, N.A, as trustee for MSSTR 2004-1, wrongfully and without privilege, caused a Notice of Trustee's Sale aswell as a Notice of Default to be recorded against the Subject Property.

Exhibit 10, Page 18 of 20

82.     Finally, WELLS FARGO HOME MORTGAGE, INC., again purportedly but falsely acting as either the trustee or the agent of the beneficiary of the Deed of Trust or the agent of US BANK, N.A., AS SUCCESSOR TRUSTEE TO WACHOVIA BANK, N.A, as trustee for MSSTR 2004-1, wrongfully and without privilege, caused a Trustee's Deed Upon Sale to be recorded against the Subject Property.

83.     None of the Foreclosing Defendants, whether jointly or severally, were ever a trustee, beneficiary or assignee of any beneficiary of any Deed of Trust recorded against the Subject Property.  Accordingly, they wrongfully caused the recording of the Notice of Default and Notice of Trustee's Sale gainst the Subject Property.

84.     US BANK, N.A., AS SUCCESSOR TRUSTEE TO WACHOVIA BANK, N.A, as trustee for MSSTR 2004-1, wrongfully and without privilege, has published matters or caused matters to be published that they are the current owners of the Subject Property which is untrue and disparaging to Plaintiff' interest in the Subject Property.

85.     By doing the acts described above, the Foreclosing Defendants have slandered Plaintiff' title to the Subject Property.

86.     In that the conduct and acts of the Foreclosing Defendants violated, among others, California Civil Code section 2924(a)(1)(C), such conduct and acts were not privileged.

87.     The conduct of the Foreclosing Defendants caused Plaintiff to suffer general and special damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff pray for judgment against the Defendants and each of them, jointly and severally, as follows:

1.     For a declaration of the rights and duties of the parties, specifically that the foreclosure of Plaintiff' residence was wrongful.

Exhibit 10, Page 19 of 20

2.      To vacate and set aside the foreclosure sale.

3.      To quiet title in favor of Plaintiff and against Defendants.

4.      For compensatory, special, general and punitive damages according to proof against all Defendants.

5.      Pursuant to Business and Professions Code § 17203, that all Defendants, their successors, agents, representatives, employees, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition in violation of § 17200, including, but not limited to, the violations alleged herein.

6.      For civil penalties pursuant to statute, restitution, injunctive relief and reasonable attorneys fees according to proof.

7.      For reasonable costs of suit and such other and further relief as the Court deems proper.

DATED: _____5/7/14_____

By: _____

Plaintiff, in Pro Per

Exhibit 10, Page 20 of 20

# EXHIBIT 8

```
<DOCUMENT>
<TYPE>424B5
<SEQUENCE>1
<FILENAME>a38459.txt
<DESCRIPTION>UBS MASTR 2004-1
<TEXT>
```

<Page>

PROSPECTUS SUPPLEMENT DATED SEPTEMBER 30, 2004                    [MASTR LOGO]
(TO PROSPECTUS DATED SEPTEMBER 30, 2004)

$724,468,034
(APPROXIMATE)

MASTR SEASONED SECURITIZATION TRUST 2004-1
(ISSUER)

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
(DEPOSITOR)

UBS REAL ESTATE SECURITIES INC.
(TRANSFEROR)

WELLS FARGO BANK, N.A.
(MASTER SERVICER AND TRUST ADMINISTRATOR)

MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2004-1

    The MASTR Seasoned Securitization Trust 2004-1 is issuing four groups of
certificates consisting in the aggregate of twenty-nine classes, but is offering
only twenty-three classes through this prospectus supplement.

    The trust will consist primarily of four pools of closed-end, fixed-rate and
adjustable-rate mortgage loans secured by first mortgages or deeds of trust
on residential one- to four-family properties.

    Credit enhancement for the certificates will be provided by the
subordination of certain classes of certificates in respect of the right to
receive interest and principal.

----------------------------------------------------------------------------

    YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE S-19 OF THIS
PROSPECTUS SUPPLEMENT AND PAGE 17 IN THE PROSPECTUS.

    The certificates will not represent obligations of Mortgage Asset
Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS
Securities LLC or any other person or entity. No governmental agency or
instrumentality or any other person will insure the certificates or the
mortgage loans securing the certificates.

    You should consult with your own advisors to determine if the offered
certificates are appropriate investments for you and to determine the
applicable legal, tax, regulatory and accounting treatment of the offered
certificates.

----------------------------------------------------------------------------

    NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS APPROVED THE OFFERED
CERTIFICATES OR DETERMINED THAT THIS PROSPECTUS SUPPLEMENT OR THE ACCOMPANYING
PROSPECTUS IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A
CRIMINAL OFFENSE.

------------------

    UBS Securities LLC will purchase the offered certificates from Mortgage
Asset Securitization Transactions, Inc. and expects to deliver the offered
certificates (other than the Class A-LR and Class A-UR certificates) in
book-entry form through the facilities of The Depository Trust Company to
purchasers on or about September 30, 2004.

    The proceeds to the depositor from the offered certificates are expected to
be approximately $750,855,932, plus accrued interest and before deducting
expenses, estimated at $794,374. See 'Underwriting' in this prospectus
supplement. The underwriter will sell the offered certificates purchased by it
from time to time in negotiated transactions at varying prices determined at the
time of sale.

[UBS INVESTMENT BANK LOGO]
UNDERWRITER

<Page>

TABLE OF CONTENTS

<TABLE>
<S>                                                                    <C>

SUMMARY..........................................................................7
RISK FACTORS....................................................................19
     Some of the Loans Are Missing Loan Files...................................19
     The Loans Are Seasoned.....................................................19
     Some of the Loans are Delinquent or Have Been Delinquent in the Past.......19
     Offered Certificates May Not Be Appropriate for Individual Investors.......20
     The Yield On The Group 2 Certificates Will Be Affected By The
          Specific Terms That Apply To Such Certificates........................20
     Credit Enhancement May Not Be Adequate....................................21
     Certain Classes of Subordinate Certificates Provide Subordination
          for all of the related Offered Senior Certificates....................21
     Inadequacy of Value of Properties Could Affect Severity of Losses..........22
     There Are Risks Involving Unpredictability of Prepayments and the
          Effect of Prepayments on Yields......................................22
     Bankruptcy of Borrowers May Adversely Affect Distributions on
          Certificates..........................................................23
     Changes to the Weighted Average Net Mortgage Rate on the Loans May
          Reduce the Yield with Respect to the Group 3 and Group 4
          Certificates..........................................................23
     The Transferor May Not Be Able to Repurchase or Replace Defective Loans....24
     There Are Risks in Holding Subordinate Certificates........................24
     Geographic Concentration Could Increase Losses on the Loans................25
     Failure of Master Servicer or Servicers to Perform May Adversely
          Affect Distributions on Certificates; Potential Conflict of Interest....26
     Limited Liquidity May Adversely Affect Market Value of Certificates........26
     Rights of Beneficial Owners May Be Limited by Book-Entry System...........27
     Risks Related to the Residual Certificates.................................27
     Recent Developments May Increase the Risk of Loss on the Loans............28
FORWARD-LOOKING STATEMENTS......................................................29
DEFINED TERMS...................................................................29
DESCRIPTION OF THE LOANS........................................................30
     MASTR Loans................................................................30
     Wells Fargo Loans..........................................................30
     Cendant Loans..............................................................31
     Characteristics of the Loans...............................................31
     Statistical Information....................................................34
THE MASTER SERVICER AND THE SERVICERS...........................................34
     General....................................................................34
     The Master Servicer........................................................35
     The Servicers..............................................................35
     Wells Fargo Bank, N.A......................................................36
     Wells Fargo Bank, N.A. Delinquency Experience..............................36
     ABN AMRO Mortgage Group, Inc...............................................38
DESCRIPTION OF THE OFFERED CERTIFICATES.........................................39
     General....................................................................39
     Book-Entry Certificates....................................................40
     Physical Certificates......................................................43
     Allocation of Available Funds..............................................43
     Interest...................................................................50
     Principal..................................................................51
     Allocation of Losses.......................................................53
     Subordination..............................................................56
     Restrictions on Transfer of the Residual Certificates......................64
     Reports to Certificateholders..............................................65
PREPAYMENT AND YIELD CONSIDERATIONS.............................................67
     General....................................................................67
     Prepayments and Defaults...................................................67
     Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6
          Certificates..........................................................70
     Class 2-A-5 Certificates...................................................71
     The Offered Group 15-B Subordinate Certificates............................71
     The Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates...............72
     The Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates...............73
     Modeling Assumptions.......................................................74
ASSUMED LOAN CHARACTERISTICS....................................................74
     Sensitivity of the Principal Only Certificates.............................77
     Sensitivity of the Interest Only Certificates..............................78
     Weighted Average Lives of the Offered Certificates.........................79
</TABLE>

S-2


<Page>


<TABLE>
<S>                                                                    <C>
     Yield on the Residual Certificates.........................................85
THE POOLING AND SERVICING AGREEMENT.............................................85
     General....................................................................85
     Assignment of the Loans....................................................86
     Collection and Other Servicing Procedures..................................87

```
   Hazard Insurance............................................................88
   Realization Upon Defaulted Loans............................................89
   Servicing and Master Servicing Compensation and Payment of Expenses........89
   Protected Accounts..........................................................90
   Collection Account and Distribution Account.................................90
   Certain Matters Regarding the Master Servicer...............................91
   Events of Servicing Termination.............................................93
   Advances....................................................................95
   Termination.................................................................95
   Voting Rights...............................................................96
   Amendment...................................................................96
   The Trustee.................................................................97
   The Trust Administrator.....................................................97
FEDERAL INCOME TAX CONSEQUENCES................................................98
   General.....................................................................98
   Regular Certificates........................................................98
   Residual Certificates.......................................................99
   Special Tax Considerations Applicable to Residual Certificates.............99
   REMIC Taxes and Reporting..................................................101
STATE TAXES...................................................................102
ERISA CONSIDERATIONS..........................................................102
LEGAL INVESTMENT..............................................................104
USE OF PROCEEDS...............................................................104
UNDERWRITING..................................................................105
RATINGS.......................................................................105
LEGAL MATTERS.................................................................106
GLOSSARY OF TERMS.............................................................107
ANNEX A: MORTGAGE LOAN STATISTICAL INFORMATION..............................A-1
```

</TABLE>

                              S-3


<Page>


                    Important Notice About Information Presented
                    in this Prospectus Supplement and the Prospectus

        Information about the offered certificates is provided in two separate
documents that progressively include more detail:

o     the accompanying prospectus, dated September 30, 2004, provides general
      information, some of which may not apply to the offered certificates; and

o     this prospectus supplement, which describes the specific terms of the
      offered certificates.

        Sales of the offered certificates may not be completed unless you have
received both this prospectus supplement and the accompanying prospectus. Please
read this prospectus supplement and the accompanying prospectus in full.

        If the terms of the offered certificates vary between this prospectus
supplement and the accompanying prospectus, then you should rely on the
information in this prospectus supplement.

        Cross-references in this prospectus supplement and the accompanying
prospectus to captions in these materials are included to assist in locating
further related discussions. The foregoing table of contents and the table of
contents in the accompanying prospectus provide the pages on which these
captions are located.

        All statistical data with respect to the loans are approximate, and
are based on the scheduled principal balances of the loans as of the cut-off
date except where otherwise noted.

                              S-4


<Page>


                    THE SERIES 2004-1 CERTIFICATES

<TABLE>
<CAPTION>
-----------------------------------------------------------------------------------------------------------------------

| Class | Initial Principal Balance or Notional Amount (1) | Initial Pass Through Rate | Principal Types | Interest Types | Initial Rating of Offered Certificates (2) | |
| | | | | | Fitch | S&P |

Offered Certificates

| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
|-----|-----|-----|-----|-----|-----|-----|
| Class 1-A-1 | $137,304,000 | (3) | Senior, Pass-Through | Variable Rate | AAA | AAA |
| Class 2-A-1 | $202,458,499 | 8.0000% | Senior, TAC, Accretion Directed | Fixed Rate | AAA | AAA |
| Class 2-A-2 | $ 50,000,000 | 5.5000% | Senior, TAC, Accretion Directed | Fixed Rate | AAA | AAA |
| Class 2-A-3 | $ 50,000,000 | 5.2500% | Senior, TAC, Accretion Directed | Fixed Rate | AAA | AAA |
| Class 2-A-4 | $127,458,501 | 5.0000% | Senior, TAC, Accretion Directed | Fixed Rate | AAA | AAA |
| Class 2-A-5 | $ 20,927,000 | 6.5000% | Senior, Sequential | Fixed Rate, Accrual | AAA | AAA |
| Class 2-A-6 | $   500,000 | 6.5000% | Senior, TAC, Accretion Directed | Fixed Rate | AAA | AAA |
| Class 3-A-1 | $ 41,159,000 | (4) | Senior, Pass-Through | Variable Rate | AAA | AAA |
| Class 4-A-1 | $ 72,304,000 | (5) | Super Senior, Pass-Through | Variable Rate | AAA | AAA |
| Class 4-A-2 | $ 3,805,000 | (5) | Senior Support, Pass-Through | Variable Rate | AAA | AAA |
| Class A-X | (6) | 6.5000% | Senior, Notional Amount | Fixed Rate | AAA | AAA |
| Class PO | $ 3,989,934 | (7) | Senior, Ratio Strip | Principal Only | AAA | AAA |
| Class A-LR | $      50 | (3) | Senior, Residual | Variable Rate | AAA | AAA |
| Class A-UR | $      50 | (3) | Senior, Residual | Variable Rate | AAA | AAA |
| Class 15-B-1 | $   555,000 | (3) | Subordinate | Variable Rate | NR | AA |
| Class 15-B-2 | $   277,000 | (3) | Subordinate | Variable Rate | NR | A |
| Class 15-B-3 | $   208,000 | (3) | Subordinate | Variable Rate | BBB | BBB |
| Class 30-B-1 | $ 8,873,000 | 6.5000% | Subordinate | Fixed Rate | NR | AA |
| Class 30-B-2 | $   934,000 | 6.5000% | Subordinate | Fixed Rate | NR | A |
| Class 30-B-3 | $   700,000 | 6.5000% | Subordinate | Fixed Rate | NR | BBB |
| Class HY-B-1 | $ 2,351,000 | (8) | Subordinate | Variable Rate | NR | AA |
| Class HY-B-2 | $   483,000 | (8) | Subordinate | Variable Rate | NR | A |
| Class HY-B-3 | $   181,000 | (8) | Subordinate | Variable Rate | NR | BBB |
| Non-Offered | | | | | | |
| Class 15-B-4 | $   139,000 | (3) | Subordinate | Variable Rate | BB | BB |
| Class 15-B-5 | $    69,000 | (3) | Subordinate | Variable Rate | B | B |
| Class 15-B-6 | $   139,634 | (3) | Subordinate | Variable Rate | NR | NR |
| Class C-B-4 | $   588,000 | (9) | Subordinate | Variable Rate | NR | BB |
| Class C-B-5 | $   294,000 | (9) | Subordinate | Variable Rate | NR | B |
| Class C-B-6 | $   587,921 | (9) | Subordinate | Variable Rate | NR | NR |

</TABLE>

----------
(1)  Approximate, subject to adjustment as described in this prospectus
     supplement.

(2)  A description of the ratings of the offered certificates is set forth under
     the heading "Ratings" in this prospectus supplement.

(3)  Interest will accrue on the Class 1-A-1, Class A-LR, Class A-UR, Class
     15-B-1, Class 15-B-2, Class 15-B-3, Class 15-B-4, Class 15-B-5 and Class
     15-B-6 certificates at a per annum rate equal to the excess of (x) the
     weighted average of the mortgage rates on the loans in loan group 1 as of
     the first day of the month immediately prior to the month in which the
     relevant distribution date occurs (after taking into account scheduled
     payments of principal on that date) over (y) the sum of the weighted
     average servicing fee rate and the master servicing fee rate, if
     applicable, as of such date on the loans in loan group 1, subject to
     adjustment for prepayments in full received and distributed prior to that
     distribution date minus 0.01%. The per annum pass-through rate on the Class
     1-A-1, Class A-LR, Class A-UR, Class 15-B-1, Class 15-B-2, Class 15-B-3,
     Class 15-B-4, Class 15-B-5 and Class 15-B-6 certificates for the first

interest accrual period is expected to be approximately 6.2587%.

(4) Interest will accrue on the Class 3-A-1 certificates at a per annum rate equal to the excess of (x) the weighted average of the mortgage rates on the loans in loan group 3 as of the first day of the month immediately prior to the month in which the relevant distribution date occurs (after taking into account scheduled payments of principal on that date) over (y) the sum of the weighted average servicing fee rate

S-5

<Page>

and the master servicing fee rate, if applicable, as of such date on the loans in loan group 3, subject to adjustment for prepayments in full received and distributed prior to that distribution date. The per annum pass-through rate on the Class 3-A-1 certificates for the first interest accrual period is expected to be approximately 4.7047%.

(5) Interest will accrue on the Class 4-A-1 and Class 4-A-2 certificates at a per annum rate equal to the excess of (x) the weighted average of the mortgage rates on the loans in loan group 4 as of the first day of the month immediately prior to the month in which the relevant distribution date occurs (after taking into account scheduled payments of principal on that date) over (y) the sum of the weighted average servicing fee rate and the master servicing fee rate, if applicable, as of such date on the loans in loan group 4, subject to adjustment for prepayments in full received and distributed prior to that distribution date. The per annum pass-through rate on the Class 4-A-1 and Class 4-A-2 certificates for the first interest accrual period is expected to be approximately 5.2613%.

(6) The Class A-X certificates are interest only certificates, will not be entitled to distributions in respect of principal and will bear interest on the Class A-X notional amount (initially approximately $22,101,782) as described under "Description of the Offered Certificates--Interest" in this prospectus supplement.

(7) The Class PO Certificates are principal-only certificates and will not be entitled to distributions in respect of interest.

(8) Interest will accrue on the Class HY-B-1, Class HY-B-2 and Class HY-B-3 certificates at a per annum rate equal to the weighted average of (i) for loan group 3, a per annum rate equal to the excess of (x) the weighted average of the mortgage rates on the loans in loan group 3 as of the first day of the month immediately prior to the month in which the relevant distribution date occurs (after taking into account scheduled payments of principal on that date) over (y) the sum of the weighted average servicing fee rate and the master servicing fee rate, if applicable, as of such date on the loans in loan group 3, subject to adjustment for prepayments in full received and distributed prior to that distribution date, and (ii) for loan group 4, a per annum rate equal to the excess of (x) the weighted average of the mortgage rates on the loans in loan group 4 as of the first day of the month immediately prior to the month in which the relevant distribution date occurs (after taking into account scheduled payments of principal on that date) over (y) the sum of the weighted average servicing fee rate and the master servicing fee rate, if applicable, as of such date on the loans in loan group 4, subject to adjustment for prepayments in full received and distributed prior to that distribution date, weighted in proportion to the results of subtracting from the principal balance of each loan group the principal balance of the related Senior Certificates. The per annum pass-through rate on the Class HY-B-1, Class HY-B-2 and Class HY-B-3 certificates for the first interest accrual period will be approximately 5.0660%.

(9) Interest will accrue on the Class C-B-4, Class C-B-5 and Class C-B-6 certificates at a per annum rate equal to the weighted average of (i) for the Group 2 Portion (as defined under "Glossary" in this prospectus supplement), weighted by 6.5000% per annum and (ii) for the Group 3/4 Portion (as defined under "Glossary" in this prospectus supplement), the weighted average of the rate described in footnote (8) above. The per annum pass-through rate on the Class C-B-4, Class C-B-5 and Class C-B-6 certificates for the first interest accrual period will be approximately 6.2058%.

S-6

<Page>

SUMMARY

This summary highlights selected information from this document and does not
contain all of the information that you need to consider in making an investment
decision. To understand the terms of the offering of the offered certificates,
you should read carefully this entire document and the accompanying prospectus.

Relevant Parties

<TABLE>
<S>                          <C>
Issuer..................      MASTR Seasoned Securitization Trust 2004-1. The
                             trust will be established under a pooling and
                             servicing agreement among Mortgage Asset
                             Securitization Transactions, Inc., as depositor,
                             Wells Fargo Bank, N.A., as master servicer, trust
                             administrator and a custodian, and Wachovia Bank,
                             National Association, as trustee, and U.S. Bank
                             National Association, as a custodian.

Depositor...............      Mortgage Asset Securitization Transactions, Inc., a
                             Delaware corporation. The depositor's address is
                             1285 Avenue of the Americas, New York, New York
                             10019, telephone number (212) 713-2000. See "The
                             Depositor" in the accompanying prospectus.

Master Servicer.........      Wells Fargo Bank, N.A., a national banking
                             association. The master servicer maintains an office
                             at 9062 Old Annapolis Road, Columbia, Maryland
                             21045. See "The Master Servicer and the
                             Servicers--The Master Servicer" in this prospectus
                             supplement.

                             Pursuant to the pooling and servicing agreement, the
                             master servicer will be required to monitor the
                             performance of the servicers. See "The Pooling and
                             Servicing Agreement" in this prospectus supplement.

Servicers...............      ABN AMRO Mortgage Group, Inc., Bank of America, N.A,
                             Cendant Mortgage Corporation, Chase Manhattan
                             Mortgage Corporation, CitiMortgage, Inc., Colonial
                             Savings, F.A., Countrywide Home Loans, Inc.,
                             Everhome Mortgage Company (formerly known as
                             Alliance Mortgage Company), GMAC Mortgage
                             Corporation, Hibernia National Bank, HSBC Mortgage
                             Corporation, (USA), The Huntington Mortgage Company,
                             National City Mortgage Co., SunTrust Mortgage, Inc.,
                             US Bank Home Mortgage, Washington Mutual Bank, F.A.
                             and Wells Fargo Bank, N.A., will initially be the
                             primary servicers of the loans. See "The Master
                             Servicer and the Servicers--The Servicers" in this
                             prospectus supplement.
</TABLE>

S-7


<Page>


<TABLE>
<S>                          <C>
                             Pursuant to each of the servicing agreements, each
                             servicer will be required to:

                                  perform customary servicing functions with
                                  respect to the loans;

                                  provide certain reports to the master servicer;
                                  and

                                  make certain advances.

Transferor .............      UBS Real Estate Securities Inc. The transferor's
                             address is 1285 Avenue of the Americas, New York,
                             New York 10019, telephone number (212) 713-2000.

Trust Administrator......      Wells Fargo Bank, N.A. See "The Pooling and
                             Servicing Agreement--The Trust Administrator" in
                             this prospectus supplement.

Trustee.................      Wachovia Bank, National Association, a national
                             banking association. The trustee's address is 401
                             South Tryon Street, Charlotte, North Carolina,
                             28288. See "The Pooling and Servicing Agreement--The
                             Trustee" in this prospectus supplement.

| | |
|---|---|
| Custodian................ | Wells Fargo Bank, N.A. and U.S. Bank National Association. |

Relevant Dates

| | |
|---|---|
| Cut-off Date............. | September 1, 2004. |
| Closing Date............. | On or about September 30, 2004. |
| Distribution Date........ | With respect to the certificates and any month, the 25th day of that month or, if that day is not a business day, the next business day, beginning in October 2004. |
| Servicer Remittance Date..................... | For each servicer the 18th day of each month (or, if the 18th day is not a business day, either the immediately preceding business day or the immediately following business day, as the case may be). |
| Interest Accrual Period................... | For each class of certificates entitled to interest, the calendar month immediately prior to the month in which the relevant distribution date occurs. |
| Offered Certificates..... | We are offering the classes of certificates listed in the table beginning on page S-5 under the heading "Offered Certificates" in this prospectus supplement. The Class 15- |

</TABLE>

S-8

<Page>

<TABLE>
<S>                        <C>
B-4, Class 15-B-5, Class 15-B-6, Class C-B-4, Class C-B-5 and Class C-B-6 certificates are not being offered through this prospectus supplement and the accompanying prospectus.

| | |
|---|---|
| Interest Distributions... | The offered certificates, other than the Class PO certificates will bear interest at the rates per annum set forth or described in the table beginning on page S-5 of this prospectus supplement. |

The actual amount of interest you receive on your certificates on each distribution date will depend on:

- o   the amount of interest accrued on your certificates;

- o   the total amount of funds available for distribution; and

- o   the amount of any accrued interest not paid on your certificates on earlier distribution dates.

Interest on the certificates accrues on the basis of a 360-day year consisting of twelve 30-day months.

On any distribution date, the Class 2-A-5 certificates will not receive interest distributions unless the aggregate principal balance of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 certificates has been reduced in accordance with the table entitled "Targeted Aggregate Principal Balance" in this prospectus supplement. On any distribution date, if such event has not occurred, the amount of interest that would otherwise be distributable on the Class 2-A-5 certificates will be added to the principal balance of the Class 2-A-5 certificates and will be distributed as principal as specified under "Description of the Offered Certificates--Principal" in this prospectus supplement. The Class PO certificates are principal only certificates and will not be entitled to distributions in respect of interest.

See "Description of the Offered Certificates" in

this prospectus supplement.

| | |
|---|---|
| Principal Distributions............ | On each distribution date, one or more classes of the offered certificates will be entitled to distributions of principal. The Class A-X certificates are interest only certificates and are not entitled to distributions of principal. See "Description of the Offered Certificates--Principal" in this prospectus supplement for a detailed discussion of the amount and timing of principal distributions. |

S-9

<Page>

| | |
|---|---|
| Related Loan Groups...... | The certificates with a "1" prefix and the Class A-LR and Class A-UR certificates are designated as certificate group 1 and correspond to loan group 1. The certificates with a "2" prefix are designated as certificate group 2 and correspond to loan group 2. The certificates with a "3" prefix are designated as certificate group 3 and correspond to loan group 3. The certificates with a "4" prefix are designated as certificate group 4 and correspond to loan group 4. The certificates with a "15-B" prefix are designated as the group 15-B subordinate certificates and correspond to loan group 1. The Class A-X Certificates correspond to loan group 1 and loan group 2. The Class PO, Class 30-B-1, Class 30-B-2 and Class 30-B-3 certificates correspond to loan group 2. The Class HY-B-1, Class HY-B-2 and Class HY-B-3 certificates correspond to loan group 3 and loan group 4. The Class C-B-4, Class C-B-5 and Class C-B-6 certificates correspond to loan group 2, loan group 3 and loan group 4. The certificates generally receive principal and interest collected from the mortgage loans in the corresponding loan group. |
| Mortgage Loans........... | The trust will be comprised of fixed-rate and adjustable-rate closed-end loans secured by first priority mortgages or deeds of trust on residential one- to four-family properties. All of the loans included in the trust have been previously included in mortgage loan pools of earlier securitizations. Approximately 88.90% of the loans (the "Transferor Clean-Up Call Loans") were acquired by the Transferor from its respective securitization through the exercise of a "clean-up call" right. Approximately 23.19% of the Transferor Clean-up Call Loans were acquired by the Transferor through the exercise of "clean-up calls" of earlier securitizations of Mortgage Asset Securitization Transactions, Inc. Approximately 59.06% of the Transferor Clean-up Call Loans were acquired by the Transferor through the exercise of "clean-up calls" of earlier securitizations of Wells Fargo Asset Securities Corporation, formerly known as Norwest Asset Securities Corporation or Norwest Integrated Structured Assets, Inc., as the case may be. Approximately 6.65% of the Transferor Clean-up Call Loans were acquired by the Transferor through the exercise of "clean-up calls" of earlier securitizations of Cendant Mortgage Corporation, formerly known as PHH Mortgage Services Corporation. Approximately 11.10% of the loans were acquired by the Transferor from ABN AMRO Mortgage Group, Inc. pursuant to a sale and servicing agreement. |
| | The loans will be divided into four loan groups. |

S-10

<Page>

```
<TABLE>
<S>                       <C>
                          All of the loans constituting loan group 1 are
                          fixed-rate mortgage loans and have original terms to
                          maturity of approximately 15 years. All of the loans
                          constituting loan group 2 are fixed-rate mortgage
                          loans and have original terms to maturity of
                          approximately 30 years. All of the loans
                          constituting loan group 3 are adjustable-rate
                          mortgage loans and have original terms to maturity
                          of approximately 30 years. All of the loans
                          constituting loan group 4 are adjustable-rate
                          mortgage loans and have original terms to maturity
                          of approximately 30 years.

                          The loans are expected to have the following
                          approximate characteristics based on the scheduled
                          principal balances of the loans as of the cut-off
                          date:
</TABLE>

GROUP 1 LOANS

<TABLE>
<S>                                                    <C>
Number of Loans:.......................................          352
Aggregate Scheduled Principal Balance:.................   $138,691,735
Range of Scheduled Principal Balances:.................  $32,188 to $908,031
Average Scheduled Principal Balance:...................      $394,011
Range of Mortgage Interest Rates:......................  5.750% to 8.500%
Weighted Average Mortgage Interest Rate:...............        6.518%
Range of Remaining Scheduled Terms to Maturity:........  57 months to 154 months
Weighted Average Remaining Scheduled Term to Maturity:...     146 months
Range of Original Loan-to-Value Ratios:................  11.60% to 95.00%
Weighted Average Original Loan-to-Value Ratio:.........       61.00%
Geographic Concentration of Mortgaged Properties Securing
   Loans in Excess of 5% of the Aggregate Scheduled
      Principal Balance:...............................  California    17.70%
                                                         New York      16.35%
                                                         Texas         13.26%
                                                         Florida       12.51%
</TABLE>


                                     S-11




<Page>


GROUP 2 LOANS

<TABLE>
<S>                                                    <C>
Number of Loans:.......................................        1,113
Aggregate Scheduled Principal Balance:.................   $467,009,328
Range of Scheduled Principal Balance:..................  $136,483 to $1,003,620
Average Scheduled Principal Balance:...................      $419,595
Range of Mortgage Interest Rates:......................  5.375% to 8.875%
Weighted Average Mortgage Interest Rate:...............        6.995%
Range of Remaining Scheduled Terms to Maturity:........  159 months to 334 months
Weighted Average Remaining Scheduled Term to Maturity:...     317 months
Range of Original Loan-to-Value Ratios:................  7.10% to 95.00%
Weighted Average Original Loan-to-Value Ratio:.........       70.71%
Geographic Concentration of Mortgaged Properties Securing
   Loans in Excess of 5% of the Aggregate Scheduled
      Principal Balance:...............................  California    28.30%
                                                         New York      11.65%
                                                         Texas          8.56%
                                                         New Jersey     7.19%

GROUP 3 LOANS

Number of Loans:.......................................           90
Aggregate Scheduled Principal Balance:.................    $42,322,604
Range of Scheduled Principal Balances:.................  $310,533 to $963,307
Average Scheduled Principal Balance:...................      $470,251
Range of Current Mortgage Interest Rates:..............  4.000% to 6.500%
Weighted Average Current Mortgage Interest Rate:.......        5.074%
Range of Remaining Scheduled Terms to Maturity:........  329 months to 336 months
Weighted Average Remaining Scheduled Term to Maturity:...     334 months
Range of Original Loan-to-Value Ratios:................  21.30% to 95.00%
Weighted Average Original Loan-to-Value Ratio:.........       67.29%
Weighted Average Gross Margin..........................        2.293%
Weighted Average Maximum Mortgage Interest Rate........       11.074%
Weighted Average Minimum Mortgage Interest Rate........        2.293%
```

```
Weighted Average Initial Periodic Rate Cap..............          2.000%
Weighted Average Periodic Rate Cap......................          2.000%
Weighted Average Months Until Next Adjustment Date......       10 months
Geographic Concentration of Mortgaged Properties Securing
   Loans in Excess of 5% of the Aggregate Scheduled
      Principal Balance:...................................   California    42.20%
                                                             Texas          9.48%
                                                             Massachusetts  6.99%
                                                             Georgia        5.13%

</TABLE>
```

<div align="center">S-12</div>

<Page>

GROUP 4 LOANS

```
<TABLE>
<S>                                                          <C>
Number of Loans:........................................              169
Aggregate Scheduled Principal Balance:..................      $78,261,924
Range of Scheduled Principal Balances:..................  $49,091 to $1,457,513
Average Scheduled Principal Balance:....................         $463,088
Range of Current Mortgage Interest Rates:...............   4.125% to 7.500%
Weighted Average Current Mortgage Interest Rate:........           5.601%
Range of Remaining Scheduled Terms to Maturity:.........  320 months to 336 months
Weighted Average Remaining Scheduled Term to Maturity:..        333 months
Range of Original Loan-to-Value Ratios:.................  23.30% to 92.30%
Weighted Average Original Loan-to-Value Ratio:..........           70.17%
Weighted Average Gross Margin...........................            2.368%
Weighted Average Maximum Mortgage Interest Rate.........           10.616%
Weighted Average Minimum Mortgage Interest Rate.........            2.368%
Weighted Average Initial Periodic Rate Cap..............            4.985%
Weighted Average Periodic Rate Cap......................            2.000%
Weighted Average Months Until Next Adjustment Date......        34 months
Geographic Concentration of Mortgaged Properties Securing
   Loans in Excess of 5% of the Aggregate Scheduled
      Principal Balance:...................................   California    36.20%
                                                             New Jersey     8.55%
                                                             Texas          8.15%
                                                             Connecticut    6.42%
                                                             New York       5.05%
```

GROUP 1 AND GROUP 2 LOANS

```
Number of Loans:........................................            1,465
Aggregate Scheduled Principal Balance:..................     $605,701,062
Range of Scheduled Principal Balances:..................  $32,188 to $1,003,620
Average Scheduled Principal Balance:....................         $413,448
Range of Mortgage Interest Rates:.......................   5.375% to 8.875%
Weighted Average Mortgage Interest Rate:................            6.886%
Range of Remaining Scheduled Terms to Maturity:.........  57 months to 334 months
Weighted Average Remaining Scheduled Term to Maturity:..        278 months
Range of Original Loan-to-Value Ratios:.................   7.10% to 95.00%
Weighted Average Original Loan-to-Value Ratio:..........           68.49%
Geographic Concentration of Mortgaged Properties Securing
   Loans in Excess of 5% of the Aggregate Scheduled
      Principal Balance:...................................   California    25.87%
                                                             New York      12.73%
                                                             Texas          9.63%
                                                             New Jersey     6.63%
                                                             Florida        6.48%

</TABLE>
```

<div align="center">S-13</div>

<Page>

GROUP 3 AND GROUP 4 LOANS

```
<TABLE>
<S>                                                          <C>
Number of Loans: .......................................              259
Aggregate Scheduled Principal Balance:..................     $120,584,528
Range of Scheduled Principal Balances:..................  $49,091 to $1,457,513
Average Scheduled Principal Balance:....................         $465,577
Range of Mortgage Interest Rates:.......................   4.000% to 7.500%
Weighted Average Mortgage Interest Rate:................            5.416%
```

```
Range of Remaining Scheduled Terms to Maturity:.........   320 months to 336 months
Weighted Average Remaining Scheduled Term to Maturity:...   333 months
Range of Original Loan-to-Value Ratios:..................   21.30% to 95.00%
Weighted Average Original Loan-to-Value Ratio:...........   69.15%
Weighted Average Gross Margin............................   2.341%
Weighted Average Maximum Mortgage Interest Rate..........   10.776%
Weighted Average Minimum Mortgage Interest Rate..........   2.341%
Weighted Average Initial Periodic Rate Cap...............   3.937%
Weighted Average Periodic Rate Cap.......................   2.000%
Weighted Average Months Until Next Adjustment Date.......   26 months
Geographic Concentration of Mortgaged Properties Securing
   Loans in Excess of 5% of the Aggregate Scheduled
      Principal Balance:..................................   California        38.31%
                                                            Texas              8.62%
                                                            New Jersey         5.55%


GROUP 2, GROUP 3 AND GROUP 4 LOANS

Number of Loans : .......................................   1,372
Aggregate Scheduled Principal Balance:...................   $587,593,856
Range of Scheduled Principal Balances:...................   $49,091 to $1,457,513
Average Scheduled Principal Balance:.....................   $428,275
Range of Current Mortgage Interest Rates:................   4.000% to 8.875%
Weighted Average Current Mortgage Interest Rate:.........   6.671%
Range of Remaining Scheduled Terms to Maturity:..........   159 months to 336 months
Weighted Average Remaining Scheduled Term to Maturity:...   320 months
Range of Original Loan-to-Value Ratios:..................   7.10% to 95.00%
Weighted Average Original Loan-to-Value Ratio:...........   70.39%
Geographic Concentration of Mortgaged Properties Securing
   Loans in Excess of 5% of the Aggregate Scheduled
      Principal Balance:..................................   California        30.35%
                                                            New York          10.07%
                                                            Texas              8.57%
                                                            New Jersey         6.85%
</TABLE>


<TABLE>
<S>                                <C>
                                   See "Description of the Mortgage Loans" in this
                                   prospectus supplement for more information about the
                                   loans.

Optional Termination.....          The master servicer may, at its option, purchase all
                                   but not less than all of the loans in each loan
                                   group on any
</TABLE>


                                   S-14



<Page>



<TABLE>
<S>                                <C>
                                   distribution date on or after the first date on
                                   which the current aggregate scheduled principal
                                   balance of such loans, as of that date of
                                   determination, is less than 1% of the aggregate
                                   scheduled principal balance of such loans as of the
                                   cut-off date. See "The Pooling and Servicing
                                   Agreement--Termination" in this prospectus
                                   supplement.

Credit Enhancement.......          Credit enhancements may reduce the harm caused to
                                   holders of certificates by shortfalls in payments
                                   collected on the loans. Credit enhancements can
                                   reduce the effect of shortfalls on all classes of
                                   offered certificates, or they can allocate
                                   shortfalls so they affect some classes before
                                   others.

                                   Subordination. The group 1, group 2, group 3, group
                                   4, Class A-X and Class PO certificates will receive
                                   distributions of interest and principal, as
                                   applicable, before the related subordinate
                                   certificates are entitled to receive distributions
                                   of interest or principal. In addition, each class
                                   of subordinate certificates will receive
                                   distributions of interest and principal prior to
                                   any other class of related subordinate certificates
                                   with a higher alphanumerical class designation. The
                                   subordinate certificates, in reverse order of
                                   alphanumerical class designation, will absorb most
                                   losses on the related loans prior to the group 1,
                                   group 2, group 3, group 4 and Class PO
                                   certificates, as applicable. In addition, as
```

described in this prospectus supplement, when the subordinate certificates related to loan group 4 have been reduced to zero, losses on the group 4 loans will be allocated to the Class 4-A-2 certificates and then to the Class 4-A-1 certificates.

Shifting of Interests. The group 1, group 2, group 3 and group 4 certificates will receive 100% of the principal prepayments received on the loans in the related loan group (not including the portion of principal payments payable to the Class PO certificates, if any, as described in this prospectus supplement) until the fifth anniversary of the first distribution date. During the next four years, these senior certificates in the aggregate will generally receive a disproportionately large, but decreasing, share of such related principal prepayments. This will result in a quicker return of principal to these senior certificates and increases the likelihood that holders of these senior certificates will be paid the full amount of principal to which they are entitled.

Cross-Collateralization. In certain limited circumstances, principal and interest collected from loans in loan group 2, loan group 3 or loan group 4 may be used to pay principal or

</TABLE>

S-15

<Page>

<TABLE>
<S>                              <C>
                                 interest, or both, to the senior certificates
                                 related to one or more of the other of such loan
                                 groups.

                                 See "Description of the Offered Certificates" in
                                 this prospectus supplement.

Registration and
  Denominations of
  the Certificates......         The offered certificates, other than the Class A-LR
                                 and Class A-UR Certificates, initially will be
                                 issued in book-entry form. The offered certificates
                                 will be issued in the minimum denominations set
                                 forth in "Description of the Offered
                                 Certificates--General" in this prospectus
                                 supplement. The Class A-LR and Class A-UR
                                 Certificates are expected to be issued in fully
                                 registered, certificated form in denominations of
                                 $50. No person acquiring an interest in the
                                 book-entry certificates will be entitled to receive
                                 a definitive certificate representing that person's
                                 interest in the trust fund, except under limited
                                 circumstances as described in this prospectus
                                 supplement. Beneficial owners may elect to hold
                                 their interests through The Depository Trust
                                 Company. Transfers within DTC will be in accordance
                                 with the usual rules and operating procedures of
                                 DTC. See "Description of the Offered
                                 Certificates--General" in this prospectus
                                 supplement.

Last Scheduled
  Distribution Date.....         The distribution date in August 2017 will be the
                                 last scheduled distribution date for the group 1
                                 and group 15-B subordinate certificates. This date
                                 represents the distribution date occurring in the
                                 month following the maturity date of the latest
                                 maturing loan in loan group 1. It is possible that
                                 the principal balance of the group 1 and group 15-B
                                 subordinate certificates may be fully paid or
                                 reduced to zero, as applicable, prior to this date,
                                 or may not be fully paid or reduced to zero, as
                                 applicable, by this date.

                                 The distribution date in August 2032 will be the
                                 last scheduled distribution date for the group 2,
                                 Class 30-B-1, Class 30-B-2, Class 30-B-3, Class A-X
                                 and Class PO certificates. This date represents the

distribution date occurring in the month following the maturity date of the latest maturing loan in loan group 2. It is possible that the principal balance of the group 2, Class 30-B-1, Class 30-B-2, Class 30-B-3, Class A-X and Class PO certificates may be fully paid or reduced to zero, as applicable, prior to this date, or may not be fully paid or reduced to zero, as applicable, by this date.

</TABLE>

S-16

<Page>

<TABLE>
<S>                          <C>
                             The distribution date in October 2032 will be the
                             last scheduled distribution date for the group 3
                             certificates. This date represents the distribution
                             date occurring in the month following the maturity
                             date of the latest maturing loan in loan group 3.
                             It is possible that the principal balance of the
                             group 3 certificates may be fully paid or reduced
                             to zero, as applicable, prior to this date, or may
                             not be fully paid or reduced to zero, as
                             applicable, by this date.

                             The distribution date in October 2032 will be the
                             last scheduled distribution date for the group 4
                             certificates. This date represents the distribution
                             date occurring in the month following the maturity
                             date of the latest maturing loan in loan group 4.
                             It is possible that the principal balance of the
                             group 4 certificates may be fully paid or reduced
                             to zero, as applicable, prior to this date, or may
                             not be fully paid or reduced to zero, as
                             applicable, by this date.

                             The distribution date in October 2032 will be the
                             last scheduled distribution date for the Class
                             HY-B-1, Class HY-B-2 and Class HY-B-3 certificates.
                             This date represents the distribution date
                             occurring in the month following the maturity date
                             of the latest maturing loan in loan group 3 and
                             loan group 4. It is possible that the principal
                             balance of the Class HY-B-1, Class HY-B-2 and Class
                             HY-B-3 certificates may be fully paid or reduced to
                             zero, as applicable, prior to this date, or may not
                             be fully paid or reduced to zero, as applicable, by
                             this date.

                             The distribution date in October 2032 will be the
                             last scheduled distribution date for the Class
                             C-B-4, Class C-B-5 and Class C-B-6 certificates.
                             This date represents the distribution date
                             occurring in the month following the maturity date
                             of the latest maturing loan in loan group 2, loan
                             group 3 and loan group 4. It is possible that the
                             principal balance of the Class C-B-4, Class C-B-5
                             and Class C-B-6 certificates may be fully paid or
                             reduced to zero, as applicable, prior to this date,
                             or may not be fully paid or reduced to zero, as
                             applicable, by this date.

Tax Status...............    Elections will be made to treat the assets of the
                             trust as multiple separate real estate mortgage
                             investment conduits or REMICs for federal income
                             tax purposes. The offered certificates, other than
                             the Class A-LR and Class A-UR certificates, will be
                             treated as debt instruments of a REMIC for federal
                             income tax purposes. The Class A-LR certificates
                             will represent ownership of the residual interests
                             in one or more lower-tier REMICs which hold the
                             loans and

</TABLE>

S-17

<Page>

```
<TABLE>
<S>                         <C>
                            the Class A-UR certificates will represent
                            ownership of the residual interest in each
                            remaining REMIC. See "Federal Income Tax
                            Consequences" in this prospectus supplement and
                            "Federal Income Tax Consequences" in the
                            accompanying prospectus.

ERISA Considerations.....   The offered certificates, other than the Class A-LR
                            and Class A-UR certificates, may be eligible for
                            purchase by persons investing assets of employee
                            benefit plans or other retirement arrangements that
                            are subject to the Employee Retirement Income
                            Security Act of 1974 or to Section 4975 of the
                            Internal Revenue Code of 1986, subject to certain
                            considerations described in this prospectus
                            supplement. Sales of the Class A-LR and Class A-UR
                            certificates to such plans or retirement accounts
                            are prohibited, except as permitted under "ERISA
                            Considerations" in this prospectus supplement. See
                            "ERISA Considerations" in this prospectus
                            supplement.

Legal Investment........   The offered certificates (other than the Class
                            15-B-2, Class 15-B-3, Class HY-B-2 and Class
                            HY-B-3, Class 30-B-2 and Class 30-B-3 certificates)
                            will constitute "mortgage related securities" for
                            purposes of the Secondary Mortgage Market
                            Enhancement Act of 1984, as amended, so long as
                            they are rated in one of the two highest rating
                            categories by S&P and Fitch Ratings or another
                            nationally recognized statistical rating
                            organization.

                            The Class 15-B-2, Class 15-B-3, Class HY-B-2 and
                            Class HY-B-3, Class 30-B-2 and Class 30-B-3
                            certificates will not constitute "mortgage related
                            securities." See "Legal Investment" in this
                            prospectus supplement.

Certificate Ratings......   On the closing date, the offered certificates must
                            have ratings not lower than those set forth in the
                            table beginning on page S-5 by each of S&P and
                            Fitch Ratings, as applicable.

                            A security rating is not a recommendation to buy,
                            sell or hold securities and the assigning rating
                            organization may revise or withdraw a rating at any
                            time. The ratings do not address the possibility
                            that holders of the offered certificates may suffer
                            a lower than anticipated yield. See "Ratings" in
                            this prospectus supplement for a discussion of the
                            primary factors on which the ratings are based.
</TABLE>
```

<center>S-18</center>

```
<Page>
```

<center>RISK FACTORS</center>

Before making an investment decision, you should carefully consider the following risks that we believe describe the principal factors that make an investment in the certificates speculative or risky. In particular, payments on your certificates will depend on payments received on, and other recoveries with respect to, the loans. Therefore, you should carefully consider the following risk factors.

Some of the Loans Are Missing Loan Files

On the closing date, for approximately 0.27% of the loans, the entire loan file is missing. There can be no assurance that these missing loan files will be obtained. The absence of these loans files may materially affect the ability of the related servicer or the master servicer to foreclose upon or otherwise service the related loan. For loans with missing loan documentation, the Transferor will not be required to repurchase such loans from the trust unless the omission or defect materially interferes with the related servicer's ability to foreclose on the related mortgaged property.

The Loans Are Seasoned

As of the cut-off date, the group 1 loans have a weighted average number of months from origination of 33 months. As of the cut-off date, the group 2 loans have a weighted average number of months from origination of 41 months. As of the cut-off date, the group 3 loans have a weighted average number of months from origination of 26 months. As of the cut-off date, the group 4 loans have a weighted average number of months from origination of 27 months. As of the cut-off date, the loans in the aggregate have a weighted average number of months from origination of 37 months. As a result, the loans are considerably seasoned. The underwriting standards for loans of this length of seasoning are of limited use and have not been included in this prospectus supplement. In addition, the property values used in determining the loan-to-value ratios may have decreased significantly, even if nationally property values have generally increased over the past several years. Other than with respect to 2.30% of the Loans, updated credit scores for the borrowers have been obtained and are included in Schedule A to this prospectus supplement.

Some of the Loans are Delinquent or Have Been Delinquent in the Past

As of the cut-off date, approximately 0.87%, 1.09%, 0.00% and 1.19% of the group 1, group 2, group 3 and group 4 loans, respectively, and approximately 0.99% of the loans in the aggregate, were 30-59 days delinquent. As of the cut-off date, approximately 0.49%, 0.60%, 1.11% and 0.00% of the group 1, group 2, group 3 and group 4 loans, respectively, and approximately 0.54% of the loans in the aggregate, were 60-89 days delinquent. In addition, as of the cut-off date, approximately 6.35%, 9.17%, 1.87% and 5.54% of the group 1, group 2, group 3 and group 4 loans, respectively, and approximately 7.82% of the loans in the aggregate have been 30 or more days delinquent in the past twelve months.

<center>S-19</center>

<Page>

Offered Certificates May Not Be Appropriate for Individual Investors

The offered certificates are not suitable investments for all investors. In particular, you should not purchase any class of offered certificates unless you understand the prepayment, credit, liquidity and market risks associated with that class because:

o    The amounts you receive on your certificates will depend primarily on the amount of the payments borrowers make on the related loans. Because we cannot predict the rate at which borrowers will repay their loans, you may receive distributions on your certificates in amounts that are larger or smaller than you expect. In addition, the life of your certificates may be longer or shorter than anticipated. Because of this, we cannot guarantee that you will receive distributions at any specific future date or in any specific amount.

o    The yield to maturity on your certificates will depend primarily on the purchase price of your certificates and the rate of principal payments on the related loans.

o    Rapid prepayment rates on the loans are likely to coincide with periods of low prevailing interest rates. During these periods, the yield at which you may be able to reinvest amounts received as payments on your certificates may be lower than the yield on your certificates. Conversely, slow prepayment rates on the loans are likely to coincide with periods of high interest rates. During these periods, the amount of payments available to you for reinvestment at high rates may be relatively low.

The certificates are complex securities. You should possess, either alone or together with an investment advisor, the expertise necessary to evaluate the information contained in this prospectus supplement and the accompanying prospectus in the context of your financial situation and tolerance for risk.

You should carefully consider, among other things, the factors described below and under "Prepayment and Yield Considerations" in this prospectus supplement and "Risk Factors" in the prospectus before purchasing the certificates.

The Yield On The Group 2 Certificates Will Be Affected By The Specific Terms That Apply To Such Certificates.

The group 2 certificates are subject to various priorities for payment of principal. Distributions of principal on the group 2 certificates with an earlier priority of payment will be affected by the rates of prepayment of the loans in loan group 2 early in the life of the mortgage pool. Those classes of group 2 certificates with a later priority of payment will be affected by the rates of prepayment of the related loans experienced both before and after the commencement of principal distributions on those classes, and will be more likely to be affected by losses on the loans not covered by the credit enhancement.

Based on the modeling assumptions described in this prospectus

supplement, the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class
2-A-6 certificates are structured so that principal payments will be made in
accordance with the table entitled "Targeted Aggregate Principal Balances" in
this prospectus supplement, but only if the group 2 loans prepay at a specific
constant rate. If prepayments occur at a rate slower than that rate, the
weighted average

<center>S-20</center>

<Page>

life of these certificates will be extended. On the other hand, if prepayments
occur at a rate faster than that rate, the weighted average life of these
certificates will be reduced.

        The Class 2-A-5 Certificates may receive small or large distributions
of principal on each distribution date to the extent necessary to stabilize
principal distributions on the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class
2-A-4 and Class 2-A-6 certificates. Due to the companion nature of the Class
2-A-5 certificates, these certificates will likely experience price and yield
volatility. Investors should consider whether this volatility is suitable to
their investment needs.

Credit Enhancement May Not Be Adequate

        Loan Delinquencies, Defaults and Losses. A decline in real estate
values or in economic conditions generally could increase the rates of
delinquencies, foreclosures and losses on the loans to a level that is
significantly higher than those experienced currently. This in turn will reduce
the yield on your certificates, particularly if the credit enhancement described
in this prospectus supplement is not enough to protect your certificates from
these losses.

        As described in "Description of the Offered Certificates--Allocation
of Losses" in this prospectus supplement, losses on a loan will be allocated
first to the related subordinate certificates in inverse order of priority.
Losses may be severe enough, however, to reduce the aggregate principal balance
of those subordinate certificates to zero. If this occurs, the related senior
certificates will bear the losses thereafter as described in this prospectus
supplement. See "Description of the Offered Certificates--Allocation of Losses"
in this prospectus supplement.

        If the protection afforded by the credit enhancement is insufficient,
you could experience a loss on your investment.

Certain Classes of Subordinate Certificates Provide Subordination for all of the
related Offered Senior Certificates

        Because the Class HY-B-1, Class HY-B-2 and Class HY-B-3 certificates
provide credit support for the senior certificates of loan group 3 and loan
group 4 and the Class C-B-4, Class C-B-5 and Class C-B-6 certificates provide
credit support for the senior certificates of loan group 2, loan group 3 and
loan group 4, the protection provided to any such group of senior certificates
by the related subordinate certificates could be reduced to zero as a result of
a disproportionate amount of realized losses on the loans in the loan group
related to one or more of the other groups of senior certificates. Therefore,
losses on the loans in one or more of loan group 2, loan group 3 and loan group
4 will reduce the subordination provided by the related subordinate certificates
to the senior certificates related to the other loan groups and increase the
likelihood that losses may be allocated to these senior certificates. See
"Description of the Offered Certificates--Allocation of Losses" in this
prospectus supplement.

        Under certain circumstances loan payments derived from one or more of
loan group 2, loan group 3 and loan group 4 otherwise payable to the related
subordinate certificates will be paid to the senior certificates related to the
other of such loan groups as described under "Description of the Offered
Certificates--Subordination--Cross-Collateralization" in this prospectus
supplement.

<center>S-21</center>

<Page>

Inadequacy of Value of Properties Could Affect Severity of Losses

        Assuming that the properties provide adequate security for the loans,
substantial delays in recoveries may occur from the foreclosure or liquidation

of defaulted loans. We cannot assure you that the values of the properties have
remained or will remain at the levels in effect on the dates of origination of
the related loans. Further, liquidation expenses, including legal fees, real
estate taxes, and maintenance and preservation expenses will reduce the proceeds
payable on the loans and thereby reduce the security for the loans. As a result,
the risk that you will suffer losses could increase. If any of the properties
fail to provide adequate security for the related loan, you may experience a
loss. See "The Pooling and Servicing Agreement--Realization Upon Defaulted
Loans" in this prospectus supplement and "Certain Legal Aspects of Residential
Loans--Foreclosure on Mortgages" in the prospectus.

There Are Risks Involving Unpredictability of Prepayments and the Effect of
Prepayments on Yields

        The borrowers may generally prepay their loans, in whole or in part at
any time without penalty. We cannot predict the rate at which borrowers will
repay their loans. A prepayment of a loan generally will result in more rapid
payments on the related certificates.

o   If you purchase a certificate at a discount and principal payments on the
    related loans or, in the case of a Class PO certificate, principal payments
    on group 2 mortgage loans having net mortgage rates below 6.5000%, occur
    more slowly than you anticipate, your yield may be lower than you
    anticipate. See "Prepayment and Yield Considerations--Sensitivity of the
    Principal Only Certificates" in this prospectus supplement for a more
    detailed description of risks associated with the purchase of the Class PO
    certificates, including a table demonstrating the particular sensitivities
    of such certificates to the rate of prepayments.

o   If you purchase a certificate at a premium and principal distributions on
    the related loans occur faster than you anticipate, your yield may be lower
    than you anticipate.

o   If you purchase a Class A-X certificate at a premium and principal payments
    on the loans in loan group 1 or loan group 2 having net mortgage rates
    above 6.5000% occur faster than you anticipate, your yield may be lower
    than you anticipate and you could fail to fully recover your initial
    investment. See "Prepayment and Yield Considerations --Sensitivity of the
    Interest Only Certificates" in this prospectus supplement for a more
    detailed description of risks associated with the purchase of such
    certificates, including a table demonstrating the particular sensitivities
    of such certificates to the rate of prepayments.

o   The rate of prepayments on the loans will be sensitive to prevailing
    interest rates. Generally, if prevailing interest rates decline
    significantly below the interest rates on the loans, the loans are more
    likely to prepay than if prevailing rates remain above the interest rates
    on the loans. Conversely, if prevailing interest rates rise significantly,
    the prepayments on the loans are likely to decrease.

o   The effective interest rate on your certificates may be less than the
    interest rate stated in this prospectus supplement. Your certificates will
    be allocated any interest shortfalls that are not compensated for as
    described in this prospectus supplement. The circumstances under which

                                  S-22


<Page>


        interest shortfalls will occur are described in "Description of the Offered
        Certificates--Interest" and "--Allocation of Available Funds" in this
        prospectus supplement.

o   UBS Real Estate Securities Inc. (in its capacity as transferor of the
    loans) may be required to purchase loans from the trust in the event
    certain breaches of representations and warranties have not been cured.
    These purchases will have the same effect on the holders of the offered
    certificates as a prepayment of the related loans.

o   Each of the loan sellers and the servicers may make general and targeted
    solicitations for refinancings. Any solicited refinancings may result in a
    rate of prepayment that is higher than you might otherwise expect.

o   If you purchase an offered certificate and the rate of default and the
    amount of losses on the related loans is higher than you expect, your yield
    may be lower than you expect.

        See "Prepayment and Yield Considerations" in this prospectus
supplement for a description of factors that may influence the rate and timing
of prepayments on the loans.

Bankruptcy of Borrowers May Adversely Affect Distributions on Certificates

        The application of federal and state laws, including bankruptcy and
debtor relief laws, may interfere with or adversely affect the ability to

realize on the properties, enforce deficiency judgments or pursue collection litigation with respect to defaulted loans. As a consequence, borrowers who have defaulted on their loans and sought, or are considering seeking, relief under bankruptcy or debtor relief laws will have substantially less incentive to repay their loans. As a result, these loans will likely experience more severe losses, which may be total losses and could therefore increase the risk that you will suffer losses. See "--Credit Enhancement May Not Be Adequate" above.

Changes to the Weighted Average Net Mortgage Rate on the Loans May Reduce the Yield with Respect to the Group 3 and Group 4 Certificates

On each distribution date the pass-through rates on the certificates will be affected by the weighted average of the net mortgage rates on the related group or groups of loans. Therefore, to the extent that the weighted average of the net mortgage rates on all the loans or group of loans related to such certificates is ever decreased, investors in the certificates may experience a lower yield.

The mortgage interest rate on each group 3 and group 4 loan will be fixed for an initial period from the date of origination of such loan as described under "Description of the Loans" in this prospectus supplement. Thereafter, Each of the loans in loan group 3 and loan group 4 provides for adjustments to the mortgage interest rate on an annual basis. The mortgage interest rate on each loan in loan group 3 and loan group 4 will adjust to equal the sum of a related index and a related gross margin. Mortgage interest rate adjustments may be subject to the limitations stated in the mortgage note with respect to increases and decreases for any adjustment (i.e., a "periodic cap"). In addition, the mortgage interest rate may be subject to an initial cap and an overall maximum and minimum lifetime interest rate. See "Description of the Loans" in this prospectus supplement.

                                    S-23


<Page>


The weighted average net mortgage rate on the group 3 and group 4 loans may decrease, and may decrease significantly, after the mortgage interest rates on such loans begin to adjust as a result of, among other factors, the dates of adjustment, the gross margins and changes in the index. If as a result of such interest rate adjustments, the weighted average of the net mortgage rates on all such loans or a group of loans is reduced, investors in some or all of the certificates will experience a lower yield as described above. In addition, if, despite increases in the index, the mortgage interest rate on any loan cannot increase due to a maximum mortgage interest limitation or a periodic cap, the yield on certain certificates could be adversely affected. Finally, because the pass-through rate on each group 3 and group 4 certificate will be based on, or limited by, the weighted average of the net mortgage rates on one or more groups of loans, disproportionate principal payments on the loans having net mortgage interest rates higher or lower than the then-current pass-through rate on such certificates will affect the pass-through rate for such certificates for future periods and the yield on such certificates.

See "Description of the Loans" and "Prepayment and Yield Considerations" in this prospectus supplement.

The Transferor May Not Be Able to Repurchase or Replace Defective Loans

UBS Real Estate Securities Inc, in its capacity as transferor, will make various representations and warranties related to the loans. Those representations are summarized in "The Pooling and Servicing Agreement--Assignment of the Loans" in this prospectus supplement.

If the transferor fails to cure a material breach of its representations and warranties with respect to any loan in a timely manner, then it will be required to repurchase or replace the defective loan. See "The Pooling and Servicing Agreement--Assignment of the Loans" in this prospectus supplement. It is possible that the transferor may not be capable of repurchasing or replacing any defective loans, for financial or other reasons. The inability of the transferor to repurchase or replace defective loans would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your certificates could occur. See "--Credit Enhancement May Not Be Adequate" above.

There Are Risks in Holding Subordinate Certificates

The protections afforded the senior certificates create risks for the subordinate certificates. Prior to any purchase of any subordinate certificates, consider the following factors that may adversely impact your yield:

o    Because the group 15-B subordinate certificates receive interest and
     principal distributions after the senior certificates in loan group 1
     receive those distributions, there is a greater likelihood that the group
     15-B subordinate certificates will not receive the distributions to which
     they are entitled on any distribution date.

o   Because the Class 30-B-1, Class 30-B-2 and Class 30-B-3 certificates
    receive interest and principal distributions after the senior certificates
    in loan group 2 receive those distributions, there is a greater likelihood
    that the Class 30-B-1, Class 30-B-2 and Class 30-B-3 certificates will not
    receive the distributions to which they are entitled on any distribution
    date.

<center>S-24</center>

<Page>

o   Because the Class HY-B-1, Class HY-B-2 and Class HY-B-3 certificates
    receive interest and principal distributions after the senior certificates
    in loan group 3 and loan group 4 receive those distributions, there is a
    greater likelihood that the Class HY-B-1, Class HY-B-2 and Class HY-B-3
    certificates will not receive the distributions to which they are entitled
    on any distribution date.

o   Because the Class C-B-4, Class C-B-5 and Class C-B-6 certificates receive
    interest and principal distributions after the senior certificates in loan
    group 2, loan group 3 and loan group 4 receive those distributions, there
    is a greater likelihood that the Class C-B-4, Class C-B-5 and Class C-B-6
    certificates will not receive the distributions to which they are entitled
    on any distribution date.

o   If any servicer determines not to advance a delinquent payment on a loan
    because such servicer determines the amount is not recoverable from a
    borrower or if the master servicer is required to make an advance and makes
    a similar determination and does not advance funds with respect to such
    delinquent payment, there may be a shortfall in distributions on the senior
    certificates related to the applicable loan group that will impact the
    related subordinate certificates.

o   The subordinate certificates are not entitled to a proportionate share of
    principal prepayments on the related loans until the beginning of the tenth
    year after the closing date. In addition, if certain losses on the loans in
    a loan group exceed stated levels, a portion of the principal distribution
    payable to classes of the related subordinate certificates with higher
    alphanumerical class designations will be paid to the classes of the
    related subordinate certificates with lower alphanumerical designations.

o   Losses resulting from the liquidation of defaulted loans in a loan group
    will generally be allocated to the related subordinate certificates. A loss
    allocation results in a reduction in a certificate balance, potentially to
    zero, without a corresponding distribution of cash to the holder. A lower
    certificate balance will result in less interest accruing on the
    certificate.

o   The earlier in the transaction that a loss on a loan occurs, the greater
    the impact on yield.

        See "Description of the Offered Certificates" and "Prepayment and
Yield Considerations" in this prospectus supplement.

Geographic Concentration Could Increase Losses on the Loans

        The yield to maturity on your certificates may be affected by the
geographic concentration of the mortgaged properties securing the loans in the
related loan group or groups. Any concentration of the mortgaged properties
securing the loans in particular geographic regions might magnify the effect on
the pool of loans of adverse economic conditions or of special hazards in these
areas, such as earthquakes, hurricanes, windstorms, wildfires or tornadoes, and
might increase the rate of delinquencies, defaults and losses on the loans.
Consequently, the geographic concentration could result in shortfalls in
distributions due on your certificates more than would be the case if the
mortgaged properties were more geographically diversified. See "Description of
the Loans" in this prospectus supplement.

<center>S-25</center>

<Page>

        Hurricane Charley, which struck Tampa, Florida and surrounding areas
on August 13 and 14, 2004, Hurricane Frances, which struck Florida's east coast
in early September 2004 and Hurricane Ivan, which struck cities in several
states in the United States including Pensacola, Florida and Mobile, Alabama in
mid September 2004 may have adversely affected any mortgaged properties located
in those areas. In addition, Hurricane Jeanne may have affected or may affect in

the future mortgaged properties located in its path. The transferor will make a representation and warranty that, to the best of its knowledge, each mortgaged property is free of material damage and in good repair as of the closing date. Notwithstanding the transferor's lack of knowledge, in the event that a mortgaged property is materially damaged as of the closing date due to Hurricane Charley, Hurricane Frances, Hurricane Ivan or Hurricane Jeanne, the transferor will be required to repurchase the related loan from the trust. Approximately 9.23%, 4.14%, 4.62%, and 3.51% of the group 1, group 2, group 3 and group 4 loans, respectively, and approximately 5.07% of the loans in the aggregate, in each case by aggregate principal balance as of the cut-off date, are located in areas which may have been affected by Hurricane Charley, Hurricane Frances and Hurricane Ivan. In addition, no assurance can be given as to the effect of these events on the rate of delinquencies and losses on the loans secured by mortgaged properties that may have been affected by Hurricane Charley, Hurricane Frances, Hurricane Ivan or Hurricane Jeanne. Any adverse impact as a result of these events may be borne by the holders of the related offered certificates, particularly if the transferor fails to repurchase any loan for which the related mortgaged property was materially damaged by Hurricane Charley, Hurricane Frances, Hurricane Ivan or Hurricane Jeanne.

Failure of Master Servicer or Servicers to Perform May Adversely Affect Distributions on Certificates; Potential Conflict of Interest

        The amount and timing of distributions on the certificates generally will be dependent on the servicers performing their respective servicing obligations and the master servicer performing its master servicing obligations in an adequate and timely manner. See "The Pooling and Servicing Agreement--Collection Account and Distribution Account" in this prospectus supplement. A potential conflict of interest exists because Wells Fargo Bank, N.A., which acts as the master servicer and the trust administrator, will also act as servicer of approximately 58.57% of the cut-off date principal balance of the loans. However, the master servicer is required to act in accordance with the master servicing standard set forth in the pooling and servicing agreement, without regard to who is servicing the loans. If any servicer fails to perform its servicing obligations, or if the master servicer fails to perform its master servicing obligations, this failure may result in the termination of that entity. That termination with its corresponding transfer of daily collection activities will likely increase the rates of delinquencies, defaults and losses on the loans. As a result, shortfalls in the distributions due on your certificates could occur.

Limited Liquidity May Adversely Affect Market Value of Certificates

        A secondary market for the offered certificates may not develop or, if it does develop, it may not provide you with liquidity of investment or continue while your certificates are outstanding. Lack of liquidity could result in a substantial decrease in the market value of your certificates. See "Risk Factors--Limited Liquidity of Securities May Adversely Affect Market Value of Securities" in the accompanying prospectus.

                                    S-26

<Page>

        The secondary market for mortgage-backed securities has experienced periods of illiquidity and can be expected to do so in the future. Illiquidity means that there may not be any purchasers for your class of certificates. Although any class of certificates may experience illiquidity, it is more likely that classes of certificates that are more sensitive to prepayment, credit or interest rate risk will experience illiquidity.

Rights of Beneficial Owners May Be Limited by Book-Entry System

        Unless you are the purchaser of a Class A-LR or Class A-UR certificate, your ownership of the offered certificates will be registered electronically with DTC. The lack of physical certificates could:

o    result in payment delays on your certificates because the trust
     administrator will be sending distributions on the certificates to DTC
     instead of directly to you;

o    make it difficult for you to pledge your certificates if physical
     certificates are required by the party demanding the pledge; and

o    hinder your ability to resell your certificates because some investors may
     be unwilling to buy certificates that are not in physical form. See
     "Description of the Offered Certificates--Book-Entry Certificates" in this
     prospectus supplement and "Description of the Securities--Book-Entry
     Registration of Securities" in the prospectus.

Risks Related to the Residual Certificates

        The holders of the Class A-LR and Class A-UR certificates (which are also called the "Residual Certificates") must include the taxable income or loss of the related REMIC in determining their federal taxable income. Prospective

investors are cautioned that the residual certificateholders' REMIC taxable income and the tax liability associated therewith may be substantial during certain periods, in which event the holders thereof must have sufficient sources of funds to pay such tax liability. It is not anticipated that the residual certificateholders will receive distributions from the trust. Furthermore, prospective investors in the Residual Certificates should expect that all of the related REMIC includible by the holders of the Residual Certificates will be treated as "excess inclusion" income, resulting in (i) the inability of such holders to use net operating losses to offset such income, (ii) the treatment of such income as "unrelated business taxable income" to certain holders who are otherwise tax-exempt, and (iii) the treatment of such income as subject to 30% withholding tax to certain non-U.S. investors, with no exemption or treaty reduction.

Under the provisions of the Internal Revenue Code of 1986 relating to REMICs, it is likely that the Residual Certificates will be considered to be "non-economic residual interests," with the result that transfers thereof would be disregarded for federal income tax purposes if any significant purpose of the transferor was to impede the assessment or collection of tax. Accordingly, the transferee affidavit used for transfers of Residual Certificates will require the transferee to affirm that it (i) historically has paid its debts as they have come due and intends to do so in the future, (ii) understands that it may incur tax liabilities with respect to the Residual Certificates in excess of cash flows generated by them, (iii) intends to pay taxes associated with holding the Residual Certificates as such taxes become due, (iv) will not cause the income from

S-27

<Page>

the Residual Certificates to be attributable to a foreign permanent establishment or fixed base, within the meaning of an applicable income tax treaty, of the transferee or any other person and (v) will not transfer the Residual Certificates to any person or entity that does not provide a similar affidavit. The transferor must certify in writing to the trust administrator that, as of the date of transfer, it had no knowledge or reason to know that the affirmations made by the transferee pursuant to the preceding sentence were false. In addition, Treasury regulations provide alternatives for either paying the transferee of the Residual Certificates a formula specified minimum price or transferring the Residual Certificates to an eligible corporation under certain conditions in order to meet the safe harbor against the possible disregard of such transfer. Finally, Residual Certificates generally may not be transferred to a person who is not a U.S. person unless the income thereon is effectively connected with the conduct of a U.S. trade or business and the transferee furnishes the transferor and the trust administrator with an effective Internal Revenue Service Form W-8ECI. See "Description of the Offered Certificates--Restrictions on Transfer of the Residual Certificates" in this prospectus supplement and "Federal Income Tax Consequences--REMICs--Taxation of Owners of Residual Securities--Limitations on Offset or Exemption of REMIC Income," "--Tax-Related Restrictions on Transfer of Residual Securities" and "--Treatment of Certain Items of REMIC Income and Expense" in the prospectus.

An individual, trust or estate that holds Residual Certificates (whether the Residual Certificates are held directly or indirectly through certain pass-through entities) also may have additional gross income with respect to the Residual Certificates, but may be subject to limitations or disallowance of deductions for servicing fees on the loans and other administrative expenses properly allocable to such Residual Certificates in computing such holder's regular tax liability, and may not be able to deduct such fees or expenses to any extent in computing such holder's alternative minimum tax liability. The pooling and servicing agreement will require that any such gross income and such fees and expenses will be allocable to holders of the Residual Certificates in proportion to their respective ownership interests. See "Federal Income Tax Consequences--REMICS--Limitations on Deduction of Certain Expenses" in the prospectus. In addition, some portion of a purchaser's basis, if any, in Residual Certificates may not be recovered until termination of the trust fund. Furthermore, although Treasury regulations have been issued concerning the federal income tax consequences of any consideration paid to a transferee on a transfer of Residual Certificates, some issues are not addressed by the regulations. Any transferee of Residual Certificates receiving such consideration should consult its tax advisors.

Due to the special tax treatment of residual interests, the effective after-tax return of the Residual Certificates may be significantly lower than would be the case if the Residual Certificates were taxed as debt instruments and could be negative.

Recent Developments May Increase the Risk of Loss on the Loans

As a result of the terrorist attacks on September 11, 2001 and the current situation in Iraq, President Bush has authorized the placement of certain military reservists and members of the National Guard on active duty status. To the extent that any such person is a borrower under a loan, the interest rate limitations and other provisions of the Servicemembers Civil

Relief Act, would apply to the loan during the period of active duty, and if the borrower is a California resident, comparable provisions of the California Military and Veterans Code may apply. It is

S-28

<Page>

possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. In addition, other borrowers who enter military service after the origination of their loans (including borrowers who are members of the National Guard at the time of origination of their loans and are later called to active duty) would be covered by the terms of the Servicemembers Civil Relief Act, the California Military and Veterans Code or other comparable state laws. The interest paid to the holders of the certificates will be reduced by any reductions in the amount of interest collectible as a result of the Servicemembers Civil Relief Act, the California Military and Veterans Code or other comparable state laws. We do not know how many of the loans have been or may be affected by the Servicemembers Civil Relief Act, the California Military and Veterans Code or other comparable state laws. See "Description of the Offered Certificates--Allocation of Losses" in this prospectus supplement and "Certain Legal Aspects of Residential Loans--Servicemembers Civil Relief Act and the California Military and Veterans Code" in the prospectus.

FORWARD-LOOKING STATEMENTS

In this prospectus supplement and the accompanying prospectus, we use certain forward-looking statements. These forward-looking statements are found in the material, including each of the tables, set forth under "Risk Factors" and "Prepayment and Yield Considerations" in this prospectus supplement. Forward-looking statements are also found elsewhere in this prospectus supplement and the prospectus and include words like "may," "will," "should," "believes," "expects," "intends," "anticipates," "estimates" and other similar words. These statements are intended to convey our projections or expectations as of the date of this prospectus supplement. These statements are inherently subject to a variety of risks and uncertainties. Actual results could differ materially from those we anticipate due to changes in, among other things:

      (1)  economic conditions and industry competition;

      (2)  political and/or social conditions; and

      (3)  the law and government regulatory initiatives.

We will not update or revise any forward-looking statement to reflect changes in our expectations or changes in the conditions or circumstances on which these statements were originally based.

DEFINED TERMS

We define and use capitalized terms in this prospectus supplement and the prospectus to assist you in understanding the terms of the offered certificates and this offering. We define the capitalized terms we use in this prospectus supplement under the caption "Glossary of Terms" beginning on page S-5 in this prospectus supplement. We define capitalized terms we use in the accompanying prospectus under the caption "Glossary of Terms" beginning on page 187 in the prospectus.

S-29

<Page>

DESCRIPTION OF THE LOANS

On or about September 30, 2004, Mortgage Asset Securitization Transactions, Inc., the depositor, will acquire four groups of Loans (which are referred to in this prospectus supplement as the Group 1 Loans, the Group 2 Loans, the Group 3 Loans and the Group 4 Loans) from UBS Real Estate Securities Inc., the transferor. The depositor will then transfer the Loans to the trust pursuant to the Pooling and Servicing Agreement.

The transferor acquired approximately 88.90% of the loans through the exercise of "clean-up call" rights of earlier securitizations of Mortgage Asset Securitizations Inc., Wells Fargo Asset Securities Corporation (formerly known as Norwest Asset Securities Corporation or Norwest Integrated Structured Assets, Inc., as the case may be), Cendant Mortgage Corporation and Bishop's Gate Residential Mortgage Trust, and PHH Mortgage Services Corporation as further

described herein. Approximately 11.10% of the loans were purchased by the transferor from ABN AMRO Mortgage Group, Inc. pursuant to a sale and servicing agreement.

MASTR Loans

       Approximately 23.19% of the loans, referred to herein as the MASTR Loans, were acquired by the transferor from various originators. The MASTR Loans were included as part of 8 pools of loans securitized by the depositor. The MASTR Loans were included in E-Trade Bank Mortgage-Backed Securities Trust 2001-2, MASTR Adjustable Rate Mortgages Trust 2002-1, MASTR Adjustable Rate Mortgages Trust 2002-2, MASTR Asset Securitization Trust 2001-1, MASTR Asset Securitization Trust 2001-2, MASTR Asset Securitization Trust 2002-3 or MASTR Asset Securitization Trust 2002-4. The MASTR Loans were purchased by the transferor from the mortgage loan trusts listed in the preceding sentence pursuant to special termination clauses contained in the related pooling and servicing agreements. Such clauses allowed the transferor to purchase the mortgage loans and REO property contained in the related mortgage trust once the principal balance of the mortgage loans and REO property in such mortgage loan trust was less than a specified percentage (which specified percentage did not exceed 10%) of the original aggregate mortgage loan principal balance.

Wells Fargo Loans

       Approximately 59.06% of the loans, referred to herein as the Wells Fargo Loans, were acquired by Wells Fargo Asset Securities Corporation (formerly known as Norwest Asset Securities Corporation or Norwest Integrated Structural Assets, Inc., as the case may be) from various originators. The Wells Fargo Loans were included as part of one of 19 pools of mortgage loans securitized by Wells Fargo Asset Securities Corporation (formerly known as Norwest Asset Securities Corporation or Norwest Integrated Structural Assets, Inc., as the case may be). The Wells Fargo Loans were included in Norwest Integrated Structured Assets, Inc.'s Mortgage Asset-Backed Pass-Through Certificates, Series 1998-3; Norwest Asset Securities Corporation's Mortgage Pass-Through Certificates, Series 1998-32, Series 1999-3, Series 1999-6, Series 1999-12, Series 1999-17, or Series 1999-22; or Wells Fargo Asset Securities Corporation's Mortgage Pass-Through Certificates, Series 2001-22, Series 2001-25, Series 2001-34, Series 2002-E, Series 2002-2, Series 2002-3, Series 2002-4, Series 2002-6, Series 2002-8, Series 2002-9, Series 2002-12 or Series 2002-15. The Wells Fargo Loans were purchased by the Transferor from the

<div align="center">S-30</div>

&lt;Page&gt;

mortgage loan trusts listed in the preceding sentence through the exercise of special termination clauses contained in the related pooling and servicing agreements. Such clauses allowed the Transferor to purchase the mortgage loans and REO property contained in the related mortgage loan trust once the principal balance of the mortgage loans and REO property in such mortgage loan trust was less than a specified percentage (which specified percentage did not exceed 10%) of the original mortgage loan principal balance.

Cendant Loans

       Approximately 6.65% of the loans, referred to herein as the Cendant Loans, were either acquired or originated by Cendant Mortgage Corporation, formerly known as PHH Mortgage Services Corporation. The Cendant Loans were included as part of 31 pools of mortgage loans securitized by Cendant Mortgage Corporation formerly known as PHH Mortgage Services Corporation. The Cendant Loans were included in PHH Mortgage Services Corporation's Mortgage Pass-Through Certificates, Series 1995-1, Series 1995-5, Series 1996-1, Series 1996-2, Series 1996-3, Series 1996-4, Series 1996-5, Series 1996-7, Series 1997-1, Series 1997-2, Series 1997-4, Series 1997-6 or 1998-1; or Cendant Mortgage Corporation's and Bishop Gates Residential Mortgage Loan Trust's CDMC Mortgage-Backed Pass-Through Certificates, Series 1998-2, Series 1998-5, Series 1998-8, Series 1998-9, Series 1998-15, Series 1999-13, Series 2000-1, Series 2000-2, Series 2000-4, Series 2000-5, Series 2000-6, Series 2000-7, Series 2000-8, Series 2000-9, Series 2000-10 Series 2000-11, Series 2001-1 or Series 2001-2. The Cendant Loans were purchased by the Transferor from the mortgage loan trusts listed in the preceding sentence pursuant to special termination clauses contained in the related pooling and servicing agreements. Such clauses allowed the Transferor to purchase the mortgage loans and REO property contained in the related mortgage loan trust once the principal balance of the mortgage loans and REO property in such mortgage loan trust was less than a specified percentage (which specified percentage did not exceed 10%) of the original mortgage loan principal balance.

Characteristics of the Loans

       The aggregate scheduled principal balance as of the Cut-off Date of the Loans is approximately $726,285,591. The trust will be entitled to all scheduled payments of principal and interest in respect of the Loans due after the Cut-off Date, and all unscheduled payments of principal and interest

received after the Cut-off Date. The Cut-off Date for the Loans is September 1, 2004.

        Unless otherwise stated, the statistical information presented in this prospectus supplement relates to the Loans as of the Cut-off Date, and information as to percentages of Loans are based on the scheduled principal balances of Loans as of the Cut-off Date (after taking into account scheduled payments of principal on that date).

        Substantially all of the Group 1 Loans have original terms to maturity of approximately 15 years. Substantially all of the Group 2, Group 3 and Group 4 Loans have original terms to maturity of approximately 30 years. As of the close of business on the Cut-off Date, approximately 0.87% of the Group 1 Loans, 1.09% of the Group 2 Loans, 0.00% of the Group 3 Loans and 1.19% of the Group 4 Loans were 30 to 59 days past due in the payment of scheduled principal and interest. As of the close of business on the Cut-off Date, approximately 0.49% of

<Page>

the Group 1 Loans, 0.60% of the Group 2 Loans, 1.11% of the Group 3 Loans and 0.00% of the Group 4 Loans were 60 to 89 days past due in the payment of scheduled principal and interest.

        The Loans are evidenced by Mortgage Notes, secured primarily by mortgages or deeds of trust on the Mortgaged Properties. As of the Cut-off Date, all of the Loans were secured by first liens on Mortgaged Properties.

        The scheduled monthly payment on each Loan generally includes a substantially equal payment consisting of interest plus principal in an amount that will amortize the outstanding principal balance of the Loan over its remaining term. All of the Loans provide for payments due as of the first day of each month. The latest scheduled maturity date of any Group 1 Loan is in July 2017. The latest scheduled maturity date of any Group 2 Loan is in July 2032. The latest scheduled maturity date of any Group 3 Loan is in September 2032. The latest scheduled maturity date of any Group 4 Loan is in September 2032. However the actual date on which any Loan is paid in full may be earlier than the stated maturity date due to unscheduled payments of principal. The borrowers may generally prepay their Loans at any time without penalty. Each of the Loans is subject to a due-on-sale clause. See "Certain Legal Aspects of Residential Loans" in the prospectus.

        No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values decline generally or in a particular geographic area decline, the LTV Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the Loans.

        Substantially all of the Group 3 Loans have a fixed Mortgage Interest Rate for the first 3 years after the origination of such Group 3 Loan. Each Group 3 Loan provides for adjustments to the Mortgage Interest Rate thereon at the end of the initial fixed-rate period and annually thereafter. On each adjustment date, the Mortgage Interest Rate of Group 3 Loans will adjust to the sum of (i) One-Year LIBOR or One-Year CMT (as defined below), as specified in the related Loan documents and (ii) the number of basis points specified in the applicable Mortgage Note, rounded up to the nearest one-eighth of one percent, subject to the limitation that with respect to each adjustment date, the interest rate after such adjustment may not vary from the Mortgage Interest Rate in effect prior to such adjustment by more than the periodic cap specified in the Mortgage Note. The initial periodic cap on each Group 3 Loan is 2.000%. The periodic cap for each subsequent adjustment date for the Group 3 Loans is 2.000%. In addition, adjustments to the Mortgage Interest Rate for each Group 3 Loan are subject to a lifetime maximum interest rate cap. On the first due date following each adjustment date for each Group 3 Loan, the monthly payment for the Group 3 Loan will be adjusted, if necessary, to an amount that will fully amortize that Loan at the adjusted Mortgage Interest Rate over its remaining scheduled term to maturity.

        Substantially all of the Group 4 Loans have a fixed Mortgage Interest Rate for the first 5 or 7 years (as specified in the related loan documents) after the origination of such Group 4 Loan. Each Group 4 Loan provides for adjustments to the Mortgage Interest Rate thereon at the end of the initial fixed-rate period and annually thereafter. On each adjustment date, the Mortgage Interest Rate of Group 4 Loans will adjust to the sum of (i) One-Year LIBOR or One-Year CMT (as defined below), as specified in the related Loan documents and (ii) the number of

<Page>

basis points specified in the applicable Mortgage Note, rounded up to the
nearest one-eighth of one percent, subject to the limitation that with respect
to each adjustment date, the interest rate after such adjustment may not vary
from the Mortgage Interest Rate in effect prior to such adjustment by more than
the periodic cap specified in the Mortgage Note. The initial periodic cap on
each Group 4 Loan is 2.000% or 5.000%, as specified in the related Loan
documents. The periodic cap for each subsequent adjustment date for the Group 4
Loans is 2.000%. In addition, adjustments to the Mortgage Interest Rate for each
Group 4 Loan are subject to a lifetime maximum interest rate cap. On the first
due date following each adjustment date for each Group 4 Loan, the monthly
payment for the Group 4 Loan will be adjusted, if necessary, to an amount that
will fully amortize that Loan at the adjusted Mortgage Interest Rate over its
remaining scheduled term to maturity.

        "One-Year LIBOR" generally means the average of the interbank offered
rate quotations for one year U.S. Dollar-denominated deposits in the London
Market, as published in The Wall Street Journal and most recently available as
of a day specified in the related Mortgage Note. In the event such index is no
longer available, the applicable servicer will select a substitute index in
accordance with the terms of the related Mortgage Note and in compliance with
federal and state law.

        "One-Year CMT" generally means the weekly average yield on United
States Treasury securities adjusted to a constant maturity of one year as
published by the Federal Reserve Board in Statistical Release H.15(519) and most
recently available as of a day specified in the related Mortgage Note.

        Listed below are historical values of One-Year LIBOR available as of
the dates shown below. The values shown are intended only to provide an
historical summary of the movements in One-Year LIBOR and may not be indicative
of future rates. The source of the values shown below is the British Bankers'
Association.

<TABLE>
<CAPTION>

|                              | One-Year LIBOR | | | | | | |
| Date                         | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
| ---------------------------- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| <S>                          | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  |
| January ...................... | 1.48% | 1.45% | 2.49% | 5.17% | 6.75% | 5.06% | 5.66% |
| February ..................... | 1.37% | 1.38% | 2.43% | 4.88% | 6.76% | 5.39% | 5.79% |
| March ........................ | 1.35% | 1.28% | 3.00% | 4.67% | 6.94% | 5.25% | 5.89% |
| April ........................ | 1.83% | 1.36% | 2.63% | 4.44% | 7.10% | 5.23% | 5.99% |
| May .......................... | 2.06% | 1.21% | 2.59% | 4.24% | 7.50% | 5.56% | 5.88% |
| June ......................... | 2.46% | 1.19% | 2.29% | 4.18% | 7.18% | 5.84% | 5.84% |
| July ......................... | 2.43% | 1.27% | 2.09% | 3.82% | 7.08% | 5.89% | 5.82% |
| August ....................... | 2.30% | 1.43% | 1.90% | 3.56% | 6.97% | 6.06% | 5.53% |
| September .................... | --   | 1.30% | 1.73% | 2.64% | 6.80% | 6.04% | 5.06% |
| October ...................... | --   | 1.48% | 1.64% | 2.27% | 6.73% | 6.25% | 4.75% |
| November ..................... | --   | 1.56% | 1.73% | 2.39% | 6.56% | 6.29% | 5.13% |
| December ..................... | --   | 1.46% | 1.45% | 2.44% | 6.50% | 6.50% | 5.10% |
</TABLE>

        Listed below are historical values of One-Year CMT available as of the
dates shown below. The values shown are intended only to provide an historical
summary of the movements in One-Year CMT and may not be indicative of future
rates. The source of the values shown below is the Federal Reserve Bank.

                                S-33

<Page>

<TABLE>
<CAPTION>

|                              | One-Year CMT | | | | | | |
| Date                         | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
| ---------------------------- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| <S>                          | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  |
| January...................... | 1.24% | 1.36% | 2.16% | 4.81% | 6.12% | 4.51% | 5.24% |
| February..................... | 1.24% | 1.30% | 2.23% | 4.68% | 6.22% | 4.70% | 5.31% |
| March........................ | 1.19% | 1.24% | 2.57% | 4.30% | 6.22% | 4.78% | 5.39% |
| April........................ | 1.43% | 1.27% | 2.48% | 3.98% | 6.15% | 4.69% | 5.38% |
| May.......................... | 1.78% | 1.18% | 2.35% | 3.78% | 6.33% | 4.85% | 5.44% |
| June......................... | 2.12% | 1.01% | 2.20% | 3.58% | 6.17% | 5.10% | 5.41% |
| July......................... | 2.10% | 1.12% | 1.96% | 3.62% | 6.08% | 5.03% | 5.36% |
| August....................... | 2.02% | 1.31% | 1.76% | 3.47% | 6.18% | 5.20% | 5.21% |
| September.................... | --   | 1.24% | 1.72% | 2.82% | 6.13% | 5.25% | 4.71% |
| October...................... | --   | 1.25% | 1.65% | 2.33% | 6.01% | 5.43% | 4.12% |

```
November......................    --   1.34% 1.49% 2.18% 6.09% 5.55% 4.53%
December......................    --   1.31% 1.45% 2.22% 5.60% 5.84% 4.52%
</TABLE>
```

Statistical Information

     Statistical information regarding characteristics of the Loans in the aggregate, as well as Loan Group, as of the Cut-off Date is set forth in Annex A to this prospectus supplement.

     Before the closing date, the depositor may remove any of the Loans identified as of the date of this prospectus supplement or may substitute comparable loans for any of the Loans identified as of the date of this prospectus supplement. However, the aggregate principal balance of the substituted Loans will not vary by more than plus or minus 5% of those Loans by Aggregate Cut-off Date Pool Balance of the replaced Loans. As a result, the statistical information presented in Annex A to this prospectus supplement regarding the characteristics of the Loans identified for inclusion in the trust may vary in some respects from comparable information based on the actual composition of the Loans included in the trust on the closing date. In addition, after the Cut-off Date, the characteristics of the Loans may materially vary from the information below due to a number of factors. These factors include prepayments of the Loans after the Cut-off Date and the substitution or repurchase of Loans after the closing date.

<div align="center">THE MASTER SERVICER AND THE SERVICERS</div>

General

     Wells Fargo Bank, N.A. ("Wells Fargo") will act as the master servicer of the Loans pursuant to the Pooling and Servicing Agreement among Mortgage Asset Securitization Transactions, Inc., as depositor, Wells Fargo, as master servicer, trust administrator and as a custodian, Wachovia Bank, National Association, as trustee, and U.S. Bank National Association, as a custodian.

     Primary servicing of the Loans will be provided for by ABN AMRO Mortgage Group, Inc., Bank of America, N.A., Cendant Mortgage Corporation, Chase Manhattan Mortgage Corporation, CitiMortgage, Inc., Countrywide Home Loans Servicing, LP, Colonial Savings, F.A., Everhome Mortgage Company (formerly known as Alliance Mortgage Company), GMAC Mortgage Corporation, Hibernia National Bank, HSBC Mortgage Corporation (USA), The Huntington Mortgage Company, National City Mortgage Co., SunTrust Mortgage, Inc., U.S.

<div align="center">S-34</div>

<Page>

Bank National Association, Washington Mutual Bank, FA and Wells Fargo Bank, N.A. in accordance with the applicable Servicing Agreements. Each servicer will be responsible for the servicing of those Loans subject to the related Servicing Agreement, and the master servicer will be required to supervise, monitor and oversee the performance of each servicer. In the event of a default by a servicer under the related Servicing Agreement, the master servicer will be required to enforce any remedies against the servicer, and will either find a successor servicer or will assume the primary servicing obligations for the related Loans.

The Master Servicer

     Wells Fargo is a national banking association, with master servicing offices located at 9062 Old Annapolis Road, Columbia, Maryland 21045. Among other things, Wells Fargo is engaged in the business of master servicing single family residential mortgage loans secured by properties located in all 50 states and the District of Columbia.

The Servicers

     The Loans will initially be serviced by the entities listed in the following table. The table shows, for each servicer, the percentage of Loans serviced by it, by Cut-off Date Pool Balance for each Loan Group and by Aggregate Cut-off Date Pool Balance for all Loan Groups.

<div align="center">S-35</div>

<Page>

<div align="center">Primary Servicing of the Loans<br>(by Percentages of the Cut-off Date Pool Balance or</div>

Aggregate Cut-off Date Principal Balance)

<TABLE>
<CAPTION>

| Servicer | Group 1 | Group 2 | Group 3 | Group 4 | Group 1, Group 2, Group 3 and Group 4 |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| ABN AMRO Mortgage Corporation ..... | 5.96% | 15.49% | 0.00% | 0.00% | 11.10% |
| Bank of America, N.A. .............. | 1.40 | 2.10 | 2.13 | 1.54 | 1.91 |
| Cendant Mortgage Corporation ...... | 2.23 | 12.79 | 0.00 | 0.00 | 8.65 |
| Chase Home Mortgage ............... | 12.25 | 0.00 | 0.00 | 0.00 | 2.34 |
| CitiMortgage, Inc. ................ | 0.00 | 0.57 | 0.00 | 0.00 | 0.37 |
| Colonial Savings, F.A. ............ | 0.00 | 0.23 | 0.00 | 0.00 | 0.15 |
| Countrywide Home Loans, Inc. ...... | 0.00 | 0.00 | 0.00 | 8.36 | 0.90 |
| Everhome Mortgage Company ......... | 0.00 | 0.23 | 0.00 | 0.00 | 0.15 |
| GMAC Mortgage Corporation ......... | 8.23 | 2.78 | 0.00 | 0.00 | 3.36 |
| Hibernia National Bank ............ | 0.00 | 0.34 | 0.00 | 0.00 | 0.22 |
| HSBC Mortgage Corporation (USA) ... | 3.27 | 1.32 | 0.00 | 0.00 | 1.47 |
| The Huntington Mortgage Company ... | 0.00 | 0.07 | 0.00 | 0.00 | 0.05 |
| National City Mortgage ............ | 20.65 | 4.82 | 4.87 | 5.82 | 7.95 |
| Sun Trust Mortgage, Inc. .......... | 4.03 | 2.43 | 0.00 | 0.00 | 2.33 |
| US Bank Home Mortgage ............. | 0.00 | 0.07 | 0.00 | 0.00 | 0.04 |
| Washington Mutual Bank, F.A. ...... | 0.24 | 0.61 | 0.00 | 0.00 | 0.44 |
| Wells Fargo Bank, N.A. ............ | 41.74 | 56.13 | 9.03 | 84.29 | 58.57 |
| Total: ............................ | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

</TABLE>

        Information relating to the servicing activities of Wells Fargo and
ABN AMRO which in the aggregate will service approximately 69.66% of the Loans,
by Aggregate Cut-off Date Pool Balance, is summarized below. The information set
forth in this section has been provided by Wells Fargo and ABN AMRO, as
applicable. None of the depositor, the master servicer, the trust administrator,
the trustee, the custodians, the underwriter or any of their respective
affiliates have made or will make any representation as to the accuracy or
completeness of this information.

Wells Fargo, N.A.

        Wells Fargo is an indirect, wholly owned subsidiary of Wells Fargo &
Company. Wells Fargo is engaged in the business of (i) originating, purchasing
and selling residential mortgage loans in its own name and through its
affiliates and (ii) servicing residential mortgage loans for its own account and
for the account of others. Wells Fargo is an approved servicer of Fannie Mae and
Freddie Mac. Wells Fargo's principal office for servicing functions is located
at 1 Home Campus, Des Moines, Iowa 50328-0001.

Wells Fargo Bank, N.A. Delinquency Experience

        The following tables set forth certain information, as reported by
Wells Fargo, concerning recent delinquency and foreclosure experience on
fixed-rate and adjustable-rate

                                    S-36


<Page>


mortgage loans included in various mortgage pools underlying all series of Wells
Fargo Asset Securities Corporation's mortgage pass-through certificates with
respect to which one or more classes of certificates were publicly offered. The
delinquency and foreclosure experience set forth in the following tables include
mortgage loans with various terms to stated maturity, and includes loans having
a variety of payment characteristics. In addition, the adjustable-rate loan
table includes mortgage loans with various periods until the first interest rate
adjustment date and different indices upon which the adjusted interest rate is
based. Certain of the adjustable-rate loans also provide for the payment of only
interest until the first adjustment date. There can be no assurance that the
delinquency and foreclosure experience set forth in the following tables will be
representative of the results that may be experienced with respect to the
mortgage loans included in the trust.

                        Wells Fargo Bank, N.A.
                        Delinquency Experience
                    (Dollar Amounts in Thousands)

<TABLE>
<CAPTION>

| | By Dollar Amount of Loans | | By Dollar Amount of Loans | | By Dollar Amount of Loans |
|---|---|---|---|---|---|
| By No. of Loans | | By No. of Loans | | By No. of Loans | |

| <S> | As of December 31, 2002 | | As of December 31, 2003 | | As of June 30, 2004 | |
|---|---|---|---|---|---|---|
| | <C> | <C> | <C> | <C> | <C> | <C> |
| Fixed-Rate Loans | 57,527 | $21,021,499 | 27,528 | $12,684,974 | 28,659 | $13,208,318 |
| | ====== | =========== | ====== | =========== | ====== | =========== |
| Period of Delinquency(1) | | | | | | |
| 30-59 Days | 398 | $   129,563 | 55 | $    25,106 | 39 | $    15,490 |
| 60-89 Days | 103 | 31,662 | 14 | 5,033 | 8 | 3,270 |
| 90 days or more | 100 | 32,817 | 9 | 3,523 | 5 | 2,157 |
| | ------ | ----------- | ------ | ----------- | ------ | ----------- |
| Total Delinquent Loans | 601 | $   194,042 | 78 | $    33,662 | 52 | $    20,917 |
| | ====== | =========== | ====== | =========== | ====== | =========== |
| Percent of Fixed-Rate Loans | 1.04% | 0.92% | 0.28% | 0.27% | 0.18% | 0.16% |
| | | | | | | |
| Foreclosures(2) | | $48,928 | | $    11,328 | | $     3,510 |
| Foreclosure Ratio(3) | | 0.23% | | 0.09% | | 0.03% |
| | | | | | | |
| Adjustable-Rate Loans | 4,352 | $ 1,993,392 | 17,353 | $ 8,733,883 | 27,474 | $13,700,245 |
| | ====== | =========== | ====== | =========== | ====== | =========== |
| Period of Delinquency(1) | | | | | | |
| 30-59 Days | 18 | $     7,633 | 19 | $    10,283 | 35 | $    17,882 |
| 60-89 Days | 0 | 0 | 4 | 2,159 | 4 | 1,357 |
| 90 days or more | 1 | 325 | 3 | 1,751 | 2 | 736 |
| | ------ | ----------- | ------ | ----------- | ------ | ----------- |
| Total Delinquent Loans | 19 | $     7,958 | 26 | $    14,193 | 41 | $    19,975 |
| | ====== | =========== | ====== | =========== | ====== | =========== |
| Percent of Adjustable-Rate Loans | 0.44% | 0.40% | 0.15% | 0.16% | 0.15% | 0.15% |
| | | | | | | |
| Foreclosures(2) | | $         0 | | $     2,267 | | $         0 |
| Foreclosure Ratio(3) | | 0.00% | | 0.03% | | 0.00% |

</TABLE>

----------

(1)  The indicated periods of delinquency are based on the number of days past
     due, based on a 30-day month. No mortgage loan is considered delinquent for
     these purposes until one month has passed since its contractual due date. A
     mortgage loan is no longer considered delinquent once foreclosure
     proceedings have commenced.

(2)  Includes loans in the applicable portfolio for which foreclosure
     proceedings had been instituted or with respect to which the related
     property had been acquired as of the dates indicated.

(3)  Foreclosure as a percentage of total loans in the applicable portfolio at
     the end of each period.

                                      S-37

<Page>

ABN AMRO Mortgage Group, Inc.

        On June 30, 1999, Standard Federal Bank contributed all of its
residential one- to four-family mortgage loan origination and servicing assets
to ABN AMRO Mortgage Group, Inc. ("ABN AMRO"), which was formed to consolidate
all of the residential one- to four-family mortgage banking operations of
Standard Federal Bank and its affiliates into one entity. Before this
contribution, ABN AMRO did not hold or service any residential one- to
four-family mortgage loans in a loan or servicing portfolio. After this
contribution, ABN AMRO began to originate, directly or indirectly, and service
residential one- to four-family mortgage loans in its loan and servicing
portfolio. On October 5, 2001, Standard Federal Bank was merged with Michigan
National Bank and the combined entity was named Standard Federal Bank National
Association. At this time the residential one- to four-family mortgage loan
assets of Michigan National Bank were consolidated with the assets of Standard
Federal Bank and the servicing of these assets were transferred to ABN AMRO.

        At June 30, 2004, ABN AMRO provided servicing for approximately $199.9
billion aggregate principal amount of residential one- to four-unit mortgage
loans.

        The table below summarizes the following delinquency and foreclosure
experience:

        o    as of December 31, 1999 and 2000, on approximately $12.14
             billion and $11.37 billion, respectively, in outstanding
             principal balances on one- to four-family, residential loans
             originated, directly or indirectly, serviced by Standard
             Federal Bank; and

        o    as of December 31, 2001, December 31, 2002, December 31,
             2003 and June 30, 2004, on approximately $139.1 billion,
             $178.4 billion, $201.8 billion and $199.9 billion,

respectively, in outstanding principal balances on one- to
four-family, residential loans, serviced by ABN AMRO
(including loans serviced for others), and originated in the
following manner:

o    if originated before June 30, 1999, then originated
     directly or indirectly by Standard Federal Bank; or

o    if originated on or after June 30, 1999, then
     originated directly or indirectly by ABN AMRO; or

o    originated directly or indirectly by Standard Federal
     Bank National Association, or predecessor entities.

                    S-38

<Page>

        Standard Federal Bank National Association/ABN AMRO Mortgage Group, Inc.
                    One- to Four-Unit Residential Loans

<TABLE>
<CAPTION>

|  |  |  |  |  |  | Six Month Ended June 30 |
| --- | --- | --- | --- | --- | --- | --- |
|  | As of December 31 | | | | | |
|  | 1999(3) | 2000(3) | 2001(4) | 2002(4) | 2003(4) | 2004(4) |
| Delinquent loans at Period End(1) | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| 30 to 59 days ......................... | 0.63% | 0.69% | 0.61% | 0.97% | 0.42% | 0.38% |
| 60 to 89 days ......................... | 0.20 | 0.28 | 0.24 | 0.30 | 0.17 | 0.15 |
| 90 days and over(2) ................... | 0.85 | 0.93 | 1.02 | 1.28 | 1.48 | 0.87 |
| Total Delinquencies and Foreclosures(1) ... | 1.68% | 1.90% | 1.87% | 2.55% | 2.07% | 1.40% |

</TABLE>

----------
(1)  With respect to each period indicated in the table above, other than the
     periods ended December 31, 1999 and 2000 and June 30, 2004, real estate
     owned property is included in the delinquency calculations.

(2)  Includes foreclosures.

(3)  As a percentage of the total dollar amount of loans held and serviced by
     Standard Federal Bank in its loan portfolio and loans held for sale
     portfolio at period end or loans held and serviced by ABN AMRO, as
     applicable.

(4)  As a percentage of the aggregate dollar amount of loans originated by ABN
     AMRO and Standard Federal Bank National Association and serviced by ABN
     AMRO.

        The above delinquency and foreclosure statistics represent the total
portfolio experience of Standard Federal Bank National Association or ABN AMRO,
as applicable, for the indicated periods. There can be no assurance that the
delinquency and foreclosure experience with respect to the mortgage loans
comprising the mortgage pool will correspond to the delinquency and foreclosure
experience of Standard Federal Bank National Association's or ABN AMRO's
mortgage portfolio set forth in the foregoing table. Indeed, the statistics
shown above represent the delinquency and foreclosure experience for the total
residential one- to four-unit mortgage portfolios for each of the periods
presented, whereas the aggregate delinquency and foreclosure experience on the
mortgage loans will depend on the results obtained over the life of the mortgage
pool. In addition, the foregoing statistics include mortgage loans with a
variety of payment and other characteristics that may not correspond to those of
the loans.

                    DESCRIPTION OF THE OFFERED CERTIFICATES

General

        The certificates will be issued pursuant to the Pooling and Servicing
Agreement. Set forth below are summaries of the specific terms and provisions
pursuant to which the offered certificates will be issued. The following
summaries do not purport to be complete and are subject to, and are qualified in
their entirety by reference to, the provisions of the Pooling and Servicing
Agreement.

        The trust will issue fourteen classes of Senior Certificates and
fifteen classes of Subordinate Certificates. All of the Senior Certificates are
offered by this prospectus supplement. Of the Subordinate Certificates, only the
Class 15-B-1, 15-B-2, 15-B-3, Class 30-B-1, Class 30-B-2, Class 30-B-3, Class

HY-B-1, Class HY-B-2 and Class HY-B-3 certificates are offered by this prospectus supplement.

The offered certificates will have the respective initial Certificate Principal Balances or Notional Amounts specified in the table beginning on page S-5.

S-39

<Page>

The offered certificates, other than the Residual Certificates, will be issued in book-entry form as described below. The offered certificates will be issued in the minimum dollar denominations described in the table below.

Forms and Denominations of Offered Certificates

<TABLE>
<CAPTION>

| Class | Original Certificate Form | Minimum Denomination | Incremental Denomination |
|-------|--------------------------|---------------------|-------------------------|
| <S> | <C> | <C> | <C> |
| Classes 1-A-1, 2-A-1, 2-A-2, 2-A-3, 2-A-4, 2-A-5, 3-A-1, 4-A-1, 4-A-2, 15-B-1, 15-B-2, 15-B-3, 30-B-1, 30-B-2, 30-B-3, HY-B-1, HY-B-2 and HY-B-3... | Book-Entry | $ 25,000 | $1 |
| Class 2-A-6................................................................ | Book-Entry | $ 1,000 | $1 |
| Class A-X................................................................. | Book-Entry | $100,000 | $1 |
| Classes A-LR and A-UR...................................................... | Physical | $     50 | N/A |

</TABLE>

Distributions on the offered certificates are required to be made by the trust administrator on the related Distribution Date, commencing in October 2004, to the persons in whose names such certificates are registered at the close of business on the related Record Date.

Book-Entry Certificates

The offered certificates, other than the Residual Certificates, will be book-entry certificates. Persons acquiring beneficial ownership interests in the offered certificates will hold certificates through DTC, or indirectly through organizations that are participants in that system. The book-entry certificates of each class will be issued in one or more certificates that equal the aggregate Certificate Principal Balance or Notional Amount of that class and will initially be registered in the name of Cede & Co., the nominee of DTC. Except as described below, no person acquiring a book-entry certificate will be entitled to receive a physical certificate. Unless and until Definitive Certificates are issued, it is anticipated that the only certificateholder of the offered certificates will be Cede & Co., as nominee of DTC. Beneficial owners will not be certificateholders as that term is used in the Pooling and Servicing Agreement. Beneficial owners are only permitted to exercise their rights indirectly through DTC and participants of DTC.

The beneficial owner's ownership of a book-entry certificate will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary that maintains the beneficial owner's account for that purpose. In turn, the financial intermediary's ownership of the book-entry certificate will be recorded on the records of DTC or of a participating firm that acts as agent for the financial intermediary, whose interest will in turn be recorded on the records of DTC, if the beneficial owner's financial intermediary is not a DTC participant.

Beneficial owners will receive all distributions of principal of and interest on the book-entry certificates from the trust administrator through DTC and the participants of DTC. While the book-entry certificates are outstanding, except under the circumstances described below, under the rules, regulations and procedures creating and affecting DTC and its operations, DTC is required to make book-entry transfers among the DTC participants on whose behalf it acts with respect to the book-entry certificates and is required to receive and transmit distributions of principal of, and interest on, the book-entry certificates. Participants and indirect participants of DTC with whom beneficial owners have accounts with respect to book-entry certificates are similarly required to make book-entry transfers and receive and transmit the

S-40

<Page>

distributions on behalf of their respective beneficial owners. Accordingly,

although beneficial owners will not possess certificates representing their respective interests in the book-entry certificates, the rules of DTC provide a mechanism by which beneficial owners will receive distributions and will be able to transfer their interest.

Certificateholders will not receive or be entitled to receive certificates representing their respective interests in the book-entry certificates, except under the limited circumstances described below. Unless and until Definitive Certificates are issued, certificateholders who are not participants of DTC may transfer ownership of book-entry certificates only through participants of DTC and indirect participants of DTC by instructing the participants and indirect participants to transfer book-entry certificates, by book-entry transfer, through DTC for the account of the purchasers of the book-entry certificates, which account is maintained with their respective participants of DTC. Under the rules of DTC and in accordance with DTC's normal procedures, transfers of ownership of book-entry certificates will be executed through DTC and the accounts of the respective participants at DTC will be debited and credited. Similarly, the participants and indirect participants of DTC will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing certificateholders.

For information with respect to tax documentation procedures relating to the certificates, see "Federal Income Tax Consequences--REMICs--Taxation of Certain Foreign Investors--Regular Securities" and "--REMICs--Backup Withholding" in the prospectus.

Transfers between participants of DTC will occur in accordance with DTC rules.

In accordance with its normal procedures, DTC is expected to record the positions held by each DTC participant in the book-entry certificates, whether held for its own account or as a nominee for another person. In general, beneficial ownership of book-entry certificates will be subject to the rules of DTC, as in effect from time to time.

Distributions on the book-entry certificates will be made on each Distribution Date by the trust administrator to Cede & Co., as nominee of DTC. DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC participants in accordance with DTC's normal procedures. Each DTC participant will be responsible for disbursing such payments to the beneficial owners of the book-entry certificates that it represents and to each financial intermediary for which it acts as agent. Each financial intermediary will be responsible for disbursing funds to the beneficial owners of the book-entry certificates that it represents.

Under a book-entry format, beneficial owners of the book-entry certificates may experience some delay in their receipt of payments, since such payments will be forwarded by the trust administrator to Cede & Co. Because DTC can only act on behalf of DTC participants, the ability of a beneficial owner to pledge book-entry certificates to persons or entities that do not participate in the depository system, or otherwise take actions in respect of the book-entry certificates, may be limited due to the lack of physical certificates for the book-entry certificates. In addition, issuance of the book-entry certificates in book-entry form may reduce the liquidity of those certificates in the secondary market since certain potential investors may be unwilling to purchase certificates for which they cannot obtain physical certificates.

S-41

<Page>

Monthly and annual reports relating to the trust will be provided to Cede & Co., as nominee of DTC. These reports may be made available by Cede & Co. to beneficial owners upon request, in accordance with the rules, regulations and procedures creating and affecting the DTC participants to whose DTC accounts the book-entry certificates of such beneficial owners are credited.

DTC has advised the trust administrator that, unless and until Definitive Certificates are issued, DTC will take any action permitted to be taken by the holders of the book-entry certificates under the Pooling and Servicing Agreement only at the direction of one or more financial intermediaries to whose DTC accounts the book-entry certificates are credited, to the extent that such actions are taken on behalf of financial intermediaries whose holdings include the book-entry certificates. DTC may take actions, at the direction of the related participants of DTC, with respect to some book-entry certificates which conflict with actions taken with respect to other book-entry certificates.

Definitive Certificates will be issued to beneficial owners of the book-entry certificates, or their nominees, rather than to DTC, only if:

(1) DTC or the depositor advises the trust administrator in writing that DTC is no longer willing, qualified or able to discharge properly its responsibilities as nominee and depository with respect to the book-entry certificates and the depositor is unable to locate a qualified

successor; or

    (2) beneficial owners having percentage interests aggregating not less than 51% of the book-entry certificates advise the trust administrator and DTC through the financial intermediaries and the DTC participants in writing that the continuation of a book-entry system through DTC, or a successor to it, is no longer in the best interests of the beneficial owners.

Upon the trust administrator's receipt of notice of the occurrence of any of the events described in the immediately preceding paragraph, the trust administrator will be required to notify all participants of the occurrence of the event and the availability through DTC of Definitive Certificates. Upon surrender by DTC of the certificates representing the book-entry certificates and instructions for re-registration to the trust administrator, the trust administrator will issue Definitive Certificates. The trust administrator will then recognize the holders of the Definitive Certificates as certificateholders under the Pooling and Servicing Agreement.

Although DTC has agreed to the foregoing procedures in order to facilitate transfers of book-entry certificates among participants of DTC, it is under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

None of the depositor, the transferor, the master servicer, the trust administrator or the trustee will have any responsibility for any aspect of the records relating to or payments made on account of beneficial ownership interests of the book-entry certificates held by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

<center>S-42</center>

&lt;Page&gt;

Physical Certificates

The Residual Certificates will be issued in fully-registered, certificated form. The Residual Certificates will be transferable and exchangeable at the office of the trust administrator located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479, Attention: Corporate Trust Services-MSSTR 2004-1. Under the Pooling and Servicing Agreement, the trust administrator will initially be appointed as the certificate registrar. No service charge will be made for any registration of transfer or exchange of the Residual Certificates but payment of a sum sufficient to cover any tax or other governmental charge may be required by the trust administrator. The Residual Certificates will be subject to certain restrictions on transfer. See "--Restrictions on Transfer of the Residual Certificates" below.

Distributions of principal and interest, if any, on each Distribution Date on the Residual Certificates will be made to the persons in whose names such certificates are registered at the close of business on the Record Date. Distributions will be made by check or money order mailed to the person entitled to them at the address appearing in the certificate register or, to the extent permitted in the Pooling and Servicing Agreement, upon written request by the certificateholder to the trust administrator, by wire transfer to a United States depository institution designated by such certificateholder and acceptable to the trust administrator or by such other means of payment as such certificateholder and the trust administrator may agree; provided, however, that the final distribution in retirement of the Residual Certificates will be made only upon presentation and surrender of such certificates at the office or agency of the trust administrator specified in the notice to the holders thereof of such final distribution.

Allocation of Available Funds

Distributions to holders of each class of Senior Certificates in each Certificate Group will be made on each Distribution Date from Available Funds related to such Certificate Group. Distributions to holders of the Class A-X certificates will be made on each Distribution Date from Available Funds related to Certificate Group 1 and Certificate Group 2. Distributions to the holders of the Class PO Certificates will be made on each Distribution Date from Available Funds related to Certificate Group 2. Distributions to the holders of Senior Certificates in Certificate Group 2, Certificate Group 3 and Certificate Group 4 will also be made, to the extent of cross-collateralization payments described in this prospectus supplement, from Available Funds from the other of such Certificate Groups remaining after payment of the Senior Certificates in such Group. Distributions to the holders of the Group 15-B Subordinate Certificates will be made on each Distribution Date from Available Funds related to Loan Group 1, remaining after payment of amounts due to the Class 1-A-1 Certificates. Distributions to holders of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates will be made on each Distribution Date from Available Funds related to Loan Group 2 remaining after payments of amounts due to the related Senior Certificates. Distributions to holders of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates will be made on each Distribution Date from Available

Funds related to Loan Group 3 and Loan Group 4 remaining after payments of amounts due to the related Senior Certificates. Distribution to holders of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates will be made on each Distribution Date from Available Funds related to Loan Group 2, Loan Group 3 and Loan Group 4 remaining after payments of amounts due to the related Senior Certificates, Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates.

S-43

<Page>

On each Distribution Date, the Available Funds for each Loan Group will be distributed in the order of priority set forth below among the certificates to the extent available:

first, concurrently,

(A) from the Available Funds for Loan Group 1,

(1) to the Class 1-A-1, Class A-LR and Class A-UR Certificates, pro rata the applicable Accrued Certificate Interest for that Distribution Date; and

(2) to the Class A-X Certificates, the Excess Interest Amount for such Distribution Date.

(B) from the Available Funds for Loan Group 2, to each Class of Group 2 Certificates and Class A-X Certificates, pro rata, the applicable Accrued Certificate Interest for that Distribution Date; provided, however, that for purposes of the distributions pursuant to this clause (B), the Accrued Certificate Interest for the Class A-X Certificates shall be calculated solely on the basis of the portion of the Class A-X Notional Amount attributable to the Group 2 Loans; provided, ,further, that the Accrued Certificate Interest with respect to the Class 2-A-5 Certificates prior to the Class 2-A-5 Accretion Termination Date will be added to the Certificate Principal Balance of the Class 2-A-5 Certificates and distributed as principal, as described below under "-Principal--Principal Allocation of the Class 2-A-5 Accrual Amount";

(C) from the Available Funds for Loan Group 3, to the Class 3-A-1 Certificates, the applicable Accrued Certificate Interest for that Distribution Date; and

(D) from the Available Funds for Loan Group 4, to the Class 4-A-1 and Class 4-A-2 Certificates, pro rata, the applicable Accrued Certificate Interest for that Distribution Date;

second, concurrently,

(A) from the Available Funds for Loan Group 1 to the Group 1 Certificates, the Senior Optimal Principal Amount for Group 1 for that Distribution Date, as follows:

(1) first, to the Class A-LR and Class A-UR Certificates, pro rata, based on Certificate Principal Balances, until their respective Certificate Principal Balances are reduced to zero; and

(2) second, to the Class 1-A-1 Certificates, until its Certificate Principal Balance is reduced to zero;

(B) from the Available Funds for Loan Group 2, to the Group 2 Certificates and Class PO Certificates, concurrently as follows:

(1) to the Group 2 Certificates, the Senior Optimal Principal Amount for Group 2 for that Distribution Date, as follows:

(a) first, to the Class 2-A-1, Class 2-A-2, Class 2-A-3 and Class 2-A-4 Certificates, pro rata, based on Certificate Principal Balances, and then to

S-44

<Page>

the Class 2-A-6 Certificates until the aggregate Certificate Principal Balance of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates is reduced to the Targeted Aggregate Principal Balance as set forth in

the table below entitled "Targeted Aggregate Principal Balance" for such Distribution Date;

(b)   second, to the Class 2-A-5 Certificates, until its Certificate Principal Balance is reduced to zero;

(c)   third, to the Class 2-A-1, Class 2-A-2, Class 2-A-3 and Class 2-A-4 Certificates, pro rata, based on Certificate Principal Balances, until their respective Certificate Principal Balances are reduced to zero; and

(d)   fourth, to the Class 2-A-6 Certificates, until its Certificate Principal Balance is reduced to zero;

(2)   to the Class PO certificates, the Class PO Principal Distribution Amount for Loan Group 2 for that Distribution Date, until its Certificate Principal Balance is reduced to zero;

(C)   from the Available Funds for Loan Group 3, to the Class 3-A-1 Certificates, the Senior Optimal Principal Amount for Group 3 for that Distribution Date; and

(D)   from the Available Funds for Loan Group 4, to the Class 4-A-1 and Class 4-A-2 Certificates pro rata, based on Certificate Principal Balances, the Senior Optimal Principal Amount for Group 4 for that Distribution Date, until their respective Certificate Principal Balances are reduced to zero;

third, on any Distribution Date prior to the related Cross-Over Date, (i) first, from any PO Recoveries for that Distribution Date related to Loan Group 2, to the Class PO Certificates, up to the Class PO Deferred Amount for that Distribution Date and (ii) second, from the remaining Available Funds for Loan Group 2, to the Class PO Certificates, up to the remaining Class PO Deferred Amount for that Distribution Date; provided that, (1) on any Distribution Date, the aggregate of the distributions pursuant to clause (ii) of this priority third of the Class PO Deferred Amount will not exceed the Subordinate Principal Distribution Amount for the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates and the Group 2 Portion for that Distribution Date, (2) such distributions will not reduce the Certificate Principal Balance of the Class PO Certificates and (3) no distribution will be made in respect of any such Class PO Deferred Amounts on or after the related Cross-Over Date;

fourth, from the remaining Available Funds for Loan Group 1, to the Group 15-B Subordinate Certificates, in the following order: (A) to the Class 15-B-1 Certificates, (1) the Accrued Certificate Interest on the Class 15-B-1 Certificates for that Distribution Date and (2) the Class 15-B-1 Certificates' Allocable Share for that Distribution Date; (B) to the Class 15-B-2 Certificates, (1) the Accrued Certificate Interest on the Class 15-B-2 Certificates for that Distribution Date and (2) the Class 15-B-2 Certificates' Allocable Share for that Distribution Date; (C) to the Class 15-B-3 Certificates, (1) the Accrued Certificate Interest on the Class 15-B-3 Certificates for that Distribution Date and (2) the Class 15-B-3 Certificates' Allocable Share

S-45

<Page>

for that Distribution Date; (D) to the Class 15-B-4 Certificates, (1) the Accrued Certificate Interest on the Class 15-B-4 Certificates for that Distribution Date and (2) the Class 15-B-4 Certificates' Allocable Share for that Distribution Date; (E) to the Class 15-B-5 Certificates, (1) the Accrued Certificate Interest on the Class 15-B-5 Certificates for that Distribution Date and (2) the Class 15-B-5 Certificates' Allocable Share for that Distribution Date; and (F) to the Class 15-B-6 Certificates, (1) the Accrued Certificate Interest on the Class 15-B-6 Certificates for that Distribution Date and (2) the Class 15-B-6 Certificates' Allocable Share for that Distribution Date;

fifth, from the remaining Available Funds for Loan Group 2, in the following order: (A) to the Class 30-B-1 Certificates, (1) the Accrued Certificate Interest on the Class 30-B-1 Certificates for that Distribution Date and (2) the Class 30-B-1 Certificates' Allocable Share for that Distribution Date; (B) to the Class 30-B-2 Certificates, (1) the Accrued Certificate Interest on the Class 30-B-2 Certificates for that Distribution Date and (2) the Class 30-B-2 Certificates' Allocable Share for that Distribution Date; and (C) to the Class 30-B-3 Certificates, (1) the Accrued Certificate Interest on the Class 30-B-3 Certificates for that Distribution Date and (2) the Class 30-B-3 Certificates' Allocable Share for that Distribution Date;

sixth, from the remaining Available Funds for Loan Group 3 and Loan Group 4 in the aggregate, in the following order: (A) to the Class HY-B-1 Certificates, (1) the Accrued Certificate Interest on the Class HY-B-1 Certificates for that Distribution Date and (2) the Class HY-B-1 Certificates' Allocable Share for that Distribution Date; (B) to the Class HY-B-2 Certificates, (1) the Accrued Certificate Interest on the Class HY-B-2 Certificates for that Distribution Date and (2) the Class HY-B-2 Certificates'

Allocable Share for that Distribution Date; and (C) to the Class HY-B-3
Certificates, (1) the Accrued Certificate Interest on the Class HY-B-3
Certificates for that Distribution Date and (2) the Class HY-B-3 Certificates'
Allocable Share for that Distribution Date;

    seventh, from the remaining Available Funds for Loan Group 2, Loan
Group 3 and Loan Group 4 in the aggregate, in the following order: (A) to the
Class C-B-4 Certificates, (1) the Accrued Certificate Interest on the Class
C-B-4 Certificates for that Distribution Date and (2) the Class C-B-4
Certificates' Allocable Share for that Distribution Date; (B) to the Class C-B-5
Certificates, (1) the Accrued Certificate Interest on the Class C-B-5
Certificates for that Distribution Date and (2) the Class C-B-5 Certificates'
Allocable Share for that Distribution Date; and (C) to the Class C-B-6
Certificates, (1) the Accrued Certificate Interest on the Class C-B-6
Certificates for that Distribution Date and (2) the Class C-B-6 Certificates'
Allocable Share for that Distribution Date; and

    eighth, to the Class A-LR or Class A-UR Certificates, as applicable,
any remaining portion (which is expected to be zero) of the Available Funds for
Loan Group 1, Loan Group 2, Loan Group 3 and Loan Group 4 in each Lower-Tier
REMIC or the Upper-Tier REMIC for that Distribution Date.

    The following table sets forth for each Distribution Date the Targeted
Aggregate Principal Balance for the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class
2-A-4 and Class 2-A-6 Certificates.

                                   S-46


<Page>


    There is no assurance that sufficient funds will be available on any
Distribution Date to reduce the aggregate Certificate Principal Balance of the
Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates
to the Targeted Aggregate Principal Balance for that Distribution Date, or that
distributions will not be made in excess of those amounts for that Distribution
Date.

                      Targeted Aggregate Principal Balances

<TABLE>
<CAPTION>

| Distribution Date | Targeted Aggregate Principal Balances ($) |
| --- | --- |
| <S> | <C> |
| October 25, 2004 | 421,288,376.92 |
| November 25, 2004 | 412,331,868.10 |
| December 25, 2004 | 403,544,209.32 |
| January 25, 2005 | 394,922,197.45 |
| February 25, 2005 | 386,462,689.34 |
| March 25, 2005 | 378,162,600.64 |
| April 25, 2005 | 370,018,904.77 |
| May 25, 2005 | 362,028,631.80 |
| June 25, 2005 | 354,188,867.40 |
| July 25, 2005 | 346,496,751.81 |
| August 25, 2005 | 338,949,478.84 |
| September 25, 2005 | 331,544,294.81 |
| October 25, 2005 | 324,278,497.66 |
| November 25, 2005 | 317,149,435.91 |
| December 25, 2005 | 310,154,507.74 |
| January 25, 2006 | 303,291,160.10 |
| February 25, 2006 | 296,556,887.74 |
| March 25, 2006 | 289,949,232.35 |
| April 25, 2006 | 283,465,781.69 |
| May 25, 2006 | 277,104,168.71 |
| June 25, 2006 | 270,862,070.74 |
| July 25, 2006 | 264,737,208.61 |
| August 25, 2006 | 258,727,345.87 |
| September 25, 2006 | 252,830,288.02 |
| October 25, 2006 | 247,043,881.65 |
| November 25, 2006 | 241,366,013.75 |
| December 25, 2006 | 235,794,610.91 |
| January 25, 2007 | 230,327,638.60 |
| February 25, 2007 | 224,963,100.44 |
| March 25, 2007 | 219,699,037.46 |
| April 25, 2007 | 214,533,527.46 |
| May 25, 2007 | 209,464,684.27 |
| June 25, 2007 | 204,490,657.10 |
| July 25, 2007 | 199,609,629.87 |
| August 25, 2007 | 194,819,820.56 |
| September 25, 2007 | 190,119,480.60 |
</TABLE>

                                   S-47

&lt;Page&gt;

&lt;TABLE&gt;
&lt;CAPTION&gt;

| Distribution Date | Targeted Aggregate Principal Balances ($) |
|-------------------|-------------------------------------------|
| &lt;S&gt; | &lt;C&gt; |
| October 25, 2007 | 185,506,894.20 |
| November 25, 2007 | 180,980,377.78 |
| December 25, 2007 | 176,743,102.93 |
| January 25, 2008 | 172,584,266.26 |
| February 25, 2008 | 168,502,357.77 |
| March 25, 2008 | 164,495,895.78 |
| April 25, 2008 | 160,563,426.38 |
| May 25, 2008 | 156,703,522.96 |
| June 25, 2008 | 152,914,785.64 |
| July 25, 2008 | 149,195,840.81 |
| August 25, 2008 | 145,545,340.64 |
| September 25, 2008 | 141,961,962.55 |
| October 25, 2008 | 138,444,408.80 |
| November 25, 2008 | 134,991,405.98 |
| December 25, 2008 | 131,601,704.59 |
| January 25, 2009 | 128,274,078.55 |
| February 25, 2009 | 125,007,324.80 |
| March 25, 2009 | 121,800,262.84 |
| April 25, 2009 | 118,651,734.33 |
| May 25, 2009 | 115,560,602.65 |
| June 25, 2009 | 112,525,752.53 |
| July 25, 2009 | 109,546,089.61 |
| August 25, 2009 | 106,620,540.07 |
| September 25, 2009 | 103,748,050.25 |
| October 25, 2009 | 100,927,586.23 |
| November 25, 2009 | 98,158,133.53 |
| December 25, 2009 | 95,438,696.69 |
| January 25, 2010 | 92,768,298.92 |
| February 25, 2010 | 90,145,981.80 |
| March 25, 2010 | 87,570,804.84 |
| April 25, 2010 | 85,041,845.24 |
| May 25, 2010 | 82,558,197.50 |
| June 25, 2010 | 80,118,973.11 |
| July 25, 2010 | 77,723,300.25 |
| August 25, 2010 | 75,370,323.45 |
| September 25, 2010 | 73,059,203.29 |
| October 25, 2010 | 70,789,116.09 |
| November 25, 2010 | 68,559,253.65 |
| December 25, 2010 | 66,368,822.92 |
| January 25, 2011 | 64,217,045.74 |
| February 25, 2011 | 62,103,158.53 |
| March 25, 2011 | 60,026,412.06 |
| April 25, 2011 | 57,986,071.14 |
| May 25, 2011 | 55,981,414.38 |
| June 25, 2011 | 54,011,733.92 |

&lt;/TABLE&gt;

S-48

&lt;Page&gt;

&lt;TABLE&gt;
&lt;CAPTION&gt;

| Distribution Date | Targeted Aggregate Principal Balances ($) |
|-------------------|-------------------------------------------|
| &lt;S&gt; | &lt;C&gt; |
| July 25, 2011 | 52,076,335.18 |
| August 25, 2011 | 50,174,536.59 |
| September 25, 2011 | 48,305,669.40 |
| October 25, 2011 | 46,469,077.37 |
| November 25, 2011 | 44,664,116.58 |
| December 25, 2011 | 42,890,155.19 |
| January 25, 2012 | 41,146,573.19 |
| February 25, 2012 | 39,432,762.21 |
| March 25, 2012 | 37,748,125.27 |
| April 25, 2012 | 36,092,076.59 |
| May 25, 2012 | 34,464,041.38 |
| June 25, 2012 | 32,863,455.60 |
| July 25, 2012 | 31,289,765.80 |

```
August 25, 2012        29,742,428.88
September 25, 2012      28,220,911.92
October 25, 2012        26,724,691.99
November 25, 2012       25,253,255.96
December 25, 2012       23,806,100.29
January 25, 2013        22,382,730.87
February 25, 2013       20,982,662.85
March 25, 2013          19,605,420.46
April 25, 2013          18,250,536.82
May 25, 2013            16,917,553.79
June 25, 2013           15,606,021.80
July 25, 2013           14,315,499.68
August 25, 2013         13,045,554.53
September 25, 2013      11,795,761.52
October 25, 2013        10,565,703.77
November 25, 2013        9,354,972.20
December 25, 2013        8,163,165.35
January 25, 2014         6,989,889.28
February 25, 2014        5,834,757.39
March 25, 2014           4,697,390.31
April 25, 2014           3,577,415.73
May 25, 2014             2,474,468.29
June 25, 2014            1,388,189.47
July 25, 2014              318,227.40
August 25, 2014                 0.00
</TABLE>
```

The Targeted Aggregate Principal Balances for each Distribution Date listed in
the table above were calculated based on assumptions, including the assumption
that prepayments on the loans in Loan Group 2 occur at a constant level of
approximately 20% CPR with respect to the Class 2-A-1, Class 2-A-2, Class 2-A-3,
Class 2-A-4 and Class 2-A-6 Certificates. The performance of the loans in Loan
Group 2 may differ from the assumptions used in determining those balances.

<center>S-49</center>

<Page>

The Targeted Aggregate Principal Balances listed in the table above are final
and binding regardless of any error or alleged error in making the calculations.

        There can be no assurance that funds available for distributions of
principal in reduction of the Certificate Principal Balances of the Class 2-A-1,
Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates will be
sufficient or will not be in excess of, amounts needed to reduce their aggregate
Certificate Principal Balance to the Targeted Aggregate Principal Balance for
any Distribution Date. Distributions in reduction of the Certificate Principal
Balances of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class
2-A-6 Certificates may commence significantly later than would be anticipated
based on the Targeted Aggregate Principal Balances shown in the table above.
Distributions of principal in reduction of the Certificate Principal Balances of
the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6
Certificates may end significantly earlier or later than would be anticipated
based on the Targeted Aggregate Principal Balances shown in the table above. See
"Certain Prepayment and Yield Considerations" in this prospectus supplement for
a further discussion of the assumptions used to produce the above table and the
effect of prepayments on the loans in Loan Group 2 on the rate of payments of
principal and on the weighted average life of those certificates.

Interest

        Interest will accrue on the certificates (other than the Class PO
Certificates) on their respective Certificate Principal Balances or Notional
Amounts, as applicable, at the respective interest rates set forth in the table
beginning on page S-5 during each Interest Accrual Period; provided, however,
that prior to the Class 2-A-5 Accretion Termination Date, interest that would
have been distributed on the Class 2-A-5 Certificates, will instead be added to
the Certificate Principal Balance of the Class 2-A-5 Certificates.

        The "Accrued Certificate Interest" for each class of certificates
(other than the Class PO Certificates) for each Distribution Date will be an
amount equal to (1) the interest accrued at such class's pass-through rate
during the related Interest Accrual Period on the Certificate Principal Balance
or Notional Amount, as applicable, of such class of certificates, minus each
class's pro rata share of any related Net Interest Shortfalls and, after the
related Cross-Over Date, the interest portion of Realized Losses to the extent
allocated to such class plus (2) any Accrued Certificate Interest for that class
remaining undistributed from previous Distribution Dates.

        The Class PO Certificates are principal only certificates and will not
accrue interest.

        For any Distribution Date, the "Net Interest Shortfall" for any Loan
Group will equal the sum of:

(A) the aggregate amount of interest that would otherwise have been received for each Loan in that Loan Group that was the subject of a Relief Act Reduction (such amount, the "Interest Shortfall"); and

(B) any related Net Prepayment Interest Shortfall.

S-50

<Page>

With respect to any Distribution Date, the "Net Prepayment Interest Shortfall" for any Loan Group will equal the aggregate Prepayment Interest Shortfalls with respect to that Distribution Date less any Compensating Interest for that Loan Group. See "The Pooling and Servicing Agreement--Servicing and Master Servicing Compensation and Payment of Expenses" in this prospectus supplement.

With respect to any Loan Group, any Net Interest Shortfall and the interest portion of any Excess Losses through the related Cross-Over Date and, after the related Cross-Over Date, the interest portion of any Realized Losses will, on each Distribution Date, be allocated among all the related outstanding certificates entitled to distributions of interest in proportion to the amount of Accrued Certificate Interest that would have been allocated to the applicable certificate in the absence of the shortfall and losses. The amount of Accrued Certificate Interest that would have been allocated to the Class HY-B-1, Class HY-B-2, Class HY-B-3, Class C-B-4, Class C-B-5 and Class C-B-6 Certificates shall be based upon the amount of interest accruing for each related Loan Group on such Class' proportionate share, based on Certificate Principal Balance of the related Group Subordinate Amount for that Distribution Date. See "--Allocation of Losses" below and "The Pooling and Servicing Agreement--Servicing and Master Servicing Compensation and Payment of Expenses" in this prospectus supplement.

With respect to any Loan Group, the interest portion of any Realized Losses occurring prior to the related Cross-Over Date will not be allocated among any certificates, but will reduce the amount of Available Funds for the related Group on the related Distribution Date. As a result of the subordination of the Subordinate Certificates, such losses will be borne first by the related outstanding Subordinate Certificates in inverse order of priority (e.g., with respect to Loan Group 1, first to Class 15-B-6, then to Class 15-B-5, and so forth and with respect to Loan Group 2, Loan Group 3 and Loan Group 4, first to Class C-B-6, then to Class C-B-5, and so forth).

If Available Funds and available credit enhancement for any Group are insufficient on any Distribution Date to distribute the aggregate Accrued Certificate Interest on the classes of Senior Certificates related to such Group, any shortfall in available amounts will be allocated among those classes in proportion to the amounts of Accrued Certificate Interest otherwise distributable to those classes. The amount of any such undistributed Accrued Certificate Interest will be added to the amount of interest to be distributed on those certificates entitled to distributions of interest on subsequent Distribution Dates in accordance with the definitions of Accrued Certificate Interest in this prospectus supplement. No interest will accrue on any Accrued Certificate Interest remaining undistributed from previous Distribution Dates.

Principal

Distributions in reduction of the Certificate Principal Balance of each certificate entitled to principal distributions will be made on each Distribution Date. The Interest Only Certificates do not have a Certificate Principal Balance and will not be entitled to distributions of principal.

Distributions in reduction of the Certificate Principal Balance of each class of Group 1, Group 2, Group 3 and Group 4 Certificates entitled to principal distributions will be made on each Distribution Date as described in the second paragraph under "--Allocation of Available Funds" above in accordance with priority second. The Available Funds related to a Group remaining after the distribution of interest will be allocated to the Senior Certificates of such

S-51

<Page>

Group (other than the Interest Only Certificates) in an aggregate amount not to exceed the Senior Optimal Principal Amount for such Group if any, for the respective Distribution Date. If the applicable Available Funds are insufficient to make the full distribution as described in the second paragraph under "--Allocation of Available Funds" above in accordance with priority second (A),

(B), (C) and (D), such Available Funds will be distributed to the Senior Certificates of such Group and the Class PO Certificates, pro rata, based on the applicable Senior Optimal Principal Amount and Class PO Principal Distribution Amount, respectively, if any.

Distributions in reduction of the Certificate Principal Balances of the Group 15-B Subordinate Certificates will be made on each Distribution Date in accordance with priority fourth under "Description of the Offered Certificates--Allocation of Available Funds".

Distributions in reduction of the Certificate Principal Balances of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates will be made on each Distribution Date in accordance with priority sixth under "Description of the Offered Certificates--Allocation of Available Funds".

Distributions in reduction of the Certificate Principal Balance of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates will be made on each Distribution Date in accordance with priority seventh under "Description of the Offered Certificates--Allocation of Available Funds", as adjusted for cross-collateralization as described under "--Subordination--Cross Collateralization" below.

Distributions in reduction of the Certificate Principal Balance of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates will be made on each Distribution Date in accordance with priority seventh under "Description of the Offered Certificates--Allocation of Available Funds" , as adjusted for cross-collateralization as described under "--Subordination--Cross Collateralization" below.

If the Class Prepayment Distribution Trigger is not satisfied for a class of outstanding Subordinate Certificates on any Distribution Date, this may have the effect of accelerating the amortization of more senior ranking classes of the related Subordinate Certificates because the amount of partial or full principal prepayments, net liquidation proceeds and net insurance proceeds otherwise distributable to such class will be distributable among the outstanding related Subordinate Certificates as to which the Class Prepayment Distribution Trigger has been satisfied, on a pro rata basis. On any Distribution Date, any reduction in funds available for distribution to the classes of Subordinate Certificates resulting from a distribution required to cover any shortfalls in distributions to the related Senior Certificates due to a shortfall in Available Funds for the related Loan Group, will be allocated to the classes of related Subordinate Certificates, in inverse order of priority.

Prior to the related Cross-Over Date, Non PO Recoveries received during the calendar month prior to a Distribution Date with respect to a loss on a Loan will be treated as a principal prepayment and will result in a payment of principal to one or more corresponding classes of certificates on the related Distribution Date. It is possible that such payment will not be made to the class that originally bore the loss. Further, even though a class may have previously had its Certificate Principal Balance reduced as a result of a loss for which there is later a Non PO Recovery, that class will not be entitled to any interest on the amount of such reduction. Because such Non PO Recoveries result in a payment of principal to certain classes without a

S-52

<Page>

corresponding decrease in the aggregate Pool Balance of the Loans, the Certificate Principal Balance of one or more classes of certificates that have been allocated Realized Losses, will be increased, as follows:

(a) first, up to the amount of the Non PO Recoveries with respect to any Loan Group, the Certificate Principal Balance of each class of Senior Certificates (other than the Class PO and the Interest Only Certificates) of the Certificate Group corresponding to that Loan Group will be increased, pro rata, up to the amount of unrecovered Realized Losses previously allocated to such class, if any; and

(b) second, up to the amount of the Non PO Recoveries remaining after allocation pursuant to clause (a), the Certificate Principal Balance of each class of related Subordinate Certificates, in order of seniority, will be increased, by the amount of unrecovered Realized Losses previously allocated to such class, if any.

Commencing on the related Cross-Over Date, the amount of any Recovery on a Loan received during the calendar month prior to a Distribution Date will be distributed to the Senior Certificates, without a corresponding reduction in their Certificate Principal Balances, as follows: (i) the PO Percentage of the Recovery will be distributable to the Class PO Certificates, and (ii) the amount of the Recovery remaining after distribution pursuant to the preceding clause (i) will be distributable to the classes of Senior Certificates (other than the Class PO and Interest Only Certificates) of the Certificate Group corresponding to that Loan Group, pro rata.

Principal Allocation of the Class 2-A-5 Accrual Amount

On each Distribution Date prior to the Class 2-A-5 Accretion Termination Date, the Class 2-A-5 Accrual Amount will be added to the Certificate Principal Balance of the Class 2-A-5 Certificates (and thereafter accrue interest at the applicable pass-through rate).

On each Distribution Date prior to the Class 2-A-5 Accretion Termination Date, the Class 2-A-5 Accrual Amount, if any, will be distributed as principal, as follows:

(1) first, to the Class 2-A-1, Class 2-A-2, Class 2-A-3 and Class 2-A-4 Certificates, pro rata, based on Certificate Principal Balances, then to the Class 2-A-6 Certificates until the aggregate Certificate Principal Balance of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates is reduced to the Targeted Aggregate Principal Balance as set forth in the table above entitled "Targeted Aggregate Principal Balance" for such Distribution Date; and

(2) second, to the Class 2-A-5 Certificates, until its Certificate Principal Balance is reduced to zero.

Allocation of Losses

On each Distribution Date, the applicable PO Percentage of the principal portion of any Realized Loss on a Discount Loan will be allocated to the Class PO Certificates until the Certificate Principal Balance of the Class PO Certificates is reduced to zero.

S-53

<Page>

On each Distribution Date prior to the related Cross-Over Date, distributions in respect of each Class PO Deferred Amount will be made on the Class PO Certificates in accordance with priority third of the second paragraph under "--Allocation of Available Funds" above to the extent of any PO Recoveries and certain other Available Funds remaining after distributions in accordance with priority second of that paragraph. Any distribution of such PO Recoveries and any other Available Funds in respect of a Class PO Deferred Amount will not reduce the Certificate Principal Balance of the Class PO Certificates. No interest will accrue on any Class PO Deferred Amount. On each Distribution Date prior to the related Cross-Over Date, first, the Group 2 Portion of the Certificate Principal Balance of the most subordinate class of Class C-B-4, C-B-5 and Class C-B-6 Certificates then outstanding and then the Certificate Principal Balance of the most subordinate class of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates then outstanding, will be reduced by the amount of any distributions made on the Distribution Date to the Class PO Certificates in respect of any Class PO Deferred Amount. After the related Cross-Over Date no distributions will be made in respect of any Class PO Deferred Amount and Realized Losses will be allocated to the Class PO Certificates without a right of reimbursement from any other class of certificates.

Prior to the applicable Cross Over Date, (a) the applicable Non-PO Percentage of the principal portion of any Realized Loss on a Group 1 Loan will be allocated to the Group 15-B Subordinate Certificates, in inverse order of priority of payment, until the Certificate Principal Balance of each such class has been reduced to zero, (b) until the Certificate Principal Balances of the Class C-B-6, Class C-B-5 and Class C-B-4 Certificates have been reduced to zero, the applicable Non-PO Percentage of the principal portion of any Realized Loss on a Group 2, Group 3 or Group 4 Loan will be allocated among the outstanding classes of Class C-B-6, Class C-B-5 and Class C-B-4 Certificates, in that order, until the Certificate Principal Balance of each class has been reduced to zero, (c) once the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the applicable Non-PO Percentage of the principal portion of any Realized Loss on a Group 2 Loan will be allocated among the outstanding classes of Class 30-B-3, Class 30-B-2 and Class 30-B-1 Certificates, in that order, until the Certificate Principal Balance of each class has been reduced to zero and (d) once the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the applicable Non-PO Percentage of the principal portion of any Realized Loss on a Group 3 Loan or Group 4 Loan will be allocated among the outstanding classes of Class HY-B-3, Class HY-B-2 and Class HY-B-1 Certificates, in that order, until the Certificate Principal Balance of each class has been reduced to zero.

Commencing on the related Cross-Over Date, the applicable Non-PO Percentage of the principal portion of any Realized Loss on a Loan in any Loan Group will be allocated among the outstanding classes of the related Senior Certificates (other than the Class PO and Interest Only Certificates), pro rata, based on Certificate Principal Balance of the Certificate Group related to the Loan that incurred the Realized Loss; provided however that any such Realized Loss incurred on a Group 4 Loan will be allocated to the Class 4-A-2 Certificates until the Certificate Principal Balance thereof has been reduced to

zero and then to the Class 4-A-1 Certificates until the Certificate Principal
Balance thereof is reduced to zero.

On each Distribution Date, a Subordinate Certificate Writedown Amount,
if any, will be deemed a Realized Loss, and will be allocated to the most
subordinate class of related Subordinate Certificates then outstanding.

S-54

<Page>

A Deficient Valuation may result from the personal bankruptcy of a
borrower if the bankruptcy court establishes the value of the Mortgaged Property
at an amount less than the then outstanding principal balance of the Loan
secured by such Mortgaged Property and reduces the secured debt to such value.
In such case, the trust, as the holder of such Loan, would become an unsecured
creditor to the extent of the difference between the outstanding principal
balance of such Loan and such reduced secured debt.

All allocations of Realized Losses to a class of certificates will be
accomplished on a Distribution Date by reducing the Certificate Principal
Balance of the class by the appropriate share of any such losses occurring
during the month preceding the month of such Distribution Date and, accordingly,
will be taken into account in determining the distributions of principal and/or
interest on the certificates, commencing on the following Distribution Date.

The interest portion of all Realized Losses will be allocated among
the applicable outstanding classes of certificates entitled to distributions of
interest as described under "--Interest" above.

No reduction of the Certificate Principal Balance of the Class 1-A-1
Certificates will be made on any Distribution Date on account of any Realized
Loss on a Group 1 Loan to the extent that the reduction would have the effect of
reducing the Certificate Principal Balance of the Class 1-A-1 Certificates as of
that Distribution Date to an amount less than the Pool Balance for Loan Group 1,
as of the following Distribution Date minus any Deficient Valuations.

No reduction of the Certificate Principal Balance of any class of
Senior Certificates of Group 2 will be made on any Distribution Date on account
of any Realized Loss on a Group 2 Loan to the extent that the reduction would
have the effect of reducing the aggregate Certificate Principal Balance of all
of the Group 2 Certificates as of that Distribution Date to an amount less than
the Pool Balance for Loan Group 2 as of the following Distribution Date minus
(i) any Deficient Valuations and (ii) the PO Percentage of any Discount Loans.

No reduction of the Certificate Principal Balance of any class of
Senior Certificates of Group 3 will be made on any Distribution Date on account
of any Realized Loss on a Loan to the extent that the reduction would have the
effect of reducing the aggregate Certificate Principal Balance of all of the
Group 3 Certificates as of that Distribution Date to an amount less than the
aggregate of the Pool Balance for Group 3 as of the following Distribution Date
minus any Deficient Valuations.

No reduction of the Certificate Principal Balance of any class of
Senior Certificates of Group 4 will be made on any Distribution Date on account
of any Realized Loss on a Loan to the extent that the reduction would have the
effect of reducing the aggregate Certificate Principal Balance of all of the
Group 4 Certificates as of that Distribution Date to an amount less than the
aggregate of the Pool Balance for Group 4 as of the following Distribution Date
minus any Deficient Valuations.

Debt Service Reductions are not Realized Losses, and the principal
portion of Debt Service Reductions will not be allocated in reduction of the
Certificate Principal Balance of any certificate. However, the portion of the
Senior Optimal Principal Amount relating to a Group, any applicable Class PO
Principal Distribution Amount and the Subordinate Optimal Principal

S-55

<Page>

Amount relating to that Group representing scheduled principal payments will be
reduced by the amount of the principal portion of any Debt Service Reductions
related to that Group. Regardless of when they occur, Debt Service Reductions
related to a Group may reduce the amount of Available Funds of that Group
otherwise available for distribution on a Distribution Date. As a result of the
subordination of the Group 15-B Subordinate Certificates, the reduction in
Available Funds of Group 1 resulting from any Debt Service Reductions will be

borne by the Group 15-B Subordinate Certificates (to the extent then outstanding) in inverse order of priority. As a result of the subordination of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates, the reduction in Available Funds of Group 2, Group 3 and Group 4 resulting from any Debt Service Reductions will be borne by the Class C-B-6, Class C-B-5 and Class C-B-4 Certificates, in that order. Once the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the reduction in Available Funds for Group 2 resulting from any Debt Service Reductions will be borne by the Class 30-B-3, Class 30-B-2 and Class 30-B-1 Certificates, in that order. Once the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the reduction in Available Funds for Group 3 and Group 4 resulting from any Debt Service Reductions will be borne by the Class HY-B-3, Class HY-B-2 and Class HY-B-1 Certificates, in that order.

Subordination

        Priority of Certificates

        As of the date of the initial issuance of the certificates, the aggregate Certificate Principal Balance of the Group 15-B Subordinate Certificates will equal approximately 1.00% of the initial Pool Balance for Loan Group 1. As of the date of the initial issuance of the certificates, the aggregate Certificate Principal Balance of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates and the Group 2 Portion will equal approximately 2.50% of the initial Pool Balance for Loan Group 2. As of the date of the initial issuance of the certificates, the aggregate Certificate Principal Balance of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates and the Group 3/4 Portion will equal approximately 2.75% of the initial aggregate Pool Balance for Loan Group 3 and Loan Group 4. The rights of the holders of the Group 15-B Subordinate Certificates to receive distributions with respect to the Group 1 Loans, the rights of the holders of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates to receive distributions with respect to the Group 2 Loans, the rights of the holders of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates to receive distributions with respect to the Group 3 and Group 4 Loans, and the rights of the holders of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates to receive distributions with respect to the Group 2, Group 3 and Group 4 Loans, in each case, will be subordinate to such rights of the holders of the related Senior Certificates, to the extent described above, and in the case of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates, will be subordinate to such right of the holders of the Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class HY-B-2 and Class HY-B3 Certificates. The subordination of the Subordinate Certificates is intended:

            (1) to enhance the likelihood of timely receipt by the holders of
        the related Senior Certificates (to the extent of the subordination of the
        related Subordinate Certificates) of the full amount of the scheduled
        monthly distributions of principal and interest allocable to the related
        Senior Certificates; and

                                    S-56


<Page>


            (2) to afford the holders of the related Senior Certificates (to
        the extent of the subordination of the related Subordinate Certificates)
        protection against Realized Losses, to the extent described above.

        If Realized Losses in a Loan Group exceed the credit support provided to the related Senior Certificates all or a portion of such losses will be borne by those Senior Certificates.

        The protection afforded to the holders of the Class 1-A-1 Certificates by means of the subordination feature will be accomplished by:

            (1) the preferential right of such holders to receive, prior to
        any distribution being made on a Distribution Date in respect of the Group
        15-B Subordinate Certificates, in accordance with the paydown rules
        specified under "--Allocation of Available Funds" above, the amounts due to
        the holders of the Class 1-A-1 Certificates on each Distribution Date out
        of the related Available Funds on that Distribution Date and, if necessary,
        by the right of holders to receive future distributions on the Group 1
        Loans that would otherwise have been payable to the holders of the Group
        15-B Subordinate Certificates; and

            (2) the allocation to the Group 15-B Subordinate Certificates of
        the principal portion of any Realized Loss on any Group 1 Loan to the
        extent set forth in this prospectus supplement.

        Prior to the date on which the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the protection afforded to the holders of the Senior Certificates related to Loan Group 2, Loan Group 3 and Loan Group 4 by means of the subordination feature will be accomplished by:

(1) the preferential right of such holders to receive, prior to any distribution being made on a Distribution Date in respect of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates, in accordance with the paydown rules specified under "--Allocation of Available Funds" above, the amounts due to the holders of such Senior Certificates on each Distribution Date out of the related Available Funds on that Distribution Date and, if necessary, by the right of holders to receive future distributions on the Group 2 Loans, Group 3 Loans and Group 4 Loans that would otherwise have been payable to the holders of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates;

(2) the allocation to the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates of the applicable Non-PO Percentage of the principal portion of any Realized Loss on any Group 2 Loan, Group 3 Loan or Group 4 Loan to the extent set forth in this prospectus supplement; and

(3) the allocation to the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates of the applicable PO Percentage of the principal portion of any Realized Loss on a Discount Loan to the extent set forth in this prospectus supplement through the operation of any Class PO Deferred Payment Writedown Amount.

Once the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the protection afforded to the holders of the Senior

S-57

<Page>

Certificates related to Loan Group 2 by means of the subordination feature will be accomplished by:

(1) the preferential right of such holders to receive, prior to any distribution being made on a Distribution Date in respect of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates, in accordance with the paydown rules specified under "--Allocation of Available Funds" above, the amounts due to the holders of such Senior Certificates on each Distribution Date out of the related Available Funds on that Distribution Date and, if necessary, by the right of holders to receive future distributions on the Group 2 Loans that would otherwise have been payable to the holders of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates;

(2) the allocation to the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates of the applicable Non-PO Percentage of the principal portion of any Realized Loss on any Group 2 Loan to the extent set forth in this prospectus supplement; and

(3) the allocation to the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates of the applicable PO Percentage of the principal portion of any Realized Loss on a Discount Loan to the extent set forth in this prospectus supplement through the operation of any Class PO Deferred Payment Writedown Amount.

Once the Certificate Principal Balance of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the protection afforded to the holders of the Senior Certificates related to Loan Group 3 and Loan Group 4 by means of the subordination feature will be accomplished by:

(1) the preferential right of such holders to receive, prior to any distribution being made on a Distribution Date in respect of the Class HY-B-1, Class HY-B-2 and Class HY- B-3 Certificates, in accordance with the paydown rules specified under "--Allocation of Available Funds" above, the amounts due to the holders of such Senior Certificates on each Distribution Date out of the related Available Funds on that Distribution Date and, if necessary, by the right of holders to receive future distributions on the Group 3 and Group 4 Loans that would otherwise have been payable to the holders of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates; and

(2) the allocation to the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates of the principal portion of any Realized Loss on any Group 3 or Group 4 Loan to the extent set forth in this prospectus supplement.

The allocation of the principal portion of Realized Losses described in this prospectus supplement to the Group 15-B Subordinate Certificates on any Distribution Date will decrease the protection provided to the Class 1-A-1 Certificates on future Distribution Dates by reducing the aggregate Certificate Principal Balance of the Group 15-B Subordinate then outstanding in inverse order of priority of payment. The allocation of the applicable Non-PO Percentage of the principal portion of Realized Losses described in this prospectus supplement to the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates on any Distribution Date will decrease the protection provided to the Group 2, Group 3 and Group 4 Certificates then outstanding on future Distribution Dates by

reducing the aggregate Certificate Principal Balance of the Class C-B-6.

S-58

<Page>

Class C-B-5 and Class C-B-4 Certificates, in that order, then outstanding. The allocation of the applicable Non-PO Percentage of the principal portion of Realized Losses described in this prospectus supplement to the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates on any Distribution Date will decrease the protection provided to the Group 2 Certificates then outstanding on future Distribution Dates by reducing the aggregate Certificate Principal Balance of the Class 30-B-3, Class 30-B-2 and Class 30-B-1 Certificates, in that order, then outstanding. The allocation of the principal portion of Realized Losses described in this prospectus supplement to the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates on any Distribution Date will decrease the protection provided to the Group 3 and Group 4 Certificates then outstanding on future Distribution Dates by reducing the aggregate Certificate Principal Balance of the Class HY-B-3, Class HY-B-2 and Class HY-B-1 Certificates, in that order, then outstanding.

       In addition, in order to extend the period during which Group 15-B Subordinate Certificates remain available as credit enhancement for the Class 1-A-1 Certificates, in order to extend the period during which the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates remain available as credit enhancement for the Group 2, Group 3 and Group 4 Certificates, in order to extend the period during which the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates remain available as credit enhancement for the Group 2 Certificates and in order to extend the period during which the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates remain available as credit enhancement for the Group 3 Certificates and Group 4, the entire amount of any prepayment of principal with respect to a Loan will be distributed to the Senior Certificates of the related Certificate Group then entitled to principal distributions during at least the first five years after the date of initial issuance of the certificates, with such allocation being subject to reduction thereafter as described in this prospectus supplement. This allocation has the effect of accelerating the amortization of the related Senior Certificates as a group while, in the absence of losses in respect of the Loans, increasing the percentage interest in the principal balance of the Loans evidenced by the related Subordinate Certificates.

       After the payment of amounts distributable in respect of the Class 1-A-1 certificates on each Distribution Date, the Group 15-B Subordinate Certificates will be entitled to the remaining portion, if any, of the Available Funds related to Loan Group 1, in an amount equal to the Accrued Certificate Interest on the Group 15B Subordinate Certificates for that Distribution Date (which includes any remaining undistributed Accrued Certificate Interest from previous Distribution Dates) and the sum of the Allocable Shares of the classes of Group 15-B Subordinate Certificates. These amounts distributed to the holders of the Group 15-B Subordinate Certificates will not be available to cover any shortfalls in distributions or any Realized Losses on subsequent Distribution Dates.

       After the payment of amounts distributable in respect of the Senior Certificates related to Loan Group 2 on each Distribution Date, the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates will be entitled to the remaining portion, if any, of the aggregate Available Funds related to Loan Group 2, in an amount equal to the Accrued Certificate Interest on the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates for that Distribution Date (which includes any remaining undistributed Accrued Certificate Interest from previous Distribution Dates) and the sum of the Allocable Shares of each of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates. These amounts distributed to the holders of the Class 30-B-1, Class 30-B-2 and

S-59

<Page>

Class 30-B-3 Certificates will not be available to cover any shortfalls in distributions or any Realized Losses on subsequent Distribution Dates.

       After the payment of amounts distributable in respect of the Senior Certificates related to Loan Group 3 and Loan Group 4 on each Distribution Date, the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates will be entitled to the remaining portion, if any, of the aggregate Available Funds related to Loan Group 3 and Loan Group 4, in an amount equal to the Accrued Certificate Interest on the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates for that Distribution Date (which includes any remaining undistributed Accrued Certificate Interest from previous Distribution Dates) and the sum of the

Allocable Shares of each of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates. These amounts distributed to the holders of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates will not be available to cover any shortfalls in distributions or any Realized Losses on subsequent Distribution Dates.

After the payment of amounts distributable in respect of the Senior Certificates related to Loan Group 2, Loan Group 3 and Loan Group 4 and the Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates on each Distribution Date, the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates will be entitled to the remaining portion, if any, of the aggregate Available Funds related to Loan Group 2, Loan Group 3 and Loan Group 4, in an amount equal to the Accrued Certificate Interest on the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates for that Distribution Date (which includes any remaining undistributed Accrued Certificate Interest from previous Distribution Dates) and the sum of the Allocable Shares of each of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates. These amounts distributed to the holders of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates will not be available to cover any shortfalls in distributions or any Realized Losses on subsequent Distribution Dates.

Priority Among Subordinate Certificates

As of the date of the initial issuance of the certificates, the aggregate Certificate Principal Balance of the Class 15-B-4, Class 15-B-5 and Class 15-B-6 Certificates, all of which are subordinate in right of distribution to the Class 15-B-1, Class 15-B-2 and Class 15-B-3 Certificates offered under this prospectus supplement, will equal approximately 0.25% of the initial aggregate Pool Balance of Loan Group 1 and approximately 25.05% of the initial aggregate Certificate Principal Balance of all of the Group 15-B Subordinate Certificates. On each Distribution Date, the holders of any particular class of Group 15-B Subordinate Certificates, will have a preferential right to receive the amounts due to them on such Distribution Date out of Available Funds for Loan Group 1 in the aggregate, prior to any distribution being made on such date on each class of Group 15-B Subordinate Certificates ranking junior to such class.

As of the date of the initial issuance of the certificates, the aggregate Certificate Principal Balance of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates, will equal approximately 0.25% of the initial aggregate Pool Balance of Loan Group 2, Loan Group 3 and Loan Group 4. As of the date of the initial issuance of the certificates, the aggregate Certificate Principal Balance of the Class C-B-4, Class C-B-5, Class C-B-6 Certificates were equal approximately 9.80% of the aggregate Certificate Principal Balance of the Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class HY-B-2, Class HY-B-3, Class C-B-4, Class C-B5 and Class C-B-6

S-60

<Page>

Certificates. On each Distribution Date, the holders of such Subordinate Certificates will have the right to receive the amounts due to them on such Distribution Date out of Available Funds for Loan Group 2, Loan Group 3 and Loan Group 4 in the following order of priority: first, to the Class C-B-4 Certificates, then to the Class C-B-5 and then to the Class C-B-6 Certificates until the Certificate Principal Balance of each such class has been reduced to zero.

In addition, the applicable Non Percentage of the principal portion of any Realized Loss and any Class PO Deferred Payment Writedown Amount will be allocated, to the extent set forth in this prospectus supplement, in reduction of the Certificate Principal Balances of the related Subordinate Certificates in inverse order of priority of such certificates. The effect of the allocation of such Realized Losses and any Class PO Deferred Payment Writedown Amount to a class of Subordinate Certificates will be to reduce future distributions allocable to such class and increase the relative portion of distributions allocable to more senior classes of related Subordinate Certificates and the Senior Certificates of the related Group.

In order to maintain the relative levels of subordination among the Subordinate Certificates of prepayments and certain other unscheduled recoveries of principal in respect of the related Loans (which in certain cases may not be distributable to those certificates for at least the first five years after the date of initial issuance of the certificates) will not be distributable to the holders of any class of Subordinate Certificates on any Distribution Date for which the Class Prepayment Distribution Trigger is not satisfied. See "--Principal" above. If the Class Prepayment Distribution Trigger is not satisfied with respect to any class of related Subordinate Certificates (other than the Class 15-B-1, Class 30-B-1 Certificates and Class HY-B-1 Certificates), the amortization of more senior ranking classes of Subordinate Certificates may occur more rapidly than would otherwise have been the case.

As a result of the subordination of the Subordinate Certificates, these certificates in increasing order of priority of payment will be more

sensitive than more senior ranking classes of related certificates to the rate
of delinquencies and defaults on the Loans, and under certain circumstances
investors in such certificates may not recover their initial investment.

Cross-Collateralization

Group 2, Group 3 and Group 4

On each related Distribution Date, funds otherwise payable to the
Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates are required to be
applied to payment of the Senior Certificates related to Loan Group 3 and Loan
Group 4 as follows: (i) first, to cover any Accrued Certificate Interest on such
Senior Certificates remaining unpaid, (ii) second, to pay principal of the
Senior Certificates of Loan Group 3 or Loan Group 4 to the extent either Loan
Group is an Undercollateralized Group, and (iii) third, to maintain
subordination levels under limited circumstances where the Senior Certificates
of either Certificate Group 3 or Certificate Group 4 have been paid in full as
described below.

On each related Distribution Date, funds otherwise payable to the
Class C-B-4, Class C-B-5 and Class C-B-6 Certificates are required to be applied
to payment of the Senior Certificates related to Loan Group 2, Loan Group 3 and
Loan Group 4 as follows: (i) first, to cover any Accrued Certificate Interest on
such Senior Certificates (other than the Principal Only

S-61

<Page>

Certificates) remaining unpaid, (ii) second, prior to the related Cross-Over
Date, in respect of Class PO Deferred Amounts for the Class PO Certificates then
payable but not paid from Available Funds for Loan Group 2, (iii) third to pay
principal of the Senior Certificates of an Undercollateralized Group, and (iv)
third, to maintain subordination levels under limited circumstances where the
Senior Certificates (other than the Principal Only Certificates and Interest
Only Certificates) of one or more of Certificate Group 2, Certificate Group 3 or
Certificate Group 4 have been paid in full as described below.

On each related Distribution Date, after making distributions to the
Senior Certificates as described in the preceding paragraph, if the aggregate
Certificate Principal Balance of the Senior Certificates and Subordinate
Certificates related to Loan Group 2 or the aggregate Certificate Principal
Balance of the Senior Certificates and the Subordinate Certificates related Loan
Group 3 and Loan Group 4, in the aggregate, exceed the aggregate Scheduled
Principal Balance of the Loans in the related Loan Group or Loan Groups, as
applicable, any of any funds otherwise payable to the Class C-B-4, Class C-B-5
and Class C-B-6 Certificates are required to be applied to payment of the Class
HY-B-1 and Class 30-B-1 Certificates as follows: (i) first, to cover any Accrued
Certificate Interest on such certificates remaining unpaid and (ii) to pay
principal to such certificates up to the amount by which the related Loan Group
or Loan Groups, as applicable, are undercollateralized.

On each related Distribution Date, after making distributions to the
Senior Certificates and the Class HY-B-1 and Class 30-B-1 Certificates as
described in the preceding paragraphs, if the aggregate Certificate Principal
Balance of the Senior Certificates and Subordinate Certificates related to Loan
Group 2 or the aggregate Certificate Principal Balance of the Senior
Certificates and the Subordinate Certificates related Loan Group 3 and Loan
Group 4, in the aggregate, exceed the aggregate Scheduled Principal Balance of
the Loans in the related Loan Group or Loan Groups, as applicable, any of any
funds otherwise payable to the Class C-B-4, Class C-B-5 and Class C-B-6
Certificates are required to be applied to payment of the Class HY-B-2 and Class
30-B-2 Certificates as follows: (i) first, to cover any Accrued Certificate
Interest on such certificates remaining unpaid and (ii) to pay principal to such
certificates up to the amount by which the related Loan Group or Loan Groups, as
applicable, are undercollateralized.

On each related Distribution Date, after making distributions to the
Senior Certificates, Class HY-B-1, Class HY-B-2, Class 30-B-1 and Class 30-B-2
as described in the preceding paragraphs, if the aggregate Certificate Principal
Balance of the Senior Certificates and Subordinate Certificates related to Loan
Group 2 or the aggregate Certificate Principal Balance of the Senior
Certificates and the Subordinate Certificates related Loan Group 3 and Loan
Group 4, in the aggregate, exceed the aggregate Scheduled Principal Balance of
the Loans in the related Loan Group or Loan Groups, as applicable, any of any
funds otherwise payable to the Class C-B-4, Class C-B-5 and Class C-B-6
Certificates are required to be applied to payment of the Class HY-B-3 and Class
30-B-3 Certificates as follows: (i) first, to cover any Accrued Certificate
Interest on such certificates remaining unpaid and (ii) to pay principal to such
certificates up to the amount by which the related Loan Group or Loan Groups, as
applicable, are undercollateralized.

To the extent any Accrued Certificate Interest with respect to any
class of Senior Certificates in Group 2, Group 3 or Group 4 remains unpaid,
Available Funds remaining from the other of such Groups after payments on Senior

Certificates in such Group will be applied to

S-62

<Page>

cover such unpaid Accrued Certificate Interest, and, to the extent payable to
more than one class within a Certificate Group, will be applied pro rata based
on the amounts of such unpaid Accrued Certificate Interest to the extent there
are insufficient funds to pay such amounts in full.

Prior to the related Cross-Over Date, to the extent any Class PO
Deferred Amount for Loan Group 2 then payable has not been paid from PO
Recoveries and any other Available Funds for Loan Group 2, then, following any
payments to the related Senior Certificates pursuant to the preceding paragraph,
amounts that would otherwise constitute the Subordinate Principal Distribution
Amount for the related Subordinate Certificates will be applied to pay any such
unpaid Class PO Deferred Amount.

If on any Distribution Date, either Certificate Group 3 or Certificate
Group 4 is an Undercollateralized Group, then all amounts otherwise
distributable as principal on the Class HY-B-1, Class HY-B-2 and Class HY-B-3
Certificates as the Subordinate Principal Distribution Amount for the Class
HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates will be paid to the Senior
Certificates related to such Undercollateralized Group as principal in
accordance with the priorities set forth above under "--Allocation of Available
Funds" until the aggregate Certificate Principal Balance of the Senior
Certificates related to such Certificate Group equals the Pool Balance of the
related Loan Group. Amounts allocated to either Certificate Group 3 or
Certificate Group 4 pursuant to this provision will be paid to the Senior
Certificates of the related Certificate in accordance with the priority of
payment set forth above under "--Allocation of Available Funds."

If on any Distribution Date more than one of Certificate Group 2,
Certificate Group 3 and Certificate Group 4 is an Undercollateralized Group,
then all amounts otherwise distributable as principal on the related Subordinate
Certificates as the Subordinate Principal Distribution Amount for such
Subordinate Certificates will be paid to the Senior Certificates related to each
such Undercollateralized Group as principal on a pro rata basis, based on the
amount by which each such Certificate Group is undercollateralized, until the
aggregate Certificate Principal Balance of the Senior Certificates related to
each such Undercollateralized Group equals the Pool Balance of the related Loan
Group (other than the Interest Only Certificates). Amounts allocated to a
Certificate Group pursuant to this provision will be paid to the Senior
Certificates of that Group in accordance with the priority of payment set forth
above under "--Allocation of Available Funds."

On or after the date on which the Certificate Principal Balances of
all of the Classes of the Senior Certificates in any of Certificate Group 2,
Certificate Group 3 or Certificate Group 4 have been reduced to zero, amounts
otherwise distributable as principal on the related Subordinate Certificates, up
to the applicable Apportioned Subordinate Principal Distribution Amount
(representing generally the portion of the Subordinate Principal Distribution
Amount for the related Subordinate Certificates attributable to Loans in the
Loan Group with respect to which the related Senior Certificates have been paid
in full), will be allocated pro rata among the other of such Certificate Groups,
based on the aggregate Certificate Principal Balance of the remaining Senior
Certificates, if applicable, of such Groups, and paid to such Senior
Certificates in accordance with the priorities set forth above for the
applicable Group under "--Allocation of Available Funds," provided that on such
Distribution Date (a) the Aggregate Subordinate Percentage for the related
Subordinate Certificates for such Distribution Date is less than twice the
initial Aggregate Subordinate Percentage for the related Subordinate
Certificates or (b) the

S-63

<Page>

average outstanding principal balance of the Loans in the related Loan Groups
delinquent 60 days or more over the last six months (including for this purpose
any of such Loans in bankruptcy or foreclosure and such Loans with respect to
which the related Mortgaged Property has been acquired by the trust) as a
percentage of the related Group Subordinate Amount is greater than or equal to
50%.

Any application of the Subordinate Principal Distribution Amount for
the related Subordinate Certificates pursuant to the preceding paragraphs will

reduce distributions of such amount in reverse order of priority pursuant to priorities set forth above in "--Allocation of Available Funds."

Restrictions on Transfer of the Residual Certificates

The REMIC provisions of the Code impose certain taxes on (i) transferors of residual interests to, or agents that acquire residual interests on behalf of, disqualified organizations and (ii) certain pass-through entities that have disqualified organizations as beneficial owners. No tax will be imposed on a pass-through entity (other than an "electing large partnership") with regard to the Residual Certificates to the extent it has received an affidavit from each owner thereof indicating that such owner is not a disqualified organization or a nominee for a disqualified organization. The Pooling and Servicing Agreement will provide that no legal or beneficial interest in a Residual Certificate may be transferred to or registered in the name of any person unless (i) the proposed purchaser provides to the transferor and the trust administrator an affidavit, substantially in the form set forth in the Pooling and Servicing Agreement, to the effect that, among other items, such transferee is not a disqualified organization and is not purchasing such Residual Certificate as an agent (i.e., as a broker, nominee, or other middleman thereof) for a disqualified organization and is otherwise making such purchase pursuant to a permitted transfer and (ii) the transferor states in a writing to the trust administrator that it has no actual knowledge that such affidavit is false. Further the affidavit requires the transferee to affirm that it (i) historically has paid its debts as they have come due and intends to do so in the future, (ii) understands that it may incur tax liabilities with respect to such Residual Certificate in excess of cash flows generated thereby, (iii) intends to pay taxes associated with holding such Residual Certificate as such taxes become due, (iv) will not cause the income attributable to such Residual Certificate to be attributable to a foreign permanent establishment or fixed base, within the meaning of an applicable income tax treaty, of the transferee or any other person and (v) will not transfer such Residual Certificate to any person or entity that does not provide a similar affidavit. The transferor must also certify in a writing to the trust administrator in the form set forth in the Pooling and Servicing Agreement that it had no knowledge or reason to know that the affirmations made by the transferee pursuant to the preceding sentence were false.

In addition, Treasury Regulations require either that (i) the transferor of a Residual Certificate pay the transferee a specified minimum formula amount designed to compensate the transferee for assuming the related tax liability or (ii) the transfer be to an eligible corporation that agrees to make any further qualifying transfers in order to meet the safe harbor against the possible disregard of such transfer. Because these rules are not mandatory but would provide safe harbor protection, the Pooling and Servicing Agreement will not require that they be met as a condition to transfer of the Residual Certificates. Holders of the Residual Certificates are advised to consult their tax advisors as to whether and how to qualify for protection of the safe harbor for transfers and whether or in what amount any payment should be made upon transfer

S-64

<Page>

thereof. See "Federal Income Tax Consequences--REMICs--Taxation of Owners of Residual Securities--Tax-Related Restrictions on Transfer of Residual Securities--Noneconomic Residual Interests" in the prospectus.

Finally, the Residual Certificates may not be purchased by or transferred to any person that is not a "U.S. Person" unless (i) such person holds such Residual Certificates in connection with the conduct of trade or business within the United States and furnishes the transferor and the trust administrator with an effective Internal Revenue Service Form W-8ECI or (ii) the transferee delivers to both the transferor and the trust administrator an opinion of a nationally recognized tax counsel to the effect that such transfer is in accordance with the requirements of the Code and the regulations promulgated thereunder and that such transfer of the Residual Certificates will not be disregarded for federal income tax purposes. The term "U.S. Person" means a citizen or resident of the United States, a corporation or partnership created or organized in or under the laws of the United States, any State thereof or the District of Columbia (unless, in the case of a partnership, Treasury Regulations are adopted that provide otherwise), including an entity treated as a corporation or partnership for federal income tax purposes, an estate whose income is subject to U.S. federal income tax regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over the administration of such trust, and one or more such U.S. Persons have the authority to control all substantial decisions of such trust (or, to the extent provided in applicable Treasury Regulations, a trust in existence on August 20, 1996 which is eligible to elect to be treated as U.S. Persons and so elects).

The Pooling and Servicing Agreement provides that any attempted or purported transfer of Residual Certificates in violation of those transfer restrictions will be null and void ab initio and will vest no rights in any

purported transferee and will not relieve the transferor of any obligations with respect to the Residual Certificates. Any transferor or agent to whom information is provided as to any applicable tax imposed on such transferor or agent may be required to bear the cost of computing or providing such information.

The Residual Certificates may not be purchased by or transferred to any person which is a Plan or any plan or arrangement subject to Similar Law. See "ERISA Considerations" in this prospectus supplement and in the prospectus.

The Residual Certificates will contain a legend describing the foregoing restrictions.

Reports to Certificateholders

On each Distribution Date, the trust administrator will be required to prepare and make available to each certificateholder, the parties to the Pooling and Servicing Agreement and any other interested parties, a Distribution Date statement, based in part on information provided by each servicer, which Distribution Date statement generally will set forth, among other things:

(1) the amount of the distribution on such Distribution Date made to the holders of each class of certificates allocable to principal;

(2) the amount of the distribution on such Distribution Date made to the holders of each class of certificates allocable to interest;

S-65

<Page>

(3) any unpaid Interest Shortfalls included in such distribution and the aggregate Interest Shortfalls remaining unpaid as of such Distribution Date;

(4) any Prepayment Interest Shortfalls included in such distribution and the aggregate Prepayment Interest Shortfalls as of such Distribution Date;

(5) the Certificate Principal Balance or Notional Amount of each class of certificates after giving effect to distribution of principal on that Distribution Date;

(6) the Pool Balance for each Loan Group for such Distribution Date;

(7) the Senior Percentage and the Subordinate Percentage for each Loan Group for the following Distribution Date;

(8) the aggregate amount of Servicing Fees with respect to such Distribution Date;

(9) the pass-through rate of interest on each class of certificates for that Distribution Date;

(10) the aggregate amount of Advances included in the distribution for the applicable Distribution Date and the aggregate amount of Advances outstanding as of the Distribution Date;

(11) (a) the number and aggregate unpaid principal balance of Loans (exclusive of Loans in foreclosure) delinquent:

(i) 1 to 30 days;

(ii) 31 to 60 days;

(iii) 61 to 90 days; and

(iv) 91 or more days.

(b) the number and aggregate unpaid principal balance of Loans in foreclosure and delinquent;

(12) with respect to any Loan that became an REO Property during the preceding calendar month, the loan number of the related Loan, the unpaid principal balance of the related Loan and the principal balance of the related Loan as of the date it became an REO Property;

(13) the book value of any REO Property as of the close of business on the last business day of the calendar month preceding the Distribution Date, and, cumulatively, the total number and cumulative principal balance of all REO Properties as of the close of business of the determination date set forth in the related Servicing Agreement;

S-66

<Page>

(14) the Senior Prepayment Percentage for each Loan Group for the Distribution Date; and

(15) the aggregate Realized Losses, for each Loan Group, on Loans incurred during the prior calendar month.

The trust administrator will make the Distribution Date statement available each month via its internet website. Assistance in using the trust administrator's website can be obtained by calling the trust administrator's customer service desk at (301) 815-6600. Parties that are unable to use the above distribution method are entitled to have a paper copy mailed to them via first class mail by calling the trust administrator's customer service desk and indicating such. The trust administrator shall have the right to change the way the Distribution Date statement is distributed in order to make such distribution more convenient and/or more accessible and the trust administrator shall provide timely and adequate notification to the certificateholders and the parties to the Pooling and Servicing Agreement regarding any such changes.

The trust administrator shall also be entitled to rely on but shall not be responsible for the content or accuracy of any information provided by third parties for purposes of preparing the Distribution Date statement and may affix to it any disclaimer it deems appropriate in its reasonable discretion.

As a condition to access the trust administrator's internet website, the trust administrator may require registration and the acceptance of a disclaimer. The trust administrator will not be liable for the dissemination of information in accordance with the Pooling and Servicing Agreement.

PREPAYMENT AND YIELD CONSIDERATIONS

General

The effective yield on the Senior Certificates of any Certificate Group will depend upon, among other things, (i) the price at which the certificates are purchased and (ii) the rate and timing of payments of principal (including both scheduled and unscheduled payments) on the related Loans. If significant principal distributions are made on your certificates, you may not be able to reinvest those distributions in a comparable alternative investment having a comparable yield or, in the case of the Interest Only Certificates, you may not fully recover your initial investment. No prediction can be made as to the rate of prepayments on the Loans in either stable or changing interest rate environments. The final distribution of principal on your certificates could occur significantly earlier than you anticipated. You will bear entirely any reinvestment risk resulting from the rate of prepayments on the related Loans.

Prepayments and Defaults

The rate of principal distributions on each class of offered certificates (other than the Interest Only Certificates), the aggregate amount of each interest distribution on each class of such certificates and the yield to maturity on each class of such certificates will be directly related to:

S-67

<Page>

(A) the amortization schedules of the related Loans;

(B) the prepayment experience of the related Loans; and

(C) under some circumstances, the rates of delinquencies, defaults or losses experienced on the related Loans.

The borrowers may generally prepay their Loans at any time without penalty. Each of the Loans is subject to a due-on-sale clause. See "Certain Legal Aspects of Residential Loans" in the prospectus. Additionally, repurchases by UBS Real Estate Securities Inc. of any Loan as to which there has been a material breach of representation or warranty or defect in documentation (or deposit of certain amounts in respect of delivery of a substitute mortgage loan therefor) or any optional repurchase of the Loans in connection with a termination of the trust will have the same effect as a prepayment and result in distributions on the offered certificates which would otherwise be distributed over the remaining terms of the Loans.

The rate of principal prepayments on the Loans will be influenced by a

variety of economic, tax, geographic, demographic, social, legal and other factors, and has fluctuated considerably in recent years. In addition, the rate of principal prepayments may differ among the Loans at any time because of specific factors relating to the Loans. These factors include:

    (1) the age of the Loans;

    (2) the geographic location of the related properties and the extent of the related borrowers' equity in those properties; and

    (3) changes in the borrowers' housing needs and employment and job transfers.

Furthermore, because the characteristics of the Loans differ, the Loans as a whole may be expected to prepay at different rates.

In general, if prevailing interest rates for loans similar to the Loans fall significantly below the interest rates at the time of origination, the Loans may be subject to higher prepayment rates than if prevailing interest rates for loans similar to the Loans remain at or above those at the time those loans were originated. Conversely, if prevailing interest rates for loans similar to the Loans rise appreciably above the interest rates at the time of origination, the Loans may experience a lower prepayment rate than if prevailing interest rates for loans similar to the Loans remained at or below those existing at the time those Loans were originated. We cannot make assurances as to the prepayment rate of the Loans. In addition, we cannot make assurances that the Loans will conform to the prepayment experience of other loans or to any past prepayment experience or any published prepayment forecast.

In general, if an offered certificate is purchased at a premium over its face amount and payments of principal on the related Loans, occur at a rate faster than that assumed at the time of purchase, the investor's actual yield to maturity will be lower than that anticipated at the time of purchase and, in the case of the Interest Only Certificates, the investor may not recover its initial investment. Conversely, if an offered certificate is purchased at a discount from its face amount and payments of principal on the related Loans occur at a rate that is slower than that assumed at

S-68

<Page>

the time of purchase, the purchaser's actual yield to maturity will be lower than originally anticipated.

As described under "Description of the Offered Certificates--Principal" in this prospectus supplement, the applicable Senior Prepayment Percentage of all principal prepayments related to a Loan Group will be initially distributed to the classes of Senior Certificates of such Group (other than the Class PO Certificates Interest Only Certificates) then entitled to receive principal distributions. This may result in all (or a disproportionate percentage) of such principal prepayments being distributed to holders of such classes of Senior Certificates (other than the Interest Only Certificates) and none (or less than their pro rata share) of such principal prepayments being distributed to holders of the related Subordinate Certificates during the periods of time described in the definition of "Senior Prepayment Percentage."

The rate and timing of defaults on the Loans will also affect the rate and timing of principal payments on the Loans and thus the yield on the offered certificates. We cannot make assurances as to the rate of losses or delinquencies on any of the Loans. To the extent that any losses are incurred on any of the Loans, the holders of the offered certificates will bear the risk of losses resulting from default by borrowers. See "Risk Factors" in this prospectus supplement and in the prospectus.

The last scheduled Distribution Date for the Group 1 Certificates and Group 15-B Subordinate Certificates is the distribution date in August 2017. This date represents the Distribution Date occurring in the month following the maturity date of the latest maturing Loan in Loan Group 1. It is possible that the Certificate Principal Balance of these certificates may be fully paid or reduced to zero, as applicable, prior to this date, or may not be fully paid or reduced to zero, as applicable, by this date.

The last scheduled Distribution Date for the Group 2, Class A-X, Class PO, Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates is the distribution date in August 2032. This date represents the Distribution Date occurring in the month following the maturity date of the latest maturing Loan in Loan Group 2. It is possible that the Certificate Principal Balance or Notional Amount of these certificates may be fully paid or reduced to zero, as applicable, prior to this date, or may not be fully paid or reduced to zero, as applicable, by this date.

The last scheduled Distribution Date for the Group 3 Certificates is the Distribution Date in October 2032. This date represents the Distribution

Date occurring in the month following the maturity date of the latest maturing Loan in Loan Group 3. It is possible that the Certificate Principal Balance of the Group 3 certificates may be fully paid or reduced to zero, as applicable, prior to this date, or may not be fully paid or reduced to zero, as applicable, by this date.

The last scheduled Distribution Date for the Group 4 Certificates is the Distribution Date in October 2032. This date represents the Distribution Date occurring in the month following the maturity date of the latest maturing Loan in Loan Group 4. It is possible that the Certificate Principal Balance of the Group 4 certificates may be fully paid or reduced to zero, as applicable, prior to this date, or may not be fully paid or reduced to zero, as applicable, by this date.

The last scheduled Distribution Date for the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates is the Distribution Date in October 2032. This date represents the

<Page>

Distribution Date occurring in the month following the maturity date of the latest maturing Loan in Loan Group 3 and Loan Group 4. It is possible that the Certificate Principal Balances of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates may be fully paid or reduced to zero, as applicable, prior to this date, or may not be fully paid or reduced to zero, as applicable, by this date.

The last scheduled Distribution Date for the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates is the Distribution Date in October 2032. This date represents the Distribution Date occurring in the month following the maturity date of the latest maturing Loan in Loan Group 2, Loan Group 3 and Loan Group 4. It is possible that the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates may be fully paid or reduced to zero, as applicable, prior to this date, or may not be fully paid or reduced to zero, as applicable, by this date.

The primary source of information available to investors concerning the offered certificates will be the monthly statements discussed under "Description of the Offered Certificates--Reports to Certificateholders" in this prospectus supplement. These statements will include information as to the outstanding Certificate Principal Balance or Notional Amount of the certificates. We cannot assure that any additional information regarding the offered certificates will be available through any other source. In addition, the depositor is not aware of any source through which price information about the offered certificates will be generally available on an ongoing basis. The limited nature of the information regarding the offered certificates may adversely affect the liquidity of the offered certificates, even if a secondary market for the offered certificates becomes available.

Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates

The Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates have been structured so that principal distributions will be made in the amounts determined by using the table entitled "Targeted Aggregate Principal Balances" in this prospectus supplement and the cash flow allocation provisions described in this prospectus supplement, assuming that prepayments on the Group 2 Loans occur each month at a constant level of approximately 20% CPR, and based on certain other assumptions.

There can be no assurance that funds available for distribution of principal on the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates will result in the aggregate Certificate Principal Balance of such certificates equaling the Targeted Aggregate Principal Balance for any Distribution Date. To the extent that prepayments occur at a level below approximately 20% CPR the funds available for principal distributions on the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates on each Distribution Date may be insufficient to reduce the aggregate Certificate Principal Balance of such certificates to the Targeted Aggregate Principal Balance for that Distribution Date and the weighted average lives of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates may be extended. Conversely, to the extent that prepayments occur at a level above approximately 20% CPR, after the Certificate Principal Balance of the Class 2-A-5 Certificates has been reduced to zero, the aggregate Certificate Principal Balance of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates may be reduced below the Targeted

<Page>

Aggregate Principal Balance and the weighted average lives of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates may be reduced.

Investors in the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates should be aware that the stabilization provided by the Class 2-A-5 Certificates is sensitive to the rate of mortgagor prepayments on the Group 2 Loans, and that the Certificate Principal Balance of the Class 2-A-5 Certificates may be reduced to zero significantly earlier than anticipated. The initial Certificate Principal Balance of the Class 2-A-5 Certificates is equal to approximately 4.86% of the initial aggregate Certificate Principal Balance of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates.

Class 2-A-5 Certificates

Investors in the Class 2-A-5 Certificates should be aware that the stabilization provided by the Class 2-A-5 Certificates for the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates is sensitive to the rate of borrower prepayments on the Group 2 Loans, and that the Certificate Principal Balance of the Class 2-A-5 Certificates may be reduced to zero significantly earlier than anticipated.

The Class 2-A-5 Certificates will receive monthly principal distributions from amounts included in the Senior Optimal Principal Amount for Loan Group 2 only after distribution of amounts sufficient to reduce the aggregate Certificate Principal Balance of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates to the Targeted Aggregate Principal Balance for any Distribution Date. Due to the companion nature of the Class 2-A-5 Certificates, this certificate will likely experience price and yield volatility. Investors should consider whether such volatility is suitable to their investment needs.

The Offered Group 15-B Subordinate Certificates

The rate of payment of principal, the aggregate amount of distributions and the yield to maturity of the Offered Group 15-B Subordinate Certificates will be affected by the rate of prepayments on the Group 1 Loans, as well as the rate of borrower defaults on the Group 1 Loans resulting in Realized Losses, by the severity of those losses and by the timing thereof. See "Description of the Offered Certificates--Allocation of Losses" in this prospectus supplement for a description of the manner in which such losses are borne by the holders of the certificates. If the purchaser of an Offered Group 15-B Subordinate Certificate calculates its anticipated yield based on an assumed rate of default and amount of Realized Losses on the Group 1 Loans that is lower than the default rate and the amount of losses actually incurred, its actual yield to maturity may be lower than that so calculated and could be negative. The timing of defaults and losses will also affect an investor's actual yield to maturity, even if the average rate of defaults and severity of losses are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity.

The yields to maturity on the classes of Offered Group 15-B Subordinate Certificates with higher alphanumerical designations will be more sensitive to losses due to liquidations of defaulted Group 1 Loans than will the yields on such classes with lower alphanumerical designations, and the yields to maturity on all of the Offered Group 15-B Subordinate Certificates will be more sensitive to such losses than will the yields on the other classes of

S-71

<Page>

related offered certificates. The Offered Group 15-B Subordinate Certificates will be more sensitive to losses due to liquidations of defaulted Group 1 Loans because the entire amount of such losses will be allocable to such certificates in inverse order of priority, either directly or through the allocation of the Subordinate Certificate Writedown Amount. To the extent not covered by a servicer's or the master servicer's advances of delinquent monthly payments of principal and interest, delinquencies on the Group 1 Loans may also have a relatively greater effect:

(1) on the yields to investors in the Offered Group 15-B Subordinate Certificates with higher alphanumerical designations than on the yields to investors in those Offered Group 15-B Subordinate Certificates with lower alphanumerical designations; and

(2) on the yields to investors in the Offered Group 15-B Subordinate Certificates than on the yields to investors in the other classes of related offered certificates.

As described under "Description of the Offered Certificates--Interest," "--Principal," "--Allocation of Losses" and "--Subordination" in this prospectus supplement, amounts otherwise distributable to holders of any class of Offered Group 15-B Subordinate Certificates will be made available to protect the holders of the Class 1-A-1 Certificates against interruptions in distributions due to certain borrower delinquencies. Such delinquencies, even if subsequently cured, may affect the timing of the receipt of distributions by the holders of the Offered Group 15-B Subordinate Certificates.

To the extent that a class of Offered Group 15-B Subordinate Certificates is being purchased at a discount from its initial Certificate Principal Balance, if the purchaser of such certificate calculates its yield to maturity based on an assumed rate of payment of principal faster than that actually received on such certificate, its actual yield to maturity may be lower than that so calculated.

The Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates

The rate of payment of principal, the aggregate amount of distributions and the yield to maturity of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates will be affected by the rate of prepayments on the Group 2 Loans, as well as the rate of borrower defaults on the Group 2 Loans resulting in Realized Losses, by the severity of those losses and by the timing thereof. See "Description of the Offered Certificates--Allocation of Losses" in this prospectus supplement for a description of the manner in which such losses are borne by the holders of the certificates. If the purchaser of a Class 30-B-1, Class 30-B-2 or Class 30-B-3 Certificate calculates its anticipated yield based on an assumed rate of default and amount of Realized Losses on the Group 2 Loans that is lower than the default rate and the amount of losses actually incurred, its actual yield to maturity may be lower than that so calculated and could be negative. The timing of defaults and losses will also affect an investor's actual yield to maturity, even if the average rate of defaults and severity of losses are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity.

After the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the yields to maturity on the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates will be more progressively more sensitive, in that order, to losses

S-72

<Page>

due to liquidations of defaulted Group 2 Loans, and the yields to maturity on the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates will be more sensitive to such losses than will the yields on the other classes of related offered certificates. After the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates will be more sensitive to losses due to liquidations of defaulted Group 2 Loans because the entire amount of such losses will be allocable to such certificates, in that order, either directly or through the allocation of the Class PO Deferred Payment Writedown Amount and the Subordinate Certificate Writedown Amount. To the extent not covered by a servicer's or the master servicer's advances of delinquent monthly payments of principal and interest, delinquencies on the Group 2 Loans may also have a relatively greater effect on the yields to investors in the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates than on the yields to investors in the other classes of related offered certificates.

As described under "Description of the Offered Certificates--Interest," "--Principal," "--Allocation of Losses" and "--Subordination" in this prospectus supplement, amounts otherwise distributable to holders of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates will be made available to protect the holders of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates against interruptions in distributions due to certain borrower delinquencies. Such delinquencies, even if subsequently cured, may affect the timing of the receipt of distributions by the holders of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates.

To the extent that a Class 30-B-1, Class 30-B-2 or Class 30-B-3 Certificate is being purchased at a discount from its initial Certificate Principal Balance, if the purchaser of such certificate calculates its yield to maturity based on an assumed rate of payment of principal faster than that actually received on such certificate, its actual yield to maturity may be lower than that so calculated.

The Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates

The rate of payment of principal, the aggregate amount of distributions and the yield to maturity of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates will be affected by the rate of prepayments on the Group 3 and Group 4 Loans, as well as the rate of borrower defaults on the Group

3 and Group 4 Loans resulting in Realized Losses, by the severity of those losses and by the timing thereof. See "Description of the Offered Certificates--Allocation of Losses" in this prospectus supplement for a description of the manner in which such losses are borne by the holders of the certificates. If the purchaser of a Class HY-B-1, Class HY-B-2 or Class HY-B-3 Certificate calculates its anticipated yield based on an assumed rate of default and amount of Realized Losses on the Group 3 and Group 4 Loans that is lower than the default rate and the amount of losses actually incurred, its actual yield to maturity may be lower than that so calculated and could be negative. The timing of defaults and losses will also affect an investor's actual yield to maturity, even if the average rate of defaults and severity of losses are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity.

After the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the yields to maturity on the Class HY-B-1, Class HY-B-2 and HY-Class B-3 Certificates will be more progressively more sensitive, in that order, to

S-73

<Page>

losses due to liquidations of defaulted Group 3 and Group 4 Loans, and the yields to maturity on the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates will be more sensitive to such losses than will the yields on the other classes of related offered certificates. After the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the Class HY-B-3, Class HY-B-2 and Class HY-B-1 Certificates will be more sensitive to losses due to liquidations of defaulted Group 3 and Group 4 Loans because the entire amount of such losses will be allocable to such certificates, in that order, either directly or through the allocation of the Subordinate Certificate Writedown Amount. To the extent not covered by a servicer's or the master servicer's advances of delinquent monthly payments of principal and interest, delinquencies on the Group 3 and Group 4 Loans may also have a relatively greater effect on the yields to investors in the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates than on the yields to investors in the other classes of related offered certificates.

As described under "Description of the Offered Certificates--Interest," "--Principal," "--Allocation of Losses" and "--Subordination" in this prospectus supplement, amounts otherwise distributable to holders of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates will be made available to protect the holders of the Group 3 and Group 4 Certificates against interruptions in distributions due to certain borrower delinquencies. Such delinquencies, even if subsequently cured, may affect the timing of the receipt of distributions by the holders of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates.

To the extent that a Class HY-B-1, Class HY-B-2 or Class HY-B-3 Certificate is being purchased at a discount from its initial Certificate Principal Balance, if the purchaser of such certificate calculates its yield to maturity based on an assumed rate of payment of principal faster than that actually received on such certificate, its actual yield to maturity may be lower than that so calculated.

Modeling Assumptions

For purposes of preparing the tables below, the following modeling assumptions have been made:

(1) no delinquencies or losses occur on the Assumed Loans (as defined below) and all scheduled principal payments on the Assumed Loans are timely received on the due date of each month commencing in October 2004;

(2) the scheduled payments on the Assumed Loans have been calculated on the outstanding principal balance, prior to giving effect to prepayments, the mortgage interest rate, and the remaining amortization term to stated maturity such that the Assumed Loans will fully amortize by their remaining amortization term;

(3) all Assumed Loans prepay monthly at the specified percentages of the Prepayment Assumption;

(a) no optional or other early termination of the offered certificates occurs; and

(b) no substitutions or repurchases of the Assumed Loans occur;

S-74

<Page>

       (4) all prepayments in respect of the Assumed Loans include 30 days' accrued interest and are received on the last day of each month commencing in September 2004;

       (5) the closing date for the offered certificates is September 30, 2004;

       (6) each year will consist of twelve 30-day months;

       (7) cash distributions are received by the holders of the offered certificates on the 25th day of each month commencing in October 2004;

       (8) no Group 3 or Group 4 Loan converts to a fixed rate of interest;

       (9) that (a) One-Year LIBOR remains constant at 2.45% and (b) One-Year CMT remains constant at 2.12%; and

       (10) each Loan Group consists of the following loans ("Assumed Loans," with the following characteristics:

ASSUMED LOAN CHARACTERISTICS

LOAN GROUP 1

<TABLE>
<CAPTION>

| Cut-off Date Principal Balance($) | Mortgage Interest Rate (%) | Net Mortgage Rate (%) | Original Term to Stated Maturity (Months) | Remaining Term to Stated Maturity (Months) | Seasoning (Months) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| 138,691,734.71 | 6.5184585028 | 6.2686594014 | 179 | 146 | 33 |

</TABLE>

LOAN GROUP 2

<TABLE>
<CAPTION>

| Cut-off Date Principal Balance($) | Mortgage Interest Rate (%) | Net Mortgage Rate (%) | Original Term to Stated Maturity (Months) | Remaining Term to Stated Maturity (Months) | Seasoning (Months) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| 85,274,337.49 | 6.4491752076 | 6.1958689816 | 360 | 310 | 50 |
| 381,734,990.04 | 7.1172734622 | 6.8727053369 | 358 | 319 | 39 |

</TABLE>

S-75

<Page>

ASSUMED LOAN CHARACTERISTICS

LOAN GROUP 3

<TABLE>
<CAPTION>

| Index Identifier | Cut-off Principal Balance ($) | Mortgage Interest Rate (%) | Net Mortgage Rate (%) | Original Term to Stated Maturity (Months) | Remaining Term to Stated Maturity (Months) | Seasoning (Months) | Gross Margin (%) |
|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| One-Year CMT | 4,049,824.31 | 5.417 | 5.042 | 360 | 330 | 30 | 2.750 |
| One-Year LIBOR | 38,272,779.74 | 5.038 | 4.669 | 360 | 334 | 26 | 2.244 |

<CAPTION>

| Index Identifier | Months to Next Rate Adjustment Date | Rate Adjustment Frequency (Months) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate-Cap (%) | Lifetime Cap (%) | Lifetime Floor (%) |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| One-Year CMT | 6 | 12 | 2.000 | 2.000 | 11.417 | 2.750 |
| One-Year LIBOR | 10 | 12 | 2.000 | 2.000 | 11.038 | 2.244 |

```
</TABLE>

                    LOAN GROUP 4

<TABLE>
<CAPTION>
                                               Original  Remaining
                                                 Term to   Term to
                    Cut-off     Mortgage    Net   Stated    Stated                Gross
       Index       Principal    Interest Mortgage Maturity  Maturity  Seasoning  Margin
     Identifier    Balance ($)  Rate (%)  Rate (%) (Months) (Months)  (Months)   (%)
     --------------  ------------  --------  -------- -------- --------- ---------  ------
<S>                <C>          <C>      <C>      <C>      <C>       <C>        <C>
One-Year CMT       11,605,686.80  6.114    5.834    360      328       32         2.750
One-Year CMT        2,096,106.19  7.364    7.114    360      321       39         2.750
One-Year LIBOR     56,815,019.90  5.372    5.005    360      335       25         2.250
One-Year LIBOR      5,729,183.10  6.094    5.844*   360      328       32         2.282
One-Year LIBOR      1,205,750.95  5.957    5.707    360      328       32         4.071
One-Year LIBOR        810,177.33  5.702    5.452*   360      330       30         2.250


<CAPTION>
                   Months to      Rate      Initial   Subsequent
                   Next Rate   Adjustment   Periodic   Periodic    Lifetime   Lifetime
       Index       Adjustment   Frequency   Rate-Cap   Rate-Cap      Cap       Floor
     Identifier      Date      (Months)      (%)        (%)         (%)        (%)
     --------------  ----------  ----------   --------  ----------   --------   --------
<S>                <C>          <C>          <C>        <C>          <C>        <C>
One-Year CMT       28           12           4.900      2.000        11.214     2.750
One-Year CMT       45           12           5.000      2.000        12.364     2.750
One-Year LIBOR     35           12           5.000      2.000        10.372     2.250
One-Year LIBOR     28           12           5.000      2.000        11.094     2.282
One-Year LIBOR     52           12           5.000      2.000        10.957     4.071
One-Year LIBOR     54           12           5.000      2.000        10.702     2.250
</TABLE>

    ----------
*       For the first due date that reflects the next adjustment to the Net
        Mortgage Rate for such loan, the Servicing Fee Rate will be increased by
        0.125%.
```

S-76

<Page>


     Prepayments on mortgage loans are commonly measured relative to a
prepayment standard or model (the "Prepayment Assumption"). The Prepayment
Assumption used in this prospectus supplement with respect to the Group 1, Group
2, Group 3 and Group 4 Loans is a constant prepayment rate ("CPR").

          The Prepayment Assumption does not purport to be either an historical
description of prepayment experience or a prediction of the anticipated rate of
prepayment of any pool of loans, including the Loans. None of the master
servicer, the depositor, the trust administrator, the trustee or the underwriter
makes any representations about the appropriateness of the Prepayment
Assumption.

Sensitivity of the Principal Only Certificates

          The Class PO Certificates will be "principal-only" certificates and
will not bear interest. As indicated in the table below, a lower than
anticipated rate of principal payments (including prepayments) on the Discount
Loans will have an adverse effect on the yield to investors in the Class PO
Certificates.

          The table below indicates the sensitivity of the pre-tax corporate
bond equivalent yields to maturity of the Principal Only Certificates to various
constant percentages of the applicable Prepayment Assumption. The yields set
forth in the table were calculated by determining the monthly discount rates
that, when applied to the assumed streams of cash flows to be paid on the
Principal Only Certificates, would cause the discounted present value of such
assumed streams of cash flows to equal the assumed aggregate purchase price of
the Principal Only Certificates, and converting such monthly rates to corporate
bond equivalent rates. These calculations do not take into account variations
that may occur in the interest rates at which investors may be able to reinvest
funds received by them as distributions on such certificates and consequently do
not purport to reflect the return on any investment in any such class of
certificate when such reinvestment rates are considered.

          As described under "Description of the Offered
Certificates--Principal" in this prospectus supplement, the Class PO Principal
Distribution Amount is calculated by reference to the principal payments
(including prepayments) on the Discount Loans in Loan Group 2. The Discount
Loans will have lower Net Mortgage Rates (and lower Mortgage Interest Rates)
than the other Loans. In general, mortgage loans with higher mortgage rates tend

to prepay at higher rates than mortgage loans with relatively lower mortgage rates in response to a given change in market interest rates. As a result, the Discount Loans may prepay at lower rates, thereby reducing the rate of payment of principal and the resulting yield of the Class PO Certificates.

The information set forth in the following table has been prepared on the basis of the modeling assumptions set forth under "--Modeling Assumptions" above and on the assumption that the purchase price of the Class PO Certificates (expressed as a percentage of the initial Certificate Principal Balance of such class) is 84.0000%:

<center>S-77</center>

&lt;Page&gt;

<center>Sensitivity of Class PO Certificates to Prepayments<br>(Pre-Tax Yields to Maturity)</center>

&lt;TABLE&gt;
&lt;CAPTION&gt;

| | Percentages of CPR | | | | |
| Class | 0% | 20% | 30% | 40% | 50% |
| ------------------ | ----- | ----- | ----- | ------- | ------- |
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| Class PO............ | 1.086% | 4.671% | 7.184% | 10.134% | 13.652% |

&lt;/TABLE&gt;

It is unlikely that the Group 2 Loans will have the precise characteristics described in this prospectus supplement or that the Group 2 Loans will all prepay at the same rate until maturity or that all of the Group 2 Loans will prepay at the same rate or time. As a result of these factors, the pre-tax yield on the Principal Only Certificates is likely to differ from those shown in the table above, even if all of the Group 2 Loans prepay at the indicated percentages of the applicable Prepayment Assumption. No representation is made as to the actual rate of principal payments on the Group 2 Loans for any period or over the life of the Principal Only Certificates or as to the yield on Principal Only Certificates. You must make your own decision as to the appropriate prepayment assumptions to be used in deciding whether to purchase any of the Principal Only Certificates.

Sensitivity of the Interest Only Certificates

The Interest Only Certificates will not be entitled to distributions of principal. As indicated in the table below, a higher than anticipated rate of principal payments (including prepayments) on the related Loans could result in the failure of investors in the Interest Only Certificates to fully recover their initial investment.

The table below indicates the sensitivity of the pre-tax corporate bond equivalent yields to maturity of the Class A-X Certificates to various constant percentages of the applicable Prepayment Assumption. The yields set forth in the table were calculated by determining the monthly discount rates that, when applied to the assumed streams of cash flows to be paid on such certificates, would cause the discounted present value of such assumed streams of cash flows to equal the assumed aggregate purchase price of such certificates and converting such monthly rates to corporate bond equivalent rates. These calculations do not take into account variations that may occur in the interest rates at which investors may be able to reinvest funds received by them as distributions on such certificates and consequently do not purport to reflect the return on any investment in any such class of certificate when such reinvestment rates are considered.

The Notional Amount of the Class A-X Certificates is based on the Scheduled Principal Balances of the Non-Discount Loans and the Excess Interest Amount. See "Description of the Offered Certificates--Interest" in this prospectus supplement. The Non-Discount Loans will have higher Net Mortgage Rates (and higher Mortgage Interest Rates) than the other related Loans. In general, mortgage loans with higher mortgage rates tend to prepay at higher rates than mortgage loans with relatively lower mortgage rates in response to a given change in market interest rates. As a result, the Non-Discount Loans may prepay at higher rates, thereby reducing the resulting yield of the Class A-X Certificates than would be the case if the Non-Discount Loans prepaid at the same rate as the other related Loans. An investor in the Class A-X Certificates should fully consider the associated risks, including the risk that a rapid rate of principal payments (including prepayments) on the related Non-Discount Loans could result in the failure of such investor to fully recover its initial investment.

<center>S-78</center>

<Page>

        In addition, since the Excess Interest Amount is generated by the
Group 1 Loans, if the Group 1 Loans prepay at a higher rate than the expected,
an investor may fail to recover its initial investment.

        The information set forth in the following table has been prepared on
the basis of the modeling assumptions and on the assumption that the purchase
price of the Class A-X Certificates (expressed as a percentage of the initial
Notional Amount of such class) is 11.7500% plus accrued interest:

               Sensitivity of Class A-X Certificates to Prepayments
                          (Pre-Tax Yields to Maturity)

<TABLE>
<CAPTION>
                                     Percentages of CPR
                        -------------------------------------------
         Class           0%      20%      30%      40%      50%
-------------------     ------   ------   ------   -----   -------
<S>                     <C>      <C>      <C>      <C>     <C>
Class A-X...........    57.682%  31.412%  16.996%  1.474%  (15.452)%
</TABLE>

        It is unlikely that the Non-Discount Loans and Group 1 Loans will have
the precise characteristics described in this prospectus supplement or that the
Non-Discount Loans and Group 1 Loans will all prepay at the same rate until
maturity or that all of the Non-Discount Loans and Group 1 Loans will prepay at
the same rate or time. As a result of these factors, the pre-tax yields on the
Class A-X Certificates are likely to differ from those shown in the tables
above, even if all of the Non-Discount Loans prepay at the indicated percentages
of the applicable Prepayment Assumption. No representation is made as to the
actual rate of principal payments on the Non-Discount Loans and Group 1 Loans
for any period or over the life of such certificates or as to the yield on such
certificates. You must make your own decision as to the appropriate prepayment
assumptions to be used in deciding whether to purchase the Class A-X
Certificates.

Weighted Average Lives of the Offered Certificates

        The following tables indicate at the specified percentages of the
applicable Prepayment Assumption, the percentages of the original Certificate
Principal Balances or Notional Amounts of the classes of offered certificates
that would be outstanding after each of the Distribution Dates shown at various
constant percentages of the Prepayment Assumption and the corresponding weighted
average lives of each class of certificates. The tables were prepared based on
the modeling assumptions and all percentages are rounded to the nearest 1%
(other than the ones indicated with an asterisk). As used in the following
tables, the weighted average life of a class is determined by:

        (a) multiplying the amount of each distribution of principal or
reduction of the Notional Amount, as the case may be, for that class by the
number of years from the date of issuance to the related Distribution Date;

        (b) summing the results; and

        (c) dividing the sum by the aggregate distributions of principal or
reductions of the Notional Amount referred to in clause (a) and rounding to two
decimal places.

                              S-79

<Page>

                PERCENTAGE OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE
                      AT THE FOLLOWING PERCENTAGES OF CPR

<TABLE>
<CAPTION>

|  | Class A-LR and Class A-UR | | | | | Class 1-A-1 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | Percentages of CPR | | | | | Percentages of CPR | | | | |
| Distribution Date | 0% | 20% | 30% | 40% | 50% | 0% | 20% | 30% | 40% | 50% |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial........................ | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| September 25, 2005............. | 0 | 0 | 0 | 0 | 0 | 94 | 75 | 66 | 56 | 47 |
| September 25, 2006............. | 0 | 0 | 0 | 0 | 0 | 88 | 56 | 43 | 31 | 22 |
| September 25, 2007............. | 0 | 0 | 0 | 0 | 0 | 82 | 42 | 28 | 17 | 10 |
| September 25, 2008............. | 0 | 0 | 0 | 0 | 0 | 75 | 31 | 18 | 10 | 5 |

```
September 25, 2009............     0     0     0     0     0    68    22    11     5     2
September 25, 2010............     0     0     0     0     0    60    16     7     3     1
September 25, 2011............     0     0     0     0     0    52    11     4     1     *
September 25, 2012............     0     0     0     0     0    43     7     2     1     *
September 25, 2013............     0     0     0     0     0    34     5     1     *     *
September 25, 2014............     0     0     0     0     0    24     3     1     *     *
September 25, 2015............     0     0     0     0     0    13     1     *     *     *
September 25, 2016............     0     0     0     0     0     2     *     *     *     *
September 25, 2017............     0     0     0     0     0     0     0     0     0     0
September 25, 2018............     0     0     0     0     0     0     0     0     0     0
September 25, 2019............     0     0     0     0     0     0     0     0     0     0
September 25, 2020............     0     0     0     0     0     0     0     0     0     0
September 25, 2021............     0     0     0     0     0     0     0     0     0     0
September 25, 2022............     0     0     0     0     0     0     0     0     0     0
September 25, 2023............     0     0     0     0     0     0     0     0     0     0
September 25, 2024............     0     0     0     0     0     0     0     0     0     0
September 25, 2025............     0     0     0     0     0     0     0     0     0     0
September 25, 2026............     0     0     0     0     0     0     0     0     0     0
September 25, 2027............     0     0     0     0     0     0     0     0     0     0
September 25, 2028............     0     0     0     0     0     0     0     0     0     0
September 25, 2029............     0     0     0     0     0     0     0     0     0     0
September 25, 2030............     0     0     0     0     0     0     0     0     0     0
September 25, 2031............     0     0     0     0     0     0     0     0     0     0
September 25, 2032............     0     0     0     0     0     0     0     0     0     0
September 25, 2033............     0     0     0     0     0     0     0     0     0     0
September 25, 2034............     0     0     0     0     0     0     0     0     0     0
Weighted Average Life
 (in years)...................  0.07  0.07  0.07  0.07  0.07  6.90  3.18  2.31  1.73  1.33

<CAPTION>
                                         Class 2-A-1, Class 2-A-2,
                                         and Class 2-A-3 Class 2-A-4
                                      --------------------------------
                                            Percentages of CPR
                                      --------------------------------
Distribution Date                      0%    20%   30%   40%   50%
-----------------------------          -----  ----  ----  ----  ----
<S>                                    <C>   <C>   <C>   <C>   <C>
Initial......................          100%  100%  100%  100%  100%
September 25, 2005............          98    77    72    61    50
September 25, 2006............          96    59    49    35    24
September 25, 2007............          94    44    33    20    11
September 25, 2008............          92    33    23    12     6
September 25, 2009............          90    24    16     7     3
September 25, 2010............          87    17    11     4     1
September 25, 2011............          85    11     7     2     1
September 25, 2012............          82     6     5     1     *
September 25, 2013............          79     3     3     1     *
September 25, 2014............          76     0     2     *     0
September 25, 2015............          72     0     1     *     0
September 25, 2016............          68     0     1     *     0
September 25, 2017............          64     0     1     0     0
September 25, 2018............          60     0     *     0     0
September 25, 2019............          56     0     *     0     0
September 25, 2020............          51     0     *     0     0
September 25, 2021............          45     0     *     0     0
September 25, 2022............          40     0     0     0     0
September 25, 2023............          34     0     0     0     0
September 25, 2024............          27     0     0     0     0
September 25, 2025............          20     0     0     0     0
September 25, 2026............          13     0     0     0     0
September 25, 2027............           5     0     0     0     0
September 25, 2028............           0     0     0     0     0
September 25, 2029............           0     0     0     0     0
September 25, 2030............           0     0     0     0     0
September 25, 2031............           0     0     0     0     0
September 25, 2032............           0     0     0     0     0
September 25, 2033............           0     0     0     0     0
September 25, 2034............           0     0     0     0     0
Weighted Average Life
 (in years)...................       14.88  3.24  2.74  1.95  1.45
</TABLE>

----------
*    Less than 0.5%, but greater than zero.
```

S-80

<Page>

              PERCENTAGE OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE
                    AT THE FOLLOWING PERCENTAGES OF CPR

<TABLE>
<CAPTION>

| | Class 2-A-5 | | | | | Class 2-A-6 | | | | |
| | Percentages of CPR | | | | | Percentages of CPR | | | | |
| Distribution Date | 0% | 20% | 30% | 40% | 50% | 0% | 20% | 30% | 40% | 50% |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial...................... | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| September 25, 2005............ | 107 | 107 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2006............ | 114 | 114 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2007............ | 121 | 121 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2008............ | 130 | 130 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2009............ | 138 | 138 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2010............ | 148 | 148 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2011............ | 157 | 157 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2012............ | 168 | 168 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2013............ | 179 | 179 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2014............ | 191 | 183 | 0 | 0 | 0 | 100 | 0 | 100 | 100 | 66 |
| September 25, 2015............ | 204 | 141 | 0 | 0 | 0 | 100 | 0 | 100 | 100 | 32 |
| September 25, 2016............ | 218 | 109 | 0 | 0 | 0 | 100 | 0 | 100 | 100 | 15 |
| September 25, 2017............ | 232 | 83 | 0 | 0 | 0 | 100 | 0 | 100 | 81 | 7 |
| September 25, 2018............ | 248 | 64 | 0 | 0 | 0 | 100 | 0 | 100 | 46 | 3 |
| September 25, 2019............ | 264 | 48 | 0 | 0 | 0 | 100 | 0 | 100 | 26 | 2 |
| September 25, 2020............ | 282 | 36 | 0 | 0 | 0 | 100 | 0 | 100 | 15 | 1 |
| September 25, 2021............ | 301 | 27 | 0 | 0 | 0 | 100 | 0 | 100 | 8 | * |
| September 25, 2022............ | 321 | 20 | 0 | 0 | 0 | 100 | 0 | 75 | 5 | * |
| September 25, 2023............ | 343 | 15 | 0 | 0 | 0 | 100 | 0 | 48 | 3 | * |
| September 25, 2024............ | 366 | 10 | 0 | 0 | 0 | 100 | 0 | 30 | 1 | * |
| September 25, 2025............ | 390 | 7 | 0 | 0 | 0 | 100 | 0 | 18 | 1 | * |
| September 25, 2026............ | 416 | 5 | 0 | 0 | 0 | 100 | 0 | 11 | * | * |
| September 25, 2027............ | 444 | 3 | 0 | 0 | 0 | 100 | 0 | 6 | * | * |
| September 25, 2028............ | 403 | 2 | 0 | 0 | 0 | 0 | 0 | 3 | * | * |
| September 25, 2029............ | 247 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | * | * |
| September 25, 2030............ | 85 | * | 0 | 0 | 0 | 0 | 0 | * | * | * |
| September 25, 2031............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 25, 2032............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 25, 2033............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 25, 2034............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life | | | | | | | | | | |
| (in years).................... | 25.12 | 13.51 | 0.22 | 0.11 | 0.08 | 23.65 | 9.87 | 19.46 | 14.41 | 10.82 |

<CAPTION>

| | Class 3-A-1 | | | | |
| | Percentages of CPR | | | | |
| Distribution Date | 0% | 40% | 50% | 60% | 70% |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Initial...................... | 100% | 100% | 100% | 100% | 100% |
| September 25, 2005............ | 98 | 58 | 48 | 38 | 28 |
| September 25, 2006............ | 96 | 33 | 23 | 14 | 8 |
| September 25, 2007............ | 94 | 19 | 11 | 5 | 2 |
| September 25, 2008............ | 92 | 11 | 5 | 2 | 1 |
| September 25, 2009............ | 90 | 7 | 3 | 1 | * |
| September 25, 2010............ | 88 | 4 | 1 | * | * |
| September 25, 2011............ | 86 | 2 | 1 | * | * |
| September 25, 2012............ | 83 | 1 | * | * | * |
| September 25, 2013............ | 81 | 1 | * | * | * |
| September 25, 2014............ | 78 | * | * | * | * |
| September 25, 2015............ | 75 | * | * | * | * |
| September 25, 2016............ | 72 | * | * | * | * |
| September 25, 2017............ | 69 | * | * | * | * |
| September 25, 2018............ | 66 | * | * | * | * |
| September 25, 2019............ | 62 | * | * | * | * |
| September 25, 2020............ | 58 | * | * | * | * |
| September 25, 2021............ | 55 | * | * | * | * |
| September 25, 2022............ | 51 | * | * | * | * |
| September 25, 2023............ | 46 | * | * | * | 0 |
| September 25, 2024............ | 42 | * | * | * | 0 |
| September 25, 2025............ | 38 | * | * | * | 0 |
| September 25, 2026............ | 33 | * | * | * | 0 |
| September 25, 2027............ | 28 | * | * | 0 | 0 |
| September 25, 2028............ | 22 | * | * | 0 | 0 |
| September 25, 2029............ | 17 | * | * | 0 | 0 |
| September 25, 2030............ | 11 | * | * | 0 | 0 |
| September 25, 2031............ | 5 | * | * | 0 | 0 |
| September 25, 2032............ | 0 | 0 | 0 | 0 | 0 |
| September 25, 2033............ | 0 | 0 | 0 | 0 | 0 |
| September 25, 2034............ | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life | | | | | |
| (in years).................... | 16.89 | 1.86 | 1.39 | 1.06 | 0.81 |

</TABLE>

----------
*    Less than 0.5%, but greater than zero.

S-81

<Page>

PERCENTAGE OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OR NOTIONAL AMOUNT
AT THE FOLLOWING PERCENTAGES OF CPR

<TABLE>
<CAPTION>

|                              | Class 4-A-1 and Class 4-A-2 | | | | | Class A-X | | | | |
|------------------------------|------|------|------|------|------|------|------|------|------|------|
|                              | Percentages of CPR | | | | | Percentages of CPR | | | | |
| Distribution Date            | 0%   | 30%  | 40%  | 50%  | 60%  | 0%   | 20%  | 30%  | 40%  | 50%  |
|------------------------------|------|------|------|------|------|------|------|------|------|------|
| <S>                          | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  |
| Initial ...................  | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| September 25, 2005 .......... | 98   | 68   | 58   | 48   | 38   | 99   | 79   | 69   | 59   | 49   |
| September 25, 2006 .......... | 97   | 46   | 33   | 23   | 14   | 97   | 62   | 48   | 35   | 24   |
| September 25, 2007 .......... | 95   | 31   | 19   | 11   | 5    | 96   | 49   | 33   | 21   | 12   |
| September 25, 2008 .......... | 93   | 21   | 11   | 5    | 2    | 94   | 38   | 23   | 12   | 6    |
| September 25, 2009 .......... | 91   | 15   | 7    | 3    | 1    | 92   | 30   | 15   | 7    | 3    |
| September 25, 2010 .......... | 89   | 10   | 4    | 1    | *    | 90   | 24   | 11   | 4    | 1    |
| September 25, 2011 .......... | 86   | 7    | 2    | 1    | *    | 88   | 18   | 7    | 2    | 1    |
| September 25, 2012 .......... | 84   | 5    | 1    | *    | *    | 86   | 14   | 5    | 1    | *    |
| September 25, 2013 .......... | 81   | 3    | 1    | *    | *    | 84   | 11   | 3    | 1    | *    |
| September 25, 2014 .......... | 78   | 2    | *    | *    | *    | 81   | 9    | 2    | *    | *    |
| September 25, 2015 .......... | 75   | 1    | *    | *    | *    | 78   | 7    | 2    | *    | *    |
| September 25, 2016 .......... | 72   | 1    | *    | *    | *    | 75   | 5    | 1    | *    | *    |
| September 25, 2017 .......... | 69   | 1    | *    | *    | *    | 72   | 4    | 1    | *    | *    |
| September 25, 2018 .......... | 66   | *    | *    | *    | *    | 69   | 3    | *    | *    | *    |
| September 25, 2019 .......... | 62   | *    | *    | *    | *    | 65   | 2    | *    | *    | *    |
| September 25, 2020 .......... | 59   | *    | *    | *    | *    | 62   | 2    | *    | *    | *    |
| September 25, 2021 .......... | 55   | *    | *    | *    | *    | 58   | 1    | *    | *    | *    |
| September 25, 2022 .......... | 51   | *    | *    | *    | *    | 53   | 1    | *    | *    | *    |
| September 25, 2023 .......... | 47   | *    | *    | *    | *    | 49   | 1    | *    | *    | *    |
| September 25, 2024 .......... | 42   | *    | *    | *    | *    | 44   | 1    | *    | *    | *    |
| September 25, 2025 .......... | 38   | *    | *    | *    | *    | 38   | *    | *    | *    | *    |
| September 25, 2026 .......... | 33   | *    | *    | *    | *    | 32   | *    | *    | *    | *    |
| September 25, 2027 .......... | 28   | *    | *    | *    | *    | 26   | *    | *    | *    | *    |
| September 25, 2028 .......... | 22   | *    | *    | *    | 0    | 20   | *    | *    | *    | *    |
| September 25, 2029 .......... | 17   | *    | *    | *    | 0    | 12   | *    | *    | *    | *    |
| September 25, 2030 .......... | 11   | *    | *    | *    | 0    | 5    | *    | *    | *    | *    |
| September 25, 2031 .......... | 5    | *    | *    | *    | 0    | 0    | 0    | 0    | 0    | 0    |
| September 25, 2032 .......... | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    |
| September 25, 2033 .......... | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    |
| September 25, 2034 .......... | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    |
| Weighted Average Life        |      |      |      |      |      |      |      |      |      |      |
| (in years) .................  | 16.96 | 2.62 | 1.86 | 1.39 | 1.06 | 17.17 | 4.13 | 2.70 | 1.93 | 1.44 |

<CAPTION>

|                              | Class PO | | | | |
|------------------------------|------|------|------|------|------|
|                              | Percentages of CPR | | | | |
| Distribution Date            | 0%   | 20%  | 30%  | 40%  | 50%  |
|------------------------------|------|------|------|------|------|
| <S>                          | <C>  | <C>  | <C>  | <C>  | <C>  |
| Initial ...................  | 100% | 100% | 100% | 100% | 100% |
| September 25, 2005 .......... | 98   | 79   | 69   | 59   | 49   |
| September 25, 2006 .......... | 97   | 62   | 47   | 35   | 24   |
| September 25, 2007 .......... | 95   | 49   | 33   | 21   | 12   |
| September 25, 2008 .......... | 93   | 38   | 22   | 12   | 6    |
| September 25, 2009 .......... | 91   | 30   | 15   | 7    | 3    |
| September 25, 2010 .......... | 89   | 23   | 10   | 4    | 1    |
| September 25, 2011 .......... | 87   | 18   | 7    | 2    | 1    |
| September 25, 2012 .......... | 84   | 14   | 5    | 1    | *    |
| September 25, 2013 .......... | 82   | 11   | 3    | 1    | *    |
| September 25, 2014 .......... | 79   | 8    | 2    | *    | *    |
| September 25, 2015 .......... | 76   | 7    | 2    | *    | *    |
| September 25, 2016 .......... | 73   | 5    | 1    | *    | *    |
| September 25, 2017 .......... | 69   | 4    | 1    | *    | *    |
| September 25, 2018 .......... | 66   | 3    | *    | *    | *    |
| September 25, 2019 .......... | 62   | 2    | *    | *    | *    |
| September 25, 2020 .......... | 58   | 2    | *    | *    | *    |
| September 25, 2021 .......... | 53   | 1    | *    | *    | *    |
| September 25, 2022 .......... | 49   | 1    | *    | *    | *    |
| September 25, 2023 .......... | 44   | 1    | *    | *    | *    |
| September 25, 2024 .......... | 39   | *    | *    | *    | *    |
| September 25, 2025 .......... | 33   | *    | *    | *    | *    |
| September 25, 2026 .......... | 27   | *    | *    | *    | *    |
| September 25, 2027 .......... | 21   | *    | *    | *    | *    |
| September 25, 2028 .......... | 14   | *    | *    | *    | *    |
| September 25, 2029 .......... | 6    | *    | *    | *    | *    |
| September 25, 2030 .......... | 0    | 0    | 0    | 0    | 0    |
| September 25, 2031 .......... | 0    | 0    | 0    | 0    | 0    |
| September 25, 2032 .......... | 0    | 0    | 0    | 0    | 0    |
| September 25, 2033 .......... | 0    | 0    | 0    | 0    | 0    |
| September 25, 2034 .......... | 0    | 0    | 0    | 0    | 0    |
| Weighted Average Life        |      |      |      |      |      |

```
(in years) ....................   16.37   4.09   2.69   1.92   1.44
</TABLE>

----------
* Less than 0.5%, but greater than zero.

                         S-82



<Page>


          PERCENTAGE OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE
                AT THE FOLLOWING PERCENTAGES OF CPR

<TABLE>
<CAPTION>
```

| | Class 15-B-1, Class 15-B-2 and Class 15-B-3 | | | | | Class 30-B-1, Class 30-B-2 and Class 30-B-3 | | | | |
| | Percentages of CPR | | | | | Percentages of CPR | | | | |
| Distribution Date | 0% | 20% | 30% | 40% | 50% | 0% | 20% | 30% | 40% | 50% |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| Initial...................... | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| September 25, 2005............ | 94 | 94 | 94 | 94 | 94 | 99 | 99 | 99 | 99 | 99 |
| September 25, 2006............ | 88 | 88 | 88 | 76 | 63 | 97 | 97 | 97 | 84 | 69 |
| September 25, 2007............ | 82 | 82 | 69 | 55 | 41 | 96 | 96 | 80 | 64 | 48 |
| September 25, 2008............ | 75 | 63 | 44 | 30 | 19 | 94 | 78 | 55 | 38 | 24 |
| September 25, 2009............ | 68 | 45 | 28 | 16 | 9 | 92 | 61 | 38 | 22 | 12 |
| September 25, 2010............ | 60 | 32 | 17 | 9 | 4 | 90 | 48 | 26 | 13 | 6 |
| September 25, 2011............ | 52 | 22 | 10 | 5 | 2 | 88 | 37 | 18 | 8 | 3 |
| September 25, 2012............ | 43 | 15 | 6 | 2 | 1 | 86 | 29 | 12 | 4 | 1 |
| September 25, 2013............ | 34 | 9 | 3 | 1 | * | 84 | 23 | 8 | 3 | 1 |
| September 25, 2014............ | 24 | 5 | 2 | * | * | 81 | 18 | 6 | 2 | * |
| September 25, 2015............ | 13 | 2 | 1 | * | * | 78 | 14 | 4 | 1 | * |
| September 25, 2016............ | 2 | * | * | * | * | 75 | 11 | 3 | 1 | * |
| September 25, 2017............ | 0 | 0 | 0 | 0 | 0 | 72 | 8 | 2 | * | * |
| September 25, 2018............ | 0 | 0 | 0 | 0 | 0 | 69 | 6 | 1 | * | * |
| September 25, 2019............ | 0 | 0 | 0 | 0 | 0 | 65 | 5 | 1 | * | * |
| September 25, 2020............ | 0 | 0 | 0 | 0 | 0 | 61 | 4 | * | * | * |
| September 25, 2021............ | 0 | 0 | 0 | 0 | 0 | 57 | 3 | * | * | * |
| September 25, 2022............ | 0 | 0 | 0 | 0 | 0 | 53 | 2 | * | * | * |
| September 25, 2023............ | 0 | 0 | 0 | 0 | 0 | 48 | 1 | * | * | * |
| September 25, 2024............ | 0 | 0 | 0 | 0 | 0 | 43 | 1 | * | * | * |
| September 25, 2025............ | 0 | 0 | 0 | 0 | 0 | 38 | 1 | * | * | * |
| September 25, 2026............ | 0 | 0 | 0 | 0 | 0 | 32 | * | * | * | * |
| September 25, 2027............ | 0 | 0 | 0 | 0 | 0 | 25 | * | * | * | * |
| September 25, 2028............ | 0 | 0 | 0 | 0 | 0 | 19 | * | * | * | * |
| September 25, 2029............ | 0 | 0 | 0 | 0 | 0 | 11 | * | * | * | * |
| September 25, 2030............ | 0 | 0 | 0 | 0 | 0 | 4 | * | * | * | * |
| September 25, 2031............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 25, 2032............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 25, 2033............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 25, 2034............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years).................... | 6.90 | 5.11 | 4.14 | 3.42 | 2.81 | 17.11 | 6.93 | 5.00 | 3.90 | 3.11 |

```
<CAPTION>
```

| | Class HY-B-1, Class HY-B-2 and Class HY-B-3 | | | | |
| | Percentages of CPR | | | | |
| Distribution Date | 0% | 30% | 40% | 50% | 60% |
| --- | --- | --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| Initial...................... | 100% | 100% | 100% | 100% | 100% |
| September 25, 2005............ | 98 | 98 | 98 | 98 | 91 |
| September 25, 2006............ | 97 | 97 | 83 | 69 | 57 |
| September 25, 2007............ | 95 | 79 | 64 | 48 | 36 |
| September 25, 2008............ | 93 | 54 | 37 | 23 | 14 |
| September 25, 2009............ | 91 | 37 | 22 | 11 | 5 |
| September 25, 2010............ | 88 | 25 | 13 | 6 | 2 |
| September 25, 2011............ | 86 | 17 | 7 | 3 | 1 |
| September 25, 2012............ | 83 | 12 | 4 | 1 | * |
| September 25, 2013............ | 81 | 8 | 3 | 1 | * |
| September 25, 2014............ | 78 | 5 | 1 | * | * |
| September 25, 2015............ | 75 | 4 | 1 | * | * |
| September 25, 2016............ | 72 | 2 | * | * | * |
| September 25, 2017............ | 69 | 2 | * | * | * |
| September 25, 2018............ | 66 | 1 | * | * | * |
| September 25, 2019............ | 62 | 1 | * | * | * |
| September 25, 2020............ | 59 | * | * | * | * |
| September 25, 2021............ | 55 | * | * | * | * |
| September 25, 2022............ | 51 | * | * | * | * |
| September 25, 2023............ | 47 | * | * | * | * |
| September 25, 2024............ | 42 | * | * | * | * |

```
September 25, 2025............    38    *    *    *    *
September 25, 2026............    33    *    *    *    *
September 25, 2027............    28    *    *    *    *
September 25, 2028............    22    *    *    *    0
September 25, 2029............    17    *    *    *    0
September 25, 2030............    11    *    *    *    0
September 25, 2031............     5    *    *    *    0
September 25, 2032............     0    0    0    0    0
September 25, 2033............     0    0    0    0    0
September 25, 2034............     0    0    0    0    0
Weighted Average Life
(in years)...................  16.94  4.95  3.87  3.09  2.58
</TABLE>
```

----------

*    Less than 0.5%, but greater than zero.


S-83




<Page>


                PERCENTAGE OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OR NOTIONAL AMOUNT
                        AT THE FOLLOWING PERCENTAGES OF CPR

<TABLE>
<CAPTION>

| | Class C-B-4, Class C-B-5 and Class C-B-6 | | | | |
|---|---|---|---|---|---|
| | Percentages of CPR | | | | |
| Distribution Date | 0% | 20% | 30% | 40% | 50% |
| ----------------- | ----- | ---- | ---- | ---- | ---- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Initial........................ | 100% | 100% | 100% | 100% | 100% |
| September 25, 2005.............. | 99 | 99 | 99 | 99 | 99 |
| September 25, 2006.............. | 97 | 97 | 97 | 84 | 69 |
| September 25, 2007.............. | 95 | 95 | 80 | 64 | 48 |
| September 25, 2008.............. | 94 | 78 | 55 | 38 | 24 |
| September 25, 2009.............. | 92 | 61 | 38 | 22 | 12 |
| September 25, 2010.............. | 90 | 48 | 26 | 13 | 6 |
| September 25, 2011.............. | 88 | 37 | 18 | 8 | 3 |
| September 25, 2012.............. | 85 | 29 | 12 | 4 | 1 |
| September 25, 2013.............. | 83 | 23 | 8 | 3 | 1 |
| September 25, 2014.............. | 80 | 18 | 6 | 2 | * |
| September 25, 2015.............. | 78 | 14 | 4 | 1 | * |
| September 25, 2016.............. | 75 | 10 | 3 | 1 | * |
| September 25, 2017.............. | 72 | 8 | 2 | * | * |
| September 25, 2018.............. | 68 | 6 | 1 | * | * |
| September 25, 2019.............. | 65 | 5 | 1 | * | * |
| September 25, 2020.............. | 61 | 3 | * | * | * |
| September 25, 2021.............. | 57 | 3 | * | * | * |
| September 25, 2022.............. | 52 | 2 | * | * | * |
| September 25, 2023.............. | 48 | 1 | * | * | * |
| September 25, 2024.............. | 43 | 1 | * | * | * |
| September 25, 2025.............. | 38 | 1 | * | * | * |
| September 25, 2026.............. | 32 | * | * | * | * |
| September 25, 2027.............. | 26 | * | * | * | * |
| September 25, 2028.............. | 19 | * | * | * | * |
| September 25, 2029.............. | 13 | * | * | * | * |
| September 25, 2030.............. | 5 | * | * | * | 0 |
| September 25, 2031.............. | 1 | * | * | * | 0 |
| September 25, 2032.............. | 0 | 0 | 0 | 0 | 0 |
| September 25, 2033.............. | 0 | 0 | 0 | 0 | 0 |
| September 25, 2034.............. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life | | | | | |
| (in years)................... | 17.08 | 6.91 | 4.99 | 3.90 | 3.11 |

</TABLE>

----------

*    Less than 0.5%, but greater than zero.


S-84




<Page>




Yield on the Residual Certificates

        The after-tax rate of return to the holders of the Residual

Certificates will reflect their pre-tax rates of return (which may be zero), reduced by the taxes required to be paid with respect to such certificates. If you hold a Residual Certificate, you may have tax liabilities during the early years of the related REMIC's term that substantially exceed any distributions payable thereon during any such period. In addition, the present value of the tax liabilities with respect to your Residual Certificate may substantially exceed the present value of any distributions on your Residual Certificate and of any tax benefits that may arise with respect to it. Accordingly, the after-tax rate of return on the Residual Certificates may be negative or may be otherwise significantly adversely affected. The timing and amount of taxable income attributable to the Residual Certificates will depend on, among other things, the timing and amounts of prepayments and losses experienced with respect to the Loans. If you own a Residual Certificate, you should consult your tax advisors regarding the effect of taxes and the receipt of any payments made in connection with the purchase of the Residual Certificate on your after-tax rate of return. See "Federal Income Tax Consequences" in this prospectus supplement and in the prospectus.

THE POOLING AND SERVICING AGREEMENT

General

The certificates will be issued pursuant to the Pooling and Servicing Agreement, among the depositor, the master servicer, the trust administrator, the custodians and the trustee. The Pooling and Servicing Agreement requires the master servicer to enforce the servicers' obligations to service the Loans pursuant to the related Servicing Agreements. The trust created under the Pooling and Servicing Agreement will consist generally of:

(1) all of the depositor's right, title and interest in the Loans, the related Mortgage Notes, mortgages and other related documents;

(2) all payments on or collections in respect of the Loans due after the Cut-off Date, together with any proceeds thereof;

(3) any Mortgaged Properties acquired on behalf of certificateholders by foreclosure or by deed in lieu of foreclosure, and any revenues received from those properties; and

(4) the rights of the depositor under the Mortgage Loan Purchase Agreement, the Servicing Agreements and the assignment assumption and recognition agreements related to the Servicing Agreements.

The certificates will be transferable and exchangeable at the corporate trust office of the trust administrator.

S-85

<Page>

Assignment of the Loans

On the closing date the depositor will transfer to the trust all of its right, title and interest in and to each Loan, the related Mortgage Notes, mortgages and other related documents, including all scheduled payments with respect to each Loan due after the Cut-off Date and all unscheduled payments with respect to each Loan received after the Cut-off Date. The trust administrator, concurrently with this transfer, will deliver the certificates to the depositor. Each Loan transferred to the trust will be identified on a mortgage loan schedule delivered to the trustee pursuant to the Pooling and Servicing Agreement. The mortgage loan schedule will include information such as the principal balance of each Loan as of the Cut-off Date, its Mortgage Interest Rate as well as other information.

The Pooling and Servicing Agreement will require that, on or prior to the closing date, the depositor will deliver or cause to be delivered to the applicable custodian, on behalf of the trustee, the Mortgage Notes endorsed to blank (or in the case of permanently lost or destroyed Mortgage Notes, lost note affidavits), the mortgages, Assignments of the Loans with the Assignee's name in blank and other related documents.

Pursuant to the Mortgage Loan Purchase Agreement, the transferor will make, among others, the following representations and warranties with respect to each Loan as of the Closing Date:

(A) the information set forth in the mortgage loan schedule was true and correct in all material respects at the date or dates respecting which such information is furnished as specified in the mortgage loan schedule;

(B) immediately prior to the transfer and assignment of the Loans to the depositor, the transferor was the sole owner and holder of the Loan free and clear of any and all liens, pledges, charges or security interests of any nature and has full right and authority to sell and assign the same; and

(C) Except with respect to approximately 0.99% of the Loans, which are

30 to 59 days delinquent, and approximately 0.54% of the Loans, which are 60 to 89 days delinquent, in each case, as of the Cut-off Date, there is no monetary default existing under any mortgage or the related mortgage note and there is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach or event of acceleration; and neither the Transferor nor any of its respective affiliates has taken any action to waive any default, breach or event of acceleration; and no foreclosure action has been commenced with respect to the Loan.

Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Loan and related loan documents, the transferor will have a period of 90 days after the earlier of discovery or notice of the breach to effect a cure. If the breach cannot be cured within the 90-day period (subject to certain time extensions), the transferor will be obligated to purchase the Loan at the Purchase Price or substitute an eligible Loan or Loans for such defective Loan. The Purchase Price will be required to be deposited in the Collection Account on or prior to the date the master servicer is required to remit amounts on deposit in the Collection Account to the trust administrator for

S-86

<Page>

deposit into the Distribution Account in the month after the purchase obligation arises. The obligation of the transferor to purchase or substitute for a defective Loan is the sole remedy regarding breaches of representations and warranties relating to the Loans available to the trustee or the certificateholders.

In connection with the substitution of a Loan, the transferor will be required to remit any Substitution Adjustment Amount, if applicable.

Collection and Other Servicing Procedures

Each servicer will act in accordance with the servicing standard set forth in the applicable Servicing Agreement to ensure that all payments required under the terms and provisions of the Loans that it is servicing are collected, and will be required to follow collection procedures comparable to the collection procedures of mortgage lenders servicing mortgage loans for its own account, to the extent such procedures are consistent with the applicable Servicing Agreement and any primary mortgage insurance policy. Consistent with the foregoing, each servicer may in its discretion waive, modify, or vary or permit to be waived, modified or varied, any term of any Loan that it is servicing, subject to the restrictions set forth in the applicable Servicing Agreement.

If a Mortgaged Property has been or is about to be conveyed by the borrower and the applicable servicer has knowledge thereof, that servicer will be required to accelerate the maturity of the Loan, to the extent permitted by the terms of the related Mortgage Note and applicable law. If it reasonably believes that the due-on-sale clause cannot be enforced under applicable law, the applicable servicer may enter into an assumption agreement with the person to whom such property has been or is about to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and the borrower, to the extent permitted by applicable law, remains liable thereon. Generally, the servicers will retain any fee collected for entering into an assumption agreement, as additional servicing compensation. In regard to circumstances in which the servicers may be unable to enforce due-on-sale clauses, see "Certain Legal Aspects of Residential Loans--Enforceability of Certain Provisions" in the prospectus.

As provided in the Servicing Agreements, the servicers will be required to establish and maintain one or more accounts (each, a "Servicing Account") into which the servicers will deposit and retain all collections from the borrower for the payment of taxes, assessments, insurance premiums, or comparable items as agent of the borrower as provided in the Servicing Agreements. Each Servicing Account and the investment of deposits in those accounts must comply with the requirements of the related Servicing Agreements. To the extent set forth in the related Servicing Agreements, withdrawals of such amounts from the Servicing Accounts may be made only to remit funds to the master servicer, on the applicable Servicer Remittance Date, to effect timely payment of taxes, assessments, insurance premiums, or comparable items, to reimburse the master servicer or servicer for any advances made with respect to such items, to refund to any borrower any sums as may be determined to be overages, to pay interest, if required, to borrowers on balances in the Servicing Accounts, to pay earnings not required to be paid to borrowers to the servicers, or to clear and terminate the Servicing Accounts at or at any time after the termination of the applicable Servicing Agreements.

S-87

<Page>

        The servicers will be required to maintain errors and omissions
insurance and fidelity bonds in certain specified amounts.

Hazard Insurance

        Each servicer will be required to maintain and keep, or cause to be
maintained and kept, with respect to each Loan that it is servicing, other than
a loan secured by a condominium unit, in full force and effect for each
Mortgaged Property a hazard insurance policy equal to at least the lesser of the
unpaid principal balance of the Loan or the maximum insurable value of the
improvements securing such Loan and containing a standard mortgagee clause;
provided, however, that the amount of the hazard insurance may not be less than
the amount necessary to prevent loss due to the application of any co-insurance
provision of the related policy. Any amounts collected by the servicers under
any such hazard insurance policy (other than amounts to be applied to the
restoration or repair of the Mortgaged Property or amounts released to the
borrower in accordance with normal servicing procedures) shall be deposited in a
Protected Account (as defined below). Any cost incurred in maintaining any such
hazard insurance policy shall not be added to the amount owing under the Loan
for the purpose of calculating monthly distributions to certificateholders,
notwithstanding that the terms of the Loan so permit. Such costs shall be
recoverable by the related servicer out of related late payments by the borrower
or out of insurance proceeds or liquidation proceeds or any other amounts in the
related Protected Account. The right of the servicer to reimbursement for such
costs incurred will be prior to the right of the master servicer to receive any
related insurance proceeds or liquidation proceeds or any other amounts in the
related Protected Account.

        In general, the standard form of fire and extended coverage policy
covers physical damage to or destruction of the improvements on the property by
fire, lightning, explosion, smoke, windstorm and hail, riot, strike and civil
commotion, subject to the conditions and exclusions particularized in each
policy. Although the policies relating to the Loans will be underwritten by
different insurers and therefore will not contain identical terms and
conditions, the basic terms thereof are dictated by state law. Such policies
typically do not cover any physical damage resulting from the following: war,
revolution, governmental actions, floods and other water-related causes, earth
movement (including earthquakes, landslides and mud flows), nuclear reactions,
wet or dry rot, vermin, rodents, insects or domestic animals, theft and, in
certain cases, vandalism and malicious mischief. The foregoing list is merely
indicative of certain kinds of uninsured risks and is not intended to be
all-inclusive.

        Hazard insurance policies covering properties similar to the Mortgaged
Properties typically contain a clause which in effect requires the insured at
all times to carry insurance of a specified percentage (generally 80% to 90%) of
the full replacement value of the improvements on the property in order to
recover the full amount of any partial loss. If the insured's coverage falls
below this specified percentage, such clause typically provides that the
insurer's liability in the event of partial loss does not exceed the greater of
(i) the replacement cost of the improvements less physical depreciation, or (ii)
such proportion of the loss as the amount of insurance carried bears to the
specified percentage of the full replacement cost of such improvements.

        Since the amount of hazard insurance to be maintained on the
improvements securing the Loans may decline as the principal balances owing
thereon decrease, and since residential

                                       S-88

<Page>

properties have historically appreciated in value over time, in the event of
partial loss, hazard insurance proceeds may be insufficient to restore fully the
damaged property.

        If the Mortgaged Property securing a Loan is located at the time of
origination in a federally designated flood area, the applicable servicer
generally will be required to cause to be maintained with respect to such Loan
flood insurance to the extent available and in accordance with industry
practices. Such flood insurance generally will be in an amount equal to the
lesser of (i) the unpaid principal balance of the related Loan and (ii) the
minimum amount required under the terms of coverage to compensate for any damage
or loss on a replacement cost basis, but not more than the maximum amount of
such insurance available for the related Mortgaged Property under either the
regular or emergency programs of the National Flood Insurance Program (assuming
that the area in which such Mortgaged Property is located is participating in
such program).

The servicers, on behalf of the trustee and certificateholders, will be required to present claims to the insurer under any applicable hazard or flood insurance policy. As set forth above, all collections under such policies that are not applied to the restoration or repair of the related Mortgaged Property or released to the borrower in accordance with normal servicing procedures are to be deposited in a Protected Account. The servicers are required to deposit in a Protected Account the amount of any deductible under a blanket hazard insurance policy.

Realization Upon Defaulted Loans

Each servicer will be required to take such action as it deems to be in the best interest of the trust with respect to defaulted Loans that it is servicing and foreclose upon or otherwise comparably convert the ownership of properties securing defaulted Loans as to which no satisfactory collection arrangements can be made. To the extent set forth in the related Servicing Agreement or any primary mortgage insurance policy, each servicer will service the property acquired by the trust through foreclosure or deed-in-lieu of foreclosure and liquidation of the related mortgaged property in accordance with procedures that the servicer employs and exercises in servicing and administering mortgage loans for its own account and which are in accordance with mortgage servicing practices of mortgage lenders servicing mortgage loans of the same type as the applicable Loans.

Since insurance proceeds cannot exceed deficiency claims and certain expenses incurred by the servicers, no insurance payments will result in a recovery to certificateholders which exceeds the principal balance of the defaulted Loan together with accrued interest thereon at its Mortgage Interest Rate.

Servicing and Master Servicing Compensation and Payment of Expenses

The master servicer will be entitled to compensation for its activities under the Pooling and Servicing Agreement equal to the investment earnings on amounts on deposit in the Collection Account and the Distribution Account. Each of the servicers will be entitled to receive a fee (the "Servicing Fee") as compensation for its activities under the related Servicing Agreement equal to the Servicing Fee Rate multiplied by the Scheduled Principal Balance of each Loan it services as of the due date in the month preceding the month in which the related Distribution Date occurs. The "Servicing Fee Rate" for each Loan will generally range from

S-89

<Page>

0.200% to 0.608% per annum with a weighted average servicing fee rate of the Loans will be approximately 0.264% per annum. With respect to approximately 0.90% of the Loans, representing approximately $6,539,360 of the aggregate Cut-Off Date Pool Balance, the Servicing Fee Rate with respect to such Loan will be increased by 0.125% commencing on the first due date that reflects the next adjustment to the Mortgage Interest Rate for such Loan. However, Prepayment Interest Shortfalls on the Loans for any Prepayment Period will be required to be offset by the related servicer (or the master servicer to the extent the related servicer fails to offset) on the related Distribution Date to the extent of Compensating Interest payments required to be made as described in this prospectus supplement.

In addition to the primary compensation described above, the applicable servicer will generally retain all prepayment charges and penalties, if any (and to the extent not retained by the applicable servicer, prepayment charges and penalties will be retained by the transferor), assumption fees, tax service fees, fees for statement of account payoff and late payment charges, all to the extent collected from borrowers.

The applicable servicer will be required to pay all related expenses incurred in connection with its servicing responsibilities (subject to limited reimbursement as described in this prospectus supplement).

Protected Accounts

Each servicer will be required to establish and maintain one or more accounts (the "Protected Accounts") into which it will deposit daily all collections of principal and interest on any Loans that it is servicing, including principal prepayments, insurance proceeds, liquidation proceeds, the Purchase Price for any Loans repurchased, and advances made from the servicer's own funds (less the applicable Servicing Fee). All Protected Accounts and amounts at any time credited to them must comply with the requirements of the applicable Servicing Agreements.

Collection Account and Distribution Account

The master servicer will be required to establish and maintain an account (the "Collection Account") into which it will deposit amounts received

from each servicer and advances (to the extent required to make advances) made from the master servicer's own funds. The Collection Account may be deemed to be a sub-account of the Distribution Account, and amounts at any time credited to it must comply with the requirements of the Pooling and Servicing Agreement and must meet the requirements of the Rating Agencies. The master servicer will be required to deposit in the Collection Account, as received, the following amounts:

(A) With respect to the Loans, all amounts received from the servicers as of the close of business on the related Servicer Remittance Date including:

(1) all payments on account of principal of the Loans, including unscheduled principal prepayments on the Loans;

(2) all payments on account of interest on the Loans adjusted to the Net Mortgage Rate;

S-90

<Page>

(3) all net insurance proceeds and net proceeds from the liquidation of Loans, including condemnation proceeds, to the extent those proceeds are not to be applied to the restoration or repair of the related Mortgaged Property or released to the related borrower in accordance with the applicable servicer's normal servicing procedures;

(4) any amounts deposited in the Collection Account by the master servicer in connection with any losses on the investments permitted by the Pooling and Servicing Agreement;

(5) any amounts deposited in the Collection Account by the master servicer in connection with a deductible clause in any blanket hazard insurance policy;

(6) all proceeds of a primary mortgage guaranty insurance policy;

(7) the net monthly rental income from the REO Properties; plus

(B) Advance amounts;

(C) Any amounts payable in connection with the purchase of any Loan and any Substitution Adjustment Amounts; and

(D) Compensating Interest payments.

On the business day prior to each Distribution Date, the master servicer will withdraw or cause to be withdrawn from the Collection Account and will be required to remit to the trust administrator for deposit in the Distribution Account the Available Funds for such Distribution Date.

The trust administrator will be required to establish and maintain in the name of the trust administrator, for the benefit of the certificateholders, an account (the "Distribution Account"), into which will be deposited on the day prior to each Distribution Date, amounts withdrawn from the Collection Account, for distribution to certificateholders on a Distribution Date, any amounts the master servicer must deposit in connection with any losses on the investments permitted by the Pooling and Servicing Agreement, and any other amounts required to be deposited under the Pooling and Servicing Agreement. The Distribution Account will be an account meeting the eligibility requirements of the Pooling and Servicing Agreement. Amounts on deposit in the Distribution Account may be invested for the benefit and in accordance with the written direction of the master servicer in the investments permitted by the Pooling and Servicing Agreement maturing on or before the business day prior to the related Distribution Date unless the investments are invested in obligations of, or obligations managed by, the institution that maintains the Distribution Account, in which case the investments may mature on the related Distribution Date.

Certain Matters Regarding the Master Servicer

The Pooling and Servicing Agreement will generally provide that the master servicer may resign from its obligations and duties thereunder upon appointment of a successor and receipt by the trustee of confirmation from each Rating Agency that such resignation and appointment will

S-91

<Page>

not result in a downgrade of the ratings of any of the certificates or upon determination, evidenced by an opinion of counsel to such effect, that the performance of such duties is no longer permissible under applicable law. No such resignation will become effective until the trustee or a successor master servicer has assumed the obligations and duties of the master servicer to the extent required under the Pooling and Servicing Agreement. The master servicer also has the right to assign, sell or transfer its rights and delegate its duties and obligations under the Pooling and Servicing Agreement; provided that the purchaser or transferee accepting such assignment, sale, transfer or delegation is qualified to service mortgage loans for Fannie Mae or Freddie Mac and shall satisfy the other requirements listed in the Pooling and Servicing Agreement with respect to the qualifications of such purchaser or transferee.

        The Pooling and Servicing Agreement will generally provide that neither the master servicer nor any of its directors, officers, employees and agents shall be under any liability to the trust for taking any action or for refraining from taking any action in good faith pursuant to the Pooling and Servicing Agreement, or for errors in judgment made in good faith; provided, however, that neither the master servicer nor any such person will be protected against any breach of warranties or representations made in the Pooling and Servicing Agreement or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of the master servicer's duties or by reason of reckless disregard of the master servicer's obligations and duties thereunder. In addition, the Pooling and Servicing Agreement will provide that the master servicer is under no obligation to appear in, prosecute or defend any legal action which is not incidental to its duties and which in its opinion may involve it in any expense or liability. The master servicer may, however, undertake any such action which it may deem necessary or desirable in respect of the Pooling and Servicing Agreement and the rights and duties of the parties to it. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of the trust, and the master servicer will be entitled to be reimbursed therefor from the trust.

        The Servicing Agreements generally provide similar protections to the servicers as are provided to the master servicer under the Pooling and Servicing Agreement described above.

        Any corporation into which the master servicer may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation, to which the master servicer is a party, or any corporation succeeding to the business of the master servicer will be the successor of the master servicer under the Pooling and Servicing Agreement, provided that any such successor to the master servicer shall be qualified to service loans on behalf of Fannie Mae or Freddie Mac.

        The Pooling and Servicing Agreement will provide that the master servicer, the depositor, the custodians and any director, officer, employee or agent of the master servicer, the depositor, either custodian will be indemnified by the trust and will be held harmless against any loss, liability or expense (i) that is an "unanticipated expense" within the meaning of the REMIC provisions of the Code or (ii) that is incurred by the master servicer, the depositor in connection with the performance of their respective duties and obligations and exercise of rights under the Pooling and Servicing Agreement, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of such duties or incurred by reason of reckless disregard of their duties and obligations under the Pooling and Servicing

                              S-92


<Page>


Agreement. The trust shall fulfill such obligation from amounts on deposit in the Collection Account.

Events of Servicing Termination

        An "Event of Servicing Termination" with respect to the master servicer under the Pooling and Servicing Agreement will consist of (i) failure by the master servicer to cause to be deposited in the Distribution Account amounts required to be deposited by the master servicer pursuant to the Pooling and Servicing Agreement, and such failure continues unremedied for one business day, (ii) failure by the master servicer to observe or perform in any material respect any other material covenants and agreements set forth in the Pooling and Servicing Agreement to be performed by it that materially affects the rights of certificateholders, and such failure continues unremedied for 60 days after the date on which written notice of such failure has been given to the master servicer, (iii) the entry against the master servicer of a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of

60 consecutive days, (iv) consent by the master servicer to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the master servicer or substantially all of its property, (v) admission by the master servicer in writing of its inability to pay its debts generally as they become due, filing of a petition to take advantage of any applicable insolvency or reorganization statute, any assignment for the benefit of its creditors, or voluntary suspension of payment of its obligations, or (vi) the assignment or delegation by the master servicer of its duties or rights under the Pooling and Servicing Agreement in contravention of the provisions in the Pooling and Servicing Agreement permitting such assignment or delegation.

In each and every such case, so long as such Event of Servicing Termination with respect to the master servicer shall not have been remedied, the trustee may, and (i) at the written direction of the holders of certificates aggregating ownership of not less than 25% of the voting rights described below under "--Voting Rights" or (ii) if such Event of Servicing Termination is related to a failure by the master servicer to make any Advance required to be made by it pursuant to the terms of the Pooling and Servicing Agreement, the trustee shall, in each case by notice in writing to the master servicer, with a copy to the Rating Agencies, terminate all of the rights and obligations (but not the liabilities accruing prior to the date of termination) of the master servicer under the Pooling and Servicing Agreement and in and to the Loans master serviced by the master servicer and the proceeds thereof. Upon the receipt by the master servicer of such written notice, all authority and power of the master servicer under the Pooling and Servicing Agreement, whether with respect to the certificates, the Loans, the Servicing Agreements, or under any other related agreements (but only to the extent that such other agreements relate to the Loans) shall, subject to the provisions of the Pooling and Servicing Agreement and to bankruptcy, insolvency or similar laws, if applicable, automatically and without further action pass to and be vested in the trustee.

Upon the receipt by the master servicer of a notice of termination or an opinion of counsel delivered to the trustee to the effect that the master servicer is legally unable to act or to

S-93

<Page>

delegate its duties to a person which is legally able to act, the trustee shall automatically become the successor in all respects to the master servicer in its capacity under the Pooling and Servicing Agreement and the transactions set forth or provided for in the Pooling and Servicing Agreement and shall thereafter be subject to all the responsibilities, duties, liabilities and limitations on liabilities placed on the master servicer by the terms and provisions of the Pooling and Servicing Agreement; provided, however, that the trustee (i) will be under no obligation to repurchase any Loan; and (ii) will have no obligation whatsoever with respect to any liability incurred by the prior master servicer. As compensation therefor, the trustee shall be entitled to all funds relating to the Loans and all other compensation which the master servicer would have been entitled to retain if the master servicer had continued to act as such, except for those amounts due the master servicer as reimbursement for advances previously made or expenses previously incurred. Notwithstanding the above, the trustee may, if it is unwilling so to act, or shall, if it is legally unable so to act or is requested in writing to do so by holders of certificates aggregating not less than 25% of the voting rights, appoint, or petition a court of competent jurisdiction to appoint, any established housing and home finance institution which is a Fannie Mae or Freddie Mac approved servicer (and which meets certain other requirements listed in the Pooling and Servicing Agreement) as the successor to the master servicer under the Pooling and Servicing Agreement in the assumption of all or any part of the responsibilities, duties or liabilities of the master servicer under the Pooling and Servicing Agreement. Pending appointment of a successor to the master servicer under the Pooling and Servicing Agreement, the trustee shall act in such capacity as provided under the Pooling and Servicing Agreement. In connection with such appointment and assumption, the trustee may make such arrangements for the compensation of such successor as it and such successor shall agree; provided, however, that such compensation may not be in excess of the compensation permitted the master servicer as provided above, and that such successor will be required to undertake and assume the obligations of the master servicer to pay compensation to any third person acting as an agent or independent contractor in the performance of master servicing responsibilities under the Pooling and Servicing Agreement. Notwithstanding the foregoing, in the case of such appointment and assumption, the trustee will be entitled to reimbursement from the master servicer or the trust (provided that the trust will be entitled to reimbursement from the master servicer) for any costs and expenses incurred in connection with the appointment of such successor master servicer.

Under each Servicing Agreement, an event of default by a servicer will generally occur if: (a) the servicer fails to remit to the master servicer or the trust administrator, as applicable, any payment required to be made under the related Servicing Agreement which continues unremedied for the period

specified in the related Servicing Agreement, (b) the servicer fails to duly observe or perform in any material respect any other of the covenants or agreements of the servicer set forth in the related Servicing Agreement which continues unremedied for the period set forth in the related Servicing Agreement, (c) certain insolvency events occur with respect to the servicer, or (d) if the servicer ceases to be approved as a servicer by Fannie Mae or Freddie Mac.

In the event of a default by a servicer under the related Servicing Agreement, the master servicer will be required under the Pooling and Servicing Agreement to enforce any remedies against the servicer, and will be required under the Pooling and Servicing Agreement to either find a successor servicer or assume the primary servicing obligations for the related Loans itself as set forth in the applicable Servicing Agreement.

S-94

<Page>

Advances

If the scheduled payment on a Loan which was due on a related due date is delinquent (other than as a result of application of the Relief Act), the applicable servicer will be required to remit to the master servicer on its Servicer Remittance Date, an amount equal to such delinquency, net of the Servicing Fee except to the extent the servicer determines any such advance to be nonrecoverable from liquidation proceeds, insurance proceeds or from future payments on the Loan for which such advance was made. Subject to the foregoing, such advances will be made by the servicers through liquidation of the related Mortgaged Property. Failure by the applicable servicer to remit any required advance, which failure goes unremedied for the days specified in the Servicing Agreement, would constitute an event of default under the related Servicing Agreement. Such event of default will then obligate the master servicer to advance, subject to a recoverability determination, such amounts to the Distribution Account to the extent provided in the Pooling and Servicing Agreement. Any failure of the master servicer to make such advances would constitute an Event of Servicing Termination as discussed under "--Events of Servicing Termination" above. The trustee, as successor master servicer, will be required to make an advance which the master servicer was required to make but failed to so make.

Termination

The obligations created by the Pooling and Servicing Agreement will terminate upon the earlier to occur of:

(1) the later of (a) the final payment or other liquidation of the last Loan included in the trust and (b) the distribution of all amounts required to be distributed to holders of the certificates under the Pooling and Servicing Agreement; and

(2) the exercise by the master servicer of its right to purchase the Loans in each Loan Group as described below.

Written notice of termination will be given to holders of certificates, and the final distribution will be made only upon surrender and cancellation of the certificates at the office of the trust administrator designated in the notice.

The master servicer will have the right to purchase all of the Loans and REO Properties in the trust and thereby effect the early retirement of the related certificates, on any Distribution Date on which the aggregate scheduled principal balance of the Loans and REO Properties is less than 1% of the aggregate scheduled principal balance of the Loans as of the Cut-off Date. In the event that option is exercised, the purchase will be made at a price equal to the sum of (i) the greater of (x) 100% of the unpaid principal balance of each Loan (other than Loans for which the related Mortgaged Property is an REO Property) plus accrued and unpaid interest for that Loan at the applicable Net Mortgage Rate and (y) the fair market value of each Loan (to be determined pursuant to a bid procedure as provided in the Pooling and Servicing Agreement) plus accrued and unpaid interest for that Loan at the applicable Net Mortgage Rate, and (ii) the lesser of (x) the appraised value of any REO Property as determined by the higher of two appraisals completed by two independent appraisers selected by the master servicer at the expense of the master servicer and (y) the unpaid principal balance of each Loan related to any REO Property

S-95

<Page>

plus accrued and unpaid interest thereon at the applicable Net Mortgage Rate. Proceeds from the purchase (other than, with respect to any Loan, an amount equal to the excess, if any, of the amount in clause (i)(y), over the amount in clause (i)(x), in each case set forth in the immediately preceding sentence (such excess, the "Fair Market Value Excess")) will be included in Available Funds and will be distributed to the holders of the certificates in accordance with the Pooling and Servicing Agreement. Any Fair Market Value Excess received in connection with the purchase will not be included in Available Funds and will be distributed to the holders of the Class A-LR certificates.

Voting Rights

    With respect to any date of determination, the percentage of all the voting rights allocated among holders of the certificates (other than the Interest Only Certificates) will be 99% and will be allocated among the classes of those certificates in the proportion that the aggregate Certificate Principal Balance of a class then outstanding bears to the aggregate Certificate Principal Balance of all certificates then outstanding. With respect to any date of determination, the percentage of all the voting rights allocated among holders of the Interest Only Certificates will be 1%. The voting rights allocated to a class of certificates will be allocated among all holders of that class in proportion to the outstanding certificate balances, or percentage interest, of those certificates.

Amendment

    The Pooling and Servicing Agreement may be amended by all of the parties to it without the consent of the holders of the certificates, for any of the following purposes:

        (1) to cure any ambiguity or mistake;

        (2) to correct or supplement any provisions which may be defective or inconsistent with any other provisions of the Pooling and Servicing Agreement or this prospectus supplement;

        (3) to add to the duties of the depositor, the transferor, the trust administrator, the trustee, the custodians or the m!ster servicer;

        (4) to make any other provisions with respect to matters or questions arising under the Pooling and Servicing Agreement; or

        (5) to modify, alter, amend or add to or rescind any of the terms or provisions contained in the Pooling and Servicing Agreement.

    However, any of the actions listed in clauses (4) and (5) above may not adversely affect in any material respect the interests of any certificateholder, as evidenced by:

        (1) notice from the Rating Agencies that the action will not result in the reduction or withdrawal of the rating of any outstanding class of certificates; or

        (2) an opinion of counsel delivered to the trustee.

                                S-96

<Page>

    In addition, the Pooling and Servicing Agreement may be amended by all of the parties to it with the consent of the holders of a majority in interest of each class of certificates affected by the amendment for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Pooling and Servicing Agreement or of modifying in any manner the rights of the holders of any class of certificates. However, no amendment of this type may:

        (1) reduce in any manner the amount of, or delay the timing of, distributions required to be made on any class of certificates without the consent of the holders of those certificates;

        (2) adversely affect in any material respect the interests of the holders of any class of certificates in a manner other than as described in clause (1) above, without the consent of the holders of that class evidencing percentage interests aggregating at least 66%; or

        (3) reduce the percentage of aggregate outstanding principal amounts of certificates, the holders of which are required to consent to an amendment, without the consent of the holders of all certificates then outstanding.

The Trustee

Wachovia Bank, National Association, a national banking association, will act as trustee for the certificates pursuant to the Pooling and Servicing Agreement. The trustee's offices for notices under the Pooling and Servicing Agreement are located at 401 South Tryon Street, Charlotte, North Carolina 28288. The principal compensation to be paid to the trustee in respect of its obligations under the Pooling and Servicing Agreement will be set forth in a separate agreement between the trustee and the master servicer and such fee is required to be paid by the master servicer from its own compensation. The Pooling and Servicing Agreement will provide that the trustee and any director, officer, employee or agent of the trustee will be indemnified by the trust and will be held harmless against any loss, liability or expense: (i) that is an "unanticipated expense" within the meaning of the REMIC provisions of the Code, (ii) that is incurred by the trustee arising out of or in connection with the acceptance or administration of its obligations and duties under the Pooling and Servicing Agreement, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of the trustee's duties under the Pooling and Servicing Agreement, (iii) that is incurred by reason of any action of the trustee taken at the direction of the holders of the certificates or (iv) that results from any error in any tax or information return prepared by the master servicer. The trust shall fulfill such obligation from amounts on deposit in the Distribution Account.

The Trust Administrator

Wells Fargo Bank, N.A., a national banking association, will act as trust administrator pursuant to the Pooling and Servicing Agreement. The trust administrator's offices for purposes of presentment of certificates for registration of transfer, exchange or final payment is Wells Fargo Bank, N.A., Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479, Attention: Corporate Trust Services--MSSTR 2004-1, and for all other purposes is located at 9062 Old Annapolis Road, Columbia, Maryland 21045, Attention: Corporate Trust Services--MSSTR 2004-1. The principal compensation to be paid to the trust administrator in respect of its

S-97

<Page>

obligations under the Pooling and Servicing Agreement will be an amount separately agreed upon with the master servicer and paid by the master servicer solely from its own funds and not from the assets of the trust. The Pooling and Servicing Agreement will provide that the trust administrator and any director, officer, employee or agent of the trust administrator will be indemnified by the trust and will be held harmless against any loss, liability or expense: (i) that is an "unanticipated expense" within the meaning of the REMIC provisions of the Code, (ii) that is incurred by the trust administrator arising out of or in connection with the performance of its duties or the exercise of its rights under the Pooling and Servicing Agreement, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of the trust administrator's duties under the Pooling and Servicing Agreement or (iii) that is incurred by reason of any action or inaction of the trust administrator taken at the direction of the holders of the certificates. The trust shall fulfill such obligation from amounts on deposit in the Distribution Account.

FEDERAL INCOME TAX CONSEQUENCES

General

The following discussion, insofar as it states conclusions of law, represents the opinion of Thacher Proffitt & Wood LLP, special counsel to the depositor.

Elections will be made to treat the trust as multiple separate REMICs (the "Upper-Tier REMIC" and one or more "Lower-Tier REMICs") for federal income tax purposes. The Upper-Tier REMIC holds REMIC regular interests issued by a Lower-Tier REMIC that will hold either Loans or REMIC regular interests issued by another Lower-Tier REMIC, as set forth in the Pooling and Servicing Agreement. The Regular Certificates will be designated as "regular interests" in the Upper-Tier REMIC. The Class A-LR certificates will represent ownership of the sole class of "residual interest" issued by one or more Lower-Tier REMICs that hold Loans. The Class A-UR certificates will represent ownership of the sole class of "residual interest" issued by each other REMIC, including the Upper-Tier REMIC and any Lower-Tier REMICs that hold REMIC regular interests.

Regular Certificates

The Regular Certificates generally will be treated as debt instruments issued by the Upper-Tier REMIC for federal income tax purposes. Income on Regular Certificates must be reported under an accrual method of accounting. The Class A-X and Class PO Certificates will be treated as having original issue discount equal to the excess of all expected payments of principal and interest on such class over the issue price of such class. A holder of a class of Interest Only Certificates may be entitled to deduct a loss to the extent that its remaining basis exceeds the maximum amount of future payments to which the

holders of such class would be entitled if there were no further prepayments of the Loans, but such treatment is unclear. Certain other classes of Regular Certificates may be issued with original issue discount in an amount equal to the excess of their initial respective Certificate Principal Balances (plus accrued interest from the last day preceding the issue date corresponding to a Distribution Date through the issue date), over their issue prices (including all accrued interest prior to the closing date) depending on their issue price. Certain classes of the Regular Certificates may be treated for federal income tax purposes as having been issued at a premium. Whether any holder of such a class of

<center>S-98</center>

<Page>

certificates will be treated as holding a certificate with amortizable bond premium will depend on such certificateholder's purchase price and the distributions remaining to be made on such certificate at the time of its acquisition by such certificateholder. Holders of such classes of certificates should consult their own tax advisors regarding the possibility of making an election to amortize such premium. The prepayment assumption that is to be used in determining the rate of accrual of original issue discount and market discount and whether any such discount is considered de minimis, and that may be used by a holder of a Regular Certificate to amortize premium, will be 30% CPR with respect to the Group 1 and Group 2 Loans, 50% CPR with respect to the Group 3 Loans and 40% CPR with respect to the Group 4 Loans. No representation is made as to the actual rate at which the Loans will prepay. See "Federal Income Tax Consequences--REMICs--General--Characterization of Investments in REMIC Securities" in the accompanying prospectus for a discussion of the status of the Regular Certificates for particular types of investors.

        The requirement to report income on a Regular Certificate under an accrual method may result in the inclusion of amounts in income that are not currently distributed in cash. In the case of a Subordinate Certificate, accrued income may exceed cash distributions as a result of the preferential right of classes of related Senior Certificates to receive cash distributions in the event of losses or delinquencies on mortgage loans. Prospective purchasers of Subordinate Certificates should consult their tax advisors regarding the timing of income from those certificates and the timing and character of any deductions that may be available with respect to principal or accrued interest that is not paid. See "Federal Income Tax Consequences--REMICs--Taxation of Owners of Regular Securities" in the accompanying prospectus.

Residual Certificates

Special Tax Considerations Applicable to Residual Certificates

        The IRS has issued REMIC regulations under the provisions the Code that significantly affect holders of Residual Certificates. The REMIC regulations impose restrictions on the transfer or acquisition of some residual interests, including the Residual Certificates. The pooling and servicing agreement includes other provisions regarding the transfer of Residual Certificates, including (i) the requirement that any transferee of a Residual Certificate provide an affidavit representing that the transferee is not a disqualified organization; is not acquiring the Residual Certificate on behalf of a disqualified organization; and will maintain that status and will obtain a similar affidavit from any person to whom the transferee shall subsequently transfer a Residual Certificate; (ii) a provision that any transfer of a Residual Certificate to a disqualified organization shall be null and void; and (iii) a grant to the servicer of the right, without notice to the holder or any prior holder, to sell to a purchaser of its choice any Residual Certificate that will become owned by a disqualified organization despite the first two provisions above.

        In addition, under the pooling and servicing agreement, the Residual Certificates may not be transferred to non-United States persons.

        The REMIC regulations also provide that a transfer to a United States person of "noneconomic" residual interests will be disregarded for all federal income tax purposes, and that the purported transferor of "noneconomic" residual interests will continue to remain liable for any taxes due with respect to the income on the residual interests, unless "no significant

<center>S-99</center>

<Page>

purpose of the transfer was to impede the assessment or collection of tax."

Based on the REMIC regulations, the Residual Certificates may constitute noneconomic residual interests during some or all of their terms for purposes of the REMIC regulations and, accordingly, unless no significant purpose of a transfer is to impede the assessment or collection of tax, transfers of the Residual Certificates may be disregarded and purported transferors may remain liable for any taxes due relating to the income on the Residual Certificates. All transfers of the Residual Certificates will be restricted in accordance with the terms of the pooling and servicing agreement that are intended to reduce the possibility of any transfer of a Residual Certificate being disregarded to the extent that the Residual Certificates constitute non-economic residual interests.

     The IRS has issued final REMIC regulations that add to the conditions necessary to assure that a transfer of a non-economic residual interest would be respected. The additional conditions require that in order to qualify as a safe harbor transfer of a residual interest, the transferee represent that it will not cause the income "to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the transferee or another U.S. taxpayer" and either (i) the amount received by the transferee be no less on a present value basis than the present value of the net tax detriment attributable to holding the residual interest reduced by the present value of the projected distributions to be received on the residual interest or (ii) the transfer is to a domestic taxable corporation with specified large amounts of gross and net assets and that meets certain other requirements where agreement is made that all future transfers will be to "taxable domestic corporations in transactions that qualify for the same "safe harbor" provision. Eligibility for the safe harbor requires, among other things, that the facts and circumstances known to the transferor at the time of transfer not indicate to a reasonable person that the taxes with respect to the residual interest will not be paid, with an unreasonably low cost for the transferor specifically mentioned as negating eligibility. See "Federal Income Tax Consequences--REMICs--Taxation of Owners of Residual Securities--Noneconomic Residual Interests" in the prospectus.

     Holders of the Residual Certificates may be required to report an amount of taxable income with respect to the earlier accrual periods of the term of each REMIC that significantly exceeds the amount of cash distributions received by the holders of the Residual Certificates with respect to those periods. Furthermore, the tax on that income may exceed the cash distributions with respect to those periods. Consequently, holders of the Residual Certificates should have other sources of funds sufficient to pay any federal income taxes due in the earlier years of the REMIC's term as a result of their ownership of the Residual Certificates. In addition, the required inclusion of this amount of taxable income during the REMIC's earlier accrual periods and the deferral of corresponding tax losses or deductions until later accrual periods or until the ultimate sale or disposition of a Residual Certificate, or possibly later under the "wash sale" rules of Section 1091 of the Internal Revenue Code may cause a Residual Certificateholders' after-tax rate of return to be zero or negative even if the Residual Certificateholders' pre-tax rate of return is positive. That is, on a present value basis, the Residual Certificateholders' resulting tax liabilities could substantially exceed the sum of any tax benefits and the amount of any cash distributions on the Residual Certificates over their life.

     An individual, trust or estate that holds, whether directly or indirectly through pass-through entities, a Residual Certificate, may have significant additional gross income with

                                   S-100


<Page>


respect to, but may be limited on the deductibility of, servicing fees, trustee's fees and other administrative expenses properly allocable to each REMIC in computing the certificateholder's regular tax liability and will not be able to deduct those fees or expenses to any extent in computing the certificateholder's alternative minimum tax liability. See "Federal Income Tax Consequences--REMICs--Taxation of Owners of Residual Securities--" in the prospectus.

     On May 11, 2004, the Internal Revenue Service issued final regulations relating to the federal income tax treatment of "inducement fees" received by transferees of non-economic REMIC residual interests. The regulations provide tax accounting rules for the inclusion of such fees in income over an appropriate period, and clarify that inducement fees represent income from sources within the United States. These rules apply to taxable years ending on or after May 11, 2004. On the same date, the IRS issued administrative guidance addressing the procedures by which transferees of such REMIC residual interests may obtain consent to change the method of accounting for REMIC inducement fee income to one of the methods provided in the regulations. Prospective purchasers of REMIC residual certificates should consult with their tax advisors regarding the effect of these regulations and the related administrative guidance.

     Purchasers of the Residual Certificates are strongly advised to consult their tax advisors as to the economic and tax consequences of investment

in the Residual Certificates.

        For further information regarding the federal income tax consequences
of investing in the Residual Certificates, see "Federal Income Tax
Consequences--REMICs--Taxation of Owners of Residual Securities--" in the
prospectus.

REMIC Taxes and Reporting

        It is not anticipated that the trust will engage in any transactions
that would subject it to the prohibited transactions tax as defined in Section
860F(a)(2) of the Code, the contributions tax as defined in Section 860G(d) of
the Code or the tax on net income from foreclosure property as defined in
Section 860G(c) of the Code. However, in the event that any such tax is imposed
on the trust, such tax will be borne:

            (1) by the trustee, if the trustee has breached its obligations
    with respect to REMIC compliance under the Pooling and Servicing Agreement;

            (2) by the trust administrator, if the trust administrator has
    breached its obligations with respect to REMIC compliance under the Pooling
    and Servicing Agreement;

            (3) by the master servicer, if the master servicer has breached
    its obligations with respect to REMIC compliance under the Pooling and
    Servicing Agreement; and

            (4) otherwise by the trust, with a resulting reduction in amounts
    otherwise distributable to holders of the certificates.

        See "Federal Income Tax Consequences--REMICs--Taxes That May Be
Imposed on the REMIC Pool--Prohibited Transactions" in the prospectus.

                                   S-101



<Page>



        The responsibility for filing annual federal information returns and
other reports will be borne by the master servicer. See "Federal Income Tax
Consequences--REMICs--Administrative Matters" in the prospectus.

        For further information regarding the federal income tax consequences
of investing in the offered certificates, see "Federal Income Tax
Consequences--REMICs" in the prospectus.

                              STATE TAXES

        The depositor makes no representations regarding the tax consequences
of purchase, ownership or disposition of the offered certificates under the tax
laws of any state. Investors considering an investment in the offered
certificates should consult their own tax advisors regarding such tax
consequences.

        All investors should consult their own tax advisors regarding the
federal, state, local or foreign income tax consequences of the purchase,
ownership and disposition of the offered certificates.

                          ERISA CONSIDERATIONS

        A fiduciary of any Plan, or any insurance company, whether through its
general or separate accounts, or any other person investing plan assets of a
Plan, should carefully review with its legal advisors whether the purchase or
holding of offered certificates could give rise to a transaction prohibited or
not otherwise permissible under ERISA or Section 4975 of the Code. The purchase
or holding of the offered certificates by or on behalf of, or with Plan assets
of, a Plan may qualify for exemptive relief under the Underwriter's exemption,
as currently in effect. The Underwriter's exemption relevant to the offered
certificates was granted by the Department of Labor on April 18, 1991 as
Prohibited Transaction Exemption, or PTE, 91-22 at 56 Fed. Reg. 15933 and was
amended by PTE 2000-58 at 65 Fed. Reg. 67765. The Department of Labor issued a
final administrative exemption, PTE 2002 41, at 67 Fed. Reg. 54487 (August 22,
2002), which amended the Underwriter's exemption and similar exemptions issued
to other underwriters. This amendment allows the trustee to be affiliated with
an underwriter despite the restriction in PTE 2000-58 to the contrary. However,
the Underwriter's exemption contains a number of conditions which must be met
for the exemption to apply, including the requirements that the offered
certificates be rated at least "BBB-" (or its equivalent) by Fitch or S&P at the
time of the Plan's purchase and that the investing Plan must be an "accredited
investor" as defined in Rule 501(a)(1) of Regulation D of the Securities and
Exchange Commission under the Securities Act. As noted in the Prospectus, one
requirement for eligibility of the offered certificates under the Underwriter's
exemption is that all of the Loans must have a loan-to-value ratio of not more
than 100%, based on the outstanding principal balance of the loan and the fair
market value of the mortgage property as of the closing date. It is possible
that, if the fair market value of any of the loans has declined substantially

since origination, this requirement may not be satisfied. This possibility is greater for the seasoned loans than it is for the other mortgage loans. A fiduciary of a Plan contemplating purchasing an offered certificate must make its own determination that the conditions set forth in the Underwriter's exemption will be satisfied with respect to those certificates.

S-102

<Page>

Each beneficial owner of an offered subordinate certificate or any interest therein will be deemed to have represented, by virtue of its acquisition or holding of that certificate or interest therein, that either (i) it is not a plan investor, (ii) it has acquired and is holding such certificates in reliance on the Underwriter's exemption, and that it understands that there are certain conditions to the availability of the Underwriter's exemption, including that such certificates must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by Fitch or S&P or (iii)(1) it is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account," as such term is defined in PTCE 95-60, and (3) the conditions in Sections I and III of PTCE 95-60 have been satisfied.

Any fiduciary or other investor of Plan assets that proposes to acquire or hold the offered certificates (other than the Residual Certificates) on behalf of, or with Plan assets of, any Plan should consult with its counsel with respect to: (i) whether, with respect to the offered certificates, the specific and general conditions and the other requirements in the Underwriter's exemption would be satisfied and (ii) the potential applicability of the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Internal Revenue Code to the proposed investment. See "ERISA Considerations" in the prospectus.

If any offered subordinate certificate or any interest therein is acquired or held in violation of the conditions described in the preceding paragraphs, the next preceding permitted beneficial owner will be treated as the beneficial owner of that certificate, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of any such certificate or interest therein was effected in violation of the conditions described in the preceding paragraph will indemnify and hold harmless the depositor, the trust administrator, the trustee, the master servicer, any subservicer, and the trust from and against any and all liabilities, claims, costs or expenses incurred by those parties as a result of that acquisition or holding.

Because the Residual Certificates are not expected to meet the conditions of the Underwriter's exemption, the Pooling and Servicing Agreement provides that each prospective Certificateholder of a Residual Certificate, each prospective transferee acquiring a Residual Certificate and each prospective owner (a transferee thereof) of a beneficial interest in the Residual Certificates must represent and warrant (or will be deemed to have represented and warranted) that either (1) it is not a Plan or acting on behalf of a Plan and is not using assets of a Plan to purchase the Residual Certificates or (2) it has delivered an opinion of counsel to the Trustee which establishes to the satisfaction of the Trustee that the purchase and holding of such Certificates is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under ERISA or section 4975 of the Code and will not subject the depositor, the master servicer, the trust administrator, the trustee or the trust fund to any obligation or liability (including obligations or liabilities under ERISA or section 4975 of the Code) in addition to those undertaken in the Pooling and Servicing Agreement, which opinion of counsel will not be an expense of any of such persons and on which such persons may rely.

The sale of any of the offered certificates to a Plan is in no respect a representation by the depositor or the underwriters that an investment in the offered certificates meets all relevant legal

S-103

<Page>

requirements relating to investments by Plans generally or any particular Plan, or that an investment in the offered certificates is appropriate for Plans generally or any particular Plan.

The depositor makes no representation that the sale of any of the offered certificates to a Plan or other purchaser acting on its behalf meets any

relevant legal requirement for investments by Plans generally or any particular Plan, or that the investment is appropriate for Plans generally or any particular Plan.

LEGAL INVESTMENT

The offered certificates, other than the Class 15-B-2, Class 15-B-3, Class 30-B-2, Class 30-B-3, Class HY-B-2 and Class HY-B-3 certificates, will constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as amended, so long as they are rated in one of the two highest rating categories by S&P, Fitch, or another nationally recognized statistical rating organization.

The Class 15-B-2, Class 15-B-3, Class 30-B-2, Class 30-B-3, Class HY-B-2 and Class HY-B-3 certificates will not constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as amended.

Institutions subject to the jurisdiction of the following agencies should review applicable rules, supervisory policies and standards of these agencies before purchasing any of the offered certificates:

       (1) the Office of the Comptroller of the Currency;

       (2) the Board of Governors of the Federal Reserve System;

       (3) the Federal Deposit Insurance Corporation;

       (4) the Office of Thrift Supervision;

       (5) the National Credit Union Administration; or

       (6) state banking, insurance or other regulatory authorities.

The offered certificates may be deemed to be unsuitable investments under one or more of these rules, policies and standards and certain restrictions may apply to those investments. It should also be noted that certain states have enacted legislation limiting to varying extents the ability of some entities, in particular, insurance companies, to invest in mortgage related securities. Investors should consult with their own legal advisors in determining whether and to what extent the offered certificates constitute legal investments for those investors. See "Legal Investment" in the prospectus.

USE OF PROCEEDS

The depositor intends to use the net proceeds to be received from the sale of the offered certificates to acquire the Loans and to pay other expenses associated with the pooling of the Loans and the issuance of the certificates.

S-104

<Page>

UNDERWRITING

Subject to the terms and conditions set forth in the underwriting agreement between the depositor and UBS Securities LLC, an affiliate of the depositor, the depositor has agreed to sell to the underwriter, and the underwriter has agreed to purchase from the depositor the offered certificates.

The depositor has been advised by the underwriter that it proposes to offer the offered certificates to the public from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. In connection with the sale of offered certificates, the underwriter may be deemed to have received compensation from the depositor in the form of underwriting discounts.

There is currently no secondary market for the offered certificates. We cannot assure you that a secondary market for the offered certificates will develop or, if it does develop, that it will continue.

The depositor has agreed to indemnify the underwriter against, or make contributions to the underwriter with respect to, certain liabilities, including liabilities under the Securities Act of 1933, as amended.

The underwriter is an affiliate of Mortgage Asset Securitization Transactions, Inc. and UBS Real Estate Securities Inc.

Each of Mortgage Asset Securitization Transactions, Inc. and UBS Real Estate Securities Inc. is a wholly owned subsidiary of UBS Americas Inc.

RATINGS

It is a condition to the original issuance of the offered certificates that each class of offered certificates will have received the ratings set forth

on the table beginning on page S-5 of this prospectus supplement.

        The ratings will be the views only of the rating agencies. We cannot assure that any ratings will continue for any period of time or that the ratings will not be revised or withdrawn. Any revision or withdrawal of the ratings may have an adverse effect on the market price of the offered certificates.

        A securities rating addresses the likelihood of the receipt by the certificateholders of distributions on the offered certificates. The ratings on the offered certificates do not constitute statements regarding the possibility that the certificateholders might realize a lower than anticipated yield. A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each securities rating should be evaluated independently of similar ratings on different securities.

        The ratings of the rating agencies do not address the possibility that, as a result of principal prepayments, certificateholders may receive a lower than anticipated yield.

                                    S-105

<Page>

        The ratings assigned by the rating agencies to mortgage pass-through certificates address the likelihood of the receipt of all distributions on mortgage loans by certificateholders under the agreements pursuant to which the certificates are issued. The ratings of the rating agencies take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The ratings assigned by the rating agencies to the Interest Only Certificates do not address whether investors will recoup their initial investment. The ratings assigned by the rating agencies to the principal only certificates only addresses the return of their class certificate balance. The rating assigned by S&P and Fitch to the Residual Certificates only addresses the return of the related Certificate Principal Balance and interest on that balance at its pass-through rate.

        The depositor has not requested a rating of the offered certificates by any rating agency other than S&P and Fitch. There can be no assurance, however, as to whether any other rating agency will rate the offered certificates or, if it does, what rating would be assigned by the other rating agency. The rating assigned by the other rating agency to the offered certificates could be lower than the respective ratings assigned by S&P and Fitch.

                                LEGAL MATTERS

        The validity of the offered certificates and certain federal income tax matters will be passed on for the depositor and the underwriter by Thacher Proffitt & Wood LLP, New York, New York.

                                    S-106

<Page>

                              GLOSSARY OF TERMS

        "ABN AMRO" means ABN AMRO Mortgage Corporation.

        "Account Property" means all amounts and investments held from time to time in a Securities Account (whether in the form of deposit accounts, physical property, book-entry securities, uncertificated securities, securities entitlements, investment property or otherwise), and all proceeds of the foregoing.

        "Accrued Certificate Interest" means, for each class of certificates for each Distribution Date, the "Accrued Certificate Interest" as defined in "Description of the Offered Certificates--Interest" in this prospectus supplement.

        "Advance" means any of the advances required to be made by the servicer or the master servicer, as applicable, for any Distribution Date in an amount equal to the aggregate of all payments of principal and interest on the Loans, net of the Servicing Fee, that were due on the related due date, and that were not received by the related determination date as set forth in the applicable Servicing Agreement.

"Aggregate Cut-off Date Pool Balance" means, the aggregate Scheduled Principal Balance of the Loans as of the Cut-off Date.

"Aggregate Subordinate Percentage" means, (A) with respect to the Group 15-B Subordinate Certificates and any Distribution Date, the sum of the Certificate Principal Balances of the Group 15-B Subordinate Certificates immediately prior to such Distribution Date divided by the aggregate of the Scheduled Principal Balances of the Group 1 Loans, (B) with respect to the Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class HY-B-2, Class HY-B-3, Class C-B-4, Class C-B-5 and Class C-B-6 Certificates and any Distribution Date on and prior to the Distribution Date on which the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the sum of the Certificate Principal Balances of the Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class HY-B-2, Class HY-B-3, Class C-B-4, Class C-B-5 and Class C-B-6 Certificates immediately prior to such Distribution Date divided by the aggregate of the Scheduled Principal Balances of the Group 2 Loans (net of the PO Percentage of the Scheduled Principal Balance of each Discount Loan), Group 3 and Group 4 Loans (C) with respect to the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates and any Distribution Date after the Distribution Date on which the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the sum of the Certificate Principal Balances of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates immediately prior to such Distribution Date divided by the aggregate of the Scheduled Principal Balances of the Group 2 Loans (net of the PO Percentage of the Scheduled Principal Balance of each Discount Loan) and (D) with respect to the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates and any Distribution Date after the Distribution Date on which the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero, the sum of the Certificate Principal Balances of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates immediately prior to such Distribution Date divided by the aggregate of the Scheduled Principal Balances of the Group 3 and Group 4 Loans.

S-107

<Page>

"Allocable Share" means, (A) with respect to any Distribution Date and any class of Group 15-B Subordinate Certificates, the portion of the Subordinate Optimal Principal Amount allocable to such class, equal to the product of the Subordinate Optimal Principal Amount for Loan Group 1 on such Distribution Date and a fraction, the numerator of which is the related Certificate Principal Balance of that class and the denominator of which is the aggregate of the Certificate Principal Balances of the Group 15-B Subordinate Certificates; provided that no class of Group 15-B Subordinate Certificates will be entitled on any Distribution Date to receive distributions pursuant to clauses (5), (6) and (7) of the definition of Subordinate Optimal Principal Amount with respect to Loan Group 1 unless the Class Prepayment Distribution Trigger for that class is satisfied for that Distribution Date; if the Class Prepayment Distribution Trigger is not satisfied for an outstanding class of Group 15-B Subordinate Certificates, those amounts will be distributable to the remaining classes of Group 15-B Subordinate Certificates for which the Class Prepayment Distribution Trigger is satisfied, pro rata, according to Certificate Principal Balance;

(B) with respect to any Distribution Date and any of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates, the portion of the Subordinate Optimal Principal Amount allocable to such class, equal to the product of the Subordinate Optimal Principal Amount for Loan Group 2 on such Distribution Date and a fraction, the numerator of which is the related Certificate Principal Balance of that class and the denominator of which is the aggregate of the Certificate Principal Balances of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates and the Group 2 Portion; provided that no such class of certificates will be entitled on any Distribution Date to receive distributions pursuant to clauses (5), (6) and (7) of the definition of Subordinate Optimal Principal Amount with respect to Loan Group 2 unless the Class Prepayment Distribution Trigger for that class is satisfied for that Distribution Date; if the Class Prepayment Distribution Trigger is not satisfied for an outstanding Class 30-B-1, Class 30-B-2 or Class 30-B-3 Certificates, those amounts will be distributable to the remaining classes of such Subordinate Certificates for which the Class Prepayment Distribution Trigger is satisfied, pro rata, according to Certificate Principal Balance;

(C) with respect to any Distribution Date and any of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates, the portion of the Subordinate Optimal Principal Amount allocable to such class, equal to the product of the Subordinate Optimal Principal Amount for Loan Group 3 and Loan Group 4 in the aggregate on such Distribution Date and a fraction, the numerator of which is the related Certificate Principal Balance of that class and the denominator of which is the aggregate of the Certificate Principal Balances of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates and the Group 3/4 Portion; provided that no such class of certificates will be entitled on any Distribution Date to receive distributions pursuant to clauses (5), (6) and (7) of the definition of Subordinate Optimal Principal Amount with respect to Loan Group 3 or Loan Group 4 unless the Class Prepayment Distribution Trigger for that class

is satisfied for that Distribution Date; if the Class Prepayment Distribution
Trigger is not satisfied for an outstanding Class HY-B-1, Class HY-B-2 or Class
HY-B-3 Certificates, those amounts will be distributable to the remaining
classes of such Subordinate Certificates for which the Class Prepayment
Distribution Trigger is satisfied, pro rata, according to Certificate Principal
Balance; and

S-108

<Page>

        (D) with respect to any Distribution Date and any of the Class C-B-4,
Class C-B-5 and Class C-B-6 Certificates, the portion of the Subordinate Optimal
Principal Amount allocable to such class, equal to the sum of (I) the product of
the Subordinate Optimal Principal Amount for Loan Group 2 on such Distribution
Date and a fraction, the numerator of which is the Group 2 Portion and the
denominator of which is the sum of the Group 2 Portion and the Certificate
Principal Balances of the Class 30-B-1, Class 30-B-2 and Class 30-B-3
Certificates and (II) the product of the Subordinate Optimal Principal Amount
for Loan Group 3 and Loan Group 4 on such Distribution Date and a fraction, the
numerator of which is the Group 3/4 Portion and the denominator of which is the
sum of the Group 3/4 Portion and the Certificate Principal Balances of the Class
HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates and a fraction, the numerator
of which is the related Certificate Principal Balance of that class and the
denominator of which is the aggregate of the Certificate Principal Balances of
the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates; provided that no
class of such Subordinate Certificates will be entitled on any Distribution Date
to receive distributions pursuant to clauses (5), (6) and (7) of the definition
of Subordinate Optimal Principal Amount with respect to Loan Group 2, Loan Group
3 or Loan Group 4 unless the Class Prepayment Distribution Trigger for that
class is satisfied for that Distribution Date; if the Class Prepayment
Distribution Trigger is not satisfied for any outstanding Class C-B-4, Class
C-B-5 and Class C-B-6 Certificates, those amounts will be distributable to the
remaining classes of such Subordinate Certificates for which the Class
Prepayment Distribution Trigger is satisfied, pro rata, according to Certificate
Principal Balance.

        "Apportioned Subordinate Principal Distribution Amount" means, (A)
with respect to the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates and
any Distribution Date, the product of (i) the aggregate Subordinate Principal
Distribution Amount for such certificates and (ii) the applicable Apportionment
Fraction; and (B) with respect to the Class C-B-4, Class C-B-5 and Class C-B-6
Certificates and any Distribution Date, the product of (i) the aggregate
Subordinate Principal Distribution Amount for such certificates (net of amounts
applied from the Subordinate Principal Distribution Amount for the Class C-B-4,
Class C-B-5 and Class C-B-6 Certificates to pay and Class PO Deferred Amount)
and (ii) the applicable Apportionment Fraction.

        "Apportionment Fraction" means, (A) with respect to the Class HY-B-1,
Class HY-B-2 and Class HY-B-3 Certificates, and in the event that the
Certificate Principal Balances of the Senior Certificates of Certificate Group 3
or Certificate Group 4 have been reduced to zero, a fraction the numerator of
which is equal to the Subordinate Optimal Principal Amount for the Group whose
Senior Certificates have been reduced to zero and the denominator of which is
equal to the sum of the Subordinate Optimal Principal Amounts with respect to
both of such Groups and (B) with respect to the Class C-B-4, Class C-B-5 and
Class C-B-6 Certificates, and in the event that the Certificate Principal
Balances of the Senior Certificates of Certificate Group 2, Certificate Group 3
or Certificate Group 4 have been reduced to zero, a fraction the numerator of
which is equal to the Subordinate Optimal Principal Amount for the Group whose
Senior Certificates have been reduced to zero and the denominator of which is
equal to the sum of the Subordinate Optimal Principal Amounts with respect to
each of such Groups.

        "Available Funds" means, with respect to any Loan Group and any
related Distribution Date, an amount equal to the amounts on deposit in the
Collection Account on the business day immediately preceding that Distribution
Date with respect to that Loan Group less:

S-109

<Page>

        (a) amounts withdrawn from the Collection Account on or prior to
the business day immediately preceding that Distribution Date with respect
to that Loan Group, including (without duplication) all amounts reimbursed
or paid to the master servicer, each servicer, the trust administrator, the
trustee or the depositor on or prior to that date;

(b) all unscheduled principal prepayments, all net insurance proceeds and all net liquidation proceeds from the liquidation of the Loans in that Loan Group, including related condemnation proceeds, in each case received after the related Prepayment Period;

(c) all scheduled principal payments on the Loans in that Loan Group due after the related due date;

(d) any amount deposited in the Collection Account on account of the Loans in that Loan Group and not required to be deposited therein;

(e) Recoveries received on or following the related Cross-Over Date and any Class PO Recoveries, which, in each case, will be distributed to certain classes of Senior Certificates, as described under "Description of the Offered Certificates--Principal" in this prospectus supplement; and

(f) any amounts representing Fair Market Value Excess received in connection with the Master Servicer's exercise of its optional termination.

"Certificate Group" means any of the Group 1 Certificates, Group 2 Certificates, Group 3 Certificates or Group 4 Certificates, as applicable.

"Certificate Principal Balance" means, with respect to any class of certificates and any date, the principal balance of that class on the date of the initial issuance of the certificates as reduced, but not below zero, by:

(1) all amounts distributed on previous Distribution Dates on that class on account of principal;

(2) the principal portion of all Realized Losses allocated to that class on previous Distribution Dates; and

(3) in the case of a class of Subordinate Certificates, the portion, if any, of any Subordinate Certificate Writedown Amount and Class PO Deferred Payment Writedown Amount allocated to that class for previous Distribution Dates;

as increased, in the case of the Class 2-A-5 Certificates, by any Class 2-A-5 Accrual Amount for such Distribution Date prior to the Class 2-A-5 Accretion Termination Date; provided, however, that the Certificate Principal Balance of a class of certificates may be increased up to the amount of related Realized Losses previously allocated to such class, in the event that there is a Recovery on a related Loan, as described under "Description of the Certificates--Principal" in this prospectus supplement.

S-110

<Page>

"Class 2-A-5 Accretion Termination Date" means the earlier to occur of:

(1) the Distribution Date following the Distribution Date on which the respective Certificate Principal Balances of the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 and Class 2-A-6 Certificates are reduced to zero; and

(2) the Distribution Date following the related Cross-Over Date.

"Class 2-A-5 Accrual Amount" means for any Distribution Date prior to the Class 2-A-5 Accretion Termination Date, the amount of interest that would otherwise have been distributable as Accrued Certificate Interest to the Class 2-A-5 Certificates if such amount had not been added to the Certificate Principal Balance of the Class 2-A-5 Certificates, as described under "Description of the Offered Certificates--Principal Allocation of Class 2-A-5 Accrual Amount" in this prospectus supplement.

"Class PO Deferred Amount" means, with respect to Loan Group 2 and any Distribution Date on or prior to the related Cross-Over Date, the sum of (1) the applicable PO Percentage of the principal portion of Realized Losses on each Discount Loan allocated to the Class PO Certificates on that date and (2) all amounts previously allocated to the Class PO Certificates in respect of those losses and not distributed to the Class PO Certificates on prior Distribution Dates.

"Class PO Deferred Payment Writedown Amount" means, with respect to any Distribution Date, the amount, if any, distributed on that Distribution Date in respect of any Class PO Deferred Amounts pursuant to priority third of the second paragraph under "Description of the Offered Certificates--Allocation of Available Funds" in this prospectus supplement.

"Class PO Principal Distribution Amount" means, for Loan Group 2 and any Distribution Date, the sum of:

(1) the applicable PO Percentage of all scheduled monthly payments of principal due on each Loan in that Loan Group on the related due date after giving effect to any Deficient Valuation or Debt Service Reduction;

(2) the applicable PO Percentage of the principal portion of the Scheduled Principal Balance of each Loan in that Loan Group that was repurchased by the transferor or another person with respect to that Distribution Date;

(3) the applicable PO Percentage of any Substitution Adjustment Amounts received in respect of Loans in that Loan Group and with respect to that Distribution Date;

(4) the applicable PO Percentage of the amount of net insurance proceeds or net liquidation proceeds allocable to principal received on Loans in that Loan Group in the prior calendar month with respect to a Loan that is not a Liquidated Loan;

(5) with respect to each Loan in that Loan Group that became a Liquidated Loan during the prior calendar month, the lesser of:

S-111

<Page>

(a) the applicable PO Percentage of the Scheduled Principal Balance of that Loan; and

(b) the applicable PO Percentage of the amount of the net insurance or net liquidation proceeds allocable to principal received with respect to that Loan during the prior calendar month; and

(6) the applicable PO Percentage of:

(a) principal prepayments in full received in respect of Loans in that Loan Group during the related Prepayment Period;

(b) partial principal prepayments in respect of Loans in that Loan Group applied during the related Prepayment Period; and

(c) Recoveries received in respect of Loans in that Loan Group during the calendar month prior to such Distribution Date, but in no event to exceed the related Class PO Deferred Amount for such Distribution Date;

provided, however, that if a Deficient Valuation or Debt Service Reduction is sustained with respect to a Discount Loan that is not a Liquidated Loan, the Class PO Principal Distribution Amount for that Loan Group will be reduced on the related Distribution Date by the applicable PO Percentage of the principal portion of the Deficient Valuation or Debt Service Reduction in respect of Loans in that Loan Group.

"Class Prepayment Distribution Trigger" is satisfied, (A) with respect to a class of Group 15-B Subordinate Certificates and any Distribution Date, if either (i) the Fractional Interest for such class for such date equals or exceeds the Fractional Interest for such class calculated as of the date of issuance of the certificates, or (ii) that class of Group 15-B Subordinate Certificates is the only class of Group 15-B Subordinate Certificates then outstanding, (B) with respect to any of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates and any Distribution Date, if either (i) the Fractional Interest for such class for such date equals or exceeds the Fractional Interest for such class calculated as of the date of issuance of the certificates, or (ii) that class of such Subordinate Certificates is the only class of such Subordinate Certificates then outstanding, (C) with respect to any of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates and any Distribution Date, if either (i) the Fractional Interest for such class for such date equals or exceeds the Fractional Interest for such class calculated as of the date of issuance of the certificates, or (ii) that class is the only class of such Subordinate Certificates then outstanding and (D) with respect to any of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates and any Distribution Date, if either (i) the Fractional Interest for such class for such date equals or exceeds the Fractional Interest for such class calculated as of the date of issuance of the certificates, or (ii) that class of such Subordinate Certificates is the only class of such Subordinate Certificates then outstanding.

"Closing Date" means September 30, 2004.

"Code" means the Internal Revenue Code of 1986, as amended.

S-112

<Page>

"Collection Account" means the account established and maintained by
the master servicer for the benefit of the certificateholders, which account may
be deemed to be a sub-account of the Distribution Account.

"Compensating Interest" means (A) for any Distribution Date and any
servicer, an amount required to be paid by such servicer under the related
Servicing Agreement in connection with Prepayment Interest Shortfalls that occur
on Loans serviced by such servicer for the related Distribution Date and (B) for
any Distribution Date and the master servicer, an amount required to be paid by
the Master Servicer pursuant to the Pooling and Servicing Agreement in
connection with Prepayment Interest Shortfalls that occur on Loans serviced
under the Wells Fargo Conduit and Norwest Conduit Servicing Guide dated January
1997, as amended in July 1997, as a result of a prepayment in full, for the
related Distribution Date. The amount of such Compensating Interest Payments is
generally limited, in the case of any servicer, to the aggregate Servicing Fees
due to the applicable servicer for such Distribution Date, and in the case of
the master servicer, to the aggregate compensation due to the Master Servicer
for such Distribution Date. If any servicer fails to make its required
Compensating Interest payment on any Distribution Date, the master servicer will
be required to make such Compensating Interest payment to the same extent that
such servicer was required to make such Compensating Interest payment.

"Constant Prepayment Rate" or "CPR" means "Constant Prepayment Rate"
or "CPR" as defined in "Prepayment and Yield Considerations--Modeling
Assumptions" in this prospectus supplement.

"Countrywide" means Countrywide Home Loans, Inc.

"Cross-Over Date" means (A) with respect to Group 1, the Distribution
Date on which the Certificate Principal Balances of the Group 15-B Subordinate
Certificates have been reduced to zero, (B) with respect to Group 2, the
Distribution Date on which the Certificate Principal Balances of the Class
30-B-1, Class 30-B-2, Class 30-B-3, Class C-B-4, Class C-B-5 and Class C-B-6
Certificates have been reduced to zero and (C) with respect to Group 3 and Group
4, the Distribution Date on which the Certificate Principal Balances of the
Class HY-B-1, Class HY-B-2, Class HY-B-3, Class C-B-4, Class C-B-5 and Class
C-B-6 Certificates have been reduced to zero.

"Cut-off Date" means September 1, 2004.

"Cut-off Date Pool Balance" means, with respect to any Loan Group, the
aggregate Scheduled Principal Balance of the Loans in such Loan Group as of the
Cut-off Date.

"Debt Service Reduction" means a reduction in the amount of the
monthly payment due on a Loan as established by a bankruptcy court in a
bankruptcy of the related borrower, other than a Deficient Valuation.

"Deficient Valuation" means the difference between the outstanding
principal balance of a Loan and a reduced secured debt as a result of a
bankruptcy court establishing the value of the mortgaged property at an amount
less than the then outstanding principal balance of the Loan in connection with
a bankruptcy of the related borrower.

S-113

<Page>

"Definitive Certificate" means any certificate represented by a
physical certificate and not a book-entry certificate.

"Discount Loan" means any Group 2 Loan having a Net Mortgage Rate as
of the Cut-off Date less than the Required Coupon for Loan Group 2.

"Distribution Account" means the account established and maintained by
the trust administrator for benefit of the certificateholders.

"Distribution Date" means, the 25th day of each month, or if that day
is not a business day, the first business day after that 25th day, commencing in
October 2004.

"ERISA" means the Employee Retirement Income Security Act of 1974, as
amended.

"Event of Servicing Termination" means "Event of Servicing Termination"
as defined in "The Pooling and Servicing Agreement--Events of Servicing
Termination" in this prospectus supplement.

"Excess Interest Amount" means, for any Distribution Date, an amount equal to the product of (i) the Excess Interest Rate divided by 12 and (ii) the aggregate Scheduled Principal Balance of the Group 1 Loans.

"Excess Interest Rate" means a per annum rate equal to 0.01%.

"Fair Market Value Excess" means, with respect to any Loan, "Fair Market Value Excess" as defined in "The Pooling and Servicing Agreement--Termination" in this prospectus supplement.

"Fitch" means Fitch Ratings.

"Fractional Interest" means, (A) with respect to any Distribution Date and each of the Group 15-B Subordinate Certificates, a fraction (expressed as a percentage), the numerator of which is the Certificate Principal Balance of such class and each class of Group 15-B Subordinate Certificates subordinate to such class, if any, and the denominator of which is the aggregate Scheduled Principal Balance of the Group 1 Loans, (B) with respect to any Distribution Date and each of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates, a fraction (expressed as a percentage), the numerator of which is the Certificate Principal Balance of such class and each class of such Subordinate Certificates subordinate to such class, if any, plus the Group 2 Portion and the denominator of which is the aggregate Scheduled Principal Balance of the Group 2 Loans (net of the PO Percentage of the Scheduled Principal Balance of each Discount Loan), (C) with respect to any Distribution Date and each of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates, a fraction (expressed as a percentage), the numerator of which is the Certificate Principal Balance of such class and each class of such Subordinate Certificates subordinate to such class, if any, plus the Group 3/4 Portion and the denominator of which is the aggregate Scheduled Principal Balance of the Group 3 and Group 4 Loans, and (D) with respect to any Distribution Date and each of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates, a fraction (expressed as a percentage), the numerator of which is the Certificate Principal Balance of such class and each class of such Subordinate Certificates

S-114

<Page>

subordinate to such class, if any, and the denominator of which is the aggregate Scheduled Principal Balance of the Group 2 (net of the PO Percentage of the Scheduled Principal Balance of each Discount Loan), Group 3 and Group 4 Loans.

"Group" means either a Certificate Group or Loan Group as the context requires.

"Group 1 Certificates" means the Class 1-A-1, Class A-LR and Class A-UR Certificates.

"Group 1 Loans" means those Loans designated as "Group 1 Loans."

"Group 2 Certificates" means the Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class 2-A-5 and Class 2-A-6 Certificates.

"Group 2 Loans" means those Loans designated as "Group 2 Loans."

"Group 2 Portion" means with respect to any date of determination, the portion of the Certificate Principal Balance of Class C-B-4, Class C-B-5 and Class C-B-6 Certificates related to Loan Group 2, which shall be equal to the excess of (x) the Scheduled Principal Balance of the Loans in Loan Group 2 over (y) the sum of (i) the Certificate Principal Balances of the Senior Certificates related to Loan Group 2 and (ii) the Certificate Principal Balances of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates as of such date of determination.

"Group 3 Certificates" means the Class 3-A-1 Certificates.

"Group 3 Loans" means those Loans designated as "Group 3 Loans."

"Group 4 Certificates" means the Class 4-A-1 and Class 4-A-2 Certificates.

"Group 4 Loans" means those Loans designated as "Group 4 Loans."

"Group 3/4 Portion" means with respect to any date of determination, the portion of the Certificate Principal Balance of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates related to Loan Group 3 and Loan Group 4, which shall be equal to the excess of (x) the Scheduled Principal Balance of the Loans in Loan Group 3 and Loan Group 4 over (y) the sum of (i) the Certificate Principal Balances of the Senior Certificates related to Loan Group 3 and Loan Group 4 and (ii) the Certificate Principal Balances of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates as of such date of determination.

"Group 15-B Subordinate Certificates" means the Class 15-B-1, Class

15-B-2, Class 15-B-3, Class 15-B-4, Class 15-B-5 and Class 15-B-6 Certificates.

"Group Subordinate Amount" means, as to any Distribution Date, with respect to a Loan Group, the amount equal to the excess of the aggregate Scheduled Principal Balance of the Loans in that Loan Group (net of the PO Percentage of each Loan in that Loan Group) over the aggregate Certificate Principal Balance of the Senior Certificates (other than the Class PO Certificates and Interest Only Certificates) of the related Certificate Group.

"Interest Accrual Period" means, for any Distribution Date and each class of offered certificates, the period from and including the first day of the calendar month immediately

S-115

<Page>

preceding the month in which such Distribution Date occurs, commencing September 1, 2004, to and including the last day of that month, on the basis of a 360-day year consisting of twelve 30-day months.

"Interest Only Certificates" means the Class A-X Certificates.

"Interest Shortfall" means, with respect to a Loan and any Distribution Date, "Interest Shortfall" as defined in "Description of the Offered Certificates--Interest" in this prospectus supplement.

"Lender Paid Mortgage Insurance Loan" means each Loan for which the Lender Paid Mortgage Insurance Rate applies.

"Lender Paid Mortgage Insurance Rate" means, with respect to 1 Loan, representing 0.05% of the Aggregate Cut-Off Date Principal Balance of the Loans, the per annum rate set forth in the mortgage loan schedule attached to the Pooling and Servicing Agreement, which represents the portion of the interest payment due from the related borrower that will be used by the related servicer to pay the premium for the required primary mortgage guaranty insurance policy.

"Liquidated Loan" means any defaulted Loan as to which the master servicer has determined that all amounts which it expects to recover from or on account of such Loan have been recovered.

"Loan" means any of the mortgage loans included in the trust.

"Loan Group" means any of Loan Group 1, Loan Group 2, Loan Group 3 or Loan Group 4.

"Loan Group 1" means the Group 1 Loans.

"Loan Group 2" means the Group 2 Loans.

"Loan Group 3" means the Group 3 Loans.

"Loan Group 4" means the Group 4 Loans.

"Loan-to-Value or LTV Ratio" means, with respect to a Loan at any given time, a fraction, expressed as a percentage, the numerator of which is the principal balance of the related Loan at the date of determination and the denominator of which is (a) in the case of a purchase, the lesser of the selling price of the Mortgaged Property or its appraised value at the time of sale, or (b) in the case of a refinance, the appraised value of the Mortgaged Property at the time of such refinance.

"Loss Allocation Limitation" means with respect to Group 1, Group 2, Group 3 or Group 4, the limitation on reductions of the Certificate Principal Balance of any class on any Distribution Date on account of any Realized Loss on a Loan to the extent that the reduction would have the effect of reducing the aggregate Certificate Principal Balance of all of the Group 1, Group 2, Group 3 or Group 4 Certificates as of that Distribution Date to an amount less than

S-116

<Page>

the aggregate of the Pool Balances for Loan Group 1, Loan Group 2, Loan Group 3 and Loan Group 4 as of the following Distribution Date, less any Deficient Valuations applicable to each such Loan Group and less the PO Percentage of the Scheduled Principal Balance of any Discount Loans.

"Mortgage Interest Rate" means, with respect to each Loan, the per annum interest rate at which the Loan accrues interest.

"Mortgage Loan Purchase Agreement" is the mortgage loan purchase agreement, dated as of September 30, 2004, between the transferor and the depositor.

"Mortgage Note" is a document that evidences an interest in a mortgage loan secured by a mortgage or deed of trust.

"Mortgaged Property" means, with respect to any Loan, the property securing the Loan.

"Net Interest Shortfall" means, as to a Loan Group with respect to any Distribution Date, "Net Interest Shortfall" as defined in "Description of the Offered Certificates--Interest" in this prospectus supplement.

"Net Mortgage Rate" for each Loan is the applicable Mortgage Interest Rate less (i) the Servicing Fee Rate and (ii) the Lender Paid Mortgage Insurance Rate, if applicable.

"Net Prepayment Interest Shortfall" means, with respect to any Distribution Date, "Net Prepayment Interest Shortfall" as defined in "Description of the Offered Certificates--Interest" in this prospectus supplement.

"Non-Discount Loan" means any Group 2 Loan having a Net Mortgage Rate as of the Cut-off Date equal to or in excess of the Required Coupon for Loan Group 2.

"Non-PO Percentage" means, with respect to any Group 1, Group 3 or Group 4 Loan, 100%, and with respect to any of Group 2 Loan:

          (1) any Discount Loan in that Loan Group, the fraction, expressed
     as a percentage, equal to Net Mortgage Rate divided by the Required Coupon
     for such Loan Group; and

          (2) any Non-Discount Loan in that Loan Group, 100%.

"Non-PO Recoveries" means, with respect to Recoveries and any Distribution Date, an amount equal to the excess, if any, of (i) the amount of Recoveries over (ii) the amount of the aggregate of the PO Recoveries for that Distribution Date.

"Notional Amount" means, with respect to any Distribution Date and the Class A-X certificates, the sum of (i) an amount equal to the product of (A) the aggregate Scheduled Principal Balance of the outstanding Non-Discount Loans and (B) a fraction, (x) the numerator of which is equal to the weighted average of the Stripped Interest Rates for the Non-Discount Loans and (y) the denominator of which is equal to 6.500% and (ii) an amount equal to the Excess Interest Amount for that Distribution Date divided by 6.500% and multiplied by 12. The

<Page>

Notional Amount of the Class A-X certificates for the first Interest Accrual Period is expected to be approximately $22,101,782.

"Offered Group 15-B Subordinate Certificates" means any of the Class 15-B-1, Class 15-B-2 or Class 15-B-3 Certificates.

"Original Subordinate Principal Balance" means, (A) with respect to the Group 15-B Subordinate Certificates, the aggregate of the Certificate Principal Balances of the Group 15-B Subordinate Certificates as of the date of issuance of the certificates, (B) with respect to the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates, the aggregate of the Certificate Principal Balances of the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates as of the date of issuance of the certificates, (C) with respect to the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates, the aggregate of the Certificate Principal Balances of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates as of the date of issuance of the certificates and (D) with respect to the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates, the aggregate of the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates as of the date of issuance of the certificates.

"Plan" is any:

          (1) employee benefit plan as defined in Section 3(3) of ERISA;

          (2) plan described in Section 4975(e)(1) of the Code, including
     individual retirement accounts or Keogh plans; or

          (3) entity whose underlying assets include plan assets by reason
     of an investment in the entity by a plan described in clause (1) or (2)

above.

"PO Percentage" means, with respect to:

(1) any Discount Loan, 100% minus the Non-PO Percentage for that Discount Loan; and

(2) any Non-Discount Loan, 0%.

"PO Recovery" means, with respect to Recoveries on Discount Loans, any Distribution Date and the Class PO Certificates, an amount equal to the lesser of (a) the PO Percentage of each Recovery on a Discount Loan and (b) the Class PO Deferred Amount for that Distribution Date.

"Pool Balance" means, with respect to any Distribution Date and Loan Group, the aggregate Scheduled Principal Balance of the Loans in that Loan Group.

"Pooling and Servicing Agreement" is the pooling and servicing agreement dated as of September 1, 2004 among the depositor, the master servicer, the trust administrator, the custodians and the trustee.

"Prepayment Assumption" means "Prepayment Assumption" as defined in "Prepayment and Yield Considerations--Modeling Assumptions" in this prospectus supplement.

S-118

<Page>

"Prepayment Interest Shortfall" means, (i) with respect to any Distribution Date and each Loan (other than a Loan serviced by Bank of America, N.A., Washington Mutual Bank, FA, Countrywide, Colonial Savings, F.A., Hibernia National Bank, the Huntington Mortgage Company, US Bank Home Mortgage or Washington Mutual Bank, F.A.) with respect to which a prepayment in full or a partial prepayment, has occurred during the month preceding such Distribution Date, the difference between (a) one month's interest at the Net Mortgage Rate on the Scheduled Principal Balance of the Loan or partial payment, as applicable, and (b) the amount of interest at the Net Mortgage Rate actually received with respect to the Loan and principal prepayment; (ii) with respect to any Distribution Date and each Loan serviced by Bank of America, N.A., Washington Mutual Bank, FA, Colonial Savings, F.A., Hibernia National Bank, The Huntington Mortgage Company or US Bank Home Mortgage, with respect to which a prepayment in full has occurred during the month preceding such Distribution Date, the difference between (a) one month's interest at the Net Mortgage Rate on the Scheduled Principal Balance of the Loan and (b) the amount of interest at the Net Mortgage Rate actually received with respect to the Loan and principal prepayment; and (iii) with respect to any Distribution Date and each Loan serviced by Countrywide Home Loans, Inc. with respect to which a prepayment in full or a partial prepayment has occurred during the month preceding such Distribution Date on any day other than the day of the month on which a monthly payment is due on such Loan, the difference between (a) one month's interest at the Net Mortgage Rate on the Scheduled Principal Balance of the Loan or partial payment, as applicable, and (b) the amount of interest at the Net Mortgage Rate actually received with respect to the Loan and principal prepayment.

"Prepayment Period" means, with respect to any prepayment of a Loan serviced by any servicer and any Distribution Date, the calendar month preceding the month in which such Distribution Date occurs.

"Principal Only Certificates" means the Class PO Certificates.

"Purchase Price" means, with respect to each Loan required to be purchased by the transferor, an amount equal to the sum of (a) 100% of the unpaid principal balance of that Loan on the date of purchase, (b) accrued and unpaid interest on that Loan at the applicable Mortgage Interest Rate from the date through which interest was last paid by the related borrower, or the date on which the applicable servicer or the master servicer, as the case may be, made an advance in respect of such interest (which was not reimbursed), to the due date in the month in which the purchase price is to be distributed to certificateholders and (c) in the event that such Loan is repurchased by the transferor due to a breach of the transferor's representations and warranties in the Pooling and Servicing Agreement relating to applicable predatory and abusive lending laws, any costs and damages incurred by the trust in connection with a violation of a predatory or abusive lending law with respect to such Loan, less (d) any amounts received in respect of such Loan which are being held for future distribution.

"Rating Agency" means either of S&P or Fitch.

"Realized Loss" means with respect to any Loan:

(1) as to any Liquidated Loan, the unpaid principal balance thereof plus accrued and unpaid interest thereon at the Net Mortgage Rate through the last day of the

S-119

<Page>

month of liquidation, less the net proceeds from the liquidation of, and
any insurance proceeds from, such Loan and the related Mortgaged Property;
and

(2) as to any Loan, a Deficient Valuation.

"Record Date" means, with respect to any Distribution Date and the
offered certificates, the last business day of the month immediately preceding
the month in which the related Distribution Date occurs.

"Recovery" means an amount, net of any reimbursable expenses, received
in respect of principal which has previously been allocated as a Realized Loss
to a class of certificates.

"Regular Certificates" means the certificates, other than the Residual
Certificates.

"Relevant UCC" means the Uniform Commercial Code as in effect in the
applicable jurisdiction.

"Relief Act" means the Servicemembers Civil Relief Act or any
comparable state or local statute (including the comparable provisions under the
California Military and Veterans Code), in each case, as amended.

"Relief Act Reduction" means any reduction in the interest rate on a
Loan due to the application of the Relief Act. See "Certain Legal Aspects of
Residential Loans--Servicemembers Civil Relief Act the California Military and
Veterans Code" in the prospectus.

"REO Property" is a property acquired on behalf of the
certificateholders in respect of a defaulted Loan through foreclosure,
deed-in-lieu of foreclosure, repossession or otherwise.

"Required Coupon" means, for Loan Group 2, 6.500% per annum.

"Residual Certificates" means the Class A-LR and Class A-UR
certificates.

"S&P" means Standard & Poor's Ratings Services, a division of The
McGraw-Hill Companies, Inc.

"Scheduled Principal Balance" means, as to any Loan and any
Distribution Date, the unpaid principal balance of such Loan as of that due date
in the month preceding the month in which that Distribution Date occurs, as
specified in the amortization schedule at the time relating to that Loan (before
any adjustment to such amortization schedule by reason of any moratorium or
similar waiver or grace period) after giving effect to (i) any previous partial
principal prepayments, liquidation proceeds and insurance proceeds allocable to
principal received during the Prepayment Period for the prior Distribution Date
and (ii) the payment of principal due on that due date and irrespective of any
delinquency in payment by the related borrower.

"Senior Certificates" means any of the Group 1, Group 2, Group 3,
Group 4, Class A-X and Class PO Certificates, as applicable.

"Senior Final Distribution Date" means as to Certificate Group 1,
Certificate Group 2, Certificate Group 3 and Certificate Group 4, the
Distribution Date on which the respective

S-120

<Page>

Certificate Principal Balances of the Senior Certificates of each of such
Certificate Groups have each been reduced to zero.

"Senior Optimal Principal Amount" means, for any Loan Group and any
Distribution Date, the sum of:

(1) the Senior Percentage related to such Group of the sum for
each Loan in that Group of the applicable Non-PO Percentage of all
scheduled monthly payments of principal due on each Loan on the related due
date after giving effect to any Deficient Valuation or Debt Service

Reduction;

(2) the Senior Percentage related to such Group of the sum for each Loan in that Group of the applicable Non-PO Percentage of the principal portion of the Purchase Price of each Loan in that Group that was repurchased by the transferor or another person with respect to that Distribution Date;

(3) the Senior Percentage related to such Group of the sum for each Loan in that Group of the applicable Non-PO Percentage of any Substitution Adjustment Amounts in respect of a Loan in that Group received with respect to that Distribution Date;

(4) the Senior Percentage related to such Group of the sum for each Loan in that Group of the applicable Non-PO Percentage of the amount of net insurance proceeds or net liquidation proceeds allocable to principal received in the prior calendar month with respect to a Loan in that Group that is not a Liquidated Loan;

(5) with respect to each Loan in that Group that became a Liquidated Loan during the prior calendar month, the lesser of:

(a) the Senior Percentage related to such Group of the applicable Non-PO Percentage of the Scheduled Principal Balance of that Loan; and

(b) the Senior Prepayment Percentage related to such Group of the applicable Non-PO Percentage of the amount of the net insurance proceeds or net liquidation proceeds allocable to principal received with respect to that Loan during the prior calendar month;

(6) the Senior Prepayment Percentage related to such Group of the sum for each Loan in that Group of the applicable Non-PO Percentage:

(a) principal prepayments in full in respect of a Loan in that Group received during the related Prepayment Period; and

(b) partial principal prepayments in respect of a Loan in that Group applied during the related Prepayment Period;

(7) with respect to any Distribution Date prior to the related Cross-Over Date only, the Senior Prepayment Percentage related to such Group of the Non- PO Recoveries for that Group received during the related Prepayment Period;

S-121

<Page>

provided, however, that if a Deficient Valuation or Debt Service Reduction is sustained with respect to a Loan in that Loan Group that is not a Liquidated Loan after the related Bankruptcy Loss Coverage Amount has been reduced to zero, the Senior Optimal Principal Amount for that Loan Group will be reduced on the related Distribution Date by the Senior Percentage of the principal portion of such Deficient Valuation or Debt Service Reduction;

"Senior Percentage" means, with respect to any Certificate Group and any Distribution Date, the lesser of 100% and the percentage obtained by dividing the aggregate Certificate Principal Balances of all Senior Certificates (other than the Principal Only Certificates and the Interest Only Certificates) of such Certificate Group immediately preceding that Distribution Date by the applicable Non-PO Percentage of the Scheduled Principal Balance of the Loans in that Loan Group for that Distribution Date.

"Senior Prepayment Percentage" means, with respect to any Certificate Group and any Distribution Date, the percentage (not exceeding 100%) set forth in the following table:

<TABLE>
<CAPTION>

| Distribution Date Occurring | Senior Prepayment Percentage |
| --- | --- |
| <S> | <C> |
| October 2004 through September 2009 | 100% |
| October 2009 through September 2010 | Senior Percentage of that Certificate Group plus 70% of the Subordinate Percentage |
| October 2010 through September 2011 | Senior Percentage of that Certificate Group plus 60% of the Subordinate Percentage |
| October 2011 through September 2012 | Senior Percentage of that Certificate Group plus 40% of the Subordinate Percentage |

```
October 2012 through September 2013    Senior Percentage of that Certificate Group plus 20% of
                                       the Subordinate Percentage

After September 2013                   Senior Percentage of that Certificate Group
</TABLE>
```

        provided, however, that on any of the foregoing Distribution Dates if
the Senior Percentage for any Certificate Group exceeds the initial Senior
Percentage for that Certificate Group, the Senior Prepayment Percentage for such
Certificate Group will once again equal 100%.

        The reductions in the Senior Prepayment Percentage for Certificate
Group 1 described above will not occur, unless, as of the last day of the month
preceding the Distribution Date:

            (1) the aggregate Scheduled Principal Balance of Group 1 Loans
        delinquent 60 days or more (including for this purpose any of such Loans in
        bankruptcy or foreclosure and such Loans with respect to which the related
        Mortgaged Property has been acquired by the trust) does not exceed 50% of
        the aggregate Certificate Principal Balances of the Group 15-B Subordinate
        Certificates as of that date; and

            (2) cumulative Realized Losses with respect to the Group 1 Loans
        do not exceed:

                                  S-122


<Page>


            (a) 30% of the Original Subordinate Principal Balance of the
        Group 15-B Subordinate Certificates if such Distribution Date
        occurs between and including October 2009 and September 2010;

            (b) 35% of the Original Subordinate Principal Balance of the
        Group 15-B Subordinate Certificates if such Distribution Date
        occurs between and including October 2010 and September 2011;

            (c) 40% of the Original Subordinate Principal Balance of the
        Group 15-B Subordinate Certificates if such Distribution Date
        occurs between and including October 2011 and September 2012;

            (d) 45% of the Original Subordinate Principal Balance of the
        Group 15-B Subordinate Certificates if such Distribution Date
        occurs between and including October 2012 and September 2013; and

            (e) 50% of the Original Subordinate Principal Balance of the
        Group 15-B Subordinate Certificates if such Distribution Date
        occurs after September 2013;

        Prior to the date on which the Certificate Principal Balances of the
Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero,
the reductions in the Senior Prepayment Percentages for Certificate Group 2,
Certificate Group 3 and Certificate Group 4 described above will not occur,
unless, as of the last day of the month preceding the Distribution Date:

            (1) the aggregate Scheduled Principal Balance of Group 2, Group 3
        and Group 4 Loans delinquent 60 days or more (including for this purpose
        any of such Loans in bankruptcy or foreclosure and such Loans with respect
        to which the related Mortgaged Property has been acquired by the trust)
        does not exceed 50% of the aggregate Certificate Principal Balances of the
        Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class HY-B-2, Class
        HY-B-3, Class C-B-4, Class C-B-5 and Class C-B-6 Certificates as of that
        date; and

            (2) cumulative Realized Losses with respect to the Group 2, Group
        3 and Group 4 Loans do not exceed:

            (a) 30% of the Original Subordinate Principal Balance of the
        Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class
        HY-B-2, Class HY-B-3, Class C-B-4, Class C-B-5 and Class C-B-6
        Certificates if such Distribution Date occurs between and
        including October 2009 and September 2010;

            (b) 35% of the Original Subordinate Principal Balance of the
        Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class
        HY-B-2, Class HY-B-3, Class C-B-4, Class C-B-5 and Class C-B-6
        Certificates if such Distribution Date occurs between and
        including October 2010 and September 2011;

            (c) 40% of the Original Subordinate Principal Balance of the
        Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class
        HY-B-2, Class HY-B-3,

                                  S-123

<Page>

> Class C-B-4, Class C-B-5 and Class C-B-6 Certificates if such
> Distribution Date occurs between and including October 2011 and
> September 2012;

> (d) 45% of the Original Subordinate Principal Balance of the
> Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class
> HY-B-2, Class HY-B-3, Class C-B-4, Class C-B-5 and Class C-B-6
> Certificates if such Distribution Date occurs between and
> including October 2012 and September 2013; and

> (e) 50% of the Original Subordinate Principal Balance of the
> Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1, Class
> HY-B-2, Class HY-B-3, Class C-B-4, Class C-B-5 and Class C-B-6
> Certificates if such Distribution Date occurs after September
> 2013;

On and after the date on which the Certificate Principal Balances of
the Class C-B-4, Class C-B-5 and Class C-B-6 have reduced to zero, the
reductions in the Senior Prepayment Percentage for Certificate Group 2 and
described above will not occur, unless, as of the last day of the month
preceding the Distribution Date:

> (1) the aggregate Scheduled Principal Balance of Group 2
> delinquent 60 days or more (including for this purpose any of such Loans in
> bankruptcy or foreclosure and such Loans with respect to which the related
> Mortgaged Property has been acquired by the trust) does not exceed 50% of
> the aggregate Certificate Principal Balances of the Class 30-B-1, Class
> 30-B-2, and 30-B-3 Certificates as of that date; and

> (2) cumulative Realized Losses with respect to the Group 2 Loans
> do not exceed:

> (a) 30% of the Original Subordinate Principal Balance of the
> Class 30-B-1, Class 30-B-2, and 30-B-3 Certificates if such
> Distribution Date occurs between and including October 2009 and
> September 2010;

> (b) 35% of the Original Subordinate Principal Balance of the
> Class 30-B-1, Class 30-B-2, and 30-B-3 Certificates if such
> Distribution Date occurs between and including October 2010 and
> September 2011;

> (c) 40% of the Original Subordinate Principal Balance of the
> Class 30-B-1, Class 30-B-2, and 30-B-3 Certificates if such
> Distribution Date occurs between and including October 2011 and
> September 2012;

> (d) 45% of the Original Subordinate Principal Balance of the
> Class 30-B-1, Class 30-B-2, and 30-B-3 Certificates if such
> Distribution Date occurs between and including October 2012 and
> September 2013; and

> (e) 50% of the Original Subordinate Principal Balance of the
> Class 30-B-1, Class 30-B-2, and 30-B-3 Certificates if such
> Distribution Date occurs after September 2013;

S-124

<Page>

On and after the date on which the Certificate Principal Balances of
the Class C-B-4, Class C-B-5 and Class C-B-6 have reduced to zero, the
reductions in the Senior Prepayment Percentages for Certificate Group 3 and
Certificate Group 4 described above will not occur, unless, as of the last day
of the month preceding the Distribution Date:

> (1) the aggregate Scheduled Principal Balance of Group 3 and
> Group 4 Loans delinquent 60 days or more (including for this purpose any of
> such Loans in bankruptcy or foreclosure and such Loans with respect to
> which the related Mortgaged Property has been acquired by the trust) does
> not exceed 50% of the aggregate Certificate Principal Balances of the Class
> HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates as of that date; and

> (2) cumulative Realized Losses with respect to the Group 3 and
> Group 4 Loans do not exceed:

(a) 30% of the Original Subordinate Principal Balance of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates if such Distribution Date occurs between and including October 2009 and September 2010;

(b) 35% of the Original Subordinate Principal Balance of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates if such Distribution Date occurs between and including October 2010 and September 2011;

(c) 40% of the Original Subordinate Principal Balance of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates if such Distribution Date occurs between and including October 2011 and September 2012;

(d) 45% of the Original Subordinate Principal Balance of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates if such Distribution Date occurs between and including October 2012 and September 2013; and

(e) 50% of the Original Subordinate Principal Balance of the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates if such Distribution Date occurs after September 2013;

Upon the reduction of a Senior Prepayment Percentage during one of the periods described above, such reduction will remain in effect for the remainder of that period.

Notwithstanding the preceding paragraphs, if (x) on or before the Distribution Date in September 2007, the Aggregate Subordinate Percentage is at least 200% of the Aggregate Subordinate Percentage as of the Closing Date, the delinquency test set forth above is satisfied and cumulative Realized Losses do not exceed 20% of the Original Subordinate Principal Balance, the related Senior Prepayment Percentage will equal the related Senior Percentage for that Distribution Date plus 50% of the amount equal to 100% minus the related Senior Percentage for that Distribution Date and (y) after the Distribution Date in September 2007, the Aggregate Subordinate Percentage is at least 200% of the Aggregate Subordinate Percentage as of the Closing Date, the delinquency test set forth above is satisfied and cumulative Realized Losses do not exceed 30% of the Original Subordinate Principal Balance (the "Two Times Test"), the related Senior Prepayment Percentage will equal the Senior Percentage.

S-125

<Page>

"Servicer Remittance Date" means the day of each month that a servicer is required to remit funds to the master servicer pursuant to the related Servicing Agreement. For each servicer the Servicer Remittance Date is the 18th day of each month (or, if such day is not a business day, either the immediately preceding business day, or the immediately following business day, as the case may be).

"Servicing Agreements" means (a) with respect to the Loans serviced by each servicer (other than Colonial Bank, F.A., Hibernia National Bank, The Huntington Mortgage Company, Washington Mutual Bank, F.A. or U.S. Bank Home Mortgage) those certain servicing agreements pursuant to which the servicers are required to service the Loans as of the Cut-off Date; and (b) with respect to the Loans serviced by Colonial Bank, F.A., Hibernia National Bank, The Huntington Mortgage Company, Washington Mutual Bank, F.A. or U.S. Bank Home Mortgage, the Wells Fargo Conduit and Norwest Conduit Servicing Guide, dated January, 1997, as amended July, 2001.

"Servicing Fee" for any Distribution Date is an amount equal to one-twelfth of the Servicing Fee Rate for the Loan on the Scheduled Principal Balance of the Loan.

"Servicing Fee Rate" means for each servicer the rate described in the applicable Servicing Agreement, as described under the caption "The Pooling and Servicing Agreement--Servicing and Master Servicing Compensation and Payment of Expenses" in this prospectus supplement.

"Similar Law" means any federal, state or local law materially similar to Title I of ERISA or Section 4975 of the Code.

"Standard Prepayment Assumption" or "SPA" means "Standard Prepayment Assumption" or "SPA" as defined in "Prepayment and Yield Considerations--Modeling Assumptions" in this prospectus supplement.

"Stripped Interest Rate" means, for each Non-Discount Loan, the excess of the Net Mortgage Rate for that Loan over the Required Coupon for that Loan Group.

"Subordinate Certificates" means the Group 15-B Subordinate Certificates and the Class 30-B-1, Class 30-B-2, Class 30-B-3, Class HY-B-1,

Class HY-B-2, Class HY-B-3, Class C-B-4, Class C-B-5 and Class C-B-6 Certificates.

"Subordinate Certificate Writedown Amount" means, (A) as of any Distribution Date with respect to the Group 15-B Subordinate Certificates, the amount by which:

(1) the Certificate Principal Balance of the Group 1 Certificates, after giving effect to the distribution of principal and the allocation of Realized Losses in reduction of the Certificate Principal Balances of Group 1 Certificates on that Distribution Date, exceeds

(2) the aggregate Pool Balance of the Group 1 Loans as of the following Distribution Date;

S-126

<Page>

(B) as of any Distribution Date on and after the date on which the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero and with respect to the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates, the amount by which:

(1) the sum of the Certificate Principal Balances of the Group 2 Certificates, after giving effect to the distribution of principal and the allocation of Realized Losses in reduction of the Certificate Principal Balances of those Certificates on that Distribution Date, exceeds

(2) the Pool Balance of the Group 2 Loans as of the following Distribution Date, less any Deficient Valuations;

(C) as of any Distribution Date on and after the date on which the Certificate Principal Balances of the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates have been reduced to zero and with respect to the Class HY-B-1, Class HY-B-2 and Class HY-B-3 Certificates, the amount by which:

(1) the sum of the Certificate Principal Balances of the Group 3 and Group 4 Certificates, after giving effect to the distribution of principal and the allocation of Realized Losses in reduction of the Certificate Principal Balances of those Certificates on that Distribution Date, exceeds

(2) the aggregate Pool Balance of the Group 3 and Group 4 Loans as of the following Distribution Date, less any Deficient Valuations;

and (D) as of any Distribution Date with respect to the Class C-B-4, Class C-B-5 and Class C-B-6 Certificates, the amount by which:

(1) the sum of the Certificate Principal Balances of the Group 2, Group 3 and Group 4 Certificates, after giving effect to the distribution of principal and the allocation of Realized Losses in reduction of the Certificate Principal Balances of those Certificates on that Distribution Date, exceeds

(2) the aggregate Pool Balance of the Group 2, Group 3 and Group 4 Loans as of the following Distribution Date, less any Deficient Valuations.

"Subordinate Optimal Principal Amount" means, for each of Group 1, Group 2, Group 3 and Group 4 and any Distribution Date, the sum of:

(1) the Subordinate Percentage related to such Group of the sum for each Loan in that Group of the applicable Non-PO Percentage of all scheduled monthly payments of principal due on each Loan in that Group on the related due date after giving effect to any Deficient Valuation or Debt Service Reduction;

(2) the Subordinate Percentage related to such Group of the sum for each Loan in that Group of the applicable Non-PO Percentage of the principal portion of the

S-127

<Page>

Purchase Price of each Loan in that Group that was repurchased by the transferor or another person with respect to that Distribution Date;

(3) the Subordinate Percentage related to such Group of the sum for each Loan in that Group of the applicable Non-PO Percentage of any Substitution Adjustment Amounts in respect of a Loan in that Group received with respect to that Distribution Date;

(4) the Subordinate Percentage related to such Group of the sum for each Loan in that Group of the amount of the applicable Non-PO Percentage of net insurance proceeds or net liquidation proceeds allocable to principal received in the prior calendar month allocable to a Loan in that Group that is not a Liquidated Loan;

(5) with respect to each Loan in that Group that became a Liquidated Loan during the prior calendar month, the applicable Non-PO Percentage of the amount of the net insurance proceeds or net liquidation proceeds allocable to principal received with respect to that Loan during the prior calendar month that was not included in clause (5) of the definition of "Senior Optional Principal Amount" for such Distribution Date; and

(6) the Subordinate Prepayment Percentage related to such Group of the sum for each Loan in that Group of the applicable Non-PO Percentage of:

(a) principal prepayments in full in respect of a Loan in that Group received during the related Prepayment Period; and

(b) partial principal prepayments in respect of a Loan in that Group applied during the related Prepayment Period; and

(7) with respect to any Distribution Date prior to the related Cross-Over Date only, the Subordinate Prepayment Percentage related to such Group of the Non PO Recoveries for that Group received during the related Prepayment Period;

provided, however, that if a Deficient Valuation or Debt Service Reduction is sustained with respect to a Loan in that Group that is not a Liquidated Loan, the Subordinate Optimal Principal Amount for that Group will be reduced on the related Distribution Date by the Subordinate Percentage related to such Group of the principal portion of any Deficient Valuation or Debt Service Reduction.

"Subordinate Percentage" means, with respect to any Certificate Group and any Distribution Date, 100% minus the Senior Percentage for that Certificate Group.

"Subordinate Prepayment Percentage" means, with respect to any Certificate Group and any Distribution Date, 100% minus the Senior Prepayment Percentage for that Certificate Group, except that, on any Distribution Date after the Senior Final Distribution Date, the Subordinate Prepayment Percentage for each Certificate Group will equal 100%.

"Subordinate Principal Distribution Amount" means (A) with respect to the Group 15-B Subordinate Certificates, the aggregate amount payable as principal on the Group 15-B Subordinate Certificates from Available Funds for Loan Group 1 in accordance with the

S-128

<Page>

priorities set forth under "Description of the Offered Certificates--Allocation of Available Funds," after application of Available Funds for Loan Group 1 to make payments on the Group 1 certificates as described under "Description of the Offered Certificates--Allocation of Available Funds" and giving effect to distributions of Accrued Certificate Interest to the Group 15-B Subordinate Certificates in accordance with the priorities set forth under "Description of the Offered Certificates--Allocation of Available Funds;"

(B) with respect to the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates, the aggregate amount payable as principal on the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates from Available Funds for Loan Group 2 in accordance with the priorities set forth under "Description of the Offered Certificates--Allocation of Available Funds," after application of Available Funds for Loan Group 2 to make payments on the Group 2 Certificates as described under "Description of the Offered Certificates--Allocation of Available Funds" and giving effect to distributions of Accrued Certificate Interest to the Class 30-B-1, Class 30-B-2 and Class 30-B-3 Certificates in accordance with the priorities set forth under "Description of the Offered Certificates--Allocation of Available Funds."

(C) with respect to the Class HY-B-1, Class HY-B-2 and Class B-3 Certificates, the aggregate amount payable as principal on the Class B-1, Class B-2 and Class B-3 Certificates from Available Funds for Loan Group 3 and Loan

Group 4 in accordance with the priorities set forth under "Description of the
Offered Certificates--Allocation of Available Funds," after application of
Available Funds for each such Loan Group to make payments on the Group 3 and
Group 4 certificates as described under "Description of the Offered
Certificates--Allocation of Available Funds" (including amounts required to be
paid as described under "Subordination--Cross-Collateralization") and giving
effect to distributions of Accrued Certificate Interest to the Class HY-B-1,
Class HY-B-2 and Class HY-B-3 Certificates in accordance with the priorities set
forth under "Description of the Offered Certificates--Allocation of Available
Funds."

        (D) with respect to the Class C-B-4, Class C-B-5 and Class C-B-6
Certificates, the aggregate amount payable as principal on the Class C-B-4,
Class C-B-5 and Class C-B-6 Certificates from Available Funds for Loan Group 2,
Loan Group 3 and Loan Group 4 in accordance with the priorities set forth under
"Description of the Offered Certificates--Allocation of Available Funds," after
application of Available Funds for each such Loan Group to make payments on the
Group 2, Group 3 and Group 4 certificates as described under "Description of the
Offered Certificates--Allocation of Available Funds" (including amounts required
to be paid as described under "Subordination--Cross-Collateralization") and
giving effect to distributions of Accrued Certificate Interest to the Class
C-B-4, Class C-B-5 and Class C-B-6 Certificates in accordance with the
priorities set forth under "Description of the Offered Certificates--Allocation
of Available Funds."

        "Substitution Adjustment Amount" means in connection with a
substitution of a defective Loan for a substitute mortgage loan, an amount equal
to the excess of the principal balance of the defective Loan over the aggregate
of the principal balance of the substitute mortgage loans.

        "Undercollateralized Group" means, with respect to any of Certificate
Group 1, Certificate Group 2, Certificate Group 3 and Certificate Group 4 and
any Distribution Date, each of such Certificate Groups for which the Certificate
Principal Balances of the Senior Certificates

                                   S-129

<Page>

(other than the Class PO Certificates) of such Group (after giving effect to
distributions to be made on such Distribution Date) is greater than the Pool
Balance of the related Loan Group.

        "Wells Fargo" means Wells Fargo Bank, N.A.

                                   S-130

<Page>

                ANNEX A - MORTGAGE LOAN STATISTICAL INFORMATION

        The information set forth in this Annex A has been based on
information provided by each of the loan sellers and tabulated by the depositor.
None of the depositor, the master servicer, the trust administrator, the
underwriter or the trustee makes any representation as to the accuracy or
completeness of that information. Due to rounding, the totals in the tables
below may not reflect the sum of the line items.

                                GROUP 1 LOANS

                        Original Principal Balances

<TABLE>
<CAPTION>

| Range of Original Principal Balances | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| $300,001 - $350,000 .......... | 39 | $ 10,505,373 | 7.57% |
| $350,001 - $400,000 .......... | 96 | 30,906,628 | 22.28 |
| $400,001 - $450,000 .......... | 65 | 22,872,498 | 16.49 |
| $450,001 - $500,000 .......... | 52 | 20,095,160 | 14.49 |
| $500,001 - $550,000 .......... | 29 | 12,788,108 | 9.22 |
| $550,001 - $600,000 .......... | 19 | 9,343,463 | 6.74 |
| $600,001 - $650,000 .......... | 23 | 12,364,050 | 8.91 |
| $650,001 - $700,000 .......... | 4 | 2,354,118 | 1.70 |
| $700,001 - $750,000 .......... | 7 | 3,993,765 | 2.88 |
| $750,001 - $800,000 .......... | 5 | 3,431,294 | 2.47 |

```
$800,001 - $850,000 .........      3        2,137,172        1.54
$850,001 - $900,000 .........      2        1,446,714        1.04
$900,001 - $950,000 .........      2        1,284,556        0.93
$950,001 - $1,000,000 ........     6        5,168,836        3.73
                                 ---     ------------       ------
Total: ......................    352    $138,691,735       100.00%
                                 ===     ============       ======
```

</TABLE>

        The average original principal balance of the Group 1 Loans was
approximately $473,940.


                              A-1




<Page>


                         Current Principal Balances

<TABLE>
<CAPTION>

| Range of Current Principal Balances | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| $25,001 - $50,000 ............ | 1 | $     32,188 | 0.02% |
| $75,001 - $100,000 ........... | 2 | 168,503 | 0.12 |
| $100,001 - $125,000 .......... | 2 | 230,452 | 0.17 |
| $125,001 - $150,000 .......... | 3 | 400,990 | 0.29 |
| $150,001 - $175,000 .......... | 3 | 477,056 | 0.34 |
| $175,001 - $200,000 .......... | 4 | 750,670 | 0.54 |
| $200,001 - $250,000 .......... | 7 | 1,571,031 | 1.13 |
| $250,001 - $300,000 .......... | 22 | 6,225,419 | 4.49 |
| $300,001 - $350,000 .......... | 108 | 35,047,555 | 25.27 |
| $350,001 - $400,000 .......... | 73 | 27,214,201 | 19.62 |
| $400,001 - $450,000 .......... | 47 | 20,028,429 | 14.44 |
| $450,001 - $500,000 .......... | 22 | 10,326,960 | 7.45 |
| $500,001 - $550,000 .......... | 18 | 9,529,256 | 6.87 |
| $550,001 - $600,000 .......... | 16 | 9,172,964 | 6.61 |
| $600,001 - $650,000 .......... | 4 | 2,515,870 | 1.81 |
| $650,001 - $700,000 .......... | 9 | 6,033,694 | 4.35 |
| $700,001 - $750,000 .......... | 2 | 1,422,889 | 1.03 |
| $750,001 - $800,000 .......... | 3 | 2,298,167 | 1.66 |
| $800,001 - $850,000 .......... | 1 | 835,446 | 0.60 |
| $850,001 - $900,000 .......... | 4 | 3,501,961 | 2.52 |
| $900,001 - $950,000 .......... | 1 | 908,031 | 0.65 |
| | --- | ------------ | ------ |
| Total: ...................... | 352 | $138,691,735 | 100.00% |
| | === | ============ | ====== |

</TABLE>

        The average current principal balance of the Group 1 Loans was
approximately $394,011.


                              A-2




<Page>


                            Loan Interest Rates

<TABLE>
<CAPTION>

| Range of Loan Interest Rates | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 5.626% - 5.750%............... | 1 | $    347,142 | 0.25% |
| 5.751% - 5.875%............... | 2 | 968,763 | 0.70 |
| 5.876% - 6.000%............... | 11 | 3,987,090 | 2.87 |
| 6.001% - 6.125%............... | 22 | 8,333,140 | 6.01 |
| 6.126% - 6.250%............... | 62 | 23,201,808 | 16.73 |
| 6.251% - 6.375%............... | 59 | 23,570,285 | 16.99 |
| 6.376% - 6.500%............... | 71 | 29,269,012 | 21.10 |
| 6.501% - 6.625%............... | 36 | 14,331,256 | 10.33 |
| 6.626% - 6.750%............... | 33 | 13,225,091 | 9.54 |
| 6.751% - 6.875%............... | 27 | 11,294,906 | 8.14 |
| 6.876% - 7.000%............... | 7 | 3,075,895 | 2.22 |
| 7.001% - 7.125%............... | 5 | 1,549,555 | 1.12 |
| 7.126% - 7.250%............... | 5 | 2,267,009 | 1.63 |

```
7.251% - 7.375%...............        6        1,760,336        1.27
7.501% - 7.625%...............        1          283,713        0.20
7.626% - 7.750%...............        1          334,660        0.24
7.751% - 7.875%...............        1          363,457        0.26
7.876% - 8.000%...............        1          167,287        0.12
8.376% - 8.500%...............        1          361,330        0.26
                                    ---     ------------       ------
Total:........................      352    $138,691,735       100.00%
                                    ===     ============       ======
```

</TABLE>

      As of the Cut-Off Date, the weighted average interest rate of the
Group 1 Loans, by Cut-Off Date Pool Balance of the Group 1 Loans, was
approximately 6.518% per annum.

                     Original LTV Ratios

<TABLE>
<CAPTION>

| Range of Original LTV Ratios | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 Loans |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| 50.00% or less................ | 88 | $ 35,725,656 | 25.76% |
| 50.01% - 55.00%............... | 33 | 13,821,374 | 9.97 |
| 55.01% - 60.00%............... | 34 | 12,838,379 | 9.26 |
| 60.01% - 65.00%............... | 31 | 13,402,676 | 9.66 |
| 65.01% - 70.00%............... | 45 | 17,256,371 | 12.44 |
| 70.01% - 75.00%............... | 49 | 18,411,656 | 13.28 |
| 75.01% - 80.00%............... | 63 | 24,607,431 | 17.74 |
| 80.01% - 85.00%............... | 2 | 657,838 | 0.47 |
| 85.01% - 90.00%............... | 5 | 1,637,404 | 1.18 |
| 90.01% - 95.00%............... | 2 | 332,949 | 0.24 |
| | --- | ------------ | ------ |
| Total:........................ | 352 | $138,691,735 | 100.00% |
| | === | ============ | ====== |

</TABLE>

      The weighted average original LTV Ratio of the Group 1 Loans, by
Cut-Off Date Pool Balance of the Group 1 Loans, was approximately 61.00%.


                           A-3


<Page>


                     Current LTV Ratios

<TABLE>
<CAPTION>

| Range of Current LTV Ratios* | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 Loans |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| 50.00% or less................ | 159 | $ 60,527,591 | 43.64% |
| 50.01% - 55.00%............... | 34 | 14,353,086 | 10.35 |
| 55.01% - 60.00%............... | 38 | 15,247,738 | 10.99 |
| 60.01% - 65.00%............... | 48 | 18,402,907 | 13.27 |
| 65.01% - 70.00%............... | 46 | 19,134,753 | 13.80 |
| 70.01% - 75.00%............... | 22 | 9,317,477 | 6.72 |
| 75.01% - 80.00%............... | 5 | 1,708,185 | 1.23 |
| | --- | ------------ | ------ |
| Total:........................ | 352 | $138,691,735 | 100.00% |
| | === | ============ | ====== |

</TABLE>

      The weighted average current LTV Ratio of the Group 1 Loans, by
Cut-Off Date Pool Balance of the Group 1 Loans, was approximately 51.92%.

----------
*    Current LTV Ratios generally were determined based on the ratio of the
     unpaid principal amount of the related Loan as of the Cut-Off Date to the
     lesser of (i) the sales price for the related Mortgaged Property or (ii)
     the appraised value of the related Mortgaged Property, in each case, at the
     time of origination of the related Loan.

                       Property Types

<TABLE>
<CAPTION>

| Property Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 Loans |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Single Family................. | 299 | $117,242,864 | 84.53% |
| Planned Unit Development...... | 33 | 12,469,058 | 8.99 |

```
Condominium...................      16       6,477,051          4.67
Coop..........................       2       1,462,579          1.05
Two- to Four-Family...........       2       1,040,182          0.75
                                   ---    ------------        ------
Total:........................     352    $138,691,735        100.00%
                                   ===    ============        ======
</TABLE>
```

                    Loan Purpose

```
<TABLE>
<CAPTION>
                                            Aggregate Unpaid    % of Cut-Off Date Pool
      Loan Purpose            Number of Loans  Principal Balance  Balance of the Group 1 Loans
------------------------------  ---------------  -----------------  ----------------------------
<S>                             <C>              <C>                <C>
Rate & Term Refinance.........      225          $ 85,054,320          61.33%
Cash Out Refinance............       64            27,661,031          19.94
Purchase......................       63            25,976,383          18.73
                                    ---          ------------        ------
Total:........................      352          $138,691,735         100.00%
                                    ===          ============        ======
</TABLE>
```

                    Occupancy Status

```
<TABLE>
<CAPTION>
                                            Aggregate Unpaid    % of Cut-Off Date Pool
    Occupancy Status          Number of Loans  Principal Balance  Balance of the Group 1 Loans
------------------------------  ---------------  -----------------  ----------------------------
<S>                             <C>              <C>                <C>
Primary.......................      334          $132,037,862          95.20%
Secondary.....................       18            6,653,873          4.80
                                    ---          ------------        ------
Total:........................      352          $138,691,735         100.00%
                                    ===          ============        ======
</TABLE>
```

                           A-4


<Page>


                 Original Terms to Maturity

```
<TABLE>
<CAPTION>
                                                    % of Cut-Off Date Pool
Original Term to Maturity                Aggregate Unpaid    Balance of the Group 1
      (Months)               Number of Loans  Principal Balance      Loans
------------------------------  ---------------  -----------------  ------------------------
<S>                             <C>              <C>                <C>
61 - 120......................        4          $  1,580,298          1.14%
121 - 180.....................      348           137,111,437         98.86
                                    ---          ------------        ------
Total:........................      352          $138,691,735         100.00%
                                    ===          ============        ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average original term to maturity
of the Group 1 Loans, by Cut-Off Date Pool Balance of the Group 1 Loans, was
approximately 179 months.

                 Remaining Terms to Maturity

```
<TABLE>
<CAPTION>
                                                    % of Cut-Off Date Pool
Remaining Term to Maturity               Aggregate Unpaid    Balance of the Group 1
      (Months)               Number of Loans  Principal Balance      Loans
------------------------------  ---------------  -----------------  ------------------------
<S>                             <C>              <C>                <C>
1 - 60........................        1          $    195,311          0.14%
61 - 120......................       30            9,896,236          7.14
121 - 180.....................      321           128,600,188         92.72
                                    ---          ------------        ------
Total:........................      352          $138,691,735         100.00%
                                    ===          ============        ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average remaining term to
maturity of the Group 1 Loans, by Cut-Off Date Pool Balance of the Group 1
Loans, was approximately 146 months.

A-5

<Page>

Geographic Distribution of Loans

<TABLE>
<CAPTION>

| Geographic Distribution | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| California..................... | 64 | $ 24,548,819 | 17.70% |
| New York...................... | 57 | 22,676,715 | 16.35 |
| Texas......................... | 49 | 18,385,558 | 13.26 |
| Florida....................... | 41 | 17,356,987 | 12.51 |
| New Jersey.................... | 17 | 6,581,118 | 4.75 |
| Georgia....................... | 12 | 4,916,826 | 3.55 |
| Virginia...................... | 12 | 4,121,536 | 2.97 |
| North Carolina............... | 10 | 4,024,566 | 2.90 |
| Pennsylvania................. | 10 | 3,496,154 | 2.52 |
| Arizona....................... | 7 | 3,451,501 | 2.49 |
| Colorado...................... | 9 | 3,226,144 | 2.33 |
| Maryland...................... | 7 | 2,943,965 | 2.12 |
| Ohio.......................... | 6 | 2,606,016 | 1.88 |
| Oregon........................ | 5 | 2,155,785 | 1.55 |
| Connecticut................... | 5 | 1,984,314 | 1.43 |
| Minnesota..................... | 5 | 1,918,872 | 1.38 |
| Massachusetts................. | 4 | 1,756,666 | 1.27 |
| Tennessee..................... | 3 | 1,445,559 | 1.04 |
| Nevada........................ | 4 | 1,356,297 | 0.98 |
| Washington.................... | 3 | 1,059,774 | 0.76 |
| Alabama....................... | 2 | 1,025,487 | 0.74 |
| Louisiana..................... | 2 | 895,845 | 0.65 |
| Arkansas...................... | 1 | 835,446 | 0.60 |
| Delaware...................... | 2 | 770,000 | 0.56 |
| Indiana....................... | 3 | 756,496 | 0.55 |
| Michigan...................... | 2 | 745,350 | 0.54 |
| Illinois...................... | 2 | 704,675 | 0.51 |
| District Of Columbia.......... | 2 | 676,533 | 0.49 |
| South Carolina............... | 2 | 631,377 | 0.46 |
| Utah.......................... | 1 | 537,243 | 0.39 |
| New Hampshire................. | 1 | 465,371 | 0.34 |
| Mississippi................... | 1 | 322,112 | 0.23 |
| New Mexico.................... | 1 | 312,626 | 0.23 |
|  | --- | ------------ | ------ |
| Total:....................... | 352 | $138,691,735 | 100.00% |
|  | === | ============ | ====== |

</TABLE>

No more than approximately 2.00% of the Group 1 Loans, by Cut-Off Date
Pool Balance of the Group 1 Loans, will be secured by properties located in any
one zip code.

Documentation Type

<TABLE>
<CAPTION>

| Documentation Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Full.......................... | 311 | $122,968,553 | 88.66% |
| Reduced....................... | 12 | 4,754,223 | 3.43 |
| Streamline.................... | 10 | 4,168,486 | 3.01 |
| No Doc........................ | 10 | 3,305,789 | 2.38 |
| Stated Doc.................... | 4 | 1,776,969 | 1.28 |
| Limited....................... | 5 | 1,717,715 | 1.24 |
|  | --- | ------------ | ------ |
| Total:....................... | 352 | $138,691,735 | 100.00% |
|  | === | ============ | ====== |

</TABLE>

A-6

<Page>

Credit Scores

```
<TABLE>
<CAPTION>
                                        Aggregate Unpaid       % of Cut-Off Date Pool
         Credit Scores*      Number of Loans   Principal Balance    Balance of the Group 1 Loans
------------------------      ---------------   -----------------    ----------------------------
<S>                          <C>               <C>                  <C>
451 - 500....................        1         $     338,725               0.24%
501 - 550....................        3             1,347,935               0.97
551 - 600....................       11             4,216,891               3.04
601 - 650....................        9             4,916,963               3.55
651 - 700....................       52            21,651,167              15.61
701 - 750....................       89            36,281,829              26.16
751 - 800....................      154            59,127,774              42.63
801 - 850....................       25             8,255,428               5.95
Not Available................        8             2,555,022               1.84
                                   ---          ------------             ------
Total:.......................      352         $138,691,735             100.00%
                                   ===          ============             ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average Credit Score of the
borrowers with a Credit Score for the Group 1 Loans, by Cut-Off Date Pool
Balance of the Group 1 Loans, was approximately 735.

----------
*    Generally all of the credit scores were obtained within 3 months prior to
     the Closing Date.

Delinquency Status

```
<TABLE>
<CAPTION>
                                        Aggregate Unpaid       % of Cut-Off Date Pool
       Delinquency Status    Number of Loans   Principal Balance    Balance of the Group 1 Loans
------------------------      ---------------   -----------------    ----------------------------
<S>                          <C>               <C>                  <C>
0............................      348         $136,815,442              98.65%
30 - 59......................        3             1,200,695               0.87
60 - 89......................        1               675,598               0.49
                                   ---          ------------             ------
Total:.......................      352         $138,691,735             100.00%
                                   ===          ============             ======
</TABLE>
```

                              A-7

<Page>


GROUP 2 LOANS

Original Principal Balances

```
<TABLE>
<CAPTION>
  Range of Original Principal                  Aggregate Unpaid       % of Cut-Off Date Pool
          Balances            Number of Loans   Principal Balance    Balance of the Group 2 Loans
------------------------      ---------------   -----------------    ----------------------------
<S>                          <C>               <C>                  <C>
$300,001 - $350,000...........      165        $ 53,414,001              11.44%
$350,001 - $400,000...........      382         136,784,667              29.29
$400,001 - $450,000...........      205          82,979,388              17.77
$450,001 - $500,000...........      127          57,820,299              12.38
$500,001 - $550,000...........       77          38,387,780               8.22
$550,001 - $600,000...........       73          40,190,814               8.61
$600,001 - $650,000...........       44          26,709,714               5.72
$650,001 - $700,000...........       10           6,424,950               1.38
$700,001 - $750,000...........        6           4,255,075               0.91
$750,001 - $800,000...........       10           7,370,435               1.58
$800,001 - $850,000...........        1             767,934               0.16
$850,001 - $900,000...........        4           3,398,104               0.73
$900,001 - $950,000...........        3           2,697,388               0.58
$950,001 - $1,000,000.........        5           4,805,157               1.03
$1,000,001 or more............        1           1,003,620               0.21
                                  -----         ------------             ------
Total:.......................     1,113        $467,009,328             100.00%
                                  =====         ============             ======
</TABLE>
```

        The average original principal balance of the Group 2 Loans was
approximately $441,872.

Current Principal Balances

<TABLE>
<CAPTION>

| Range of Current Principal Balances | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| $125,001 - $150,000........... | 1 | $    136,483 | 0.03% |
| $150,001 - $175,000........... | 3 | 496,796 | 0.11 |
| $200,001 - $250,000........... | 5 | 1,191,525 | 0.26 |
| $250,001 - $300,000........... | 11 | 3,145,296 | 0.67 |
| $300,001 - $350,000........... | 265 | 88,194,485 | 18.88 |
| $350,001 - $400,000........... | 332 | 123,486,353 | 26.44 |
| $400,001 - $450,000........... | 180 | 75,821,029 | 16.24 |
| $450,001 - $500,000........... | 121 | 57,158,048 | 12.24 |
| $500,001 - $550,000........... | 76 | 40,029,573 | 8.57 |
| $550,001 - $600,000........... | 48 | 27,376,348 | 5.86 |
| $600,001 - $650,000........... | 38 | 23,606,686 | 5.05 |
| $650,001 - $700,000........... | 7 | 4,750,923 | 1.02 |
| $700,001 - $750,000........... | 7 | 5,084,004 | 1.09 |
| $750,001 - $800,000........... | 6 | 4,627,510 | 0.99 |
| $800,001 - $850,000........... | 1 | 805,540 | 0.17 |
| $850,001 - $900,000........... | 5 | 4,387,574 | 0.94 |
| $900,001 - $950,000........... | 2 | 1,833,547 | 0.39 |
| $950,001 - $1,000,000......... | 4 | 3,873,988 | 0.83 |
| $1,000,001 or more............ | 1 | 1,003,620 | 0.21 |
| | ----- | ------------ | ------ |
| Total:....................... | 1,113 | $467,009,328 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

       The average current principal balance of the Group 2 Loans was
approximately $419,595.


                           A-8




<Page>



                       Loan Interest Rates

<TABLE>
<CAPTION>

| Range of Loan Interest Rates | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 5.251% - 5.375%............... | 1 | $    591,403 | 0.13% |
| 5.751% - 5.875%............... | 3 | 1,103,388 | 0.24 |
| 5.876% - 6.000%............... | 6 | 2,187,487 | 0.47 |
| 6.001% - 6.125%............... | 11 | 4,825,545 | 1.03 |
| 6.126% - 6.250%............... | 24 | 9,531,513 | 2.04 |
| 6.251% - 6.375%............... | 30 | 12,766,274 | 2.73 |
| 6.376% - 6.500%............... | 58 | 24,083,013 | 5.16 |
| 6.501% - 6.625%............... | 68 | 29,490,819 | 6.31 |
| 6.626% - 6.750%............... | 177 | 73,633,213 | 15.77 |
| 6.751% - 6.875%............... | 233 | 101,670,772 | 21.77 |
| 6.876% - 7.000%............... | 123 | 52,953,119 | 11.34 |
| 7.001% - 7.125%............... | 73 | 29,502,229 | 6.32 |
| 7.126% - 7.250%............... | 94 | 38,302,818 | 8.2 |
| 7.251% - 7.375%............... | 55 | 23,888,954 | 5.12 |
| 7.376% - 7.500%............... | 40 | 16,119,422 | 3.45 |
| 7.501% - 7.625%............... | 27 | 10,501,137 | 2.25 |
| 7.626% - 7.750%............... | 16 | 5,791,943 | 1.24 |
| 7.751% - 7.875%............... | 25 | 9,809,652 | 2.10 |
| 7.876% - 8.000%............... | 14 | 5,780,986 | 1.24 |
| 8.001% - 8.125%............... | 5 | 2,391,062 | 0.51 |
| 8.126% - 8.250%............... | 7 | 2,864,648 | 0.61 |
| 8.251% - 8.375%............... | 12 | 4,717,384 | 1.01 |
| 8.376% - 8.500%............... | 2 | 758,165 | 0.16 |
| 8.501% - 8.625%............... | 5 | 1,952,699 | 0.42 |
| 8.626% - 8.750%............... | 3 | 1,295,646 | 0.28 |
| 8.751% - 8.875%............... | 1 | 496,036 | 0.11 |
| | ----- | ------------ | ------ |
| Total:....................... | 1,113 | $467,009,328 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

       As of the Cut-Off Date, the weighted average interest rate of the
Group 2 Loans, by Cut-Off Date Pool Balance of the Group 2 Loans, was
approximately 6.995% per annum.

                       Original LTV Ratios

<TABLE>
<CAPTION>

| | | Aggregate Unpaid | % of Cut-Off Date Pool |
|---|---|---|---|

| Range of Original LTV Ratios | Number of Loans | Principal Balance | Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 50.00% or less................ | 92 | $ 41,821,367 | 8.96% |
| 50.01% – 55.00%.............. | 38 | 16,928,901 | 3.62 |
| 55.01% – 60.00%.............. | 69 | 30,787,305 | 6.59 |
| 60.01% – 65.00%.............. | 71 | 31,143,921 | 6.67 |
| 65.01% – 70.00%.............. | 167 | 74,090,642 | 15.86 |
| 70.01% – 75.00%.............. | 142 | 59,553,770 | 12.75 |
| 75.01% – 80.00%.............. | 440 | 177,562,163 | 38.02 |
| 80.01% – 85.00%.............. | 20 | 7,524,848 | 1.61 |
| 85.01% – 90.00%.............. | 64 | 24,143,982 | 5.17 |
| 90.01% – 95.00%.............. | 10 | 3,452,428 | 0.74 |
| Total:...................... | 1,113 | $467,009,328 | 100.00% |

</TABLE>

        The weighted average original LTV Ratio of the Group 2 Loans, by
Cut-Off Date Pool Balance of the Group 2 Loans, was approximately 70.71%.

                        A-9

<Page>

                    Current LTV Ratios

<TABLE>
<CAPTION>

| Range of Current LTV Ratios* | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 50.00% or less................ | 114 | $ 50,667,172 | 10.85% |
| 50.01% – 55.00%.............. | 53 | 23,214,800 | 4.97 |
| 55.01% – 60.00%.............. | 91 | 37,410,539 | 8.01 |
| 60.01% – 65.00%.............. | 106 | 46,599,351 | 9.98 |
| 65.01% – 70.00%.............. | 163 | 71,293,172 | 15.27 |
| 70.01% – 75.00%.............. | 214 | 87,298,131 | 18.69 |
| 75.01% – 80.00%.............. | 289 | 119,040,987 | 25.49 |
| 80.01% – 85.00%.............. | 38 | 14,597,311 | 3.13 |
| 85.01% – 90.00%.............. | 38 | 14,450,799 | 3.09 |
| 90.01% – 95.00%.............. | 7 | 2,437,066 | 0.52 |
| Total:...................... | 1,113 | $467,009,328 | 100.00% |

</TABLE>

        The weighted average current LTV Ratio of the Group 2 Loans, by
Cut-Off Date Pool Balance of the Group 2 Loans, was approximately 67.29%.

----------
*    Current LTV Ratios generally were determined based on the ratio of the
     unpaid principal amount of the related Loan as of the Cut-Off Date to the
     lesser of (i) the sales price for the related Mortgaged Property or (ii)
     the appraised value of the related Mortgaged Property, in each case, at the
     time of origination of the related Loan.

                    Property Types

<TABLE>
<CAPTION>

| Property Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Single Family................. | 984 | $412,379,214 | 88.30% |
| Planned Unit Development...... | 60 | 23,296,270 | 4.99 |
| Condominium................... | 50 | 22,524,316 | 4.82 |
| Two- to Four-Family........... | 10 | 5,141,637 | 1.10 |
| Coop.......................... | 8 | 3,338,057 | 0.71 |
| Manufactured Housing.......... | 1 | 329,834 | 0.07 |
| Total:...................... | 1,113 | $467,009,328 | 100.00% |

</TABLE>

                    Loan Purpose

<TABLE>
<CAPTION>

| Loan Purpose | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |

```
Purchase.....................     536      $219,898,444           47.09%
Rate & Term Refinance.........    344       149,809,553           32.08
Cash Out Refinance............    230        96,087,700           20.58
Construction to Perm..........      3         1,213,630            0.26
                                -----    -------------          ------
Total:.......................   1,113      $467,009,328          100.00%
                                =====    =============          ======
```

</TABLE>

### Occupancy Status

<TABLE>
<CAPTION>

| Occupancy Status | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Primary...................... | 1,058 | $442,688,247 | 94.79% |
| Secondary.................... | 45 | 20,212,069 | 4.33 |
| Investor..................... | 10 | 4,109,012 | 0.88 |
| | ----- | ------------ | ------ |
| Total:....................... | 1,113 | $467,009,328 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

A-10

<Page>

### Original Terms to Maturity

<TABLE>
<CAPTION>

| Original Term to Maturity (Months) | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 181 - 240.................... | 16 | $ 5,930,402 | 1.27% |
| 241 - 300.................... | 2 | 774,973 | 0.17 |
| 301 - 360.................... | 1,095 | 460,303,952 | 98.56 |
| | ----- | ------------ | ------ |
| Total:....................... | 1,113 | $467,009,328 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

        As of the Cut-Off Date, the weighted average original term to maturity
of the Group 2 Loans, by Cut-Off Date Pool Balance of the Group 2 Loans, was
approximately 358 months.

### Remaining Terms to Maturity

<TABLE>
<CAPTION>

| Remaining Term to Maturity (Months) | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 121 - 180.................... | 1 | $ 286,435 | 0.06% |
| 181 - 240.................... | 16 | 6,144,355 | 1.32 |
| 241 - 300.................... | 236 | 91,483,524 | 19.59 |
| 301 - 360.................... | 860 | 369,095,014 | 79.03 |
| | ----- | ------------ | ------ |
| Total:....................... | 1,113 | $467,009,328 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

        As of the Cut-Off Date, the weighted average remaining term to
maturity of the Group 2 Loans, by Cut-Off Date Pool Balance of the Group 2
Loans, was approximately 317 months.

A-11

<Page>

### Geographic Distribution of Loans

<TABLE>
<CAPTION>

| Geographic Distribution | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| California.................... | 317 | $132,153,375 | 28.30% |
| New York..................... | 120 | 54,403,603 | 11.65 |
| Texas........................ | 94 | 39,956,402 | 8.56 |
| New Jersey................... | 85 | 33,584,964 | 7.19 |
| Florida...................... | 50 | 21,890,657 | 4.69 |
| Georgia...................... | 51 | 20,859,646 | 4.47 |
| Virginia..................... | 38 | 16,449,372 | 3.52 |
| Pennsylvania................. | 34 | 13,792,425 | 2.95 |
| Maryland..................... | 32 | 11,853,684 | 2.54 |
| Connecticut.................. | 28 | 11,197,476 | 2.40 |
| Minnesota.................... | 26 | 10,407,016 | 2.23 |
| Colorado..................... | 26 | 10,281,144 | 2.20 |
| Illinois..................... | 21 | 9,379,408 | 2.01 |
| North Carolina............... | 21 | 8,798,620 | 1.88 |
| Massachusetts................ | 19 | 7,827,512 | 1.68 |
| Washington................... | 15 | 6,060,697 | 1.30 |
| Michigan..................... | 14 | 5,722,917 | 1.23 |
| Arizona...................... | 13 | 5,386,279 | 1.15 |
| Nevada....................... | 10 | 4,673,907 | 1.00 |
| Oregon....................... | 10 | 4,638,977 | 0.99 |
| Tennessee.................... | 10 | 4,273,651 | 0.92 |
| Missouri..................... | 8 | 3,410,947 | 0.73 |
| Louisiana.................... | 8 | 3,011,073 | 0.64 |
| District Of Columbia......... | 6 | 2,914,702 | 0.62 |
| Alabama...................... | 6 | 2,807,760 | 0.60 |
| Ohio......................... | 7 | 2,758,214 | 0.59 |
| New Mexico................... | 6 | 2,749,711 | 0.59 |
| Utah......................... | 5 | 2,499,117 | 0.54 |
| Indiana...................... | 7 | 2,425,425 | 0.52 |
| Oklahoma..................... | 4 | 1,626,893 | 0.35 |
| Kentucky..................... | 4 | 1,518,932 | 0.33 |
| South Carolina............... | 4 | 1,315,859 | 0.28 |
| Hawaii....................... | 2 | 1,109,655 | 0.24 |
| New Hampshire................ | 2 | 821,890 | 0.18 |
| Nebraska..................... | 2 | 782,481 | 0.17 |
| West Virginia................ | 1 | 580,531 | 0.12 |
| Idaho........................ | 1 | 566,915 | 0.12 |
| Wisconsin.................... | 1 | 545,984 | 0.12 |
| Kansas....................... | 1 | 464,076 | 0.10 |
| Maine........................ | 1 | 451,757 | 0.10 |
| Iowa......................... | 1 | 400,186 | 0.09 |
| Delaware..................... | 1 | 335,756 | 0.07 |
| South Dakota................. | 1 | 319,730 | 0.07 |
| | ----- | ------------ | ------ |
| Total:....................... | 1,113 | $467,009,328 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

        No more than approximately 0.53% of the Group 2 Loans, by Cut-Off Date
Pool Balance of the Group 2 Loans, will be secured by properties located in any
one zip code.


                    A-12



<Page>



                    Documentation Type

<TABLE>
<CAPTION>

| Documentation Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Full......................... | 940 | $396,160,980 | 84.83% |
| No Doc....................... | 114 | 44,290,202 | 9.48 |
| Reduced...................... | 35 | 14,606,998 | 3.13 |
| Limited...................... | 14 | 7,185,257 | 1.54 |
| Streamline................... | 5 | 2,797,496 | 0.60 |
| Stated Doc................... | 5 | 1,968,394 | 0.42 |
| | ----- | ------------ | ------ |
| Total:....................... | 1,113 | $467,009,328 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

                    Credit Scores

<TABLE>
<CAPTION>

| Credit Scores* | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2 Loans |
|---|---|---|---|

```
------------------------------ --------------- ----------------- ----------------------------
<S>                            <C>             <C>               <C>
401 - 450.....................       1         $      664,813              0.14%
451 - 500.....................      11              4,777,605              1.02
501 - 550.....................      33             14,175,809              3.04
551 - 600.....................      41             17,281,950              3.70
601 - 650.....................      97             41,135,082              8.81
651 - 700.....................     199             86,201,773             18.46
701 - 750.....................     311            128,764,117             27.57
751 - 800.....................     339            140,965,513             30.18
801 - 850.....................      47             19,339,250              4.14
Not Available.................      34             13,703,416              2.93
                                 -----         ------------           ------
Total:.......................    1,113         $467,009,328            100.00%
                                 =====         ============           ======
```

</TABLE>

        As of the Cut-Off Date, the weighted average Credit Score of the
borrowers with a Credit Score for the Group 2 Loans, by Cut-Off Date Pool
Balance of the Group 2 Loans, was approximately 712.

----------
*    Generally all of the credit scores were obtained within 3 months prior to
     the Closing Date.

                        Delinquency Status

<TABLE>
<CAPTION>
                                                Aggregate Unpaid       % of Cut-Off Date Pool
    Delinquency Status         Number of Loans  Principal Balance    Balance of the Group 2 Loans
------------------------------ --------------- ----------------- ----------------------------
<S>                            <C>             <C>               <C>
0............................    1,096         $459,131,409             98.31%
30 - 59......................       12              5,078,616              1.09
60 - 89......................        5              2,799,303              0.60
                                 ----          ------------           ------
Total:.......................    1,113         $467,009,328            100.00%
                                 =====         ============           ======
```

</TABLE>

                        A-13

<Page>

                        GROUP 3 LOANS

                Original Principal Balances

<TABLE>
<CAPTION>
    Range of Original                             Aggregate Unpaid       % of Cut-Off Date Pool
    Principal Balances         Number of Loans  Principal Balance    Balance of the Group 3 Loans
------------------------------ --------------- ----------------- ----------------------------
<S>                            <C>             <C>               <C>
$300,001 - $350,000...........       7         $  2,316,190              5.47%
$350,001 - $400,000...........      18              6,488,872             15.33
$400,001 - $450,000...........      19              7,883,838             18.63
$450,001 - $500,000...........      16              7,437,321             17.57
$500,001 - $550,000...........       6              3,096,124              7.32
$550,001 - $600,000...........       8              4,475,290             10.57
$600,001 - $650,000...........       8              4,651,752             10.99
$650,001 - $700,000...........       3              1,968,329              4.65
$700,001 - $750,000...........       3              2,124,104              5.02
$900,001 - $950,000...........       1                917,478              2.17
$950,001 - $1,000,000.........       1                963,307              2.28
                                  ---          ------------           ------
Total:.......................       90         $42,322,604            100.00%
                                  ===          ============           ======
```

</TABLE>

        The average original principal balance of the Group 3 Loans was
approximately $490,711.

                Current Principal Balances

<TABLE>
<CAPTION>
    Range of Current                              Aggregate Unpaid       % of Cut-Off Date Pool
    Principal Balances         Number of Loans  Principal Balance    Balance of the Group 3 Loans
------------------------------ --------------- ----------------- ----------------------------
<S>                            <C>             <C>               <C>
$300,001 - $350,000...........      11         $  3,662,338              8.65%
$350,001 - $400,000...........      17              6,248,142             14.76
$400,001 - $450,000...........      21              8,868,561             20.95
```

```
$450,001 - $500,000..........        14        6,649,653        15.71
$500,001 - $550,000..........         6        3,172,613         7.50
$550,001 - $600,000..........         7        3,988,683         9.42
$600,001 - $650,000..........         7        4,392,250        10.38
$650,001 - $700,000..........         3        2,024,478         4.78
$700,001 - $750,000..........         2        1,435,100         3.39
$900,001 - $950,000..........         1          917,478         2.17
$950,001 - $1,000,000.........        1          963,307         2.28
                                    ---      -----------        ------
Total:.....................           90      $42,322,604       100.00%
                                    ===      ===========        ======
```

`</TABLE>`

        The average current principal balance of the Group 3 Loans was
approximately $470,251.

                              A-14

`<Page>`

                        Loan Interest Rates

`<TABLE>`
`<CAPTION>`

| Range of Loan Interest Rates | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
| --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` |
| 3.876% - 4.000%............... | 4 | $ 1,826,739 | 4.32% |
| 4.001% - 4.125%............... | 2 | 1,058,206 | 2.50 |
| 4.126% - 4.250%............... | 8 | 3,544,909 | 8.38 |
| 4.251% - 4.375%............... | 7 | 3,468,148 | 8.19 |
| 4.376% - 4.500%............... | 4 | 1,884,495 | 4.45 |
| 4.501% - 4.625%............... | 4 | 1,785,264 | 4.22 |
| 4.626% - 4.750%............... | 8 | 3,526,031 | 8.33 |
| 4.751% - 4.875%............... | 2 | 1,261,772 | 2.98 |
| 4.876% - 5.000%............... | 3 | 1,573,223 | 3.72 |
| 5.001% - 5.125%............... | 5 | 2,014,009 | 4.76 |
| 5.126% - 5.250%............... | 3 | 1,290,625 | 3.05 |
| 5.251% - 5.375%............... | 5 | 2,611,710 | 6.17 |
| 5.376% - 5.500%............... | 8 | 4,822,590 | 11.39 |
| 5.501% - 5.625%............... | 9 | 3,874,689 | 9.16 |
| 5.626% - 5.750%............... | 9 | 3,884,514 | 9.18 |
| 5.751% - 5.875%............... | 5 | 2,255,049 | 5.33 |
| 5.876% - 6.000%............... | 1 | 433,078 | 1.02 |
| 6.126% - 6.250%............... | 1 | 460,406 | 1.09 |
| 6.251% - 6.375%............... | 1 | 339,487 | 0.80 |
| 6.376% - 6.500%............... | 1 | 407,659 | 0.96 |
| | --- | ----------- | ------ |
| Total:....................... | 90 | $42,322,604 | 100.00% |
| | === | =========== | ====== |

`</TABLE>`

        As of the Cut-Off Date, the weighted average interest rate of the
Group 3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was
approximately 5.074% per annum.

                           Index Type

`<TABLE>`
`<CAPTION>`

| Index Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
| --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` |
| One-Year CMT.................. | 9 | $ 4,049,824 | 9.57% |
| One-Year Libor................ | 81 | 38,272,780 | 90.43 |
| | --- | ----------- | ------ |
| Total:....................... | 90 | $42,322,604 | 100.00% |
| | === | =========== | ====== |

`</TABLE>`

                          Gross Margin

`<TABLE>`
`<CAPTION>`

| Gross Margin | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
| --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` |
| 1.876% - 2.000%............... | 2 | $ 902,903 | 2.13% |
| 2.126% - 2.250%............... | 79 | 37,369,877 | 88.30 |
| 2.626% - 2.750%............... | 9 | 4,049,824 | 9.57 |
| | --- | ----------- | ------ |
| Total:....................... | 90 | $42,322,604 | 100.00% |

```
                    ===          ===========          ======
</TABLE>
```

    As of the Cut-Off Date, the weighted average gross margin of the Group 3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 2.293% per annum.

<div align="center">A-15</div>

&lt;Page&gt;

<div align="center">Initial Periodic Rate Cap</div>

```
<TABLE>
<CAPTION>
```

| Initial Periodic Rate Cap | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|---|---|---|---|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| 2.000%........................ | 90 | $42,322,604 | 100.00% |
| | --- | ----------- | ------ |
| Total:........................ | 90 | $42,322,604 | 100.00% |
| | === | =========== | ====== |

```
</TABLE>
```

    As of the Cut-Off Date, the weighted average initial periodic rate cap of the Group 3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 2.000%.

<div align="center">Subsequent Periodic Rate Cap</div>

```
<TABLE>
<CAPTION>
```

| Subsequent Period Rate Cap | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|---|---|---|---|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| 2.000%........................ | 90 | $42,322,604 | 100.00% |
| | --- | ----------- | ------ |
| Total:........................ | 90 | $42,322,604 | 100.00% |
| | === | =========== | ====== |

```
</TABLE>
```

    As of the Cut-Off Date, the weighted average subsequent periodic rate cap of the Group 3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 2.000%.

<div align="center">Maximum Loan Interest Rates</div>

```
<TABLE>
<CAPTION>
```

| Maximum Loan Interest Rates | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|---|---|---|---|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| 9.876% - 10.000%.............. | 4 | $ 1,826,739 | 4.32% |
| 10.001% - 10.125%............. | 2 | 1,058,206 | 2.50 |
| 10.126% - 10.250%............. | 8 | 3,544,909 | 8.38 |
| 10.251% - 10.375%............. | 7 | 3,468,148 | 8.19 |
| 10.376% - 10.500%............. | 4 | 1,884,495 | 4.45 |
| 10.501% - 10.625%............. | 4 | 1,785,264 | 4.22 |
| 10.626% - 10.750%............. | 8 | 3,526,031 | 8.33 |
| 10.751% - 10.875%............. | 2 | 1,261,772 | 2.98 |
| 10.876% - 11.000%............. | 3 | 1,573,223 | 3.72 |
| 11.001% - 11.125%............. | 5 | 2,014,009 | 4.76 |
| 11.126% - 11.250%............. | 3 | 1,290,625 | 3.05 |
| 11.251% - 11.375%............. | 5 | 2,611,710 | 6.17 |
| 11.376% - 11.500%............. | 8 | 4,822,590 | 11.39 |
| 11.501% - 11.625%............. | 9 | 3,874,689 | 9.16 |
| 11.626% - 11.750%............. | 9 | 3,884,514 | 9.18 |
| 11.751% - 11.875%............. | 5 | 2,255,049 | 5.33 |
| 11.876% - 12.000%............. | 1 | 433,078 | 1.02 |
| 12.126% - 12.250%............. | 1 | 460,406 | 1.09 |
| 12.251% - 12.375%............. | 1 | 339,487 | 0.80 |
| 12.376% - 12.500%............. | 1 | 407,659 | 0.96 |
| | --- | ----------- | ------ |
| Total:........................ | 90 | $42,322,604 | 100.00% |
| | === | =========== | ====== |

```
</TABLE>
```

    As of the Cut-Off Date, the weighted average maximum loan interest rate of the Group 3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 11.074%.

A-16

<Page>

## Loan Interest Rate Adjustment Frequency

<TABLE>
<CAPTION>

| Loan Interest Rate Adjustment Frequency | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|-----|-----|-----|-----|
| <S> | <C> | <C> | <C> |
| 12 ........................... | 90 | $42,322,604 | 100.00% |
| | --- | ----------- | ------ |
| Total: ...................... | 90 | $42,322,604 | 100.00% |
| | === | =========== | ====== |

</TABLE>

## Next Loan Interest Rate Adjustment Date

<TABLE>
<CAPTION>

| Next Loan Interest Rate Adjustment Date | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|-----|-----|-----|-----|
| <S> | <C> | <C> | <C> |
| February 2005 ................ | 3 | $ 1,365,534 | 3.23% |
| March 2005 .................. | 10 | 4,514,658 | 10.67 |
| April 2005 .................. | 3 | 1,132,204 | 2.68 |
| June 2005 ................... | 4 | 1,788,029 | 4.22 |
| July 2005 ................... | 18 | 9,503,825 | 22.46 |
| August 2005 ................. | 42 | 19,570,963 | 46.24 |
| September 2005 .............. | 10 | 4,447,391 | 10.51 |
| | --- | ----------- | ------ |
| Total: ...................... | 90 | $42,322,604 | 100.00% |
| | === | =========== | ====== |

</TABLE>

## Original LTV Ratios

<TABLE>
<CAPTION>

| Range of Original LTV Ratios | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|-----|-----|-----|-----|
| <S> | <C> | <C> | <C> |
| 50.00% or less ............... | 9 | $ 4,886,462 | 11.55% |
| 50.01% - 55.00% ............. | 6 | 3,827,444 | 9.04 |
| 55.01% - 60.00% ............. | 6 | 3,048,286 | 7.2 |
| 60.01% - 65.00% ............. | 6 | 2,898,409 | 6.85 |
| 65.01% - 70.00% ............. | 15 | 6,666,537 | 15.75 |
| 70.01% - 75.00% ............. | 10 | 4,369,043 | 10.32 |
| 75.01% - 80.00% ............. | 33 | 14,786,713 | 34.94 |
| 80.01% - 85.00% ............. | 3 | 1,099,990 | 2.60 |
| 85.01% - 90.00% ............. | 1 | 330,336 | 0.78 |
| 90.01% - 95.00% ............. | 1 | 409,385 | 0.97 |
| | --- | ----------- | ------ |
| Total: ...................... | 90 | $42,322,604 | 100.00% |
| | === | =========== | ====== |

</TABLE>

The weighted average original LTV Ratio of the Group 3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 67.29%.

A-17

<Page>

## Current LTV Ratios

<TABLE>
<CAPTION>

| Range of Current LTV Ratios* | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|-----|-----|-----|-----|
| <S> | <C> | <C> | <C> |
| 50.00% or less ............... | 13 | $ 7,200,230 | 17.01% |
| 50.01% - 55.00% ............. | 7 | 3,922,152 | 9.27 |
| 55.01% - 60.00% ............. | 5 | 2,289,240 | 5.41 |

```
60.01% - 65.00% .............      7        3,290,451         7.77
65.01% - 70.00% .............     13        5,727,987        13.53
70.01% - 75.00% .............      7        3,266,121         7.72
75.01% - 80.00% .............     34       15,146,887        35.79
80.01% - 85.00% .............      2          739,816         1.75
85.01% - 90.00% .............      1          330,336         0.78
90.01% - 95.00% .............      1          409,385         0.97
                                 ---      ------------      ------
Total: ......................     90      $42,322,604       100.00%
                                 ===      ============      ======
```

</TABLE>

        As of the Cut-Off Date, the weighted average current LTV of the Group
3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately
64.73%.

----------
*    Current LTV Ratios generally were determined based on the ratio of the
     unpaid principal amount of the related loan as of the Cut-Off Date to the
     lesser of (i) the sales price for the related Mortgaged Property or (ii)
     the appraised value of the related Mortgaged Property, in each case, at the
     time of origination of the related Loan.

                          Property Types

<TABLE>
<CAPTION>
                                              Aggregate Unpaid     % of Cut-Off Date Pool
        Property Type        Number of Loans  Principal Balance  Balance of the Group 3 Loans
-----------------------------  ---------------  -----------------  ----------------------------
<S>                               <C>              <C>                    <C>
Single Family ................     84          $39,445,290              93.20%
Condominium ..................      3            1,410,415               3.33
Planned Unit Development .....      2              932,455               2.20
Two-to-Four Family ...........      1              534,443               1.26
                                  ---          ------------            ------
Total: ......................      90          $42,322,604             100.00%
                                  ===          ============            ======

</TABLE>

                           Loan Purpose

<TABLE>
<CAPTION>
                                              Aggregate Unpaid     % of Cut-Off Date Pool
        Loan Purpose         Number of Loans  Principal Balance  Balance of the Group 3 Loans
-----------------------------  ---------------  -----------------  ----------------------------
<S>                               <C>              <C>                    <C>
Purchase ....................      43          $19,771,414              46.72%
Rate & Term Refinance ........     30           14,566,932              34.42
Cash Out Refinance ..........      17            7,984,258              18.87
                                  ---          ------------            ------
Total: ......................      90          $42,322,604             100.00%
                                  ===          ============            ======

</TABLE>

                         Occupancy Status

<TABLE>
<CAPTION>
                                              Aggregate Unpaid     % of Cut-Off Date Pool
      Occupancy Status       Number of Loans  Principal Balance  Balance of the Group 3 Loans
-----------------------------  ---------------  -----------------  ----------------------------
<S>                               <C>              <C>                    <C>
Primary .....................      90          $42,322,604             100.00%
                                  ---          ------------            ------
Total: ......................      90          $42,322,604             100.00%
                                  ===          ============            ======

</TABLE>

                      Original Terms to Maturity

<TABLE>
<CAPTION>
   Original Term to Maturity                  Aggregate Unpaid     % of Cut-Off Date Pool
         (Months)            Number of Loans  Principal Balance  Balance of the Group 3 Loans
-----------------------------  ---------------  -----------------  ----------------------------
<S>                               <C>              <C>                    <C>
301 - 360 ...................      90          $42,322,604             100.00%
                                  ---          ------------            ------
Total: ......................      90          $42,322,604             100.00%
                                  ===          ============            ======

</TABLE>

                              A-18


<Page>

As of the Cut-Off Date, the weighted average original term to maturity of the Group 3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 360 months.

Remaining Terms to Maturity

<TABLE>
<CAPTION>

| Remaining Term to Maturity (Months) | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 301 - 360 .................... | 90 | $42,322,604 | 100.00% |
| Total: ...................... | 90 | $42,322,604 | 100.00% |

</TABLE>

As of the Cut-Off Date, the weighted average remaining term to maturity of the Group 3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 334 months.

Geographic Distribution of Loans

<TABLE>
<CAPTION>

| Geographic Distribution | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| California .................... | 38 | $17,861,801 | 42.20% |
| Texas ...................... | 8 | 4,013,009 | 9.48 |
| Massachusetts ............... | 5 | 2,957,387 | 6.99 |
| Georgia .................... | 4 | 2,173,130 | 5.13 |
| Illinois .................... | 4 | 1,785,781 | 4.22 |
| Michigan .................... | 4 | 1,496,791 | 3.54 |
| Colorado ................... | 3 | 1,441,573 | 3.41 |
| Florida .................... | 2 | 1,322,249 | 3.12 |
| North Carolina .............. | 3 | 1,277,936 | 3.02 |
| Virginia ................... | 2 | 859,049 | 2.03 |
| New York ................... | 2 | 818,217 | 1.93 |
| Maryland ................... | 2 | 771,917 | 1.82 |
| Pennsylvania ................ | 2 | 766,787 | 1.81 |
| Alabama .................... | 1 | 632,854 | 1.50 |
| Ohio ....................... | 1 | 572,041 | 1.35 |
| Connecticut ................ | 1 | 476,916 | 1.13 |
| South Carolina ............. | 1 | 469,824 | 1.11 |
| Indiana .................... | 1 | 439,290 | 1.04 |
| Missouri ................... | 1 | 419,885 | 0.99 |
| Kentucky ................... | 1 | 407,302 | 0.96 |
| Rhode Island ............... | 1 | 359,982 | 0.85 |
| Minnesota .................. | 1 | 339,487 | 0.80 |
| Washington ................. | 1 | 330,336 | 0.78 |
| Wisconsin .................. | 1 | 329,058 | 0.78 |
| Total: ...................... | 90 | $42,322,604 | 100.00% |

</TABLE>

No more than approximately 2.53% of the Group 3 Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, will be secured by properties located in any one zip code.

A-19

<Page>

Documentation Type

<TABLE>
<CAPTION>

| Documentation Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Full ........................ | 45 | $21,394,659 | 50.55% |
| No Doc ...................... | 21 | 9,024,976 | 21.32 |
| Reduced ..................... | 15 | 7,493,170 | 17.70 |
| Limited ..................... | 8 | 3,976,720 | 9.40 |
| Alternate ................... | 1 | 433,078 | 1.02 |
| Total: ...................... | 90 | $42,322,604 | 100.00% |

```
                    ===           ===========          ======
</TABLE>
```

Credit Scores

```
<TABLE>
<CAPTION>
                                        Aggregate Unpaid        % of Cut-Off Date Pool
        Credit Scores*          Number of Loans  Principal Balance   Balance of the Group 3 Loans
------------------------------  ---------------  -----------------   ----------------------------
<S>                                  <C>              <C>                    <C>
501 - 550 ....................        1          $    409,385               0.97%
551 - 600 ....................        1               469,824               1.11
601 - 650 ....................        2               936,655               2.21
651 - 700 ....................       18             8,908,992              21.05
701 - 750 ....................       25            11,739,544              27.74
751 - 800 ....................       39            18,045,070              42.64
801 - 850 ....................        3             1,350,504               3.19
Not Available ................        1               462,631               1.09
                                    ---          -----------             ------
Total: .......................       90          $42,322,604             100.00%
                                    ===          ===========             ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average Credit Score of the
borrowers with a Credit Score for the Group 3 Loans, by Cut-Off Date Pool
Balance of the Group 3 Loans, was approximately 735.

```
----------
```
*       Generally all of the credit scores were obtained within 3 months prior to
        the Closing Date.

Delinquency Status

```
<TABLE>
<CAPTION>
                                        Aggregate Unpaid        % of Cut-Off Date Pool
      Delinquency Status        Number of Loans  Principal Balance   Balance of the Group 3 Loans
------------------------------  ---------------  -----------------   ----------------------------
<S>                                  <C>              <C>                    <C>
0 ...........................        89          $41,852,780              98.89%
60 - 89 .....................         1               469,824               1.11
                                    ---          -----------             ------
Total: ......................        90          $42,322,604             100.00%
                                    ===          ===========             ======
</TABLE>
```

A-20

<Page>

GROUP 4 LOANS

Original Principal Balances

```
<TABLE>
<CAPTION>
     Range of Original                  Aggregate Unpaid        % of Cut-Off Date Pool
    Principal Balances          Number of Loans  Principal Balance   Balance of the Group 4 Loans
------------------------------  ---------------  -----------------   ----------------------------
<S>                                  <C>              <C>                    <C>
$300,001 - $350,000...........       23          $ 7,575,351               9.68%
$350,001 - $400,000...........       47           17,055,317              21.79
$400,001 - $450,000...........       26           10,555,344              13.49
$450,001 - $500,000...........       18            7,881,695              10.07
$500,001 - $550,000...........       14            6,694,512               8.55
$550,001 - $600,000...........       13            7,258,403               9.27
$600,001 - $650,000...........       12            7,360,915               9.41
$650,001 - $700,000...........        2            1,352,419               1.73
$700,001 - $750,000...........        2            1,403,820               1.79
$750,001 - $800,000...........        1              766,678               0.98
$800,001 - $850,000...........        3            2,384,825               3.05
$850,001 - $900,000...........        2            1,721,206               2.20
$950,001 - $1,000,000.........        4            3,556,019               4.54
$1,000,001 or more............        2            2,695,421               3.44
                                    ---          -----------             ------
Total:.......................       169          $78,261,924             100.00%
                                    ===          ===========             ======
</TABLE>
```

        The average original principal balance of the Group 4 Loans was
approximately $486,655.

Current Principal Balances

<TABLE>
<CAPTION>

| Range of Current Principal Balances | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| $25,001 - $50,000............. | 1 | $    49,091 | 0.06% |
| $175,001 - $200,000........... | 1 | 196,182 | 0.25 |
| $250,001 - $300,000........... | 1 | 290,701 | 0.37 |
| $300,001 - $350,000........... | 35 | 11,665,076 | 14.91 |
| $350,001 - $400,000........... | 43 | 16,133,707 | 20.62 |
| $400,001 - $450,000........... | 22 | 9,324,876 | 11.91 |
| $450,001 - $500,000........... | 19 | 9,006,728 | 11.51 |
| $500,001 - $550,000........... | 10 | 5,244,964 | 6.70 |
| $550,001 - $600,000........... | 12 | 6,875,871 | 8.79 |
| $600,001 - $650,000........... | 9 | 5,594,339 | 7.15 |
| $650,001 - $700,000........... | 3 | 2,043,363 | 2.61 |
| $700,001 - $750,000........... | 2 | 1,426,471 | 1.82 |
| $750,001 - $800,000........... | 2 | 1,544,312 | 1.97 |
| $800,001 - $850,000........... | 2 | 1,607,192 | 2.05 |
| $850,001 - $900,000........... | 2 | 1,721,206 | 2.20 |
| $900,001 - $950,000........... | 2 | 1,873,355 | 2.39 |
| $950,001 - $1,000,000......... | 1 | 969,069 | 1.24 |
| $1,000,001 or more........... | 2 | 2,695,421 | 3.44 |
| | --- | ----------- | ------ |
| Total:...................... | 169 | $78,261,924 | 100.00% |
| | === | =========== | ====== |

</TABLE>

        The average current principal balance of the Group 4 Loans was
approximately $463,088.

                                A-21

<Page>

                            Loan Interest Rates

<TABLE>
<CAPTION>

| Range of Loan Interest Rates | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| 4.001% - 4.125%............... | 1 | $   339,076 | 0.43% |
| 4.126% - 4.250%............... | 1 | 466,816 | 0.60 |
| 4.251% - 4.375%............... | 4 | 1,750,388 | 2.24 |
| 4.376% - 4.500%............... | 5 | 2,303,891 | 2.94 |
| 4.501% - 4.625%............... | 2 | 1,061,137 | 1.36 |
| 4.626% - 4.750%............... | 4 | 1,812,412 | 2.32 |
| 4.751% - 4.875%............... | 5 | 2,505,738 | 3.20 |
| 4.876% - 5.000%............... | 11 | 5,146,518 | 6.58 |
| 5.001% - 5.125%............... | 9 | 4,735,347 | 6.05 |
| 5.126% - 5.250%............... | 13 | 5,996,861 | 7.66 |
| 5.251% - 5.375%............... | 11 | 6,081,614 | 7.77 |
| 5.376% - 5.500%............... | 14 | 7,175,092 | 9.17 |
| 5.501% - 5.625%............... | 11 | 5,084,173 | 6.50 |
| 5.626% - 5.750%............... | 12 | 5,038,809 | 6.44 |
| 5.751% - 5.875%............... | 16 | 6,824,296 | 8.72 |
| 5.876% - 6.000%............... | 11 | 5,615,859 | 7.18 |
| 6.001% - 6.125%............... | 5 | 1,916,065 | 2.45 |
| 6.126% - 6.250%............... | 11 | 4,663,820 | 5.96 |
| 6.251% - 6.375%............... | 8 | 2,693,287 | 3.44 |
| 6.376% - 6.500%............... | 5 | 2,085,857 | 2.67 |
| 6.501% - 6.625%............... | 5 | 2,171,304 | 2.77 |
| 6.626% - 6.750%............... | 1 | 312,312 | 0.40 |
| 6.751% - 6.875%............... | 1 | 385,147 | 0.49 |
| 7.126% - 7.250%............... | 1 | 676,066 | 0.86 |
| 7.251% - 7.375%............... | 1 | 933,659 | 1.19 |
| 7.376% - 7.500%............... | 1 | 486,381 | 0.62 |
| | --- | ----------- | ------ |
| Total:...................... | 169 | $78,261,924 | 100.00% |
| | === | =========== | ====== |

</TABLE>

        As of the Cut-Off Date, the weighted average interest rate of the
Group 4 Loans, by Cut-Off Date Pool Balance of the Group 4 Loans, was
approximately 5.601% per annum.

                                A-22

<Page>

Index Type

```
<TABLE>
<CAPTION>
                                          Aggregate Unpaid          % of Cut-Off Date Pool
         Index Type           Number of Loans   Principal Balance    Balance of the Group 4 Loans
------------------------------  ---------------  ------------------  ------------------------------
<S>                            <C>              <C>                 <C>
One-Year CMT.................     32             $13,701,793            17.51%
One-Year Libor...............    137              64,560,131            82.49
                                 ---            ------------           ------
Total:.......................    169             $78,261,924           100.00%
                                 ===            ============           ======
</TABLE>
```

Gross Margin

```
<TABLE>
<CAPTION>
                                          Aggregate Unpaid          % of Cut-Off Date Pool
        Gross Margin          Number of Loans   Principal Balance    Balance of the Group 4 Loans
------------------------------  ---------------  ------------------  ------------------------------
<S>                            <C>              <C>                 <C>
2.126% - 2.250%..............    133             $62,987,826            80.48%
2.626% - 2.750%..............     33              14,068,347            17.98
3.376% - 3.500%..............      1                 327,201             0.42
3.876% - 4.000%..............      1                 561,424             0.72
4.876% - 5.000%..............      1                 317,125             0.41
                                 ---            ------------           ------
Total:.......................    169             $78,261,924           100.00%
                                 ===            ============           ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average gross margin of the Group
4 Loans, by Cut-Off Date Pool Balance of the Group 4 Loans, was approximately
2.368%.

Initial Periodic Rate Cap

```
<TABLE>
<CAPTION>
                                          Aggregate Unpaid          % of Cut-Off Date Pool
   Initial Periodic Rate Cap  Number of Loans   Principal Balance    Balance of the Group 4 Loans
------------------------------  ---------------  ------------------  ------------------------------
<S>                            <C>              <C>                 <C>
2.000%.......................      1            $   387,039             0.49%
5.000%.......................    168              77,874,885            99.51
                                 ---            ------------           ------
Total:.......................    169             $78,261,924           100.00%
                                 ===            ============           ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average initial periodic rate cap
of the 4 Loans, by Cut-Off Date Pool Balance of the Group 4 Loans, was
approximately 4.985%.

Subsequent Periodic Rate Cap

```
<TABLE>
<CAPTION>
                                          Aggregate Unpaid          % of Cut-Off Date Pool
   Subsequent Period Rate Cap Number of Loans   Principal Balance    Balance of the Group 4 Loans
------------------------------  ---------------  ------------------  ------------------------------
<S>                            <C>              <C>                 <C>
2.000%.......................    169             $78,261,924           100.00%
                                 ---            ------------           ------
Total:.......................    169             $78,261,924           100.00%
                                 ===            ============           ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average subsequent periodic rate
cap of the Group 4 Loans, by Cut-Off Date Pool Balance of the Group 4 Loans, was
approximately 2.000%.

                                    A-23

<Page>

Maximum Loan Interest Rates

```
<TABLE>
<CAPTION>
                                            Aggregate Unpaid      % of Cut-Off Date Pool
   Maximum Loan Interest Rates   Number of Loans  Principal Balance  Balance of the Group 4 Loans
   ------------------------------  ---------------  -----------------  ----------------------------
<S>                                <C>              <C>                <C>
9.001% - 9.125%...............      1              $   339,076            0.43%
9.126% - 9.250%...............      1                  466,816            0.60
9.251% - 9.375%...............      4                1,750,388            2.24
9.376% - 9.500%...............      4                1,916,852            2.45
9.501% - 9.625%...............      2                1,061,137            1.36
9.626% - 9.750%...............      4                1,812,412            2.32
9.751% - 9.875%...............      5                2,505,738            3.20
9.876% - 10.000%..............     11                5,146,518            6.58
10.001% - 10.125%.............      9                4,735,347            6.05
10.126% - 10.250%.............     13                5,996,861            7.66
10.251% - 10.375%.............     11                6,081,614            7.77
10.376% - 10.500%.............     14                7,175,092            9.17
10.501% - 10.625%.............     11                5,084,173            6.50
10.626% - 10.750%.............     12                5,038,809            6.44
10.751% - 10.875%.............     16                6,824,296            8.72
10.876% - 11.000%.............     11                5,615,859            7.18
11.001% - 11.125%.............      5                1,916,065            2.45
11.126% - 11.250%.............     11                4,663,820            5.96
11.251% - 11.375%.............      8                2,693,287            3.44
11.376% - 11.500%.............      5                2,085,857            2.67
11.501% - 11.625%.............      5                2,171,304            2.77
11.626% - 11.750%.............      1                  312,312            0.40
11.751% - 11.875%.............      1                  385,147            0.49
12.126% - 12.250%.............      1                  676,066            0.86
12.251% - 12.375%.............      1                  933,659            1.19
12.376% - 12.500%.............      2                  873,420            1.12
                                   ---            ------------          ------
Total:.......................      169            $78,261,924          100.00%
                                   ===            ============          ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average maximum loan interest
rate of the Group 4 Loans, by Cut-Off Date Pool Balance of the Group 4 Loans,
was approximately 10.616%.

                Loan Interest Rate Adjustment Frequency

```
<TABLE>
<CAPTION>
      Loan Interest Rate                       Aggregate Unpaid      % of Cut-Off Date Pool
    Adjustment Frequency      Number of Loans  Principal Balance  Balance of the Group 4 Loans
   ------------------------------  ---------------  -----------------  ----------------------------
<S>                                <C>              <C>                <C>
12...........................      169            $78,261,924          100.00%
                                   ---            ------------          ------
Total:.......................      169            $78,261,924          100.00%
                                   ===            ============          ======
</TABLE>
```

                                A-24


<Page>


                Next Loan Interest Rate Adjustment Date

```
<TABLE>
<CAPTION>
   Next Loan Interest Rate                       Aggregate Unpaid      % of Cut-Off Date Pool
     Adjustment Date          Number of Loans  Principal Balance  Balance of the Group 4 Loans
   ------------------------------  ---------------  -----------------  ----------------------------
<S>                                <C>              <C>                <C>
October 1, 2006 .............      2              $   826,989            1.06%
November 1, 2006 ............      9                3,364,199            4.30
December 1, 2006 ............     14                5,739,100            7.33
February 1, 2007 ............      2                1,025,188            1.31
March 1, 2007 ...............     12                4,932,971            6.30
April 1, 2007 ...............     10                4,341,152            5.55
May 1, 2007 .................      2                  733,837            0.94
June 1, 2007 ................      1                  777,634            0.99
July 1, 2007 ................      3                1,300,457            1.66
August 1, 2007 ..............     65               29,789,630           38.06
September 1, 2007 ...........     41               21,318,734           27.24
June 1, 2008 ................      3                2,096,106            2.68
January 1, 2009 .............      2                  878,550            1.12
February 1, 2009 ............      1                  327,201            0.42
March 1, 2009 ...............      2                  810,177            1.04
                                   ---            ------------          ------
Total: ......................      169            $78,261,924          100.00%
                                   ===            ============          ======
</TABLE>
```

```
</TABLE>
```

Original LTV Ratios

```
<TABLE>
<CAPTION>
```

| Range of Original LTV Ratios | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 50.00% or less ............... | 16 | $ 6,232,892 | 7.96% |
| 50.01% – 55.00% .............. | 7 | 3,336,861 | 4.26 |
| 55.01% – 60.00% .............. | 10 | 4,725,185 | 6.04 |
| 60.01% – 65.00% .............. | 20 | 9,556,104 | 12.21 |
| 65.01% – 70.00% .............. | 20 | 11,164,785 | 14.27 |
| 70.01% – 75.00% .............. | 16 | 7,396,592 | 9.45 |
| 75.01% – 80.00% .............. | 75 | 33,651,460 | 43.00 |
| 80.01% – 85.00% .............. | 2 | 717,281 | 0.92 |
| 85.01% – 90.00% .............. | 2 | 1,136,997 | 1.45 |
| 90.01% – 95.00% .............. | 1 | 343,766 | 0.44 |
| | --- | ------------ | ------ |
| Total: ...................... | 169 | $78,261,924 | 100.00% |
| | === | ============ | ====== |

```
</TABLE>
```

        The weighted average original LTV Ratio of the Group 4 Loans, by
Cut-Off Date Pool Balance of the Group 4 Loans, was approximately 70.17%.


                                A-25



```
<Page>
```


                            Current LTV Ratios

```
<TABLE>
<CAPTION>
```

| Range of Current LTV Ratios* | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 50.00% or less ............... | 17 | $ 6,946,487 | 8.88% |
| 50.01% – 55.00% .............. | 10 | 4,431,148 | 5.66 |
| 55.01% – 60.00% .............. | 14 | 6,228,647 | 7.96 |
| 60.01% – 65.00% .............. | 20 | 9,257,175 | 11.83 |
| 65.01% – 70.00% .............. | 19 | 11,042,903 | 14.11 |
| 70.01% – 75.00% .............. | 20 | 9,378,341 | 11.98 |
| 75.01% – 80.00% .............. | 65 | 29,363,860 | 37.52 |
| 80.01% – 85.00% .............. | 2 | 717,281 | 0.92 |
| 85.01% – 90.00% .............. | 2 | 896,083 | 1.14 |
| | --- | ------------ | ------ |
| Total: ...................... | 169 | $78,261,924 | 100.00% |
| | === | ============ | ====== |

```
</TABLE>
```

        As of the Cut-Off Date, the weighted average current LTV of the Group
4 Loans, by Cut-Off Date Pool Balance of the Group 4 Loans, was approximately
67.37%.

----------
*    Current LTV Ratios generally were determined based on the ratio of the
     unpaid principal amount of the related Loan as of the Cut-Off Date to the
     lesser of (i) the sales price for the related Mortgaged Property or (ii)
     the appraised value of the related Mortgaged Property, in each case, at the
     time of origination of the related Loan.

                            Property Types

```
<TABLE>
<CAPTION>
```

| Property Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Single Family ................ | 153 | $71,438,264 | 91.28% |
| Planned Unit Development ..... | 12 | 4,845,731 | 6.19 |
| Condominium .................. | 4 | 1,977,930 | 2.53 |
| | --- | ------------ | ------ |
| Total: ...................... | 169 | $78,261,924 | 100.00% |
| | === | ============ | ====== |

```
</TABLE>
```

                            Loan Purpose

```
<TABLE>
<CAPTION>
```

| Loan Purpose | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Purchase ..................... | 89 | $43,407,308 | 55.46% |
| Rate & Term Refinance ........ | 61 | 27,033,145 | 34.54 |
| Cash Out Refinance ........... | 19 | 7,821,472 | 9.99 |
| Total: ..................... | 169 | $78,261,924 | 100.00% |

</TABLE>

Occupancy Status

<TABLE>
<CAPTION>

| Loan Purpose | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Primary ..................... | 165 | $76,213,269 | 97.38% |
| Secondary ................... | 4 | 2,048,655 | 2.62 |
| Total: ..................... | 169 | $78,261,924 | 100.00% |

</TABLE>

A-26


<Page>


Original Terms to Maturity

<TABLE>
<CAPTION>

| Original Term to Maturity (Months) | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 301 - 360.................... | 169 | $78,261,924 | 100.00% |
| Total:...................... | 169 | $78,261,924 | 100.00% |

</TABLE>

        As of the Cut-Off Date, the weighted average original term to maturity
of the Group 4 Loans, by Cut-Off Date Pool Balance of the Group 4 Loans, was
approximately 360 months.

Remaining Terms to Maturity

<TABLE>
<CAPTION>

| Remaining Term to Maturity (Months) | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 301 - 360.................... | 169 | $78,261,924 | 100.00% |
| Total:...................... | 169 | $78,261,924 | 100.00% |

</TABLE>

        As of the Cut-Off Date, the weighted average remaining term to
maturity of the Group 4 Loans, by Cut-Off Date Pool Balance of the Group 4
Loans, was approximately 333 months.

Geographic Distribution of Loans

<TABLE>
<CAPTION>

| Geographic Distributions | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| California.................... | 64 | $28,328,180 | 36.20% |
| New Jersey.................... | 14 | 6,690,235 | 8.55 |
| Texas........................ | 13 | 6,381,008 | 8.15 |
| Connecticut.................. | 7 | 5,024,201 | 6.42 |
| New York..................... | 8 | 3,952,890 | 5.05 |
| Georgia...................... | 8 | 3,470,078 | 4.43 |
| Florida...................... | 7 | 3,448,267 | 4.41 |
| Arizona...................... | 5 | 2,402,292 | 3.07 |
| Colorado..................... | 6 | 2,358,125 | 3.01 |
| North Carolina............... | 4 | 1,892,149 | 2.42 |

| | | | |
|---|---|---|---|
| Massachusetts................ | 4 | 1,768,919 | 2.26 |
| Pennsylvania................. | 4 | 1,726,790 | 2.21 |
| Washington................... | 4 | 1,481,191 | 1.89 |
| Indiana...................... | 3 | 1,137,159 | 1.45 |
| Virginia..................... | 2 | 1,108,712 | 1.42 |
| Illinois..................... | 2 | 1,081,787 | 1.38 |
| Tennessee.................... | 3 | 1,002,045 | 1.28 |
| Missouri..................... | 2 | 955,820 | 1.22 |
| Oregon....................... | 2 | 910,719 | 1.16 |
| Kansas....................... | 2 | 782,564 | 1.00 |
| Maryland..................... | 1 | 616,101 | 0.79 |
| South Carolina............... | 1 | 540,601 | 0.69 |
| Rhode Island................. | 1 | 480,979 | 0.61 |
| Minnesota.................... | 1 | 384,016 | 0.49 |
| Michigan..................... | 1 | 337,096 | 0.43 |
| | --- | ----------- | ------ |
| Total:....................... | 169 | $78,261,924 | 100.00% |
| | === | =========== | ====== |

</TABLE>

        No more than approximately 2.28% of the Group 4 Loans, by Cut-Off Date
Pool Balance of the Group 4 Loans, will be secured by properties located in any
one zip code.


                        A-27




        <Page>



                        Documentation Type

<TABLE>
<CAPTION>

| Documentation Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Full......................... | 102 | $47,185,595 | 60.29% |
| Reduced...................... | 22 | 12,656,342 | 16.17 |
| No doc....................... | 27 | 11,074,685 | 14.15 |
| Limited...................... | 9 | 3,743,326 | 4.78 |
| Alternate.................... | 8 | 3,275,099 | 4.18 |
| Stated....................... | 1 | 326,878 | 0.42 |
| | --- | ----------- | ------ |
| Total:....................... | 169 | $78,261,924 | 100.00% |
| | === | =========== | ====== |

</TABLE>

                        Credit Scores

<TABLE>
<CAPTION>

| Credit Scores | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 451 - 500.................... | 1 | $   933,659 | 1.19% |
| 551 - 600.................... | 2 | 695,082 | 0.89 |
| 601 - 650.................... | 7 | 2,739,909 | 3.50 |
| 651 - 700.................... | 35 | 16,083,246 | 20.55 |
| 701 - 750.................... | 50 | 23,387,075 | 29.88 |
| 751 - 800.................... | 67 | 31,658,572 | 40.45 |
| 801 - 850.................... | 7 | 2,764,382 | 3.53 |
| | --- | ----------- | ------ |
| Total:....................... | 169 | $78,261,924 | 100.00% |
| | === | =========== | ====== |

</TABLE>

        As of the Cut-Off Date, the weighted average Credit Score of the
borrowers with a Credit Score for the Group 4 Loans, by Cut-Off Date Pool
Balance of the Group 4 Loans, was approximately 733.

----------
*    Generally all of the credit scores were obtained within 3 months prior to
     the Closing Date.

                        Delinquency Status

<TABLE>
<CAPTION>

| Delinquency Status | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 0............................ | 168 | $77,328,265 | 98.81% |
| 30 - 59...................... | 1 | 933,659 | 1.19 |

```
                          ---       -----------      ------
Total:......................  169     $78,261,924     100.00%
                          ===       ===========      ======
</TABLE>


                              A-28



<Page>


                     GROUP 1 AND GROUP 2 LOANS

                    Original Principal Balances

<TABLE>
<CAPTION>
                                                    % of Cut-Off Date Pool
        Range of Original                           Balance of the Group 1
       Principal Balances    Number of Loans    Aggregate Unpaid    and Group 2 Loans
                                                Principal Balance
-----------------------------  ---------------  -----------------  -----------------------
<S>                            <C>              <C>                <C>
$300,001 - $350,000...........   204            $ 63,919,374        10.55%
$350,001 - $400,000...........   478             167,691,295        27.69
$400,001 - $450,000...........   270             105,851,885        17.48
$450,001 - $500,000...........   179              77,915,460        12.86
$500,001 - $550,000...........   106              51,175,889         8.45
$550,001 - $600,000...........    92              49,534,277         8.18
$600,001 - $650,000...........    67              39,073,764         6.45
$650,001 - $700,000...........    14               8,779,069         1.45
$700,001 - $750,000...........    13               8,248,841         1.36
$750,001 - $800,000...........    15              10,801,729         1.78
$800,001 - $850,000...........     4               2,905,106         0.48
$850,001 - $900,000...........     6               4,844,817         0.80
$900,001 - $950,000...........     5               3,981,944         0.66
$950,001 - $1,000,000.........    11               9,973,993         1.65
$1,000,001 or more............     1               1,003,620         0.17
                               -----          ------------        ------
Total:......................   1,465          $605,701,062        100.00%
                               =====          ============        ======
</TABLE>

        The average original principal balance of the Group 1 and Group 2
Loans was approximately $449,577.

                    Current Principal Balances

<TABLE>
<CAPTION>
                                                    % of Cut-Off Date Pool
        Range of Current                            Balance of the Group 1
       Principal Balances    Number of Loans    Aggregate Unpaid    and Group 2 Loans
                                                Principal Balance
-----------------------------  ---------------  -----------------  -----------------------
<S>                            <C>              <C>                <C>
$25,001 - $50,000.............     1            $     32,188         0.01%
$75,001 - $100,000............     2                 168,503         0.03
$100,001 - $125,000...........     2                 230,452         0.04
$125,001 - $150,000...........     4                 537,473         0.09
$150,001 - $175,000...........     6                 973,852         0.16
$175,001 - $200,000...........     4                 750,670         0.12
$200,001 - $250,000...........    12               2,762,556         0.46
$250,001 - $300,000...........    33               9,370,715         1.55
$300,001 - $350,000...........   373             123,242,040        20.35
$350,001 - $400,000...........   405             150,700,555        24.88
$400,001 - $450,000...........   227              95,849,458        15.82
$450,001 - $500,000...........   143              67,485,008        11.14
$500,001 - $550,000...........    94              49,558,829         8.18
$550,001 - $600,000...........    64              36,549,312         6.03
$600,001 - $650,000...........    42              26,122,556         4.31
$650,001 - $700,000...........    16              10,784,617         1.78
$700,001 - $750,000...........     9               6,506,893         1.07
$750,001 - $800,000...........     9               6,925,677         1.14
$800,001 - $850,000...........     2               1,640,987         0.27
$850,001 - $900,000...........     9               7,889,535         1.30
$900,001 - $950,000...........     3               2,741,578         0.45
$950,001 - $1,000,000.........     4               3,873,988         0.64
$1,000,001 or more............     1               1,003,620         0.17
                               -----          ------------        ------
Total:......................   1,465          $605,701,062        100.00%
                               =====          ============        ======
</TABLE>

        The average current principal balance of the Group 1 and Group 2 Loans
was approximately $413,448.

                              A-29
```

<Page>

Loan Interest Rates

<TABLE>
<CAPTION>

| Range of Loan Interest Rates | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 5.251% – 5.375%............... | 1 | $    591,403 | 0.10% |
| 5.626% – 5.750%............... | 1 | 347,142 | 0.06 |
| 5.751% – 5.875%............... | 5 | 2,072,151 | 0.34 |
| 5.876% – 6.000%............... | 17 | 6,174,577 | 1.02 |
| 6.001% – 6.125%............... | 33 | 13,158,684 | 2.17 |
| 6.126% – 6.250%............... | 86 | 32,733,321 | 5.40 |
| 6.251% – 6.375%............... | 89 | 36,336,559 | 6.00 |
| 6.376% – 6.500%............... | 129 | 53,352,025 | 8.81 |
| 6.501% – 6.625%............... | 104 | 43,822,074 | 7.23 |
| 6.626% – 6.750%............... | 210 | 86,858,305 | 14.34 |
| 6.751% – 6.875%............... | 260 | 112,965,678 | 18.65 |
| 6.876% – 7.000%............... | 130 | 56,029,014 | 9.25 |
| 7.001% – 7.125%............... | 78 | 31,051,784 | 5.13 |
| 7.126% – 7.250%............... | 99 | 40,569,828 | 6.70 |
| 7.251% – 7.375%............... | 61 | 25,649,290 | 4.23 |
| 7.376% – 7.500%............... | 40 | 16,119,422 | 2.66 |
| 7.501% – 7.625%............... | 28 | 10,784,851 | 1.78 |
| 7.626% – 7.750%............... | 17 | 6,126,603 | 1.01 |
| 7.751% – 7.875%............... | 26 | 10,173,109 | 1.68 |
| 7.876% – 8.000%............... | 15 | 5,948,273 | 0.98 |
| 8.001% – 8.125%............... | 5 | 2,391,062 | 0.39 |
| 8.126% – 8.250%............... | 7 | 2,864,648 | 0.47 |
| 8.251% – 8.375%............... | 12 | 4,717,384 | 0.78 |
| 8.376% – 8.500%............... | 3 | 1,119,495 | 0.18 |
| 8.501% – 8.625%............... | 5 | 1,952,699 | 0.32 |
| 8.626% – 8.750%............... | 3 | 1,295,646 | 0.21 |
| 8.751% – 8.875%............... | 1 | 496,036 | 0.08 |
| Total:...................... | 1,465 | $605,701,062 | 100.00% |

</TABLE>

     As of the Cut-Off Date, the weighted average interest rate of the Group 1 and Group 2 Loans, by Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans, was approximately 6.886% per annum.

Original LTV Ratios

<TABLE>
<CAPTION>

| Range of Original LTV Ratios | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 50.00% or less................ | 180 | $ 77,547,023 | 12.80% |
| 50.01% – 55.00%............... | 71 | 30,750,276 | 5.08 |
| 55.01% – 60.00%............... | 103 | 43,625,685 | 7.20 |
| 60.01% – 65.00%............... | 102 | 44,546,596 | 7.35 |
| 65.01% – 70.00%............... | 212 | 91,347,013 | 15.08 |
| 70.01% – 75.00%............... | 191 | 77,965,426 | 12.87 |
| 75.01% – 80.00%............... | 503 | 202,169,595 | 33.38 |
| 80.01% – 85.00%............... | 22 | 8,182,686 | 1.35 |
| 85.01% – 90.00%............... | 69 | 25,781,386 | 4.26 |
| 90.01% – 95.00%............... | 12 | 3,785,377 | 0.62 |
| Total:...................... | 1,465 | $605,701,062 | 100.00% |

</TABLE>

     The weighted average original LTV Ratio of the Group 1 and Group 2 Loans, by Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans, was approximately 68.49%.

A-30

<Page>

Current LTV Ratios

```
<TABLE>
<CAPTION>
```

| Range of Current LTV Ratios* | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 50.00% or less .............. | 273 | $111,194,762 | 18.36% |
| 50.01% - 55.00% ............. | 87 | 37,567,885 | 6.20 |
| 55.01% - 60.00% ............. | 129 | 52,658,277 | 8.69 |
| 60.01% - 65.00% ............. | 154 | 65,002,258 | 10.73 |
| 65.01% - 70.00% ............. | 209 | 90,427,924 | 14.93 |
| 70.01% - 75.00% ............. | 236 | 96,615,608 | 15.95 |
| 75.01% - 80.00% ............. | 294 | 120,749,172 | 19.94 |
| 80.01% - 85.00% ............. | 38 | 14,597,311 | 2.41 |
| 85.01% - 90.00% ............. | 38 | 14,450,799 | 2.39 |
| 90.01% - 95.00% ............. | 7 | 2,437,066 | 0.40 |
| Total: ...................... | 1,465 | $605,701,062 | 100.00% |

</TABLE>

        As of the Cut-Off Date, the weighted average current LTV of the Group
1 and Group 2 Loans, by Cut-Off Date Pool Balance of the Group 1 and Group 2
Loans, was approximately 63.77%.

----------
*       Current LTV Ratios generally were determined based on the ratio of the
        unpaid principal amount of the related Loan as of the Cut-Off Date to the
        lesser of (i) the sales price for the related Mortgaged Property or (ii)
        the appraised value of the related Mortgaged Property, in each case, at the
        time of origination of the related Loan.

Property Types

```
<TABLE>
<CAPTION>
```

| Property Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Single Family ................ | 1,283 | $529,622,078 | 87.44% |
| Planned Unit Development ..... | 93 | 35,765,328 | 5.90 |
| Condominium .................. | 66 | 29,001,367 | 4.79 |
| Two- to Four-Family .......... | 12 | 6,181,819 | 1.02 |
| Coop ......................... | 10 | 4,800,636 | 0.79 |
| Manufactured Housing ......... | 1 | 329,834 | 0.05 |
| Total: ...................... | 1,465 | $605,701,062 | 100.00% |

</TABLE>

Loan Purpose

```
<TABLE>
<CAPTION>
```

| Loan Purpose | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Purchase ..................... | 599 | $245,874,827 | 40.59% |
| Rate & Term Refinance ........ | 569 | 234,863,873 | 38.78 |
| Cash Out Refinance ........... | 294 | 123,748,732 | 20.43 |
| Construction to Perm ......... | 3 | 1,213,630 | 0.20 |
| Total: ...................... | 1,465 | $605,701,062 | 100.00% |

</TABLE>

Occupancy Status

```
<TABLE>
<CAPTION>
```

| Occupancy Status | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Primary ...................... | 1,392 | $574,726,109 | 94.89% |
| Secondary .................... | 63 | 26,865,941 | 4.44 |
| Investor ..................... | 10 | 4,109,012 | 0.68 |
| Total: ...................... | 1,465 | $605,701,062 | 100.00% |

</TABLE>

A-31

<Page>

## Original Terms to Maturity

<TABLE>
<CAPTION>

| Original Term to Maturity (Months) | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 61 - 120 ..................... | 4 | $ 1,580,298 | 0.26% |
| 121 - 180 ..................... | 348 | 137,111,437 | 22.64 |
| 181 - 240 ..................... | 16 | 5,930,402 | 0.98 |
| 241 - 300 ..................... | 2 | 774,973 | 0.13 |
| 301 - 360 ..................... | 1,095 | 460,303,952 | 76.00 |
| Total: ..................... | 1,465 | $605,701,062 | 100.00% |

</TABLE>

As of the Cut-Off Date, the weighted average original term to maturity of the Group 1 and Group 2 Loans, by Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans, was approximately 317 months.

## Remaining Terms to Maturity

<TABLE>
<CAPTION>

| Remaining Term to Maturity (Months) | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 1 - 60 ..................... | 1 | $ 195,311 | 0.03% |
| 61 - 120 ..................... | 30 | 9,896,236 | 1.63 |
| 121 - 180 ..................... | 322 | 128,886,623 | 21.28 |
| 181 - 240 ..................... | 16 | 6,144,355 | 1.01 |
| 241 - 300 ..................... | 236 | 91,483,524 | 15.10 |
| 301 - 360 ..................... | 860 | 369,095,014 | 60.94 |
| Total: ..................... | 1,465 | $605,701,062 | 100.00% |

</TABLE>

As of the Cut-Off Date, the weighted average remaining term to maturity of the Group 1 and Group 2 Loans, by Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans, was approximately 278 months.

A-32

<Page>

## Geographic Distribution of Loans

<TABLE>
<CAPTION>

| Geographic Distribution | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| California.................... | 381 | $156,702,195 | 25.87% |
| New York..................... | 177 | 77,080,318 | 12.73 |
| Texas........................ | 143 | 58,341,960 | 9.63 |
| New Jersey................... | 102 | 40,166,082 | 6.63 |
| Florida...................... | 91 | 39,247,644 | 6.48 |
| Georgia...................... | 63 | 25,776,472 | 4.26 |
| Virginia..................... | 50 | 20,570,908 | 3.40 |
| Pennsylvania................. | 44 | 17,288,579 | 2.85 |
| Maryland..................... | 39 | 14,797,649 | 2.44 |
| Colorado..................... | 35 | 13,507,288 | 2.23 |
| Connecticut.................. | 33 | 13,181,790 | 2.18 |
| North Carolina............... | 31 | 12,823,186 | 2.12 |
| Minnesota.................... | 31 | 12,325,888 | 2.03 |
| Illinois..................... | 23 | 10,084,083 | 1.66 |
| Massachusetts................ | 23 | 9,584,178 | 1.58 |

| | | | |
|---|---|---|---|
| Arizona..................... | 20 | 8,837,781 | 1.46 |
| Washington................. | 18 | 7,120,471 | 1.18 |
| Oregon..................... | 15 | 6,794,762 | 1.12 |
| Michigan................... | 16 | 6,468,268 | 1.07 |
| Nevada..................... | 14 | 6,030,204 | 1.00 |
| Tennessee.................. | 13 | 5,719,209 | 0.94 |
| Ohio....................... | 13 | 5,364,230 | 0.89 |
| Louisiana.................. | 10 | 3,906,918 | 0.65 |
| Alabama.................... | 8 | 3,833,246 | 0.63 |
| District Of Columbia....... | 8 | 3,591,235 | 0.59 |
| Missouri................... | 8 | 3,410,947 | 0.56 |
| Indiana.................... | 10 | 3,181,921 | 0.53 |
| New Mexico................. | 7 | 3,062,338 | 0.51 |
| Utah....................... | 6 | 3,036,360 | 0.50 |
| South Carolina............. | 6 | 1,947,237 | 0.32 |
| Oklahoma................... | 4 | 1,626,893 | 0.27 |
| Kentucky................... | 4 | 1,518,932 | 0.25 |
| New Hampshire.............. | 3 | 1,287,261 | 0.21 |
| Hawaii..................... | 2 | 1,109,655 | 0.18 |
| Delaware................... | 3 | 1,105,756 | 0.18 |
| Arkansas................... | 1 | 835,446 | 0.14 |
| Nebraska................... | 2 | 782,481 | 0.13 |
| West Virginia.............. | 1 | 580,531 | 0.10 |
| Idaho...................... | 1 | 566,915 | 0.09 |
| Wisconsin.................. | 1 | 545,984 | 0.09 |
| Kansas..................... | 1 | 464,076 | 0.08 |
| Maine...................... | 1 | 451,757 | 0.07 |
| Iowa....................... | 1 | 400,186 | 0.07 |
| Mississippi................ | 1 | 322,112 | 0.05 |
| South Dakota............... | 1 | 319,730 | 0.05 |
| | ----- | ------------- | ------ |
| Total:..................... | 1,465 | $605,701,062 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

No more than approximately 0.86% of the Group 1 and Group 2 Loans, by Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans, will be secured by properties located in any one zip code.

A-33

<Page>

Documentation Type

<TABLE>
<CAPTION>

| Documentation Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool and Balance of the Group 1 Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Full....................... | 1,251 | $519,129,534 | 85.71% |
| No Doc..................... | 124 | 47,595,991 | 7.86 |
| Reduced.................... | 47 | 19,361,221 | 3.20 |
| Limited.................... | 19 | 8,902,971 | 1.47 |
| Streamline................. | 15 | 6,965,982 | 1.15 |
| Stated Doc................. | 9 | 3,745,363 | 0.62 |
| | ----- | ------------- | ------ |
| Total:..................... | 1,465 | $605,701,062 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

Credit Scores

<TABLE>
<CAPTION>

| Credit Scores* | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool and Balance of the Group 1 Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 401 - 450.................. | 1 | $   664,813 | 0.11% |
| 451 - 500.................. | 12 | 5,116,330 | 0.84 |
| 501 - 550.................. | 36 | 15,523,745 | 2.56 |
| 551 - 600.................. | 52 | 21,498,841 | 3.55 |
| 601 - 650.................. | 106 | 46,052,045 | 7.60 |
| 651 - 700.................. | 251 | 107,852,940 | 17.81 |
| 701 - 750.................. | 400 | 165,045,946 | 27.25 |
| 751 - 800.................. | 493 | 200,093,287 | 33.03 |
| 801 - 850.................. | 72 | 27,594,678 | 4.56 |
| Not Available.............. | 42 | 16,258,438 | 2.68 |
| | ----- | ------------- | ------ |
| Total:..................... | 1,465 | $605,701,062 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

As of the Cut-Off Date, the weighted average Credit Score of the borrowers with a Credit Score for the Group 1 and Group 2 Loans, by Cut-Off Date Pool Balance of the Group 1 and Group 2 Loans, was approximately 717.

----------
*    Generally all of the credit scores were obtained within 3 months prior to the Closing Date.

Delinquency Status

<TABLE>
<CAPTION>

| Delinquency Status | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool and Balance of the Group 1 Group 2 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 0.......................... | 1,444 | $595,946,851 | 98.39% |
| 30 - 59..................... | 15 | 6,279,310 | 1.04 |
| 60 - 89..................... | 6 | 3,474,901 | 0.57 |
| | ----- | ------------ | ------ |
| Total:..................... | 1,465 | $605,701,062 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

A-34


<Page>


GROUP 3 AND GROUP 4 LOANS

Original Principal Balances

<TABLE>
<CAPTION>

| Range of Original Principal Balances | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| $300,001 - $350,000........... | 30 | $  9,891,541 | 8.20% |
| $350,001 - $400,000........... | 65 | 23,544,189 | 19.53 |
| $400,001 - $450,000........... | 45 | 18,439,182 | 15.29 |
| $450,001 - $500,000........... | 34 | 15,319,016 | 12.70 |
| $500,001 - $550,000........... | 20 | 9,790,635 | 8.12 |
| $550,001 - $600,000........... | 21 | 11,733,693 | 9.73 |
| $600,001 - $650,000........... | 20 | 12,012,667 | 9.96 |
| $650,001 - $700,000........... | 5 | 3,320,748 | 2.75 |
| $700,001 - $750,000........... | 5 | 3,527,924 | 2.93 |
| $750,001 - $800,000........... | 1 | 766,678 | 0.64 |
| $800,001 - $850,000........... | 3 | 2,384,825 | 1.98 |
| $850,001 - $900,000........... | 2 | 1,721,206 | 1.43 |
| $900,001 - $950,000........... | 1 | 917,478 | 0.76 |
| $950,001 - $1,000,000......... | 5 | 4,519,326 | 3.75 |
| $1,000,001 or more............ | 2 | 2,695,421 | 2.24 |
| | --- | ------------ | ------ |
| Total:..................... | 259 | $120,584,528 | 100.00% |
| | === | ============ | ====== |

</TABLE>

The average original principal balance of the Group 3 and Group 4 Loans was approximately $488,064.

Current Principal Balances

<TABLE>
<CAPTION>

| Range of Current Principal Balances | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| $25,001 - $50,000............ | 1 | $   49,091 | 0.04% |
| $175,001 - $200,000........... | 1 | 196,182 | 0.16 |
| $250,001 - $300,000........... | 1 | 290,701 | 0.24 |
| $300,001 - $350,000........... | 46 | 15,327,414 | 12.71 |
| $350,001 - $400,000........... | 60 | 22,381,850 | 18.56 |
| $400,001 - $450,000........... | 43 | 18,193,438 | 15.09 |
| $450,001 - $500,000........... | 33 | 15,656,381 | 12.98 |
| $500,001 - $550,000........... | 16 | 8,417,577 | 6.98 |
| $550,001 - $600,000........... | 19 | 10,864,554 | 9.01 |
| $600,001 - $650,000........... | 16 | 9,986,589 | 8.28 |
| $650,001 - $700,000........... | 6 | 4,067,842 | 3.37 |

```
$700,001 - $750,000..........        4        2,861,571        2.37
$750,001 - $800,000..........        2        1,544,312        1.28
$800,001 - $850,000..........        2        1,607,192        1.33
$850,001 - $900,000..........        2        1,721,206        1.43
$900,001 - $950,000..........        3        2,790,832        2.31
$950,001 - $1,000,000........        2        1,932,376        1.60
$1,000,001 or more...........        2        2,695,421        2.24
                                   ---     ------------      ------
Total:......................       259      $120,584,528     100.00%
                                   ===     ============      ======
```

</TABLE>

The average current principal balance of the Group 3 and Group 4 Loans
was approximately $465,577.

A-35

<Page>

Loan Interest Rates

<TABLE>
<CAPTION>

| Range of Loan Interest Rates | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 3.876% - 4.000%............... | 4 | $ 1,826,739 | 1.51% |
| 4.001% - 4.125%............... | 3 | 1,397,281 | 1.16 |
| 4.126% - 4.250%............... | 9 | 4,011,725 | 3.33 |
| 4.251% - 4.375%............... | 11 | 5,218,536 | 4.33 |
| 4.376% - 4.500%............... | 9 | 4,188,386 | 3.47 |
| 4.501% - 4.625%............... | 6 | 2,846,401 | 2.36 |
| 4.626% - 4.750%............... | 12 | 5,338,443 | 4.43 |
| 4.751% - 4.875%............... | 7 | 3,767,510 | 3.12 |
| 4.876% - 5.000%............... | 14 | 6,719,741 | 5.57 |
| 5.001% - 5.125%............... | 14 | 6,749,356 | 5.60 |
| 5.126% - 5.250%............... | 16 | 7,287,485 | 6.04 |
| 5.251% - 5.375%............... | 16 | 8,693,325 | 7.21 |
| 5.376% - 5.500%............... | 22 | 11,997,681 | 9.95 |
| 5.501% - 5.625%............... | 20 | 8,958,862 | 7.43 |
| 5.626% - 5.750%............... | 21 | 8,923,323 | 7.40 |
| 5.751% - 5.875%............... | 21 | 9,079,346 | 7.53 |
| 5.876% - 6.000%............... | 12 | 6,048,937 | 5.02 |
| 6.001% - 6.125%............... | 5 | 1,916,065 | 1.59 |
| 6.126% - 6.250%............... | 12 | 5,124,226 | 4.25 |
| 6.251% - 6.375%............... | 9 | 3,032,774 | 2.52 |
| 6.376% - 6.500%............... | 6 | 2,493,516 | 2.07 |
| 6.501% - 6.625%............... | 5 | 2,171,304 | 1.80 |
| 6.626% - 6.750%............... | 1 | 312,312 | 0.26 |
| 6.751% - 6.875%............... | 1 | 385,147 | 0.32 |
| 7.126% - 7.250%............... | 1 | 676,066 | 0.56 |
| 7.251% - 7.375%............... | 1 | 933,659 | 0.77 |
| 7.376% - 7.500%............... | 1 | 486,381 | 0.40 |
| Total:...................... | 259 | $120,584,528 | 100.00% |

</TABLE>

As of the Cut-Off Date, the weighted average interest rate of the
Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 3 and Group
4 Loans, was approximately 5.416% per annum.

Index Type

<TABLE>
<CAPTION>

| Index Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| One-Year CMT................. | 41 | $ 17,751,617 | 14.72% |
| One-Year Libor............... | 218 | 102,832,911 | 85.28 |
| Total:...................... | 259 | $120,584,528 | 100.00% |

</TABLE>

A-36

\<Page\>

## Gross Margin

\<TABLE\>
\<CAPTION\>

| Gross Margin | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| \<S\> | \<C\> | \<C\> | \<C\> |
| 1.876% - 2.000%............... | 2 | $   902,903 | 0.75% |
| 2.126% - 2.250%............... | 212 | 100,357,703 | 83.23 |
| 2.626% - 2.750%............... | 42 | 18,118,171 | 15.03 |
| 3.376% - 3.500%............... | 1 | 327,201 | 0.27 |
| 3.876% - 4.000%............... | 1 | 561,424 | 0.47 |
| 4.876% - 5.000%............... | 1 | 317,125 | 0.26 |
| Total: ..................... | 259 | $120,584,528 | 100.00% |

\</TABLE\>

As of the Cut-Off Date, the weighted average gross margin of the Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans, was approximately 2.341%.

## Initial Periodic Rate Cap

\<TABLE\>
\<CAPTION\>

| Initial Periodic Rate Cap | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| \<S\> | \<C\> | \<C\> | \<C\> |
| 2.000%....................... | 91 | $ 42,709,643 | 35.42% |
| 5.000%....................... | 168 | 77,874,885 | 64.58 |
| Total: ..................... | 259 | $120,584,528 | 100.00% |

\</TABLE\>

As of the Cut-Off Date, the weighted average initial periodic rate cap of the Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans, was approximately 3.937%.

## Subsequent Periodic Rate Cap

\<TABLE\>
\<CAPTION\>

| Subsequent Period Rate Cap | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| \<S\> | \<C\> | \<C\> | \<C\> |
| 2.000%....................... | 259 | $120,584,528 | 100.00% |
| Total: ..................... | 259 | $120,584,528 | 100.00% |

\</TABLE\>

As of the Cut-Off Date, the weighted average subsequent periodic rate cap of the Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans, was approximately 2.000%.

A-37

\<Page\>

## Maximum Loan Interest Rates

\<TABLE\>
\<CAPTION\>

| Maximum Loan Interest Rates | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| \<S\> | \<C\> | \<C\> | \<C\> |
| 9.001% - 9.125%............... | 1 | $   339,076 | 0.28% |
| 9.126% - 9.250%............... | 1 | 466,816 | 0.39 |
| 9.251% - 9.375%............... | 4 | 1,750,388 | 1.45 |

```
9.376% -  9.500%..............        4        1,916,852       1.59
9.501% -  9.625%..............        2        1,061,137       0.88
9.626% -  9.750%..............        4        1,812,412       1.50
9.751% -  9.875%..............        5        2,505,738       2.08
9.876% - 10.000%..............       15        6,973,257       5.78
10.001% - 10.125%..............       11        5,793,552       4.80
10.126% - 10.250%..............       21        9,541,770       7.91
10.251% - 10.375%..............       18        9,549,763       7.92
10.376% - 10.500%..............       18        9,059,586       7.51
10.501% - 10.625%..............       15        6,869,437       5.70
10.626% - 10.750%..............       20        8,564,840       7.10
10.751% - 10.875%..............       18        8,086,068       6.71
10.876% - 11.000%..............       14        7,189,082       5.96
11.001% - 11.125%..............       10        3,930,074       3.26
11.126% - 11.250%..............       14        5,954,444       4.94
11.251% - 11.375%..............       13        5,304,997       4.40
11.376% - 11.500%..............       13        6,908,447       5.73
11.501% - 11.625%..............       14        6,045,993       5.01
11.626% - 11.750%..............       10        4,196,827       3.48
11.751% - 11.875%..............        6        2,640,197       2.19
11.876% - 12.000%..............        1          433,078       0.36
12.126% - 12.250%..............        2        1,136,473       0.94
12.251% - 12.375%..............        2        1,273,147       1.06
12.376% - 12.500%..............        3        1,281,078       1.06
                                    ---     ------------     -------
Total: ......................      259     $120,584,528     100.00%
                                    ===     ============     ======
```

</TABLE>

        As of the Cut-Off Date, the weighted average maximum loan interest
rate of the Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group
3 and Group 4 Loans, was approximately 10.776%.

                               A-38


<Page>


                    Loan Interest Rate Adjustment Frequency

<TABLE>
<CAPTION>
                                                     % of Cut-Off Date Pool
   Loan Interest Rate Adjustment               Balance of the Group 3 and
        Frequency (months)      Number of Loans  Aggregate Unpaid      Group 4 Loans
                                                 Principal Balance
   -----------------------------  ---------------  ------------------  --------------------------
<S>                               <C>              <C>                 <C>
12...........................      259            $120,584,528         100.00%
                                   ---            ------------         ------
Total: ......................      259            $120,584,528         100.00%
                                   ===            ============         ======

</TABLE>

                   Next Loan Interest Rate Adjustment Date

<TABLE>
<CAPTION>
                                                     % of Cut-Off Date Pool
      Next Loan Interest Rate                  Balance of the Group 3 and
         Adjustment Date        Number of Loans  Aggregate Unpaid      Group 4 Loans
                                                 Principal Balance
   -----------------------------  ---------------  ------------------  --------------------------
<S>                               <C>              <C>                 <C>
February 1, 2005..............        3          $  1,365,534          1.13%
March 1, 2005.................       10            4,514,658           3.74
April 1, 2005.................        3            1,132,204           0.94
June 1, 2005..................        4            1,788,029           1.48
July 1, 2005..................       18            9,503,825           7.88
August 1, 2005................       42           19,570,963          16.23
September 1, 2005.............       10            4,447,391           3.69
October 1, 2006...............        2              826,989           0.69
November 1, 2006..............        9            3,364,199           2.79
December 1, 2006..............       14            5,739,100           4.76
February 1, 2007..............        2            1,025,188           0.85
March 1, 2007.................       12            4,932,971           4.09
April 1, 2007.................       10            4,341,152           3.60
May 1, 2007...................        2              733,837           0.61
June 1, 2007..................        1              777,634           0.64
July 1, 2007..................        3            1,300,457           1.08
August 1, 2007................       65           29,789,630          24.70
September 1, 2007.............       41           21,318,734          17.68
June 1, 2008..................        3            2,096,106           1.74
January 1, 2009...............        2              878,550           0.73
February 1, 2009..............        1              327,201           0.27
March 1, 2009.................        2              810,177           0.67
                                    ---          ------------         ------
Total: ......................      259          $120,584,528         100.00%
```

```
                        ===      ============      ======
</TABLE>
```

Original LTV Ratios

```
<TABLE>
<CAPTION>
                                                        % of Cut-Off Date Pool
                                            Aggregate Unpaid   Balance of the Group 3 and
  Range of Original LTV Ratios   Number of Loans   Principal Balance      Group 4 Loans
  ---------------------------    ---------------   ----------------   --------------------------
<S>                                  <C>             <C>                    <C>
50.00% or less...............         25          $ 11,119,354              9.22%
50.01% - 55.00%..............         13            7,164,305               5.94
55.01% - 60.00%..............         16            7,773,471               6.45
60.01% - 65.00%..............         26           12,454,513              10.33
65.01% - 70.00%..............         35           17,831,322              14.79
70.01% - 75.00%..............         26           11,765,635               9.76
75.01% - 80.00%..............        108           48,438,172              40.17
80.01% - 85.00%..............          5            1,817,271               1.51
85.01% - 90.00%..............          3            1,467,334               1.22
90.01% - 95.00%..............          2              753,151               0.62
                                     ---          ------------            ------
Total: ......................        259         $120,584,528             100.00%
                                     ===          ============            ======
</TABLE>
```

         The weighted average original LTV Ratio of the Group 3 and Group 4
Loans, by Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans, was
approximately 69.15%.


                          A-39



<Page>


                          Current LTV Ratios

```
<TABLE>
<CAPTION>
                                                        % of Cut-Off Date Pool
                                            Aggregate Unpaid   Balance of the Group 3 and
  Range of Current LTV Ratios*   Number of Loans   Principal Balance      Group 4 Loans
  ---------------------------    ---------------   ----------------   --------------------------
<S>                                  <C>             <C>                    <C>
50.00% or less...............         30          $ 14,146,717             11.73%
50.01% - 55.00%..............         17            8,353,300               6.93
55.01% - 60.00%..............         19            8,517,887               7.06
60.01% - 65.00%..............         27           12,547,625              10.41
65.01% - 70.00%..............         32           16,770,890              13.91
70.01% - 75.00%..............         27           12,644,462              10.49
75.01% - 80.00%..............         99           44,510,747              36.91
80.01% - 85.00%..............          4            1,457,097               1.21
85.01% - 90.00%..............          3            1,226,419               1.02
90.01% - 95.00%..............          1              409,385               0.34
                                     ---          ------------            ------
Total: ......................        259         $120,584,528             100.00%
                                     ===          ============            ======
</TABLE>
```

         As of the Cut-Off Date, the weighted average current LTV of the Group 3
and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 3 and Group 4
Loans, was approximately 66.44%.

----------
*    Current LTV Ratios generally were determined based on the ratio of the
     unpaid principal amount of the related Loan as of the Cut-Off Date to the
     lesser of (i) the sales price for the related Mortgaged Property or (ii)
     the appraised value of the related Mortgaged Property, in each case, at the
     time of origination of the related Loan.

                          Property Types

```
<TABLE>
<CAPTION>
                                                        % of Cut-Off Date Pool
                                            Aggregate Unpaid   Balance of the Group 3 and
       Property Type            Number of Loans   Principal Balance      Group 4 Loans
  ---------------------------    ---------------   ----------------   --------------------------
<S>                                  <C>             <C>                    <C>
Single Family................        237         $110,883,554             91.96%
Planned Unit Development......        14            5,778,186               4.79
Condominium..................          7            3,388,345               2.81
Two-to-Four Family...........          1              534,443               0.44
                                     ---          ------------            ------
Total: ......................        259         $120,584,528             100.00%
                                     ===          ------------            ------
```

```
                        ===        ============        ======
</TABLE>
```

Loan Purpose

```
<TABLE>
<CAPTION>
                                                     % of Cut-Off Date Pool
                                              Aggregate Unpaid   Balance of the Group 3 and
      Loan Purpose           Number of Loans  Principal Balance        Group 4 Loans
-------------------------    ---------------   ----------------   -------------------------
<S>                          <C>               <C>                <C>
Purchase.....................   132            $ 63,178,722            52.39%
Rate & Term Refinance.........   91              41,600,077            34.5
Cash Out Refinance............   36              15,805,730            13.11
                               ---             ------------           ------
Total: ......................   259            $120,584,528           100.00%
                               ===             ============           ======
</TABLE>
```

Occupancy Status

```
<TABLE>
<CAPTION>
                                                     % of Cut-Off Date Pool
                                              Aggregate Unpaid   Balance of the Group 3 and
    Occupancy Status         Number of Loans  Principal Balance        Group 4 Loans
-------------------------    ---------------   ----------------   -------------------------
<S>                          <C>               <C>                <C>
Primary.......................   255           $118,535,873            98.30%
Secondary.....................    4               2,048,655             1.70
                               ---             ------------           -----
Total: ......................   259           $120,584,528           100.00%
                               ===             ============           ======
</TABLE>
```

A-40

<Page>

Original Terms to Maturity

```
<TABLE>
<CAPTION>
                                                     % of Cut-Off Date Pool
      Original Term                           Aggregate Unpaid   Balance of the Group 3
   to Maturity (Months)      Number of Loans  Principal Balance    and Group 4 Loans
-------------------------    ---------------   ----------------   ----------------------
<S>                          <C>               <C>                <C>
301 - 360....................   259            120,584,528            100.00%
                               ---             ------------           ------
Total:.......................   259            $120,584,528           100.00%
                               ===             ============           ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average original term to maturity
of the Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 3
and Group 4 Loans, was approximately 360 months

Remaining Terms to Maturity

```
<TABLE>
<CAPTION>
                                                     % of Cut-Off Date Pool
      Remaining Term                          Aggregate Unpaid   Balance of the Group 3
   to Maturity (Months)      Number of Loans  Principal Balance    and Group 4 Loans
-------------------------    ---------------   ----------------   ----------------------
<S>                          <C>               <C>                <C>
301 - 360....................   259            $120,584,528           100.00%
                               ---             ------------           ------
Total:.......................   259            $120,584,528           100.00%
                               ===             ============           ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average remaining term to
maturity of the Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the
Group 3 and Group 4 Loans, was approximately 333 months.

A-41

<Page>

## Geographic Distribution of Loans

<TABLE>
<CAPTION>

| Geographic Distribution | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| California...................... | 102 | $ 46,189,981 | 38.31% |
| Texas.......................... | 21 | 10,394,017 | 8.62 |
| New Jersey..................... | 14 | 6,690,235 | 5.55 |
| Georgia........................ | 12 | 5,643,208 | 4.68 |
| Connecticut.................... | 8 | 5,501,118 | 4.56 |
| New York....................... | 10 | 4,771,107 | 3.96 |
| Florida........................ | 9 | 4,770,517 | 3.96 |
| Massachusetts.................. | 9 | 4,726,306 | 3.92 |
| Colorado....................... | 9 | 3,799,698 | 3.15 |
| North Carolina................. | 7 | 3,170,085 | 2.63 |
| Illinois....................... | 6 | 2,867,568 | 2.38 |
| Pennsylvania................... | 6 | 2,493,578 | 2.07 |
| Arizona........................ | 5 | 2,402,292 | 1.99 |
| Virginia....................... | 4 | 1,967,761 | 1.63 |
| Michigan....................... | 5 | 1,833,886 | 1.52 |
| Washington..................... | 5 | 1,811,527 | 1.50 |
| Indiana........................ | 4 | 1,576,449 | 1.31 |
| Maryland....................... | 3 | 1,388,018 | 1.15 |
| Missouri....................... | 3 | 1,375,704 | 1.14 |
| South Carolina................. | 2 | 1,010,426 | 0.84 |
| Tennessee...................... | 3 | 1,002,045 | 0.83 |
| Oregon......................... | 2 | 910,719 | 0.76 |
| Rhode Island................... | 2 | 840,961 | 0.70 |
| Kansas......................... | 2 | 782,564 | 0.65 |
| Minnesota...................... | 2 | 723,503 | 0.60 |
| Alabama........................ | 1 | 632,854 | 0.52 |
| Ohio........................... | 1 | 572,041 | 0.47 |
| Kentucky....................... | 1 | 407,302 | 0.34 |
| Wisconsin...................... | 1 | 329,058 | 0.27 |
| | --- | ------------- | ------ |
| Total:........................ | 259 | $120,584,528 | 100.00% |
| | === | ============ | ====== |

</TABLE>

No more than approximately 1.48% of the Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans, will be secured by properties located in any one zip code.

## Documentation Type

<TABLE>
<CAPTION>

| Documentation Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Full........................... | 147 | $ 68,580,253 | 56.87% |
| Reduced........................ | 37 | 20,149,513 | 16.71 |
| No Doc......................... | 48 | 20,099,661 | 16.67 |
| Limited........................ | 17 | 7,720,046 | 6.40 |
| Alternate...................... | 9 | 3,708,177 | 3.08 |
| Stated Doc..................... | 1 | 326,878 | 0.27 |
| | --- | ------------- | ------ |
| Total:........................ | 259 | $120,584,528 | 100.00% |
| | === | ============ | ====== |

</TABLE>

A-42

<Page>

## Credit Scores

<TABLE>
<CAPTION>

| Credit Scores* | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 451 - 500..................... | 1 | $ 933,659 | 0.77% |

| | | | |
|---|---|---|---|
| 501 – 550...................... | 1 | 409,385 | 0.34 |
| 551 – 600...................... | 3 | 1,164,906 | 0.97 |
| 601 – 650...................... | 9 | 3,676,564 | 3.05 |
| 651 – 700...................... | 53 | 24,992,238 | 20.73 |
| 701 – 750...................... | 75 | 35,126,619 | 29.13 |
| 751 – 800...................... | 106 | 49,703,642 | 41.22 |
| 801 – 850...................... | 10 | 4,114,886 | 3.41 |
| Not Available................. | 1 | 462,631 | 0.38 |
| | --- | ------------- | ------ |
| Total:........................ | 259 | $120,584,528 | 100.00% |
| | === | ============= | ====== |

</TABLE>

        As of the Cut-Off Date, the weighted average Credit Score of the
borrowers with a Credit Score for the Group 3 and Group 4 Loans, by Cut-Off Date
Pool Balance of the Group 3 and Group 4 Loans, was approximately 733.

----------
*    Generally all of the credit scores were obtained within 3 months prior to
     the Closing Date.

                        Delinquency Status

<TABLE>
<CAPTION>

| Delinquency Status | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 0........................... | 257 | $119,181,045 | 98.84% |
| 30 – 59..................... | 1 | 933,659 | 0.77 |
| 60 – 89..................... | 1 | 469,824 | 0.39 |
| | --- | ------------- | ------ |
| Total:........................ | 259 | $120,584,528 | 100.00% |
| | === | ============= | ====== |

</TABLE>

                            A-43

<Page>

            GROUP 2, GROUP 3 AND GROUP 4 LOANS IN THE AGGREGATE

                    Original Principal Balances

<TABLE>
<CAPTION>

| Range of Original Principal Balances | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| $300,001 – $350,000........... | 195 | $ 63,305,542 | 10.77% |
| $350,001 – $400,000........... | 447 | 160,328,856 | 27.29 |
| $400,001 – $450,000........... | 250 | 101,418,569 | 17.26 |
| $450,001 – $500,000........... | 161 | 73,139,315 | 12.45 |
| $500,001 – $550,000........... | 97 | 48,178,415 | 8.20 |
| $550,001 – $600,000........... | 94 | 51,924,507 | 8.84 |
| $600,001 – $650,000........... | 64 | 38,722,381 | 6.59 |
| $650,001 – $700,000........... | 15 | 9,745,698 | 1.66 |
| $700,001 – $750,000........... | 11 | 7,782,999 | 1.32 |
| $750,001 – $800,000........... | 11 | 8,137,114 | 1.38 |
| $800,001 – $850,000........... | 4 | 3,152,760 | 0.54 |
| $850,001 – $900,000........... | 6 | 5,119,309 | 0.87 |
| $900,001 – $1,000,000......... | 4 | 3,614,866 | 0.62 |
| $950,001 – $1,000,000......... | 10 | 9,324,483 | 1.59 |
| $1,000,001 or more............ | 3 | 3,699,041 | 0.63 |
| | ----- | ------------- | ------ |
| Total:........................ | 1,372 | $587,593,856 | 100.00% |
| | ===== | ============= | ====== |

</TABLE>

        The average original principal balance of the Group 2, Group 3 and
Group 4 Loans was approximately $450,592.

                            A-44

<Page>

Current Principal Balances

```
<TABLE>
<CAPTION>
```

| Range of Current Principal Balances | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| $25,001 - $50,000............ | 1 | $ 49,091 | 0.01% |
| $125,001 - $150,000........... | 1 | 136,483 | 0.02 |
| $150,001 - $175,000........... | 3 | 496,796 | 0.08 |
| $175,001 - $200,000........... | 1 | 196,182 | 0.03 |
| $200,001 - $250,000........... | 5 | 1,191,525 | 0.20 |
| $250,001 - $300,000........... | 12 | 3,435,997 | 0.58 |
| $300,001 - $350,000........... | 311 | 103,521,899 | 17.62 |
| $350,001 - $400,000........... | 392 | 145,868,203 | 24.82 |
| $400,001 - $450,000........... | 223 | 94,014,467 | 16.00 |
| $450,001 - $500,000........... | 154 | 72,814,429 | 12.39 |
| $500,001 - $550,000........... | 92 | 48,447,150 | 8.25 |
| $550,001 - $600,000........... | 67 | 38,240,902 | 6.51 |
| $600,001 - $650,000........... | 54 | 33,593,274 | 5.72 |
| $650,001 - $700,000........... | 13 | 8,818,764 | 1.50 |
| $700,001 - $750,000........... | 11 | 7,945,575 | 1.35 |
| $750,001 - $800,000........... | 8 | 6,171,822 | 1.05 |
| $800,001 - $850,000........... | 3 | 2,412,732 | 0.41 |
| $850,001 - $900,000........... | 7 | 6,108,779 | 1.04 |
| $900,001 - $950,000........... | 5 | 4,624,379 | 0.79 |
| $950,001 - $1,000,000......... | 6 | 5,806,364 | 0.99 |
| $1,000,001 or more............ | 3 | 3,699,041 | 0.63 |
| | ------ | ------------ | ------ |
| Total:...................... | 1,372 | $587,593,856 | 100.00% |
| | ====== | ============ | ====== |

```
</TABLE>
```

The average current principal balance of the Group 2, Group 3 and Group 4 Loans was approximately $428,275.

A-45

<Page>

Loan Interest Rates

```
<TABLE>
<CAPTION>
```

| Range of Loan Interest Rates | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 3.876% - 4.000%.............. | 4 | $ 1,826,739 | 0.31% |
| 4.001% - 4.125%.............. | 3 | 1,397,281 | 0.24 |
| 4.126% - 4.250%.............. | 9 | 4,011,725 | 0.68 |
| 4.251% - 4.375%.............. | 11 | 5,218,536 | 0.89 |
| 4.376% - 4.500%.............. | 9 | 4,188,386 | 0.71 |
| 4.501% - 4.625%.............. | 6 | 2,846,401 | 0.48 |
| 4.626% - 4.750%.............. | 12 | 5,338,443 | 0.91 |
| 4.751% - 4.875%.............. | 7 | 3,767,510 | 0.64 |
| 4.876% - 5.000%.............. | 14 | 6,719,741 | 1.14 |
| 5.001% - 5.125%.............. | 14 | 6,749,356 | 1.15 |
| 5.126% - 5.250%.............. | 16 | 7,287,485 | 1.24 |
| 5.251% - 5.375%.............. | 17 | 9,284,728 | 1.58 |
| 5.376% - 5.500%.............. | 22 | 11,997,681 | 2.04 |
| 5.501% - 5.625%.............. | 20 | 8,958,862 | 1.52 |
| 5.626% - 5.750%.............. | 21 | 8,923,323 | 1.52 |
| 5.751% - 5.875%.............. | 24 | 10,182,733 | 1.73 |
| 5.876% - 6.000%.............. | 18 | 8,236,425 | 1.40 |
| 6.001% - 6.125%.............. | 16 | 6,741,610 | 1.15 |
| 6.126% - 6.250%.............. | 36 | 14,655,740 | 2.49 |
| 6.251% - 6.375%.............. | 39 | 15,799,048 | 2.69 |
| 6.376% - 6.500%.............. | 64 | 26,576,529 | 4.52 |
| 6.501% - 6.625%.............. | 73 | 31,662,122 | 5.39 |
| 6.626% - 6.750%.............. | 178 | 73,945,526 | 12.58 |
| 6.751% - 6.875%.............. | 234 | 102,055,919 | 17.37 |
| 6.876% - 7.000%.............. | 123 | 52,953,119 | 9.01 |
| 7.001% - 7.125%.............. | 73 | 29,502,229 | 5.02 |
| 7.126% - 7.250%.............. | 95 | 38,978,885 | 6.63 |
| 7.251% - 7.375%.............. | 56 | 24,822,613 | 4.22 |
| 7.376% - 7.500%.............. | 41 | 16,605,803 | 2.83 |
| 7.501% - 7.625%.............. | 27 | 10,501,137 | 1.79 |
| 7.626% - 7.750%.............. | 16 | 5,791,943 | 0.99 |
| 7.751% - 7.875%.............. | 25 | 9,809,652 | 1.67 |
| 7.876% - 8.000%.............. | 14 | 5,780,986 | 0.98 |

```
8.001% - 8.125%...............        5        2,391,062        0.41
8.126% - 8.250%...............        7        2,864,648        0.49
8.251% - 8.375%...............       12        4,717,384        0.80
8.376% - 8.500%...............        2          758,165        0.13
8.501% - 8.625%...............        5        1,952,699        0.33
8.626% - 8.750%...............        3        1,295,646        0.22
8.751% - 8.875%...............        1          496,036        0.08
                                  ------    ------------      ------
Total:.......................     1,372     $587,593,856      100.00%
                                  ======    ============      ======
```
</TABLE>

As of the Cut-Off Date, the weighted average interest rate of the Group 2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans, was approximately 6.671% per annum.

A-46

<Page>

### Index Type

<TABLE>
<CAPTION>

| Index Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Fixed Rate.................... | 1,113 | $467,009,328 | 79.48% |
| One-Year CMT................ | 41 | 17,751,617 | 3.02 |
| One-Year Libor.............. | 218 | 102,832,911 | 17.50 |
| | ----- | ------------ | ------ |
| Total:...................... | 1,372 | $587,593,856 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

### Gross Margin

<TABLE>
<CAPTION>

| Gross Margin | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Fixed Rate.................... | 1,113 | $467,009,328 | 79.48% |
| 1.876% - 2.000%.............. | 2 | 902,903 | 0.15 |
| 2.126% - 2.250%.............. | 212 | 100,357,703 | 17.08 |
| 2.626% - 2.750%.............. | 42 | 18,118,171 | 3.08 |
| 3.376% - 3.500%.............. | 1 | 327,201 | 0.06 |
| 3.876% - 4.000%.............. | 1 | 561,424 | 0.10 |
| 4.876% - 5.000%.............. | 1 | 317,125 | 0.05 |
| | ----- | ------------ | ------ |
| Total:...................... | 1,372 | $587,593,856 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

As of the Cut-Off Date, the weighted average gross margin of the Group 2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans, was approximately 2.341% per annum.

### Initial Periodic Rate Cap

<TABLE>
<CAPTION>

| Initial Periodic Rate Cap | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Fixed Rate.................... | 1,113 | $467,009,328 | 79.48% |
| 2.000%....................... | 91 | 42,709,643 | 7.27 |
| 5.000%................... | 168 | 77,874,885 | 13.25 |
| | ----- | ------------ | ------ |
| Total:...................... | 1,372 | $587,593,856 | 100.00% |
| | ===== | ============ | ====== |

</TABLE>

As of the Cut-Off Date, the weighted average initial periodic rate cap of the Group 2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans, was approximately 3.937% per annum.

### Subsequent Periodic Rate Cap

```
<TABLE>
<CAPTION>
                                                             % of Cut-Off Date Pool
                                               Aggregate Unpaid    Balance of the Group 2,
      Subsequent Period Rate Cap   Number of Loans  Principal Balance  Group 3 and Group 4 Loans
      ----------------------------  ---------------  -----------------  -------------------------
<S>                                <C>              <C>               <C>
Fixed Rate....................     1,113           $467,009,328      79.48%
2.000%........................       259            120,584,528      20.52
                                   -----           ------------      ------
Total:........................     1,372           $587,593,856      100.00%
                                   =====           ============      ======
</TABLE>
```

        As of the Cut-Off Date, the subsequent periodic rate cap of the Group
2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 2, Group
3 and Group 4 Loans, was approximately 2.000% per annum.


                                    A-47




<Page>



                            Maximum Loan Interest Rates

```
<TABLE>
<CAPTION>
                                                             % of Cut-Off Date Pool
                                               Aggregate Unpaid    Balance of the Group 2,
      Maximum Loan Interest Rates   Number of Loans  Principal Balance  Group 3 and Group 4 Loans
      ----------------------------  ---------------  -----------------  -------------------------
<S>                                <C>              <C>               <C>
Fixed Rate....................     1,113           $467,009,328      79.48%
  9.001% -   9.125%..........          1               339,076       0.06
  9.126% -   9.250%..........          1               466,816       0.08
  9.251% -   9.375%..........          4             1,750,388       0.30
  9.376% -   9.500%..........          4             1,916,852       0.33
  9.501% -   9.625%..........          2             1,061,137       0.18
  9.626% -   9.750%..........          4             1,812,412       0.31
  9.751% -   9.875%..........          5             2,505,738       0.43
  9.876% -  10.000%..........         15             6,973,257       1.19
 10.001% -  10.125%..........         11             5,793,552       0.99
 10.126% -  10.250%..........         21             9,541,770       1.62
 10.251% -  10.375%..........         18             9,549,763       1.63
 10.376% -  10.500%..........         18             9,059,586       1.54
 10.501% -  10.625%..........         15             6,869,437       1.17
 10.626% -  10.750%..........         20             8,564,840       1.46
 10.751% -  10.875%..........         18             8,086,068       1.38
 10.876% -  11.000%..........         14             7,189,082       1.22
 11.001% -  11.125%..........         10             3,930,074       0.67
 11.126% -  11.250%..........         14             5,954,444       1.01
 11.251% -  11.375%..........         13             5,304,997       0.90
 11.376% -  11.500%..........         13             6,908,447       1.18
 11.501% -  11.625%..........         14             6,045,993       1.03
 11.626% -  11.750%..........         10             4,196,827       0.71
 11.751% -  11.875%..........          6             2,640,197       0.45
 11.876% -  12.000%..........          1               433,078       0.07
 12.126% -  12.250%..........          2             1,136,473       0.19
 12.251% -  12.375%..........          2             1,273,147       0.22
 12.376% -  12.500%..........          3             1,281,078       0.22
                                   -----           ------------      ------
Total:........................     1,372           $587,593,856      100.00%
                                   =====           ============      ======
</TABLE>
```

        As of the Cut-Off Date, the weighted average maximum loan interest
rate of the Group 2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of
the Group 2, Group 3 and Group 4 Loans, was approximately 10.776% per annum.


                                    A-48




<Page>



                        Loan Interest Rate Adjustment Frequency

```
<TABLE>
<CAPTION>
                                                             % of Cut-Off Date Pool
                                               Aggregate Unpaid    Balance of the Group 2,
      Loan Interest Rate Adjustment
```

```
         Frequency (months)        Number of Loans    Principal Balance    Group 3 and Group 4 Loans
         --------------------      ---------------    -----------------    -------------------------
<S>                                      <C>               <C>                    <C>
Fixed.........................           1,113          $467,009,328              79.48%
12............................             259           120,584,528              20.52
                                         -----          ------------             ------
Total:........................           1,372          $587,593,856             100.00%
                                         =====          ============             ======
```

</TABLE>

### Next Loan Interest Rate Adjustment Date

<TABLE>
<CAPTION>

```
    Next Loan Interest Rate                            Aggregate Unpaid     Balance of the Group 2,
      Adjustment Date            Number of Loans     Principal Balance    Group 3 and Group 4 Loans
    -----------------------      ---------------     -----------------    -------------------------
<S>                                   <C>                 <C>                    <C>
Fixed Rate....................        1,113          $467,009,328               79.48%
February 1, 2005..............            3             1,365,534                0.23
March 1, 2005.................           10             4,514,658                0.77
April 1, 2005.................            3             1,132,204                0.19
June 1, 2005..................            4             1,788,029                0.30
July 1, 2005..................           18             9,503,825                1.62
August 1, 2005................           42            19,570,963                3.33
September 1, 2005.............           10             4,447,391                0.76
October 1, 2006...............            2               826,989                0.14
November 1, 2006..............            9             3,364,199                0.57
December 1, 2006..............           14             5,739,100                0.98
February 1, 2007..............            2             1,025,188                0.17
March 1, 2007.................           12             4,932,971                0.84
April 1, 2007.................           10             4,341,152                0.74
May 1, 2007...................            2               733,837                0.12
June 1, 2007..................            1               777,634                0.13
July 1, 2007..................            3             1,300,457                0.22
August 1, 2007................           65            29,789,630                5.07
September 1, 2007.............           41            21,318,734                3.63
June 1, 2008..................            3             2,096,106                0.36
January 1, 2009...............            2               878,550                0.15
February 1, 2009..............            1               327,201                0.06
March 1, 2009.................            2               810,177                0.14
                                      -----          ------------               ------
Total:........................        1,372          $587,593,856              100.00%
                                      =====          ============               ======
```

*% of Cut-Off Date Pool*

</TABLE>

A-49

<Page>

### Original LTV Ratios

<TABLE>
<CAPTION>

```
  Range of Original LTV Ratios     Number of Loans     Aggregate Unpaid     Balance of the Group 2,
                                                       Principal Balance    Group 3 and Group 4 Loans
  ----------------------------     ---------------     -----------------    -------------------------
<S>                                     <C>                 <C>                    <C>
50.00% or less................          117          $ 52,940,721               9.01%
50.01% - 55.00%...............           51            24,093,207               4.10
55.01% - 60.00%...............           85            38,560,776               6.56
60.01% - 65.00%...............           97            43,598,434               7.42
65.01% - 70.00%...............          202            91,921,964              15.64
70.01% - 75.00%...............          168            71,319,405              12.14
75.01% - 80.00%...............          548           226,000,335              38.46
80.01% - 85.00%...............           25             9,342,119               1.59
85.01% - 90.00%...............           67            25,611,315               4.36
90.01% - 95.00%...............           12             4,205,579               0.72
                                        -----          ------------             ------
Total:........................        1,372          $587,593,856             100.00%
                                        =====          ============             ======
```

*% of Cut-Off Date Pool*

</TABLE>

The weighted average original LTV Ratio of the Group 2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans, was approximately 70.39%.

### Current LTV Ratios

<TABLE>
<CAPTION>

```
                                                       Aggregate Unpaid     Balance of the Group 2,
```

*% of Cut-Off Date Pool*

| Range of Current LTV Ratios* | Number of Loans | Principal Balance | Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 50.00% or less................. | 144 | $ 64,813,889 | 11.03% |
| 50.01% - 55.00%............... | 70 | 31,568,100 | 5.37 |
| 55.01% - 60.00%............... | 110 | 45,928,426 | 7.82 |
| 60.01% - 65.00%............... | 133 | 59,146,977 | 10.07 |
| 65.01% - 70.00%............... | 195 | 88,064,061 | 14.99 |
| 70.01% - 75.00%............... | 241 | 99,942,593 | 17.01 |
| 75.01% - 80.00%............... | 388 | 163,551,734 | 27.83 |
| 80.01% - 85.00%............... | 42 | 16,054,408 | 2.73 |
| 85.01% - 90.00%............... | 41 | 15,677,218 | 2.67 |
| 90.01% - 95.00%............... | 8 | 2,846,450 | 0.48 |
| Total:...................... | 1,372 | $587,593,856 | 100.00% |

</TABLE>

As of the Cut-Off Date, the weighted average current LTV of the Group 2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans, was approximately 67.12%.

----------

* Current LTV Ratios generally were determined based on the ratio of the unpaid principal amount of the related Loan as of the Cut-Off Date to the lesser of (i) the sales price for the related Mortgaged Property or (ii) the appraised value of the related Mortgaged Property, in each case, at the time of origination of the related Loan.

A-50

<Page>

## Property Types

<TABLE>
<CAPTION>

| Property Type | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Single Family................. | 1,221 | $523,262,768 | 89.05% |
| Planned Unit Development...... | 74 | 29,074,456 | 4.95 |
| Condominium................... | 57 | 25,912,661 | 4.41 |
| Two- to Four-Family........... | 11 | 5,676,080 | 0.97 |
| Coop.......................... | 8 | 3,338,057 | 0.57 |
| Manufactured Housing.......... | 1 | 329,834 | 0.06 |
| Total:...................... | 1,372 | $587,593,856 | 100.00% |

</TABLE>

## Loan Purpose

<TABLE>
<CAPTION>

| Loan Purpose | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Purchase...................... | 668 | $283,077,166 | 48.18% |
| Rate & Term Refinance......... | 435 | 191,409,630 | 32.58 |
| Cash Out Refinance............ | 266 | 111,893,430 | 19.04 |
| Construction to Perm.......... | 3 | 1,213,630 | 0.21 |
| Total:...................... | 1,372 | $587,593,856 | 100.00% |

</TABLE>

## Occupancy Status

<TABLE>
<CAPTION>

| Occupancy Status | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Primary....................... | 1,313 | $561,224,120 | 95.51% |
| Secondary..................... | 49 | 22,260,724 | 3.79 |
| Investor...................... | 10 | 4,109,012 | 0.70 |
| Total:...................... | 1,372 | $587,593,856 | 100.00% |

```
                    =====        ============          ======
</TABLE>
```

Original Terms to Maturity

```
<TABLE>
<CAPTION>
                                                        % of Cut-Off Date Pool
         Original Term to                           Aggregate Unpaid   Balance of the Group 2,
         Maturity (Months)        Number of Loans  Principal Balance  Group 3 and Group 4 Loans
-----------------------------     ---------------  -----------------  -------------------------
<S>                               <C>              <C>                <C>
181 - 240.....................           16             5,930,402           1.01%
241 - 300.....................            2               774,973           0.13
301 - 360.....................        1,354           580,888,480          98.86
                                      -----          ------------          ------
Total:........................        1,372          $587,593,856         100.00%
                                      =====          ============          ======
</TABLE>
```

      As of the Cut-Off Date, the weighted average original term to maturity
of the Group 2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the
Group 2, Group 3 and Group 4 Loans, was approximately 359 months.

A-51

<Page>

Remaining Terms to Maturity

```
<TABLE>
<CAPTION>
                                                        % of Cut-Off Date Pool
       Remaining Term to                            Aggregate Unpaid   Balance of the Group 2,
       Maturity (Months)          Number of Loans  Principal Balance  Group 3 and Group 4 Loans
-----------------------------     ---------------  -----------------  -------------------------
<S>                               <C>              <C>                <C>
121 - 180.....................            1        $       286,435           0.05%
181 - 240.....................           16             6,144,355           1.05
241 - 300.....................          236            91,483,524          15.57
301 - 360.....................        1,119           489,679,542          83.34
                                      -----          ------------          ------
Total:........................        1,372          $587,593,856         100.00%
                                      =====          ============          ======
</TABLE>
```

      As of the Cut-Off Date, the weighted average remaining term to
maturity of the Group 2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance
of the Group 2, Group 3 and Group 4 Loans, was approximately 320 months.

A-52

<Page>

Geographic Distribution of Loans

```
<TABLE>
<CAPTION>
                                                        % of Cut-Off Date Pool
                                                    Aggregate Unpaid   Balance of the Group 2,
       Geographic Distribution    Number of Loans  Principal Balance  Group 3 and Group 4 Loans
-----------------------------     ---------------  -----------------  -------------------------
<S>                               <C>              <C>                <C>
California ....................          419        $178,343,357          30.35%
New York ......................          130            59,174,710         10.07
Texas .........................          115            50,350,419          8.57
New Jersey ....................           99            40,275,199          6.85
Florida .......................           59            26,661,174          4.54
Georgia .......................           63            26,502,855          4.51
Virginia ......................           42            18,417,133          3.13
Connecticut ...................           36            16,698,594          2.84
Pennsylvania ..................           40            16,286,003          2.77
Colorado ......................           35            14,080,841          2.40
Maryland ......................           35            13,241,703          2.25
Massachusetts .................           28            12,553,818          2.14
Illinois ......................           27            12,246,975          2.08
North Carolina ................           28            11,968,705          2.04
Minnesota .....................           28            11,130,519          1.89
```

```
Washington ...................     20       7,872,224         1.34
Arizona ......................     18       7,788,571         1.33
Michigan .....................     19       7,556,804         1.29
Oregon .......................     12       5,549,696         0.94
Tennessee ....................     13       5,275,696         0.90
Missouri .....................     11       4,786,652         0.81
Nevada .......................     10       4,673,907         0.80
Indiana ......................     11       4,001,874         0.68
Alabama ......................      7       3,440,614         0.59
Ohio .........................      8       3,330,255         0.57
Louisiana ....................      8       3,011,073         0.51
District Of Columbia .........      6       2,914,702         0.50
New Mexico ...................      6       2,749,711         0.47
Utah .........................      5       2,499,117         0.43
South Carolina ...............      6       2,326,285         0.40
Kentucky .....................      5       1,926,234         0.33
Oklahoma .....................      4       1,626,893         0.28
Kansas .......................      3       1,246,640         0.21
Hawaii .......................      2       1,109,655         0.19
Wisconsin ....................      2         875,042         0.15
Rhode Island .................      2         840,961         0.14
New Hampshire ................      2         821,890         0.14
Nebraska .....................      2         782,481         0.13
West Virginia ................      1         580,531         0.10
Idaho ........................      1         566,915         0.10
Maine ........................      1         451,757         0.08
Iowa .........................      1         400,186         0.07
Delaware .....................      1         335,756         0.06
South Dakota .................      1         319,730         0.05
                                -----    -------------       ------
Total: ......................   1,372    $587,593,856        100.00%
                                =====    =============       ======
```

</TABLE>

       No more than approximately 0.58% of the Group 2, Group 3 and Group 4
Loans, by Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans,
will be secured by properties located in any one zip code.

                              A-53

<Page>

                        Documentation Type

<TABLE>
<CAPTION>

|                          |                 | Aggregate Unpaid    | % of Cut-Off Date Pool Balance of the Group 2, |
| Documentation Type       | Number of Loans | Principal Balance   | Group 3 and Group 4 Loans |
| ------------------------ | --------------- | ------------------- | ------------------------- |
| <S>                      | <C>             | <C>                 | <C>                       |
| Full ................... | 1,087           | $464,741,234        | 79.09%                    |
| No Doc ................. | 162             | 64,389,864          | 10.96                     |
| Reduced ................ | 72              | 34,756,511          | 5.92                      |
| Limited ................ | 31              | 14,905,303          | 2.54                      |
| Alternate .............. | 9               | 3,708,177           | 0.63                      |
| Streamline ............. | 5               | 2,797,496           | 0.48                      |
| Stated Doc ............. | 6               | 2,295,272           | 0.39                      |
|                          | -----           | ------------        | ------                    |
| Total: ................. | 1,372           | $587,593,856        | 100.00%                   |
|                          | =====           | ============        | ======                    |

</TABLE>

                        Credit Scores

<TABLE>
<CAPTION>

|                          |                 | Aggregate Unpaid    | % of Cut-Off Date Pool Balance of the Group 2, |
| Credit Scores*           | Number of Loans | Principal Balance   | Group 3 and Group 4 Loans |
| ------------------------ | --------------- | ------------------- | ------------------------- |
| <S>                      | <C>             | <C>                 | <C>                       |
| 401 - 450 .............. | 1               | $    664,813        | 0.11%                     |
| 451 - 500 .............. | 12              | 5,711,264           | 0.97                      |
| 501 - 550 .............. | 34              | 14,585,194          | 2.48                      |
| 551 - 600 .............. | 44              | 18,446,856          | 3.14                      |
| 601 - 650 .............. | 106             | 44,811,646          | 7.63                      |
| 651 - 700 .............. | 252             | 111,194,011         | 18.92                     |
| 701 - 750 .............. | 386             | 163,890,735         | 27.89                     |
| 751 - 800 .............. | 445             | 190,669,154         | 32.45                     |
| 801 - 850 .............. | 57              | 23,454,136          | 3.99                      |
| Not Available .......... | 35              | 14,166,047          | 2.41                      |
|                          | -----           | ------------        | ------                    |
| Total: ................. | 1,372           | $587,593,856        | 100.00%                   |
|                          | =====           | ============        | ======                    |

</TABLE>

As of the Cut-Off Date, the weighted average Credit Score of the borrowers with a Credit Score for the Group 2, Group 3 and Group 4 Loans, by Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans, was approximately 717.

----------
* Generally all of the credit scores were obtained within 3 months prior to the Closing Date.

Delinquency Status

<TABLE>
<CAPTION>

| Delinquency Status | Number of Loans | Aggregate Unpaid Principal Balance | % of Cut-Off Date Pool Balance of the Group 2, Group 3 and Group 4 Loans |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 0 ........................... | 1,353 | $578,312,454 | 98.42% |
| 30 - 59 ..................... | 13 | 6,012,275 | 1.02 |
| 60 - 89 ..................... | 6 | 3,269,127 | 0.56 |
| Total: ...................... | 1,372 | $587,593,856 | 100.00% |

</TABLE>

A-54


<Page>


PROSPECTUS
September 30, 2004

Mortgage Asset Securitization Transactions, Inc.
Depositor

Asset-Backed Certificates

Asset-Backed Notes
(Issuable in Series)

Mortgage Asset Securitization Transactions, Inc. from time to time will offer asset-backed pass-through certificates or asset-backed notes. We will offer the certificates or notes through this prospectus and a separate prospectus supplement for each series.

For each series we will establish a trust fund consisting primarily of

o   a segregated pool of various types of single-family and multifamily residential mortgage loans, home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them; or

o   pass-through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

The certificates of a series will evidence beneficial ownership interests in the trust fund. The notes of a series will evidence indebtedness of the trust fund. The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

--------------------------------------------------------------------------
You should consider carefully the risk factors beginning on page 17 in this prospectus and in the related prospectus supplement.

The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the certificates or the collateral securing the securities.

You should consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.
--------------------------------------------------------------------------

The Securities and Exchange Commission and state securities regulators have not approved or disapproved of the offered certificates or notes or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for

the certificates or notes, as applicable, of any series, or, if it does develop,
that it will continue.

UBS Investment Bank


<Page>


        We may offer the certificates or notes, as applicable, through one or more
different methods, including offerings through underwriters, as more fully
described under "Plans of Distribution" in this prospectus and in the related
prospectus supplement. Our affiliates may from time to time act as agents or
underwriters in connection with the sale of the offered certificates or notes,
as applicable. We may retain or hold for sale, from time to time, one or more
classes of a series of certificates or notes, as applicable. We may offer
certain classes of the certificates or notes, as applicable, if so specified in
the related prospectus supplement, in one or more transactions exempt from the
registration requirements of the Securities Act of 1933, as amended. These
offerings will not be made pursuant to this prospectus or the related
registration statement.

                            ----------

        This prospectus may not be used to consummate sales of the offered
certificates or notes, as applicable, unless accompanied by a prospectus
supplement.

                              -2-


<Page>


                        TABLE OF CONTENTS

<TABLE>
<CAPTION>
                                                                    Page
                                                                    ----
<S>                                                                 <C>

Summary of Terms ...............................................6

Risk Factors ..................................................17
    Limited Liquidity of Securities May Adversely Affect Market Value of
        Securities ............................................17
    Assets of Trust Fund Are Limited ..........................17
    Credit Enhancement Is Limited in Amount and Coverage ......18
    Yield Is Sensitive to Rate of Principal Prepayment ........18
    Borrower May Be Unable to Make Balloon Payment ............19
    Nature of Mortgages Could Adversely Affect Value of Properties .............19
    Violations of Environmental Laws May Reduce Recoveries on Properties ......21
    Violations of Federal Laws May Adversely Affect Ability to Collect on
        Loans .................................................22
    Rating of the Securities Are Limited and May Be Withdrawn or Lowered ......23
    Adverse Conditions in the Residential Real Estate Markets May Result
        in a Decline in Property Values .......................24
    Book-Entry System for Certain Classes May Decrease Liquidity and Delay
        Payment ...............................................25
    Unsecured Home Improvement Contracts May Experience Relatively Higher
        Losses ................................................25
    Mortgage Loans Underwritten as Non-Conforming Credits May Experience
        Relatively Higher Losses ..............................26
    Assets of the Trust Fund May Include Delinquent and Sub-Performing
        Residential Loans ......................................26
    Changes in the Market Value of Properties May Adversely Affect
        Payments on the Securities ............................27

Defined Terms .................................................27

The Trust Funds ...............................................27
    Residential Loans .........................................27
    Agency Securities .........................................35
    Stripped Agency Securities ................................40
    Additional Information Concerning the Trust Funds ..........41

Use of Proceeds ...............................................43

Yield Considerations ..........................................43

Maturity and Prepayment Considerations ........................45

The Depositor .................................................48

Residential Loans .............................................49

```
        Underwriting Standards ...................................................49
        Representations by Unaffiliated Sellers; Repurchases ....................49
        Sub-Servicing ...........................................................50

Description of the Securities ...................................................51
        General .................................................................51
        Assignment of Assets of the Trust Fund ..................................53
        Deposits to the Trust Account ...........................................56
        Pre-Funding Account .....................................................57
        Payments on Residential Loans ...........................................57
        Payments on Agency Securities ...........................................58
        Distributions ...........................................................58
        Principal and Interest on the Securities ................................60
        Available Distribution Amount ...........................................62
        Subordination ...........................................................62
        Advances ................................................................65
        Statements to Holders of Securities .....................................65
        Book-Entry Registration of Securities ...................................67
        Collection and Other Servicing Procedures ...............................72
        Realization on Defaulted Residential Loans ..............................73
        Retained Interest, Administration Compensation and Payment
            of Expenses .........................................................75
        Evidence as to Compliance ...............................................76
        Certain Matters Regarding the Master Servicer, the Depositor and the
            Trustee .............................................................77
        Deficiency Events .......................................................81
        Events of Default .......................................................82
        Amendment ...............................................................86
        Termination .............................................................87
        Voting Rights ...........................................................88

Description of Primary Insurance Coverage .......................................88
        Primary Credit Insurance Policies .......................................88
        FHA Insurance and VA Guarantees .........................................89
        Primary Hazard Insurance Policies .......................................91

Description of Credit Support ...................................................94
        Pool Insurance Policies .................................................94
        Special Hazard Insurance Policies .......................................97
        Bankruptcy Bonds .......................................................100
        Reserve Funds ..........................................................100
        Cross-Support Provisions ...............................................101
        Letter of Credit .......................................................101
        Insurance Policies and Surety Bonds ....................................101
        Excess Spread ..........................................................101
        Overcollateralization .................................................102
</TABLE>
```

                                    -3-


<Page>


```
<TABLE>
<S>                                                                             <C>
Certain Legal Aspects of Residential Loans .....................................102
        General ................................................................102
        Mortgage Loans .........................................................103
        Cooperative Loans ......................................................104
        Tax Aspects of Cooperative Ownership ...................................105
        Manufactured Housing Contracts Other Than Land Contracts ...............105
        Foreclosure on Mortgages ...............................................108
        Foreclosure on Cooperative Shares ......................................111
        Repossession with respect to Manufactured Housing Contracts that are
            not Land Contracts .................................................112
        Rights of Redemption with respect to Residential Properties ............113
        Notice of Sale; Redemption Rights with respect to Manufactured Homes ...114
        Anti-Deficiency Legislation, Bankruptcy Laws and Other Limitations on
            Lenders ............................................................114
        Consumer Compliance Laws and Regulations ...............................117
        Homeownership Act and Similar State Laws ...............................117
        Junior Mortgages .......................................................119
        Consumer Protection Laws ...............................................119
        Enforceability of Certain Provisions ...................................121
        Prepayment Charges and Prepayments .....................................122
        Subordinate Financing ..................................................123
        Applicability of Usury Laws ............................................124
        Alternative Mortgage Instruments .......................................124
        Environmental Legislation ..............................................125
        Servicemembers Civil Relief Act and the California Military and
            Veterans Code ......................................................126
        Forfeiture for Drug, RICO and Money Laundering Violations ..............127

Federal Income Tax Consequences ................................................128
        General ................................................................128
        REMICs .................................................................129
        General ................................................................129
```

```
          Taxation of Owners of Regular Securities ...............................133
          Taxation of Owners of Residual Securities .............................142
          Taxes That May Be Imposed on the REMIC Pool ...........................153
          Liquidation of the REMIC Pool .........................................154
          Administrative Matters ................................................154
          Limitations on Deduction of Certain Expenses ..........................155
          Taxation of Certain Foreign Investors .................................156
          Backup Withholding ....................................................157
          Reporting Requirements ................................................157
          Grantor Trust Funds ...................................................158
          Classification of Grantor Trust Funds .................................158
          Standard Securities ...................................................159
          Stripped Securities ...................................................163
          Reporting Requirements and Backup Withholding .........................167
          Partnership Trust Funds ...............................................167
          Classification of Partnership Trust Funds .............................167
          Characterization of Investments in Partnership Securities and Debt
             Securities .........................................................168
          Taxation of Holder of Debt Securities .................................168
          Taxation of Owners of Partnership Securities ..........................169

State and Other Tax Consequences ..........................................174

ERISA Considerations ......................................................175

Legal Investment ..........................................................179

Plans of Distribution .....................................................182

Incorporation of Certain Information by Reference .........................184

Legal Matters .............................................................184

Financial Information .....................................................185

Rating ....................................................................185

Glossary of Terms .........................................................187
```
</TABLE>

-4-

<Page>

PROSPECTUS
September 30, 2004

               Important Notice about Information Presented in this
                Prospectus and Each Accompanying Prospectus Supplement

     Two separate documents contain information about the offered certificates
or notes, as applicable. These documents progressively provide more detail:

     (1) this prospectus, which provides general information, some of which may
not apply to the offered securities; and

     (2) the accompanying prospectus supplement for each series, which describes
the specific terms of the offered securities.

     If the terms of the offered securities vary between this prospectus and the
accompanying prospectus supplement, you should rely on the information in the
prospectus supplement.

     You should rely only on the information contained in this prospectus and
the accompanying prospectus supplement. We have not authorized anyone to provide
you with information that is different from that contained in this prospectus
and the related prospectus supplement. The information in this prospectus is
accurate only as of the date of this prospectus.

               ----------

     If you require additional information, the mailing address of our principal
executive offices is Mortgage Asset Securitization Transactions, Inc., 1285
Avenue of the Americas, New York, NY 10019 and the telephone number is (212)
713-2000.

               -5-

<Page>

--------------------------------------------------------------------------------
                              SUMMARY OF TERMS

      This summary highlights selected information from this document. It does
not contain all of the information that you need to consider in making an
investment decision. Please read this entire prospectus and the accompanying
prospectus supplement as well as the terms and provisions of the related pooling
and servicing agreement or trust agreement carefully to understand all of the
terms of a series of securities.

<TABLE>
<S>                                 <C>
Relevant Parties

      Depositor.....................  Mortgage Asset Securitization Transactions,
                                      Inc., the depositor, is a corporation
                                      organized under the laws of the State of
                                      Delaware. The depositor is a wholly owned
                                      limited purpose finance subsidiary of UBS
                                      Americas Inc.

      Master Servicer...............  The entity or entities named as master
                                      servicer in the related prospectus
                                      supplement.

      Trustees......................  The trustee or indenture trustee named as
                                      trustee in the related prospectus supplement.
                                      The owner trustee named as owner trustee in
                                      the related prospectus supplement.

      Issuer of Notes...............  The depositor or an owner trust established
                                      for the purpose of issuing the series of
                                      notes will issue each series of notes through
                                      a separate trust. The depositor, and the
                                      owner trustee will enter into a separate
                                      trust agreement to form each owner trust.

Securities

      Description of Securities....  The depositor will offer asset-backed
                                      pass-through certificates or asset-backed
                                      notes from time to time. The depositor will
                                      offer these securities in one or more series.
                                      Each series of securities will include one or
                                      more classes representing either a beneficial
                                      ownership interest in, or indebtedness
                                      secured by, a trust fund. The trust fund will
                                      consist of a segregated pool of residential
                                      loans or agency securities, or beneficial
                                      interests in them, and certain other assets
                                      described below.

                                      A series of securities may include one or
                                      more classes of securities that may be
                                      entitled to, among other things:

                                      o    principal distributions, with
                                           disproportionate nominal or no interest
                                           distributions;
</TABLE>

--------------------------------------------------------------------------------

                                     -6-


<Page>


--------------------------------------------------------------------------------

<TABLE>
<S>                                 <C>
                                      o    interest distributions, with
                                           disproportionate, nominal or no
                                           principal distributions;

                                      o    distributions only of prepayments of
                                           principal throughout the lives of the
                                           securities or during specified periods;

                                      o    subordinated distributions of scheduled
                                           payments of principal, prepayments of
                                           principal, interest or any combination
                                           of these payments;

                                      o    distributions only after the occurrence

```
                              of events specified in the related
                              prospectus supplement;

                      o       distributions in accordance with a
                              schedule or formula or on the basis of
                              collections from designated portions of
                              the assets in the related trust fund;

                      o       interest at a fixed rate or a rate that
                              is subject to change from time to time;

                      o       distributions allocable to interest only
                              after the occurrence of events specified
                              in the related prospectus supplement and
                              may accrue interest until these events
                              occur.

                      The related prospectus supplement will
                      specify these entitlements.

                      The timing and amounts of these distributions
                      may vary among classes, over time. In
                      addition, a series may include two or more
                      classes of securities which differ as to
                      timing, sequential order or amount of
                      distributions of principal or interest, or
                      both.

                      The related prospectus supplement will
                      specify if each class of securities

                      o       has a stated principal amount; and

                      o       is entitled to distributions of interest
                              on the security principal balance based
                              on a specified security interest rate.

   Interest...................  Interest on each class of securities for a
                      series:

                      o       will accrue at the applicable security
                              interest rate on its outstanding
                              security principal balance;
</TABLE>

--------------------------------------------------------------------------------

                              -7-


<Page>


--------------------------------------------------------------------------------

<TABLE>
<S>                           <C>
                      o       will be distributed to holders of the
                              securities as provided in the related
                              prospectus supplement on the related
                              distribution date; and

                      o       may be reduced to the extent of certain
                              delinquencies or other contingencies
                              described in the related prospectus
                              supplement.

                      Distributions with respect to accrued
                      interest on accrual securities will be
                      identified in the related prospectus
                      supplement. This accrued interest will not be
                      distributed but rather will be added to the
                      security principal balance of each series
                      prior to the time when accrued interest
                      becomes payable.

                      Distributions with respect to interest on
                      interest-only securities with no or, in
                      certain cases, a nominal security principal
                      balance will be made on each distribution
                      date on the basis of a notional amount as
                      described in this prospectus and in the
                      related prospectus supplement.

                      See "Yield Considerations," "Maturity and
                      Prepayment Considerations" and "Description
                      of the Securities" in this prospectus.
```

```
    Principal...................  The security principal balance of a security
                                  represents the maximum dollar amount,
                                  exclusive of interest, which you are entitled
                                  to receive as principal from future cash flow
                                  on the assets in the related trust fund. The
                                  related prospectus supplement will set forth
                                  the initial security principal balance of
                                  each class of securities.

                                  Generally, distributions of principal will be
                                  payable as set forth in the related
                                  prospectus supplement, which may be on a pro
                                  rata basis among all of the securities of the
                                  same class, in proportion to their respective
                                  outstanding security principal balances.

                                  If an interest-only security does not have a
                                  security principal balance, it will not
                                  receive distributions of principal. See "The
                                  Trust Funds," "Maturity and Prepayment
                                  Considerations" and "Description of the
                                  Securities" in this prospectus.

Assets

    The Trust Funds..............  Each trust fund will consist of:
</TABLE>
```

--------------------------------------------------------------------------------

                                      -8-


<Page>


--------------------------------------------------------------------------------
<TABLE>
<S>                               <C>
                                  o    a segregated pool of residential loans,
                                       agency securities and/or mortgage
                                       securities; and

                                  o    certain other assets as described in
                                       this prospectus and in the related
                                       prospectus supplement.

                                  The depositor will purchase all assets of the
                                  trust fund, either directly or through an
                                  affiliate, from unaffiliated sellers. The
                                  depositor will generally deposit the assets
                                  into the related trust fund as of the first
                                  day of the month in which the securities
                                  evidencing interests in the trust fund or
                                  collateralized by the assets of the trust
                                  fund are initially issued. See "Description
                                  of the Securities-Pre-Funding Account" in
                                  this prospectus.

    A. Residential Loans.........  The residential loans will consist of any
                                  combination of:

                                  o    mortgage loans secured by first or
                                       junior liens on one- to four-family
                                       residential properties;

                                  o    mortgage loans secured by first or
                                       junior liens on multifamily residential
                                       properties consisting of five or more
                                       dwelling units;

                                  o    home improvement installment sales
                                       contracts and installment loan
                                       agreements which may be unsecured or
                                       secured by a lien on the related
                                       mortgaged property;

                                  o    a manufactured home, which may have a
                                       subordinate lien on the related
                                       mortgaged property, as described in the
                                       related prospectus supplement;

                                  o    one- to four-family first or junior lien
                                       closed end home equity loans for
                                       property improvement, debt consolidation
                                       or home equity purposes;
```

<table>
o   cooperative loans secured primarily by
    shares in a private cooperative housing
    corporation. The shares, together with
    the related proprietary lease or
    occupancy agreement give the owner of
    the shares the right to occupy a
    particular dwelling unit in the
    cooperative housing corporation; or
</table>

--------------------------------------------------------------------------------

-9-

<Page>

--------------------------------------------------------------------------------

<TABLE>
<S>                               <C>
o   manufactured housing conditional sales
    contracts and installment loan
    agreements which may be secured by
    either liens on:

    o   new or used manufactured homes; or

    o   the real property and any
        improvements on it which may
        include the related manufactured
        home if deemed to be part of the
        real property under applicable
        state law relating to a
        manufactured housing contract; and

    o   in certain cases, new or used
        manufactured homes which are not
        deemed to be a part of the related
        real property under applicable
        state law.

The mortgage properties, cooperative shares,
together with the right to occupy a
particular dwelling unit, and manufactured
homes may be located in any one of the fifty
states, the District of Columbia, the
Commonwealth of Puerto Rico or the
territories of Guam or the United States
Virgin Islands.

Each trust fund may contain any combination
of the following types of residential loans:

o   fully amortizing loans

o   with a fixed rate of interest and

    o   level monthly payments to maturity;

o   fully amortizing loans with

    o   a fixed interest rate providing for
        level monthly payments, or

    o   for payments of interest that
        increase annually at a
        predetermined rate until the loan
        is repaid or for a specified number
        of years,

    o   after which level monthly payments
        resume;

o   fully amortizing loans

    o   with a fixed interest rate
        providing for monthly payments
        during the early years of the term
        that are
</TABLE>

--------------------------------------------------------------------------------

-10-

```
<Page>

--------------------------------------------------------------------------------
<TABLE>
<S>                                 <C>
                                         calculated on the basis of an
                                         interest rate below the interest
                                         rate,

                             o       followed by monthly payments of
                                     principal and interest that
                                     increase annually by a
                                     predetermined percentage over the
                                     monthly payments payable in the
                                     previous year until the loan is
                                     repaid or for a specified number of
                                     years,

                             o       followed by level monthly payments;

                         o fixed interest rate loans providing for

                             o       level payments of principal and
                                     interest on the basis of an assumed
                                     amortization schedule and

                             o       a balloon payment of principal at
                                     the end of a specified term;

                         o       fully amortizing loans with

                             o       an interest rate adjusted
                                     periodically, and

                             o       corresponding adjustments in the
                                     amount of monthly payments, to
                                     equal the sum, which may be
                                     rounded, of a fixed margin and an
                                     index as described in the related
                                     prospectus supplement.

                                     These loans may provide for an
                                     election, at the borrower's option
                                     during a specified period after
                                     origination of the loan, to convert
                                     the adjustable interest rate to a
                                     fixed interest rate, as described
                                     in the related prospectus
                                     supplement;

                         o       fully amortizing loans with an
                                 adjustable interest rate providing for
                                 monthly payments less than the amount of
                                 interest accruing on the loan and for
                                 the amount of interest accrued but not
                                 paid currently to be added to the
                                 principal balance of the loan;

                         o       adjustable interest rate loans providing
                                 for an election at the borrower's option
                                 to extend the term to maturity for a
                                 period that will result in level monthly
                                 payments to maturity if an adjustment to
                                 the interest rate occurs resulting in a
                                 higher interest rate than at
                                 origination; or
</TABLE>

--------------------------------------------------------------------------------

                                  -11-



<Page>

--------------------------------------------------------------------------------
<TABLE>
<S>                                 <C>
                         o       other types of residential loans as may
                                 be described in the related prospectus
```

```
                                supplement.

                                The related prospectus supplement may specify
                                that the residential loans are covered by:

                                o    primary mortgage insurance policies;

                                o    insurance issued by the Federal Housing
                                     Administration; or

                                o    partial guarantees of the Veterans
                                     Administration.

                                See "Description of Primary Insurance
                                Coverage" in this prospectus.

     B. Agency Securities........   The agency securities may consist of any
                                combination of:

                                o    "fully modified pass-through"
                                     mortgage-backed certificates guaranteed
                                     by the Government National Mortgage
                                     Association;

                                o    guaranteed mortgage pass-through
                                     securities issued by the Federal
                                     National Mortgage Association; and

                                o    mortgage participation certificates
                                     issued by the Federal Home Loan Mortgage
                                     Corporation.

     C. Mortgage Securities.......   A trust fund may include previously issued:

                                o    asset-backed certificates;

                                o    collateralized mortgage obligations; or

                                o    participation certificates evidencing
                                     interests in, or collateralized by,
                                     residential loans or agency securities.

     D. Trust Account.............   Each trust fund will include one or more
                                trust accounts established and maintained on
                                behalf of the holders of securities. To the
                                extent described in this prospectus and in
                                the related prospectus supplement, the master
                                servicer or the trustee will deposit into the
                                trust account all payments and collections
                                received or advanced with respect to assets
                                of the related trust fund. A trust account
                                may be maintained as an interest bearing or a
                                non-interest bearing account. Alternatively,
                                funds held in the trust account may be
                                invested in certain short-term high-quality
                                obligations.See
</TABLE>
```

--------------------------------------------------------------------------------

                                     -12-


```
<Page>
```

--------------------------------------------------------------------------------

```
<TABLE>
<S>                             <C>
                                "Description of the Securities -- Deposits to
                                the Trust Account" in this prospectus.

     E. Credit Support...........   One or more classes of securities within any
                                series may be covered by any combination of:

                                o    a surety bond;

                                o    a guarantee;

                                o    letter of credit;

                                o    an insurance policy;

                                o    a bankruptcy bond;

                                o    a reserve fund;
```

    o    a cash account;

    o    reinvestment income;

    o    overcollateralization;

    o    subordination of one or more classes of
securities in a series or, with respect
to any series of notes, the related
equity certificates, to the extent
provided in the related prospectus
supplement;

    o    cross-support between securities backed
by different asset groups within the
same trust fund; or

    o    another type of credit support to
provide partial or full coverage for
certain defaults and losses relating to
the residential loans.

The related prospectus supplement may provide
that the coverage provided by one or more
forms of credit support may apply
concurrently to two or more separate trust
funds. If applicable, the related prospectus
supplement will identify the trust funds to
which this credit support relates. The
related prospectus supplement will also
specify the manner of determining the amount
of the coverage provided by the credit
support and the application of this coverage
to the identified trust funds. See
"Description of Credit Support" and
"Description of the Securities --
Subordination" in this prospectus.

```
</TABLE>

--------------------------------------------------------------------------------

                                     -13-



<Page>


--------------------------------------------------------------------------------

<TABLE>
<S>                                  <C>
```

Pre-Funding Account.............    The related prospectus supplement may specify
that funds on deposit in a pre-funding
account will be used to purchase additional
residential loans during the period specified
in the related prospectus supplement.

Servicing And Advances..........    The master servicer, directly or through
sub-servicers:

    o    will service and administer the
residential loans included in a trust
fund; and

    o    if and to the extent the related
prospectus supplement so provides, will
be obligated to make certain cash
advances with respect to delinquent
scheduled payments on the residential
loans. This advancing obligation will be
limited to the extent that the master
servicer determines that the advances
will be recoverable.

Advances made by the master servicer will be
reimbursable to the extent described in the
related prospectus supplement. The prospectus
supplement with respect to any series may
provide that the master servicer will obtain
a cash advance surety bond, or maintain a
cash advance reserve fund, to cover any
obligation of the master servicer to make
advances. The borrower on any surety bond
will be named, and the terms applicable to a
cash advance reserve fund will be described
in the related prospectus supplement. See
"Description of the Securities -- Advances."
in this prospectus.

```
Optional Termination............  The related prospectus supplement may specify
                                  that the assets in the related trust fund may
                                  be sold, causing an early termination of a
                                  series of securities in the manner set forth
                                  in the related prospectus supplement. See
                                  "Description of the Securities --
                                  Termination" in this prospectus and the
                                  related section in the related prospectus
                                  supplement.

Tax Status.....................   The treatment of the securities for federal
                                  income tax purposes will depend on:

                                  o     whether a REMIC election is made with
                                        respect to a series of certificates; and

                                  o     if a REMIC election is made, whether the
                                        certificates are "regular" interest
                                        securities or "residual" interest
                                        securities.
</TABLE>
```

--------------------------------------------------------------------------------

                                      -14-


<Page>


--------------------------------------------------------------------------------
```
<TABLE>
<S>                               <C>
                                  Unless otherwise indicated in the related
                                  prospectus supplement, notes will represent
                                  indebtedness of the related trust fund. You
                                  are advised to consult your tax advisors.

                                  See "Federal Income Tax Consequences" in this
                                  prospectus and in the related prospectus
                                  supplement.

ERISA Considerations............  If you are a fiduciary of any employee
                                  benefit plan subject to the fiduciary
                                  responsibility provisions of the Employee
                                  Retirement Income Security Act of 1974, as
                                  amended, you should carefully review with
                                  your own legal advisors whether the purchase
                                  or holding of securities could give rise to a
                                  transaction prohibited or otherwise
                                  impermissible under ERISA or the Internal
                                  Revenue Code.

                                  See "ERISA Considerations" in this prospectus
                                  and in the related prospectus supplement.

Legal Investment................  The applicable prospectus supplement will
                                  specify whether the securities offered will
                                  constitute "mortgage related securities" for
                                  purposes of the Secondary Mortgage Market
                                  Enhancement Act of 1984, as amended. If your
                                  investment activities are subject to legal
                                  investment laws and regulations, regulatory
                                  capital requirements, or review by regulatory
                                  authorities, then you may be subject to
                                  restrictions on investment in the securities.
                                  You should consult your own legal advisors
                                  for assistance in determining the suitability
                                  of and consequences to you of the purchase,
                                  ownership, and sale of the securities.

                                  See "Legal Investment" in this prospectus and
                                  in the related prospectus supplement.

Use Of Proceeds.................  The depositor will use the net proceeds from
                                  the sale of each series for one or more of
                                  the following purposes:

                                  o     to purchase the related assets of the
                                        trust fund;

                                  o     to repay indebtedness which was incurred
                                        to obtain funds to acquire the assets of
                                        the trust fund;

                                  o     to establish any reserve funds described
```

```
                                  in the related prospectus supplement;
                                  and

                          o       to pay costs of structuring,
                                  guaranteeing and issuing the securities.
</TABLE>
```

--------------------------------------------------------------------------------

-15-

<Page>

--------------------------------------------------------------------------------

```
<TABLE>
<S>                               <C>
                                  See "Use of Proceeds" in this prospectus and
                                  in the related prospectus supplement.

Ratings........................   Prior to offering securities pursuant to this
                                  prospectus and the related prospectus
                                  supplement, each offered class must be rated
                                  upon issuance in one of the four highest
                                  applicable rating categories of at least one
                                  nationally recognized statistical rating
                                  organization. The rating or ratings
                                  applicable to the securities of each series
                                  offered by this prospectus and by the related
                                  prospectus supplement will be set forth in
                                  the related prospectus supplement.

                          o       A security rating is not a
                                  recommendation to buy, sell or hold the
                                  securities of any series.

                          o       A security rating is subject to revision
                                  or withdrawal at any time by the
                                  assigning rating agency.

                          o       A security rating does not address the
                                  effect of prepayments on the yield you
                                  may anticipate when you purchase your
                                  securities.
</TABLE>
```

--------------------------------------------------------------------------------

-16-

<Page>

RISK FACTORS

        Before making an investment decision, you should carefully consider the
following risks and the risks described under "Risk Factors" in the prospectus
supplement for the applicable series of securities. We believe these sections
describe the principal factors that make an investment in the securities
speculative or risky. In particular, distributions on your securities will
depend on payments received on and other recoveries with respect to the loans.
Therefore, you should carefully consider the risk factors relating to the loans
and the properties.

Limited Liquidity of Securities May Adversely Affect Market Value of Securities

        We cannot assure you that a secondary market for the securities of any
series will develop or, if it does develop, that it will provide you with
liquidity of investment or will continue for the life of your securities. The
market value of your securities will fluctuate with changes in prevailing rates
of interest. Consequently, if you sell your security in any secondary market
that develops, you may sell it for less than par value or for less than your
purchase price. You will have optional redemption rights only to the extent the
related prospectus supplement so specifies. The prospectus supplement for any
series may indicate that an underwriter intends to establish a secondary market
in the securities, but no underwriter must do so.

Assets of Trust Fund Are Limited

        The trust fund for your series constitutes the sole source of payment for
your securities. The trust fund will consist of, among other things:

    o     payments with respect to the assets of the trust fund; and

    o     any amounts available pursuant to any credit enhancement for your
          series, for the payment of principal of and interest on the securities
          of your series.

You will have no recourse to the depositor or any other person if you do
not receive distributions on your securities. Furthermore, certain assets of the
trust fund and/or any balance remaining in the trust account may be promptly
released or remitted to the depositor, the master servicer, any credit
enhancement provider or any other person entitled to these amounts immediately
after making

    o     all payments due on the securities of your series;

    o     adequate provision for future payments on certain classes of
          securities; and

    o     any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

The securities will not represent an interest in or obligation of the
depositor, the master servicer or any of their respective affiliates.

-17-

&lt;Page&gt;

Credit Enhancement Is Limited in Amount and Coverage

Credit enhancement reduces your risk of delinquent payments or losses.
However, the amount of credit enhancement will be limited, as set forth in the
related prospectus supplement, and may decline and could be depleted under
certain circumstances before payment in full of your securities. As a result,
you may suffer losses. Moreover, the credit enhancement may not cover all
potential losses or risks. For example, it may or may not fully cover fraud or
negligence by a loan originator or other parties. See "Description of Credit
Support" in this prospectus.

Yield Is Sensitive to Rate of Principal Prepayment

The yield on the securities of each series will depend in part on the rate
of principal payment on the assets of the trust fund. In particular, variations
on this rate will include:

    o     the extent of prepayments of the residential loans and, in the case of
          agency securities, the underlying loans, comprising the trust fund;

    o     the allocation of principal and/or payment among the classes of
          securities of a series as specified in the related prospectus
          supplement;

    o     the exercise of any right of optional termination; and

    o     the rate and timing of payment defaults and losses incurred with
          respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of
residential loans not affiliated with the depositor, the originator or the
master servicer may result in repurchases of assets of the trust fund. These
repurchases may lead to prepayments of principal. The rate of prepayment of the
residential loans comprising or underlying the assets of the trust fund may
affect the yield to maturity on your securities. See "Yield Considerations" and
"Maturity and Prepayment Considerations" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

    o     prevailing mortgage market interest rates;

    o     local and national interest rates;

    o     homeowner mobility; and

    o     the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include
all interest accrued during the period specified in the related prospectus
supplement. If interest accrues over a period ending two or more days before a
distribution date, your effective yield will be reduced from the yield you would
have obtained if interest payable on the securities accrued through the day
immediately before each distribution date. Consequently, your effective yield,
at par, will be

-18-

<Page>

less than the indicated coupon rate. See "Description of the Securities --
Distributions" and "-- Principal Interest on the Securities" in this prospectus.

Borrower May Be Unable to Make Balloon Payment

    Some of the residential loans may not fully amortize over their terms to
maturity and, thus, may require principal payments, i.e. balloon payments, at
their stated maturity. Residential loans with balloon payments involve greater
risk because a borrower's ability to make a balloon payment typically will
depend on its ability to:

    o    timely refinance the loan; or

    o    timely sell the related residential property.

    A number of factors will affect a borrower's ability to accomplish either
of these goals, including:

    o    the level of available mortgage rates at the time of sale or
         refinancing;

    o    the borrower's equity in the related residential property;

    o    the financial condition of the borrower; and

    o    the tax laws.

A borrower's failure to make a balloon payment would increase the risk that you
might not receive all payments to which you are entitled.

Nature of Mortgages Could Adversely Affect Value of Properties

    Several factors could adversely affect the value of the residential
properties. As a result, the outstanding balance of the related residential
loans, together with any senior financing on the residential properties, if
applicable, may equal or exceed the value of the residential properties. Among
these factors are:

    o    an overall decline in the residential real estate market in the areas
         in which the residential properties are located;

    o    a decline in the general condition of the residential properties as a
         result of failure of borrowers to adequately maintain the residential
         properties; or

    o    a decline in the general condition of the residential properties as a
         result of natural disasters that are not necessarily covered by
         insurance, such as earthquakes and floods.

A decline that affects residential loans secured by junior liens could
extinguish the value of the interest of a junior mortgagee in the residential
property before having any effect on the interest of the related senior
mortgagee. If a decline occurs, the actual rates of delinquencies,

-19-

<Page>

foreclosures and losses on all residential loans could be higher than those
currently experienced in the mortgage lending industry in general.

    Even if the residential properties provide adequate security for the
residential loans, the master servicer could encounter substantial delays in
liquidating the defaulted residential loans. These delays in liquidating the
loans could lead to delays in receiving your proceeds because:

    o    foreclosures on residential properties securing residential loans are
         regulated by state statutes and rules;

    o    foreclosures on residential properties are also subject to delays and
         expenses of other types of lawsuits if defenses or counterclaims are
         interposed, sometimes requiring several years to complete; and

    o    in some states an action to obtain a deficiency judgment is not
         permitted following a nonjudicial sale of residential properties.

Therefore, if a borrower defaults, the master servicer may be unable to

foreclose on or sell the residential property or obtain liquidation proceeds sufficient to repay all amounts due on the related residential loan. In addition, the master servicer will be entitled to deduct from related liquidation proceeds all expenses reasonably incurred in attempting to recover amounts due on defaulted residential loans and not yet reimbursed. These expenses may include payments to senior lienholders, legal fees and costs of legal action, real estate taxes and maintenance and preservation expenses.

Liquidation expenses with respect to defaulted loans do not vary directly with the outstanding principal balances of the loan at the time of default. Therefore, assuming that a servicer took the same steps in realizing on a defaulted loan having a small remaining principal balance as it would in the case of a defaulted loan having a large remaining principal balance, the amount realized after expenses of liquidation would be smaller as a percentage of the outstanding principal of the small loan than would be the case with the larger defaulted loan having a large remaining principal balance. The mortgages and deeds of trust securing certain mortgage loans, multifamily loans and home improvement contracts may be junior liens subordinate to the rights of the senior lienholder. Consequently, the proceeds from the liquidation, insurance or condemnation proceeds will be available to satisfy the junior loan amount only to the extent that the claims of the senior mortgagees have been satisfied in full, including any related foreclosure costs.

In addition, a junior mortgagee may not foreclose on the property securing a junior mortgage unless it forecloses subject to any senior mortgage. If a junior mortgagee forecloses, it must either pay the entire amount due on any senior mortgage at or prior to the foreclosure sale or undertake the obligation to make payments on the senior mortgage if the borrower defaults under the senior mortgage. The trust fund will not have any source of funds to satisfy any senior mortgages or make payments due to any senior mortgagees. However, the master servicer or sub-servicer may, at its option, advance these amounts to the extent deemed recoverable and prudent.

-20-

<Page>

If proceeds from a foreclosure or similar sale of the related mortgaged property are insufficient to satisfy all senior liens and the junior lien in the aggregate, the trust fund, as the holder of the junior lien, and, accordingly, holders of one or more classes of the securities, to the extent not covered by credit enhancement, are likely to:

o   incur losses in jurisdictions in which a deficiency judgment against the borrower is not available; and

o   incur losses if any deficiency judgment obtained is not realized on.

In addition, the rate of default of junior loans may be greater than that of mortgage loans secured by first liens on comparable properties.

Applicable state laws generally:

o   regulate interest rates and other charges;

o   require certain disclosures; and

o   require licensing of certain originators and servicers of residential loans.

In addition, most states have other laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and practices which may apply to the origination, servicing and collection of the residential loans. Violations of these laws, policies and principles:

o   may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans;

o   may entitle the borrower to a refund of amounts previously paid; and

o   could subject the master servicer to damages and administrative sanctions.

See "Certain Legal Aspects of Residential Loans" in this prospectus.

Violations of Environmental Laws May Reduce Recoveries on Properties

Real property pledged as security to a lender may be subject to certain environmental risks. Under federal law and the laws of certain states, contamination of a property may result in a lien on the property to assure the costs of cleanup. In several states, this lien has priority over the lien of an existing mortgage against the property. In addition, under the laws of some states and under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, a lender may become liable, as an "owner or operator," for costs of addressing releases or threatened releases of hazardous

substances that require remedy on a property. This liability could result if
agents or employees of the lender have become sufficiently involved in the
operations of the borrower, regardless of whether the environmental damage or
threat was caused by a prior owner. A lender also risks this liability on
foreclosure of the related property. If this liability is imposed on the trust
fund there would be an increased risk that you might not receive

-21-

<Page>

all payments to which you are entitled. See *Certain Legal Aspects of
Residential Loans -- Environmental Legislation* in this prospectus.

Violations of Federal Laws May Adversely Affect Ability to Collect on Loans

The residential loans may also be subject to federal laws, including:

o    the federal Truth in Lending Act and Regulation Z promulgated under
     that act, which require certain disclosures to the borrowers regarding
     the terms of the residential loans;

o    the Equal Credit Opportunity Act and Regulation B promulgated under
     that act, which prohibit discrimination on the basis of age, race,
     color, sex, religion, marital status, national origin, receipt of
     public assistance or the exercise of any right under the Consumer
     Credit Protection Act, in the extension of credit;

o    the Fair Credit Reporting Act, which regulates the use and reporting
     of information related to the borrower's credit experience; and

o    the Home Equity Loan Consumer Protection Act of 1988, which requires
     additional disclosures, limits changes that may be made to the loan
     documents without the borrower's consent. This Act also restricts a
     lender's ability to declare a default or to suspend or reduce a
     borrower's credit limit to certain enumerated events.

Certain mortgage loans may be subject to the Home Ownership and Equity
Protection Act of 1994. These provisions may:

o    impose additional disclosure and other requirements on creditors with
     respect to non-purchase money mortgage loans with high interest rates
     or high up-front fees and charges;

o    impose specific statutory liabilities on creditors who fail to comply
     with their provisions; and

o    affect the enforceability of the related loans.

In addition, any assignee of the creditor would generally be subject to all
claims and defenses that the consumer could assert against the creditor,
including, without limitation, the right to rescind the mortgage loan.

The Home Improvement Contracts are also subject to the Preservation of
Consumers' Claims and Defenses regulations of the Federal Trade Commission and
other similar federal and state statutes and regulations. These laws

o    protect the homeowner from defective craftsmanship or incomplete work
     by a contractor;

-22-

<Page>

o    permit the obligated party to withhold payment if the work does not
     meet the quality and durability standards agreed to by the homeowner
     and the contractor; and

o    subject any person to whom the seller assigns its consumer credit
     transaction to all claims and defenses which the obligated party in a
     credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the
ability of the master servicer to collect all or part of the principal of or
interest on the residential loans. In addition, violations could subject the
trust fund to damages and administrative enforcement. Accordingly, violations of
these federal laws would increase the risk that you might not receive all
payments to which you are entitled. See *Certain Legal Aspects of Residential
Loans* in this prospectus.

Rating of the Securities Are Limited and May be Withdrawn or Lowered

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

o   the adequacy of the value of the assets of the trust fund;

o   any credit enhancement with respect to the class; and

o   the likelihood that you will receive payments to which you are entitled under the terms of your securities.

The rating will not be based on:

o   the likelihood that principal prepayments on the related residential loans will be made;

o   the degree to which prepayments might differ from those originally anticipated; or

o   the likelihood of early optional termination of the series of securities.

You should not interpret the rating as a recommendation to purchase, hold or sell securities, because it does not address market price or suitability for a particular investor. The rating will not address:

o   the possibility that prepayment at higher or lower rates than you anticipate may cause you to experience a lower than anticipated yield; or

o   the possibility that if you purchase your security at a significant premium, then you might fail to recoup your initial investment under certain prepayment scenarios.

-23-

<Page>

We cannot assure you that any rating will remain in effect for any given period of time or that a rating agency will not lower or withdraw its rating entirely in the future due to, among other reasons:

o   if in the judgment of the rating agency, circumstances in the future so warrant;

o   any erosion in the adequacy of the value of the assets of the trust fund or any credit enhancement with respect to a series; or

o   an adverse change in the financial or other condition of a credit enhancement provider or a change in the rating of the credit enhancement provider's long term debt.

Each rating agency rating the securities will establish criteria to determine the amount, type and nature of credit enhancement, if any, established with respect to a class of securities. Rating agencies often determine the amount of credit enhancement required with respect to each class based on an actuarial analysis of the behavior of similar loans in a larger group. With respect to the rating, we cannot assure you:

o   that the historical data supporting the actuarial analysis will accurately reflect future experience;

o   that the data derived from a large pool of similar loans accurately predicts the delinquency, foreclosure or loss experience of any particular pool of residential loans; or

o   that the values of any residential properties have remained or will remain at their levels on the respective dates of origination of the related residential loans. See "Rating" in this prospectus.

A rating agency's withdrawal or reduction of a rating on your securities would increase the risk that the market value of your securities will decrease.

Adverse Conditions in the Residential Real Estate Markets May Result in a Decline in Property Values

The residential real estate markets may experience an overall decline in property values. This decline could lead to a number of adverse results:

o   the outstanding principal balances of the residential loans in a particular trust fund are equal to or greater than the value of the residential properties;

> o   any secondary financing on the related residential properties are equal to or greater than the value of the residential properties; and
>
> o   the rate of delinquencies, foreclosures and losses are higher than those now generally experienced in the mortgage lending industry.

<center>-24-</center>

<Page>

In addition, adverse economic conditions, which may or may not affect real property values, may affect the timely payment by borrowers of scheduled payments of principal and interest on the residential loans. Accordingly, these factors may also affect the rates of delinquencies, foreclosures and losses with respect to any trust fund. To the extent that these losses are not covered by credit enhancement, these losses may be borne, at least in part, by you.

Book-Entry System for Certain Classes May Decrease Liquidity and Delay Payment

Transactions in the classes of book-entry securities of any series generally can be effected only through The and its participating members, financial intermediaries and certain banks. Therefore:

> o   the liquidity of book-entry securities in the secondary trading market that may develop may be limited because investors may be unwilling to purchase securities for which they cannot obtain physical securities;
>
> o   your ability to pledge a security to persons or entities that do not participate in the DTC system, or otherwise to take action in respect of the securities, may be limited due to lack of a physical security representing the securities; and
>
> o   you may experience some delay in receiving distributions of interest and principal on your securities because the trustee will make distributions to DTC or its participating members. DTC will then be required to credit the distributions to the accounts of the participating organizations. Only then will they be credited to your account either directly or indirectly through Financial Intermediaries.

See "Description of the Securities-- Book-Entry Registration of Securities" in this prospectus.

Unsecured Home Improvement Contracts May Experience Relatively Higher Losses

A borrower's obligations under an unsecured home improvement contract will not be secured by an interest in the related real estate or otherwise. A borrower's loan being unsecured would increase the risk that you might not receive all payments to which you are entitled because:

> o   the related trust fund, as the owner of the unsecured home improvement contract, will be a general unsecured creditor to these obligations;
>
> o   if a default occurs under an unsecured home improvement contract, the related trust fund will have recourse only against the borrower's assets generally, along with all other general unsecured creditors of the borrower;
>
> o   in a bankruptcy or insolvency proceeding relating to a borrower on an unsecured home improvement contract, the borrower's obligations under this unsecured home improvement contract may be discharged in their entirety. This discharge may occur even if the portion of the borrower's assets made available to pay the amount due and

<center>-25-</center>

<Page>

> owing to the related trust fund as a general unsecured creditor are sufficient to pay these amounts in whole or part; and
>
> o   the borrower may not demonstrate the same degree of concern over performance of the borrower's obligations as if these obligations were secured by the real estate owned by the borrower.

Mortgage Loans Underwritten as Non-Conforming Credits May Experience Relatively Higher Losses

The single family mortgage loans assigned and transferred to a trust fund may include mortgage loans underwritten in accordance with the underwriting

standards for "non-conforming credits." These borrowers may include those whose creditworthiness and repayment ability do not satisfy Fannie Mae or Freddie Mac underwriting guidelines.

A mortgage loan made to a "non-conforming credit" means a residential loan that is:

- o   ineligible for purchase by Fannie Mae or Freddie Mac due to borrower credit characteristics, property characteristics, loan documentation guidelines or other characteristics that do not meet Fannie Mae or Freddie Mac underwriting guidelines;

- o   made to a borrower whose creditworthiness and repayment ability do not satisfy the Fannie Mae or Freddie Mac underwriting guidelines; or

- o   made to a borrower who may have a record of major derogatory credit items such as default on a prior residential loan, credit write-offs, outstanding judgments or prior bankruptcies.

Mortgage loans made to borrowers who are characterized as "non-conforming credits" may experience greater delinquency and foreclosure rates than loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. This may occur because these borrowers are less creditworthy than borrowers who meet the Fannie Mae or Freddie Mac underwriting guidelines. As a result, if the values of the mortgaged properties decline, then the rates of loss on mortgage loans made to "non-conforming credits" are more likely to increase than the rates of loss on mortgage loans made in accordance with the Fannie Mae or Freddie Mac guidelines and this increase may be substantial. As a result you may suffer losses. See "Residential Loans -- Underwriting Standards" in this prospectus.

Assets of the Trust Fund May Include Delinquent and Sub-Performing Residential Loans

The assets of the trust fund may include residential loans that are delinquent or sub-performing. The credit enhancement provided with respect to your series of securities may not cover all losses related to these delinquent or sub-performing residential loans. You should consider the risk that including these residential loans in the trust fund could increase the risk that you will suffer losses because:

- o   the rate of defaults and prepayments on the residential loans to increase; and

                                   -26-


<Page>


- o   in turn, losses may exceed the available credit enhancement for the series and affect the yield on your securities.

See "The Trust Funds -- Residential Loans" in this prospectus.

Changes in the Market Value of Properties May Adversely Affect Payments on the Securities

We cannot assure you that the market value of the assets of the trust fund or any other assets of a trust fund will at any time be equal to or greater than the principal amount of the securities of the related series then outstanding, plus accrued interest on it. If the assets in the trust fund have to be sold for any reason, the net proceeds from the sale, after paying expenses of sale and unpaid fees and other amounts owing to the master servicer and the trustee, may be insufficient to pay in full the principal of and interest on your securities.

                              DEFINED TERMS

We define and use capitalized terms in this prospectus to assist you in understanding the terms of the offered securities and this offering. These terms are defined under the section "Glossary of Terms" in this prospectus on page 187.

                             THE TRUST FUNDS

The depositor will select each asset of the trust fund to include in a trust fund from among those purchased, either directly or through affiliates, from unaffiliated sellers, or, from sellers affiliated with the depositor, as provided in the related prospectus supplement.

Residential Loans

The residential loans may consist of any combination of:

- o   Mortgage loans secured by first or junior liens on one-to four-family residential properties;

- o   Multifamily Loans;

     o    Home Improvement Contracts;

     o    Home Equity Loans;

     o    Cooperative Loans; or

     o    Manufactured Housing Contracts

The mortgaged properties, cooperative shares, the right to occupy a particular cooperative unit in any of these cooperative shares and manufactured homes may be located in any one of the fifty states, the District of Columbia, the Commonwealth of Puerto Rico or the territories of

-27-

<Page>

Guam or the United States Virgin Islands. Each trust fund may contain, and any participation interest in any of the foregoing will relate to, any combination of the following types of residential loans:

(1) Fully amortizing loans with a fixed rate of interest and level monthly payments to maturity;

(2) Fully amortizing loans with a fixed interest rate providing for level monthly payments, or for payments of interest only during the early years of the term, followed by monthly payments of principal and interest that increase annually at a predetermined rate until the loan is repaid or for a specified number of years, after which level monthly payments resume;

(3) Fully amortizing loans with a fixed interest rate providing for monthly payments during the early years of the term that are calculated on the basis of an interest rate below the interest rate, followed by monthly payments of principal and interest that increase annually by a predetermined percentage over the monthly payments payable in the previous year until the loan is repaid or for a specified number of years, followed by level monthly payments;

(4) Fixed interest rate loans providing for level payments of principal and interest on the basis of an assumed amortization schedule and a balloon payment of principal at the end of a specified term;

(5) Fully amortizing loans with an interest rate adjusted periodically, with corresponding adjustments in the amount of monthly payments, to equal the sum, that may be rounded, of a fixed margin and an index as described in the related prospectus supplement. These loans may provide for an election, at the borrower's option during a specified period after origination of the loan, to convert the adjustable interest rate to a fixed interest rate, as described in the related prospectus supplement;

(6) Fully amortizing loans with an adjustable interest rate providing for monthly payments less than the amount of interest accruing on the loan and for the amount of interest accrued but not paid currently to be added to the principal balance of the loan;

(7) Fully amortizing loans with an adjustable interest rate providing for an election at the borrower's option, if an adjustment to the interest rate occurs resulting in an interest rate in excess of the interest rate at origination of the loan, to extend the term to maturity for a period as will result in level monthly payments to maturity; or

(8) Any other types of residential loans as may be described in the related prospectus supplement.

The related prospectus supplement may specify that the trust fund underlying a series of securities may include mortgage securities consisting of previously issued asset-backed certificates, collateralized mortgage obligations or participation certificates. The mortgage securities may:

     o    evidence interests in, or be collateralized by, residential loans or agency securities as described in this prospectus and in the related prospectus supplement; or

-28-

<Page>

     o    have been issued previously by:

          o    the depositor or an affiliate of the depositor;

      o    a financial institution; or

      o    another entity engaged generally in the business of lending or a limited purpose corporation organized for the purpose of, among other things, establishing trusts, acquiring and depositing loans into the trusts, and selling beneficial interests in these trusts.

If the mortgage securities were issued by an entity other than the depositor or its affiliates, the mortgage securities will have been:

      o    acquired in bona fide secondary market transactions from persons other than the issuer of the mortgage securities or its affiliates; and

      (1)    offered and distributed to the public pursuant to an effective registration statement, or

      (2)    purchased in a transaction not involving any public offering from a person who is not an affiliate of the issuer of those securities at the time of sale nor an affiliate of the issuer at any time during the preceding three months. However, a period of two years must have elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer.

Generally, the mortgage securities will be similar to securities offered by this prospectus. As to any series of securities that the Trust Fund includes mortgage securities, the related prospectus supplement will include a description of:

      o    the mortgage securities;

      o    any related credit enhancement;

      o    the residential loans underlying the mortgage securities; and

      o    any other residential loans included in the trust fund relating to the series.

References to advances to be made and other actions to be taken by the master servicer in connection with the residential loans underlying the mortgage securities, may include the advances made and other actions taken pursuant to the terms of the mortgage securities.

The related prospectus supplement may specify that residential loans contain provisions prohibiting prepayments for a specified Lockout Period.

The related prospectus supplement may specify that the assets of a trust fund will include residential loans that are delinquent or sub-performing. The inclusion of these residential loans in the trust fund for a series may cause the rate of defaults and prepayments on the residential loans

-29-


<Page>


to increase. This, in turn, may cause losses to exceed the available credit enhancement for the series and affect the yield on the securities of the series.

Mortgage Loans. The mortgage loans will be evidenced by promissory notes secured by mortgages or deeds of trust creating first or junior liens on the mortgaged properties. The mortgage loans will be secured by one- to four-family residences, including:

      o    detached and attached dwellings;

      o    townhouses;

      o    rowhouses;

      o    individual condominium units;

      o    individual units in planned-unit developments; and

      o    individual units in de minimis planned-unit developments.

The related prospectus supplement may specify that the mortgage loans will be insured by the FHA or partially guaranteed by the VA. See "The Trust Funds -- Residential Loans -- FHA Loans and VA Loans" and "Description of Primary Insurance Coverage -- FHA Insurance and VA Guarantees" in this prospectus.

Certain of the mortgage loans may be secured by junior liens, and the related senior liens may not be included in the mortgage pool. The primary risk to holders of mortgage loans secured by junior liens is the possibility that adequate funds will not be received in connection with a foreclosure of the

related senior lien to satisfy fully both the senior lien and the junior lien. This possibility could arise under any of a number of different circumstances:

- o   If a holder of a senior lien forecloses on a mortgaged property, the proceeds of the foreclosure or similar sale will be applied:

    - o   first, to the payment of court costs and fees in connection with the foreclosure;

    - o   second, to real estate taxes; and

    - o   third, in satisfaction of all principal, interest, prepayment or acceleration penalties, if any, and any other sums due and owing to the holder of the senior lien.

The claims of the holders of senior liens will be satisfied in full out of proceeds of the liquidation of the mortgage loan, if the proceeds are sufficient, before the trust fund as holder of the junior lien receives any payments in respect of the mortgage loan.

<div align="center">-30-</div>

<Page>

- o   If the master servicer forecloses on any mortgage loan, it would do so subject to any related senior liens.

    - o   In order for the debt related to the mortgage loan included in the Trust Fund to be paid in full at the sale, a bidder at the foreclosure sale of the mortgage loan would have to bid an amount sufficient to pay off all sums due under the mortgage loan and any senior liens or purchase the related mortgaged property subject to any senior liens.

    - o   If the proceeds from a foreclosure or similar sale of the related mortgaged property are insufficient to satisfy all senior liens and the junior lien in the aggregate, the trust fund, as the holder of the junior lien. As a result, holders of one or more classes of the securities bear:

        - o   the risk of delay in distributions while a deficiency judgment against the borrower is obtained;

        - o   the risk of loss if the deficiency judgment is not realized on; and

        - o   the risk that deficiency judgments may not be available in certain jurisdictions.

- o   In addition, a junior mortgagee may not foreclose on the property securing a junior mortgage unless it forecloses subject to the senior mortgage.

   Liquidation expenses with respect to defaulted mortgage loans do not vary directly with the outstanding principal balance of the loan at the time of default. Therefore, assuming that a servicer took the same steps in realizing on a defaulted mortgage loan having a small remaining principal balance as it would in the case of a defaulted mortgage loan having a large remaining principal balance, the amount realized after expenses of liquidation of a loan with a smaller remaining balance would be smaller as a percentage of the loan amount than would be the case with the defaulted mortgage loan having a larger remaining balance.

   Multifamily Loans. The Multifamily Loan will be evidenced by mortgage notes secured by mortgages creating first or junior liens on rental apartment buildings or projects containing five or more dwelling units. The related prospectus supplement will specify the original terms to stated maturity of the Multifamily Loans, which are generally not more than 30 years. The related prospectus supplement may specify that the Multifamily Loans are FHA loans. Mortgaged properties which secure Multifamily Loans may include high-rise, mid-rise and garden apartments. See "The Trust Funds -- Residential Loans -- FHA Loans and VA Loans" and "Description of Primary Insurance Coverage -- FHA Insurance and VA Guarantees" in this prospectus.

   The related prospectus supplement may specify that the Multifamily Loans:

- o   contain a Lockout Period;

<div align="center">-31-</div>

<Page>

     o   prohibit prepayments entirely; or

     o   require the payment of a prepayment penalty if prepayment in full or
          in part occurs.

If you are entitled to all or a portion of any prepayment penalties collected in
respect of the related Multifamily Loans, the related prospectus supplement will
specify the method or methods by which the prepayment penalties are calculated.

    Home Equity Loans and Home Improvement Contracts. The Home Equity Loans
will be secured by first or junior liens on the related mortgaged properties for
property improvement, debt consolidation or home equity purposes. The Home
Improvement Contracts will either be unsecured or secured by mortgages on one-
to four-family, multifamily properties or manufactured housing which mortgages
are generally subordinate to other mortgages on the same property. The Home
Improvement Contracts may be fully amortizing or may have substantial balloon
payments due at maturity. They may also have fixed or adjustable rates of
interest and may provide for other payment characteristics. The related
prospectus supplement may specify that the Home Improvement Contracts are FHA
loans. See "The Trust Funds -- Residential Loans -- FHA Loans and VA Loans" and
"Description of Primary Insurance Coverage -- FHA Insurance and VA Guarantees"
in this prospectus.

    Cooperative Loans. The Cooperative Loans will be evidenced by promissory
notes secured by security interests in shares issued by cooperative housing
corporations and in the related proprietary leases or occupancy agreements
granting exclusive rights to occupy specific cooperative units in the related
buildings.

    Manufactured Housing Contracts. The Manufactured Housing Contracts will
consist of manufactured housing conditional sales contracts and installment loan
agreements each secured by a manufactured home, or in the case of a Land
Contract, by a lien on the real estate to which the manufactured home is deemed
permanently affixed and, in some cases, the related manufactured home which is
not real property under the applicable state law.

    The manufactured homes securing the Manufactured Housing Contracts will
generally consist of manufactured homes within the meaning of 42 United States
Code, Section 5402(6). Under Section 5402(6), a "manufactured home" is defined
as "a structure, transportable in one or more sections, which in the traveling
mode, is eight body feet or more in width or forty body feet or more in length,
or, when erected on site, is three hundred twenty or more square feet, and which
is built on a permanent chassis and designed to be used as a dwelling with or
without a permanent foundation when connected to the required utilities, and
includes the plumbing, heating, air conditioning, and electrical systems
contained in the manufactured home. However, the term "manufactured home" shall
include any structure which meets all the requirements of this paragraph except
the size requirements and with respect to which the manufacturer voluntarily
files a certification required by the Secretary of Housing and Urban Development
and complies with the standards established under this chapter."

    The related prospectus supplement may specify that the Manufactured Housing
Contracts are FHA loans or VA loans. See "The Trust Funds -- Residential Loans
-- FHA Loans and VA

                                    -32-


<Page>


Loans" and "Description of Primary Insurance Coverage -- FHA Insurance and VA
Guarantees" in this prospectus.

    Buydown Loans. The related prospectus supplement may specify that
residential loans are subject to temporary buydown plans. The monthly payments
made by the borrower in the early years of these loans, known as the buydown
period, will be less than the scheduled payments on these loans. The resulting
difference will be recovered from:

     o   an amount contributed by the borrower, the seller of the residential
          property or another source and placed in a custodial account; and

     o   investment earnings on the buydown funds to the extent that the
          related prospectus supplement provides for these earnings.

Generally, the borrower under each of these loans will be eligible for at a
reduced interest rate. Accordingly, the repayment of these loans is dependent on
the ability of the borrowers to make larger monthly payments after the buydown
funds have been depleted and, for certain buydown loans, during the buydown
period. See "Residential Loans -- Underwriting Standards" in this prospectus.

    FHA Loans and VA Loans. FHA loans will be insured by the FHA as authorized
under the National Housing Act of 1934, as amended, and the United States
Housing Act of 1937, as amended. One- to four-family FHA loans will be insured
under various FHA programs including the standard FHA 203-b programs to finance

the acquisition of one- to four-family housing units and the FHA 245 graduated payment mortgage program. The FHA loans generally require a minimum down payment of approximately 5% of the original principal amount of the FHA loan. No FHA loan may have an interest rate or original principal balance exceeding the applicable FHA limits at the time of origination of the FHA loan. See "Description of Primary Insurance Coverage -- FHA Insurance and VA Guarantees" in this prospectus.

Home Improvement Contracts and Manufactured Housing Contracts that are FHA loans are insured by the FHA pursuant to Title I of the Housing Act. As described in the related prospectus supplement, these loans are insured up to an amount equal to 90% of the sum of the unpaid principal of the FHA loan, a portion of the unpaid interest and certain other liquidation costs.

There are two primary FHA insurance programs that are available for Multifamily Loans:

    o    Sections 221(d)(3) and (d)(4) of the Housing Act allow HUD to insure Multifamily Loans that are secured by newly constructed and substantially rehabilitated multifamily rental projects. Section 244 of the Housing Act provides for co-insurance of the loans made under Sections 221(d)(3) and (d)(4) by HUD/FHA and a HUD-approved co-insurer. Generally the term of these Multifamily Loans may be up to 40 years and the ratio of the loan amount to property replacement cost can be up to 90%.

    o    Section 223(f) of the Housing Act allows HUD to insure Multifamily Loans made for the purchase or refinancing of existing apartment projects that are at least three years

-33-

<Page>

old. Section 244 also provides for co-insurance of mortgage loans made under Section 223(f). Under Section 223(f), the loan proceeds cannot be used for substantial rehabilitation work. However, repairs may be made for up to, in general, the greater of 15% of the value of the project and a dollar amount per apartment unit established from time to time by HUD. In general the loan term may not exceed 35 years and a loan-to-value ratio of no more than 85% is required for the purchase of a project and 70% for the refinancing of a project.

VA loans will be partially guaranteed by the VA under the Servicemen's Readjustment Act of 1944, as amended. The Servicemen's Readjustment Act permits a veteran, or in certain instances the spouse of a veteran, to obtain a mortgage loan guarantee by the VA covering mortgage financing of the purchase of a one- to four-family dwelling unit at interest rates permitted by the VA. The program has no mortgage loan limits, requires no down payment from the purchasers and permits the guarantee of mortgage loans of up to 30 years' duration. However, no VA loan will have an original principal amount greater than five times the partial VA guarantee for the VA loan. The maximum guarantee that may be issued by the VA under this program will be set forth in the related prospectus supplement. See "Description of Primary Insurance Coverage -- FHA Insurance and VA Guarantees" in this prospectus.

Loan-to-Value Ratio. The prospectus supplement for a series backed by residential loans will describe the Loan-to-Value Ratios of the loans.

    o    Generally, for purposes of calculating the Loan-to-Value Ratio of a Manufactured Housing Contract relating to a new manufactured home, the Collateral Value is no greater than the sum of:

        (1)  a fixed percentage of the list price of the unit actually billed by the manufacturer to the dealer, exclusive of freight to the dealer site, including "accessories" identified in the invoice, plus

        (2)  the actual cost of any accessories purchased from the dealer, a delivery and set-up allowance, depending on the size of the unit, and the cost of state and local taxes, filing fees and up to three years prepaid hazard insurance premiums.

    o    Generally, with respect to used manufactured homes, the Collateral Value is the least of the sales price, appraised value, and National Automobile Dealer's Association book value plus prepaid taxes and hazard insurance premiums. The appraised value of a manufactured home is based on the age and condition of the manufactured housing unit and the quality and condition of the mobile home park in which it is situated, if applicable.

Residential properties may be subject to subordinate financing at the time of origination. As is customary in residential lending, subordinate financing may be obtained with respect to a residential property after the origination of the residential loan without the lender's consent.

-34-

<Page>

We cannot assure you that values of the residential properties have remained or will remain at their historic levels on the respective dates of origination of the related residential loans. If the residential real estate market experiences an overall decline in property values such that the outstanding principal balances of the residential loans, and any other financing on the related residential properties, become equal to or greater than the value of the residential properties, the actual rates of delinquencies, foreclosures and losses may be higher than those now generally experienced in the mortgage lending industry. In addition, adverse economic conditions, which may or may not affect real property values, may affect the timely payment by borrowers of scheduled payments of principal and interest on the residential loans and, accordingly, the actual rates of delinquencies, foreclosures and losses. To the extent that the losses are not covered by the applicable insurance policies and other forms of credit support described in this prospectus and in the related prospectus supplement, the losses will be borne, at least in part, by you. See "Description of the Securities" and "Description of Credit Support" in this prospectus.

Agency Securities

The agency securities will consist of any combination of "fully modified pass-through" mortgage-backed certificates guaranteed by the GNMA, guaranteed mortgage pass-through securities issued by Fannie Mae and mortgage participation certificates issued by Freddie Mac.

GNMA. Government National Mortgage Association is a wholly owned corporate instrumentality of the United States within the Department of Housing and Urban Development. Section 306(g) of Title III of the Housing Act authorizes GNMA to guarantee the timely payment of the principal of and interest on certificates that are based on and backed by a pool of FHA loans, VA loans or by pools of other eligible residential loans.

Section 306(g) of the Housing Act provides that "the full faith and credit of the United States is pledged to the payment of all amounts which may be required to be paid under any guaranty under this subsection." In order to meet its obligations under the guaranty, GNMA is authorized, under Section 306(d) of the Housing Act, to borrow from the United States Treasury with no limitations as to amount, to perform its obligations under its guarantee.

GNMA Certificates. Each GNMA Certificate will be a "fully modified pass-through" mortgage-backed certificate issued and serviced by an issuer approved by GNMA or Fannie Mae as a seller-servicer of FHA loans or VA loans, except as described below with respect to Stripped Agency Securities. The loans underlying GNMA Certificates may consist of FHA loans, VA loans and other loans eligible for inclusion in loan pools underlying GNMA Certificates. GNMA Certificates may be issued under either or both of the GNMA I program and the GNMA II program, as described in the related prospectus supplement. The prospectus supplement for certificates of each series evidencing interests in a trust fund including GNMA Certificates will set forth additional information regarding:

    o    the GNMA guaranty program;

    o    the characteristics of the pool underlying the GNMA Certificates;

-35-

<Page>

    o    the servicing of the related pool;

    o    the payment of principal and interest on GNMA Certificates to the extent not described in this prospectus; and

    o    other relevant matters with respect to the GNMA Certificates.

Generally, with respect to Stripped Agency Securities, each GNMA Certificate will provide for the payment, by or on behalf of the issuer, to the registered holder of the GNMA Certificates. Generally, this payment shall be in an amount of monthly payments of principal and interest equal to the holder's proportionate interest in the aggregate amount of the monthly principal and interest payments on each related FHA loan or VA loan, less servicing and guaranty fees aggregating the excess of the interest on the FHA loan or VA loan over the GNMA Certificates' pass-through rate. In addition, each payment to a holder of a GNMA Certificate will include proportionate pass-through payments to the holder of any prepayments of principal of the FHA loans or VA loans

underlying the GNMA Certificates and the holder's proportionate interest in the remaining principal balance if a foreclosure or other disposition of any the FHA loan or VA loan occurs.

The GNMA Certificates do not constitute a liability of, or evidence any recourse against, the issuer of the GNMA Certificates, the depositor or any of their affiliates. The only recourse of a registered holder, such as the trustee, is to enforce the guaranty of GNMA.

GNMA will have approved the issuance of each of the GNMA Certificates included in a trust fund in accordance with a guaranty agreement or contract between GNMA and the issuer of the GNMA Certificates. Pursuant to the agreement, the issuer, in its capacity as servicer, is required to perform customary functions of a servicer of FHA loans and VA loans, including:

   o    collecting payments from borrowers and remitting the collections to
        the registered holder;

   o    maintaining escrow and impound accounts of borrowers for payments
        of taxes, insurance and other items required to be paid by the
        borrower;

   o    maintaining primary hazard insurance; and

   o    advancing from its own funds in order to make timely payments of all
        amounts due on the GNMA Certificates, even if the payments received by
        the issuer on the loans backing the GNMA Certificates are less than
        the amounts due on the loans.

If the issuer is unable to make payments on GNMA Certificates as they become due, it must promptly notify GNMA and request GNMA to make the payment. After the notification and request, GNMA will make the payments directly to the registered holder of the GNMA Certificate. If no payment is made by the issuer and the issuer fails to notify and request GNMA to make the payment, the registered holder of the GNMA Certificate has recourse against only GNMA to obtain the payment. The trustee or its nominee, as registered holder of the GNMA Certificates included in a trust fund, is entitled to proceed directly against GNMA under the

                                    -36-


<Page>


terms of the guaranty agreement or contract relating to the GNMA Certificates for any amounts that are not paid when due under each GNMA Certificate.

The GNMA Certificates included in a trust fund may have other characteristics and terms, different from those described above so long as the GNMA Certificates and underlying residential loans meet the criteria of the rating agency or agencies. The GNMA Certificates and underlying residential loans will be described in the related prospectus supplement.

Fannie Mae. The Federal National Mortgage Association is a federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act, as amended. Fannie Mae was originally established in 1938 as a United States government agency to provide supplemental liquidity to the mortgage market and was transformed into a stockholder-owned and privately managed corporation by legislation enacted in 1968.

Fannie Mae provides funds to the mortgage market by purchasing mortgage loans from lenders. Fannie Mae acquires funds to purchase loans from many capital market investors, thus expanding the total amount of funds available for housing. Operating nationwide, Fannie Mae helps to redistribute mortgage funds from capital-surplus to capital-short areas. In addition, Fannie Mae issues mortgage-backed securities primarily in exchange for pools of mortgage loans from lenders. Fannie Mae receives fees for its guaranty of timely payment of principal and interest on its mortgage-backed securities.

Fannie Mae Certificates. Fannie Mae Certificates are guaranteed mortgage pass-through certificates typically issued pursuant to a prospectus which is periodically revised by Fannie Mae. Fannie Mae Certificates represent fractional undivided interests in a pool of mortgage loans formed by Fannie Mae. Each mortgage loan:

   o    must meet the applicable standards of the Fannie Mae purchase program;

   o    is either provided by Fannie Mae from its own portfolio or purchased
        pursuant to the criteria of the Fannie Mae purchase program; and

   o    is either a conventional mortgage loan, an FHA loan or a VA loan.

The prospectus supplement for securities of each series evidencing interests in a trust fund including Fannie Mae Certificates will set forth additional information regarding:

o    the Fannie Mae program;

o    the characteristics of the pool underlying the Fannie Mae
     Certificates;

o    the servicing of the related pool;

o    payment of principal and interest on the Fannie Mae Certificates to
     the extent not described in this prospectus; and

o    other relevant matters with respect to the Fannie Mae Certificates.

-37-

<Page>

Except as described below with respect to Stripped Agency Securities,
Fannie Mae guarantees to each registered holder of a Fannie Mae Certificate that
it will distribute amounts representing the holder's proportionate share of
scheduled principal and interest at the applicable pass-through rate provided
for by the Fannie Mae Certificate on the underlying mortgage loans, whether or
not received. In addition, Fannie Mae will distribute the holder's proportionate
share of the full principal amount of any prepayment or foreclosed or other
finally liquidated mortgage loan, whether or not that principal amount is
actually recovered.

The obligations of Fannie Mae under its guarantees are obligations solely
of Fannie Mae and are not backed by, nor entitled to, the full faith and credit
of the United States. If Fannie Mae were unable to satisfy its obligations,
distributions to the holders of Fannie Mae Certificates would consist solely of
payments and other recoveries on the underlying loans. Accordingly, monthly
distributions to the holders of Fannie Mae Certificates would be affected by
delinquent payments and defaults on these loans. Fannie Mae Certificates
evidencing interests in pools of mortgage loans formed on or after May 1, 1985,
other than Fannie Mae Certificates backed by pools containing graduated payment
mortgage loans or Multifamily Loans, are available in book-entry form only. With
respect to a Fannie Mae Certificate issued in book-entry form, distributions on
that certificate will be made by wire. With respect to a fully registered Fannie
Mae Certificate, distributions on that certificate will be made by check.

The Fannie Mae Certificates included in a trust fund may have other
characteristics and terms, different from those described above, so long as the
Fannie Mae Certificates and underlying mortgage loans meet the criteria of the
rating agency or rating agencies rating the certificates of the related series.
These Fannie Mae Certificates and underlying mortgage loans will be described in
the related prospectus supplement.

Freddie Mac. The Federal Home Loan Mortgage Corporation is a corporate
instrumentality of the United States created pursuant to Title III of the
Emergency Home Finance Act of 1970, as amended. Freddie Mac was established
primarily for the purpose of increasing the availability of mortgage credit for
the financing of needed housing. It seeks to provide an enhanced degree of
liquidity for residential mortgage investments primarily by assisting in the
development of secondary markets for conventional mortgages. The principal
activity of Freddie Mac currently consists of purchasing first lien,
conventional residential mortgage loans or participation interests in the
mortgage loans and reselling the mortgage loans so purchased in the form of
mortgage securities, primarily Freddie Mac Certificates. Freddie Mac is confined
to purchasing, so far as practicable, mortgage loans and participation interests
in those mortgage loans which it deems to be of a quality, type and class as to
meet generally the purchase standards imposed by private institutional mortgage
investors.

Freddie Mac Certificates. Each Freddie Mac Certificate represents an
undivided interest in a pool of residential loans that may consist of first lien
conventional residential loans, FHA loans or VA loans. Each mortgage loan
securing an Freddie Mac Certificate must meet the applicable standards set forth
in Title III of the Emergency House Finance Act of 1970, as amended. A group of
Freddie Mac Certificates may include whole loans, participation interests in
whole loans and undivided interests in whole loans and/or participations
comprising another group of Freddie Mac Certificates. The prospectus supplement
for securities of each series

-38-

<Page>

evidencing interests in a trust fund including Freddie Mac Certificates will set
forth additional information regarding:

o   the Freddie Mac guaranty program;

o   the characteristics of the pool underlying the Freddie Mac Certificate;

o   the servicing of the related pool;

o   payment of principal and interest on the Freddie Mac Certificate to the extent not described in this prospectus; and

o   other relevant matters with respect to the Freddie Mac Certificates.

Except as described below with respect to Stripped Agency Securities:

o   Freddie Mac guarantees to each registered holder of a Freddie Mac Certificate the timely payment of interest on the underlying mortgage loans. This guarantee is only to the extent of the applicable pass-through rate on the registered holder's pro rata share of the unpaid principal balance outstanding on the underlying mortgage loans in the group of Freddie Mac Certificates represented by the Freddie Mac Certificate, whether or not received.

o   Freddie Mac also guarantees to each registered holder of a Freddie Mac Certificate collection by the holder of all principal on the underlying mortgage loans, without any offset or deduction, to the extent of the holder's pro rata share. Freddie Mac's guarantee of timely payment of scheduled principal will be limited to the extent set forth in the prospectus supplement.

o   Freddie Mac also guarantees ultimate collection of scheduled principal payments, prepayments of principal and the remaining principal balance in the event of a foreclosure or other disposition of a mortgage loan. Freddie Mac may remit the amount due on account of its guarantee of collection of principal at any time after default on an underlying mortgage loan, but not later than 30 days following the latest of:

    o   foreclosure sale;

    o   payment of the claim by any mortgage insurer; and

    o   the expiration of any right of redemption; but in any event no later than one year after demand has been made of the borrower for accelerated payment of principal.

In taking actions regarding the collection of defaulted mortgage loans underlying Freddie Mac Certificates, including the timing of demand for acceleration, Freddie Mac reserves the right to exercise its servicing judgment in the same manner used for mortgage loans which it has purchased but not sold. The length of time necessary for Freddie Mac to determine that a

-39-

<Page>

mortgage loan should be accelerated varies with the particular circumstances of each borrower. Freddie Mac has not adopted servicing standards that require that the demand be made within any specified period.

    Freddie Mac Certificates are not guaranteed by the United States or by any Federal Home Loan Bank. Freddie Mac Certificates do not constitute debts or obligations of the United States or any Federal Home Loan Bank. The obligations of Freddie Mac under its guarantee are obligations solely of Freddie Mac and are not backed by, nor entitled to, the full faith and credit of the United States. If Freddie Mac were unable to satisfy the obligations, distributions to holders of Freddie Mac Certificates would consist solely of payments and other recoveries on the underlying mortgage loans. Accordingly, monthly distributions to holders of Freddie Mac Certificates would be affected by delinquent payments and defaults on the mortgage loans.

    The Freddie Mac Certificates included in a trust fund may have other characteristics and terms, different from those described above, so long as those Freddie Mac Certificates and underlying mortgage loans meet the criteria of the rating agency or rating agencies rating the securities of the related series. The Freddie Mac Certificates and underlying mortgage loans will be described in the related prospectus supplement.

Stripped Agency Securities

    The GNMA Certificates, Fannie Mae Certificates or Freddie Mac Certificates may be issued in the form of certificates, known as Stripped Agency Securities, which represent:

o   an undivided interest in all or part of either the principal distributions, but not the interest distributions, or the interest distributions, but not the principal distributions; or

 o in some specified portion of the principal or interest distributions but not all of the distributions, on an underlying pool of mortgage loans or certain other GNMA Certificates, Fannie Mae Certificates or Freddie Mac Certificates.

 To the extent set forth in the related Prospectus Supplement, GNMA, Fannie Mae or Freddie Mac, as applicable, will guarantee each Stripped Agency Security to the same extent as the entity guarantees the underlying securities backing the Stripped Agency Securities or to the extent described above with respect to a Stripped Agency Security backed by a pool of mortgage loans. The prospectus supplement for each series of Stripped Agency Securities will set forth

 o additional information regarding the characteristics of the assets underlying the Stripped Agency Securities,

 o the payments of principal and interest on the Stripped Agency Securities and

 o other relevant matters with respect to the Stripped Agency Securities.

<div align="center">-40-</div>

&lt;Page&gt;

Additional Information Concerning the Trust Funds

 Each prospectus supplement relating to a series of securities will contain information, as of the date of the prospectus supplement, if applicable and to the extent specifically known to the depositor, with respect to the residential loans or agency securities contained in the related trust fund, including, but not limited to:

 o the aggregate outstanding principal balance and the average outstanding principal balance of the assets of the trust fund as of the applicable Cut-Off Date;

 o the types of related residential properties--e.g.,

  o one- to four-family dwellings,

  o multifamily residential properties,

  o shares in cooperative housing corporations and the related proprietary leases or occupancy agreements,

  o condominiums and planned-unit development units,

  o vacation and second homes, and

  o new or used manufactured homes;

 o the original terms to maturity;

 o the outstanding principal balances;

 o the years in which the loans were originated;

 o with respect to Multifamily Loans, the Lockout Periods and prepayment penalties;

 o the Loan-To-Value ratios or, with respect to residential loans secured by a junior lien, the combined Loan-To-Value ratios at origination;

 o the interest rates or range of interest rates borne by the residential loans or residential loans underlying the agency securities;

 o the geographical distribution of the residential properties on a state-by-state basis;

 o with respect to fully amortizing loans with an adjustable interest rate, the adjustment dates, the highest, lowest and weighted average margin, and the maximum interest rate variations at the time of adjustments and over the lives of these loans; and

 o information as to the payment characteristics of the residential loans.

<div align="center">-41-</div>

&lt;Page&gt;

If specific information respecting the assets of the trust fund is not known to the depositor at the time a series of securities is initially offered, more general information of the nature described above will be provided in the related prospectus supplement. In addition, specific information will be set forth in a report made available at or before the issuance of those securities. This information will be included in a report on Form 8-K and will be available to purchasers of the related securities at or before the initial issuance of those securities. This report on Form 8-K will be filed with the SEC within fifteen days after the initial issuance of those securities.

The depositor will cause the residential loans comprising each trust fund, or mortgage securities evidencing interests in the residential loans to be assigned to the trustee for the benefit of the holders of the securities of the related series. The master servicer will service the residential loans comprising any trust fund, either directly or through other servicing institutions, each a sub-servicer, pursuant to a pooling and servicing agreement or servicing agreement among itself, the depositor, the trustee and the other parties specified in the related prospectus supplement, and will receive a fee for these services. See "Residential Loans" and "Description of the Securities" in this prospectus. With respect to residential loans serviced through a sub-servicer, the master servicer will remain liable for its servicing obligations under the related servicing agreement as if the master servicer alone were servicing the residential loans, unless the related prospectus supplement provides otherwise.

The depositor will assign the residential loans to the related trustee on a non-recourse basis. The obligations of the depositor with respect to the residential loans will be limited to certain representations and warranties made by it, unless the related prospectus supplement provides that another party will make the representations and warranties. See "Description of the Securities -- Assignment of Assets of the Trust Fund" in this prospectus. The obligations of the master servicer with respect to the residential loans will consist principally of its contractual servicing obligations under the related servicing agreement, including its obligation to enforce purchases and other obligations of sub-servicers or Unaffiliated Sellers, or both, as more fully described in this prospectus under "Residential Loans -- Representations by Unaffiliated Sellers; Repurchases"; "-- Sub-Servicing" and "Description of the Securities -- Assignment of Assets of the Trust Fund." In addition, the related prospectus supplement may specify that the master servicer has an obligation to make certain cash advances in the event of delinquencies in payments on or with respect to the residential loans in amounts described in this prospectus under "Description of the Securities -- Advances" or pursuant to the terms of any mortgage securities. Any obligation of the master servicer to make advances may be subject to limitations, to the extent provided in this prospectus and in the related prospectus supplement.

The depositor will cause the agency securities comprising each trust fund to be registered in the name of the trustee or its nominee on the books of the issuer or guarantor or its agent or, in the case of agency securities issued only in book-entry form, through the Federal Reserve System. The depositor will register the agency securities in accordance with the procedures established by the issuer or guarantor for these securities with a member of the Federal Reserve System. Distributions on agency securities to which the trust fund is entitled will be made directly to the trustee.

-42-

<Page>

The trustee will administer the assets comprising any trust fund including agency securities pursuant to a trust agreement between the depositor and the trustee, and will receive a fee for these services. The agency securities and any moneys attributable to distributions on the agency securities will not be subject to any right, charge, security interest, lien or claim of any kind in favor of the trustee or any person claiming through it. The trustee will not have the power or authority to assign, transfer, pledge or otherwise dispose of any assets of any trust fund to any person, except to a successor trustee, to the depositor or the holders of the securities to the extent they are entitled to those assets of the trust fund or to other persons specified in the related prospectus supplement and except for its power and authority to invest assets of the trust fund in certain permitted instruments in compliance with the trust agreement. The trustee will have no responsibility for distributions on the securities, other than to pass through all distributions it receives with respect to the agency securities to the holders of the related securities without deduction, other than for

    o    any applicable trust administration fee payable to the trustee,

    o    certain expenses of the trustee, if any, in connection with legal
         actions relating to the agency securities,

    o    any applicable withholding tax required to be withheld by the trustee,
         and

    o    as otherwise described in the related prospectus supplement.

USE OF PROCEEDS

The depositor will apply all or substantially all of the net proceeds from the sale of each series of securities for one or more of the following purposes:

- o   to purchase the related assets of the trust fund;

- o   to repay indebtedness which was incurred to obtain funds to acquire the assets of the trust fund;

- o   to establish any Reserve Funds or other funds described in the related prospectus supplement; and

- o   to pay costs of structuring, guaranteeing and issuing the securities, including the costs of obtaining credit support, if any.

The purchase of the assets of the trust fund for a series may be effected by an exchange of securities with the seller of the assets of the trust fund.

YIELD CONSIDERATIONS

The related prospectus supplement will specify the manner in which each monthly or other periodic interest payment on an asset of the trust fund is calculated--generally, one-twelfth of the applicable interest rate multiplied by the unpaid principal balance of the asset. In the case

-43-

<Page>

of Accrual Securities and interest-only securities, the distributions of interest will be made in the manner and amount described in the related prospectus supplement. The securities of each series may bear a fixed, variable or adjustable security interest rate.

The effective yield to holders of the securities will be below the yield otherwise produced by the applicable security interest rate, or with respect to an interest-only security, the distributions of interest on the security, and purchase price paid by the investors of these securities. This is so because while interest will generally accrue on each asset of the trust fund from the first day of each month, the distribution of the interest, or the accrual of the interest in the case of Accrual Securities, will not be made until the distribution date occurring:

- o   in the month or other periodic interval following the month or other period of accrual in the case of residential loans;

- o   in later months in the case of agency securities; or

- o   in intervals occurring less frequently than monthly in the case of series of securities having distribution dates occurring at intervals less frequently than monthly.

When a full prepayment is made on a residential loan, the borrower is generally charged interest only for the number of days actually elapsed from the due date of the preceding monthly payment up to the date of the prepayment, instead of for a full month. Accordingly, the effect of the prepayments is to reduce the aggregate amount of interest collected that is available for distribution to holders of the securities. However, the residential loans may contain provisions limiting prepayments of the loans or requiring the payment of a prepayment penalty if the loan is prepaid in full or in part. The related prospectus supplement may specify that any prepayment penalty collected with respect to the residential loans will be applied to offset the shortfalls in interest collections on the related distribution date. Holders of agency securities are entitled to a full month's interest in connection with prepayments in full of the underlying residential loans. The related prospectus supplement may specify that partial principal prepayments are applied on the first day of the month following receipt, with no resulting reduction in interest payable by the borrower for the month in which the partial principal prepayment is made. The related prospectus supplement may specify that neither the trustee, the master servicer nor the depositor will be obligated to fund shortfalls in interest collections resulting from full prepayments. Full and partial prepayments collected during the applicable Prepayment Period will be available for distribution to holders of the securities on the related distribution date. See "Maturity and Prepayment Considerations" and "Description of the Securities" in this prospectus.

Even assuming that the mortgaged properties provide adequate security for the mortgage loans, substantial delays could be encountered in connection with the liquidation of defaulted mortgage loans. Accordingly, corresponding delays in the receipt of related proceeds by holders of the securities could occur. An action to foreclose on a mortgaged property securing a mortgage loan is regulated by state statutes and rules and is subject to many of the delays and expenses of other lawsuits if defenses or counterclaims are interposed, sometimes requiring several years to complete. Furthermore, in some states an

action to obtain a deficiency judgment is not permitted following a nonjudicial sale of a property. If a default by a borrower occurs, these restrictions, among other things, may impede the ability of the master servicer to foreclose

-44-

<Page>

on or sell the mortgaged property or to obtain liquidation proceeds sufficient to repay all amounts due on the related mortgage loan. In addition, the master servicer will be entitled to deduct from related liquidation proceeds all expenses reasonably incurred in attempting to recover amounts due on defaulted mortgage loans and not yet reimbursed, including

- o     payments to senior lienholders,

- o     legal fees and costs of legal action,

- o     real estate taxes, and

- o     maintenance and preservation expenses.

Liquidation expenses with respect to defaulted mortgage loans do not vary directly with the outstanding principal balance of the loan at the time of default. Therefore, assuming that a servicer took the same steps in realizing on a defaulted mortgage loan having a small remaining principal balance, the amount realized after expenses of liquidation of a mortgage loan with a small remaining balance would be smaller as a percentage of the loan than would be the case with the other defaulted mortgage loan having a larger remaining principal balance.

Applicable state laws generally regulate interest rates and other charges, require certain disclosures, and require licensing of certain originators and servicers of residential loans. In addition, most states have other laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and practices which may apply to the origination, servicing and collection of the residential loans. Depending on the provisions of the applicable law and the specific facts and circumstances involved, violations of these laws, policies and principles may

- o     limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans,

- o     entitle the borrower to a refund of amounts previously paid, and

- o     subject the trustee or master servicer to damages and administrative sanctions which could reduce the amount of distributions available to holders of the securities.

The prospectus supplement for each series of securities may set forth additional information regarding yield considerations.

MATURITY AND PREPAYMENT CONSIDERATIONS

The original terms to maturity of the assets of the trust fund in a given trust fund may vary depending on the type of residential loans or the residential loans underlying the agency securities included in the trust fund. Each prospectus supplement will contain information with respect to the type and maturities of the assets of the trust fund. The related prospectus supplement may specify that the residential loans or residential loans underlying the agency securities may be prepaid in full or in part at any time without penalty. The prepayment

-45-

<Page>

experience on the residential loans or residential loans underlying the agency securities will affect the life of the related securities.

The average life of a security refers to the average amount of time that will elapse from the date of issuance of a security until the principal amount of the security is reduced to zero. The average life of the securities will be affected by, among other things, the rate at which principal on the related residential loans is paid, which may be in the form of scheduled amortization payments or unscheduled prepayments and liquidations due to default, casualty, insurance, condemnation and similar sources. If substantial principal prepayments on the residential loans are received, the actual average life of the securities may be significantly shorter than would otherwise be the case. As to any series of securities, based on the public information with respect to the residential lending industry, it may be anticipated that a significant number of

the related residential loans will be paid in full prior to stated maturity.

Prepayments on residential loans are commonly measured relative to a prepayment standard or model. For certain series of securities comprised of more than one class, or as to other types of series where applicable, the prospectus supplement will describe the prepayment standard or model used in connection with the offering of the related series. If applicable, the prospectus supplement will also contain tables setting forth the projected weighted average life of the securities of the related series and the percentage of the initial security principal balance that would be outstanding on specified distribution dates based on the assumptions stated in the prospectus supplement. These assumptions include prepayments on the related residential loans or residential loans underlying the agency securities are made at rates corresponding to various percentages of the prepayment standard or model specified in the prospectus supplement.

It is unlikely that prepayment of the assets of the trust fund will conform to any model specified in the related prospectus supplement. The rate of principal prepayments on pools of residential loans is influenced by a variety of economic, social, geographic, demographic and other factors, including:

- o   homeowner mobility;

- o   economic conditions;

- o   enforceability of due-on-sale clauses;

- o   market interest rates and the availability of funds;

- o   the existence of lockout provisions and prepayment penalties;

- o   the inclusion of delinquent or sub-performing residential loans in the assets of the trust fund;

- o   the relative tax benefits associated with the ownership of property; and

- o   in the case of Multifamily Loans, the quality of management of the property.

-46-

<Page>

The rate of prepayments of conventional residential loans has fluctuated significantly in recent years. In general, however, if prevailing interest rates fall significantly below the interest rates on the assets of the trust fund, the assets of the trust fund are likely to be the subject of higher principal prepayments than if prevailing rates remain at or above the interest rates borne by the assets of the trust fund.

Other factors that might be expected to affect the prepayment rate of securities backed by junior lien mortgage loans or Home Improvement Contracts include:

- o   the amounts of the underlying senior mortgage loans;

- o   the interest rates on the underlying senior mortgage loans;

- o   the use of first mortgage loans as long-term financing for home purchase; and

- o   the use of subordinate mortgage loans as shorter-term financing for a variety of purposes, including:

    - o   home improvement;

    - o   education expenses; and

    - o   purchases of consumer durables such as automobiles.

In addition, any future limitations on the right of borrowers to deduct interest payments on junior liens that are home equity loans for federal income tax purposes may increase the rate of prepayments on the residential loans.

In addition, acceleration of payments on the residential loans or residential loans underlying the agency securities as a result of certain transfers of the underlying properties is another factor affecting prepayment rates. The related prospectus supplement may specify that the residential loans, except for FHA loans and VA loans, contain or do not contain "due-on-sale" provisions permitting the lender to accelerate the maturity of the residential loan upon sale or certain transfers by the borrower with respect to the underlying residential property. Conventional residential loans that underlie Freddie Mac Certificates and Fannie Mae Certificates may contain, and in certain cases must contain, "due-on-sale" clauses permitting the lender to accelerate the unpaid balance of the loan upon transfer of the property by the borrower.

FHA loans and VA loans and all residential loans underlying GNMA Certificates contain no clause of this type and may be assumed by the purchaser of the property.

In addition, Multifamily Loans may contain "due-on-encumbrance" clauses permitting the lender to accelerate the maturity of the Multifamily Loan if there is a further encumbrance by the borrower of the underlying residential property. In general, where a "due-on-sale" or "due-on-encumbrance" clause is contained in a conventional residential loan under a Freddie Mac or the Fannie Mae program, the lender's right to accelerate the maturity of the residential loan if there is a transfer or further encumbrance of the property must be exercised, so long as the acceleration is permitted under applicable law.

-47-

<Page>

With respect to a series of securities evidencing interests in a trust fund including residential loans, the master servicer generally is required to enforce any provision limiting prepayments and any due-on-sale or due-on-encumbrance clause. The master servicer is required to enforce these provisions only to the extent it has knowledge of the conveyance or encumbrance or the proposed conveyance or encumbrance of the underlying residential property and reasonably believes that it is entitled to do so under applicable law. However, the master servicer will generally be prohibited from taking any enforcement action that would impair or threaten to impair any recovery under any related insurance policy. See "Description of the Securities -- Collection and Other Servicing Procedures" and "Certain Legal Aspects of Residential Loans -- Enforceability of Certain Provisions" and "--Prepayment Charges and Prepayments" in this prospectus for a description of provisions of each pooling and servicing agreement and legal developments that may affect the prepayment experience on the residential loans. See also "Description of the Securities -- Termination" in this prospectus for a description of the possible early termination of any series of securities. See also "Residential Loans -- Representations by Unaffiliated Sellers; Repurchases" and "Description of the Securities -- Assignment of Assets of the Trust Fund" in this prospectus for a description of the circumstances under which the Unaffiliated Sellers, the master servicer and the depositor are generally obligated to repurchase residential loans.

With respect to a series of securities evidencing interests in a trust fund including agency securities, principal prepayments may also result from guaranty payments and from the exercise by the issuer or guarantor of the related agency securities of any right to repurchase the underlying residential loans. The prospectus supplement relating to each series of securities will describe the circumstances and the manner in which the optional repurchase right, if any, may be exercised.

In addition, the mortgage securities included in the trust fund may be backed by underlying residential loans having differing interest rates. Accordingly, the rate at which principal payments are received on the related securities will, to a certain extent, depend on the interest rates on the underlying residential loans.

The prospectus supplement for each series of securities may set forth additional information regarding related maturity and prepayment considerations.

THE DEPOSITOR

Mortgage Asset Securitization Transactions, Inc., the depositor, is a Delaware corporation organized on April 23, 1987, as a wholly owned limited purpose finance subsidiary of UBS Americas Inc.. The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713-2000.

The depositor does not have, nor is it expected in the future to have, any significant assets. We do not expect that the depositor will have any business operations other than acquiring and pooling residential loans and agency securities, offering securities or other mortgage- or asset-related securities, and related activities.

-48-

<Page>

Neither the depositor nor any of the depositor's affiliates will insure or guarantee distributions on the securities of any series.

RESIDENTIAL LOANS

Underwriting Standards

The residential loans will have been purchased by the depositor, either
directly or through affiliates, from loan sellers. The related prospectus
supplement will specify the underwriting criteria generally used to originate
the residential loans. The underwriting standards applicable to residential
loans underlying mortgage securities may vary substantially from the
underwriting standards set forth in the related prospectus supplement.

Representations by Unaffiliated Sellers; Repurchases

Each Unaffiliated Seller made representations and warranties in respect of
the residential loans sold by the Unaffiliated Seller. The related prospectus
supplement will specify these representations and warranties which may include,
among other things:

- that the Unaffiliated Seller had good title to each residential loan
  and the residential loan was subject to no offsets, defenses,
  counterclaims or rights of rescission except to the extent that any
  buydown agreement may forgive certain indebtedness of a borrower;

- if the trust fund includes mortgage loans, that each mortgage
  constituted a valid lien on the mortgaged property, subject only to
  permissible title insurance exceptions and senior liens, if any;

- if the trust fund includes manufactured housing contracts, each
  manufactured housing contract creates a valid, subsisting and
  enforceable first priority security interest in the manufactured home
  covered by the contract;

- that the residential property was free from damage and was in good
  repair;

- that there were no delinquent tax or assessment liens against the
  residential property;

- that each residential loan was current as to all required payments;
  and

- that each residential loan was made in compliance with, and is
  enforceable under, all applicable local, state and federal laws and
  regulations in all material respects.

In certain cases, the representations and warranties of an Unaffiliated
Seller in respect of a residential loan may have been made as of the date on
which the Unaffiliated Seller sold the residential loan to the depositor or its
affiliate. A substantial period of time may have elapsed between that date and
the date of initial issuance of the series of securities evidencing an interest
in the residential loan. Since the representations and warranties of an
Unaffiliated Seller do not address events that may occur following the sale of a
residential loan by the Unaffiliated Seller,

-49-

<Page>

its repurchase obligation will not arise if the relevant event that would
otherwise have given rise to this type of obligation occurs after the date of
the sale to or on behalf of the depositor.

The master servicer or the trustee will be required to promptly notify the
relevant Unaffiliated Seller of any breach of any representation or warranty
made by it in respect of a residential loan which materially and adversely
affects the interests of the holders of the securities in the residential loan.
If the Unaffiliated Seller cannot cure the breach, then the Unaffiliated Seller
will be obligated to repurchase this residential loan from the trustee at the
purchase price for the loan. The related prospectus supplement will specify this
purchase price, which is generally equal to the sum of:

- the unpaid principal balance of the residential loans;

- unpaid accrued interest on the unpaid principal balance from the date
  as to which interest was last paid by the borrower to the end of the
  calendar month in which the purchase is to occur at a rate equal to
  the net mortgage rate minus the rate at which the sub-servicer's
  servicing fee is calculated if the sub-servicer is the purchaser; and

- if applicable, any expenses reasonably incurred or to be incurred by
  the master servicer or the trustee in respect of the breach or defect
  giving rise to a purchase obligation.

An Unaffiliated Seller, rather than repurchase a residential loan as to
which a breach has occurred, may have the option to cause the removal of the
breached residential loan from the trust fund and substitute in its place one or
more other residential loans. This option must be exercised within a specified
period after initial issuance of the related series of securities and be done in

accordance with the standards described in the related prospectus supplement. The related prospectus supplement may specify that this repurchase or substitution obligation will constitute the sole remedy available to holders of securities or the trustee for a breach of representation by an Unaffiliated Seller.

Neither the depositor nor the master servicer unless the master servicer is an Unaffiliated Seller will be obligated to purchase or substitute for a residential loan if an Unaffiliated Seller defaults on its obligation to do so. We cannot assure you that Unaffiliated Sellers will carry out their repurchase and substitution obligations with respect to residential loans. Any residential loan that is not repurchased or substituted for will remain in the related trust fund. Any resulting losses on that residential loan will be borne by holders of the securities, to the extent not covered by credit enhancement.

Sub-Servicing

Any master servicer may delegate its servicing obligations in respect of a residential loan to sub-servicers pursuant to a sub-servicing agreement. The sub-servicing agreement must be consistent with the terms of the servicing agreement relating to the trust fund that includes the residential loan. Although each sub-servicing agreement will be a contract solely between the master servicer and the sub-servicer, the related pooling and servicing agreement pursuant to which a series of securities is issued may provide that, if for any reason the master servicer for

-50-

<Page>

the series of securities is no longer acting in that capacity, the trustee or any successor master servicer must recognize the sub-servicer's rights and obligations under any sub-servicing agreement.

DESCRIPTION OF THE SECURITIES

General

The certificates of each series evidencing interests in a trust fund will be issued pursuant to a separate pooling and servicing agreement or trust agreement. Each series of notes, or, in certain instances, two or more series of notes, will be issued pursuant to an indenture, and the issuer of the notes will be a trust established by the depositor pursuant to an owner trust agreement or another entity as may be specified in the related prospectus supplement. As to each series of notes where the issuer is an owner trust, the ownership of the trust fund will be evidenced by equity certificates issued under the owner trust agreement, which may be offered by the related prospectus supplement.

Forms of each of the agreements referred to above are filed as exhibits to the Registration Statement of which this prospectus is a part. The agreement relating to each series of securities will be filed as an exhibit to a report on Form 8-K to be filed with the SEC within fifteen days after the initial issuance of the securities and a copy of the agreement will be available for inspection at the corporate trust office of the trustee specified in the related prospectus supplement.

As to each series, the securities will be issued in authorized denominations evidencing a portion of all of the securities of the related series as set forth in the related prospectus supplement. Each trust fund will consist of:

o   residential loans, including any mortgage securities, or agency securities, exclusive of

    o   any portion of interest payments relating to the residential loans retained by the depositor, any of its affiliates or its predecessor in interest ("retained interest") and

    o   principal and interest due on or before the Cut-Off Date, as from time to time are subject to the agreement;

o   funds or assets as from time to time are deposited in the Trust Account described below and any other account held for the benefit of holders of the securities;

o   with respect to trust funds that include residential loans:

    o   property acquired by foreclosure or deed in lieu of foreclosure of mortgage loans on behalf of the holders of the securities, or, in the case of Manufactured Housing Contracts that are not Land Contracts, by repossession;

-51-

<Page>

- o   any Primary Credit Insurance Policies and Primary Hazard Insurance;

- o   any combination of a Pool Insurance Policy, a Bankruptcy Bond, a special hazard insurance policy or other type of credit support; and

- o   the rights of the trustee to any cash advance reserve fund or surety bond as described under "--Advances" in this prospectus;

- o   if specified in the related prospectus supplement, the reserve fund; and

- o   any other assets as described in the related prospectus supplement.

The securities will be transferable and exchangeable for securities of the same class and series in authorized denominations at the Corporate Trust Office. No service charge will be made for any registration of exchange or transfer of securities on the Security Register maintained by the Security Registrar. However, the depositor or the trustee may require payment of a sum sufficient to cover any tax or other governmental charge.

Each series of securities may consist of any combination of:

- o   one or more classes of senior securities, one or more classes of which will be senior in right of payment to one or more of the other classes subordinate to the extent described in the related prospectus supplement.

- o   one or more classes of securities which will be entitled to:

  - o   principal distributions, with disproportionate, nominal or no interest distributions; or

  - o   interest distributions, with disproportionate, nominal or no principal distributions;

- o   two or more classes of securities that differ as to the timing, sequential order or amount of distributions of principal or interest or both, which may include one or more classes of Accrual Securities; or

- o   other types of classes of securities, as described in the related prospectus supplement.

Each class of securities, other than certain interest-only securities, will have a security principal balance and, generally will be entitled to payments of interest based on a specified security interest rate as specified in the related prospectus supplement. See "--Principal and Interest on the Securities" in this Prospectus. The security interest rates of the various classes of securities of each series may differ, and as to some classes may be in excess of the lowest Net Interest Rate in a trust fund. The specific percentage ownership interests of each class of securities and the minimum denomination per security will be set forth in the related prospectus supplement.

-52-

<Page>

Assignment of Assets of the Trust Fund

At the time of issuance of each series of securities, the depositor will cause the assets comprising the related trust fund or mortgage securities included in the related trust fund to be assigned to the trustee. The residential loan or agency security documents described below will be delivered to the trustee or to the custodian. The trustee will, concurrently with the assignment, deliver the securities to the depositor in exchange for the assets of the trust fund. Each asset of the trust fund will be identified in a schedule appearing as an exhibit to the related agreement. The schedule will include, among other things:

- o   information as to the outstanding principal balance of each trust fund asset after application of payments due on or before the Cut-Off Date;

- o   the maturity of the mortgage note, cooperative note, Manufactured Housing Contract or agency securities;

- o   any Retained Interest, with respect to a series of securities evidencing interests in a trust fund including agency securities;

- o   the pass-through rate on the agency securities;

- o   and with respect to a series of securities evidencing interests in residential loans, for each loan:

  - o   information respecting its interest rate;

  - o   its current scheduled payment of principal and interest;

  - o   its Loan-to-Value Ratio; and

  - o   certain other information.

If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS'r' System. With respect to mortgage loans registered through the MERS'r' System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

Mortgage Loans and Multifamily Loans. The depositor will be required, as to each mortgage loan, other than mortgage loans underlying any mortgage securities, and Multifamily Loan, to deliver or cause to be delivered to the trustee, or to the custodian, the mortgage file for each mortgage loan, containing legal documents relating to the mortgage loan, including:

- o   the mortgage note endorsed without recourse to the order of the trustee or evidence that the Mortgage is held for the trustee through the MERS'r' System;

-53-

<Page>

- o   the mortgage with evidence of recording indicated, except for any mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage certified by the related Unaffiliated Seller that it is a true and complete copy of the original of that Mortgage submitted for recording; and

- o   an assignment in recordable form of the mortgage to the trustee.

The related prospectus supplement may specify that the depositor or another party will be required to promptly cause the assignment of each related mortgage loan and Multifamily Loan (except for Mortgages held under the MERS'r' System) to be recorded in the appropriate public office for real property records. However, recording of assignments will not be required in states where, in the opinion of counsel acceptable to the trustee, recording is not required to protect the trustee's interest in the mortgage loan or the Multifamily Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the mortgage loan.

Home Equity Loans and Home Improvement Contracts. The related prospectus supplement may specify that the depositor will:

- o   as to each Home Equity Loan and Home Improvement Contract, cause to be delivered to the trustee or to the custodian the note endorsed to the order of the trustee;

- o   with respect to Home Equity Loans and secured Home Improvement Contracts, the mortgage with evidence of recording indicated on it. If any mortgage is not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage certified by the related Unaffiliated Seller that it is a true and complete copy of the original of the mortgage submitted for recording; and

- o   with respect to Home Equity Loans and secured Home Improvement Contracts, an assignment in recordable form of the mortgage to the trustee.

The related prospectus supplement may specify that the depositor or another party will be required to promptly cause the assignment of each related Home Equity Loan and secured Home Improvement Contract to be recorded in the appropriate public office for real property records. However, recording of assignments will not be required in states where, in the opinion of counsel acceptable to the trustee, recording is not required to protect the trustee's interest in the Home Equity Loan and Home Improvement Contract against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of a Home Equity Loan or Home Improvement Contract.

With respect to unsecured Home Improvement Contracts, the depositor will cause to be transferred physical possession of the Home Improvement Contracts to

the trustee or a designated custodian or, if applicable, the Unaffiliated Seller
may retain possession of the Home Improvement Contracts as custodian for the
trustee. In addition, the depositor will be required to cause to be made, an
appropriate filing of a UCC-1 financing statement in the appropriate states

-54-

<Page>

to give notice of the trustee's ownership of or security interest in the Home
Improvement Contracts. The related prospectus supplement may specify that the
Home Improvement Contracts will not be stamped or otherwise marked to reflect
their assignment from the Unaffiliated Seller or the depositor, as the case may
be, to the trustee. Therefore, if through negligence, fraud or otherwise, a
subsequent purchaser were able to take physical possession of the contracts
without notice of an assignment, the trustee's interest in the contracts could
be defeated.

     Cooperative Loans. The depositor will, as to each Cooperative Loan, deliver
or cause to be delivered to the trustee or to the custodian:

     o    the related cooperative note;

     o    the original security agreement;

     o    the proprietary lease or occupancy agreement;

     o    the related stock certificate and related stock powers endorsed in
          blank; and

     o    a copy of the original filed financing statement together with an
          assignment of the financing statement to the trustee in a form
          sufficient for filing.

The depositor or another party will cause the assignment and financing statement
of each related Cooperative Loan to be filed in the appropriate public office.
However, a filing is not required in states where in the opinion of counsel
acceptable to the trustee, filing is not required to protect the trustee's
interest in the Cooperative Loan against the claim of any subsequent transferee
or any successor to or creditor of the depositor or the originator of the
Cooperative Loan.

     Manufactured Housing Contracts. The related prospectus supplement may
specify that the depositor will be required, as to each Manufactured Housing
Contract, to deliver or cause to be delivered to the trustee or to the
custodian:

     o    the original Manufactured Housing Contract endorsed to the order of
          the trustee; and

     o    if applicable, copies of documents and instruments related to each
          Manufactured Housing Contract and the security interest in the
          manufactured home securing each Manufactured Housing Contract.

The related prospectus supplement may specify that in order to give notice of
the right, title and interest of the holders of securities to the Manufactured
Housing Contracts, the depositor will be required to cause to be executed and
delivered to the trustee a UCC-1 financing statement identifying the trustee as
the secured party and identifying all Manufactured Housing Contracts as
collateral of the trust fund.

     Agency Securities. Agency securities will be registered in the name of the
trustee or its nominee on the books of the issuer or guarantor or its agent or,
in the case of agency securities issued only in book-entry form, through the
Federal Reserve System. Registration must be done in accordance with the
procedures established by the issuer or guarantor for registration of the

-55-

<Page>

securities with a member of the Federal Reserve System. Distributions on the
agency securities to which the trust fund is entitled will be made directly to
the trustee.

     Review of Residential Loans. The trustee or the custodian will review the
residential loan documents after receipt, and the trustee or custodian will hold
the documents in trust for the benefit of the holders of securities. Generally,
if any document is found to be missing or defective in any material respect, the
trustee or custodian will immediately notify the master servicer and the

depositor. The master servicer will then immediately notify the applicable Unaffiliated Seller. If the Unaffiliated Seller cannot cure the omission or defect, the Unaffiliated Seller will be obligated to repurchase the related residential loan from the trustee at the purchase price specified under "Residential Loans--Representations by Unaffiliated Sellers; Repurchases," or, in certain cases, substitute for the residential loan.

We cannot assure you that an Unaffiliated Seller will fulfill this repurchase or substitution obligation. Although the master servicer or trustee is obligated to enforce this obligation to the extent described above under "Residential Loans -- Representations by Unaffiliated Sellers; Repurchases" neither the master servicer nor the depositor will be obligated to repurchase or substitute for the residential loan if the Unaffiliated Seller defaults on its obligation. Generally, this repurchase or substitution obligation, if applicable, will constitute the sole remedy available to the holders of securities or the trustee for omission of, or a material defect in, a constituent document.

The trustee will be authorized to appoint a custodian pursuant to a custodial agreement to maintain possession of and review the documents relating to the residential loans as agent of the trustee.

Deposits to the Trust Account

The master servicer or the trustee shall, as to each trust fund, establish and maintain or cause to be established and maintained a separate Trust Account or Trust Accounts for the collection of payments on the related assets of the trust fund. The Trust Account(s) must be maintained with a federal or state chartered depository institution, and in a manner, satisfactory to each rating agency rating the securities of the related series at the time any amounts are held on deposit in the Trust Account.

The collateral eligible to secure amounts in the Trust Account is limited to United States government securities and other high quality investments. A Trust Account may be maintained as an interest bearing or non-interest bearing account. Alternatively, the funds held in the Trust Account may be invested pending the distribution on each succeeding distribution date in United States government securities and other high quality investments. The prospectus supplement will specify who is entitled to the interest or other income earned on funds in the Trust Account. In respect of any series of securities having distribution dates occurring less frequently than monthly, the master servicer may obtain from an entity named in the related prospectus supplement a guaranteed investment contract to assure a specified rate of return on funds held in the Trust Account. If permitted by each rating agency rating the securities of the series, a Trust Account may contain funds relating to more than one series of securities.

-56-

<Page>

Pre-Funding Account

The master servicer or the trustee may establish and maintain a pre-funding account, in the name of the related trustee on behalf of the related holders of the securities, into which the depositor will deposit the pre-funded amount on the related closing date. The pre-funded amount will be used by the related trustee to purchase loans from the depositor from time to time during the funding period. The funding period, if any, for a trust fund will begin on the related closing date and will end on the date specified in the related prospectus supplement, which in no event will be later than the date that is three months after the closing date. Any amounts remaining in the pre-funding account at the end of the funding period will be distributed to the related holders of securities in the manner and priority specified in the related prospectus supplement, as a prepayment of principal of the related securities.

Payments on Residential Loans

The prospectus supplement may specify that the master servicer will be required to deposit or cause to be deposited in a Trust Account for each trust fund including residential loans or, in the case of advances on or before the applicable distribution date, the following payments and collections received or made by or on behalf of the master servicer subsequent to the Cut-Off Date. These payments will not include payments due on or before the Cut-Off Date and exclusive of any amounts representing a Retained Interest:

(1) all payments on account of principal, including principal prepayments, on the residential loans;

(2) all payments on account of interest on the residential loans, exclusive of any portion representing interest in excess of the Net Interest Rate, unless the excess amount is required to be deposited pursuant to the related agreement, and, if provided in the related prospectus supplement, prepayment penalties;

(3) all proceeds of

o  any Primary Hazard Insurance Policies and any special hazard
   insurance policy, to the extent the proceeds are not applied to
   the restoration of the property or released to the borrower in
   accordance with the master servicer's normal servicing
   procedures, and

o  any Primary Credit Insurance Policy, any FHA Insurance, VA
   Guarantee, any Bankruptcy Bond and any Pool Insurance Policy,
   other than proceeds that represent reimbursement of the master
   servicer's costs and expenses incurred in connection with
   presenting claims under the related insurance policies;

(4) all other cash amounts received, by foreclosure, eminent domain,
condemnation or otherwise, in connection with the liquidation of defaulted
residential loans. These amounts will also include the net proceeds on a monthly
basis with respect to any properties acquired for the benefit of holders of
securities by deed in lieu of foreclosure or repossession

(5) any advances made as described under "--Advances" in this prospectus;

-57-


<Page>


(6) all amounts required to be transferred to the Trust Account from a
Reserve Fund, if any, as described below under "--Subordination" in this
prospectus;

(7) all proceeds of any residential loan or underlying mortgaged property
purchased by any Unaffiliated Seller as described under "Residential Loans --
Representations by Unaffiliated Sellers; Repurchases," exclusive of any Retained
Interest applicable to the loan;

(8) all proceeds of any residential loan repurchased as described under
"--Termination" in this prospectus;

(9) any payments required to be deposited in the Trust Account with respect
to any deductible clause in any blanket insurance policy described under
"Description of Primary Insurance Coverage -- Primary Hazard Insurance Policies"
in this prospectus;

(10) any amount required to be deposited by the trustee or the master
servicer in connection with losses realized on investments of funds held in the
Trust Account;

(11) any amounts required to be transferred to the Trust Account pursuant
to any guaranteed investment contract; and

(12) any distributions received on any mortgage securities included in the
related trust fund.

Payments on Agency Securities

The agency securities included in a trust fund will be registered in the
name of the trustee so that all distributions on the agency securities will be
made directly to the trustee. The trustee will deposit or cause to be deposited
into the Trust Account as and when received, unless otherwise provided in the
related trust agreement, all distributions received by the trustee with respect
to the related agency securities. The trustee will not be required to deposit
payments due on or before the Cut-Off Date and any trust administration fee and
amounts representing the Retained Interest, if any.

Distributions

Distributions of principal and interest on the securities of each series
will be made by or on behalf of the trustee or the master servicer on the
distribution dates and at the intervals specified in the related prospectus
supplement. These intervals may be monthly, quarterly, semi-annual or as
specified in the related prospectus supplement. The trustee will make these
distributions to the persons in whose names the securities are registered at the
close of business on the record date specified in the related prospectus
supplement. The amount of each distribution will be determined as of the close
of business on each determination date specified in the related prospectus
supplement.

Distributions will be made either:

o  by wire transfer in immediately available funds to the account of a
   holder of securities at a bank or other entity having appropriate
   facilities for the transfer, if the holder of

-58-

<Page>

> securities has so notified the trustee or the master servicer and holds securities in any requisite amount specified in the related prospectus supplement, or

> o   by check mailed to the address of the person entitled to the check as it appears on the Security Register.

However, the final distribution in retirement of the securities will be made only if presentation and surrender of the securities has occurred at the office or agency of the Security Registrar specified in the notice to holders of securities of the final distribution. The related prospectus supplement may specify that distributions made to the holders of securities will be made on a pro rata basis among the holders of securities of record on the related record date, other than in respect of the final distribution, based on the aggregate percentage interest represented by their respective securities.

Final Distribution Date. If specified in the prospectus supplement for any series consisting of classes having sequential priorities for distributions of principal, the final distribution date for each class of securities is the latest distribution date on which the security principal balance is expected to be reduced to zero. The final distribution date will be based on various assumptions, including the assumption that no prepayments or defaults occur with respect to the related assets of the trust fund. Since the rate of distribution of principal of any class of securities will depend on, among other things, the rate of payment, including prepayments, of the principal of the assets of the trust fund, the actual last distribution date for any class of securities could occur significantly earlier than its final distribution date.

The rate of payments on the assets of the trust fund for any series of securities will depend on their particular characteristics, as well as on the prevailing level of interest rates from time to time and other economic factors. We cannot assure the actual prepayment experience of the assets of the trust fund. See "Maturity and Prepayment Considerations" in this prospectus. In addition, substantial losses on the assets of the trust fund in a given period, even though within the limits of the protection afforded by the instruments described under "Description of Credit Support," in this prospectus or by the subordinate securities in the case of a senior/subordinate series, may cause the actual last distribution date of certain classes of securities to occur after their final distribution date.

Special Distributions. With respect to any series of securities with distribution dates occurring at intervals less frequently than monthly, the securities may be subject to special distributions under the circumstances and in the manner described below if and to the extent provided in the related prospectus supplement. If applicable, the master servicer may be required to make or cause to be made special distributions allocable to principal and interest on securities of a series out of, and to the extent of, the amount available for the distributions in the related Trust Account. The related prospectus supplement will specify the date the special distribution is to be made. Special distributions may be made if, as a result of

> o   substantial payments of principal on the assets of the trust fund,

> o   low rates then available for reinvestment of payments on assets of the trust fund,

<Page>

> o   substantial Realized Losses or

> o   some combination of the foregoing, and

> o   based on the assumptions specified in the related agreement,

it is determined that the amount anticipated to be on deposit in the Trust Account on the next distribution date, together with the amount available to be withdrawn from any related Reserve Fund, may be insufficient to make required distributions on the securities of the related series on the distribution date or the intervening date as may be provided in the related prospectus supplement.

The amount of any special distribution that is allocable to principal will not exceed the amount that would otherwise be distributed as principal on the next distribution date from amounts then on deposit in the Trust Account. All special distributions will include interest at the applicable Trust Interest Rate on the amount of the special distribution allocable to principal to the date specified in the related prospectus supplement.

All special distributions of principal will be made in the same priority and manner as distributions in respect of principal on the securities on a

distribution date. Special distributions of principal with respect to securities of the same class will be made on a pro rata basis. Notice of any special distributions will be given by the master servicer or trustee prior to the special distribution date.

Principal and Interest on the Securities

Each class of securities, other than certain classes of interest-only securities, may have a different security interest rate, which may be a fixed, variable or adjustable security interest rate. The related prospectus supplement will specify the security interest rate for each class, or in the case of a variable or adjustable security interest rate, the method for determining the security interest rate. The related prospectus supplement will specify the basis on which interest on the securities will be calculated.

Some classes of securities will not be entitled to interest payments.

With respect to each distribution date, the accrued interest with respect to each security other than an interest-only security, will be equal to interest on the outstanding security principal balance immediately prior to the distribution date, at the applicable security interest rate, for a period of time corresponding to the intervals between the distribution dates for the related series. As to each interest-only security, the interest with respect to any distribution date will equal the amount described in the related prospectus supplement for the related period.

The related prospectus supplement may specify that the Accrued Security Interest on each security of a series will be reduced, if shortfalls in collections of interest occur resulting from prepayments of residential loans that are not covered by payments by the master servicer out of its servicing fees or by application of prepayment penalties. This shortfall will be allocated among all of the securities of that series in proportion to the respective amounts of Accrued Security Interest that would have been payable on the securities absent the reductions

-60-

<Page>

and absent any delinquencies or losses. The related prospectus supplement may specify that neither the trustee, the master servicer nor the depositor will be obligated to fund shortfalls in interest collections resulting from prepayments. See "Yield Considerations" and "Maturity and Prepayment Considerations" in this prospectus.

Distributions of Accrued Security Interest that would otherwise be payable on any class of Accrual Securities of a series will be added to the security principal balance of the Accrual Securities on each distribution date until the time specified in the related prospectus supplement on and after which payments of interest on the Accrual Securities will be made. See "--Distributions--Final Distribution Date" in this prospectus.

Some securities will have a security principal balance that, at any time, will equal the maximum amount that the holder will be entitled to receive in respect of principal out of the future cash flow on the assets of the trust fund and other assets included in the related trust fund. With respect to each of those securities, distributions generally will be applied to accrued and currently payable interest, and then to principal. The outstanding security principal balance of a security will be reduced to the extent of distributions in respect of principal, and in the case of securities evidencing interests in a trust fund that includes residential loans, by the amount of any Realized Losses allocated to the securities.

Some securities will not have a security principal balance and will not be entitled to principal payments. The initial aggregate security principal balance of a series and each class of the related series will be specified in the related prospectus supplement. The initial aggregate security principal balance of all classes of securities of a series may be based on the aggregate principal balance of the assets in the related trust fund. Alternatively, the initial security principal balance for a series of securities may equal the initial aggregate Cash Flow Value of the related assets of the trust fund as of the applicable Cut-Off Date.

The aggregate of the initial Cash Flow Values of the assets of the trust fund included in the trust fund for a series of securities will be at least equal to the aggregate security principal balance of the securities of that series at the date of initial issuance of that series.

With respect to any series as to which the initial security principal balance is calculated on the basis of Cash Flow Values of the assets of the trust fund, the amount of principal distributed for the series on each distribution date will be calculated in the manner set forth in the related prospectus supplement, which may be on the basis of:

o   the decline in the aggregate Cash Flow Values of the assets of the trust fund during the related Due Period, calculated in the manner

prescribed in the related agreement; minus

o   with respect to any Realized Loss incurred during the related Due
    Period and not covered by any of the instruments described under
    "Description of Credit Support" in this prospectus, the portion of the
    Cash Flow Value of the assets of the trust fund corresponding to the
    Realized Loss.

-61-

<Page>

Generally, distributions in respect of principal will be made on each
distribution date to the class or classes of security entitled to distributions
of principal until the security principal balance of the class has been reduced
to zero. In the case of two or more classes of securities in a series, the
timing, sequential order and amount of distributions, including distributions
among multiple classes of senior securities or subordinate securities, in
respect of principal on each class will be as provided in the related prospectus
supplement. Distributions in respect of principal of any class of securities
will be made on a pro rata basis among all of the securities of the class.

Available Distribution Amount

As more specifically set forth in the related prospectus supplement, all
distributions on the securities of each series on each distribution date will
generally be made from the "Available Distribution Amount" which consists of the
following amounts:

(1) the total amount of all cash on deposit in the related Trust Account as
of a determination date specified in the related prospectus supplement,
exclusive of certain amounts payable on future distribution dates and certain
amounts payable to the master servicer, any applicable sub-servicer, the trustee
or another person as expenses of the trust fund;

(2) any principal and/or interest advances made with respect to the
distribution date, if applicable;

(3) any principal and/or interest payments made by the master servicer out
of its servicing fee in respect of interest shortfalls resulting from principal
prepayments, if applicable; and

(4) all net income received in connection with the operation of any
residential property acquired on behalf of the holders of securities through
deed in lieu of foreclosure or repossession, if applicable.

On each distribution date for a series of securities, the trustee or the
master servicer will be required to withdraw or cause to be withdrawn from the
Trust Account the entire Available Distribution Amount. The trustee or master
servicer will then be required to distribute the withdrawn amount or cause the
withdrawn amount to be distributed to the related holders of securities in the
manner set forth in this prospectus and in the related prospectus supplement.

Subordination

A senior/subordinate series will consist of one or more classes of
securities senior in right of payment to one or more classes of subordinate
securities, as specified in the related prospectus supplement. Subordination of
the subordinate securities of any series will be effected by either of the two
following methods, or by any other alternative method as may be described in the
related prospectus supplement.

Shifting Interest Subordination. With respect to any series of securities
as to which credit support is provided by shifting interest subordination, the
rights of the holders of certain classes of subordinate securities to receive
distributions with respect to the residential loans will be subordinate to the
rights of the holders of certain classes of senior securities. With respect to

-62-

<Page>

any defaulted residential loan that is finally liquidated, the amount of any
Realized Loss will generally equal the portion of the unpaid principal balance
remaining after application of all principal amounts recovered, net of amounts
reimbursable to the master servicer for related expenses. With respect to
certain residential loans the principal balances of which have been reduced in
connection with bankruptcy proceedings, the amount of the reduction will be
treated as a Realized Loss.

All Realized Losses will be allocated first to the most subordinate securities of the related series as described in the related prospectus supplement, until the security principal balance of the most subordinate securities has been reduced to zero. Any additional Realized Losses will then be allocated to the more senior securities or, if the series includes more than one class of more senior securities, either on a pro rata basis among all of the more senior securities in proportion to their respective outstanding security principal balances, or as provided in the related prospectus supplement. With respect to certain Realized Losses resulting from physical damage to residential properties which are generally of the same type as are covered under a special hazard insurance policy, the amount that may be allocated to the subordinate securities of the related series may be limited to an amount specified in the related prospectus supplement. See "Description of Credit Support -- Special Hazard Insurance Policies" in this prospectus. If so, any Realized Losses which are not allocated to the subordinate classes may be allocated among all outstanding classes of securities of the related series, either on a pro rata basis in proportion to their outstanding security principal balances, regardless of whether any subordinate securities remain outstanding, or as provided in the related prospectus supplement.

As set forth above, the rights of holders of the various classes of securities of any series to receive distributions of principal and interest is determined by the aggregate security principal balance of each class. The security principal balance of any security will be reduced by all amounts previously distributed on the security in respect of principal, and, if so provided in the related prospectus supplement, by any Realized Losses allocated to the security. However, to the extent so provided in the related prospectus supplement, holders of senior securities may be entitled to receive a disproportionately larger amount of prepayments received in certain circumstances. This will have the effect, in the absence of offsetting losses, of accelerating the amortization of the senior securities and increasing the respective percentage interest evidenced by the subordinate securities in the related trust fund, with a corresponding decrease in the percentage interest evidenced by the senior securities, as well as preserving the availability of the subordination provided by the subordinate securities. In addition, the Realized Losses will be first allocated to subordinate securities by reduction of their security principal balance, which will have the effect of increasing the respective ownership interest evidenced by the senior securities in the related trust fund. If there were no Realized Losses or prepayments of principal on any of the residential loans, the respective rights of the holders of securities of any series to future distributions would not change.

Cash Flow Subordination. With respect to any series of securities as to which credit support is provided by cash flow subordination, if losses on the residential loans occur not in excess of the Available Subordination Amount, the rights of the holders of subordinate securities to receive distributions of principal and interest with respect to the residential loans will be subordinate to the rights of the holders of senior securities.

-63-

<Page>

The protection afforded to the holders of senior securities from the subordination provisions may be effected both by the preferential right of the holders of senior securities to receive current distributions from the trust fund, subject to the limitations described in this prospectus, and by the establishment and maintenance of any Reserve Fund. The Reserve Fund may be funded by an initial cash deposit on the date of the initial issuance of the related series of securities and by deposits of amounts otherwise due on the subordinate securities to the extent set forth in the related prospectus supplement.

Amounts in the Reserve Fund, if any, other than earnings on the Reserve Funds, will be withdrawn for distribution to holders of senior securities as may be necessary to make full distributions to those holders on a particular distribution date, as described above. If on any distribution date, after giving effect to the distributions to the holders of senior securities on this date, the amount of the Reserve Fund exceeds the amount required to be held in the Reserve Fund, the excess will be withdrawn and distributed in the manner specified in the related prospectus supplement.

If any Reserve Fund is depleted before the Available Subordination Amount is reduced to zero, the holders of senior securities will nevertheless have a preferential right to receive current distributions from the trust fund to the extent of the then Available Subordination Amount. However, under these circumstances, if current distributions are insufficient, the holders of senior securities could suffer shortfalls of amounts due to them. The holders of senior securities will bear their proportionate share of any losses realized on the trust fund in excess of the Available Subordination Amount.

Amounts remaining in any Reserve Fund after the Available Subordination Amount is reduced to zero will no longer be subject to any claims or rights of the holders of senior securities of the series.

Funds in any Reserve Fund may be invested in United States government

securities and other high quality investments. The earnings or losses on those investments will be applied in the manner described in the related prospectus supplement.

The time necessary for any Reserve Fund to reach the required Reserve Fund balance will be affected by the prepayment, foreclosure, and delinquency experience of the residential loans and therefore cannot accurately be predicted.

Subordination and Cash Flow Values. The security principal balances of the various classes of securities comprising a senior/subordinate series may be based on the Cash Flow Value of the residential loans. If the percentage allocated to the senior securities of the decline in the Cash Flow Value of the residential loans during the related Deposit Period exceeds the remaining amount of collections and advances in respect of the residential loans after paying interest on the senior securities, the holders of the senior securities may not receive all amounts to which they are entitled. In addition, this may result in a loss being borne by the holders of the subordinate securities.

Because the Cash Flow Value of a residential loan will never exceed the outstanding principal balance of the residential loan, prepayments in full and liquidations of the residential

-64-

<Page>

loans may result in proceeds attributable to principal in excess of the corresponding Cash Flow Value decline. Any excess will be applied to offset losses realized during the related Deposit Period, such as those described in the immediately preceding paragraph, in respect of other liquidated residential loans without affecting the remaining subordination. This excess may also be deposited in a Reserve Fund for future distributions.

Advances

The related prospectus supplement, with respect to any series of securities evidencing interests in a trust fund that includes residential loans may specify that the master servicer will be obligated to advance on or before each distribution date, from its own funds, or from amounts held for future distribution in the Trust Account that are not included in the Available Distribution Amount for the distribution date. The amount of the advance will be equal to the aggregate of payments of principal and/or interest, adjusted to the applicable Net Interest Rate, on the residential loans that were due during the related Due Period and that were delinquent, and not advanced by any sub-servicer, on the applicable determination date. Any amounts held for future distribution and so used will be replaced by the master servicer on or before any future distribution date to the extent that funds in the Trust Account on the distribution date will be less than payments to holders of securities required to be made on the distribution date.

The related prospectus supplement may specify that the obligation of the master servicer to make advances may be subject to the good faith determination of the master servicer that the advances will be reimbursable from related late collections, Insurance Proceeds or Liquidation Proceeds. See "Description of Credit Support" in this prospectus. As specified in the related prospectus supplement with respect to any series of securities as to which the trust fund includes mortgage securities, the master servicer's advancing obligations, if any, will be pursuant to the terms of the mortgage securities.

Advances are intended to maintain a regular flow of scheduled interest and principal payments to holders of securities, rather than to guarantee or insure against losses. The related prospectus supplement may specify that advances will be reimbursable to the master servicer, with interest, out of related recoveries on the residential loans respecting which amounts were advanced, or, to the extent that the master servicer determines that any advance previously made will not be ultimately recoverable from Insurance Proceeds or Liquidation Proceeds, a nonrecoverable advance, from any cash available in the Trust Account. The related prospectus supplement may specify that the obligations of the master servicer to make advances may be secured by a cash advance reserve fund or a surety bond. Information regarding the characteristics of, and the identity of any borrower of, any surety bond, will be set forth in the related prospectus supplement.

Statements to Holders of Securities

On each distribution date, the master servicer or the trustee will forward or cause to be forwarded to each holder of securities of the related series and to the depositor a statement including the information specified in the related prospectus supplement. This information may include the following:

-65-

&lt;Page&gt;

(1) the amount of the distribution, if any, allocable to principal, separately identifying the aggregate amount of principal prepayments and, if applicable, related prepayment penalties received during the related Prepayment Period;

(2) the amount of the distribution, if any, allocable to interest;

(3) the amount of administration and servicing compensation received by or on behalf of the trustee, master servicer and any sub-servicer with respect to the distribution date and other customary information as the master servicer or the trustee deems necessary or desirable to enable holders of securities to prepare their tax returns or which a holder of securities reasonably requests for this purpose;

(4) if applicable, the aggregate amount of any advances included in this distribution and the aggregate amount of any unreimbursed advances as of the close of business on the distribution date;

(5) the security principal balance of a minimum denomination security, and the aggregate security principal balance of all of the securities of that series, after giving effect to the amounts distributed on the distribution date;

(6) the number and aggregate principal balance of any residential loans in the related trust fund (a) delinquent one month, (b) delinquent two or more months and (c) as to which repossession or foreclosure proceedings have been commenced;

(7) with respect to any residential property acquired through foreclosure, deed in lieu of foreclosure or repossession during the preceding calendar month, the loan number and principal balance of the related residential loan as of the close of business on the distribution date in the month and the date of acquisition;

(8) the book value of any residential property acquired through foreclosure, deed in lieu of foreclosure or repossession as of the close of business on the last business day of the calendar month preceding the distribution date;

(9) the aggregate unpaid principal balance of the mortgage loans at the close of business on the related distribution date;

(10) in the case of securities with a variable security interest rate, the security interest rate applicable to the distribution date, as calculated in accordance with the method specified in the prospectus supplement relating to the related series;

(11) in the case of securities with an adjustable security interest rate, for statements to be distributed in any month in which an adjustment date occurs, the adjusted security interest rate applicable to the next succeeding distribution date;

(12) as to any series including one or more classes of Accrual Securities, the interest accrued on each class with respect to the related distribution date and added to the security principal balance;

-66-

&lt;Page&gt;

(13) the amount remaining in the Reserve Fund, if any, as of the close of business on the distribution date, after giving effect to distributions made on the related distribution date;

(14) as to any senior/subordinate series, information as to the remaining amount of protection against losses afforded to the holders of senior securities by the subordination provisions and information regarding any shortfalls in payments to the holder of senior securities which remain outstanding; and

(15) with respect to any series of securities as to which the trust fund includes mortgage securities, certain additional information as required under the related pooling and servicing agreement or trust agreement, as applicable.

Information furnished pursuant to clauses (1), (2) and (3) above may be expressed as a dollar amount per minimum denomination security.

Within a reasonable period of time after the end of each calendar year, the master servicer or the trustee will furnish or cause to be furnished a report to every person who was a holder of record of a security at any time during the calendar year. This report will set forth the aggregate of amounts reported pursuant to clauses (1), (2) and (3) of the immediately preceding paragraph for the related calendar year or if the person was a holder of record during a

portion of the calendar year, for the applicable portion of that year.

The related prospectus supplement may provide that additional information with respect to a series of securities will be included in these statements. In addition, the master servicer or the trustee will file with the Internal Revenue Service and furnish to holders of securities the statements or information as may be required by the Code or applicable procedures of the IRS.

Book-Entry Registration of Securities

If not issued in fully registered form, each class of securities will be registered as book-entry securities. Persons acquiring beneficial ownership interests in the securities will hold their securities through the Depository Trust Company in the United States, or, if provided in the related prospectus supplement, Clearstream Banking, societe anonyme or Euroclear Bank, as operator of the Euroclear System in Europe, or indirectly through organizations that are Participants in these systems. The Depository Trust Company is referred to as "DTC." Clearstream Banking, societe anonyme is referred to as "Clearstream." The Euroclear System is referred to as "Euroclear."

The book-entry securities will be issued in one or more certificates which equal the aggregate principal balance of the securities and will initially be registered in the name of Cede & Co., the nominee of DTC or one of the relevant depositories. If the aggregate principal amount of any book-entry security exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount and an additional certificate will be issued with respect to any remaining principal amount. Clearstream and Euroclear will hold omnibus positions on behalf of their Participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositaries which in turn will hold these positions in customers' securities accounts in the depositaries' names on the books of DTC. Except as described below, no Security Owner will be entitled to receive a Definitive Security.

-67-

<Page>

Unless and until Definitive Securities are issued, we anticipate that the only "holders" of the securities will be Cede & Co., as nominee of DTC or one of the relevant depositories. Security Owners are only permitted to exercise their rights indirectly through the Participants and DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its Participants deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is owned by a number of its Participants and Members of the National Securities Clearing Corporation, Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing Corporation, as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks, and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly. The Rules applicable to DTC and its Participants and indirect participants are on file with the Securities and Exchange Commission.

Purchases of book-entry securities under the DTC system must be made by or through Participants, which will receive a credit for the book-entry securities on DTC's records. The ownership interest of each Security Owner is in turn to be recorded on the Participants' or Financial Intermediaries' records. The Financial Intermediary's ownership of the book-entry security will be recorded on the records of DTC or of a participating firm that acts as agent for the Financial Intermediary, whose interest will in turn be recorded on the records of DTC, if the Security Owner's Financial Intermediary is not a Participant and on the records of Clearstream or Euroclear, as appropriate). Security Owners will not receive written confirmation from DTC of their purchase, but Security Owners are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Participant or indirect participant through which the Security Owner entered into the transaction. Transfers of ownership interests in the book-entry securities are to be accomplished by entries made on the books of Participants and indirect participants acting on behalf of Security Owners. Security Owners will not receive certificates representing their ownership interests in the book-entry securities, except in the event that use of the book-entry system for the book-entry securities is discontinued.

To facilitate subsequent transfers, all book-entry securities deposited by Participants with DTC are registered in the name of DTC's partnership nominee,

Cede & Co. or such other name as may be requested by an authorized
representative of DTC. The deposit of book-entry securities with DTC and their
registration in the name of Cede & Co. or such other nominee do not effect any
change in beneficial ownership. DTC has no knowledge of the actual Security
Owners of the book-entry securities; DTC's records reflect only the identity of
the Participants to whose accounts such book-entry securities are credited,
which may or may not be the Security

                                    -68-

<Page>

Owners. The Participants and indirect participants will remain responsible for
keeping account of their holdings on behalf of their customers.

        Conveyance of notices and other communications by DTC to Participants, by
Participants to indirect participants, and by Participants and indirect
participants to Security Owners will be governed by arrangements among them,
subject to any statutory or regulatory requirements as may be in effect from
time to time.

        Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or
vote with respect to the book-entry securities. Under its usual procedures, DTC
mails an omnibus proxy to the issuer as soon as possible after the record date.
The omnibus proxy assigns Cede & Co.'s consenting or voting rights to those
Participants to whose accounts the book-entry securities are credited on the
record date (identified in a listing attached to the omnibus proxy).

        Distributions on the book-entry securities will be made to Cede & Co., or
such other nominee as may be requested by an authorized representative of DTC.
DTC's practice is to credit Participants' accounts, upon DTC's receipt of funds
and corresponding detail information from the issuer or agent on the payable
date in accordance with their respective holdings shown on DTC's records.
Payments by Participants to Security Owners will be governed by standing
instructions and customary practices, as is the case with securities held for
the accounts of customers in bearer form or registered in "street name," and
will be the responsibility of such Participant and not of DTC, agent, or issuer,
subject to any statutory or regulatory requirements as may be in effect from
time to time. Payment of distributions to Cede & Co. (or such other nominee as
may be requested by an authorized representative of DTC) is the responsibility
of issuer or agent, disbursement of such payments to Participants shall be the
responsibility of DTC, and disbursement of such payments to the Security Owners
shall be the responsibility of Participants and indirect participants.

        Because of time zone differences, it is possible that credits of securities
received in Clearstream or Euroclear as a result of a transaction with a
Participant will be made during subsequent securities settlement processing and
dated the business day following the DTC settlement date. The credits or any
transactions in the securities settled during this processing will be reported
to the relevant Euroclear or Clearstream Participants on that business day. Cash
received in Clearstream or Euroclear as a result of sales of securities by or
through a Clearstream Participant or Euroclear Participant to a DTC Participant
will be received with value on the DTC settlement date but, due to different
time zones, may be available in the relevant Clearstream or Euroclear cash
account only as of the business day following settlement in DTC.

        Transfers between Participants will occur in accordance with the rules
creating and affecting DTC and its operations. Transfers between Clearstream
Participants and Euroclear Participants will occur in accordance with their
respective rules and operating procedures.

        Cross-market transfers between persons holding directly or indirectly
through DTC, on the one hand, and directly or indirectly through Clearstream
Participants or Euroclear Participants, on the other, will be effected in DTC in
accordance with DTC rules on behalf of the relevant European international
clearing system by the relevant depositary, each of which is a participating
member of DTC. However, such cross-market transactions will require delivery of

                                    -69-

<Page>

instructions to the relevant European international clearing system by the
counterparty in such system in accordance with its rules and procedures and
within its established deadlines. The relevant European international clearing
system will, if the transaction meets its settlement requirements, deliver
instructions to the relevant depositary to take action to effect final
settlement on its behalf by delivering or receiving securities in DTC, and
making or receiving distribution in accordance with normal procedures for same
day funds settlement applicable to DTC. Clearstream Participants and Euroclear

Participants may not deliver instructions directly to the relevant depositories for Clearstream or Euroclear.

Clearstream holds securities for its Participant organizations and facilitates the clearance and settlement of securities transactions between Clearstream Participants through electronic book-entry changes in accounts of Clearstream Participants, thus eliminating the need for physical movement of securities. Transactions may be settled through Clearstream in many currencies, including United States dollars. Clearstream provides to its Clearstream Participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries. Clearstream Participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream Participant, either directly or indirectly.

Euroclear was created to hold securities for its Participants and to clear and settle transactions between its Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. The Euroclear System is owned by Euroclear plc and operated through a license agreement by Euroclear Bank S.A./N.V., a bank incorporated under the laws of the Kingdom of Belgium (the "Euroclear Operator"). The Euroclear Operator holds securities and book-entry interests in securities for participating organizations and facilitates the clearance and settlement of securities transactions between Euroclear Participants, and between Euroclear Participants and Participants of certain other securities intermediaries through electronic book-entry changes in accounts of such Participants or other securities intermediaries. Non-Participants of Euroclear may hold and transfer book-entry interests in the offered certificates through accounts with a direct Participant of Euroclear or any other securities intermediary that holds a book-entry interest in the offered certificates through one or more securities intermediaries standing between such other securities intermediary and the Euroclear Operator. Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System, and applicable Belgian law. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts only on behalf of Euroclear Participants and has no record of or relationship with persons holding through Euroclear Participants.

Under a book-entry format, beneficial owners of the book-entry securities may experience some delay in their receipt of payments, since the trustee will forward payments to Cede & Co. Distributions with respect to securities held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream Participants or Euroclear Participants in

-70-

<Page>

accordance with the relevant system's rules and procedures, to the extent received by the relevant depositary. These distributions will be subject to tax reporting in accordance with the relevant United States tax laws and regulations. See "Federal Income Tax Consequences" in this prospectus. Because DTC can only act on behalf of Financial Intermediaries, the ability of a beneficial owner to pledge book-entry securities to persons or entities that do not participate in the depository system, or otherwise take actions in respect of the book-entry securities, may by limited due to the lack of physical certificates for the book-entry securities. In addition, issuance of the book-entry securities in book-entry form may reduce the liquidity of the securities in the secondary market since certain potential investors may be unwilling to purchase securities for which they cannot obtain physical certificates.

The related prospectus supplement may specify that Cede & Co. will provide monthly and annual reports on the trust fund as nominee of DTC. Cede & Co. may make these reports available to beneficial owners if requested, in accordance with the rules, regulations and procedures creating and affecting the depository, and to the Financial Intermediaries to whose DTC accounts the book-entry securities of the beneficial owners are credited.

We understand that, unless and until Definitive Securities are issued, DTC will take any action permitted to be taken by the holders of the book-entry securities under the terms of the securities only at the direction of one or more Financial Intermediaries to whose DTC accounts the book-entry securities are credited, to the extent that these actions are taken on behalf of Financial Intermediaries whose holdings include these book-entry securities. Clearstream or Euroclear, as the case may be, will take any other action permitted to be taken by a holder of securities under the terms of the securities on behalf of a Clearstream Participant or Euroclear Participant only in accordance with its relevant rules and procedures and subject to the ability of the relevant

depositary to effect the actions on its behalf through DTC. DTC may take actions, at the direction of the related Participants, with respect to some securities which conflict with actions taken with respect to other securities.

Definitive Securities will be delivered to beneficial owners of securities (or their nominees) only if:

(1) DTC is no longer willing or able properly to discharge its responsibilities as depository with respect to the securities, and the depositor is unable to locate a qualified successor,

(2) the depositor or trustee notifies DTC of its intent to terminate the book-entry system through DTC and, upon receipt of notice of such intent from DTC, the Participants holding beneficial interests in the securities agree to initiate such termination, or

(3) after the occurrence of an event of default under the pooling and servicing agreement, Security Owners representing a majority in principal amount of the securities of any class then outstanding advise DTC through a Participant of DTC in writing that the continuation of a book-entry system through DTC or a successor thereto is no longer in the best interest of the Security Owners.

-71-

<Page>

If any of the events described in the immediately preceding paragraph occur, the trustee will notify all beneficial owners of the occurrence of the event and the availability through DTC of Definitive Securities. If the global certificate or certificates representing the book-entry securities and instructions for reregistration are surrendered by DTC, the trustee will issue Definitive Securities. The trustee will then recognize the holders of the Definitive Securities as holders of securities under the applicable agreement.

Although DTC, Clearstream and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of securities among Participants of DTC, Clearstream and Euroclear, they are under no obligation to perform or continue to perform the procedures and may discontinue the procedures at any time.

None of the master servicer, the depositor or the trustee will have any responsibility for any aspect of the records relating, to or payments made on account of beneficial ownership interests of the book-entry securities held by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests. We cannot assure you that Cede & Co., DTC or any Financial Intermediary will provide information to you or act in accordance with their respective rules, regulations, and procedures.

The information in this section concerning DTC, Clearstream, Euroclear and DTC's book-entry system has been obtained from sources that we believe to be reliable, but we take no responsibility for the accuracy thereof.

Collection and Other Servicing Procedures

Residential Loans. The master servicer, directly or through sub-servicers, will be required to

o    make reasonable efforts to collect all required payments under the residential loans and

o    follow or cause to be followed the collection procedures as it would follow with respect to the servicing of residential loans that are comparable to the residential loans and held for its own account. However, these procedures must be consistent with any insurance policy, bond or other instrument described under "Description of Primary Insurance Coverage" or "Description of Credit Support" in this prospectus.

With respect to any series of securities as to which the trust fund includes mortgage securities, the master servicer's servicing and administration obligations, if any, will be pursuant to the terms of these mortgage securities.

In any case in which a residential property has been, or is about to be, conveyed, or in the case of a multifamily residential property, encumbered, by the borrower, the master servicer will, to the extent it has knowledge of the conveyance, encumbrance, or proposed conveyance or encumbrance, exercise or cause to be exercised its rights to accelerate the maturity of the residential loan under any applicable due-on-sale or due-on-encumbrance clause. The master servicer will accelerate the maturity only if the exercise of the rights is permitted by applicable

-72-

<Page>

law and will not impair or threaten to impair any recovery under any related Insurance Instrument. If these conditions are not met or if the master servicer or sub-servicer reasonably believes it is unable under applicable law to enforce the due-on-sale or due-on-encumbrance clause, the master servicer or sub-servicer will enter into or cause to be entered into an assumption and modification agreement with the person to whom the property has been conveyed, encumbered or is proposed to be conveyed or encumbered. Pursuant to the assumption and modification agreement, the person to whom the property has been conveyed becomes liable under the mortgage note, cooperative note, Home Improvement Contract or Manufactured Housing Contract. To the extent permitted by applicable law, the borrower remains liable on the mortgage note, cooperative note, Home Improvement Contract or Manufactured Housing Contract, provided that coverage under any Insurance Instrument with respect to the residential loan is not adversely affected.

The master servicer can enter into a substitution of liability agreement with the person to whom the property is conveyed, pursuant to which the original borrower is released from liability and the person is substituted as the borrower and becomes liable under the mortgage note, cooperative note, Home Improvement Contract or Manufactured Housing Contract. In connection with any assumption, the interest rate, the amount of the monthly payment or any other term affecting the amount or timing of payment on the residential loan may not be changed. Any fee collected by or on behalf of the master servicer for entering into an assumption agreement may be retained by or on behalf of the master servicer as additional compensation for administering of the assets of the trust fund. See "Certain Legal Aspects of Residential Loans -- Enforceability of Certain Provisions" and "-- Prepayment Charges and Prepayments" in this prospectus. The master servicer will be required to notify the trustee and any custodian that any assumption or substitution agreement has been completed.

Agency Securities. The trustee will be required, if it has not received a distribution with respect to any agency security by the date specified in the related prospectus supplement in accordance with the terms of its agency security, to request the issuer or guarantor, if any, of the agency security to make this payment as promptly as possible. The trustee will be legally permitted to take legal action against the issuer or guarantor as the trustee deems appropriate under the circumstances, including the prosecution of any claims in connection with the agency securities. The reasonable legal fees and expenses incurred by the trustee in connection with the prosecution of the legal action will be reimbursable to the trustee out of the proceeds of the action and will be retained by the trustee prior to the deposit of any remaining proceeds in the Trust Account pending distribution to holders of securities of the related series. If the proceeds of the legal action may be insufficient to reimburse the trustee for its legal fees and expenses, the trustee will be entitled to withdraw from the Trust Account an amount equal to the expenses incurred by it, in which event the trust fund may realize a loss up to the amount so charged.

Realization on Defaulted Residential Loans

As servicer of the residential loans, the master servicer, on behalf of itself, the trustee and the holders of securities, will present claims to the insurer under each Insurance Instrument, to the extent specified in the related prospectus supplement. The master servicer will be required to take reasonable steps as are necessary to receive payment or to permit recovery under the Insurance Instrument with respect to defaulted residential loans. The related prospectus

-73-

<Page>

supplement may specify that the master servicer will not receive payment under any letter of credit included as an Insurance Instrument with respect to a defaulted residential loan unless all Liquidation Proceeds and Insurance Proceeds which it deems to be finally recoverable have been realized. However, the master servicer may be entitled to reimbursement for any unreimbursed advances and reimbursable expenses for the defaulted residential loan.

If any property securing a defaulted residential loan is damaged and proceeds, if any, from the related Primary Hazard Insurance Policy are insufficient to restore the damaged property to a condition sufficient to permit recovery under the related Primary Credit Insurance Policy, if any, the master servicer will not be required to expend its own funds to restore the damaged property unless it determines:

(1) that the restoration will increase the proceeds to holders of securities on liquidation of the residential loan after reimbursement of the master servicer for its expenses; and

(2) that the expenses will be recoverable by it from related Insurance Proceeds or Liquidation Proceeds.

If recovery on a defaulted residential loan under any related Primary Credit Insurance Policy is not available for the reasons set forth in the preceding paragraph, or for any other reason, the master servicer nevertheless will be obligated to follow or cause to be followed the normal practices and procedures as it deems necessary, and appropriate for the type of defaulted residential loan, or advisable to realize on the defaulted residential loan. If the proceeds of any liquidation of the property securing the defaulted residential loan are less than:

o    the outstanding principal balance of the defaulted residential loan, or the Cash Flow Value of the mortgage loan if the security principal balances are based on Cash Flow Values);

o    the amount of any liens senior to the defaulted residential loan plus interest accrued on the defaulted residential loan at the Net Interest Rate; plus

o    the aggregate amount of expenses incurred by the master servicer in connection with the proceedings and which are reimbursable under the related agreement

the trust fund will realize a loss in the amount of this difference.

If the master servicer recovers Insurance Proceeds which, when added to any related Liquidation Proceeds and after deduction of certain expenses reimbursable to the master servicer, exceed the outstanding principal balance of the defaulted residential loan together with accrued interest at the Net Interest Rate, the master servicer will be entitled to withdraw or cause to be withdrawn from the Trust Account amounts representing its normal administration compensation on the related residential loan. If the master servicer has expended its own funds to restore damaged property and these funds have not been reimbursed under any Insurance Instrument, it will be entitled to withdraw from the Trust Account out of related Liquidation Proceeds or Insurance Proceeds an amount equal to the expenses incurred by it, in which event the trust fund may realize a loss up to the amount charged. Because Insurance Proceeds cannot exceed

-74-

<Page>

deficiency claims and certain expenses incurred by the master servicer, no payment or recovery will result in a recovery to the trust fund which exceeds the principal balance of the defaulted residential loan together with accrued interest on the defaulted residential loan at the Net Interest Rate.

In addition, when property securing a defaulted residential loan can be resold for an amount exceeding the outstanding principal balance of the related residential loan together with accrued interest and expenses, it may be expected that, if retention of any amount is legally permissible, the insurer will exercise its right under any related pool insurance policy to purchase the property and realize for itself any excess proceeds. See "Description of Primary Insurance Coverage" and "Description of Credit Support" in this prospectus.

With respect to collateral securing a Cooperative Loan, any prospective purchaser will generally have to obtain the approval of the board of directors of the relevant cooperative housing corporation before purchasing the shares and acquiring rights under the proprietary lease or occupancy agreement securing that Cooperative Loan. See "Certain Legal Aspects of Residential Loans -- Foreclosure on Cooperative Shares" in this prospectus. This approval is usually based on the purchaser's income and net worth and numerous other factors. The necessity of acquiring approval could limit the number of potential purchasers for those shares and otherwise limit the master servicer's ability to sell, and realize the value of, those shares.

Retained Interest, Administration Compensation and Payment of Expenses

If the related prospectus supplement provides for Retained Interests, they may be established on a loan-by-loan or security-by-security basis and will be specified in the related agreement or in an exhibit to the related agreement. A Retained Interest in an asset of the trust fund represents a specified portion of the interest payable on the asset. The Retained Interest will be deducted from related payments as received and will not be part of the related trust fund. Any partial recovery of interest on a residential loan, after deduction of all applicable administration fees, may be allocated between Retained Interest, if any, and interest at the Net Interest Rate on a pro rata basis.

The related prospectus supplement may specify that the primary administration compensation of the master servicer or the trustee with respect to a series of securities will generally come from the monthly payment to it, with respect to each interest payment on a trust fund asset. The amount of the compensation may be at a rate equal to one-twelfth of the difference between the interest rate on the asset and the sum of the Net Interest Rate and the Retained

Interest Rate, if any, times the scheduled principal balance of the trust fund asset.

With respect to a series of securities as to which the trust fund includes mortgage securities, the compensation payable to the master servicer for servicing and administering these mortgage securities on behalf of the holders of the securities may be based on a percentage per annum described in the related prospectus supplement of the outstanding balance of the mortgage securities and may be retained from distributions on the mortgage securities. Any sub-servicer may receive a portion of the master servicer's primary compensation as its sub-servicing compensation. Since any Retained Interest and the primary compensation of the master servicer

-75-

<Page>

or the trustee are percentages of the outstanding principal balance of each trust fund asset, these amounts will decrease as the assets of the trust fund amortize.

As additional compensation in connection with a series of securities relating to residential loans, the master servicer or the sub-servicers may be entitled to retain all assumption fees and late payment charges and any prepayment fees collected from the borrowers and any excess recoveries realized on liquidation of a defaulted residential loan. Any interest or other income that may be earned on funds held in the Trust Account pending monthly, quarterly, semiannual or other periodic distributions, as applicable, or any sub-servicing account may be paid as additional compensation to the trustee, the master servicer or the sub-servicers, as the case may be. The prospectus supplement will further specify any allocations for these amounts.

With respect to a series of securities relating to residential loans, the master servicer will pay from its administration compensation its regular expenses incurred in connection with its servicing of the residential loans, other than expenses relating to foreclosures and disposition of property acquired in foreclosure.

We anticipate that the administration compensation will in all cases exceed these expenses. The master servicer is entitled to reimbursement for certain expenses incurred by it in connection with the liquidation of defaulted residential loans. The reimbursement includes under certain circumstances reimbursement of expenditures incurred by it in connection with the restoration of residential properties, this right of reimbursement being prior to the rights of holders of securities to receive any related Liquidation Proceeds. The master servicer may also be entitled to reimbursement from the Trust Account for advances, if applicable. With respect to a series of securities relating to agency securities, the trustee will be required to pay all of its anticipated recurring expenses.

Evidence as to Compliance

Each agreement will generally provide that on or before a specified date in each year, beginning with the first date that occurs at least six months after the Cut-Off Date, the master servicer, or the trustee, at its expense shall cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the trustee. In the statement, the accounting firm will be required to state that they have performed tests in accordance with generally accepted accounting principles regarding the records and documents relating to residential loans or agency securities serviced, as part of their examination of the financial statements of the master servicer or the trustee, as the case may be. Based on the examination, the accountants will be required to state that there were no exceptions that, in their opinion, were material, or provide a list of the exceptions. In rendering that statement, the firm may rely, as to matters relating to direct servicing of residential loans by sub-servicers, on comparable statements for examinations conducted substantially in compliance with generally accepted accounting principles in the residential loan servicing industry, rendered within one year of the statement, of independent public accountants with respect to the related sub-servicer.

Each applicable servicing agreement or trust agreement will also provide for delivery to the trustee, on or before a specified date in each year, of an annual statement signed by an officer

-76-

<Page>

of the master servicer, in the case of a pool of agency securities or mortgage

securities, or of the trustee, in the case of a trust agreement. This statement
will be to the effect that, to the best of the officer's knowledge, the master
servicer or the trustee, as the case may be, has fulfilled its obligations under
the related agreement throughout the preceding year.

Certain Matters Regarding the Master Servicer, the Depositor and the Trustee

     The Master Servicer. The master servicer under each servicing agreement
will be identified in the related prospectus supplement. Each pooling and
servicing agreement or servicing agreement will generally provide that:

     o    the master servicer may resign from its obligations and duties under
          the related agreement under circumstances set forth in the related
          agreement, which may include a determination by the master servicer
          that it will no longer engage in the business of servicing mortgage
          loans; and

     o    the master servicer shall resign if a determination is made that its
          duties under the related agreement are no longer permissible under
          applicable law; and

     o    the resignation of the master servicer will not become effective until
          a successor master servicer meeting the eligibility requirements set
          forth in the servicing agreement has assumed, in writing, the master
          servicer's obligations and responsibilities under the servicing
          agreement.

     Each servicing agreement will further provide that neither the master
servicer nor any director, officer, employee, or agent of the master servicer
shall be under any liability to the related trust fund or holders of securities
for any action taken or for refraining from the taking of any action in good
faith pursuant to the servicing agreement, or for errors in judgment. However,
neither the master servicer nor any person shall be protected:

     o    against any liability for any breach of warranties or representations
          made in the servicing agreement;

     o    against any specific liability imposed on the master servicer;

     o    by the terms of the servicing agreement;

     o    by reason of willful misfeasance, bad faith or gross negligence in the
          performance of duties under the agreement; or

     o    by reason of reckless disregard of obligations and duties under the
          related servicing agreement.

The master servicer and any director, officer, employee or agent of the master
servicer will be entitled to rely in good faith on any document of any kind
prima facie properly executed and submitted by any person respecting any matters
arising under the related servicing agreement. Each servicing agreement may
further provide that the master servicer and any director, officer, employee or
agent of the master servicer will be

                                      -77-

<Page>

     o    entitled to indemnification by the trust fund and

     o    will be held harmless against any loss, liability, or expense incurred
          in connection with any legal action relating to the servicing
          agreement or the securities, any representation or warranty regarding
          the mortgage loans, the Pool Insurance Policy, the special hazard
          insurance policy and the Bankruptcy Bond, if any, other than:

          o    any loss, liability, or expense related to any specific
               residential loan or residential loans,

          o    any loss, liability, or expense otherwise reimbursable pursuant
               to the servicing agreement, and

          o    any loss, liability, or expense incurred by reason of willful
               misfeasance, bad faith or gross negligence in the performance of
               duties under the agreement or by reason of reckless disregard of
               obligations and duties under the agreement.

     In addition, each servicing agreement will provide that the master servicer
will be under no obligation to appear in, prosecute, or defend any legal action
which is not incidental to its duties under the servicing agreement and which in
its opinion may involve it in any expense or liability. The master servicer may
be permitted, however, in its discretion to undertake any action which it may
deem necessary or desirable with respect to the servicing agreement and the
rights and duties of the parties to the servicing agreement and the interests of
the holders of securities under the servicing agreement. In that event, the
legal expenses and costs of the action and any liability resulting from taking

the actions will be expenses, costs and liabilities of the trust fund. The master servicer will be entitled to be reimbursed for these expenses out of the Trust Account. This right of reimbursement is prior to the rights of holders of securities to receive any amount in the Trust Account.

Any entity into which the master servicer may be merged, consolidated or converted, or any entity resulting from any merger, consolidation or conversion to which the master servicer is a party, or any entity succeeding to the business of the master servicer, will be the successor of the master servicer under each servicing agreement. However, the successor or surviving entity must meet the qualifications specified in the related prospectus supplement.

The related prospectus supplement may specify that the master servicer's duties may be terminated if a termination fee is paid, and the master servicer may be replaced with a successor meeting the qualifications specified in the related prospectus supplement.

The Depositor. Each applicable agreement will provide that neither the depositor nor any director, officer, employee, or agent of the depositor shall be under any liability to the related trust fund or holders of securities for any action taken or for refraining from the taking of any action in good faith pursuant to the agreement, or for errors in judgment. However, neither the depositor nor any person will be protected against any liability for any breach of warranties or representations made in the agreement or against any specific liability imposed on the depositor by the terms of the agreement or by reason of willful misfeasance, bad faith or gross negligence in the performance of duties under the agreement or by reason of reckless disregard of

-78-

<Page>

obligations and duties under the agreement. The depositor and any director, officer, employee or agent of the depositor will be entitled to rely in good faith on any document of any kind prima facie properly executed and submitted by any person respecting any matters arising under the related agreement.

Each agreement will further provide that the depositor and any director, officer, employee or agent of the depositor will be entitled to indemnification by the trust fund and will be held harmless against any loss, liability, or expense incurred in connection with any legal action relating to:

   o   the agreement or the securities;

   o   any representation or warranty regarding the mortgage loans;

   o   any Pool Insurance Policy;

   o   any special hazard insurance policy and the Bankruptcy Bond; or

   o   any agency securities,

other than any loss, liability, or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties under the related agreement or by reason of reckless disregard of obligations and duties under the related agreement.

In addition, each agreement will provide that the depositor will be under no any obligation to appear in, prosecute, or defend any legal action which is not incidental to its duties under the related agreement and which in its opinion may involve it in any expense or liability. The depositor may be permitted, however, in its discretion to undertake any action which it may deem necessary or desirable with respect to the related agreement and the rights and duties of the parties to the related agreement and the interests of the holders of securities under the related agreement. In that event, the legal expenses and costs of the action and any liability resulting from taking these actions will be expenses, costs and liabilities of the trust fund. The depositor will be entitled to be reimbursed for those expenses out of the Trust Account. This right of reimbursement will be prior to the rights of holders of securities to receive any amount in the Trust Account.

Any entity into which the depositor may be merged, consolidated or converted, or any entity resulting from any merger, consolidation or conversion to which the depositor is a party, or any entity succeeding to the business of the depositor will be the successor of the depositor under each agreement.

The Trustees. Each trustee for any series of securities will be required to be an entity possessing corporate trust powers having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal or state authority as identified in the related prospectus supplement. The commercial bank or trust company serving as trustee may have normal banking relationships with the depositor and its affiliates and the master servicer, if any, and its affiliates. For the purpose of meeting the legal requirements of certain local jurisdictions,

-79-

<Page>

the depositor or the trustee may have the power to appoint co-trustees or
separate trustees of all or any part of the trust fund. If the appointment
occurs, all rights, powers, duties and obligations conferred or imposed on the
trustee by the agreement relating to the series shall be conferred or imposed on
the trustee and the separate trustee or co-trustee jointly. In any jurisdiction
in which the trustee shall be incompetent or unqualified to perform certain
acts, the rights, powers and duties shall be conferred or imposed on the
separate trustee or co-trustee singly. The separate trustee or co-trustee will
be required to exercise and perform these rights, powers and duties and obligations
solely at the direction of the trustee.

      The trustee may resign at any time, in which event the depositor or the
other party specified in the related agreements will be obligated to appoint a
successor trustee. The depositor or the other party specified in the related
agreements may also remove the trustee if the trustee ceases to be eligible to
continue as such under the agreement or if the trustee becomes insolvent,
incapable of acting or a receiver or similar person shall be appointed to take
control of its affairs. In these circumstances, the depositor or the other party
specified in the related agreements will be obligated to appoint a successor
trustee. The holders of securities evidencing not less than a majority of the
voting rights allocated to the securities may at any time remove the trustee and
appoint a successor trustee by written instrument in accordance with additional
procedures set forth in the related agreement. Any resignation or removal of the
trustee and appointment of a successor trustee does not become effective until
acceptance of the appointment by a successor trustee.

      Duties of the Trustees. The trustee will make no representations as to the
validity or sufficiency of any agreement, the securities, any asset of the trust
fund or related document other than the certificate of authentication on the
forms of securities, and will not assume any responsibility for their
correctness. The trustee under any agreement will not be accountable for the use
or application by or on behalf of the master servicer of any funds paid to the
master servicer in respect of the securities, the assets of the trust fund, or
deposited into or withdrawn from the Trust Account or any other account by or on
behalf of the depositor or the master servicer. If no event of default has
occurred and is continuing, the trustee will be required to perform only those
duties specifically required under the related agreement. However, when the
trustee receives the various certificates, reports or other instruments required
to be furnished to it under an agreement, the trustee will be required to
examine those documents and to determine whether they conform to the
requirements of the agreement.

      Each agreement may further provide that neither the trustee nor any
director, officer, employee, or agent of the trustee shall be under any
liability to the related trust fund or holders of securities for any action
taken or for refraining from the taking of any action in good faith pursuant to
the agreement, or for errors in judgment. However, neither the trustee nor any
person shall be protected against specific liability imposed on the trustee by
the terms of the agreement or by reason of willful misfeasance, bad faith or
gross negligence in the performance of duties under the related agreement or by
reason of reckless disregard of obligations and duties under the related
agreement. The trustee and any director, officer, employee or agent of the
trustee may rely in good faith on any document of any kind prima facie properly
executed and submitted by any person respecting any matters arising under the
related agreement.

-80-

<Page>

      Each agreement may further provide that the trustee and any director,
officer, employee or agent of the trustee will be entitled to indemnification by
the trust fund and will be held harmless against any loss, liability, or expense
incurred in connection with any legal action relating to the agreement, the
securities or the agency securities. However, the trustee may not be held
harmless against any loss, liability, or expense incurred by reason of willful
misfeasance, bad faith or gross negligence in the performance of duties under
the related agreement or by reason of reckless disregard of obligations and
duties under the related agreement.

Deficiency Events

      With respect to each series of securities with distribution dates occurring
at intervals less frequently than monthly, and with respect to each series of
securities including two or more classes with sequential priorities for
distribution of principal, the following provisions may apply if specified in
the related prospectus supplement.

A deficiency event with respect to the securities of any of the series is the inability to distribute to holders of one or more classes of securities of these series, in accordance with the terms of the securities and the related agreement, any distribution of principal or interest on these securities when and as distributable, in each case because of the insufficiency for the purpose of the funds then held in the related trust fund.

If a deficiency event occurs, the trustee or master servicer, as may be set forth in the related prospectus supplement, may be required to determine the sufficiency of funds available to make future required distributions on the securities.

The trustee or master servicer may obtain and rely on an opinion or report of a firm of independent accountants of recognized national reputation as to the sufficiency of the amounts receivable with respect to the trust fund to make the distributions on the securities, which opinion or report will be conclusive evidence as to sufficiency. Prior to making this determination, distributions on the securities shall continue to be made in accordance with their terms.

If the trustee or master servicer makes a positive determination, the trustee or master servicer will apply all amounts received in respect of the related trust fund, after payment of expenses of the trust fund, to distributions on the securities of the series in accordance with their terms. However, these distributions will be made monthly and without regard to the amount of principal that would otherwise be distributable on any distribution date. Under certain circumstances following the positive determination, the trustee or master servicer may resume making distributions on the securities expressly in accordance with their terms.

If the trustee or master servicer is unable to make the positive determination described above, the trustee or master servicer will apply all amounts received in respect of the related trust fund, after payment of expenses, to monthly distributions on the securities of the series pro rata, without regard to the priorities as to distribution of principal set forth in these securities. Also, these securities will, to the extent permitted by applicable law, accrue interest at the highest security interest rate borne by any security of the series. Alternatively, if any class of the series shall have an adjustable or variable security interest rate, interest will accrue at the weighted average security interest rate, calculated on the basis of the maximum security interest rate

-81-

<Page>

applicable to the class having the initial security principal balance of the securities of that class. In this case, the holders of securities evidencing a majority of the voting rights allocated to the securities may direct the trustee to sell the related trust fund. Any direction to sell the trust fund will be irrevocable and binding on the holders of all securities of the series and on the owners of any residual interests in the trust fund. In the absence of this direction, the trustee may not sell all or any portion of the trust fund.

Events of Default

Pooling and Servicing Agreements. Events of default under each pooling and servicing agreement will be specified in the related prospectus supplement and will generally consist of:

o    any failure by the master servicer to distribute or cause to be
     distributed to holders of the certificates, or the failure of the
     master servicer to remit funds to the trustee for this distribution,
     which continues unremedied for five days or another period specified
     in the servicing agreement after the giving of written notice of the
     failure in accordance with the procedures described in the agreement;

o    any failure by the master servicer duly to observe or perform in any
     material respect any of its other covenants or agreements in the
     agreement which continues unremedied for sixty days or another period
     specified in the pooling and servicing agreement after the giving of
     written notice of the failure in accordance with the procedures
     described in the agreement;

o    certain events of insolvency, readjustment of debt, marshalling of
     assets and liabilities or similar proceedings and certain actions by
     or on behalf of the master servicer indicating its insolvency or
     inability to pay its obligations; and

o    any other event of default specified in the pooling and servicing
     agreement.

A default pursuant to the terms of any mortgage securities included in any trust fund will not constitute an event of default under the related pooling and servicing agreement.

So long as an event of default under a pooling and servicing agreement remains unremedied, the depositor or the trustee may, and at the direction of holders of certificates evidencing a percentage of the voting rights allocated to the certificates as may be specified in the pooling and servicing agreement will be required to terminate all of the rights and obligations of the master servicer under the pooling and servicing agreement and in and to the residential loans and the proceeds of the residential loans. The trustee or another successor servicer will then succeed to all responsibilities, duties and liabilities of the master servicer and will be entitled to similar compensation arrangements.

If the trustee would be obligated to succeed the master servicer but is unwilling to act as master servicer, it may, or if it is unable so to act, it shall, appoint, or petition a court of competent jurisdiction for the appointment of, an approved mortgage servicing institution with a net worth of at least $10,000,000, or other amount as may be specified in the related agreement, to act as successor to the master servicer under the pooling and servicing agreement. Pending the

-82-

<Page>

appointment, the trustee is obligated to act in this capacity. The trustee and the successor may agree on the administration compensation to be paid, which in no event may be greater than the compensation to the master servicer under the pooling and servicing agreement.

No holder of the certificate will have the right under any pooling and servicing agreement to institute any proceeding with respect to its certificates unless permitted in the related agreement and:

  o   the holder previously has given to the trustee written notice of an
      event of default or of a default by the depositor or the trustee in
      the performance of any obligation under the pooling and servicing
      agreement, and of the continuance of the event of default;

  o   the holders of certificates evidencing not less than 25% of the voting
      rights allocated to the certificates, or other percentages specified
      in the agreement, have made written request to the trustee to
      institute the proceeding in its own name as trustee and have offered
      to the trustee reasonable indemnity as it may require against the
      costs, expenses and liabilities to be incurred by instituting the
      proceedings; and

  o   the trustee for sixty days after receipt of notice, request and offer
      of indemnity has neglected or refused to institute any proceeding.

The trustee, however, is generally under no obligation to

  o   exercise any of the trusts or powers vested in it by any pooling and
      servicing agreement or to make any investigation of matters arising
      under the pooling and servicing agreement, or

  o   institute, conduct, or defend any litigation under, or in relation to,
      the pooling and servicing agreement, at the request, order or
      direction of any of the holders of certificates covered by the pooling
      and servicing agreement,

unless the holders of the certificates have offered to the trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred in the undertaking.

Servicing Agreement. Servicing defaults under the related servicing agreement will be specified in the related prospectus supplement and will generally include:

  o   any failure by the master servicer to pay or cause to be paid to
      holders of the notes, or the failure of the master servicer to remit
      funds to the trustee for the payment which continues unremedied for
      the period specified in the servicing agreement after the giving of
      written notice of the failure in accordance with the procedures
      described in the agreement;

  o   any failure by the master servicer duly to observe or perform in any
      material respect any of its other covenants or agreements in the
      agreement which continues unremedied for the period specified in the
      pooling and servicing agreement after the

-83-

<Page>

giving of written notice of the failure in accordance with the
procedures described in the agreement;

o    certain events of insolvency, readjustment of debt, marshalling of
     assets and liabilities or similar proceedings and certain actions by
     or on behalf of the master servicer indicating its insolvency or
     inability to pay its obligations; and

o    any other servicing default specified in the servicing agreement.

So long as a servicing default remains unremedied, either the depositor or
the trustee may, by written notification to the master servicer and to the
issuer or the trustee or trust fund, as applicable, terminate all of the rights
and obligations of the master servicer under the servicing agreement. However,
the right of the master servicer as noteholder or as holder of the Equity
Certificates and the right to receive servicing compensation and expenses for
servicing the mortgage loans during any period prior to the date of the
termination may not be terminated. The trustee or another successor servicer
will then succeed to all responsibilities, duties and liabilities of the master
servicer and will be entitled to similar compensation arrangements.

If the trustee would be obligated to succeed the master servicer but is
unwilling so to act, it may appoint, or if it is unable so to act, it shall
appoint, or petition a court of competent jurisdiction for the appointment of an
approved mortgage servicing institution with a net worth of an amount specified
in the related agreement, to act as successor to the master servicer under the
servicing agreement. Pending this appointment, the trustee is obligated to act
in that capacity. The trustee and the successor may agree on the servicing
compensation to be paid, which in no event may be greater than the compensation
to the initial master servicer under the servicing agreement.

Indenture. Events of default under the indenture will be specified in the
related prospectus supplement and will generally include:

o    a default for five days or more, or another period of time specified
     in the related indenture, in the payment of any principal of or
     interest on any note of the related series;

o    failure to perform any other covenant of the issuer or the trust fund
     in the indenture which continues for the period specified in the
     related indenture, after notice of the event of default is given in
     accordance with the procedures described in the related indenture;

o    any representation or warranty made by the issuer or the trust fund in
     the indenture or in any other writing delivered in connection with the
     indenture having been incorrect in a material respect as of the time
     made, and the breach is not cured within the period specified in the
     related indenture, after notice of the breach is given in accordance
     with the procedures described in the related indenture;

o    certain events of bankruptcy, insolvency, receivership or liquidation
     of the issuer or the trust fund; and

                                   -84-


<Page>


o    any other event of default provided with respect to notes of that
     series.

If an event of default with respect to the notes of any series at the time
outstanding occurs and is continuing, the trustee or the holders of a majority
of the voting rights allocable to the notes, or another percentage specified in
the indenture, may declare the principal amount of all the notes of the series
to be due and payable immediately. This declaration may, under certain
circumstances, be rescinded and annulled by the holders of a majority in
aggregate outstanding amount of the related notes.

If following an event of default with respect to any series of notes, the
notes of the series have been declared to be due and payable, the trustee may,
in its discretion, regardless of acceleration, elect to

o    maintain possession of the collateral securing the notes of the series
     and

o    continue to apply payments on the collateral as if there had been no
     declaration of acceleration.

The trustee may only do so if the collateral continues to provide sufficient
funds for the payment of principal of and interest on the notes of the series as
they would have become due if there had not been a declaration.

In addition, the trustee may not sell or otherwise liquidate the collateral

securing the notes of a series following an event of default, unless

- o    the holders of 100% of the voting rights allocated to the notes of the
       series consent to the sale,

- o    the proceeds of the sale or liquidation are sufficient to pay in full
       the principal of and accrued interest, due and unpaid, on the
       outstanding notes of the series at the date of the sale,

- o    the trustee determines that the collateral would not be sufficient on
       an ongoing basis to make all payments on the notes as the payments
       would have become due if the related notes had not been declared due
       and payable, and the trustee obtains the consent of the holders of 66
       2/3 % of the then aggregate outstanding amount of the notes of the
       series, or

- o    the trustee satisfies the other requirements as may be set forth in
       the related indenture.

    If the trustee liquidates the collateral in connection with an event of
default under the indenture, the indenture provides that the trustee will have a
prior lien on the proceeds of any liquidation for unpaid fees and expenses. As a
result, if an event of default occurs under the indenture, the amount available
for payments to the noteholders would be less than would otherwise be the case.
However, the trustee will not be permitted to institute a proceeding for the
enforcement of its lien except in connection with a proceeding for the
enforcement of the lien of the indenture

                                     -85-


<Page>


for the benefit of the noteholders after the occurrence of an event of default
under the indenture.

    If the principal of the notes of a series is declared due and payable, the
holders of any notes issued at a discount from par may be entitled to receive no
more than an amount equal to the unpaid principal amount of the related note
less the amount of the discount that is unamortized.

    No noteholder generally will have any right under an indenture to institute
any proceeding with respect to the related agreement unless permitted by the
indenture and

- o    the holder previously has given to the trustee written notice of
       default and the continuance of a default;

- o    the holders of notes or Equity Certificates of any class evidencing
       not less than 25% of the voting rights allocated to the notes, or
       another percentage specified in the indenture:

    - o    have made written request to the trustee to institute the
           proceeding in its own name as trustee; and

    - o    have offered to the trustee reasonable indemnity;

- o    the trustee has neglected or refused to institute any proceeding for
       60 days after receipt of a request and indemnity; and

- o    no direction inconsistent with the written request has been given to
       the trustee during the 60 day period by the holders of a majority of
       the note principal balances of the related class.

However, the trustee will generally be under no obligation to

- o    exercise any of the trusts or powers vested in it by the indenture, or

- o    institute, conduct or defend any litigation under the indenture or in
       relation to the indenture at the request, order or direction of any of
       the holders of notes covered by the agreement,

unless those holders have offered to the trustee reasonable security or
indemnity against the costs, expenses and liabilities which may be incurred in
this undertaking.

Amendment

    With respect to each series of securities, each agreement governing the
rights of the holders of the securities may generally be amended by the parties
to the agreement, without the consent of any of the holders of securities:

    (1) to cure any ambiguity;

                                     -86-

&lt;Page&gt;

(2) to correct or supplement any provision in any agreement which may be inconsistent with any other provision in any agreement;

(3) to make any other provisions with respect to matters or questions arising under the agreement; and

(4) if the amendment, as evidenced by an opinion of counsel, is reasonably necessary to comply with any requirements imposed by the Code or any successor or mandatory statutes or any temporary or final regulation, revenue ruling, revenue procedure or other written official announcement or interpretation relating to federal income tax law or any proposed action which, if made effective, would apply retroactively to the trust fund at least from the effective date of the amendment,

provided, that, the required action, other than an amendment described in clause (4) above, will not adversely affect in any material respect the interests of any holder of the securities covered by the agreement, as evidenced by either an opinion of counsel or a confirmation by the rating agencies that such amendment will not result in the downgrading of the securities. No amendment will be deemed to adversely affect in any material respect the interests of any Certificateholder who shall have consented thereto, and no opinion of counsel or written notice from the rating agencies will be required to address the effect of any such amendment on any such consenting Certificateholder. Each agreement may also be amended, subject to certain restrictions to continue favorable tax treatment of the entity by the parties to this agreement, with the consent of the holders of securities evidencing not less than 51% of the voting rights allocated to the securities, or another percentage specified in the indenture, for any purpose. However, no amendment may

(a) reduce in any manner the amount of, or delay the timing of, payments received on assets of the trust fund which are required to be distributed on any security without the consent of the holder of the security; or

(b) reduce the aforesaid percentage of voting rights required for the consent to the amendment (as evidenced by either an opinion of counsel or a confirmation by the rating agencies that such amendment will not result in the downgrading of the securities).

Termination

The obligations created by the agreement for each series of securities will generally terminate when any of the following first occurs

o    the payment to the holders of securities of that series of all amounts held in the Trust Account and required to be paid to the holders of securities pursuant to the agreement,

o    the final payment or other liquidation, including the disposition of all property acquired upon foreclosure or repossession, of the last trust fund asset remaining in the related trust fund or,

-87-

&lt;Page&gt;

o    the purchase of all of the assets of the trust fund by the party entitled to effect the termination,

in each case, under the circumstances and in the manner set forth in the related prospectus supplement.

In no event, however, will the trust created by the agreement continue beyond the period specified in the related prospectus supplement. Written notice of termination of the agreement will be given to each holder of securities. The final distribution will be made only after surrender and cancellation of the securities at an office or agency appointed by the trustee which will be specified in the notice of termination.

The exercise of the right to purchase the assets of the trust fund as set forth in the preceding paragraph will effect early retirement of the securities of that series.

Voting Rights

Voting rights allocated to securities of a series will generally be based on security principal balances. Any other method of allocation will be specified in the related prospectus supplement. The prospectus supplement may specify that a provider of credit support may be entitled to direct certain actions of the

master servicer and the trustee or to exercise certain rights of the master servicer, the trustee or the holders of securities.

## DESCRIPTION OF PRIMARY INSURANCE COVERAGE

The prospectus supplement may specify that each residential loan may be covered by a Primary Hazard Insurance Policy and, if required as described in the related prospectus supplement, a Primary Credit Insurance Policy. In addition, the prospectus supplement may specify that a trust fund may include any combination of a Pool Insurance Policy, a special Hazard Insurance Policy, a bankruptcy bond or another form of credit support, as described under "Description of Credit Support."

The following is only a brief description of certain insurance policies and does not purport to summarize or describe all of the provisions of these policies. This insurance is subject to underwriting and approval of individual residential loans by the respective insurers.

Primary Credit Insurance Policies

The prospectus supplement will specify whether the master servicer will be required to maintain or cause to be maintained in accordance with the underwriting standards adopted by the depositor a Primary Credit Insurance Policy with respect to each residential loan, other than Multifamily Loans, FHA loans, and VA loans, for which this insurance is required, as described under "Description of the Securities -- Realization on Defaulted Residential Loans" in this prospectus.

The master servicer will be required to cause to be paid the premium for each Primary Credit Insurance Policy to be paid on a timely basis. The master servicer, or the related sub-

-88-

<Page>

servicer, if any, will be required to exercise its best reasonable efforts to be named the insured or a loss payee under any Primary Credit Insurance Policy. The ability to assure that Insurance Proceeds are appropriately applied may be dependent on its being so named, or on the extent to which information in this regard is furnished by borrowers. All amounts collected by the master servicer under any policy will be required to be deposited in the Trust Account. The master servicer will generally not be permitted to cancel or refuse to renew any Primary Credit Insurance Policy in effect at the time of the initial issuance of the securities that is required to be kept in force under the related agreement. However, the master servicer may cancel or refuse to renew any Primary Credit Insurance Policy, if it uses its best efforts to obtain a replacement Primary Credit Insurance Policy for the canceled or nonrenewed policy maintained with an insurer the claims-paying ability of which is acceptable to the rating agency or agencies for pass-through certificates or notes having the same rating as the securities on their date of issuance.

As conditions precedent to the filing or payment of a claim under a Primary Credit Insurance Policy, the insured typically will be required, if a default by the borrower occurs, among other things, to:

    o    advance or discharge:

        o    hazard insurance premiums; and

        o    as necessary and approved in advance by the insurer, real estate taxes, protection and preservation expenses and foreclosure and related costs;

    o    if any physical loss or damage to the residential property occurs, have the residential property restored to at least its condition at the effective date of the Primary Credit Insurance Policy, with ordinary wear and tear excepted; and

    o    tender to the insurer good and merchantable title to, and possession of, the residential property.

FHA Insurance and VA Guarantees

Residential loans designated in the related prospectus supplement as insured by the FHA will be insured by the FHA as authorized under the United States Housing Act of 1934, as amended. Certain residential loans will be insured under various FHA programs including the standard FHA 203(b) program to finance the acquisition of one- to four-family housing units, the FHA 245 graduated payment mortgage program and the FHA Title I Program. These programs generally limit the principal amount and interest rates of the mortgage loans insured. The prospectus supplement relating to securities of each series evidencing interests in a trust fund including FHA loans will set forth additional information regarding the regulations governing the applicable FHA insurance programs. The following, together with any further description in the related prospectus supplement, describes FHA insurance programs and regulations

as generally in effect with respect to FHA loans.

The insurance premiums for FHA loans are collected by lenders approved by the Department of Housing and Urban Development or by the master servicer or any sub-servicer

-89-

<Page>

and are paid to the FHA. The regulations governing FHA single-family mortgage insurance programs provide that insurance benefits are payable either upon foreclosure or other acquisition of possession and conveyance of the mortgage premises to the United States of America or upon assignment of the defaulted loan to the United States of America. With respect to a defaulted FHA-insured residential loan, the master servicer or any sub-servicer will be limited in its ability to initiate foreclosure proceedings. When it is determined, either by the master servicer or any sub-servicer or HUD, that default was caused by circumstances beyond the borrower's control, the master servicer or any sub-servicer is expected to make an effort to avoid foreclosure by entering, if feasible, into one of a number of available forms of forbearance plans with the borrower. These forbearance plans may involve the reduction or suspension of regular mortgage payments for a specified period, with the payments to be made on or before the maturity date of the mortgage, or the recasting of payments due under the mortgage up to or, other than residential loans originated under the Title I Program of the FHA, beyond the maturity date. In addition, when a default caused by circumstances beyond a borrower's control is accompanied by certain other criteria, HUD may provide relief by making payments. These payments are to be repaid to HUD by borrower, to the master servicer or any sub-servicer in partial or full satisfaction of amounts due under the residential loan or by accepting assignment of the loan from the master servicer or any sub-servicer. With certain exceptions, at least three full monthly installments must be due and unpaid under the FHA loan, and HUD must have rejected any request for relief from the borrower before the master servicer or any sub-servicer may initiate foreclosure proceedings.

HUD has the option, in most cases, to pay insurance claims in cash or in debentures issued by HUD. Currently, claims are being paid in cash, and claims have not been paid in debentures since 1965. HUD debentures issued in satisfaction of FHA insurance claims bear interest at the applicable HUD debentures interest rate. The master servicer or any sub-servicer of each FHA-insured single family loan will generally be obligated to purchase any debenture issued in satisfaction of the residential loan if a default occurs for an amount equal to the principal amount of any debenture.

Other than in relation to the Title I Program of the FHA, the amount of insurance benefits generally paid by the FHA is equal to the entire unpaid principal amount of the defaulted residential loan adjusted to reimburse the master servicer or sub-servicer for certain costs and expenses and to deduct certain amounts received or retained by the master servicer or sub-servicer after default. When entitlement to insurance benefits results from foreclosure or other acquisition of possession and conveyance to HUD, the master servicer or sub-servicer will be compensated for no more than two-thirds of its foreclosure costs, and will be compensated for interest accrued and unpaid prior to this date but in general only to the extent it was allowed pursuant to a forbearance plan approved by HUD. When entitlement to insurance benefits results from assignment of the residential loan to HUD, the insurance payment will include full compensation for interest accrued and unpaid to the assignment date. The insurance payment itself, upon foreclosure of an FHA-insured residential loan, bears interest from a date 30 days after the borrower's first uncorrected failure to perform any obligation to make any payment due under the mortgage and, upon assignment, from the date of assignment to the date of payment of the claim, in each case at the same interest rate as the applicable HUD debenture interest rate as described above.

-90-

<Page>

Residential loans designated in the related prospectus supplement as guaranteed by the VA will be partially guaranteed by the VA under the Serviceman's Readjustment Act of 1944, as amended. The Serviceman's Readjustment Act of 1944, as amended, permits a veteran, or in certain instances the spouse of a veteran, to obtain a mortgage loan guarantee by the VA covering mortgage financing of the purchase of a one- to four-family dwelling unit at interest rates permitted by the VA. The program has no mortgage loan limits, requires no down payment from the purchaser and permits the guarantee of mortgage loans of up to 30 years' duration. However, no residential loan guaranteed by the VA will have an original principal amount greater than five times the partial VA guarantee for the related residential loan. The prospectus supplement relating

to securities of each series evidencing interests in a trust fund including VA
loans will set forth additional information regarding the regulations governing
the applicable VA insurance programs.

With respect to a defaulted VA guaranteed residential loan, the master
servicer or sub-servicer will be, absent exceptional circumstances, authorized
to announce its intention to foreclose only when the default has continued for
three months. Generally, a claim for the guarantee will be submitted after
liquidation of the residential property.

The amount payable under the guarantee will be the percentage of the
VA-insured residential loan originally guaranteed applied to indebtedness
outstanding as of the applicable date of computation specified in the VA
regulations. Payments under the guarantee will generally be equal to the unpaid
principal amount of the residential loan, interest accrued on the unpaid balance
of the residential loan to the appropriate date of computation and limited
expenses of the mortgagee, but in each case only to the extent that these
amounts have not been recovered through liquidation of the residential property.
The amount payable under the guarantee may in no event exceed the amount of the
original guarantee.

Primary Hazard Insurance Policies

The related prospectus supplement may specify that the related servicing
agreement will require the master servicer to cause the borrower on each
residential loan to maintain a Primary Hazard Insurance Policy. This coverage
will be specified in the related prospectus supplement, and in general will
equal the lesser of the principal balance owing on the residential loan and the
amount necessary to fully compensate for any damage or loss to the improvements
on the residential property on a replacement cost basis. In either case, the
coverage may not be less than the amount necessary to avoid the application of
any co-insurance clause contained in the policy. The master servicer, or the
related sub-servicer, if any, will be required to exercise its best reasonable
efforts to be named as an additional insured under any Primary Hazard Insurance
Policy and under any flood insurance policy referred to below. The ability to
assure that hazard Insurance Proceeds are appropriately applied may be dependent
on its being so named, or on the extent to which information in this regard is
furnished by borrowers. All amounts collected by the master servicer under any
policy, except for amounts to be applied to the restoration or repair of the
residential property or released to the borrower in accordance with the master
servicer's normal servicing procedures, subject to the terms and conditions of
the related mortgage and mortgage note, will be deposited in the Trust Account.

-91-

<Page>

Each servicing agreement provides that the master servicer may satisfy its
obligation to cause each borrower to maintain a hazard insurance policy by the
master servicer's maintaining a blanket policy insuring against hazard losses on
the residential loans. If the blanket policy contains a deductible clause, the
master servicer will generally be required to deposit in the Trust Account all
sums which would have been deposited in the Trust Account but for this clause.
The master servicer will also generally be required to maintain a fidelity bond
and errors and omissions policy with respect to its officers and employees. This
policy will generally provide coverage against losses that may be sustained as a
result of an officer's or employee's misappropriation of funds or errors and
omissions in failing to maintain insurance, subject to limitations as to amount
of coverage, deductible amounts, conditions, exclusions and exceptions.

In general, the standard form of fire and extended coverage policy covers
physical damage to or destruction of the improvements of the property by fire,
lightning, explosion, smoke, windstorm and hail, and riot, strike and civil
commotion, subject to the conditions and exclusions specified in each policy.
The policies relating to the residential loans will be underwritten by different
insurers under different state laws in accordance with applicable
state forms. Therefore, the policies will not contain identical terms and
conditions. The basic terms of those policies are dictated by respective state
laws, and most policies typically do not cover any physical damage resulting
from the following:

    o   war,

    o   revolution,

    o   governmental actions,

    o   floods and other water-related causes,

    o   earth movement, including earthquakes, landslides and mudflows,

    o   nuclear reactions,

    o   wet or dry rot,

    o   vermin, rodents, insects or domestic animals,

o    theft, and

o    in certain cases, vandalism.

The foregoing list is merely indicative of certain kinds of uninsured risks and is not intended to be all-inclusive.

-92-

<Page>

When a residential property is located at origination in a federally designated flood area, each servicing agreement may require the master servicer to cause the borrower to acquire and maintain flood insurance in an amount equal in general to the lesser of:

(1) the amount necessary to fully compensate for any damage or loss to the improvements which are part of the residential property on a replacement cost basis; and

(2) the maximum amount of insurance available under the federal flood insurance program, whether or not the area is participating in the program.

The hazard insurance policies covering the residential properties typically contain a co-insurance clause that in effect requires the insured at all times to carry insurance of a specified percentage of the full replacement value of the improvements on the property in order to recover the full amount of any partial loss. If the insured's coverage falls below this specified percentage, this clause generally provides that the insurer's liability if a partial loss occurs does not exceed the greater of:

(1) the replacement cost of the improvements less physical depreciation; and

(2) that proportion of the loss as the amount of insurance carried bears to the specified percentage of the full replacement cost of the improvements.

The related agreement will generally not require that a hazard or flood insurance policy be maintained for any Cooperative Loan. Generally, the cooperative housing corporation is responsible for maintenance of hazard insurance for the property owned by it and the tenant-stockholders of that cooperative housing corporation do not maintain individual hazard insurance policies. To the extent, however, that a cooperative housing corporation and the related borrower on a cooperative note do not maintain similar insurance or do not maintain adequate coverage or any insurance proceeds are not applied to the restoration of the damaged property, damage to the borrower's cooperative apartment or the building could significantly reduce the value of the collateral securing the cooperative note.

The effect of co-insurance if a partial loss occurs on improvements securing residential loans may be that hazard Insurance Proceeds may be insufficient to restore fully the damaged property because:

(1) the amount of hazard insurance the master servicer will be required to cause to be maintained on the improvements securing the residential loans will decline as the principal balances owing on them decrease, and

(2) residential properties have historically appreciated in value over time.

Under the terms of the residential loans, borrowers are generally required to present claims to insurers under hazard insurance policies maintained on the residential properties.

The master servicer, on behalf of the trustee and holders of securities, is obligated to present or cause to be presented claims under any blanket insurance policy insuring against hazard losses on residential properties. The ability of the master servicer to present or cause to be

-93-

<Page>

presented these claims is dependent on the extent to which information in this regard is furnished to the master servicer by borrowers. However, the related prospectus supplement may specify that to the extent of the amount available to cover hazard losses under the special hazard insurance policy for a series, holders of securities may not suffer loss by reason of delinquencies or foreclosures following hazard losses, whether or not subject to co-insurance

claims.

<div align="center">DESCRIPTION OF CREDIT SUPPORT</div>

The related prospectus supplement will specify if the trust fund that includes residential loans for a series of securities may include credit support for this series or for one or more classes of securities comprising this series, which credit support may consist of any combination of the following separate components, any of which may be limited to a specified percentage of the aggregate principal balance of the residential loans covered by this credit support or a specified dollar amount:

    o    a Pool Insurance Policy;

    o    a special hazard insurance policy;

    o    a Bankruptcy Bond;

    o    a reserve fund;

    o    or a similar credit support instrument.

Alternatively, the prospectus supplement relating to a series of securities will specify if credit support may be provided by subordination of one or more classes of securities or by overcollateralization, in combination with or in lieu of any one or more of the instruments set forth above. See "Description of the Securities -- Subordination" and "Description of Credit Support--Overcollateralization" in this prospectus. The amount and type of credit support with respect to a series of securities or with respect to one or more classes of securities comprising the related series, and the borrowers on the credit support, will be set forth in the related prospectus supplement.

To the extent provided in the related prospectus supplement and the agreement, credit support may be periodically reduced based on the aggregate outstanding principal balance of the residential loans covered by the credit support.

Pool Insurance Policies

The prospectus supplement relating to a series of securities may specify that the master servicer will exercise its best reasonable efforts to maintain or cause to be maintained a Pool Insurance Policy in full force and effect, unless coverage under the Pool Insurance Policy has been exhausted through payment of claims. The Pool Insurance Policy for any series of securities will be issued by the pool insurer named in the related prospectus supplement. The master servicer will be required to pay the premiums for each Pool Insurance Policy on a timely basis unless, as described in the related prospectus supplement, the payment of these fees is otherwise

<div align="center">-94-</div>

<Page>

provided. The master servicer will be required to present or cause to be presented claims under each Pool Insurance Policy to the pool insurer on behalf of itself, the trustee and the holders of securities. Pool Insurance Policies, however, are not blanket policies against loss, since claims under these policies may be made only if certain conditions are satisfied, as described below and, if applicable, in the related prospectus supplement.

Pool Insurance Policies do not cover losses arising out of the matters excluded from coverage under Primary Credit Insurance Policies, FHA Insurance or VA Guarantees or losses due to a failure to pay or denial of a claim under a Primary Credit Insurance Policy, FHA Insurance or VA Guarantee, irrespective of the reason for the failure.

Pool Insurance Policies in general provide that no claim may be validly presented under Pool Insurance Policies with respect to a residential loan unless:

    o    an acceptable Primary Credit Insurance Policy, if the initial
         Collateral Value of the residential loan exceeded 80%, has been kept
         in force until the Collateral Value is reduced to 80%;

    o    premiums on the Primary Hazard Insurance Policy have been paid by the
         insured and real estate taxes (if applicable) and foreclosure,
         protection and preservation expenses have been advanced by or on
         behalf of the insured, as approved by the pool insurer;

    o    if there has been physical loss or damage to the residential property,
         it has been restored to its physical condition at the time the
         residential loan became insured under the Pool Insurance Policy,
         subject to reasonable wear and tear; and

    o    the insured has acquired good and merchantable title to the
         residential property, free and clear of all liens and encumbrances,

except permitted encumbrances, including any right of redemption by or on behalf of the borrower, and if required by the pool insurer, has sold the property with the approval of the pool insurer.

Assuming the satisfaction of these conditions, the pool insurer typically has the option to either

    (1) acquire the property securing the defaulted residential loan for a payment equal to the principal balance of the loan plus accrued and unpaid interest at its interest rate to the date of acquisition and certain expenses described above advanced by or on behalf of the insured. This option is conditioned on the pool insurer being provided with good and merchantable title to the residential property, unless the property has been conveyed pursuant to the terms of the applicable Primary Credit Insurance Policy; or

    (2) pay the amount by which the sum of the principal balance of the defaulted residential loan and accrued and unpaid interest at its interest rate to the date of the payment of the claim and these expenses exceeds the proceeds received from a sale of the residential property that the pool insurer has approved.

In both (1) and (2), the amount of payment under a Pool Insurance Policy will generally be reduced by the amount of the loss paid under any Primary Credit Insurance Policy.

                                -95-


<Page>

    Unless earlier directed by the pool insurer, a claim under a Pool Insurance Policy generally must be filed

    (1) in the case when a Primary Credit Insurance Policy is in force, within a specified number of days after the claim for loss has been settled or paid under a Primary Credit Insurance Policy, or after acquisition by the insured or a sale of the property approved by the pool insurer, whichever is later; or

    (2) in the case when a Primary Credit Insurance Policy is not in force, within a specified number of days after acquisition by the insured or a sale of the property approved by the pool insurer.

A claim must be paid within a specified period after the claim is made by the insured.

    The prospectus supplement relating to a series of securities will specify whether the amount of coverage under each Pool Insurance Policy will be reduced over the life of the securities of the series by the aggregate dollar amount of claims paid less the aggregate of the net amounts realized by the pool insurer upon disposition of all acquired properties. The amount of claims paid will generally include certain expenses incurred by the master servicer as well as accrued interest on delinquent residential loans to the date of payment of the claim. However, holders of securities may experience a shortfall in the amount of interest distributed in connection with the payment of claims under a Pool Insurance Policy. This shortfall may result because the pool insurer will be required to remit only unpaid interest through the date a claim is paid, rather than unpaid interest through the end of the month in which the claim is paid.

    In addition, holders of securities may experience losses in connection with payments made under a Pool Insurance Policy to the extent that the master servicer expends funds for the purpose of enabling it to make a claim under the Pool Insurance Policy. These expenditures by the master servicer could include amounts necessary to cover real estate taxes and to repair the related residential property. The master servicer will be reimbursed for the expenditures from amounts that otherwise would be distributed to holders of securities, and the expenditures will not be covered by payments made under the related Pool Insurance Policy. See "Certain Legal Aspects of Residential Loans--Foreclosure on Mortgages" and "--Repossession with respect to Manufactured Housing Contracts that are not Land Contracts" in this prospectus. Accordingly, if aggregate net claims paid under a Pool Insurance Policy reach the applicable policy limit, coverage under that Pool Insurance Policy will be exhausted. As a result, any further losses will be borne by holders of securities of the related series.

    If a pool insurer ceases to be a Qualified Insurer, the master servicer will be required to use its best reasonable efforts to obtain or cause to be obtained from another Qualified Insurer a replacement insurance policy comparable to the Pool Insurance Policy with a total coverage equal to the then outstanding coverage of the Pool Insurance Policy. However, the related prospectus supplement will specify whether if the cost of the replacement policy is greater than the cost of the Pool Insurance Policy, the coverage of the replacement policy may be reduced to a level such that its premium rate does not exceed the premium rate on the Pool Insurance Policy. However, if the pool insurer ceases to be a Qualified Insurer solely because it ceases to be approved as an insurer by Freddie Mac, Fannie Mae, or any successor entity, the master servicer

-96-

<Page>

will be required to review, or cause to be reviewed, the financial condition of
the pool insurer with a view towards determining whether recoveries under the
Pool Insurance Policy are jeopardized for reasons related to the financial
condition of the pool insurer. If the master servicer determines that recoveries
are so jeopardized, it will be required to exercise its best reasonable efforts
to obtain from another Qualified Insurer a replacement policy as described
above, subject to the same cost limitation.

        Because each Pool Insurance Policy will require that the property subject
to a defaulted residential loan be restored to its original condition prior to
claiming against the pool insurer, this policy will not provide coverage against
hazard losses. As set forth under "Description of Primary Insurance
Coverage--Primary Hazard Insurance Policies" in this prospectus, the Primary
Hazard Insurance Policies covering the residential loans typically exclude from
coverage physical damage resulting from a number of causes. Even when the damage
is covered, the Primary Hazard Insurance Policies may afford recoveries that are
significantly less than full replacement cost of the losses. Further, a special
hazard insurance policy will not cover all risks, and the coverage under this
type of policy will be limited in amount. Certain hazard risks will, as a
result, be uninsured and will therefore be borne by you.

Special Hazard Insurance Policies

        The prospectus supplement with respect to a series of securities may
specify that the master servicer will be required to obtain a special hazard
insurance policy for the series. This policy will be issued by the special
hazard insurer specified in the prospectus supplement and cover any special
hazard amount as described in the immediately succeeding paragraph. The master
servicer will be obligated to exercise its best reasonable efforts to keep or
cause to be kept a special hazard insurance policy in full force and effect,
unless coverage under the policy has been exhausted through payment of claims.
However, the master servicer will be under no obligation to maintain the policy
if a Pool Insurance Policy covering the series is no longer in effect. The
master servicer will be obligated to pay the premiums on each special hazard
insurance policy on a timely basis unless, as described in the related
prospectus supplement, payment of these premiums is otherwise provided for.

        Claims under each special hazard insurance policy will generally be limited
to:

        (1) a percentage set forth in the related prospectus supplement, which is
generally not greater than 1%, of the aggregate principal balance as of the
Cut-Off Date of the residential loans comprising the related trust fund;

        (2) twice the unpaid principal balance as of the Cut-Off Date of the
largest residential loan in the trust fund; or

        (3) the greatest aggregate principal balance of residential loans secured
by residential properties located in any one California postal zip code area,
whichever is the greatest.

                            -97-

<Page>

        As more specifically provided in the related prospectus supplement, each
special hazard insurance policy will, subject to limitations of the kind
described below, typically protect holders of securities of the related series
from:

        o    loss by reason of damage to residential properties caused by certain
             hazards, including earthquakes and mudflows, not insured against under
             the Primary Hazard Insurance Policies or a flood insurance policy if
             the property is in a federally designated flood area; and

        o    loss from partial damage caused by reason of the application of the
             co-insurance clause contained in the Primary Hazard Insurance
             Policies.

Special hazard insurance policies will typically not cover losses such as those
occasioned by

        o    normal wear and tear,

        o    war,

- o   civil insurrection,

- o   certain governmental actions,

- o   errors in design,

- o   faulty workmanship or materials,

- o   except under certain circumstances, nuclear or chemical reaction or contamination,

- o   flood, if the property is located in a federally designated flood area, and

- o   certain other risks.

Subject to the foregoing limitations, each special hazard insurance policy will typically provide that, when there has been damage to property securing a defaulted residential loan acquired by the insured and to the extent the damage is not covered by the related Primary Hazard Insurance Policy or flood insurance policy, the insurer will pay the lesser of:

(1) the cost of repair to the property; and

(2) when transfer of the property to the insurer occurs, the unpaid principal balance of the residential loan at the time of acquisition of the property by foreclosure, deed in lieu of foreclosure or repossession, plus

(a) accrued interest at the interest rate to the date of claim settlement and

(b) certain expenses incurred by or on behalf of the master servicer with respect to the property.

-98-

<Page>

The amount of coverage under the special hazard insurance policy will be reduced by the sum of:

(a) the unpaid principal balance plus accrued interest and certain expenses paid by the insurer, less any net proceeds realized by the insurer from the sale of the property, plus

(b) any amount paid as the cost of repair of the property.

Typically, restoration of the property with the proceeds described under clause (1) of the immediately preceding paragraph will satisfy the condition under a Pool Insurance Policy that the property be restored before a claim under this type of policy may be validly presented with respect to the defaulted residential loan secured by the property. The payment described under clause (2) of the immediately preceding paragraph will render unnecessary presentation of a claim in respect of the residential loan under a Pool Insurance Policy. Therefore, so long as the Pool Insurance Policy remains in effect, the payment by the insurer of either of the above alternative amounts will not affect the total Insurance Proceeds paid to holders of securities, but will affect the relative amounts of coverage remaining under any special hazard insurance policy and any Pool Insurance Policy.

The special hazard insurer must typically approve the sale of a residential property under any special hazard insurance policy. The funds received by the insured in excess of the unpaid principal balance of the residential loan plus interest on that balance to the date of sale, plus certain expenses incurred by or on behalf of the master servicer with respect to the property, not to exceed the amount actually paid by the special hazard insurer, must be refunded to the special hazard insurer. To the extent funds are refunded to the special hazard insurer, coverage under the special hazard insurance policy will be restored. If aggregate claim payments under a special hazard insurance policy reach the policy limit, coverage under the policy will be exhausted and any further losses will be borne by the holders of securities.

A claim under a special hazard insurance policy generally must be filed within a specified number of days after the insured has acquired good and merchantable title to the property, and a claim payment is generally payable within a specified number of days after a claim is accepted by the special hazard insurer. Special hazard insurance policies generally provide that no claim may be paid unless

- o   Primary Hazard Insurance Policy premiums,

- o   flood insurance premiums, if the property is located in a federally designated flood area, and, as approved by the special hazard insurer,

- o   real estate property taxes, if applicable,

    o     property protection and preservation expenses, and

    o     foreclosure costs

have been paid by or on behalf of the insured, and unless the insured has
maintained the Primary Hazard Insurance Policy.

-99-

<Page>

If a special hazard insurance policy is canceled or terminated for any
reason, other than the exhaustion of total policy coverage, the master servicer
will be obligated to use its best reasonable efforts to obtain or cause to be
obtained from another insurer a replacement policy comparable to the special
hazard insurance policy. The replacement policy must have total coverage that is
equal to the then existing coverage of the special hazard insurance policy.
However, if the cost of the replacement policy is greater than the cost of the
special hazard insurance policy, the coverage of the replacement policy may be
reduced to a level so that the premium rate does not exceed the premium rate on
the special hazard insurance policy as provided in the related prospectus
supplement.

Each special hazard insurance policy is designed to permit full recoveries
under a Pool Insurance Policy in circumstances in which the recoveries would
otherwise be unavailable because property has been damaged by a cause not
insured against by a Primary Hazard Insurance Policy and thus would not be
restored. Therefore, each pooling and servicing agreement will generally provide
that, if the related Pool Insurance Policy shall have lapsed or terminated or
been exhausted through payment of claims, the master servicer will be under no
further obligation to maintain the special hazard insurance policy.

Bankruptcy Bonds

The prospectus supplement with respect to a series of securities may
specify that the master servicer will be required to obtain a Bankruptcy Bond
for the series. The obligor on, and the amount of coverage of, any Bankruptcy
Bond will be set forth in the related prospectus supplement. The master servicer
will be required to exercise its best reasonable efforts to maintain or cause to
be maintained the Bankruptcy Bond in full force and effect, unless coverage
under the Bankruptcy Bond has been exhausted through payment of claims. The
master servicer will be required to pay or cause to be paid the premiums for
each Bankruptcy Bond on a timely basis, unless, as described in the related
prospectus supplement, payment of the premiums is otherwise provided for.

Reserve Funds

The related prospectus supplement may specify that the depositor will
deposit or cause to be deposited in an account any combination of cash, one or
more irrevocable letters of credit or one or more United States government
securities and other high quality investments in specified amounts, or any other
instrument satisfactory to the rating agency or agencies. These deposits will be
applied and maintained in the manner and under the conditions specified in the
prospectus supplement. In the alternative or in addition to the deposit, to the
extent described in the related prospectus supplement, a Reserve Fund may be
funded through application of a portion of the interest payment on each mortgage
loan or of all or a portion of amounts otherwise payable on the subordinate
securities. Amounts in a Reserve Fund may be distributed to holders of
securities, or applied to reimburse the master servicer for outstanding
advances, or may be used for other purposes, in the manner and to the extent
specified in the related prospectus supplement. The related prospectus
supplement may specify that any Reserve Fund will not be deemed to be part of
the related trust fund.

-100-

<Page>

Amounts deposited in any Reserve Fund for a series will be invested in
certain permitted Instruments by, or at the direction of, the master servicer or
any other person named in the related prospectus supplement.

Cross-Support Provisions

The related prospectus supplement may specify that the residential loans
for a series of securities may be divided into separate groups, each supporting
a separate class or classes of securities of a series. In addition, credit
support may be provided by cross-support provisions requiring that distributions
be made on securities evidencing interests in one group of mortgage loans prior
to distributions on securities evidencing interests in a different group of

mortgage loans within the trust fund. The prospectus supplement relating to a
series that includes a cross-support provision will describe the manner and
conditions for applying the provisions.

The coverage provided by one or more forms of credit support may apply
concurrently to two or more related trust funds. If applicable, the related
prospectus supplement will identify the trust funds to which the credit support
relates and the manner of determining the amount of the coverage provided by the
credit support and of the application of the coverage to the identified trust
funds.

Letter of Credit

The prospectus supplement relating to a series of securities may specify
that the residential loans in the related trust fund may be covered by one or
more letters of credit, issued by a bank or financial institution specified in
the prospectus supplement. Under a letter of credit, the issuing bank or
financial institution will be obligated to honor draws in an aggregate fixed
dollar amount, net of unreimbursed payments, equal to the percentage specified
in the related prospectus supplement of the aggregate principal balance of the
residential loans on the related Cut-Off Date or one or more classes of
securities. Any letter of credit may permit draws only if certain types of
losses occur. The amount available under the letter of credit will, in all
cases, be reduced to the extent of the unreimbursed payments under the letter of
credit.

Insurance Policies and Surety Bonds

The prospectus supplement relating to a series of securities may specify
that one or more classes of securities of the series will be covered by
insurance policies and/or surety bonds provided by one or more insurance
companies or sureties. The instruments may cover timely distributions of
interest and/or full distributions of principal on the basis of a schedule of
principal distributions set forth in or determined in the manner specified in
the related prospectus supplement.

Excess Spread

The prospectus supplement may specify that a portion of the interest
payments on residential loans may be applied to reduce the principal balance of
one or more classes of securities to provide or maintain a cushion against
losses on the residential loans.

                                     -101-


<Page>


Overcollateralization

The related prospectus supplement may specify that the subordination
provisions of a trust fund may be used to accelerate to a limited extent the
amortization of one or more classes of securities relative to the amortization
of the related assets of the trust fund. The accelerated amortization is
achieved by the application of certain excess interest to the payment of
principal of one or more classes of securities. This acceleration feature
creates, with respect to the assets of the trust fund, overcollateralization
which results from the excess of the aggregate principal balance of the related
assets of the trust fund, over the principal balance of the related class or
classes of securities. This acceleration may continue for the life of the
related security, or may be limited. In the case of limited acceleration, once
the required level of overcollateralization is reached, and subject to certain
provisions specified in the related prospectus supplement, the limited
acceleration feature may cease, unless necessary to maintain the required level
of overcollateralization.

                      CERTAIN LEGAL ASPECTS OF RESIDENTIAL LOANS

The following discussion contains general summaries of certain legal
aspects of loans secured by residential properties. Because the legal aspects
are governed by applicable state law, which may differ substantially, the
summaries do not purport to be complete nor to reflect the laws of any
particular state, nor to encompass the laws of all states in which the security
for the residential loans is situated. The summaries are qualified in their
entirety by reference to the applicable federal and state laws governing the
residential loans. In this regard, the following discussion does not fully
reflect federal regulations with respect to FHA loans and VA loans. See "The
Trust Funds--Residential Loans" and "Description of Primary Insurance
Coverage--FHA Insurance and VA Guarantees" in this prospectus.

General

All of the residential loans are generally loans to homeowners. All of the
mortgage loans and Multifamily Loans are evidenced by notes or bonds and secured
by instruments which may be mortgages, deeds of trust, security deeds or deeds
to secure debt, depending on the type of security instrument customary to grant
a security interest in real property in the state in which the residential

property is located. The prospectus supplement relating to a series of securities may specify that a trust fund also contains:

(1) Home Improvement Contracts evidenced by promissory notes, which may be secured by an interest in the related mortgaged property or may be unsecured;

(2) Cooperative Loans evidenced by promissory notes secured by security interests in shares issued by private, cooperative housing corporations and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the related buildings; or

-102-

<Page>

(3) Manufactured Housing Contracts evidencing both

    o   the obligation of the borrower to repay the loan evidenced by the Manufactured Housing Contract; and

    o   the grant of a security interest in the related manufactured home or with respect to Land Contracts, a lien on the real estate to which the related manufactured homes are deemed to be affixed, and including in some cases a security interest in the related manufactured home, to secure repayment of this loan.

Generally, any of the foregoing types of encumbrance will create a lien on, or grant a title interest in, the subject property. The priority of the lien will depend on the terms of the particular security instrument, if any, the knowledge of the parties to the instruments, as well as the order of recordation or filing of the instrument in the appropriate public office. This lien is generally not prior to the lien for real estate taxes and assessments and other charges imposed under governmental police powers.

Mortgage Loans

The mortgage loans and Multifamily Loans will generally be secured by either mortgages, deeds of trust, security deeds or deeds to secure debt depending on the type of security instrument customary to grant a security interest according to the prevailing practice in the state in which the property subject to a mortgage loan or Multifamily Loan is located. Any of the foregoing types of encumbrance creates a lien on or conveys title to the real property encumbered by this instrument and represents the security for the repayment of an obligation that is customarily evidenced by a promissory note. This lien is generally not prior to the lien for real estate taxes and assessments and other charges imposed under governmental police powers. Priority with respect to these security instruments depend on their terms and generally on the order of recording with the applicable state, county or municipal office.

There are two parties to a mortgage, the mortgagor, who is the borrower and usually the owner of the subject property or the land trustee, and the mortgagee, who is the lender. Under the mortgage instrument, the mortgagor delivers to the mortgagee a note or bond and the mortgage. However, in the case of a land trust, title to the property is held by a land trustee under a land trust agreement, while the owner is the beneficiary of the land trust; at origination of a mortgage loan, the borrower executes a separate undertaking to make payments on the mortgage note.

Although a deed of trust is similar to a mortgage, a deed of trust normally has three parties, the trustor, who is similar to a mortgagor and who is the owner of the subject property and may or may not be the borrower, the beneficiary who is similar to a mortgagee and who is the lender, and the trustee, a third-party grantee. Under a deed of trust, the trustor grants the property, irrevocably until the debt is paid, in trust, generally with a power of sale, to the trustee to secure payment of the obligation. A security deed and a deed to secure debt are special types of deeds which indicate on their face that they are granted to secure an underlying debt. By executing a security deed or deed to secure debt, the grantor conveys title to, as opposed to merely creating a lien on, the subject property to the grantee until a time when the underlying

-103-

<Page>

debt is repaid. The mortgagee's authority under a mortgage and the trustee's authority under a deed of trust, security deed or deed to secure debt are governed by

    o   the law of the state in which the real property is located,

o   the express provisions of the mortgage, deed of trust, security deed or deed to secure debt, and

o   in some cases, with respect to deeds of trust, the directions of the beneficiary.

Cooperative Loans

     The Cooperative owns all the real property or some interest in the real property sufficient to permit it to own the building and all separate dwelling units in the building. The Cooperative is directly responsible for property management and, in most cases, payment of real estate taxes, other governmental impositions and hazard and liability insurance. If there is a blanket mortgage on the cooperative apartment building and/or underlying land, or an underlying lease of the land, the Cooperative, as mortgagor, or lessee, as the case may be, is also responsible for meeting these blanket mortgage or rental obligations. A blanket mortgage is ordinarily incurred by the Cooperative in connection with either the construction or purchase of the Cooperative's apartment building or the obtaining of capital by the Cooperative. The interests of the occupants under proprietary leases or occupancy agreements as to which the Cooperative is the landlord are generally subordinate to the interests of the holder of the blanket mortgage and to the interest of the holder of a land lease.

     If the Cooperative is unable to meet the payment obligations

     (1) arising under its blanket mortgage, the mortgagee holding the blanket mortgage could foreclose on that mortgage and terminate all subordinate proprietary leases and occupancy agreements; or

     (2) arising under its land lease, the holder of the landlord's interest under the land lease could terminate it and all subordinate proprietary leases and occupancy agreements.

Also, a blanket mortgage on a Cooperative may provide financing in the form of a mortgage that does not fully amortize, with a significant portion of principal being due in one final payment at final maturity. The inability of the Cooperative to refinance the mortgage and its consequent inability to make the final payment could lead to foreclosure by the mortgagee. Similarly, a land lease has an expiration date and the inability of the Cooperative to extend its term or, in the alternative, to purchase the land could lead to termination of the Cooperative's interest in the property and termination of all proprietary leases and occupancy agreements. In either event, foreclosure by the holder of the blanket mortgage or the termination of the underlying lease could eliminate or significantly diminish the value of any collateral held by the lender that financed the purchase by an individual tenant-stockholder of Cooperative shares or, in the case of the trust fund, the collateral securing the Cooperative Loans.

     The Cooperative is owned by tenant-stockholders who, through ownership of stock, shares or membership certificates in the corporation, receive proprietary leases or occupancy

                              -104-


<Page>


agreements which confer exclusive rights to occupy specific units. Generally, a tenant-stockholder of a Cooperative must make a monthly payment to the Cooperative representing the tenant-stockholder's pro rata share of the Cooperative's payments for its blanket mortgage, real property taxes, maintenance expenses and other capital or ordinary expenses. An ownership interest in a Cooperative and accompanying occupancy rights is financed through a Cooperative share loan evidenced by a promissory note and secured by an assignment of and a security interest in the occupancy agreement or proprietary lease and in the related Cooperative shares. The lender generally takes possession of the share certificate and a counterpart of the proprietary lease or occupancy agreement and a financing statement covering the proprietary lease or occupancy agreement and the Cooperative shares is filed in the appropriate state and local offices to perfect the lender's interest in its collateral. If a default of the tenant-stockholder occurs, the lender may generally sue for judgment on the promissory note, dispose of the collateral at a public or private sale or otherwise proceed against the collateral or tenant-stockholder as an individual as provided in the security agreement covering the assignment of the proprietary lease or occupancy agreement and the pledge of Cooperative shares. See "--Foreclosure on Cooperative Shares" below.

Tax Aspects of Cooperative Ownership

     In general, a "tenant-stockholder," as defined in Section 216(b)(2) of the Code, of a "cooperative housing corporation" within the meaning of Section 216(b)(1) of the Code, is allowed a deduction for amounts paid or accrued within his taxable year to the corporation. These amounts paid or accrued represent his proportionate share of certain interest expenses and certain real estate taxes allowable as a deduction under Section 216(a) of the Code to the corporation under Sections 163 and 164 of the Code. In order for a corporation to qualify

under Section 216(b)(1) of the Code for its taxable year in which the items are allowable as a deduction to the corporation, this section requires, among other things, that at least 80% of the gross income of the corporation be derived from its tenant-stockholders. By virtue of this requirement, the status of a corporation for purposes of Section 216(b)(1) of the Code must be determined on a year-to-year basis. Consequently, there can be no assurance that cooperatives relating to the Cooperative Loans will qualify under this section for any particular year. If a Cooperative of this type fails to qualify for one or more years, the value of the collateral securing any related Cooperative Loans could be significantly impaired because no deduction would be allowable to tenant-stockholders under Section 216(a) of the Code with respect to those years. In view of the significance of the tax benefits accorded tenant-stockholders of a corporation that qualifies under Section 216(b)(1) of the Code, the likelihood that this failure would be permitted to continue over a period of years appears remote.

Manufactured Housing Contracts Other Than Land Contracts

    Under the laws of most states, manufactured housing constitutes personal property and is subject to the motor vehicle registration laws of the state or other jurisdiction in which the unit is located. In a few states, where certificates of title are not required for the perfection of security interests in manufactured homes, security interests are perfected by the filing of a financing statement under Article 9 of the UCC which has been adopted by all states. The financing statements are effective for five years and must be renewed at the end of each five years. The certificate of title laws adopted by the majority of states provide that ownership of motor

                                -105-

<Page>

vehicles and manufactured housing shall be evidenced by a certificate of title issued by the motor vehicles department, or a similar entity, of the responsible state. In the states which have enacted certificate of title laws, a security interest in a unit of manufactured housing, so long as it is not attached to land in so permanent a fashion as to become a fixture, is generally perfected by the recording of the interest on the certificate of title to the unit in the appropriate motor vehicle registration office or by delivery of the required documents and payment of a fee to the office, depending on state law.

    The master servicer will generally be required to obtain possession of the certificate of title, but, the related prospectus supplement may specify if it will not be required to effect the notation or delivery of the required documents and fees. The failure to effect the notation or delivery, or the taking of action under the wrong law, under a motor vehicle title statute rather than under the UCC, is likely to cause the trustee not to have a perfected security interest in the manufactured home securing a Manufactured Housing Contract.

    As manufactured homes have become larger and often have been attached to their sites without any apparent intention to move them, courts in many states have held that manufactured homes may, under certain circumstances, become subject to real estate title and recording laws. As a result, a security interest in a manufactured home could be rendered subordinate to the interests of other parties, including a trustee in bankruptcy claiming an interest in the home under applicable state real estate law, regardless of compliance with the requirements described above. In order to perfect a security interest in a manufactured home under real estate laws, the holder of the security interest must file either a *fixture filing* under the provisions of the UCC or a real estate mortgage under the real estate laws of the state where the home is located. These filings must be made in the real estate records office of the county where the home is located.

    Generally, Manufactured Housing Contracts will contain provisions prohibiting the borrower from permanently attaching the manufactured home to its site. So long as the borrower does not violate this agreement, a security interest in the manufactured home will be governed by the certificate of title laws or the UCC, and the notation of the security interest on the certificate of title or the filing of a UCC financing statement will be effective to perfect the security interest in the manufactured home. If, however, a manufactured home is permanently attached to its site, other parties, including a trustee in bankruptcy, could obtain an interest in the manufactured home which is prior to the security interest originally retained by the seller and transferred to the depositor.

    The depositor will assign or cause to be assigned a security interest in the manufactured homes to the trustee, on behalf of the holders of securities. The related prospectus supplement may specify that neither the depositor, the master servicer nor the trustee will amend the certificates of title to identify the trustee, on behalf of the holders of securities, as the new secured party. Accordingly, the depositor or the Unaffiliated Seller will continue to be named as the secured party on the certificates of title relating to the manufactured homes. In most states, the assignment is an effective conveyance of the security interest without amendment of any lien noted on the related certificate of title and the new secured party, therefore, succeeds to the depositor's rights as the

secured party. However, in some states there exists a risk that, in the absence of an amendment to the certificate of title, the assignment of the security interest might not be held effective against creditors of the depositor or the Unaffiliated Seller.

-106-

<Page>

In the absence of fraud, forgery or permanent affixation of the manufactured home to its site by the manufactured home owner, or administrative error by state recording officials, the following actions should be sufficient to protect the trustee against the rights of subsequent purchasers of a manufactured home or subsequent lenders who take a security interest in the manufactured home:

o    the notation of the lien of the depositor on the certificate of title or delivery of the required documents and fees, or

o    in states where a security interest in manufactured homes is perfected pursuant to Article 9 of the UCC, the filing of a financing statement, and continuation statements before the end of each five year period.

If there are any manufactured homes as to which the depositor has failed to perfect or cause to be perfected the security interest assigned to the trust fund, the security interest would be subordinate to, among others, subsequent purchasers for value of manufactured homes, holders of perfected security interests, and a trustee in bankruptcy. There also exists a risk in not identifying the trustee, on behalf of the holders of securities as the new secured party on the certificate of title that, through fraud or negligence, the security interest of the trustee could be released.

If the owner of a manufactured home moves it to a state other than the state in which the manufactured home initially is registered, under the laws of most states the perfected security interest in the manufactured home would continue for four months after the relocation and after that period until the owner re-registers the manufactured home in the new state. If the owner were to relocate a manufactured home to another state and re-register the manufactured home in the other state, and if the depositor did not take steps to re-perfect its security interest in the new state, the security interest in the manufactured home would cease to be perfected.

A majority of states generally require surrender of a certificate of title to re-register a manufactured home. Accordingly, if the depositor holds the certificate of title to this manufactured home, it must surrender possession of the certificate. In the case of manufactured homes registered in states which provide for notation of lien, the depositor would receive notice of surrender if the security interest in the manufactured home is noted on the certificate of title. Accordingly, the depositor could re-perfect its security interest in the manufactured home in the state of relocation. In states which do not require a certificate of title for registration of a manufactured home, re-registration could defeat perfection. Similarly, when a borrower under a manufactured housing conditional sales contract sells a manufactured home, the lender must surrender possession of the certificate of title or it will receive notice as a result of its lien noted thereon. Accordingly, the lender will have an opportunity to require satisfaction of the related manufactured housing conditional sales contract before release of the lien. The master servicer will be obligated to take the steps, at the master servicer's expense, as are necessary to maintain perfection of security interests in the manufactured homes.

Under the laws of most states, statutory liens, such as liens for repairs performed on a manufactured home and liens for personal property taxes take priority even over a perfected security interest. In addition, certain liens arising as a matter of federal law, such as federal tax

-107-

<Page>

liens, also take priority over a perfected security interest. The depositor will obtain the representation of the Unaffiliated Seller that it has no knowledge of any liens with respect to any manufactured home securing a contract. However, these types of liens could arise at any time during the term of a mortgage note or Manufactured Housing Contract. No notice will be given to the trustee or holders of securities if this type of a lien arises.

Foreclosure on Mortgages

Foreclosure of a mortgage is generally accomplished by judicial action. Generally, the action is initiated by serving legal pleadings on all parties

having an interest of record in the real property. Delays in completion of the foreclosure may occasionally result from difficulties in locating necessary party defendants. When the mortgagee's right to foreclose is contested, the legal proceedings necessary to resolve the issue can be time consuming. After the completion of a judicial foreclosure, the court generally issues a judgment of foreclosure and appoints a referee or other court officer to conduct the sale of the property.

An action to foreclose a mortgage is an action to recover the mortgage debt by enforcing the mortgagee's rights under the mortgage in and to the mortgaged property. It is regulated by statutes and rules and subject throughout to the court's equitable powers. Generally, a borrower is bound by the terms of the mortgage note and the mortgage as made and cannot be relieved from its own default. A foreclosure action is equitable in nature and is addressed to a court of equity. Accordingly, the court may relieve a borrower of a default and deny the mortgagee foreclosure on proof that the borrower's default was neither willful nor in bad faith and that the mortgagee's action was meant to establish a waiver, or fraud, bad faith, oppressive or unconscionable conduct to warrant a court of equity to refuse affirmative relief to the mortgagee. Under certain circumstances a court of equity may relieve the borrower from an entirely technical default where the default was not willful.

A foreclosure action or sale pursuant to a power of sale is subject to most of the delays and expenses of other lawsuits if defenses or counterclaims are interposed, sometimes requiring up to several years to complete. Moreover, a non-collusive, regularly conducted foreclosure sale or sale pursuant to a power of sale may be challenged as a fraudulent conveyance, regardless of the parties' intent. The challenge could be successful if a court determines that the sale was for less than fair consideration and the sale occurred while the borrower was insolvent and within one year, or within the state statute of limitations if the trustee in bankruptcy elects to proceed under state fraudulent conveyance law, of the filing of bankruptcy. Similarly, a suit against the debtor on the mortgage note may take several years and, generally, is a remedy alternative to foreclosure, the mortgagee being precluded from pursuing both at the same time. In some states, mortgages may also be foreclosed by advertisement in accordance with a power of sale provided in the mortgage. Foreclosure of a mortgage by advertisement is essentially similar to foreclosure of a deed of trust by nonjudicial power of sale.

Foreclosure of a deed of trust is generally accomplished by a non-judicial trustee's sale under a specific provision in the deed of trust which authorizes the trustee to sell the property if the borrower defaulted under the terms of the note or deed of trust. In some states, prior to the sale, the trustee must record a notice of default and send a copy to the borrower-trustor and to any person who has recorded a request for a copy of a notice of default and notice of sale. In

-108-

<Page>

addition, in some states the trustee must provide notice to any other individual having an interest in the real property, including any junior lienholder. In some states, the trustor, borrower, or any person having a junior encumbrance on the real estate, may, during a reinstatement period, cure the default by paying the entire amount in arrears plus the costs and expenses incurred in enforcing the obligation to the extent allowed by applicable law. Generally, state law controls the amount of foreclosure expenses and costs, including attorneys' fees, which may be recovered by a lender. Certain states require that a notice of sale must be posted in a public place and, in most states, published for a specific period of time in a specified manner prior to the date of the trustee's sale. In addition, some state laws require posting of a copy of the notice of sale on the property, recording and sending the notice to all parties having an interest in the real property. In certain states, foreclosure under a deed of trust may also be accomplished by judicial action in the manner provided for foreclosure of mortgages.

In case of foreclosure under either a mortgage or a deed of trust, the sale by the referee or other designated officer or by the trustee is generally a public sale. It is uncommon for a third party to purchase the property at the foreclosure sale because:

(1) of the difficulty potential third party purchasers at the sale might have in determining the exact status of title, and

(2) the physical condition of the property may have deteriorated during the foreclosure proceedings.

In some states, potential buyers may be further unwilling to purchase a property at a foreclosure sale as a result of the 1980 decision of the United States Court of Appeals for the Fifth Circuit in Durrett v. Washington National Insurance Company. The court in Durrett held that even a non-collusive, regularly conducted foreclosure sale was a fraudulent transfer under section 67 of the former Bankruptcy Act and section 548 of the current Bankruptcy Code, and, therefore, could be rescinded in favor of the bankrupt's estate, if:

(1) the foreclosure sale was held while the debtor was insolvent and not more than one year prior to the filing of the bankruptcy petition; and

(2) the price paid for the foreclosed property did not represent "fair consideration," which is "reasonably equivalent value" under the Bankruptcy Code.

However, on May 23, 1994, Durrett was effectively overruled by the United States Supreme Court in BFP v. Resolution Trust Corporation, as Receiver for Imperial Federal Savings and Loan Association, et al., in which the Court held that "'reasonably equivalent value', for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." The Supreme Court decision, however, may not be controlling as to whether a non-collusive, regularly conducted foreclosure can be avoided as a fraudulent conveyance under applicable state law, if a court determines that the sale was for less than "fair consideration" under applicable state law. For these reasons, it is common for the lender to purchase the property from the trustee or referee for an amount equal to the principal amount of the mortgage or deed of trust plus accrued and unpaid interest and the expenses of foreclosure.

-109-

<Page>

Generally, state law controls the amount of foreclosure costs and expenses, including attorneys' and trustee's fees, which may be recovered by a lender. In some states there is a statutory minimum purchase price which the lender may offer for the property. Thereafter, subject to the right of the borrower in some states to remain in possession during the redemption period, the lender will assume ownership of the mortgaged property. The burdens of ownership include obtaining casualty insurance, paying taxes and making repairs at the lender's own expense as are necessary to render the property suitable for sale. Depending on market conditions, the ultimate proceeds of the sale of the property may not equal the lender's investment in the property. Any loss may be reduced by the receipt of any mortgage Insurance Proceeds, if any.

A junior mortgagee may not foreclose on the property securing a junior mortgage unless it forecloses subject to the senior mortgages. If it does foreclose, the junior mortgagee must either pay the entire amount due on the senior mortgages to the senior mortgagees prior to or at the time of the foreclosure sale or undertake the obligation to make payments on the senior mortgages if the borrower is in default under the senior mortgage. In either event the junior mortgagee would add the amounts expended to the balance due on the junior loan, and it may be subrogated to the rights of the senior mortgagees. In addition, if the foreclosure of a junior mortgage triggers the enforcement of a "due-on-sale" clause, the junior mortgagee may be required to pay the full amount of the senior mortgages to the senior mortgagees. Accordingly, with respect to those mortgage loans which are junior mortgage loans, if the lender purchases the property, the lender's title will be subject to all senior liens and claims and certain governmental liens.

The proceeds received by the referee or trustee from the sale are applied first to the costs, fees and expenses of sale and then in satisfaction of the indebtedness secured by the mortgage or deed of trust under which the sale was conducted. Any remaining proceeds are generally payable to the holders of junior mortgages or deeds of trust and other liens and claims in order of their priority, whether or not the borrower is in default. Any additional proceeds are generally payable to the borrower or trustor. The payment of the proceeds to the holders of junior mortgages may occur in the foreclosure action of the senior mortgagee or may require the institution of separate legal proceedings.

In foreclosure, courts have imposed general equitable principles. The equitable principles are generally designed to relieve the borrower from the legal effect of his defaults under the loan documents. Examples of judicial remedies that have been fashioned include judicial requirements that the lender undertake affirmative and expensive actions to determine the causes for the borrower's default and the likelihood that the borrower will be able to reinstate the loan. The courts have taken a number of different approaches:

    o   in some cases, courts have substituted their judgment for the lender's
        judgment and have required that lenders reinstate loans or recast
        payment schedules in order to accommodate borrowers who are suffering
        from temporary financial disability;

    o   in other cases, courts have limited the right of a lender to foreclose
        if the default under the mortgage instrument is not monetary, such as
        the borrower's failure to

-110-

<Page>

adequately maintain the property or the borrower's execution of a
second mortgage or deed of trust affecting the property;

o     finally, some courts have been faced with the issue of whether or not
      federal or state constitutional provisions reflecting due process
      concerns for adequate notice require that borrowers under deeds of
      trust or mortgages receive notices in addition to the
      statutorily-prescribed minimums. For the most part, these cases have
      upheld the notice provisions as being reasonable or have found that
      the sale by a trustee under a deed of trust, or under a mortgage
      having a power of sale, does not involve sufficient state action to
      afford constitutional protections to the borrower.

     In addition, certain states impose a statutory lien for associated costs on
property that is the subject of a cleanup action by the state on account of
hazardous wastes or hazardous substances released or disposed of on the
property. This statutory lien may have priority over all subsequent liens on the
property and, in certain of these states, will have priority over prior recorded
liens, including the lien of a mortgage. In addition, under federal
environmental law and possibly under state law in a number of states, a secured
party that takes a deed in lieu of foreclosure or acquires a mortgaged property
at a foreclosure sale may become liable for the costs of cleaning up a
contaminated site. Although these costs could be substantial, it is unclear when
they would be imposed on a secured lender on residential properties. If title to
a residential property was acquired on behalf of holders of securities and
cleanup costs were incurred in respect of the residential property, the holders
of securities might realize a loss if these costs were required to be paid by
the related trust fund.

Foreclosure on Cooperative Shares

     The Cooperative shares and proprietary lease or occupancy agreement owned
by the tenant-stockholder and pledged to the lender are, in almost all cases,
subject to restrictions on transfer as set forth in the Cooperative's
Certificate of Incorporation and By-laws, as well as in the proprietary lease or
occupancy agreement. These agreements may be canceled by the Cooperative, even
while pledged, for failure by the tenant-stockholder to pay rent or other
obligations or charges owed by the tenant-stockholder, including mechanics'
liens against the Cooperative apartment building incurred by the
tenant-stockholder. Commonly, rent and other obligations and charges arising
under a proprietary lease or occupancy agreement which are owed to the
cooperative are made liens on the shares to which the proprietary lease or
occupancy agreement relates.

     In addition, the proprietary lease or occupancy agreement generally permits
the Cooperative to terminate this lease or agreement if the tenant-stockholder
fails to make payments or defaults in the performance of covenants required
under the related agreement. Typically, the lender and the Cooperative enter
into a recognition agreement which, together with any lender protection
provisions contained in the proprietary lease, establishes the rights and
obligations of both parties if a default by the tenant-stockholder occurs on its
obligations under the proprietary lease or occupancy agreement. A default by the
tenant-stockholder under the proprietary lease or occupancy agreement will
usually constitute a default under the security agreement between the lender and
the tenant-stockholder.

                              -111-

<Page>

     The recognition agreement generally provides that, if the
tenant-stockholder has defaulted under the proprietary lease or occupancy
agreement, the Cooperative will take no action to terminate the proprietary
lease or agreement until the lender has been provided with notice of and an
opportunity to cure the default. The recognition agreement typically provides
that if the proprietary lease or occupancy agreement is terminated, the
Cooperative will recognize the lender's lien against proceeds from a sale of the
Cooperative apartment. However, the Cooperative will retain its right to sums
due under the proprietary lease or occupancy agreement or which have become
liens on the shares relating to the proprietary lease or occupancy agreement.
The total amount owed to the Cooperative by the tenant-stockholder, which the
lender generally cannot restrict and does not monitor, could reduce the value of
the collateral below the outstanding principal balance of the Cooperative Loan
and accrued and unpaid interest on the Cooperative Loan.

     Recognition agreements also provide that if a foreclosure occurs on a
Cooperative Loan, the lender must obtain the approval or consent of the
Cooperative as required by the proprietary lease before transferring the
Cooperative shares or assigning the proprietary lease. Generally, the lender is
not limited in any rights it may have to dispossess the tenant-stockholders.

     Foreclosure on the Cooperative shares is accomplished by a sale in
accordance with the provisions of Article 9 of the UCC and the security

agreement relating to those shares. Article 9 of the UCC requires that a sale be conducted in a "commercially reasonable" manner. Whether a sale has been conducted in a "commercially reasonable" manner will depend on the facts in each case. In determining commercial reasonableness, a court will look to the notice given the debtor and the method, manner, time, place and terms of the sale. Generally, a sale conducted according to the usual practice of similar parties selling similar collateral will be considered reasonably conducted.

Article 9 of the UCC provides that the proceeds of the sale will be applied first to pay the costs and expenses of the sale and then to satisfy the indebtedness secured by the lender's security interest. The recognition agreement, however, generally provides that the lender's right to reimbursement is subject to the right of the Cooperative to receive sums due under the proprietary lease or occupancy agreement. If there are proceeds remaining, the lender must account to the tenant-stockholder for the surplus. Conversely, if a portion of the indebtedness remains unpaid, the tenant-stockholder is generally responsible for the deficiency. See "--Anti-Deficiency Legislation and Other Limitations on Lenders" below.

Repossession with respect to Manufactured Housing Contracts that are not Land Contracts

Repossession of manufactured housing is governed by state law. So long as a manufactured home has not become so attached to real estate that it would be treated as a part of the real estate under the law of the state where it is located, repossession of the home, if a default occurs by the borrower, will generally be governed by the UCC. Article 9 of the UCC provides the statutory framework for the repossession of manufactured housing. While the UCC as adopted by the various states may vary in certain small particulars, the general repossession procedure established by the UCC is as follows:

-112-

<Page>

(1) Except in those few states where the debtor must receive notice of his right to cure his default -typically 30 days to bring the account current-repossession can commence immediately when a default occurs without prior notice. Repossession may be effected either through self-help, which is the peaceable retaking without court order, voluntary repossession or through judicial process, which is the repossession pursuant to court-issued writ of replevin. The self-help and/or voluntary repossession methods are more commonly employed, and are accomplished simply by retaking possession of the manufactured home. In cases where the debtor objects or raises a defense to repossession, a court order must be obtained from the appropriate state court, and the manufactured home must then be repossessed in accordance with that order. Whether the method employed is self-help, voluntary repossession or judicial repossession, the repossession can be accomplished either by an actual physical removal of the manufactured home to a secure location for refurbishment and resale or by removing the occupants and their belongings from the manufactured home and maintaining possession of the manufactured home on the location where the occupants were residing. Various factors may affect whether the manufactured home is physically removed or left on location, such as the nature and term of the lease of the site on which it is located and the condition of the unit. In many cases, leaving the manufactured home on location is preferable, if the home is already set up, because the expenses of retaking and redelivery will be saved. However, in those cases where the home is left on location, expenses for site rentals will usually be incurred.

(2) Once repossession has been achieved, preparation for the subsequent disposition of the manufactured home can commence. The disposition may be by public or private sale, if notice to the debtor is given, and the method, manner, time, place and terms of the sale must be commercially reasonable. The UCC and consumer protection laws in most states place restrictions on repossession sales, including requiring prior notice to the debtor.

(3) Sale proceeds are to be applied first to repossession expenses --expenses incurred in retaking, storage, preparing for sale to include refurbishing costs and selling-- and then to satisfaction of the indebtedness. While some states impose prohibitions or limitations on deficiency judgments if the net proceeds from resale do not cover the full amount of the indebtedness, the deficiency may be sought from the debtor in the form of a deficiency judgment in those states which do not prohibit or limit judgments. The deficiency judgment is a personal judgment against the debtor for the shortfall. Occasionally, after resale of a manufactured home and payment of all expenses and indebtedness, there is a surplus of funds. In that case, the UCC requires the party suing for the deficiency judgment to remit the surplus to the debtor. Because the defaulting owner of a manufactured home generally has very little capital or income available following repossession, a deficiency judgment may not be sought in many cases or, if obtained, will be settled at a significant discount in light of the defaulting owner's strained financial condition.

Rights of Redemption with respect to Residential Properties

The purposes of a foreclosure action are to enable the mortgagee to realize on its security and to bar the borrower, and all persons who have an interest in

the property which is subordinate to the foreclosing mortgagee, from exercising their "equity of redemption." The doctrine of equity of redemption provides that, until the property covered by a mortgage has been sold in accordance with a properly conducted foreclosure and foreclosure sale, parties having an

-113-

<Page>

interest which is subordinate to that of the foreclosing mortgagee may redeem the property by paying the entire debt with interest. In addition, in some states, when a foreclosure action has been commenced, the redeeming party must pay certain costs of the foreclosure action. Parties having an equity of redemption must generally be made parties and duly summoned to the foreclosure action in order for their equity of redemption to be barred.

Equity of redemption which is a non-statutory right that must be exercised prior to foreclosure sale, should be distinguished from statutory rights of redemption. In some states, after sale pursuant to a deed of trust or foreclosure of a mortgage, the trustor or borrower and certain foreclosed junior lienors are given a statutory period in which to redeem the property from the foreclosure sale. In some states, redemption may occur only after payment of the foreclosure sales price, accrued interest and expenses of foreclosure. In other states, redemption may be authorized if the former borrower pays only a portion of the sums due. The effect of a statutory right of redemption is to diminish the ability of the lender to sell the foreclosed property. The exercise of a right of redemption would defeat the title of any purchaser subsequent to foreclosure or sale under a deed of trust. Consequently, the practical effect of a right of redemption is to force the lender to retain the property and pay the expenses of ownership and maintenance of the property until the redemption period has expired. In some states, there is no right to redeem property after a trustee's sale under a deed of trust.

Notice of Sale; Redemption Rights with respect to Manufactured Homes

While state laws do not usually require notice to be given debtors prior to repossession, many states do require delivery of a notice of default and of the debtor's right to cure defaults before repossession. The law in most states also requires that the debtor be given notice of sale prior to the resale of the home so that the owner may redeem at or before resale. In addition, the sale must comply with the requirements, including the notice requirements, of the UCC.

Anti-Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders

States have taken a number of approaches to anti-deficiency and related legislation:

- o   Certain states have imposed statutory prohibitions which limit the remedies of a beneficiary under a deed of trust or a mortgagee under a mortgage.

- o   In some states, statutes limit the right of the beneficiary or mortgagee to obtain a deficiency judgment against the borrower following foreclosure or sale under a deed of trust. A deficiency judgment is a personal judgment against the former borrower equal in most cases to the difference between the net amount realized from the public sale of the real property and the amount due to the lender.

- o   Other statutes require the beneficiary or mortgagee to exhaust the security afforded under a deed of trust or mortgage by foreclosure in an attempt to satisfy the full debt before bringing a personal action against the borrower.

- o   In certain other states, the lender has the option of bringing a personal action against the borrower on the debt without first exhausting its security. However in some of

-114-

<Page>

these states, the lender, following judgment on the personal action, may be deemed to have elected a remedy and may be precluded from exercising remedies with respect to the security. Consequently, the practical effect of the election requirement, in those states permitting election, is that lenders will usually proceed against the security first rather than bringing a personal action against the borrower.

- o   Finally, other statutory provisions limit any deficiency judgment

against the former borrower following a judicial sale to the excess of the outstanding debt over the fair market value of the property at the time of the public sale. The purpose of these statutes is generally to prevent a beneficiary or a mortgagee from obtaining a large deficiency judgment against the former borrower as a result of low or no bids at the judicial sale.

In addition to anti-deficiency and related legislation, numerous other federal and state statutory provisions, including the Bankruptcy Code and state laws affording relief to debtors, may interfere with or affect the ability of a secured mortgage lender to obtain payment of a mortgage loan, to realize on collateral and/or enforce a deficiency judgment. For example, under the Bankruptcy Code, virtually all actions, including foreclosure actions and deficiency judgment proceedings, are automatically stayed when a bankruptcy petition is filed, and, usually, no interest or principal payments are made during the course of the bankruptcy case. Foreclosure of an interest in real property of a debtor in a case under the Bankruptcy Code can typically occur only if the bankruptcy court vacates the stay; an action the bankruptcy court may be reluctant to take, particularly if the debtor has the prospect of restructuring his or her debts and the mortgage collateral is not deteriorating in value. The delay and the consequences caused by the automatic stay can be significant. Also, under the Bankruptcy Code, the filing of a petition in bankruptcy by or on behalf of a subordinate lender secured by a mortgage on the property may stay the senior lender from taking action to foreclose out the junior lien.

A homeowner may file for relief under the Bankruptcy Code under any of three different chapters of the Bankruptcy Code. Under Chapter 7, the assets of the debtor are liquidated and a lender secured by a lien may "bid in," i.e., bid up to the amount of the debt, at the sale of the asset. See "--Foreclosure on Mortgages" above. A homeowner may also file for relief under Chapter 11 of the Bankruptcy Code and reorganize his or her debts through his or her reorganization plan. Alternatively, a homeowner may file for relief under Chapter 13 of the Bankruptcy Code and address his or her debts in a rehabilitation plan. Chapter 13 is often referred to as the "wage earner chapter" or "consumer chapter" because most individuals seeking to restructure their debts file for relief under Chapter 13 rather than under Chapter 11.

A reorganization plan under Chapter 11 and a rehabilitation plan under Chapter 13 of the Bankruptcy Code may each allow a debtor to cure a default with respect to a mortgage loan on the debtor's residence by paying arrearages within a reasonable time period and to deaccelerate and reinstate the original mortgage loan payment schedule. This cure is allowed even though the lender accelerated the loan and a final judgment of foreclosure had been entered in state court provided no sale of the property had yet occurred, prior to the filing of the debtor's petition under the Bankruptcy Code. Courts have approved Chapter 11 plans that have allowed curing of defaults over a number of years. In certain circumstances, defaults may be cured over a number of years even if the full amount due under the original loan is never repaid, even if the mortgagee

-115-

<Page>

objects. Under a Chapter 13 plan, curing of defaults must be accomplished within the five year maximum term permitted for repayment plans.

Generally, a repayment plan filed in a case under Chapter 13 may not modify the claim of a mortgage lender if the borrower elects to retain the property, the property is the borrower's principal residence and the property is the lender's only collateral. If the last payment on the original payment schedule of a mortgage loan secured only by the debtor's principal residence is due before the final date for payment under a debtor's Chapter 13 plan --which date could be up to five years after the debtor emerges from bankruptcy--under a case recently decided by an intermediate appellate court, the debtor's rehabilitation plan could modify the terms of the loan by bifurcating an undersecured lender's claim into a secured and an unsecured component in the same manner as if the debtor were a debtor in a case under Chapter 11. While this decision is contrary to a prior decision of a more senior appellate court in another jurisdiction, it is possible that the intermediate court's decision will become the accepted interpretation in view of the language of the applicable statutory provision. If this interpretation is adopted by a court considering the treatment in a Chapter 13 repayment plan of a home equity loan, the home equity loan could be restructured as if the bankruptcy case were under Chapter 11 if the final payment is due within five years of the debtor's emergence from bankruptcy.

In a case under Chapter 11, provided certain substantive and procedural safeguards are met, the amount and terms of a mortgage loan secured by property of the debtor, including the debtor's principal residence, may be modified. Under the Bankruptcy Code, the outstanding amount of a loan secured by the real property may be reduced to the then-current value of the property as determined by the court, with a corresponding partial reduction of the amount of the lender's security interest, if the value is less than the amount due on the loan. This reduction will leave the lender a general unsecured creditor for the difference between the value of the collateral and the outstanding balance of the loan. A borrower's unsecured indebtedness will typically be discharged in

full when payment of a substantially reduced amount is made.

Other modifications may include a reduction in the amount of each scheduled payment, and/or an extension or reduction of the final maturity date. State statutes and general principles of equity may also provide a borrower with means to halt a foreclosure proceeding or sale and to force a restructuring of a mortgage loan on terms a lender would not otherwise accept. Because many of the mortgage loans will have loan-to-value ratios in excess of 100% at origination, or the loan-to-value ratios otherwise may exceed 100% in cases where the market value declined subsequent to origination, a potentially significant portion of the unpaid principal amount of the related mortgage loan would likely be treated as unsecured indebtedness in a case under Chapter 11.

In a bankruptcy or similar proceeding of a borrower, action may be taken seeking the recovery, as a preferential transfer or on other grounds, of any payments made by the borrower under the related mortgage loan. Payments on long-term debt may be protected from recovery as preferences if they are payments in the ordinary course of business made on debts incurred in the ordinary course of business or if the value of the collateral exceeds the debt on the date the case is commenced if within the applicable preference period. Whether any particular payment would be protected depends on the facts specific to a particular transaction.

-116-

<Page>

A trustee in bankruptcy, in some cases, may be entitled to collect its costs and expenses in preserving or selling the mortgaged property ahead of payment to the lender. In certain circumstances, subject to the court's approval, a debtor in a case under Chapter 11 of the Bankruptcy Code may have the power to grant liens senior to the lien of a mortgage. Moreover, the laws of certain states also give priority to certain tax and mechanics liens over the lien of a mortgage. Under the Bankruptcy Code, if the court finds that actions of the mortgagee have been unreasonable and inequitable, the lien of the related mortgage may be subordinated to the claims of unsecured creditors.

Various proposals to amend the Bankruptcy Code in ways that could adversely affect the value of the mortgage loans have been considered by Congress, and more proposed legislation may be considered in the future. No assurance can be given that any particular proposal will or will not be enacted into law, or that any provision so enacted will not differ materially from the proposals described above.

The Code provides priority to certain tax liens over the lien of the mortgage. This may have the effect of delaying or interfering with the enforcement of rights in respect of a defaulted mortgage loan.

Consumer Compliance Laws and Regulations

In addition, substantive requirements are imposed upon lenders in connection with the origination and the servicing of mortgage loans by numerous federal and some state consumer protection laws. These laws include the federal Truth-in-Lending Act, or TILA, as implemented by Regulation Z, Real Estate Settlement Procedures Act, as implemented by Regulation X, Equal Credit Opportunity Act, as implemented by Regulation B, Fair Credit Billing Act, Fair Credit Reporting Act and related statutes. These federal laws impose specific statutory liabilities upon lenders who originate mortgage loans and who fail to comply with the provisions of the law. In some cases, this liability may affect assignees of the mortgage loans. In particular, an originator's failure to comply with certain requirements of the federal TILA, as implemented by Regulation Z, could subject both originators and assignees of such obligations to monetary penalties and could result in obligors' rescinding the mortgage loans either against the originators or assignees.

Homeownership Act and Similar State Laws

Some of the mortgage loans, known as High Cost Loans, may be subject to the Home Ownership and Equity Protection Act of 1994, or Homeownership Act, which amended TILA to provide new requirements applicable to loans that exceed certain interest rates and/or points and fees thresholds. Purchasers or assignees of any High Cost Loan, including any trust, could be liable under federal law for all claims and subject to all defenses that the borrower could assert against the originator of the High Cost Loan. Remedies available to the borrower include monetary penalties, as well as rescission rights if the appropriate disclosures were not given as required. The maximum damages that may be recovered under these provisions from an assignee, including the trust, is the remaining amount of indebtedness plus the total amount paid by the borrower in connection with the mortgage loan.

-117-

<Page>

In addition to the Homeownership Act, a number of legislative proposals have been introduced at both the federal and state level that are designed to discourage predatory lending practices. Some states have enacted, and other states or local governments may enact, laws that impose requirements and restrictions greater than those in the Homeownership Act. These laws prohibit inclusion of some provisions in mortgage loans that have interest rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of the mortgage loans. Purchasers or assignees of a mortgage loan, including the related trust, could be exposed to all claims and defenses that the mortgagor could assert against the originator of the mortgage loan for a violation of state law. Claims and defenses available to the borrower could include monetary penalties, rescission and defenses to a foreclosure action or an action to collect.

Some of the mortgage loans in a mortgage pool that were originated between October 1, 2002 and March 6, 2003 may be "home loans" and also may be "covered home loans" under the Georgia Fair Lending Act, or Georgia Act. The Georgia Act applies to any mortgage loan that is secured by a property located in the State of Georgia that is the mortgagor's principal residence and has a principal amount not in excess of the conforming loan balance limit established by Fannie Mae. These loans are referred to under the Georgia Act as "home loans." Certain home loans, which are referred to as "covered home loans," have met certain fee and finance-charge criteria. Certain covered home loans, which are referred to as "Georgia high-cost home loans," have met higher limits regarding fees and finance charges. The Georgia Act prohibits certain activities and charges in connection with these loans. Additional prohibitions apply to covered home loans and further prohibitions apply to Georgia high-cost home loans. Except in the case of a transaction in which the mortgage loans are provided by an unaffiliated seller or unless otherwise specified in the accompanying prospectus supplement, the Depositor will represent and warrant that all of the mortgage loans in the mortgage pool complied in all materials respects with all applicable local, state and federal laws at the time of origination.

Purchasers or assignees of a Georgia high-cost home loan, including the related trust, could be exposed to all claims and defenses that the mortgagor could assert against the originator of the home loan. Purchasers or assignees of a covered home loan, including the related trust, could be subject to defenses to foreclosure or an action to collect or to counterclaims by a mortgagor if the loan is in violation of the Georgia Act. Remedies available to a mortgagor include actual, statutory and punitive damages, costs and attorneys' fees, rescission rights and other, unspecified equitable remedies. No maximum penalty has been set with respect to violations of the Georgia Act, and courts have been given discretion under the statute to fashion equitable remedies as they deem appropriate.

With respect to loans originated during the period between October 1, 2002 and March 6, 2003, there are some uncertainties in making a determination as to whether a particular Georgia loan is a covered home loan or a Georgia high-cost home loan, and in determining whether a loan complies with all of the provisions of the Georgia Act. Although the Depositor will be obligated to repurchase any mortgage loan as to which a breach of its representation and warranty has occurred if that breach is material and adverse to the interests of the certificateholders, the repurchase price of those mortgage loans could be less than the damages and/or equitable remedies imposed pursuant to the Georgia Act.

-118-

<Page>

The Georgia Act was amended on March 7, 2003. Mortgage loans originated on or after that date are subject to a less stringent version of the Georgia Act.

Lawsuits have been brought in various states making claims against assignees of High Cost Loans for violations of federal and state law allegedly committed by the originator. Named defendants in these cases include numerous Participants within the secondary mortgage market, including some securitization trusts.

For Cooperative Loans. Generally, Article 9 of the UCC governs foreclosure on Cooperative shares and the related proprietary lease or occupancy agreement. Some courts have interpreted section 9-504 of the UCC to prohibit a deficiency award unless the creditor establishes that the sale of the collateral, which, in the case of a Cooperative Loan, would be the shares of the Cooperative and the related proprietary lease or occupancy agreement, was conducted in a commercially reasonable manner.

Junior Mortgages

Some of the mortgage loans, Multifamily Loans and Home Improvement Contracts may be secured by junior mortgages or deeds of trust, which are junior to senior mortgages or deeds of trust which are not part of the trust fund. The rights of the holders of securities as the holders of a junior deed of trust or

a junior mortgage are subordinate in lien priority and in payment priority to those of the holder of the senior mortgage or deed of trust. These rights include the prior rights of the senior mortgagee or beneficiary to receive and apply hazard insurance and condemnation proceeds and, if the borrower defaults, to cause a foreclosure on the property. When the foreclosure proceedings are completed by the holder of the senior mortgage or the sale pursuant to the deed of trust, the junior mortgagee's or junior beneficiary's lien will be extinguished unless the junior lienholder satisfies the defaulted senior loan or asserts its subordinate interest in a property in foreclosure proceedings. See *-- Foreclosure* in this prospectus.

Furthermore, the terms of the junior mortgage or deed of trust are subordinate to the terms of the senior mortgage or deed of trust. If a conflict exists between the terms of the senior mortgage or deed of trust and the junior mortgage or deed of trust, the terms of the senior mortgage or deed of trust will govern generally. If the borrower or trustor fails to perform any of its obligations, the senior mortgagee or beneficiary, subject to the terms of the senior mortgage or deed of trust, may have the right to perform the obligation itself. Generally, all sums so expended by the mortgagee or beneficiary become part of the indebtedness secured by the mortgage or deed of trust. To the extent a senior mortgagee makes these expenditures, the expenditures will generally have priority over all sums due under the junior mortgage.

Consumer Protection Laws

Numerous federal consumer protection laws impose substantial requirements on creditors involved in consumer finance. These laws include

    o   the federal Truth-in-Lending Act and Regulation Z,

    o   Real Estate Settlement Procedures Act and Regulation X,

-119-

<Page>

    o   Equal Credit Opportunity Act and Regulation B,

    o   Fair Credit Billing Act,

    o   Fair Credit Reporting Act,

    o   Fair Housing Act, Housing and Community Development Act,

    o   Home Mortgage Disclosure Act,

    o   Federal Trade Commission Act,

    o   Fair Debt Collection Practices Act,

    o   Uniform Consumer Credit Code,

    o   Consumer Credit Protection Act,

    o   Riegle Act, and

    o   related statutes and regulations.

In addition state consumer protection laws also impose substantial requirements on creditors involved in consumer finance. The applicable state laws generally regulate:

    o   the disclosures required to be made to borrowers,

    o   licensing of originators of residential loans,

    o   debt collection practices,

    o   origination practices, and

    o   servicing practices.

These federal and state laws can impose specific statutory liabilities on creditors who fail to comply with their provisions and may affect the enforceability of a residential loan. In particular, a violation of these consumer protection laws may:

    o   limit the ability of the master servicer to collect all or part of the principal of or interest on the loan,

    o   subject the trust, as an assignee of the loans, to liability for expenses, damages and monetary penalties resulting from the violation,

    o   subject the trust to an administrative enforcement action,

    o   provide the borrower with the right to rescind the loan, and

-120-

<Page>

    o   provide the borrower with set-off rights against the trust.

    Residential loans often contain provisions obligating the borrower to pay late charges if payments are not timely made. In certain cases, federal and state law may specifically limit the amount of late charges that may be collected. The related prospectus supplement may specify that late charges will be retained by the master servicing servicer as additional servicing compensation, and any inability to collect these amounts will not affect payments to holders of securities.

    Courts have imposed general equitable principles upon repossession and litigation involving deficiency balances. These equitable principles are generally designed to relieve a consumer from the legal consequences of a default.

    In several cases, consumers have asserted that the remedies provided secured parties under the UCC and related laws violate the due process protections provided under the 14th Amendment to the Constitution of the United States. For the most part, courts have upheld the notice provisions of the UCC and related laws as reasonable or have found that the repossession and resale by the creditor does not involve sufficient state action to afford constitutional protection to consumers.

    The so-called "Holder-in-Due-Course" Rules of the Federal Trade Commission have the effect of subjecting a seller, and certain related creditors and their assignees in a consumer credit transaction and any assignee of the creditor to all claims and defenses which the debtor in the transaction could assert against the seller of the goods. Liability under the Holder-in-Due-Course Rules is subject to any applicable limitations implied by the Riegle Act and is limited to the amounts paid by a debtor on the residential loan, and the holder of the residential loan may also be unable to collect amounts still due under those rules.

    If a residential loan is subject to the requirements of the Holder-in-Due-Course-Rules, the trustee will be subject to any claims or defenses that the debtor may assert against the seller.

Enforceability of Certain Provisions

    Generally, residential loans, except for FHA loans and VA loans, contain due-on-sale clauses. These clauses permit the lender to accelerate the maturity of the loan if the borrower sells, transfers, or conveys the property without the prior consent of the mortgagee. The enforceability of these clauses has been impaired in various ways in certain states by statute or decisional law. The ability of mortgage lenders and their assignees and transferees to enforce due-on-sale clauses was addressed by the Garn-St. Germain Depository Institutions Act of 1982 which was enacted on October 15, 1982. Section 341(b) of the Garn-St. Germain Act permits a lender, subject to certain conditions, to "enter into or enforce a contract containing a due-on-sale clause with respect to a real property loan," notwithstanding any contrary state law. The Garn-St. Germain Act gave states that previously had enacted "due-on-sale" restrictions a three-year window to reenact the previous restrictions or enact new restrictions. Only six states acted within this window period: Arizona, Florida, Michigan, Minnesota, New Mexico and Utah. Consequently, due-on-sale provisions in documents governed by the law of those states are not preempted by federal law.

-121-

<Page>

    The Garn-St. Germain Act also sets forth nine specific instances in which a mortgage lender covered by the Garn-St. Germain Act, including federal savings and loan associations and federal savings banks, may not exercise a due-on-sale clause, regardless of the fact that a transfer of the property may have occurred. These include intra-family transfers, certain transfers by operation of law, leases of fewer than three years, the creation of a junior encumbrance and other instances where regulations promulgated by the Director of the Office of Thrift Supervision, successor to the Federal Home Loan Bank Board, prohibit the enforcement of due-on-sale clauses. To date none of these regulations have been issued. Regulations promulgated under the Garn-St. Germain Act prohibit the imposition of a prepayment penalty if a loan is accelerated pursuant to a due-on-sale clause.

    The inability to enforce a due-on-sale clause may result in a mortgage loan

bearing an interest rate below the current market rate being assumed by a new home buyer rather than being paid off. As a result, this inability to enforce due-on-sale clauses may have an impact on the average life of the mortgage loans related to a series and the number of those mortgage loans which may be outstanding until maturity.

Transfer of Manufactured Homes. Generally, Manufactured Housing Contracts contain provisions prohibiting the sale or transfer of the related manufactured homes without the consent of the lender on the contract and permitting the acceleration of the maturity of the related contracts by the lender on the contract if any sale or transfer occurs that is not consented to. The related prospectus supplement may specify that the master servicer will, to the extent it has knowledge of this conveyance or proposed conveyance, exercise or cause to be exercised its rights to accelerate the maturity of the related Manufactured Housing Contracts through enforcement of "due-on-sale" clauses, subject to applicable state law. In certain cases, the transfer may be made by a delinquent borrower in order to avoid a repossession proceeding with respect to a manufactured home.

In the case of a transfer of a manufactured home as to which the master servicer desires to accelerate the maturity of the related Manufactured Housing Contract, the master servicer's ability to do so will depend on the enforceability under state law of the "due-on-sale" clause. The Garn-St. Germain Act preempts, subject to certain exceptions and conditions, state laws prohibiting enforcement of "due-on-sale" clauses applicable to the manufactured homes. Consequently, some states may prohibit the master servicer from enforcing a "due-on-sale" clause in respect of certain manufactured homes.

Prepayment Charges and Prepayments

Generally, conventional mortgage loans, Cooperative Loans, Home Improvement Contracts and Manufactured Housing Contracts, residential owner occupied FHA loans and VA loans may be prepaid in full or in part without penalty. Generally, multifamily residential loans, including multifamily FHA loans, may contain provisions limiting prepayments on these loans, including:

o    prohibiting prepayment for a specified period after origination,

o    prohibiting partial prepayments entirely, or

-122-

<Page>

o    requiring the payment of a prepayment penalty if a prepayment in full or in part occurs.

The laws of certain states may:

o    render prepayment fees unenforceable after a mortgage loan is outstanding for a certain number of years, or

o    limit the amount of any prepayment fee to a specified percentage of the original principal amount of the mortgage loan, to a specified percentage of the outstanding principal balance of a mortgage loan, or to a fixed number of months' interest on the prepaid amount.

In certain states, prepayment fees payable on default or other involuntary acceleration of a residential loan may not be enforceable against the related borrower. Some state statutory provisions may also treat certain prepayment fees as usurious if in excess of statutory limits.

Some state laws restrict the imposition of prepayment charges and late fees even when the loans expressly provide for the collection of those charges. Although the Alternative Mortgage Transaction Parity Act 1982, or the Parity Act, permits the collection of prepayment charges and late fees in connection with some types of eligible loans preempting any contrary state law prohibitions, some states may not recognize the preemptive authority of the Parity Act or have formally opted of the Parity Act. As a result, it is possible that prepayment charges and late fees may not be collected even on loans that provide for the payment of those charges unless otherwise specified in the accompanying prospectus supplement. The master servicer or another entity identified in the accompanying prospectus supplement will be entitled to all prepayment charges and late payment charges received on the loans and these amounts will not be available for payment on the certificates. Effective July 1, 2003, the Office of Thrift Supervision ("OTS"), the agency that administers the Parity Act for unregulated housing creditors, has withdrawn its favorable Parity Act regulations and Chief Counsel Opinions that have authorized lenders to charge prepayment charges and late fees in certain circumstances notwithstanding contrary state law. However, the OTS's ruling does not have retroactive effect on loans originated before July 1, 2003.

Subordinate Financing

When the borrower encumbers mortgaged property with one or more junior liens, the senior lender is subjected to additional risk. First, the borrower

may have difficulty servicing and repaying multiple loans. In addition, if the junior loan permits recourse to the borrower - as junior loans often do - and the senior loan does not, a borrower may be more likely to repay sums due on the junior loan than those on the senior loan. Second, acts of the senior lender that prejudice the junior lender or impair the junior lender's security may create a superior equity in favor of the junior lender. For example, if the borrower and the senior lender agree to an increase in the principal amount of or the interest rate payable on the senior loan, the senior lender may lose its priority to the extent an existing junior lender is harmed or the borrower is additionally burdened. Third, if the borrower defaults on the senior loan and/or any junior loan or loans, the existence of junior loans and actions taken by junior lenders can impair the security available to

-123-

<Page>

the senior lender and can interfere with or delay the taking of action by the senior lender. Moreover, the bankruptcy of a junior lender may operate to stay foreclosure or similar proceedings by the senior lender.

Applicability of Usury Laws

Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980, enacted in March 1980, provides that state usury limitations shall not apply to certain types of residential first mortgage loans originated by certain lenders after March 31, 1980. A similar federal statute was in effect with respect to mortgage loans made during the first three months of 1980. The statute authorized any state to reimpose interest rate limits by adopting, before April 1, 1983, a law or constitutional provision which expressly rejects application of the federal law. In addition, even where Title V is not so rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on mortgage loans covered by Title V. Certain states have taken action to reimpose interest rate limits and/or to limit discount points or other charges.

The depositor believes that a court interpreting Title V would hold that mortgage loans related to a series originated on or after January 1, 1980 are subject to federal preemption. Therefore, in a state that has not taken the requisite action to reject application of Title V or to adopt a provision limiting discount points or other charges prior to origination of the mortgage loans, any limitation under the state's usury law would not apply to the mortgage loans.

In any state in which application of Title V has been expressly rejected or a provision limiting discount points or other charges is adopted, no mortgage loans originated after the date of this state action will be eligible for inclusion in a trust fund if the mortgage loans bear interest or provide for discount points or charges in excess of permitted levels. No mortgage loan originated prior to January 1, 1980 will bear interest or provide for discount points or charges in excess of permitted levels.

Alternative Mortgage Instruments

Adjustable rate mortgage loans originated by non-federally chartered lenders have historically been subject to a variety of restrictions. These restrictions differed from state to state, resulting in difficulties in determining whether a particular alternative mortgage instrument originated by a state-chartered lender complied with applicable law. These difficulties were simplified substantially as a result of the enactment of Title VIII of the Garn-St. Germain Act. Title VIII of the Garn-St. Germain Act which provides that, regardless of any state law to the contrary,

(1) state-chartered banks may originate "alternative mortgage instruments," including adjustable rate mortgage loans, in accordance with regulations promulgated by the Comptroller of the Currency with respect to origination of alternative mortgage instruments by national banks;

(2) state-chartered credit unions may originate alternative mortgage instruments in accordance with regulations promulgated by the National Credit Union Administration with respect to origination of alternative mortgage instruments by federal credit unions; and

-124-

<Page>

(3) all other non-federally chartered housing creditors, including without limitation

- o   state-chartered savings and loan associations,

- o   savings banks and mutual savings banks and

- o   mortgage banking companies

may originate alternative mortgage instruments in accordance with the regulations promulgated by the Federal Home Loan Bank Board, predecessor to the Office of Thrift Supervision, with respect to origination of alternative mortgage instruments by federal savings and loan associations.

Title VIII of the Garn-St. Germain Act further provides that a state does not need to apply the provisions of Title VIII by adopting, prior to October 15, 1985, a law or constitutional provision expressly rejecting the applicability of these provisions. Certain states have done this.

Environmental Legislation

Under the federal Comprehensive Environmental Response, Compensation, and Liability Act, as amended, and under state law in certain states, a secured party which takes a deed-in-lieu of foreclosure, purchases a mortgaged property at a foreclosure sale, or operates a mortgaged property may become liable in certain circumstances for the costs of cleaning up hazardous substances regardless of whether the secured party contaminated the property. CERCLA imposes strict, as well as joint and several, liability on several classes of potentially responsible parties, including current owners and operators of the property who did not cause or contribute to the contamination. Furthermore, liability under CERCLA is not limited to the original or unamortized principal balance of a loan or to the value of the property securing a loan. Lenders may be held liable under CERCLA as owners or operators unless they qualify for the secured creditor exemption to CERCLA. This exemption exempts from the definition of owners and operators those who, without participating in the management of a facility, hold indicia of ownership primarily to protect a security interest in the facility.

Recent amendments to CERCLA help clarify the actions that may be undertaken by a lender holding security in a contaminated facility without exceeding the bounds of the secured creditor exemption. The amendments offer protection to lenders by defining certain activities in which a lender can engage and still have the benefit of the secured creditor exemption. A lender will be deemed to have participated in the management of a mortgaged property, and will lose the secured creditor exemption, if it actually participates in the management or operational affairs of the property of the borrower. The amendments provide that "merely having the capacity to influence, or the unexercised right to control" operations does not constitute participation in management. A lender will lose the protection of the secured creditor exemption if it exercises decision-making control over the borrower's environmental compliance or hazardous substance handling and disposal practices, or assumes management of substantially all operational functions of the mortgaged property. The amendments also provide that a lender may continue to have the benefit of the secured creditor exemption even if it forecloses on a mortgaged property, purchases it at a foreclosure sale, or accepts a deed-in-lieu of foreclosure

-125-

<Page>

provided that the lender seeks to sell the mortgaged property at the earliest practicable commercially reasonable time on commercially reasonable terms. However, the protections afforded lenders under the amendments are subject to conditions that have not been clarified by the courts.

Other federal and state laws in certain circumstances may impose liability on a secured party which takes a deed-in-lieu of foreclosure, purchases a mortgaged property at a foreclosure sale, or operates a mortgaged property on which contaminants or other substances are present, including petroleum, agricultural chemicals, hazardous wastes, asbestos, radon, and lead-based paint. The cleanup costs or other liabilities may be substantial. It is possible that the costs could become a liability of a trust fund and reduce the amounts otherwise distributable to the holders of the related series of securities. Moreover, certain federal statutes and certain states by statute impose an environmental lien for any cleanup costs incurred by the government on the property that is the subject of these types of cleanup costs. All subsequent liens on the property generally are subordinated to the environmental lien. In some states, even prior recorded liens are subordinated to environmental liens. In the latter states, the security interest of the trustee in a related parcel of real property that is subject to an environmental lien could be adversely affected.

The related prospectus supplement may specify that the mortgage loan seller will make representations as to the material compliance of the related residential property with applicable environmental laws and regulations as of the date of transfer and assignment of the mortgage loan to the trustee. In addition, the related agreement may provide that the master servicer and any special servicer acting on behalf of the trustee, may not acquire title to a residential property or take over its operation unless the master servicer or

special servicer has previously determined, based on a report prepared by a person who regularly conducts environmental audits, that:

     (a) there are no circumstances present at the residential property relating to substances for which some action relating to their investigation or clean-up could be required or that it would be in the best economic interest of the trust fund to take these actions with respect to the affected residential property; and

     (b) that the residential property is in compliance with applicable environmental laws or that it would be in the best economic interest of the trust fund to take the actions necessary to comply with these laws.

See "Description of the Securities--Realization on Defaulted Mortgage Loans" in this prospectus.

Servicemembers Civil Relief Act and the California Military and Veterans Code

     Generally, under the terms of the Servicemembers Civil Relief Act, a borrower who enters military service after the origination of the borrower's residential loan, including a borrower who was in reserve status and is called to active duty after origination of the mortgage loan, upon notification by such borrower, shall not be charged interest, including fees and charges, in excess of 6% per annum during the period of the borrower's active duty status. In

-126-

<Page>

addition to adjusting the interest, the lender must forgive any such interest in excess of 6%, unless a court or administrative agency orders otherwise upon application of the lender. In addition, the Relief Act provides broad discretion for a court to modify a mortgage loan upon application by the borrower. The Relief Act applies to borrowers who are members of the Army, Navy, Air Force, Marines, National Guard, Reserves, Coast Guard, and officers of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration assigned to duty with the military. The California Military and Veterans Code provides protection equivalent to that provided by the Relief Act to California national guard members called up to active service by the Governor, California national guard members called up to active service by the President and reservists called to active duty. Because the Relief Act and the California Military Code apply to borrowers who enter military service, no information can be provided as to the number of mortgage loans that may be affected by the Relief Act or the California Military Code. Application of the Relief Act or the California Military Code would adversely affect, for an indeterminate period of time, the ability of the master servicer to collect full amounts of interest on certain of the mortgage loans.

     Any shortfalls in interest collections resulting from the application of the Relief Act or the California Military Code would result in a reduction of the amounts distributable to the holders of the related series of securities, and the prospectus supplement may specify that the shortfalls would not be covered by advances or, any form of credit support provided in connection with the securities. In addition, the Relief Act and the California Military Code impose limitations that impair the ability of the master servicer to foreclose on an affected mortgage loan or enforce rights under a Home Improvement Contract or Manufactured Housing Contract during the borrower's period of active duty status, and, under certain circumstances, during an additional three month period after that period. Thus, if a mortgage loan or Home Improvement Contract or Manufactured Housing Contract goes into default, there may be delays and losses occasioned as a result.

Forfeiture for Drug, RICO and Money Laundering Violations

     Federal law provides that property purchased or improved with assets derived from criminal activity or otherwise tainted, or used in the commission of certain offenses, can be seized and ordered forfeited to the United States of America. The offenses which can trigger such a seizure and forfeiture include, among others, violations of the Racketeer Influenced and Corrupt Organizations Act, the Bank Secrecy Act, the anti-money laundering laws and regulations, including the USA Patriot Act of 2001 and the regulations issued pursuant to that Act, as well as the narcotic drug laws. In many instances, the United States may seize the property even before a conviction occurs.

     In the event of a forfeiture proceeding, a lender may be able to establish its interest in the property by proving that (1) its mortgage was executed and recorded before the commission of the illegal conduct from which the assets used to purchase or improve the property were derived or before the commission of any other crime upon which the forfeiture is based, or (2) the lender, at the time of the execution of the mortgage, "did not know or was reasonably without cause to believe that the property was subject to forfeiture." However, there is no assurance that such a defense will be successful.

-127-

<Page>

FEDERAL INCOME TAX CONSEQUENCES

General

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the securities offered by this prospectus. This discussion is directed solely to holders of securities that hold the securities as capital assets within the meaning of Section 1221 of the Code. This discussion does not purport to discuss all federal income tax consequences that may be applicable to particular categories of investors, some of which, such as banks, insurance companies and foreign investors, may be subject to special rules. Further, the authorities on which this discussion, and the opinion referred to below, are based are subject to change or differing interpretations, which could apply retroactively. In addition to the federal income tax consequences described in this prospectus, potential investors should consider the state and local tax consequences, if any, of the purchase, ownership and disposition of the securities. See "State and Other Tax Consequences" in this prospectus. Holders of securities are advised to consult their own tax advisors concerning the federal, state, local or other tax consequences to them of the purchase, ownership and disposition of the securities offered under this prospectus.

The following discussion addresses securities of four general types:

(1)  REMIC Securities,

(2)  Grantor Trust Securities,

(3)  Partnership Securities, and

(4)  Debt Securities.

The prospectus supplement relating to each series of securities will indicate which of the foregoing treatments will apply to the series. If a REMIC election or elections will be made for the related trust fund, the prospectus supplement will identify all "regular interests" and "residual interests" in the REMIC. For purposes of this tax discussion:

(1) references to a "holder of securities" or a "holder" are to the beneficial owner of a security,

(2) references to "REMIC Pool" are to an entity or portion of an entity as to which a REMIC election will be made and

(3) references to mortgage loans include agency securities and private mortgage-backed securities as specified in the related prospectus supplement.

The following discussion is based in part on the OID Regulations, and in part on the REMIC Provisions. The OID Regulations do not adequately address certain issues relevant to, and in some instances provide that they are not applicable to, debt instruments such as the securities.

-128-

<Page>

REMICs

General

Classification of REMICs. When each series of REMIC Securities is issued, Cadwalader, Wickersham & Taft LLP, McKee Nelson LLP, Thacher Proffitt & Wood or such other counsel to the depositor, specified in the related prospectus supplement ("Tax Counsel"), will deliver an opinion. This opinion will generally be to the effect that, assuming compliance with all provisions of the related pooling and servicing agreement,

(1) the related trust fund, or each applicable portion of the related trust fund, will qualify as a REMIC and

(2) the REMIC securities offered with respect to the related trust fund will be considered to evidence ownership of "regular interests" or "residual interests" in that REMIC within the meaning of the REMIC Provisions.

In order for the REMIC Pool to qualify as a REMIC, there must be ongoing compliance on the part of the REMIC Pool with the requirements set forth in the Code. The REMIC Pool must fulfill an asset test, which requires that no more than a de minimis portion of the assets of the REMIC Pool, as of the close of the third calendar month beginning after the Startup Day and at all times after

that date, may consist of assets other than "qualified mortgages" and "permitted investments." The REMIC Regulations provide a safe harbor pursuant to which the de minimis requirement will be met if at all times the aggregate adjusted basis of the nonqualified assets is less than 1% of the aggregate adjusted basis of all the REMIC Pool's assets. An entity that fails to meet the safe harbor may nevertheless demonstrate that it holds no more than a de minimis amount of nonqualified assets. A REMIC Pool also must provide "reasonable arrangements" to prevent its residual interests from being held by "disqualified organizations" or their agents and must furnish applicable tax information to transferors or agents that violate this requirement. The pooling and servicing agreement with respect to each series of REMIC certificates will contain provisions meeting these requirements. See "--Taxation of Owners of Residual Securities--Tax-Related Restrictions on Transfer of Residual Securities--Disqualified Organizations" in this prospectus.

A qualified mortgage is any obligation that is principally secured by an interest in real property and that is either transferred to the REMIC Pool on the Startup Day or is purchased by the REMIC Pool within a three-month period after that date pursuant to a fixed price contract in effect on the Startup Day. Qualified mortgages include whole mortgage loans, and, generally, certificates of beneficial interest in a grantor trust that holds mortgage loans and regular interests in another REMIC, such as lower-tier regular interests in a tiered REMIC. The REMIC Regulations specify that loans secured by timeshare interests and shares held by a tenant stockholder in a cooperative housing corporation can be qualified mortgages. A qualified mortgage includes a qualified replacement mortgage, which is any property that would have been treated as a qualified mortgage if it were transferred to the REMIC Pool on the Startup Day and that is received either

-129-

<Page>

          (i) in exchange for any qualified mortgage within a three-month period after that date; or

          (ii) in exchange for a "defective obligation" within a two-year period thereafter.

A "defective obligation" includes

          (i) a mortgage in default or as to which default is reasonably foreseeable;

          (ii) a mortgage as to which a customary representation or warranty made at the time of transfer to the REMIC Pool has been breached;

          (iii) a mortgage that was fraudulently procured by the borrower; and

          (iv) a mortgage that was not in fact principally secured by real property, but only if that mortgage is disposed of within 90 days of discovery.

A mortgage loan that is "defective" as described in clause (iv) that is not sold or, if within two years of the Startup Day, exchanged, within 90 days of discovery, ceases to be a qualified mortgage after the 90-day period.

Permitted investments include cash flow investments, qualified reserve assets, and foreclosure property. A cash flow investment is an investment, earning a return in the nature of interest, of amounts received on or with respect to qualified mortgages for a temporary period, not exceeding 13 months, until the next scheduled distribution to holders of interests in the REMIC Pool. A qualified reserve asset is any intangible property held for investment that is part of any reasonably required reserve maintained by the REMIC Pool to provide for payments of expenses of the REMIC Pool or amounts due on the regular or residual interests if defaults occur, including delinquencies, on the qualified mortgages, lower than expected reinvestment returns, prepayment interest shortfalls and certain other contingencies. The Reserve Fund will be disqualified if more than 30% of the gross income from the assets in that fund for the year is derived from the sale or other disposition of property held for less than three months, unless required to prevent a default on the regular interests caused by a default on one or more qualified mortgages. A Reserve Fund must be reduced "promptly and appropriately" as payments on the mortgage loans are received. Foreclosure property is real property acquired by the REMIC Pool in connection with the default or imminent default of a qualified mortgage. Foreclosure property is generally not held beyond the close of the third calendar year following the year of acquisition, with one extension available from the Internal Revenue Service.

In addition to the foregoing requirements, the various interests in a REMIC Pool also must meet certain requirements. All of the interests in a REMIC Pool must be either of the following:

          (1) one or more classes of regular interests or

          (2) a single class of residual interests on which distributions, if any,

are made pro rata.

-130-

<Page>

A regular interest is an interest in a REMIC Pool that is

     o    issued on the Startup Day with fixed terms,

     o    designated as a regular interest,

     o    unconditionally entitles the holder to receive a specified principal
          amount, or other similar amount, and

     o    provides that interest payments, or other similar amounts, if any, at
          or before maturity either are payable based on a fixed rate or a
          qualified variable rate, or consist of a specified, nonvarying portion
          of the interest payments on qualified mortgages. The specified portion
          may consist of a fixed number of basis points, a fixed percentage of
          the total interest, or a qualified variable rate, inverse variable
          rate or difference between two fixed or qualified variable rates on
          some or all of the qualified mortgages. The specified principal amount
          of a regular interest that provides for interest payments consisting
          of a specified, nonvarying portion of interest payments on qualified
          mortgages may be zero.

A residual interest is an interest in a REMIC Pool other than a regular interest
that is issued on the Startup Day and that is designated as a residual interest.
An interest in a REMIC Pool may be treated as a regular interest even if
payments of principal with respect to that interest are subordinated to payments
on other regular interests or the residual interest in the REMIC Pool, and are
dependent on the absence of defaults or delinquencies on qualified mortgages or
permitted investments, unanticipated expenses incurred by the REMIC Pool or prepayment
investments, unanticipated expenses incurred by the REMIC Pool or prepayment
interest shortfalls. Accordingly, the Regular Securities of a series will
constitute one or more classes of regular interests, and the Residual Securities
with respect to that series will constitute a single class of residual interests
with respect to each REMIC Pool.

    If an entity electing to be treated as a REMIC fails to comply with one or
more of the ongoing requirements of the Code for REMIC status during any taxable
year, the Code provides that the entity will not be treated as a REMIC for that
year and after that year. In that event, the entity may be taxable as a
corporation under Treasury regulations, and the related REMIC Securities may not
be accorded the status or given the tax treatment described below. Although the
Code authorizes the Treasury Department to issue regulations providing relief in
the event of an inadvertent termination of REMIC status, no regulations have
been issued. Any relief, moreover, may be accompanied by sanctions, such as the
imposition of a corporate tax on all or a portion of the trust fund's income for
the period in which the requirements for REMIC status are not satisfied. The
agreement pursuant to which each REMIC Pool is formed will include provisions
designed to maintain the trust fund's status as a REMIC under the REMIC
Provisions. We do not anticipate that the status of any trust fund as a REMIC
will be terminated.

    Characterization of Investments in REMIC Securities. In general, the REMIC
Securities will be treated as "real estate assets" within the meaning of Section
856(c)(5)(B) of the Code and assets described in Section 7701(a)(19)(C) of the
Code in the same proportion that the assets of the REMIC Pool underlying REMIC
Securities would be treated. Moreover, if 95% or

-131-

<Page>

more of the assets of the REMIC Pool qualify for either of the foregoing
treatments at all times during a calendar year, the REMIC Securities will
qualify for the corresponding status in their entirety for that calendar year.
If the assets of the REMIC Pool include Buydown Loans, it is possible that the
percentage of assets constituting "loans . . . secured by an interest in real
property which is . . . residential real property" for purposes of Code Section
7701(a)(19)(C)(v) may be required to be reduced by the amount of the related
funds paid on those loans. Interest, including original issue discount, on the
Regular Securities and income allocated to the class of Residual Securities will
be interest described in Section 856(c)(3)(B) of the Code to the extent that
those securities are treated as "real estate assets" within the meaning of
Section 856(c)(5)(B) of the Code.

    In addition, the Regular Securities will be "qualified mortgages" within

the meaning of Section 860G(a)(3) of the Code if transferred to another REMIC on its Startup Day in exchange for regular or residual interests in the REMIC, and will be "permitted assets" within the meaning of Section 860L(c) for a financial asset securitization investment trust. The determination as to the percentage of the REMIC Pool's assets that constitute assets described in the foregoing sections of the Code will be made with respect to each calendar quarter based on the average adjusted basis of each category of the assets held by the REMIC Pool during that calendar quarter. The REMIC will report those determinations to holders of securities in the manner and at the times required by applicable Treasury regulations.

The assets of the REMIC Pool will include, in addition to mortgage loans, payments on mortgage loans held pending distribution on the REMIC Securities and property acquired by foreclosure held pending sale, and may include amounts in reserve accounts. It is unclear whether property acquired by foreclosure held pending sale and amounts in reserve accounts would be considered to be part of the mortgage loans, or whether that property, to the extent not invested in assets described in the foregoing sections, otherwise would receive the same treatment as the mortgage loans for purposes of all of the foregoing sections. The REMIC Regulations do provide, however, that payments on mortgage loans held pending distribution are considered part of the mortgage loans for purposes of Section 856(c)(4)(A) of the Code. Furthermore, foreclosure property will qualify as "real estate assets" under Section 856(c)(5)(B) of the Code.

Tiered REMIC Structures. For certain series of REMIC Securities, tiered REMICs may be effected by two or more separate elections being made to treat designated portions of the related trust fund as REMICs for federal income tax purposes. When any series of REMIC Securities is issued, Tax Counsel will deliver an opinion. This opinion will generally be to the effect that, assuming compliance with all provisions of the related agreement governing the REMIC Securities, the tiered REMICs will each qualify as a REMIC and the REMIC Securities issued by the tiered REMICs, respectively, will be considered to evidence ownership of Regular Securities or Residual Securities in the related REMIC within the meaning of the REMIC Provisions.

Solely for purposes of determining whether the REMIC Securities will be "real estate assets" within the meaning of Section 856(c)(5)(B) of the Code and "loans secured by an interest in real property" under Section 7701(a)(19)(C) of the Code, and whether the income on those

-132-

<Page>

securities is interest described in Section 856(c)(3)(B) of the Code, the tiered REMICs will be treated as one REMIC.

Taxation of Owners of Regular Securities

General. Regular securities will be treated as newly originated debt instruments for federal income tax purposes. In general, interest, original issue discount, and market discount on a Regular Security will be treated as ordinary income to a Regular Securityholder. In addition, principal payments on a Regular Security will generally be treated as a return of capital to the extent of the Regular Securityholder's basis in the Regular Security allocable thereto. Regular Securityholders must use the accrual method of accounting with regard to Regular Securities, regardless of the method of accounting otherwise used by the Regular Securityholder.

Original Issue Discount. Regular Securities may be issued with "original issue discount" within the meaning of Code Section 1273(a). Holders of any class or subclass of Regular Securities having original issue discount generally must include original issue discount in ordinary income for federal income tax purpose as it accrues. Original issue discount is determined in accordance with a constant yield method that takes into account the compounding of interest, in advance of the receipt of the cash attributable to income. The following discussion is based in part on the OID Regulations and in part on the legislative history of the 1986 Act. Regular Securityholders should be aware, however, that the OID Regulations do not adequately address certain issues relevant to prepayable securities, such as the Regular Securities. To the extent certain issues are not addressed in the regulations, it is anticipated that the trustee will apply the methodology described in the conference committee report to the 1986 Act. We cannot assure you that the Internal Revenue Service will not take a different position as to those matters not currently addressed by the OID Regulations. Moreover, the OID Regulations include an anti-abuse rule allowing the Internal Revenue Service to apply or depart from the OID Regulations where necessary or appropriate to ensure a reasonable tax result in light of the applicable statutory provisions. A tax result will not be considered unreasonable under the anti-abuse rule in the absence of a substantial effect on the present value of a taxpayer's tax liability. Investors are advised to consult their own tax advisors as to the discussion in the OID Regulations and the appropriate method for reporting interest and original issue discount with respect to the Regular Securities.

Each Regular Security, except to the extent described below with respect to a Non-Pro rata Security, will be treated as a single installment obligation for

purposes of determining the original issue discount includible in a Regular
Securityholder's income. The total amount of original issue discount on a
Regular Security is the excess of the "stated redemption price at maturity" of
the Regular Security over its "issue price." The issue price of a class of
Regular Securities offered pursuant to this prospectus generally is the first
price at which a substantial amount of a particular class is sold to the public,
excluding bond houses, brokers and underwriters. Although unclear under the OID
Regulations, it is anticipated that the trustee will treat the issue price of a
class as to which there is no substantial sale as of the issue date or that is
retained by the depositor as the fair market value of the class as of the issue
date. The issue price of a Regular Security also includes any amount paid by an
initial Regular Securityholder for accrued interest that relates to a period
prior to the issue date of the Regular Security, unless the Regular
Securityholder elects on its federal income tax return to exclude that amount
from the

-133-

<Page>

issue price and to recover it on the first distribution date. The stated
redemption price at maturity of a Regular Security always includes the original
principal amount of the Regular Security, but generally will not include
distributions of interest if those distributions constitute "qualified stated
interest."

    Under the OID Regulations, qualified stated interest generally means
interest payable at a single fixed rate or a qualified variable rate provided
that interest payments are unconditionally payable at intervals of one year or
less during the entire term of the Regular Security. Because there is no penalty
or default remedy in the case of nonpayment of interest with respect to a
Regular Security, it is possible that no interest on any class of Regular
Securities will be treated as qualified stated interest. However, except as
provided in the following three sentences or in the related prospectus
supplement, because the underlying mortgage loans provide for remedies if a
default occurs, it is anticipated that the trustee will treat interest with
respect to the Regular Securities as qualified stated interest. Distributions of
interest on Regular Securities with respect to which deferred interest will
accrue, will not constitute qualified stated interest, in which case the stated
redemption price at maturity of those Regular Securities includes all
distributions of interest as well as principal on them. Likewise, it is
anticipated that the trustee will treat an interest-only class or a class on
which interest is substantially disproportionate to its principal amount --a
so-called "super-premium" class-- as having no qualified stated interest. Where
the interval between the issue date and the first distribution date on a Regular
Security is shorter than the interval between subsequent distribution dates and
shorter than the number of days of interest due on such distribution date, the
interest attributable to the additional days will be included in the stated
redemption price at maturity.

    Under a de minimis rule, original issue discount on a Regular Security will
be considered to be zero if the original issue discount is less than 0.25% of
the stated redemption price at maturity of the Regular Security multiplied by
the weighted average maturity of the Regular Security. For this purpose, the
weighted average maturity of the Regular Security is computed as the sum of the
amounts determined by multiplying the number of full years, rounding down
partial years, from the issue date until each distribution in reduction of
stated redemption price at maturity is scheduled to be made by a fraction, the
numerator of which is the amount of each distribution included in the stated
redemption price at maturity of the Regular Security and the denominator of
which is the stated redemption price at maturity of the Regular Security. The
conference committee report to the 1986 Act provides that the schedule of
distributions should be determined in accordance with the Prepayment Assumption
and the anticipated reinvestment rate, if any, relating to the Regular
Securities. The Prepayment Assumption with respect to a series of Regular
Securities will be set forth in the related prospectus supplement. Holders
generally must report de minimis original issue discount pro rata as principal
payments are received, and that income will be capital gain if the Regular
Security is held as a capital asset. Under the OID Regulations, however, Regular
Securityholders may elect to accrue all de minimis original issue discount as
well as market discount and market premium, under the constant yield method. See
"--Election to Treat All Interest Under the Constant Yield Method" below.

    A Regular Securityholder generally must include in gross income for any
taxable year the sum of the "daily portions," as defined below, of the original
issue discount on the Regular Security accrued during an accrual period for each
day on which it holds the Regular Security,

-134-

<Page>

including the date of purchase but excluding the date of disposition. The trustee will treat the monthly period ending on the day before each distribution date as the accrual period. With respect to each Regular Security, a calculation will be made of the original issue discount that accrues during each successive full accrual period, or shorter period from the date of original issue, that ends on the day before the related distribution date on the Regular Security. The Conference Committee Report to the Code states that the rate of accrual of original issue discount is intended to be based on the Prepayment Assumption. The original issue discount accruing in a full accrual period would be the excess, if any, of

    (1) the sum of:

        (a) the present value of all of the remaining distributions to be made on the Regular Security as of the end of that accrual period, and

        (b) the distributions made on the Regular Security during the accrual period that are included in Regular Security's stated redemption price at maturity, over

    (2) the adjusted issue price of the Regular Security at the beginning of the accrual period.

The present value of the remaining distributions referred to in the preceding sentence is calculated based on:

    (1) the yield to maturity of the Regular Security at the issue date,

    (2) events, including actual prepayments, that have occurred prior to the end of the accrual period, and

    (3) the Prepayment Assumption.

For these purposes, the adjusted issue price of a Regular Security at the beginning of any accrual period equals the issue price of the Regular Security, increased by the aggregate amount of original issue discount with respect to the Regular Security that accrued in all prior accrual periods and reduced by the amount of distributions included in the Regular Security's stated redemption price at maturity that were made on the Regular security in prior periods. The original issue discount accruing during any accrual period, as determined in this paragraph, will then be divided by the number of days in the period to determine the daily portion of original issue discount for each day in the period. With respect to an initial accrual period shorter than a full accrual period, the daily portions of original issue discount must be determined according to an appropriate allocation under any reasonable method.

Under the method described above, the daily portions of original issue discount required to be included in income by a Regular Securityholder generally will increase to take into account prepayments on the Regular Securities as a result of prepayments on the mortgage loans that exceed the Prepayment Assumption, and generally will decrease, but not below zero for any period, if the prepayments are slower than the Prepayment Assumption. An increase in prepayments on the mortgage loans with respect to a series of Regular Securities can result in both a change in the priority of principal payments with respect to certain classes of Regular

-135-

&lt;Page&gt;

Securities and either an increase or decrease in the daily portions of original issue discount with respect to those Regular Securities.

In the case of a Non-Pro Rata Security, we anticipate that the trustee will determine the yield to maturity of this type of Security based on the anticipated payment characteristics of the class as a whole under the Prepayment Assumption. In general, the original issue discount accruing on each Non-Pro Rata Security in a full accrual period would be its allocable share of the original issue discount with respect to the entire class, as determined in accordance with the preceding paragraph. However, in the case of a distribution in retirement of the entire unpaid principal balance of any Non-Pro Rata Security, or portion of its unpaid principal balance:

    (1) the remaining unaccrued original issue discount allocable to the security, or to that portion, will accrue at the time of distribution, and

    (2) the accrual of original issue discount allocable to each remaining security of that class will be adjusted by reducing the present value of the remaining payments on that class and the adjusted issue price of that class to the extent attributable to the portion of the unpaid principal balance of that security that was distributed.

The depositor believes that the foregoing treatment is consistent with the "pro rata prepayment" rules of the OID Regulations, but with the rate of accrual

of original issue discount determined based on the Prepayment Assumption for the class as a whole. You are advised to consult your tax advisors as to this treatment.

Acquisition Premium. A purchaser of a Regular Security at a price greater than its adjusted issue price but less than its stated redemption price at maturity must include in gross income the daily portions of the original issue discount on the Regular Security reduced pro rata by a fraction,

(1) the numerator of which is the excess of its purchase price over the adjusted issue price, and

(2) the denominator of which is the excess of the remaining stated redemption price at maturity over the adjusted issue price.

Alternatively, a subsequent purchaser may elect to treat all acquisition premium under the constant yield method, as described below under the heading "--Election to Treat All Interest Under the Constant Yield Method."

Variable Rate Regular Securities. Regular Securities may provide for interest based on a variable rate. Under the OID Regulations, interest is treated as payable at a variable rate if, generally:

(1) the issue price does not exceed the original principal balance by more than a specified amount and

-136-

<Page>

(2) the interest compounds or is payable at least annually at current values of:

(a) one or more "qualified floating rates,"

(b) a single fixed rate and one or more qualified floating rates,

(c) a single "objective rate," or

(d) a single fixed rate and a single objective rate that is a "qualified inverse floating rate."

A floating rate is a qualified floating rate if variations can reasonably be expected to measure contemporaneous variations in the cost of newly borrowed funds, where the rate is subject to a fixed multiple that is greater that 0.65 but not more than 1.35. This floating rate may also be increased or decreased by a fixed spread or subject to a fixed cap or floor, or a cap or floor that is not reasonably expected as of the issue date to affect the yield of the instrument significantly. An objective rate is any rate, other than a qualified floating rate, that is determined using a single fixed formula and that is based on objective financial or economic information, provided that the information is not

(1)  within the control of the issuer or a related party or

(2)  unique to the circumstances of the issuer or a related party.

A qualified inverse floating rate is a rate equal to a fixed rate minus a qualified floating rate that inversely reflects contemporaneous variations in the cost of newly borrowed funds. An inverse floating rate that is not a qualified inverse floating rate may nevertheless be an objective rate. A class of Regular Securities may be issued under this prospectus that does not have a variable rate under the foregoing rules, for example, a class that bears different rates at different times during the period it is outstanding such that it is considered significantly "front-loaded" or "back-loaded" within the meaning of the OID Regulations. It is possible that this type of class may be considered to bear "contingent interest" within the meaning of the OID Regulations. The OID Regulations, as they relate to the treatment of contingent interest, are by their terms not applicable to Regular Securities. However, if final regulations dealing with contingent interest with respect to Regular Securities apply the same principles as the OID Regulations, these regulations may lead to different timing of income inclusion than would be the case under the OID Regulations. Furthermore, application of these principles could lead to the characterization of gain on the sale of contingent interest Regular Securities as ordinary income. Investors should consult their tax advisors regarding the appropriate treatment of any Regular Security that does not pay interest at a fixed rate or variable rate as described in this paragraph.

Under the REMIC Regulations, a Regular Security bearing the following interest rates will qualify as a regular interest in a REMIC:

(1) (a) a rate that qualifies as a variable rate under the OID Regulations that is tied to current values of a variable rate, or

-137-

<Page>

     (b) the highest, lowest or average of two or more variable rates, including a rate based on the average cost of funds of one or more financial institutions, or

     (c) a positive or negative multiple of that rate, plus or minus a specified number of basis points, or that represents a weighted average of rates on some or all of the mortgage loans, including a rate that is subject to one or more caps or floors, or

    (2) one or more variable rates for one or more periods, or one or more fixed rates for one or more periods, and a different variable rate or fixed rate for other periods.

    Accordingly, it is anticipated that the trustee will treat Regular Securities that qualify as regular interests under this rule in the same manner as obligations bearing a variable rate for original issue discount reporting purposes.

    The amount of original issue discount with respect to a Regular Security bearing a variable rate of interest will accrue in the manner described above under "--Original Issue Discount." The yield to maturity and future payments on the Regular Security will generally be determined by assuming that interest will be payable for the life of the Regular Security based on the initial rate or, if different, the value of the applicable variable rate as of the pricing date, for the relevant class. Unless required otherwise by applicable final regulations, it is anticipated that the trustee will treat variable interest as qualified stated interest, other than variable interest on an interest-only or super-premium class, which will be treated as non-qualified stated interest includible in the stated redemption price at maturity. Ordinary income reportable for any period will be adjusted based on subsequent changes in the applicable interest rate index.

    Although unclear under the OID Regulations, unless required otherwise by applicable final regulations, we anticipate that the trustee will treat Regular Securities bearing an interest rate that is a weighted average of the net interest rates on mortgage loans as having qualified stated interest, except to the extent that initial "teaser" rates cause sufficiently "back-loaded" interest to create more than de minimis original issue discount. The yield on Regular Securities for purposes of accruing original issue discount will be a hypothetical fixed rate based on the fixed rate, in the case of fixed rate mortgage loans, and initial "teaser rates" followed by fully indexed rates, in the case of adjustable rate mortgage loans. In the case of adjustable rate mortgage loans, the applicable index used to compute interest on the mortgage loans in effect on the pricing date or possibly the issue date will be deemed to be in effect beginning with the period in which the first weighted average adjustment date occurring after the issue date occurs. Adjustments will be made in each accrual period either increasing or decreasing the amount of ordinary income reportable to reflect the actual Pass-Through Rate on the Regular Securities.

    Market Discount. A purchaser of a Regular Security also may be subject to the market discount rules of Code Sections 1276 through 1278. Under these sections and the principles applied by the OID Regulations in the context of original issue discount, "market discount" is the amount by which the purchaser's original basis in the Regular Security:

    (1) is exceeded by the then-current principal amount of the Regular Security, or

    (2) in the case of a Regular Security having original issue discount, is exceeded by the adjusted issue price of that Regular Security at the time of purchase.

-138-

<Page>

    Any purchaser generally will be required to recognize ordinary income to the extent of accrued market discount on Regular Security as distributions includible in the stated redemption price at maturity of the Regular Securities are received, in an amount not exceeding any distribution. Any market discount would accrue in a manner to be provided in Treasury regulations and should take into account the Prepayment Assumption. The Conference Committee Report to the 1986 Act provides that until the regulations are issued, market discount would accrue either:

    (1) on the basis of a constant interest rate, or

(2) in the ratio of stated interest allocable to the relevant period to the sum of the interest for the period plus the remaining interest as of the end of the period, or in the case of a Regular Security issued with original issue discount, in the ratio of original issue discount accrued for the relevant period to the sum of the original issue discount accrued for the period plus the remaining original issue as of the end of the period.

Any purchaser also generally will be required to treat a portion of any gain on a sale or exchange of the Regular Security as ordinary income to the extent of the market discount accrued to the date of disposition under one of the foregoing methods, less any accrued market discount previously reported as ordinary income as partial distributions in reduction of the stated redemption price at maturity were received. Any purchaser will be required to defer deduction of a portion of the excess of the interest paid or accrued on indebtedness incurred to purchase or carry a Regular Security over the interest distributable on that security. The deferred portion of interest expense in any taxable year generally will not exceed the accrued market discount on the Regular Security for the year. Any deferred interest expense is, in general, allowed as a deduction not later than the year in which the related market discount income is recognized or the Regular Security is disposed of. As an alternative to the inclusion of market discount in income on the foregoing basis, the Regular Securityholder may elect to include market discount in income currently as it accrues on all market discount instruments acquired by the Regular Securityholder in that taxable year or thereafter, in which case the interest deferral rule will not apply. See "--Election to Treat All Interest Under the Constant Yield Method" below regarding an alternative manner in which an election may be deemed to be made.

By analogy to the OID Regulations, market discount with respect to a Regular Security will be considered to be zero if the market discount is less than 0.25% of the remaining stated redemption price at maturity of the Regular Security multiplied by the weighted average maturity of the Regular Security, determined as described in the fourth paragraph under "--Original Issue Discount," remaining after the date of purchase. It appears that de minimis market discount would be reported in a manner similar to de minimis original issue discount. See "--Original Issue Discount" above. Treasury regulations implementing the market discount rules have not yet been issued. Therefore investors should consult their own tax advisors regarding the application of these rules. Investors should also consult Revenue Procedure 92-67 concerning the elections to include market discount in income currently and to accrue market discount on the basis of the constant yield method.

Premium. A Regular Security purchased at a cost greater than its remaining stated redemption price at maturity generally is considered to be purchased at a premium. If the Regular

-139-

<Page>

Securityholder holds a Regular Security as a "capital asset" within the meaning of Code Section 1221, the Regular Securityholder may elect under Code Section 171 to amortize the premium under the constant yield method. This election will apply to all debt obligations acquired by the Regular Securityholder at a premium held in that taxable year or after that taxable year, unless revoked with the permission of the Internal Revenue Service. Final Treasury regulations with respect to amortization of bond premium do not by their terms apply to obligations, such as the Regular Securities, which are prepayable as described in Code Section 1272(a)(6). However, the conference committee report to the 1986 Act indicates a Congressional intent that the same rules that apply to the accrual of market discount on installment obligations will also apply to amortizing bond premium under Code Section 171 on installment obligations such as the Regular Securities. It is unclear whether the alternatives to the constant interest method described above under "--Market Discount" are available. Amortizable bond premium will be treated as an offset to interest income on a Regular Security, rather than as a separate deductible item. See "--Election to Treat All Interest Under the Constant Yield Method" below regarding an alternative manner in which the Code Section 171 election may be deemed to be made.

Election to Treat All Interest Under the Constant Yield Method. A holder of a debt instrument such as a Regular Security may elect to treat all interest that accrues on the instrument using the constant yield method, with none of the interest being treated as qualified stated interest. For purposes of applying the constant yield method to a debt instrument subject to this election:

(1) "interest" includes stated interest, original issue discount, de minimis original issue discount, market discount and de minimis market discount, as adjusted by any amortizable bond premium or acquisition premium and

(2) the debt instrument is treated as if the instrument were issued on the holder's acquisition date in the amount of the holder's adjusted basis immediately after acquisition.

It is unclear whether, for this purpose, the initial Prepayment Assumption would continue to apply or if a new prepayment assumption as of the date of the

holder's acquisition would apply. A holder generally may make this election on an instrument by instrument basis or for a class or group of debt instruments. However, if the holder makes this election with respect to a debt instrument with amortizable bond premium or with market discount, the holder is deemed to have made elections to amortize bond premium or to report market discount income currently as it accrues under the constant yield method, respectively, for all premium bonds held or market discount bonds acquired by the holder in the same taxable year or thereafter. The election is made on the holder's federal income tax return for the year in which the debt instrument is acquired and is irrevocable except with the approval of the Internal Revenue Service. You should consult your own tax advisors regarding the advisability of making this type of an election.

Treatment of Losses. Regular Securityholders will be required to report income with respect to Regular Securities on the accrual method of accounting, without giving effect to delays or reductions in distributions attributable to defaults or delinquencies on the mortgage loans, except to the extent it can be established that those losses are uncollectible. Accordingly, the holder of a Regular Security, particularly a subordinate security, may have income, or may incur a diminution in cash flow as a result of a default or delinquency. However, the holder of a

-140-

<Page>

Regular Security may not be able to take a deduction, subject to the discussion below, for the corresponding loss until a subsequent taxable year. In this regard, investors are cautioned that while they may generally cease to accrue interest income if it reasonably appears that the interest will be uncollectible, the Internal Revenue Service may take the position that original issue discount must continue to be accrued in spite of its uncollectibility until the debt instrument is disposed of in a taxable transaction or becomes worthless in accordance with the rules of Code Section 166.

Under Code Section 166, it appears that Regular Securityholders that are corporations or that otherwise hold the Regular Securities in connection with a trade or business should in general be allowed to deduct as an ordinary loss a loss with respect to principal sustained during the taxable year on account of any Regular Securities becoming wholly or partially worthless. In general, Regular Securityholders that are not corporations and do not hold the Regular Securities in connection with a trade or business should be allowed to deduct as a short-term capital loss any loss sustained during the taxable year on account of a portion of any Regular Securities becoming wholly worthless. Although the matter is not free from doubt, the non-corporate Regular Securityholders should be allowed a bad debt deduction at a time when the principal balance of the Regular Securities is reduced to reflect losses resulting from any liquidated mortgage loans. The Internal Revenue Service, however, could take the position that non-corporate holders will be allowed a bad debt deduction to reflect losses only after all the mortgage loans remaining in the trust fund have been liquidated or the applicable class of Regular Securities has been otherwise retired. The Internal Revenue Service could also assert that losses on the Regular Securities are deductible based on some other method that may defer deductions for all holders, such as reducing future cashflow for purposes of computing original issue discount. This may have the effect of creating "negative" original issue discount which would be deductible only against future original issue discount or otherwise if the class is terminated. Regular Securityholders are urged to consult their own tax advisors regarding the appropriate timing, amount and character of any loss sustained with respect to Regular Securities.

While losses attributable to interest previously reported as income should be deductible as ordinary losses by both corporate and non-corporate holders, the Internal Revenue Service may take the position that losses attributable to accrued original issue discount may only be deducted as capital losses in the case of non-corporate holders who do not hold the Regular Securities in connection with a trade or business. Special loss rules are applicable to banks and thrift institutions, including rules regarding reserves for bad debts. You are advised to consult your tax advisors regarding the treatment of losses on Regular Securities.

Sale or Exchange of Regular Securities. If a Regular Securityholder sells or exchanges a Regular Security, the Regular Securityholder will recognize gain or loss equal to the difference, if any, between the amount received and its adjusted basis in the Regular Security. The adjusted basis of a Regular Security generally will equal

(1) the cost of the Regular Security to the seller,

(2) increased by any original issue discount or market discount previously included in the seller's gross income with respect to the Regular Security and

-141-

<Page>

(3) reduced by amounts included in the stated redemption price at maturity of the Regular Security that were previously received by the seller, by any amortized premium and by any recognized losses.

Except as described above with respect to market discount, and except as provided in this paragraph, any gain or loss on the sale or exchange of a Regular Security realized by an investor who holds the Regular Security as a capital asset will be capital gain or loss and will be long-term or short-term depending on whether the Regular Security has been held for the applicable holding period described below. Gain will be treated as ordinary income:

(1) if a Regular Security is held as part of a "conversion transaction" as defined in Code Section 1258(c), up to the amount of interest that would have accrued on the Regular Security holder's net investment in the conversion transaction at 120% of the appropriate applicable federal rate under Code Section 1274(d) in effect at the time the taxpayer entered into the transaction minus any amount previously treated as ordinary income with respect to any prior disposition of property that was held as part of the transaction,

(2) in the case of a non-corporate taxpayer, to the extent the taxpayer has made an election under Code Section 163(d)(4) to have net capital gains taxed as investment income at ordinary income rates, or

(3) to the extent that the gain does not exceed the excess, if any, of

(a) the amount that would have been includible in the gross income of the holder if its yield on the Regular Security were 110% of the applicable federal rate as of the date of purchase, over

(b) the amount of income actually includible in the gross income of the holder with respect to the Regular Security.

In addition, gain or loss recognized from the sale of a Regular Security by certain banks or thrift institutions will be treated as ordinary income or loss pursuant to Code Section 582(c). Capital gains of non-corporate taxpayers generally are subject to a lower maximum tax rate than ordinary income of those taxpayers for capital assets held for more than one year. The maximum tax rate for corporations is the same with respect to both ordinary income and capital gains.

Holders that recognize a loss on a sale or exchange of a Regular Security for federal income tax purposes in excess of certain threshold amounts should consult their tax advisors as to the need to file IRS Form 8886 (disclosing certain potential tax shelters) on their federal income tax returns.

Taxation of Owners of Residual Securities

Taxation of REMIC Income. Generally, the "daily portions" of REMIC taxable income or net loss will be includible as ordinary income or loss in determining the federal taxable income of holders of Residual Securities, and will not be taxed separately to the REMIC Pool. The daily portions of REMIC taxable income or net loss of a Residual Holder are determined by allocating the REMIC Pool's taxable income or net loss for each calendar quarter ratably to each

-142-

<Page>

day in the quarter and by allocating each daily portion among the Residual Holders in proportion to their respective holdings of Residual Securities in the REMIC Pool on that day. REMIC taxable income is generally determined in the same manner as the taxable income of an individual using the accrual method of accounting, except that:

(1) the limitations on deductibility of investment interest expense and expenses for the production of income do not apply,

(2) all bad loans will be deductible as business bad debts, and

(3) the limitation on the deductibility of interest and expenses related to tax-exempt income will apply.

The REMIC Pool's gross income includes:

(1) interest, original issue discount income and market discount income, if any, on the mortgage loans,

(2) reduced by amortization of any premium on the mortgage loans,

(3) plus income from amortization of issue premium, if any, on the Regular

Securities,

(4) plus income on reinvestment of cash flows and reserve assets, and

(5) plus any cancellation of indebtedness income if realized losses are allocated to the Regular Securities.

The REMIC Pool's deductions include:

(1) interest and original issue discount expense on the Regular Securities,

(2) servicing fees on the mortgage loans,

(3) other administrative expenses of the REMIC Pool, and

(4) realized losses on the mortgage loans.

The requirement that Residual Holders report their pro rata share of taxable income or net loss of the REMIC Pool will continue until there are no securities of any class of the related series outstanding.

The taxable income recognized by a Residual Holder in any taxable year will be affected by, among other factors, the timing of recognition of interest, original issue discount or market discount income or amortization of premium with respect to the mortgage loans, on the one hand, and the timing of deductions for interest, including original issue discount, or income from amortization of issue premium on the Regular Securities, on the other hand. If an interest in the mortgage loans is acquired by the REMIC Pool at a discount, and one or more of the mortgage loans is prepaid, the prepayment may be used in whole or in part to

-143-

<Page>

make distributions in reduction of principal on the Regular Securities. The discount on the mortgage loans which is includible in income may exceed the deduction allowed upon distributions on those Regular Securities on account of any unaccrued original issue discount relating to those Regular Securities. When more than one class of Regular Securities distributes principal sequentially, this mismatching of income and deductions is particularly likely to occur in the early years following issuance of the Regular Securities when distributions in reduction of principal are being made in respect of earlier classes of Regular Securities to the extent that those classes are not issued with substantial discount or are issued at a premium.

If taxable income attributable to a mismatching is realized, in general, losses would be allowed in later years as distributions on the later maturing classes of Regular Securities are made. Taxable income may also be greater in earlier years than in later years as a result of the fact that interest expense deductions, expressed as a percentage of the outstanding principal amount of a series of Regular Securities, may increase over time as distributions in reduction of principal are made on the lower yielding classes of Regular Securities. By contrast, to the extent the REMIC Pool consists of fixed rate mortgage loans, interest income with respect to any given mortgage loan will remain constant over time as a percentage of the outstanding principal amount of that loan. Consequently, Residual Holders must have sufficient other sources of cash to pay any federal, state, or local income taxes due as a result of any mismatching or unrelated deductions against which to offset income, subject to the discussion of "excess inclusions" below under "-- Limitations on Offset or Exemption of REMIC Income." The timing of any mismatching of income and deductions described in this paragraph, if present with respect to a series of securities, may have a significant adverse effect on a Residual Holder's after-tax rate of return.

Basis and Losses. The amount of any net loss of the REMIC Pool that may be taken into account by the Residual Holder is limited to the adjusted basis of the Residual Security as of the close of the quarter, or time of disposition of the Residual Security, if earlier, determined without taking into account the net loss for the quarter. The initial adjusted basis of a purchaser of a Residual Security is the amount paid for the Residual Security. The adjusted basis will be increased by the amount of taxable income of the REMIC Pool reportable by the Residual Holder and will be decreased, but not below zero,

(1) first, by a cash distribution from the REMIC Pool, and

(2) second, by the amount of loss of the REMIC Pool reportable by the Residual Holder.

Any loss that is disallowed on account of this limitation may be carried over indefinitely with respect to the Residual Holder as to whom a loss was disallowed and may be used by the Residual Holder only to offset any income generated by the same REMIC Pool.

A Residual Holder will not be permitted to amortize directly the cost of its Residual Security as an offset to its share of the taxable income of the

related REMIC Pool. However, the taxable income will not include cash received by the REMIC Pool that represents a recovery of the REMIC Pool's basis in its assets. This recovery of basis by the REMIC Pool will have the effect of amortization of the issue price of the Residual Securities over their life. However, in

-144-

<Page>

view of the possible acceleration of the income of Residual Holders described above under "--Taxation of REMIC Income," the period of time over which the issue price is effectively amortized may be longer than the economic life of the Residual Securities.

A Residual Security may have a negative value if the net present value of anticipated tax liabilities exceeds the present value of anticipated cash flows. The REMIC Regulations appear to treat the issue price of a residual interest as zero rather than a negative amount for purposes of determining the REMIC Pool's basis in its assets. Regulations have been issued addressing the federal income tax treatment of "inducement fees" received by transferees of non-economic Residual Securities. These regulations require inducement fees to be included in income over a period reasonably related to the period in which the related Residual Security is expected to generate taxable income or net loss to its holder. Under two safe harbor methods, inducement fees are permitted to be included in income (i) in the same amounts and over the same period that the taxpayer uses for financial reporting purposes, provided that such period is not shorter than the period the REMIC Pool is expected to generate taxable income or (ii) ratably over the remaining anticipated weighted average life of all the regular and residual interests issued by the REMIC Pool, determined based on actual distributions projected as remaining to be made on such interests under the Prepayment Assumption. If the holder of a non-economic Residual Security sells or otherwise disposes of the non-economic residual interest, any unrecognized portion of the inducement fee would be required to be taken into account at the time of the sale or disposition. The regulations also provide that inducement fees constitute income from sources within the United States. Prospective purchasers of the Residual Securities should consult with their tax advisors regarding the effect of these regulations.

Further, to the extent that the initial adjusted basis of a Residual Holder, other than an original holder, in the Residual Security is greater than the corresponding portion of the REMIC Pool's basis in the mortgage loans, the Residual Holder will not recover a portion of that basis until termination of the REMIC Pool unless future Treasury regulations provide for periodic adjustments to the REMIC income otherwise reportable by the holder. The REMIC Regulations currently in effect do not so provide. See "--Treatment of Certain Items of REMIC Income and Expense--Market Discount" below regarding the basis of mortgage loans to the REMIC Pool and "--Sale or Exchange of a Residual Security" below regarding possible treatment of a loss on termination of the REMIC Pool as a capital loss.

Treatment of Certain Items of REMIC Income and Expense. Although it is anticipated that the trustee will compute REMIC income and expense in accordance with the Code and applicable regulations, the authorities regarding the determination of specific items of income and expense are subject to differing interpretations. The depositor makes no representation as to the specific method that will be used for reporting income with respect to the mortgage loans and expenses with respect to the Regular Securities. Different methods could result in different timing or reporting of taxable income or net loss to Residual Holders or differences in capital gain versus ordinary income.

Original Issue Discount and Premium. Generally, the REMIC Pool's deductions for original issue discount and income from amortization of issue premium or the Regular Securities will be determined in the same manner as original issue discount income on Regular Securities as described above under "--Taxation of Owners of Regular Securities -- Original Issue

-145-

<Page>

Discount" and "-- Variable Rate Regular Securities," without regard to the de minimis rule described in this prospectus, and "-- Premium," below.

Market Discount. The REMIC Pool will have market discount income in respect of mortgage loans if, in general, the basis of the REMIC Pool in the mortgage loans is exceeded by their unpaid principal balances. The REMIC Pool's basis in the mortgage loans is generally the fair market value of the mortgage loans immediately after the transfer of the mortgage loans to the REMIC Pool. The REMIC Regulations provide that in the REMIC Pool's basis in the mortgage loans

is equal in the aggregate to the issue prices of all regular and residual interests in the REMIC Pool. The accrued portion of the market discount would be recognized currently as an item of ordinary income in a manner similar to original issue discount. Market discount income generally should accrue in the manner described above under "--Taxation of Owners of Regular Securities--Market Discount."

Premium. Generally, if the basis of the REMIC Pool in the mortgage loans exceeds their unpaid principal balances, the REMIC Pool will be considered to have acquired the mortgage loans at a premium equal to the amount of the excess. As stated above, the REMIC Pool's basis in mortgage loans is the fair market value of the mortgage loans, based on the aggregate of the issue prices of the regular and residual interests in the REMIC Pool immediately after the transfer of the mortgage loans to the REMIC Pool. In a manner analogous to the discussion above under "--Taxation of Owners of Regular Securities--Premium," a person that holds a mortgage loan as a capital asset under Code Section 1221 may elect under Code Section 171 to amortize premium on mortgage loans originated after September 27, 1985 under the constant yield method. Amortizable bond premium will be treated as an offset to interest income on the mortgage loans, rather than as a separate deduction item. Because substantially all of the borrowers on the mortgage loans are expected to be individuals, Code Section 171 will not be available for premium on mortgage loans originated on or prior to September 27, 1985. Premium with respect to those mortgage loans may be deductible in accordance with a reasonable method regularly employed by the holder of the mortgage loans. The allocation of a premium pro rata among principal payments should be considered a reasonable method. However, the Internal Revenue Service may argue that a premium should be allocated in a different manner, such as allocating the premium entirely to the final payment of principal.

Limitations on Offset or Exemption of REMIC Income. A portion or all of the REMIC taxable income includible in determining the federal income tax liability of a Residual Holder will be subject to special treatment. That portion, referred to as the "excess inclusion," is equal to the excess of REMIC taxable income for the calendar quarter allocable to a Residual Security over the daily accruals for each quarterly period of:

(1) 120% of the long-term applicable federal rate that would have applied to the Residual Security if it were a debt instrument on the Startup Day under Code Section 1274(d), multiplied by

(2) the adjusted issue price of the Residual Security at the beginning of each quarterly period.

-146-

<Page>

For this purpose, the adjusted issue price of a Residual Security at the beginning of a quarter is the issue price of the Residual Security, plus the amount of the daily accruals of REMIC income described in this paragraph for all prior quarters, decreased by any distributions made with respect to the Residual Security prior to the beginning of each quarterly period. Accordingly, the portion of the REMIC Pool's taxable income that will be treated as excess inclusions will be a larger portion of income as the adjusted issue price of the Residual Securities diminishes.

The portion of a Residual Holder's REMIC taxable income consisting of the excess inclusions generally may not be offset by other deductions, including net operating loss carryforwards, on the Residual Holder's return. However, net operating loss carryovers are determined without regard to excess inclusion income. Further, if the Residual Holder is an organization subject to the tax on unrelated business income imposed by Code Section 511, the Residual Holder's excess inclusions will be treated as unrelated business taxable income of that Residual Holder for purposes of Code Section 511. In addition, REMIC taxable income is subject to 30% withholding tax with respect to certain persons who are not U.S. Persons and the portion of the REMIC taxable income attributable to excess inclusions is not eligible for any reduction in the rate of withholding tax, by treaty or otherwise. See "--Taxation of Certain Foreign Investors--Residual Securities" below. Finally, if a real estate investment trust or a regulated investment company owns a Residual Security, a portion, allocated under Treasury regulations yet to be issued, of dividends, paid by the real estate investment trust or regulated investment company

(1) could not be offset by net operating losses of its shareholders,

(2) would constitute unrelated business taxable income for tax-exempt shareholders, and

(3) would be ineligible for reduction of withholding to certain persons who are not U.S. Persons.

Alternative minimum taxable income for a Residual Holder is determined without regard to the special rule, discussed above, that taxable income cannot be less than excess inclusions. A Residual Holder's alternative minimum taxable income for a taxable year cannot be less than the excess inclusions for the year. The amount of any alternative minimum tax net operating loss deduction

must be computed without regard to any excess inclusions.

Tax-Related Restrictions on Transfer of Residual Securities. Disqualified Organizations. If any legal or beneficial interest in a Residual Security is transferred to a Disqualified Organization, a tax would be imposed in an amount equal to the product of:

(1) the present value of the total anticipated excess inclusions with respect to a Residual Security for periods after the transfer and

(2) the highest marginal federal income tax rate applicable to corporations.

The REMIC Regulations provide that the anticipated excess inclusions are based on actual prepayment experience to the date of the transfer and projected payments based on the

-147-

<Page>

Prepayment Assumption. The present value rate equals the applicable federal rate under Code Section 1274(d) as of the date of the transfer for a term ending with the last calendar quarter in which excess inclusions are expected to accrue. This rate is applied to the anticipated excess inclusions from the end of the remaining calendar quarters in which they arise to the date of the transfer. This tax generally would be imposed on the transferor of the Residual Security, except that where a transfer is through an agent, including a broker, nominee, or other middleman, for a Disqualified Organization, the tax would instead be imposed on the agent. However, a transferor of a Residual Security would in no event be liable for this tax with respect to a transfer if the transferee furnished to the transferor an affidavit stating that the transferee is not a Disqualified Organization and, as of the time of the transfer, the transferor does not have actual knowledge that the affidavit is false. The tax also may be waived by the Internal Revenue Service if the Disqualified Organization promptly disposes of the Residual Security and the transferor pays income tax at the highest corporate rate on the excess inclusion for the period the Residual Security is actually held by the Disqualified Organization.

In addition, if a "Pass-Through Entity," as defined in the second succeeding paragraph, has excess inclusion income with respect to a Residual Security during a taxable year and a Disqualified Organization is the record holder of an equity interest in that entity, then a tax is imposed on that entity equal to the product of:

(1) the amount of excess inclusions that are allocable to the interest in the Pass-Through Entity during the period that interest is held by the Disqualified Organization, and

(2) the highest marginal federal corporate income tax rate. That tax would be deductible from the ordinary gross income of the Pass-Through Entity for the taxable year.

The Pass-Through Entity would not be liable for the tax if it received an affidavit from the record holder that it is not a Disqualified Organization or stating the holder's taxpayer identification number and, during the period the person is the record holder of the Residual Security, the Pass-Through Entity does not have actual knowledge that the affidavit is false.

If an "electing large partnership," as defined in the immediately succeeding paragraph, holds a Residual Security, all interests in the electing large partnership are treated as held by Disqualified Organizations for purposes of the tax imposed on a Pass-Through Entity by Section 860E(c) of the Code. An exception to this tax, otherwise available to a Pass-Through Entity that is furnished certain affidavits by record holders of interests in the entity and that does not know the affidavits are false, is not available to an electing large partnership.

For these purposes,

(1) "Disqualified Organization" means:

(a) the United States,

(b) any state or political subdivision of the United States or any state,

(c) any foreign government,

-148-

<Page>

(d) any international organization,

(e) any agency or instrumentality of any of the foregoing,

(f) any cooperative organization furnishing electric energy or providing telephone service or persons in rural areas as described in Code Section 1381(a)(2)(C), and

(g) any organization, other than a farmers' cooperative described in Code Section 521, that is exempt from taxation under the Code unless the organization is subject to the tax on unrelated business income imposed by Code Section 511.

However, the term does not include an instrumentality if all of its activities are subject to tax and a majority of its board of directors is not selected by the governmental entity.

(2) "Pass-Through Entity" means any regulated investment company, real estate investment trust, common trust fund, partnership, trust or estate and certain corporations operating on a cooperative basis. Except as may be provided in Treasury regulations, any person holding an interest in a Pass-Through Entity as a nominee for another will, with respect to the interest, be treated as a Pass-Through Entity; and

(3) an "electing large partnership" means any partnership having more than 100 members during the preceding tax year, other than certain service partnerships and commodity pools, which elects to apply certain simplified reporting provisions under the Code.

The applicable agreement with respect to a series will provide that no legal or beneficial interest in a Residual Security may be transferred or registered unless:

(1) the proposed transferee furnished to the transferor and the trustee an affidavit providing its taxpayer identification number and stating that the transferee is the beneficial owner of the Residual Security and is not a Disqualified Organization and is not purchasing the Residual Security on behalf of a Disqualified Organization, i.e., as a broker, nominee or middleman of the Disqualified Organization; and

(2) the transferor provides a statement in writing to the trustee that it has no actual knowledge that the affidavit is false.

Moreover, the related agreement will provide that any attempted or purported transfer in violation of these transfer restrictions will be null and void and will vest no rights in any purported transferee. Each Residual Security with respect to a series will bear a legend referring to the restrictions on transfer. Each Residual Holder will be deemed to have agreed, as a condition of ownership of a Residual Security, to any amendments to the related agreement required under the Code or applicable Treasury regulations to effectuate the foregoing restrictions. Information necessary to compute an applicable excise tax must be furnished to the Internal Revenue Service and to the requesting party within 60 days of the request, and the depositor or the trustee may charge a fee for computing and providing this information.

-149-

<Page>

Noneconomic Residual Interests. The REMIC Regulations would disregard certain transfers of Residual Securities, in which case the transferor would continue to be treated as the owner of the Residual Securities and thus would continue to be subject to tax on its allocable portion of the net income of the REMIC Pool. Under the REMIC Regulations, a transfer of a "noneconomic residual interest," as defined in the following sentence, to a Residual Holder, other than a Residual Holder who is not a U.S. Person, is disregarded for all federal income tax purposes if a significant purpose of the transferor is to impede the assessment or collection of tax. A residual interest in a REMIC, including a residual interest with a positive value at issuance, is a "noneconomic residual interest" unless, at the time of the transfer:

(1) the present value of the expected future distributions on the residual interest at least equals the product of the present value of the anticipated excess inclusions and the highest corporate income tax rate in effect for the year in which the transfer occurs, and

(2) the transferor reasonably expects that the transferee will receive distributions from the REMIC at or after the time at which taxes accrue on the anticipated excess inclusions in an amount sufficient to satisfy the accrued taxes on each excess inclusion.

The anticipated excess inclusions and the present value rate are determined in the same manner as set forth above under "--Disqualified Organizations." The

REMIC Regulations explain that a significant purpose to impede the assessment or collection of tax exists if the transferor, at the time of the transfer, either knew or should have known that the transferee would be unwilling or unable to pay taxes due on its share of the taxable income of the REMIC. A safe harbor is provided if:

(1) the transferor

(a) conducted, at the time of the transfer, a reasonable investigation of the financial condition of the transferee,

(b) found that the transferee historically paid its debts as they came due, and

(c) found no significant evidence to indicate that the transferee would not continue to pay its debts as they came due in the future,

(2) the transferee represents to the transferor that it understands that, as the holder of the non-economic residual interest, the transferee may incur liabilities in excess of any cash flows generated by the interest and that the transferee intends to pay taxes associated with holding the residual interest as they become due, and

(3) the transferee represents to the transferor that it will not cause income from the Residual Security to be attributable to a foreign permanent establishment or fixed base, within the meaning of an applicable income tax treaty, of the transferee or any other person, and the Residual Security, is, in fact, not transferred to such permanent establishment or fixed base, and

-150-

<Page>

(4) one of the following two tests is satisfied: either

(a) the present value of the anticipated tax liabilities associated with holding the noneconomic residual interest does not exceed the sum of:

(i) the present value of any consideration given to the transferee to acquire the interest;

(ii) the present value of the expected future distributions on the interest; and

(iii) the present value of the anticipated tax savings associated with holding the interest as the REMIC generates losses.

For purposes of the computations under this alternative, the transferee is presumed to pay tax at the highest corporate rate (currently 35%) or, in certain circumstances the alternative minimum tax rate. Further, present values generally are computed using a discount rate equal to the short-term federal rate set forth in Section 1274(d) of the Code, for the month of such transfer and the compounding period used by the transferee; or

(b) (i) the transferee must be a domestic "C" corporation (other than a corporation exempt from taxation or a regulated investment company or real estate investment trust) that meets certain gross and net asset tests (generally, $100 million of gross assets and $10 million of net assets for the current year and the two preceding fiscal years);

(ii) the transferee must agree in writing that it will transfer the residual interest only to a subsequent transferee that is an eligible corporation and meets the requirements for a safe harbor transfer; and

(iii) the facts and circumstances known to the transferor on or before the date of the transfer must not reasonably indicate that the taxes associated with ownership of the residual interest will not be paid by the transferee.

Because these rules are not mandatory but would provide safe harbor protection, the related pooling and servicing agreement will not require that clause (a) or (b) be met as a condition to transfer of a Residual Security. Holders of Residual Securities are advised to consult their tax advisors as to whether or in what amount any such payment should be make upon transfer thereof.

Foreign Investors. The REMIC Regulations provide that the transfer of a Residual Security that has "tax avoidance potential" to a "foreign person" will be disregarded for all federal tax purposes. This rule appears intended to apply to a transferee who is not a U.S. Person, unless that transferee's income is effectively connected with the conduct of a trade or business within the United States. A Residual Security is deemed to have tax avoidance potential unless, at the time of the transfer:

-151-

<Page>

(1) the future value of expected distributions equals at least 30% of the anticipated excess inclusions after the transfer, and

(2) the transferor reasonably expects that the transferee will receive sufficient distributions from the REMIC Pool at or after the time at which the excess inclusions accrue and prior to the end of the next succeeding taxable year for the accumulated withholding tax liability to be paid.

If the non-U.S. Person transfers the Residual Security back to a U.S. Person, the transfer will be disregarded and the foreign transferor will continue to be treated as the owner unless arrangements are made so that the transfer does not have the effect of allowing the transferor to avoid tax on accrued excess inclusions.

The prospectus supplement relating to the securities of a series may provide that a Residual Security may not be purchased by or transferred to any person that is not a U.S. Person or may describe the circumstances and restrictions pursuant to which a transfer may be made.

Sale or Exchange of a Residual Security. If the sale or exchange of a Residual Security occurs, the Residual Holder will recognize gain or loss equal to the excess, if any, of the amount realized over the adjusted basis, as described above under "--Taxation of Owners of Residual Securities--Basis and Losses," of a Residual Holder in a Residual Security at the time of the sale or exchange. In addition to reporting the taxable income of the REMIC Pool, a Residual Holder will have taxable income to the extent that any cash distribution to it from the REMIC Pool exceeds the adjusted basis on that distribution date. Income will be treated as gain from the sale or exchange of the Residual Holder's Residual Security. As a result, if the Residual Holder has an adjusted basis in its Residual Security remaining when its interest in the REMIC Pool terminates, and if it holds the Residual Security as a capital asset under Code Section 1221, then it will recognize a capital loss at that time in the amount of the remaining adjusted basis.

Any gain on the sale of a Residual Security will be treated as ordinary income

(1) if a Residual Security is held as part of a "conversion transaction" as defined in Code Section 1258(c), up to the amount of interest that would have accrued on the Residual Holder's net investment in the conversion transaction at 120% of the appropriate applicable federal rate in effect at the time the taxpayer entered into the transaction minus any amount previously treated as ordinary income with respect to any prior disposition of property that was held as a part of the transaction or

(2) in the case of a non-corporate taxpayer, to the extent that taxpayer has made an election under Code Section 163(d)(4) to have net capital gains taxed as investment income at ordinary income rates.

In addition, gain or loss recognized from the sale of a Residual Security by certain banks or thrift institutions will be treated as ordinary income or loss pursuant to Code Section 582(c).

The conference committee report to the 1986 Act provides that, except as provided in Treasury regulations yet to be issued, the wash sale rules of Code Section 1091 will apply to dispositions of Residual Securities. These wash sale rules will apply where the seller of the

-152-

<Page>

Residual Security, during the period beginning six months before the sale or disposition of the Residual Security and ending six months after the sale or disposition of the Residual Security, acquires, or enters into any other transaction that results in the application of Code Section 1091, any residual interest in any REMIC or any interest in a "taxable mortgage pool," such as a non-REMIC owner trust, that is economically comparable to a Residual Security.

Mark to Market Regulations. Regulations under Code Section 475 relating to the requirement that a securities dealer mark to market securities held for sale to customers provide that a Residual Security is not treated as a security and thus may not be marked to market.

Taxes That May Be Imposed on the REMIC Pool

Prohibited Transactions. Income from certain transactions by the REMIC

Pool, called prohibited transactions, will not be part of the calculation of income or loss includible in the federal income tax returns of Residual Holders, but rather will be taxed directly to the REMIC Pool at a 100% rate. Prohibited transactions generally include:

(1) the disposition of a qualified mortgage other than for:

(a) substitution within two years of the Startup Day for a defective, including a defaulted, obligation, or repurchase in lieu of substitution of a defective, including a defaulted, obligation at any time, or for any qualified mortgage within three months of the Startup Day,

(b) foreclosure, default, or imminent default of a qualified mortgage,

(c) bankruptcy or insolvency of the REMIC Pool, or

(d) a qualified (complete) liquidation,

(2) the receipt of income from assets that are not the type of mortgages or investments that the REMIC Pool is permitted to hold,

(3) the receipt of compensation for services, or

(4) the receipt of gain from disposition of cash flow investments other than pursuant to a qualified liquidation.

Regardless of clauses (1) and (4) above, it is not a prohibited transaction to sell REMIC Pool property to prevent a default on Regular Securities as a result of a default on qualified mortgages or to facilitate a clean-up call --generally, an optional termination to save administrative costs when no more than a small percentage of the securities is outstanding. The REMIC Regulations indicate that the modification of a mortgage loan generally will not be treated as a disposition if it is occasioned by

(1) a default or reasonably foreseeable default,

(2) an assumption of the mortgage loan,

-153-


<Page>


(3) the waiver of a due-on-sale or due-on-encumbrance clause, or

(4) the conversion of an interest rate by a borrower pursuant to the terms of a convertible adjustable rate mortgage loan.

Contributions to the REMIC Pool After the Startup Day. In general, the REMIC Pool will be subject to a tax at a 100% rate on the value of any property contributed to the REMIC Pool after the Startup Day. Exceptions are provided for cash contributions to the REMIC Pool

(1) during the three months following the Startup Day,

(2) made to a qualified Reserve Fund by a Residual Holder,

(3) in the nature of a guarantee,

(4) made to facilitate a qualified liquidation or clean-up call, and

(5) as otherwise permitted in Treasury regulations yet to be issued. We do not anticipate that there will be any contributions to the REMIC Pool after the Startup Day.

Net Income from Foreclosure Property. The REMIC Pool will be subject to federal income tax at the highest corporate rate on "net income from foreclosure property," determined by reference to the rules applicable to real estate investment trusts. Generally, property acquired by deed in lieu of foreclosure would be treated as "foreclosure property" until the close of the third calendar year following the year of acquisition, with a possible extension. Net income from foreclosure property generally means gain from the sale of a foreclosure property that is inventory property and gross income from foreclosure property other than qualifying rents and other qualifying income for a real estate investment trust. We do not anticipate that the REMIC Pool will have any taxable net income from foreclosure property.

Liquidation of the REMIC Pool

If a REMIC Pool adopts a plan of complete liquidation, within the meaning of Code Section 860F(a)(4)(A)(i), which may be accomplished by designating in the REMIC Pool's final tax return a date on which the adoption is deemed to occur, and sells all of its assets, other than cash, within a 90-day period beginning on that date, the REMIC Pool will not be subject to the prohibited transaction rules on the sale of its assets, provided that the REMIC Pool credits or distributes in liquidation all of the sale proceeds plus its cash, other than amounts retained to meet claims, to holders of Regular Securities and

Residual Holders within the 90-day period.

Administrative Matters

The REMIC Pool will be required to maintain its books on a calendar year basis and to file federal income tax returns for federal income tax purposes in a manner similar to a partnership. The form for the income tax return is Form 1066, U.S. Real Estate Mortgage Investment Conduit REMIC Income Tax Return. The trustee will be required to sign the REMIC Pool's returns. Treasury regulations provide that, except where there is a single Residual Holder for an entire taxable year, the REMIC Pool will be subject to the procedural and administrative

-154-

<Page>

rules of the Code applicable to partnerships, including the determination by the Internal Revenue Service of any adjustments to, among other things, items of REMIC income, gain, loss, deduction, or credit in a unified administrative proceeding. The master servicer will be obligated to act as "tax matters person," as defined in applicable Treasury regulations, with respect to the REMIC Pool as agent of the Residual Holder holding the largest percentage interest in the Residual Securities. If the Code or applicable Treasury regulations do not permit the master servicer to act as tax matters person in its capacity as agent of the Residual Holder, the Residual Holder or the other person specified pursuant to Treasury regulations will be required to act as tax matters person.

Limitations on Deduction of Certain Expenses

An investor who is an individual, estate, or trust will be subject to limitation with respect to certain itemized deductions described in Code Section 67, to the extent that these itemized deductions, in the aggregate, do not exceed 2% of the investor's adjusted gross income. In addition, Code Section 68 provides that itemized deductions otherwise allowable for a taxable year of an individual taxpayer will be reduced by the lesser of:

(1) 3% of the excess, if any, of adjusted gross income over a threshold amount adjusted annually for inflation, or

(2) 80% of the amount of itemized deductions otherwise allowable for the year.

However, the Code Section 68 reduction of allowable itemized deductions will be phased out beginning in 2006 and eliminated after 2009.

In the case of a REMIC Pool, these deductions may include deductions under Code Section 212 for the Servicing Fee and all administrative and other expenses relating to the REMIC Pool, or any similar expenses allocated to the REMIC Pool with respect to a regular interest it holds in another REMIC. These investors who hold REMIC Securities either directly or indirectly through certain Pass-Through Entities may have their pro rata share of expenses allocated to them as additional gross income, but may be subject to a limitation on deductions. In addition, these expenses are not deductible at all for purposes of computing the alternative minimum tax, and may cause investors of this type to be subject to significant additional tax liability. Temporary Treasury regulations provide that the additional gross income and corresponding amount of expenses generally are to be allocated entirely to the holders of Residual Securities in the case of a REMIC Pool that would not qualify as a fixed investment trust in the absence of a REMIC election. However, this additional gross income and limitation on deductions will apply to the allocable portion of these expenses to holders of Regular Securities, as well as holders of Residual Securities, where Regular Securities are issued in a manner that is similar to pass-through certificates in a fixed investment trust. Generally, all these expenses will be allocable to the Residual Securities. In general, the allocable portion will be determined based on the ratio that a REMIC Holder's income, determined on a daily basis, bears to the income of all holders of Regular Securities and Residual Securities with respect to a REMIC Pool. As a result, individuals, estates or trusts holding REMIC Securities, either directly or indirectly through a grantor trust, partnership, S corporation, REMIC, or certain other Pass-Through Entities described in the foregoing temporary Treasury regulations, may have taxable

-155-

<Page>

income in excess of the interest income at the pass-through rate on Regular Securities that are issued in a single class or otherwise consistently with

fixed investment trust status or in excess of cash distributions for the related period on Residual Securities.

Taxation of Certain Foreign Investors

Regular Securities. Interest, including original issue discount, distributable to Regular Securityholders who are non-resident aliens, foreign corporations, or other non-U.S. Persons, will be considered "portfolio interest" and, therefore, generally will not be subject to 30% United States withholding tax, provided that the non-U.S. Person:

(1) is not a "10-percent shareholder" within the meaning of Code Section 871(h)(3)(B) or a controlled foreign corporation described in Code Section 881(c)(3)(C), and

(2) provides the trustee, or the person who would otherwise be required to withhold tax from the distributions under Code Section 1441 or 1442, with an appropriate statement, signed under penalties of perjury, identifying the beneficial owner and stating, among other things, that the beneficial owner of the Regular Security is a non-U.S. Person.

If the signed statement, or any other required statement, is not provided, 30% withholding will apply unless reduced or eliminated pursuant to an applicable tax treaty or unless the interest on the Regular Security is effectively connected with the conduct of a trade or business within the United States by the non-U.S. Person. In the latter case, the non-U.S. Person will be subject to United States federal income tax at regular rates.

In the case of Regular Securities held by a foreign partnership, Treasury Regulations require that:

(1) the certification described above be provided by the partners rather than by the foreign partnership and

(2) the partnership provide certain information, including a United States taxpayer identification number.

In addition, a look-through rule applies in the case of tiered partnerships. Investors who are non-U.S. Persons should consult their own tax advisors regarding the specific tax consequences to them of owning a Regular Security and the certification requirements of the Code and Regulations.

Residual Securities. The Conference Committee Report to the 1986 Act indicates that amounts paid to Residual Holders who are non-U.S. Persons generally should be treated as interest for purposes of the 30%, or lower treaty rate, United States withholding tax. Treasury regulations provide that amount distributed to Residual Holders may qualify as "portfolio interest," subject to the conditions described in "Regular Securities" above, but only to the extent that:

(1) the mortgage loans were issued after July 18, 1984 and

-156-

<Page>

(2) the trust fund or segregated pool of assets in that trust fund, as to which a separate REMIC election will be made, to which the Residual Security relates, consists of obligations issued in "registered form" within the meaning of Code Section 163(f)(1).

Generally, mortgage loans will not be, but regular interests in another REMIC Pool will be, considered obligations issued in registered form. Furthermore, Residual Holders will not be entitled to any exemption from the 30% withholding tax, or lower treaty rate to the extent of that portion of REMIC taxable income that constitutes an "excess inclusion." See "--Taxation of Owners of Residual Securities--Limitations on Offset or Exemption of REMIC Income" in this prospectus. If the amounts paid to Residual Holders who are non-U.S. Persons are effectively connected with the conduct of a trade or business within the United States by non-U.S. Persons, 30% or lower treaty rate withholding will not apply. Instead, the amounts paid to the non-U.S. Persons will be subject to United States federal income tax at regular rates. If 30% or lower treaty rate withholding is applicable, those amounts generally will be taken into account for purposes of withholding only when paid or otherwise distributed, or when the Residual security is disposed of, under rules similar to withholding upon disposition of debt instruments that have original issue discount. See "--Tax-Related Restrictions on Transfer of Residual Securities--Foreign Investors" above concerning the disregard of certain transfers having "tax avoidance potential." Investors who are non-U.S. Persons should consult their own tax advisors regarding the specific tax consequences to them of owning Residual Securities.

Backup Withholding

Distributions made on the Regular Securities, and proceeds from the sale of the Regular Securities to or through certain brokers, may be subject to a

*backup* withholding tax under Code Section 3406 of 28% (which rate will be increased to 31% after 2010) on *reportable payments.* Reportable payments include interest distributions, original issue discount, and, under certain circumstances, principal distributions, unless the Regular Holder complies with certain reporting and/or certification procedures. These reporting and/or certification procedures include the provision of its taxpayer identification number to the trustee, its agent or the broker who effected the sale of the Regular Security, or the holder is otherwise an exempt recipient under applicable provisions of the Code. Any amounts to be withheld from distribution on the Regular Securities would be refunded by the Internal Revenue Service or allowed as a credit against the Regular Holder's federal income tax liability. The New Regulations change certain of the rules relating to certain presumptions relating to information reporting and backup withholding. Investors are urged to contact their own tax advisors regarding the application to them of backup withholding and information reporting.

Reporting Requirements

     Reports of accrued interest, original issue discount and information necessary to compute the accrual of market discount will be made annually to the Internal Revenue Service and to individuals, estates, non-exempt and non-charitable trusts, and partnerships who are either holders of record of Regular Securities or beneficial owners who own Regular Securities through a broker or middleman as nominee. All brokers, nominees and all other non-exempt holders of record of Regular Securities, including

                              -157-

<Page>

          o    corporations,

          o    non-calendar year taxpayers,

          o    securities or commodities dealers,

          o    real estate investment trusts,

          o    investment companies,

          o    common trust funds,

          o    thrift institutions and

          o    charitable trusts,

may request information for any calendar quarter by telephone or in writing by contacting the person designated in Internal Revenue Service Publication 938 with respect to a particular series of Regular Securities. Holders through nominees must request information from the nominee.

     The Internal Revenue Service's Form 1066 has an accompanying Schedule Q, Quarterly Notice to Residual Interest Holders of REMIC Taxable Income or Net Loss Allocation.

     Treasury regulations require that Schedule Q be furnished by the REMIC Pool to each Residual Holder by the end of the month following the close of each calendar quarter --41 days after the end of a quarter under proposed Treasury regulations-- in which the REMIC Pool is in existence. Treasury regulations require that, in addition to the foregoing requirements, information must be furnished quarterly to Residual Holders, furnished annually, if applicable, to holders of Regular Securities, and filed annually with the Internal Revenue Service concerning Code Section 67 expenses as, as described under "--Limitations on Deduction of Certain Expenses" above, allocable to the holders. Furthermore, under the regulations, information must be furnished quarterly to Residual Holders, furnished annually to holders of Regular Securities, and filed annually with the Internal Revenue Service concerning the percentage of the REMIC Pool's assets meeting the qualified asset tests described above under "--Characterization of Investments in REMIC Securities."

                         Grantor Trust Funds

Classification of Grantor Trust Funds

     With respect to each series of Grantor Trust Securities, Tax Counsel will deliver an opinion. The opinion will be to the effect that, assuming compliance with all provisions of the applicable agreement, the related Grantor Trust Fund will be classified as a grantor trust under subpart E, part I of subchapter J of Chapter 1 of Subtitle A of the Code and not as a partnership, an association taxable as a corporation, or a taxable mortgage pool" within the meaning of Code Section 7701(i). Accordingly, each holder of a Grantor Trust Security generally will be treated as the beneficial owner of an undivided interest in the mortgage loans included in the Grantor Trust Fund.

                              -158-

<Page>


Standard Securities

     General. Where there is no Retained Interest with respect to the mortgage
loans underlying the securities of a series, and where these securities are not
designated as "Stripped Securities," the holder of each security in the series,
referred to in this Prospectus as "Standard Securities," will be treated as the
owner of a pro rata undivided interest in the ordinary income and corpus
portions of the Grantor Trust Fund represented by its Standard Security. As a
result, the holder of these securities will be considered the beneficial owner
of a pro rata undivided interest in each of the mortgage loans, subject to the
discussion below under "--Recharacterization of Servicing Fees." Accordingly,
the holder of a Standard Security of a particular series will be required to
report on its federal income tax return, in accordance with the holder's method
of accounting, its pro rata share of the entire income from the mortgage loans
represented by its Standard Security, including:

     (1) interest at the coupon rate on the mortgage loans,

     (2) original issue discount, if any,

     (3) prepayment fees,

     (4) assumption fees, and

     (5) late payment charges received by the servicer.

     A holder of securities generally will be able to deduct its share of the
servicing fee and all administrative and other expenses of the trust fund in
accordance with its method of accounting, provided that the amounts are
reasonable compensation for services rendered to that Grantor Trust Fund.
However, investors who are individuals, estates or trusts who own securities,
either directly or indirectly through certain pass-through entities, will be
subject to limitation with respect to certain itemized deductions described in
Code Section 67, including deductions under Code Section 212 for the servicing
fee and all administrative and other expenses of the Grantor Trust Fund, to the
extent that the deductions, in the aggregate, do not exceed two percent of an
investor's adjusted gross income. In addition, Code Section 68 provides that
itemized deductions otherwise allowable for a taxable year of an individual
taxpayer will be reduced by the lesser of:

     (1) 3% of the excess, if any, of adjusted gross income over a threshold
amount adjusted annually for inflation, or

     (2) 80% of the amount of itemized deductions otherwise allowable for that
year.

However, the Code Section 68 reduction of allowable itemized deductions will be
phased out beginning in 2006 and eliminated after 2009.

As a result, investors holding Standard Securities, directly or indirectly
through a Pass-Through Entity, may have aggregate taxable income in excess of
the aggregate amount of cash received on those Standard Securities with respect
to interest at the pass-through rate or as discount income on those Standard
Securities. In addition, the expenses are not deductible at all for purposes of
computing the alternative minimum tax, and may cause the investors to be subject
to

                              -159-


<Page>


significant additional tax liability. Moreover, where there is Retained Interest
with respect to the mortgage loans underlying a series of securities or where
the servicing fees are in excess of reasonable servicing compensation, the
transaction will be subject to the application of the "stripped bond" and
"stripped coupon" rules of the Code, as described below under "--Stripped
Securities" and "--Recharacterization of Servicing Fees," respectively.

     Tax Status. Tax Counsel has advised the depositor that:

     (1) A Standard Security owned by a "domestic building and loan association"
within the meaning of Code Section 7701(a)(19) will be considered to represent
"loans. . . secured by an interest in real property which is. . . residential
real property" within the meaning of Code Section 7701(a)(19)(C)(v), provided
that the real property securing the mortgage loans represented by that Standard
Security is of the type described in that section of the Code.

     (2) A Standard Security owned by a real estate investment trust will be

considered to represent "real estate assets" within the meaning of Code Section 856(c)(5)(B) to the extent that the assets of the related Grantor Trust Fund consist of qualified assets. Interest income on the assets will be considered "interest on obligations secured by mortgages on real property" to that extent within the meaning of Code Section 856(c)(3)(B).

(3) A Standard Security owned by a REMIC will be considered to represent an "obligation, including any participation or certificate of beneficial ownership in the REMIC, which is principally secured by an interest in real property" within the meaning of Code Section 860G(a)(3)(A) to the extent that the assets of the related Grantor Trust Fund consist of "qualified mortgages" within the meaning of Code Section 860G(a)(3).

(4) A Standard Security owned by a "financial asset securitization investment trust" within the meaning of Code Section 860L(a) will be considered to represent "permitted assets" within the meaning of Code Section 860L(c) to the extent that the assets of related Grantor Trust Fund consist of "debt instruments" or other permitted assets within the meaning of Code Section 860L(c).

Premium and Discount. We advise you to consult with your tax advisors as to the federal income tax treatment of premium and discount arising either at the time of initial issuance of Standard Securities or subsequent acquisition.

Premium. The treatment of premium incurred at the time of the purchase of a Standard Security will be determined generally as described above under "--REMICs--Taxation of Owners of Residual Securities --Premium."

Original Issue Discount. The original issue discount rules of Code Section 1271 through 1275 will be applicable to a holder's interest in those mortgage loans as to which the conditions for the application of those sections are met. Rules regarding periodic inclusion of original issue discount income are applicable to mortgages of corporations originated after May 27, 1969, mortgages of noncorporate borrowers, other than individuals, originated after July 1, 1982, and mortgages of individuals originated after March 2, 1984. Under the OID Regulations, an original issue discount could arise by the charging of points by the originator of the mortgages in an amount greater than the statutory de minimis exception, including a payment of points that is

-160-


<Page>


currently deductible by the borrower under applicable Code provisions or, under certain circumstances, by the presence of "teaser" rates on the mortgage loans. See "--Stripped Securities" below regarding original issue discount on Stripped Securities.

Original issue discount generally must be reported as ordinary gross income as it accrues under a constant interest method that takes into account the compounding of interest, in advance of the cash attributable to the income. Unless indicated otherwise in the related prospectus supplement, no prepayment assumption will be assumed for purposes of the accrual. However, Code Section 1272 provides for a reduction in the amount of original issue discount includible in the income of a holder of an obligation that acquires the obligation after its initial issuance at a price greater than the sum of the original issue price and the previously accrued original issue discount, less prior payments of principal. Accordingly, if the mortgage loans acquired by a holder of securities are purchased at a price equal to the then unpaid principal amount of those mortgage loans, no original issue discount attributable to the difference between the issue price and the original principal amount of those mortgage loans, i.e., points, will be includible by the related holder.

Market Discount. Holders of securities also will be subject to the market discount rules to the extent that the conditions for application of those sections are met. Market discount on the mortgage loans will be determined and will be reported as ordinary income generally in the manner described above under "--REMICs -- Taxation of Owners of Regular Securities -- Market Discount," except that the ratable accrual methods described in those sections will not apply. Rather, the holder will accrue market discount pro rata over the life of the mortgage loans, unless the constant yield method is elected. The related prospectus supplement will specify what, if any, prepayment assumption will be assumed for purposes of accrual.

Recharacterization of Servicing Fees. If the servicing fees paid to a servicer were deemed to exceed reasonable servicing compensation, the amount of excess would represent neither income nor a deduction to holders of securities. In this regard, there are no authoritative guidelines for federal income tax purposes as to either the maximum amount of servicing compensation that may be considered reasonable in the context of this or similar transactions or whether, in the case of Standard Securities, the reasonableness of servicing compensation should be determined on a weighted average or loan-by-loan basis. If a loan-by-loan basis is appropriate, the likelihood that the applicable amount would exceed reasonable servicing compensation as to some of the mortgage loans would be increased. Internal Revenue Service guidance indicates that a servicing fee in excess of reasonable compensation --"excess servicing"-- will cause the

mortgage loans to be treated under the "stripped bond" rules. This guidance provides safe harbors for servicing deemed to be reasonable and requires taxpayers to demonstrate that the value of servicing fees in excess of these applicable amounts is not greater than the value of the services provided.

Accordingly, if the Internal Revenue Service's approach is upheld, a Servicer who receives a servicing fee in excess of those amounts would be viewed as retaining an ownership interest in a portion of the interest payments on the mortgage loans. Under the rules of Code Section 1286, the separation of ownership of the right to receive some or all of the interest payments on an obligation from the right to receive some or all of the principal payments on the obligation would result in treatment of those mortgage loans as "stripped coupons" and "stripped

-161-

<Page>

bonds." Subject to the de minimis rule discussed below under "--Stripped Securities," each stripped bond or stripped coupon could be considered for this purpose as a non-interest bearing obligation issued on the date of issue of the Standard Securities, and the original issue discount rules of the Code would apply to the holder of those securities. While holders of securities would still be treated as owners of beneficial interests in a grantor trust for federal income tax purposes, the corpus of the trust could be viewed as excluding the portion of the mortgage loans the ownership of which is attributed to the servicer, or as including the portion as a second class of equitable interest. Applicable Treasury regulations treat an arrangement of this type as a fixed investment trust, since the multiple classes of trust interests should be treated as merely facilitating direct investments in the trust assets and the existence of multiple classes of ownership interests is incidental to that purpose. In general, a recharacterization should not have any significant effect on the timing or amount of income reported by a holder of securities, except that the income reported by a cash method holder may be slightly accelerated. See "--Stripped Securities" below for a further description of the federal income tax treatment of stripped bonds and stripped coupons.

Sale or Exchange of Standard Securities. If a sale or exchange of a Standard Security occurs, a holder of securities will recognize gain or loss equal to the difference between the amount realized on the sale and its aggregate adjusted basis in the mortgage loans and other assets represented by the security. In general, the aggregate adjusted basis will equal the holder's cost for the Standard Security, exclusive of accrued interest, increased by the amount of any income previously reported with respect to the Standard Security and decreased by the amount of any losses previously reported with respect to the Standard Security and the amount of any distributions other than accrued interest received on those securities. Except as provided above with respect to market discount on any mortgage loans, and except for certain financial institutions subject to the provisions of Code Section 582(c), any gain or loss generally would be capital gain or loss if the Standard Security was held as a capital asset. However, gain on the sale of a Standard Security will be treated as ordinary income:

(1) if a Standard Security is held as part of a "conversion transaction" as defined in Code Section 1258(c), up to the amount of interest that would have accrued on the holder's net investment in the conversion transaction at 120% of the appropriate applicable federal rate in effect at the time the taxpayer entered into the transaction minus any amount previously treated as ordinary income with respect to any prior disposition of property that was held as part of that transaction or

(2) in the case of a non-corporate taxpayer, to the extent the taxpayer has made an election under Code Section 163(d)(4) to have net capital gains taxed as investment income at ordinary income rates.

Capital gains of noncorporate taxpayers generally are subject to a lower maximum tax rate than ordinary income of the taxpayers for capital assets held for more than one year. The maximum tax rate for corporations is the same with respect to both ordinary income and capital gains.

Holders that recognize a loss on a sale or exchange of a Standard Security for federal income tax purposes in excess of certain threshold amounts should consult their tax advisors as

-162-

<Page>

to the need to file IRS Form 8886 (disclosing certain potential tax shelters) on their federal income tax returns.

Stripped Securities

General. Pursuant to Code Section 1286, the separation of ownership of the right to receive some or all of the principal payments on an obligation from ownership of the right to receive some or all of the interest payments results in the creation of "stripped bonds" with respect to principal payments and "stripped coupons" with respect to interest payments. For purposes of this discussion, securities that are subject to those rules will be referred to as "Stripped Securities." The securities will be subject to those rules if:

(1) the Depositor or any of its affiliates retains, for its own account or for purposes of resale, in the form of Retained Interest, or otherwise, an ownership interest in a portion of the payments on the mortgage loans,

(2) the depositor or any of its affiliates is treated as having an ownership interest in the mortgage loans to the extent it is paid or retains servicing compensation in an amount greater than reasonable consideration for servicing the mortgage loans (see "--Standard Securities -- Recharacterization of Servicing Fees"), and

(3) a class of securities are issued in two or more classes or subclasses representing the right to non-pro-rata percentages of the interest and principal payments on the mortgage loans.

In general, a holder of a Stripped Security will be considered to own "stripped bonds" with respect to its pro rata share of all or a portion of the principal payments on each mortgage loan and/or "stripped coupons" with respect to its pro rata share of all or a portion of the interest payments on each mortgage loan, including the Stripped Security's allocable share of the servicing fees paid to a servicer, to the extent that those fees represent reasonable compensation for services rendered. See the discussion above under "--Standard Securities--Recharacterization of Servicing Fees." Although not free from doubt, for purposes of reporting to holders of Stripped Securities, the servicing fees will be allocated to the classes of Stripped Securities in proportion to the distributions to the classes for the related period or periods. The holder of a Stripped Security generally will be entitled to a deduction each year in respect of the servicing fees, as described above under "--Standard Securities--General," subject to the limitation described in that section.

Code Section 1286 treats a stripped bond or a stripped coupon generally as an obligation issued on the date that the stripped interest is purchased. Although the treatment of Stripped Securities for federal income tax purposes is not clear in certain respects, particularly where Stripped Securities are issued with respect to a mortgage pool containing variable-rate mortgage loans, the depositor has been advised by counsel that:

(1) the Grantor Trust Fund will be treated as a grantor trust under subpart E, Part I of subchapter J of Chapter 1 of Subtitle A the Code and not as an association taxable as a corporation or a "taxable mortgage pool" within the meaning of Code Section 7701(i), and

-163-

<Page>

(2) each Stripped Security should be treated as a single installment obligation for purposes of calculating original issue discount and gain or loss on disposition.

This treatment is based on the interrelationship of Code Section 1286, Code Sections 1272 through 1275, and the OID Regulations. Although it is possible that computations with respect to Stripped Securities could be made in one of the ways described below under "--Possible Alternative Characterizations," the OID Regulations state, in general, that two or more debt instruments issued by a single issuer to a single investor in a single transaction should be treated as a single debt instrument. Accordingly, for original issue discount purposes, all payments on any Stripped Securities should be aggregated and treated as though they were made on a single debt instrument. The applicable agreement will require that the trustee make and report all computations described below using this aggregate approach, unless substantial legal authority requires otherwise.

Furthermore, Treasury regulations provide for treatment of a Stripped Security as a single debt instrument issued on the date it is purchased for purposes of calculating any original issue discount. In addition, under those regulations, a Stripped Security that represents a right to payments of both interest and principal may be viewed either as issued with original issue discount or market discount, as described below, at a de minimis original issue discount, or, presumably, at a premium. This treatment indicates that the interest component of a Stripped Security of this type would be treated as qualified stated interest under the OID Regulations, assuming it is not an interest-only or super-premium Stripped Security. Further, these regulations provide that the purchaser of a Stripped Security will be required to account for any discount as market discount rather than original issue discount if either:

(1) the initial discount with respect to the Stripped Security was treated as zero under the de minimis rule, or

(2) no more than 100 basis points in excess of reasonable servicing is stripped off the related mortgage loans. Any market discount would be reportable as described above under "--REMICs--Taxation of Owners of Regular Securities--Market Discount," without regard to the de minimis rule described in this prospectus, assuming that a prepayment assumption is employed in that computation.

Status of Stripped Securities. No specific legal authority exists as to whether the character of the Stripped Securities, for federal income tax purposes, will be the same as that of the mortgage loans. Although the issue is not free from doubt, counsel has advised the depositor that Stripped Securities owned by applicable holders should be considered to represent

(1) "real estate assets" within the meaning of Code Section 856(c)(4)(A),

(2) "obligation[s]. . . principally secured by an interest in real property" within the meaning of Code Section 860G(a)(3)(A), and

(3) "loans. . . secured by an interest in real property" within the meaning of Code Section 7701(a)(19)(C)(v).

-164-

<Page>

Interest including original issue discount income attributable to Stripped Securities should be considered to represent "interest on obligations secured by mortgages on real property" within the meaning of Code Section 856(c)(3)(B), provided that in each case the mortgage loans and interest on those mortgage loans qualify for this tax treatment. See "--Standard Securities -- Tax Status" above.

Taxation of Stripped Securities. Original Issue Discount. Except as described above under "General," each Stripped Security will be considered to have been issued at an original issue discount for federal income tax purposes. Original issue discount with respect to a Stripped Security must be included in ordinary income as it accrues, in accordance with a constant yield method that takes into account the compounding of interest, which may be prior to the receipt of the cash attributable to that income. Based in part on the issue discount required to be included in the income of a holder of a Stripped Security in any taxable year likely will be computed generally as described above under "--REMICs--Taxation of Owner of Regular Securities -- Original Issue Discount" and "-- Variable Rate Regular Securities." However, with the apparent exception of a Stripped Security qualifying as a market discount obligation as described above under "-- General," the issue price of a Stripped Security will be the purchase price paid by each holder of the Stripped Security. The stated redemption price at maturity will include the aggregate amount of the payments to be made on the Stripped Security to the holder of securities, presumably under the Prepayment Assumption, other than qualified stated interest.

If the mortgage loans prepay at a rate either faster or slower than that under the Prepayment Assumption, a holder's recognition of original issue discount will be either accelerated or decelerated and the amount of the original issue discount will be either increased or decreased depending on the relative interests in principal and interest on each mortgage loan represented by the holder's Stripped Security. While the matter is not free from doubt, the holder of a Stripped Security should be entitled in the year that it becomes certain, assuming no further prepayments, that the holder will not recover a portion of its adjusted basis in that Stripped Security to recognize a loss, which may be a capital loss, equal to that portion of unrecoverable basis.

As an alternative to the method described above, the fact that some or all of the interest payments with respect to the Stripped Securities will not be made if the mortgage loans are prepaid could lead to the interpretation that those interest payments are "contingent" within the meaning of the OID Regulations. The OID Regulations, as they relate to the treatment of contingent interest, are by their terms not applicable to prepayable securities such as the Stripped Securities. However, if final regulations dealing with contingent interest with respect to the Stripped Securities apply the same principles as the OID Regulations, those regulations may lead to different timing of income inclusion that would be the case under the OID Regulations. Furthermore, application of those principles could lead to the characterization of gain on the sale of contingent interest Stripped Securities as ordinary income. Investors should consult their tax advisors regarding the appropriate tax treatment of Stripped Securities.

Sale or Exchange of Stripped Securities. Sale or exchange of a Stripped Security prior to its maturity will result in gain or loss equal to the difference, if any, between the amount received and the holder's adjusted basis in that Stripped Security, as described above under "--REMICs--Taxation of Owners of Regular Securities -- Sale or Exchange of Regular Securities." To the

-165-

<Page>

extent that a subsequent purchaser's purchase price is exceeded by the remaining payments on the Stripped Securities, the subsequent purchaser will be required for federal income tax purposes to accrue and report the excess as if it were original issue discount in the manner described above. It is not clear for this purpose whether the assumed prepayment rate that is to be used in the case of a holder of securities other than an original holder of securities should be the Prepayment Assumption or a new rate based on the circumstances at the date of subsequent purchase.

Holders that recognize a loss on a sale or exchange of a Stripped Security for federal income tax purposes in excess of certain threshold amounts should consult their tax advisors as to the need to file IRS Form 8886 (disclosing certain potential tax shelters) on their federal income tax returns.

Purchase of More Than One Class of Stripped Securities. When an investor purchases more than one class of Stripped Securities, it is currently unclear whether for federal income tax purposes the classes of Stripped Securities should be treated separately or aggregated for purposes of the rules described above.

Possible Alternative Characterizations. The characterizations of the Stripped Securities discussed above are not the only possible interpretations of the applicable Code provisions. For example, the holder of securities may be treated as the owner of:

(1) one installment obligation consisting of the Stripped Security's pro rata share of the payments attributable to principal on each mortgage loan and a second installment obligation consisting of the respective Stripped Security's pro rata share of the payments attributable to interest on each mortgage loan,

(2) as many stripped bonds or stripped coupons as there are scheduled payments of principal and/or interest on each mortgage loan, or

(3) a separate installment obligation for each mortgage loan, representing the Stripped Security's pro rata share of payments of principal and/or interest to be made with respect to that Stripped Security.

Alternatively, the holder of one or more classes of Stripped Securities may be treated as the owner of a pro rata fractional undivided interest in each mortgage loan to the extent that the related Stripped Security, or classes of Stripped Securities in the aggregate, represent the same pro rata portion of principal and interest on each mortgage loan, and a stripped bond or stripped coupon, as the case may be, treated as an installment obligation or contingent payment obligation, as to the remainder. Treasury regulations regarding original issue discount on stripped obligations make the foregoing interpretations less likely to be applicable. The preamble to these regulations states that they are premised on the assumption that an aggregation approach is appropriate for determining whether original issue discount on a stripped bond or stripped coupon is de minimis, and solicits comments on appropriate rules for aggregating stripped bonds and stripped coupons under Code Section 1286.

Because of these possible varying characterizations of Stripped Securities and the resultant differing treatment of income recognition, holders of securities are urged to consult

-166-

<Page>

their own tax advisors regarding the proper treatment of Stripped Securities for federal income tax purposes.

Reporting Requirements and Backup Withholding

The trustee will furnish, within a reasonable time after the end of each calendar year, to each holder of Grantor Trust Securities at any time during that calendar year, information, prepared on the basis described above, as is necessary to enable the holder of those securities to prepare its federal income tax returns. The information will include the amount of original issue discount accrued on Grantor Trust Securities held by persons other than holders of securities exempted from the reporting requirements. However, the amount required to be reported by the trustee may not be equal to the proper amount of original issue discount required to be reported as taxable income by a holder of Grantor Trust Securities, other than an original holder of securities that purchased at the issue price. In particular, in the case of Stripped Securities, the reporting will be based on a representative initial offering price of each

class of Stripped Securities or some price as set forth in the related prospectus supplement. The trustee will also file original issue discount information with the Internal Revenue Service. If a holder of securities fails to supply an accurate taxpayer identification number or if the Secretary of the Treasury determines that a holder of securities has not reported all interest and dividend income required to be shown on his federal income tax return, 28% backup withholding (which rate will be increased to 31% after 2010) may be required in respect of any reportable payments, as described above under "--REMICs--Backup Withholding."

Taxation of Certain Foreign Investors. To the extent that a Grantor Trust Security evidences ownership in mortgage loans that are issued on or before July 18, 1984, interest or original issue discount paid by the person required to withhold tax under Code Section 1441 or 1442 to nonresident aliens, foreign corporations, or other non-U.S. Persons generally will be subject to 30% United States withholding tax, or any lower rate as may be provided for interest by an applicable tax treaty. Accrued original issue discount recognized by the holder of Grantor Trust Securities on the sale or exchange of that security also will be subject to federal income tax at the same rate.

Treasury regulations provide that interest or original issue discount paid by the trustee or other withholding agent to a non-U.S. Person evidencing ownership interest in mortgage loans issued after July 18, 1984 will be "portfolio interest" and will be treated in the manner, and these persons will be subject to the same certification requirements, described above under "--REMICs--Taxation of Certain Foreign Investors--Regular Securities."

Partnership Trust Funds

Classification of Partnership Trust Funds

With respect to each series of Partnership Securities or Debt Securities, Tax Counsel will deliver its opinion that the trust fund will not be a taxable mortgage pool or an association, or publicly traded partnership, taxable as a corporation for federal income tax purposes. This opinion will be based on the assumption that the terms of the applicable agreement and related documents will be complied with, and on counsel's conclusion that the nature of the income of

-167-

<Page>

the trust fund will exempt it from the rule that certain publicly traded partnerships are taxable as corporations.

Characterization of Investments in Partnership Securities and Debt Securities

For federal income tax purposes:

(1) Partnership Securities and Debt Securities held by a thrift institution taxed as a domestic building and loan association will not constitute "loans . . . secured by an interest in real property which is . . . residential real property" within the meaning of Code Section 7701(a)(19)(C)(v) and

(2) interest on Debt Securities held by a real estate investment trust will not be treated as "interest on obligations secured by mortgages on real property or on interests in real property" within the meaning of Code Section 856(c)(3)(B), and Debt Securities held by a real estate investment trust will not constitute "real estate assets" within the meaning of Code Section 856(c)(5)(B). However, Partnership Securities held by a real estate investment trust will qualify under those sections based on the real estate investments trust's proportionate interest in the assets of the Partnership Trust Fund based on capital accounts unless the Partnership Security is not treated as equity in the issuing trust.

Taxation of Holder of Debt Securities

Treatment of the Debt Securities as Indebtedness. The Depositor will agree, and the holders of securities will agree by their purchase of Debt Securities, to treat the Debt Securities as debt for federal income tax purposes. No regulations, published rulings, or judicial decisions exist that discuss the characterization for federal income tax purposes of securities with terms substantially the same as the Debt Securities. However, with respect to each series of Debt Securities, Tax Counsel will deliver its opinion that, unless otherwise specified in the related prospectus supplement, the Debt Securities will be classified as indebtedness for federal income tax purposes. The discussion below assumes this characterization of the Debt Securities is correct.

If, contrary to the opinion of counsel, the IRS successfully asserted that the Debt Securities were not debt for federal income tax purposes, the Debt Securities might be treated as equity interests in the Partnership Trust Fund. As a result, the timing and amount of income allocable to holders of the Debt Securities may be different than as described in the following paragraph.

Debt Securities generally will be subject to the same rules of taxation as

Regular Securities issued by a REMIC, as described above, except that:

(1) income reportable on Debt Securities is not required to be reported under the accrual method unless the holder otherwise uses the accrual method,

(2) the special rule treating a portion of the gain on sale or exchange of a Regular Security as ordinary income is inapplicable to Debt Securities. See "--REMICs--Taxation of Owners of Regular Securities--Sale or Exchange of Regular Securities" above, and

-168-

<Page>

(3) the character and timing of any Realized Losses may be governed by Code Section 165(g) relating to worthless securities rather than by Code Section 166 relating to bad debts if the Debt Securities are considered issued by a corporation. This could occur, for example, if the issuing trust were disregarded as separate from a single holder of the residual interest in the trust that was a corporation.

Taxation of Owners of Partnership Securities

Treatment of the Partnership Trust Fund as a Partnership. The prospectus supplement may specify that the Depositor will agree, and the holders of Partnership Securities will agree by their purchase of Partnership Securities, to treat the Partnership Trust Fund:

(1) as a partnership for purposes of federal and state income tax, franchise tax and any other tax measured in whole or in part by income, with the assets of the partnership being the assets held by the Partnership Trust Fund, the partners of the Partnership being the holders of Partnership Securities, including the depositor, and the Debt Securities, if any, being debt of the partnership or

(2) if a single beneficial owner owns all of the Partnership Securities in a trust fund, the trust fund will be ignored for federal income tax purposes and the assets and Debt Securities of the trust fund will be treated as assets and indebtedness of this beneficial owner.

A variety of alternative characterizations are possible. For example, because one or more of the classes of Partnership Securities have certain features characteristic of debt, the Partnership Securities might be considered debt of the depositor or the Partnership Trust Fund. A characterization of this type would not result in materially adverse tax consequences to holders of securities as compared to the consequences from treatment of the Partnership Securities as equity in a partnership, described below. The following discussion assumes that the Partnership Securities represent equity interests in a partnership.

Partnership Taxation. As a partnership, the Partnership Trust Fund will not be subject to federal income tax. Rather, each holder of Partnership Securities will be required to separately take into account each holder's allocated share of income, gains, losses, deductions and credits of the Partnership Trust Fund. We anticipate that the Partnership Trust Fund's income will consist primarily of interest earned on the mortgage loans, including appropriate adjustments for market discount, original issue discount and bond premium, as described above under "--Grantor Trust Funds--Standard Securities--General," and "--Premium and Discount" and any gain upon collection or disposition of mortgage loans. The Partnership Trust Fund's deductions will consist primarily of interest and original issue discount accruing with respect to the Debt Securities and servicing and other fees.

The tax items of a partnership are allocable to the partners in accordance with the Code, Treasury regulations and the partnership agreement, i.e., the applicable governing agreement and related documents. The partnership agreement will provide, in general, that the holders of securities will be allocated gross income of the Partnership Trust Fund for each Due Period equal to the sum of:

-169-

<Page>

(1) the interest that accrues on the Partnership Securities in accordance with their terms for the Due Period, including interest accruing at the applicable pass-through rate for the applicable Due Period and interest on amounts previously due on the Partnership Securities but not yet distributed;

(2) any Partnership Trust Fund income attributable to discount on the mortgage loans that corresponds to any excess of the principal amount of the

Partnership Securities over their initial issue price; and

(3) any other amounts of income payable to the holders of securities for the applicable Due Period.

That allocation will be reduced by any amortization by the Partnership Trust Fund of premium on mortgage loans that corresponds to any excess of the issue price of Partnership Securities over their principal amount. All remaining taxable income or net loss of the Partnership Trust Fund will be allocated to the depositor and any remaining net loss will be allocated to the depositor to the extent of the depositor's capital account and then will be allocated to holders of Partnership Securities in the order in which they bear losses. Based on the economic arrangement of the parties, this approach for allocating Partnership Trust Fund income should be permissible under applicable Treasury regulations. No assurance can be given that the IRS would not require a greater amount of income to be allocated to Partnership Securities. Moreover, even under the foregoing method of allocation, holders of Partnership Securities may be allocated income equal to the entire pass-through rate plus the other items described above even though the trust fund might not have sufficient cash to make current cash distributions of that amount. Thus, cash basis holders will in effect be required to report income from the Partnership Securities on the accrual basis and holders of Partnership Securities may become liable for taxes on Partnership Trust Fund income even if they have not received cash from the Partnership Trust Fund to pay these taxes.

All of the taxable income allocated to a holder of Partnership Securities that is a pension, profit-sharing or employee benefit plan or other tax-exempt entity, including an individual retirement account, will constitute "unrelated business taxable income" generally taxable to a holder under the Code.

A share of expenses of the Partnership Trust Fund, including fees of the master servicer but not interest expense, allocable to an individual, estate or trust holder of Partnership Securities would be miscellaneous itemized deductions subject to the limitations described above under "--Grantor Trust Funds--Standard Securities -- General." Accordingly, these deductions might be disallowed to the individual in whole or in part and might result in the holder of the Partnership Securities being taxed on an amount of income that exceeds the amount of cash actually distributed to the holder of the securities over the life of the Partnership Trust Fund.

Discount income or premium amortization with respect to each mortgage loan would be calculated in a manner similar to the description above under "--Grantor Trust Funds--Standard Securities -- General" and "-- Premium and Discount." Regardless of that description, it is intended that the Partnership Trust Fund will make all tax calculations relating to income and allocations to holders of Partnership Securities on an aggregate basis with respect to all mortgage

-170-

<Page>

loans held by the Partnership Trust Fund rather than on a mortgage loan-by-mortgage loan basis. If the IRS required calculations to be made separately for each mortgage loan, the Partnership Trust Fund might be required to incur additional expense, but we believe that there would not be a material adverse effect on holders of Partnership Securities.

Discount and Premium. The prospectus supplement may provide that the mortgage loans will have been issued with original discount. However, it is not anticipated that the mortgage loans will have been issued with original issue discount and, therefore, the Partnership Trust Fund should not have original issue discount income. However, the purchase price paid by the Partnership Trust Fund for the mortgage loans may be greater or less than the remaining principal balance of the mortgage loans at the time of purchase. If so, the mortgage loans will have been acquired at a premium or discount, as the case may be. See "--Grantor Trust Funds--Standard Securities--Premium and Discount" in this prospectus. As previously indicated above, the Partnership Trust Fund will make this calculation on an aggregate basis, but might be required to recompute it on a mortgage loan-by-mortgage loan basis.

If the Partnership Trust Fund acquires the mortgage loans at a market discount or premium, the Partnership Trust Fund will elect to include any discount in income currently as it accrues over the life of the mortgage loans or to offset any premium against interest income on the mortgage loans. As indicated above, a portion of any market discount income or premium deduction may be allocated to holders of Partnership Securities.

Section 708 Termination. Under Section 708 of the Code, the Partnership Trust Fund will be deemed to terminate for federal income tax purposes if 50% or more of the capital and profits interests in the Partnership Trust Fund are sold or exchanged within a 12-month period. A termination of this type would cause a deemed contribution of the assets of a Partnership Trust Fund --the "old partnership"-- to a new Partnership Trust Fund --the "new partnership"-- in exchange for interests in the new partnership. The interests in a new Partnership Trust Fund would be deemed distributed to the partners of the old

partnership in liquidation of the old partnership, which would not constitute a sale or exchange. The Partnership Trust Fund will not comply with certain technical requirements that might apply when a constructive termination occurs. As a result, the Partnership Trust Fund may be subject to certain tax penalties and may incur additional expenses if it is required to comply with those requirements. Furthermore, the Partnership Trust Fund might not be able to comply due to lack of data.

Disposition of Securities. Generally, capital gain or loss will be recognized on a sale of Partnership Securities in an amount equal to the difference between the amount realized and the seller's tax basis in the Partnership Securities sold. A holder's tax basis in a Partnership Security will generally equal the holder's cost increased by the holder's share of Partnership Trust Fund income (includible in income) and decreased by any distributions received with respect to a Partnership Security. In addition, both the tax basis in the Partnership Securities and the amount realized on a sale of a Partnership Security would include the holder's share of the Debt Securities and other liabilities of the Partnership Trust Fund. A holder acquiring Partnership Securities at different prices may be required to maintain a single aggregate adjusted tax basis in the Partnership Securities. If a sale or other disposition of some of the Partnership Securities occurs, the holder may be required to allocate a portion of the aggregate tax basis to the

-171-

<Page>

Partnership Securities sold, rather than maintaining a separate tax basis in each Partnership Security for purposes of computing gain or loss on a sale of that Partnership Security.

Any gain on the sale of a Partnership Security attributable to the holder's share of unrecognized accrued market discount on the mortgage loans would generally be treated as ordinary income to the holder and would give rise to special tax reporting requirements. The Partnership Trust Fund does not expect to have any other assets that would give rise to similar special reporting considerations. Thus, to avoid those special reporting requirements, the Partnership Trust Fund will elect to include market discount in income as it accrues.

If a holder of Partnership Securities is required to recognize an aggregate amount of income, not including income attributable to disallowed itemized deductions described above, over the life of the Partnership Securities that exceeds the aggregate cash distributions with respect to those Partnership Securities, the excess will generally give rise to a capital loss if the retirement of the Partnership Securities occurs.

Allocations Between Transferors and Transferees. In general, the Partnership Trust Fund's taxable income and losses will be determined each Due Period and the tax items for a particular Due Period will be apportioned among the holders of securities in proportion to the principal amount of Partnership Securities owned by them as of the close of the last day of the related Due Period. As a result, a holder purchasing Partnership Securities may be allocated tax items attributable to periods before the actual transaction, which will affect its tax liability and tax basis.

The use of this Due Period convention may not be permitted by existing regulations. If a Due Period convention is not allowed, or only applies to transfers of less than all of the partner's interest, taxable income or losses of the Partnership Trust Fund might be reallocated among the holders of Partnership Securities. The depositor will be authorized to revise the Partnership Trust Fund's method of allocation between transferors and transferees to conform to a method permitted by future regulations.

Section 731 Distributions. In the case of any distribution to a holder of Partnership Securities, no gain will be recognized to that holder of securities to the extent that the amount of any money distributed with respect to that holder's Partnership Security exceeds the adjusted basis of that holder's interest in the security. To the extent that the amount of money distributed exceeds that holder's adjusted basis, gain will be currently recognized. In the case of any distribution to a holder of Partnership Securities, no loss will be recognized except if a distribution in liquidation of a holder's interest occurs. Any gain or loss recognized by a holder of Partnership Securities will be capital gain or loss.

Section 754 Election. If a holder of Partnership Securities sells its securities at a profit or loss, the purchasing holder of Partnership Securities will have a higher or lower basis, as applicable, in the Partnership Securities than the selling holder of Partnership Securities had. The tax basis of the Partnership Trust Fund's assets would not be adjusted to reflect that higher or lower basis unless the Partnership Trust Fund were to file an election under Section 754 of the Code. In order to avoid the administrative complexities that would be involved in keeping accurate accounting records, as well as potentially onerous information reporting requirements,

-172-

<Page>

the Partnership Trust Fund will not make that election. As a result, holders of Partnership Securities might be allocated a greater or lesser amount of Partnership Trust Fund income than would be appropriate based on their own purchase price for Partnership Securities.

Administrative Matters. The trustee is required to keep or have kept complete and accurate books of the Partnership Trust Fund. The books will be maintained for financial reporting and tax purposes on an accrual basis and the fiscal year of the Partnership Trust Fund will be the calendar year. The trustee will file a partnership information return on IRS Form 1065 with the IRS for each taxable year of the Partnership Trust Fund and will report each holder's allocable share of items of Partnership Trust Fund income and expense to holders and the IRS on Schedule K-1 to Form 1065. The trustee will provide the Schedule K-1 information to nominees that fail to provide the Partnership Trust Fund with the information statement described below and those nominees will be required to forward the information to the beneficial owners of the Partnership Securities. Generally, holders must file tax returns that are consistent with the information return filed by the Partnership Trust Fund or be subject to penalties unless the holder notifies the IRS of all inconsistencies.

Under Section 6031 of the Code, any person that holds Partnership Securities as a nominee at any time during a calendar year is required to furnish the Partnership Trust Fund with a statement containing certain information on the nominee, the beneficial owners and the Partnership Securities so held. This information includes:

(1) the name, address and taxpayer identification number of the nominee and

(2) as to each beneficial owner:

    (x)  the name, address and identification number of the beneficial owner,

    (y)  whether the beneficial owner is a U.S. Person, a tax-exempt entity or a foreign government, an international organization, or any wholly owned agency or instrumentality of either of the foregoing, and

    (z)  certain information on Partnership Securities that were held, bought or sold on behalf of the beneficial owner throughout the year.

In addition, brokers and financial institutions that hold Partnership Securities through a nominee are required to furnish directly to the trustee information as to themselves and their ownership of Partnership Securities. A clearing agency registered under Section 17A of the Exchange Act is not required to furnish any information statement of this type to the Partnership Trust Fund. The information referred to above for any calendar year must be furnished to the Partnership Trust Fund on or before the following January 31. Nominees, brokers and financial institutions that fail to provide the Partnership Trust Fund with the information described above may be subject to penalties.

The person specified in the applicable agreement as the tax matters partner will be responsible for representing the holders of securities in any dispute with the IRS. The Code provides for administrative examination of a partnership as if the partnership were a separate and distinct taxpayer. Generally, the statute of limitations for partnership items does not expire until

-173-

<Page>

three years after the date on which the partnership information return is filed. Any adverse determination following an audit of the return of the Partnership Trust Fund by the appropriate taxing authorities could result in an adjustment of the returns of the holders of Partnership Securities, and, under certain circumstances, a holder of securities may be precluded from separately litigating a proposed adjustment to the items of the Partnership Trust Fund. An adjustment could also result in an audit of a holder's returns and adjustments of items not related to the income and losses of the Partnership Trust Fund.

Tax Consequences to Foreign Holders of Partnership Securities. It is not clear whether the Partnership Trust Fund would be considered to be engaged in a trade or business in the United States for purposes of federal withholding taxes with respect to non-U.S. Persons. This is so because there is no clear authority dealing with that issue under facts substantially similar to those described in this prospectus. However, for taxable years of a Partnership Trust Fund

commencing on or after January 1, 1998, securityholders who are non-U.S. Persons would in any event not be treated as engaged in a trade or business in the United States if holding the Partnership Security, or other investing or trading in stock or securities for the holder's own account, is the only activity of the securityholder within the United States and the securityholder is not a dealer in securities. Accordingly, the securityholders will not be subject to withholding tax pursuant to Section 1446 of the Code, at the highest marginal rate applicable to U.S. corporations for non-U.S. Persons that are taxable as corporations and at the highest marginal rate applicable to U.S. individuals for all other foreign holders. The prospectus supplement relating to an applicable series will describe whether an exception to the 30% United States withholding tax on interest may apply to securityholders.

Backup Withholding. Distributions made on the Partnership Securities and proceeds from the sale of the Partnership Securities will be subject to a "backup" withholding tax of 28% (which rate will be increased to 31% after 2010) if, in general, the holder of Partnership Securities fails to comply with certain identification procedures, unless the holder is an exempt recipient under applicable provisions of the Code.

The federal tax discussions set forth above are included for general information only and may not be applicable depending on a securityholder's particular tax situation. Prospective purchasers should consult their tax advisors with respect to the tax consequences to them of the purchase, ownership and disposition of REMIC Securities, Grantor Trust Securities, Partnership Securities and Debt Securities, including the tax consequences under state, local, foreign and other tax laws and the possible effects of changes in federal or other tax laws.

### STATE AND OTHER TAX CONSEQUENCES

In addition to the federal income tax consequences described in "Federal Income Tax Consequences" in this prospectus, potential investors should consider the state and local tax consequences of the acquisition, ownership, and disposition of the securities offered under this prospectus. State tax law may differ substantially from the corresponding federal tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state or other jurisdiction. Therefore, prospective investors should consult their own tax advisors with respect to the various tax consequences of investments in the securities offered under this prospectus.

-174-

<Page>

### ERISA CONSIDERATIONS

Title I of ERISA and Section 4975 of the Code impose certain requirements on ERISA Plans and on persons who are fiduciaries with respect to ERISA Plans. Certain employee benefit plans, such as governmental plans as defined in Section 3(32) of ERISA, and, if no election has been made under Section 410(d) of the Code, church plans as defined in Section 3(33) of ERISA, are not subject to the ERISA requirements discussed in this prospectus. However, assets of such plans (collectively with ERISA Plans, "Plans") may be subject to the provisions of applicable federal, state or local law that is materially similar to the foregoing provisions of ERISA or the Code. Any such plan which is qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code, however, is subject to the prohibited transaction rules set forth in Section 503 of the Code.

In addition to the imposition of general fiduciary requirements, including those of investment prudence and diversification and the requirement that a Plan's investment be made in accordance with the documents governing the Plan, Section 406(a) of ERISA and Section 4975(c)(1)(A), (B), (C) and (D) of the Code prohibit a broad range of transactions involving assets of a Plan and persons who have certain specified relationships to the Plan. In addition, Section 406(b) of ERISA and Section 4975(c)(1)(E) and (F) of the Code impose certain prohibitions on Parties in Interest who are fiduciaries with respect to the Plan. Certain Parties in Interest that participate in a prohibited transaction may be subject to a penalty imposed under Section 502(i) of ERISA or an excise tax pursuant to Sections 4975(a) and (b) of the Code, unless a statutory or administrative exemption is available.

Certain transactions involving a trust fund might be deemed to constitute prohibited transactions under ERISA and Section 4975 of the Code with respect to a Plan that purchases securities if the residential loans, agency securities, mortgage securities and other assets included in the trust fund are deemed to be assets of the Plan. The U.S. Department of Labor has promulgated regulations at 29 C.F.R. 'SS' 2510.3-101 defining the term "plan assets" for purposes of applying the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and the Code. Under these regulations, generally, when a Plan acquires an equity interest in an entity such as a trust fund, the Plan's assets include the investment in the entity and an undivided interest in each of the underlying assets of the entity, unless certain exceptions not applicable here apply, or unless the equity participation in the entity by "Benefit Plan Investors" is not significant. For this purpose,

in general, equity participation is considered "significant" on any date if 25% or more of the value of any class of equity interests is held by "Benefit Plan Investors." "Benefit Plan Investors" include ERISA Plans, as well as any "employee benefit plan," as defined in Section 3(3) of ERISA, which is not subject to Title I of ERISA, such as governmental plans, as defined in Section 3(32) of ERISA, and church plans, as defined in Section 3(33) of ERISA, which have not made an election under Section 410(d) of the Code, and any entity whose underlying assets include plan assets by reason of a Plan's investment in the entity. Because of the factual nature of certain of the rules set forth in these regulations, neither Plans nor persons investing plan assets should acquire or hold securities in reliance on the availability of any exception under the regulations.

In addition, the regulations provide that the term "equity interest" means any interest in an entity other than an instrument which is treated as indebtedness under applicable local law

-175-

<Page>

and which has no "substantial equity features." If notes of a particular series are deemed to be indebtedness under applicable local law without any substantial equity features, an investing Plan's assets would include notes of this type, but would not, by reason of the purchase, include the underlying assets of the related trust fund. However, without regard to whether notes of this type are treated as an equity interest for these purposes, the purchase or holding of notes by or on behalf of a Plan could be considered to result in a prohibited transaction. A prohibited transaction may result if the Issuer, the holder of an Equity Certificate or any of their respective affiliates is or becomes a Party in Interest with respect to the Plan, or if the depositor, the master servicer, any sub-servicer or any trustee has investment authority with respect to the assets of the Plan.

Any person who has discretionary authority or control respecting the management or disposition of plan assets, and any person who provides investment advice with respect to the assets for a fee, is a fiduciary of the investing Plan. If the residential loans, agency securities, mortgage securities and other assets included in a trust fund constitute plan assets, then any party exercising management or discretionary control regarding those assets, such as the master servicer or any sub-servicer, may be deemed to be a Plan "fiduciary" subject to the fiduciary requirements of ERISA and the prohibited transaction provisions of ERISA and the Code or similar provisions of Similar Law with respect to the investing Plan. In addition, if the assets included in a trust fund constitute plan assets, the purchase or holding of securities by a Plan, as well as the operation of the related trust fund, may constitute or involve a prohibited transaction under ERISA, the Code or Similar Law.

Some of the transactions involving the securities that might otherwise constitute prohibited transactions under ERISA or the Code might qualify for relief from the prohibited transaction rules under certain administrative exemptions, which may be individual or class exemptions. The United States Department of Labor issued an individual exemption, Prohibited Transaction Exemption 91-22, referred to as the "Exemption," on April 18, 1991 to UBS Securities LLC. The Exemption, together with similar exemptions issued to other underwriters, has been amended by Prohibited Transaction Exemption 97-34, Prohibited Transaction Exemption 2000-58 and Prohibited Transaction Exemption 2002-41. The Exemption generally exempts from the application of the prohibited transaction provisions of Section 406 of ERISA, and the excise taxes and civil penalties imposed on the prohibited transactions pursuant to Section 4975(a) and (b) of the Code and Section 502(i) of ERISA, certain transactions, among others, relating to the servicing and operation of mortgage pools and the purchase, sale and holding of pass-through certificates underwritten by an underwriter, provided that certain conditions set forth in the Exemption are satisfied. For purposes of this Section "ERISA Considerations," the term "underwriter" shall include:

(1) UBS Securities LLC,

(2) any person directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with UBS Securities LLC and

(3) any member of the underwriting syndicate or selling group of which a person described in (a) or (b) is a manager or co-manager with respect to a class of certificates.

-176-

<Page>

The Exemption sets forth five general conditions which must be satisfied for a transaction involving the purchase, sale and holding of certificates of the type issued pursuant to this prospectus to be eligible for exemptive relief under the Exemption:

(1) the acquisition of certificates by an ERISA Plan must be on terms that are at least as favorable to the Plan as they would be in an arm's-length transaction with an unrelated party;

(2) the certificates at the time of acquisition by the ERISA Plan must be rated in one of the four highest generic rating categories by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc. or Fitch, Inc.;

(3) the trustee cannot be an affiliate of any other member of the "restricted group" other than an underwriter. The "restricted group" consists of any underwriter, the depositor, the trustee, the master servicer, any sub-servicer, the obligor on credit support and any borrower with respect to assets of the trust fund constituting more than 5% of the aggregate unamortized principal balance of the assets of the trust fund in the related trust fund as of the date of initial issuance of the certificates;

(4) (a) the sum of all payments made to and retained by the underwriter(s) must represent not more than reasonable compensation for underwriting the certificates;

(b) the sum of all payments made to and retained by the depositor pursuant to the assignment of the assets of the trust fund to the related trust fund must represent not more than the fair market value of those obligations; and

(c) the sum of all payments made to and retained by the master servicer and any sub-servicer must represent not more than reasonable compensation for that person's services and reimbursement of that person's reasonable expenses in connection with those services;

(5) the investing ERISA Plan must be an accredited investor as defined in Rule 501(a)(1) of Regulation D of the Securities and Exchange Commission under the Securities Act of 1933, as amended.

The Exemption also requires that the trust fund meet the following requirements:

(1) the trust fund must consist solely of assets of the type that have been included in other investment pools;

(2) certificates evidencing interests in such other investment pools must have been rated in one of the four highest categories of one of Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc. or Fitch, Inc. for at least one year prior to the acquisition of certificates by or on behalf of an ERISA Plan or with plan assets; and

(3) certificates evidencing interests in those other investment pools must have been purchased by investors other than ERISA Plans for at least one year prior to any acquisition of certificates by or on behalf of an ERISA Plan or with plan assets.

-177-

<Page>

A fiduciary of an ERISA Plan contemplating purchasing a certificate must make its own determination that the general conditions set forth above will be satisfied with respect to its certificate. The Exemption will not apply to an investment by a Plan during a Funding Period unless certain additional conditions specified in the related prospectus supplement are satisfied.

If the general conditions of the Exemption are satisfied, the Exemption may provide an exemption from the restrictions imposed by Sections 406(a) and 407(a) of ERISA, as well as the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c) of the Code, in connection with the direct or indirect sale, exchange, transfer, holding or the direct or indirect acquisition or disposition in the secondary market of certificates by ERISA Plans. However, no exemption is provided from the restrictions of Sections 406(a)(1)(E), 406(a)(2) and 407 of ERISA for the acquisition or holding of a certificate on behalf of an "Excluded Plan" by any person who has discretionary authority or renders investment advice with respect to the assets of the "Excluded Plan." For purposes of the certificates, an Excluded Plan is an ERISA Plan sponsored by any member of the Restricted Group.

If certain specific conditions of the Exemption are also satisfied, the Exemption may provide an exemption from the restrictions imposed by Sections 406(b)(1) and (b)(2) of ERISA and the taxes imposed by Section 4975(c)(1)(E) of the Code in connection with:

(1) the direct or indirect sale, exchange or transfer of certificates in the initial issuance of certificates between UBS Securities LLC or another underwriter and an ERISA Plan when the person who has discretionary authority or renders investment advice with respect to the investment of ERISA Plan assets in the certificates is

    (a) a borrower with respect to 5% or less of the fair market value of the assets of the trust fund or

    (b) an affiliate of that person,

(2) the direct or indirect acquisition or disposition in the secondary market of certificates by an ERISA Plan and

(3) the holding of certificates by an ERISA Plan.

Further, if certain specific conditions of the Exemption are satisfied, the Exemption may provide an exemption from the restrictions imposed by Sections 406(a), 406(b) and 407(a) of ERISA, and the taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c) of the Code for transactions in connection with the servicing, management and operation of the related trust fund. The depositor expects that the specific conditions of the Exemption required for this purpose will be satisfied with respect to the certificates, although prospective investors should consult the relevant prospectus supplement in this regard. Satisfaction of the conditions would provide an exemption from the restrictions imposed by Sections 406(a) and (b) of ERISA, as well as the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c) of the Code, for transactions in connection with the servicing, management and operation of the related trust fund, provided that the general conditions of the Exemption are satisfied.

-178-

<Page>

The Exemption also may provide an exemption from the restrictions imposed by Sections 406(a) and 407(a) of ERISA, and the taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c) of the Code if the restrictions are deemed to otherwise apply merely because a person is deemed to be a Party in Interest with respect to an investing ERISA Plan by virtue of providing services to the ERISA Plan, or by virtue of having certain specified relationships to a person of that type, solely as a result of the ERISA Plan's ownership of certificates.

Before purchasing a certificate, a fiduciary of an ERISA Plan should itself confirm:

(1) that the certificates constitute "certificates" for purposes of the Exemption and

(2) that the specific and general conditions and other applicable requirements set forth in the Exemption would be satisfied. In addition to making its own determination as to the availability of the exemptive relief provided in the Exemption, the ERISA Plan fiduciary should consider its general fiduciary obligations under ERISA in determining whether to purchase any certificates on behalf of an ERISA Plan.

In addition, based on the reasoning of the United States Supreme Court's decision in John Hancock Life Ins. Co. v. Harris Trust and Sav. Bank, 510 U.S. 86 (1993), under certain circumstances assets in the general account of an insurance company may be deemed to be plan assets for certain purposes, and under such reasoning a purchase of investor certificates with assets of an insurance company's general account might be subject to the prohibited transaction rules described above. Insurance companies investing assets of their general accounts should also consider the potential effects of the enactment of Section 401(c) of ERISA, PTCE 95-60, Labor Department Regulation 29 CFR 'SS' 2550.401c-1, and the fact that the Exemption (discussed above) has been designated by the Department of Labor as an "Underwriter Exemption" for purposes of Section V(h) of Prohibited Transaction Exemption 95-60.

Any plan fiduciary which proposes to cause an ERISA Plan to purchase securities should consult with its counsel with respect to the potential applicability of ERISA, Section 4975 of the Code and Similar Law to that investment and the availability of the Exemption or any other exemption in connection with that investment. We cannot assure you that the Exemption or any other individual or class exemption will apply with respect to any particular ERISA Plan that acquires or holds securities or, even if all of the conditions specified in the Exemption or class exemption were satisfied, that the exemption would apply to all transactions involving the trust fund. The prospectus supplement with respect to a series of securities may contain additional information regarding the application of the Exemption or any other exemption with respect to the securities offered.

LEGAL INVESTMENT

The prospectus supplement relating to each series of securities will

specify which, if any, of the classes of securities offered constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as amended, which we refer to as SMMEA. Generally, any class of securities offered by this prospectus and by the related prospectus supplement that is not initially rated in one of the two highest rating categories by at

-179-

<Page>

least one nationally recognized statistical rating organization, or that represents an interest in a trust fund that includes junior real estate loans or loans originated by originators not qualifying under SMMEA, will not constitute "mortgage related securities" for purposes of SMMEA. The appropriate characterization of those securities not qualifying as "mortgage related securities", which we refer to as non-SMMEA securities, under various legal investment restrictions, and thus the ability of investors subject to these restrictions to purchase these securities, may be subject to significant interpretive uncertainties. Accordingly, all investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements, or review by regulatory authorities should consult with their own legal advisors in determining whether and to what extent the non-SMMEA securities constitute legal investments for them.

Classes of securities qualifying as "mortgage related securities" will constitute legal investments for persons, trusts, corporations, partnerships, associations, business trusts and business entities, including, but not limited to,

(1)  depository institutions,

(2)  insurance companies, and

(3)  trustees and pension funds,

created pursuant to or existing under the laws of the United States or of any state, including the District of Columbia and Puerto Rico, whose authorized investments are subject to state regulation to the same extent that, under applicable law, obligations issued by or guaranteed as to principal and interest by the United States or any of its agencies or instrumentalities constitute legal investments for these types of entities.

Pursuant to SMMEA, a number of states enacted legislation, on or before the October 3, 1991 cutoff for those enactments, limiting to varying extents the ability of certain entities, in particular, insurance companies, to invest in "mortgage related securities" secured by liens on residential, or mixed residential and commercial properties, in most cases by requiring the affected investors to rely solely on existing state law, and not SMMEA. Accordingly, the investors affected by any state legislation overriding the preemptive effect of SMMEA will be authorized to invest in securities qualifying as "mortgage related securities" only to the extent provided in that legislation.

SMMEA also amended the legal investment authority of federally-chartered depository institutions as follows:

(1) federal savings and loan associations and federal savings banks may invest in, sell or otherwise deal in "mortgage related securities" without limitation as to the percentage of their assets represented by these "mortgage related securities,"

(2) federal credit unions may invest in "mortgage related securities," and

(3) national banks may purchase "mortgage related securities" for their own account without regard to the limitations generally applicable to investment securities set forth in 12 U.S.C. 'SS' 24 (Seventh),

-180-

<Page>

subject in each case to those regulations as the applicable federal regulatory authority may prescribe. In this connection, the Office of the Comptroller of the Currency (the "OCC") amended 12 C.F.R. Part 1 to authorize national banks to purchase and sell for their own account, without limitation as to a percentage of the bank's capital and surplus (but subject to compliance with certain general standards in 12 C.F.R. 'SS' 1.5 concerning "safety and soundness" and retention of credit information), certain "Type IV securities," defined in 12 C.F.R. 'SS' 1.2(m) to include certain "residential mortgage-related securities." As so defined, "residential mortgage-related security" means, in relevant part, "mortgage related security" within the meaning of SMMEA. The

National Credit Union Administration (the "NCUA") has adopted rules, codified at 12 C.F.R. Part 703, which permit federal credit unions to invest in "mortgage related securities," other than stripped mortgage related securities (unless the credit union complies with the requirements of 12 C.F.R. Part 703.16(e) for investing in stripped mortgage related securities) and residual interests in mortgage related securities, subject to compliance with general rules governing investment policies and practices; however, credit unions approved for the NCUA's "investment pilot program" under 12 C.F.R. 'SS' 703.19 may be able to invest in those prohibited forms of securities. The Office of Thrift Supervision (the "OTS") has issued Thrift Bulletins 73a, entitled "Investing in Complex Securities" ("TB 73a"), which is effective as of December 18, 2001, and 13a, entitled "Management of Interest Rate Risk, Investment Securities, and Derivatives Activities" ("TB 13a"), which is effective as of December 1, 1998, which thrift institutions subject to the jurisdiction of the OTS should consider before investing in any of the securities.

All depository institutions considering an investment in the securities should review the "Supervisory Policy Statement on Investment Securities and End-User Derivatives Activities" -- the "1998 Policy Statement" -- of the Federal Financial Institutions Examination Council, which has been adopted by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the OCC and the OTS effective May 26, 1998, and by the NCUA, effective October 1, 1998. The 1998 Policy Statement sets forth general guidelines which depository institutions must follow in managing risks, including market, credit, liquidity, operational (transaction), and legal risks, applicable to all securities, including mortgage pass-through securities and mortgage-derivative products, used for investment purposes.

Investors whose investment activities are subject to regulation by federal or state authorities should review rules, policies and guidelines adopted from time to time by federal and state authorities before purchasing any securities because certain series or classes may be deemed unsuitable investments, or may otherwise be restricted, under these rules, policies or guidelines, in certain instances irrespective of SMMEA.

The foregoing does not take into consideration the applicability of statutes, rules, regulations, orders, guidelines or agreements generally governing investments made by a particular investor, including, but not limited to,

    (1) "prudent investor" provisions,

    (2) percentage-of-assets limits,

-181-

<Page>

    (3) provisions which may restrict or prohibit investment in securities which are not "interest bearing" or "income paying," and

    (4) with regard to any securities issued in book-entry form, provisions which may restrict or prohibit investments in securities which are issued in book-entry form.

Except as to the status of certain classes of securities as "mortgage related securities," no representations are made as to the proper characterization of the securities for legal investment purposes, financial institution regulatory purposes, or other purposes, or as to the ability of particular investors to purchase securities under applicable legal investment restrictions. The uncertainties described above, and any unfavorable future determinations concerning legal investment or financial institution regulatory characteristics of the securities, may adversely affect the liquidity of the securities.

Accordingly, all investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their own legal advisors in determining:

    (1) whether and to what extent the securities constitute legal investments or are subject to investment, capital or other restrictions, and

    (2) if applicable, whether SMMEA has been overridden in any jurisdiction relevant to the investor.

PLANS OF DISTRIBUTION

The securities offered by this prospectus and by the supplements to this prospectus will be offered in series. The distribution of the securities may be effected from time to time in one or more transactions, including negotiated transactions, at a fixed public offering price or at varying prices to be determined at the time of sale or at the time of commitment for a sale. The related prospectus supplement will specify whether the securities will be distributed in a firm commitment underwriting, subject to the terms and conditions of the underwriting agreement, by UBS Securities LLC acting as

underwriter with other underwriters, if any, named in the related underwriting agreement. If it is a firm commitment underwriting, the related prospectus supplement may also specify that the underwriters will not be obligated to pay for any securities agreed to be purchased by purchasers pursuant to purchase agreements acceptable to the depositor. In connection with the sale of the securities, underwriters may receive compensation from the depositor or from purchasers of the securities in the form of discounts, concessions or commissions. The related prospectus supplement will describe any compensation paid by the depositor to the underwriters.

Alternatively, the related prospectus supplement may specify that the securities will be distributed by UBS Securities LLC acting as agent or in some cases as principal with respect to securities which it has previously purchased or agreed to purchase. If UBS Securities LLC acts as agent in the sale of securities, UBS Securities LLC will receive a selling commission with respect to each series of securities, depending on market conditions, expressed as a percentage of the aggregate principal balance of the related residential loans as of the Cut-Off Date. The exact

-182-

<Page>

percentage for each series of securities will be disclosed in the related prospectus supplement. To the extent that UBS Securities LLC elects to purchase securities as principal, UBS Securities LLC may realize losses or profits based on the difference between its purchase price and the sales price. The prospectus supplement with respect to any series offered other than through underwriters will contain information regarding the nature of the offering and any agreements to be entered into between the depositor and purchasers of securities of the related series.

The depositor will indemnify UBS Securities LLC and any underwriters against certain civil liabilities, including liabilities under the Securities Act of 1933, or will contribute to payments UBS Securities LLC and any underwriters may be required to make in respect of any liability.

The related prospectus supplement relating to securities of a particular series offered by this prospectus will specify whether the depositor or any other person or persons specified in the prospectus supplement may purchase some or all of the securities from the underwriter or underwriters or other person or persons specified in the related prospectus supplement. A purchaser may thereafter from time to time offer and sell, pursuant to this prospectus and the related prospectus supplement, some or all of the securities so purchased, directly, through one or more underwriters to be designated at the time of the offering of these securities, through dealers acting as agent and/or principal or in any other manner as may be specified in the related prospectus supplement. The related offering may be restricted in the manner specified in the related prospectus supplement. The related transactions may be effected at market prices prevailing at the time of sale, at negotiated prices or at fixed prices. Any underwriters and dealers participating in the purchaser's offering of the related securities may receive compensation in the form of underwriting discounts or commissions from a purchaser and dealers may receive commissions from the investors purchasing the related securities for whom they may act as agent. The discounts or commissions will not exceed those customary in those types of transactions involved. Any dealer that participates in the distribution of the related securities may be deemed to be an "underwriter" within the meaning of the Securities Act of 1933. Any commissions and discounts received by a dealer and any profit on the resale or the securities by that dealer might be deemed to be underwriting discounts and commissions under the Securities Act of 1933.

In the ordinary course of business, UBS Securities LLC and the depositor, or their affiliates, may engage in various securities and financing transactions. These financing transactions include repurchase agreements to provide interim financing of the depositor's residential loans pending the sale of residential loans or interests in residential loans, including the securities.

The depositor anticipates that the securities will be sold primarily to institutional investors. Purchasers of securities, including dealers, may, depending on the facts and circumstances of the related purchases, be deemed to be "underwriters" within the meaning of the Securities Act of 1933 in connection with reoffers and sales by them of securities. Holders of securities should consult with their legal advisors in this regard prior to any reoffer or sale.

As to each series of securities, only those classes rated in one of the four highest rating categories by any rating agency will be offered by this prospectus. Any unrated class may be

-183-

<Page>

initially retained by the depositor, and may be sold by the depositor at any
time to one or more institutional investors.

INCORPORATION OF CERTAIN INFORMATION BY REFERENCE

With respect to each series of securities offered by this prospectus, there
are incorporated in this prospectus and in the related prospectus supplement by
reference all documents and reports filed or caused to be filed by the depositor
pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of
1934, prior to the termination of the offering of the related series of
securities, that relate specifically to the related series of securities. The
depositor will provide or cause to be provided without charge to each person to
whom this prospectus and a related prospectus supplement is delivered in
connection with the offering of one or more classes of series of securities, if
written or oral request of any person is made, a copy of any or all reports
incorporated in this prospectus by reference. The depositor will be required to
provide these reports only to the extent reports relate to one or more of
classes of the related series of securities, other than the exhibits to these
documents, unless these exhibits are specifically incorporated by reference in
these documents. Requests should be directed in writing to Mortgage Asset
Securitization Transactions, Inc., 1285 Avenue of the Americas, New York, New
York 10019, Attention: General Counsel, or by telephone at (212) 713-2000.

The depositor filed a registration statement relating to the securities
with the SEC. This prospectus is part of the registration statement, but the
registration statement includes additional information.

Copies of the registration statement and any other materials filed with the
SEC in connection with the securities offered by this prospectus and the related
prospectus supplement may be obtained from, or read at, the Public Reference
Room of the SEC located at 450 Fifth Street N.W., Washington, D.C. 20549. You
may obtain information on the operation of the Public Reference Room by calling
the SEC at 1-800-SEC-0330. The SEC also maintains a site on the World Wide Web
at "http://www.sec.gov" at which you can view and download copies of reports,
proxy and information statements and other information filed electronically
through the Electronic Data Gathering, Analysis and Retrieval -- EDGAR --
system. The depositor filed the registration statement, including all exhibits
to the registration statement, through the EDGAR system and therefore these
materials should be available by logging onto the SEC's Web site. The SEC
maintains computer terminals providing access to the EDGAR system at each of the
offices referred to above.

LEGAL MATTERS

The validity of the securities and certain federal income tax matters in
connection with the securities will be passed on for the depositor by
Cadwalader, Wickersham & Taft LLP, New York, New York, McKee Nelson LLP, New
York, New York, Thacher Proffitt & Wood, New York, New York or such other
counsel for the depositor as specified in the related prospectus supplement.

-184-

<Page>

FINANCIAL INFORMATION

A new trust fund will be formed with respect to each series of securities
and no trust fund will engage in any business activities or have any assets or
obligations prior to the issuance of the related series of securities.
Accordingly, no financial statements with respect to any trust fund will be
included in this prospectus or in the related prospectus supplement.

RATING

It will be a condition to the issuance of the securities of each series
offered by this prospectus and by the related prospectus supplement that they
shall have been rated in one of the four highest rating categories by the
nationally recognized statistical rating agency or agencies specified in the
related prospectus supplement.

Any rating would be based on, among other things, the adequacy of the value
of the assets of the trust fund and any credit enhancement with respect to the
related class. A rating will reflect the specified rating agency's assessment
solely of the likelihood that holders of a class of securities of the related
class will receive payments to which holders of securities are entitled by their
terms. The rating will not constitute

(1) an assessment of the likelihood that principal prepayments on the
related residential loans will be made,

(2) the degree to which the rate of prepayments might differ from that
originally anticipated, or

(3) the likelihood of early optional termination of the series of
securities. The rating should not be deemed a recommendation to purchase, hold
or sell securities, inasmuch as it does not address market price or suitability
for a particular investor.

The rating will not address the possibility that prepayment at higher or lower
rates than anticipated by an investor may cause the investor to experience a
lower than anticipated yield. The rating will not address that an investor
purchasing a security at a significant premium might fail to recoup its initial
investment under certain prepayment scenarios.

     We cannot assure you that any rating will remain in effect for any given
period of time or that it may not be lowered or withdrawn entirely by the rating
agency in the future if in its judgment circumstances in the future so warrant.
A rating may be lowered or withdrawn due to any erosion in the adequacy of the
value of the assets of the trust fund or any credit enhancement with respect to
a series. The rating might also be lowered or withdrawn among other reasons,
because of an adverse change in the financial or other condition of a credit
enhancement provider or a change in the rating of the credit enhancement
provider's long term debt.

     The amount, type and nature of credit enhancement, if any, established with
respect to a series of securities will be determined on the basis of criteria
established by each rating agency rating classes of the related series. These
criteria are sometimes based on an actuarial analysis of the behavior of
mortgage loans in a larger group. The foregoing analysis is often the basis on

                                    -185-


<Page>


which each rating agency determines the amount of credit enhancement required
with respect to each class. We cannot assure you that the historical data
supporting any actuarial analysis will accurately reflect future experience. In
addition, we cannot assure you that the data derived from a large pool of
mortgage loans accurately predicts the delinquency, foreclosure or loss
experience of any particular pool of residential loans. We cannot assure you
that values of any residential properties have remained or will remain at their
levels on the respective dates of origination of the related residential loans.

     If the residential real estate markets should experience an overall decline
in property values and the outstanding principal balances of the residential
loans in a particular trust fund and any secondary financing on the related
residential properties become equal to or greater than the value of the
residential properties, the rates of delinquencies, foreclosures and losses
could be higher than those now generally experienced in the mortgage lending
industry. In addition, adverse economic conditions, which may or may not affect
real property values, may affect the timely payment by borrowers of scheduled
payments of principal and interest on the residential loans. Accordingly, the
rates of delinquencies, foreclosures and losses with respect to any trust fund
may be affected. To the extent that these losses are not covered by credit
enhancement, these losses will be borne, at least in part, by the holders of one
or more classes of the security of the related series.

                                    -186-


<Page>


                              GLOSSARY OF TERMS

     "1986 Act" is the Tax Reform Act of 1986.

     "Accrual Securities" are one or more classes of securities with respect to
which accrued interest will not be distributed but rather will be added to the
security principal balance of the securities on each distribution date for the
period described in the related prospectus supplement.

     "Accrued Security Interest" is the interest accruing with respect to each
class of securities related to a series, in an amount equal to interest on the
outstanding security principal balance, or notional amount with respect to
interest-only securities, immediately prior to the distribution date, at the
applicable security interest rate, for a period of time corresponding to the
intervals between the distribution dates for the series.

     "Available Distribution Amount" is the amount which will be available for
distribution on the securities of each series on each distribution date as may
be specified in the related prospectus supplement and generally includes:

     (1) the total amount of all cash on deposit in the related Trust Account as

of a determination date specified in the related prospectus supplement, exclusive of amounts payable on future distribution dates and amounts payable to the master servicer, any applicable sub-servicer, the trustee or another person as expenses of the trust fund;

(2) any principal and/or interest advances made with respect to the distribution date, if applicable;

(3) any principal and/or interest payments made by the master servicer out of its servicing fee in respect of interest shortfalls resulting from principal prepayments, if applicable; and

(4) all net income received in connection with the operation of any residential property acquired on behalf of the holders of securities through deed in lieu of foreclosure or repossession, if applicable.

"Available Subordination Amount" is an amount equal to the difference between

(1) the applicable percentage amount of the aggregate initial principal balance of the residential loans in the related trust fund as specified in the related prospectus supplement and

(2) the amounts paid to the holders of senior securities that but for the subordination provisions would have been payable to the holders of subordinate securities.

"Bankruptcy Bond" is a bond insuring residential loans which covers

(1) certain losses resulting from

(a) an extension of the maturity of a residential loan, or

-187-

<Page>

(b) a reduction by the bankruptcy court of the principal balance of or the interest rate on a residential loan, and

(2) the unpaid interest on the amount of a principal reduction during the pendency of a proceeding under the United States Bankruptcy Code, 11 U.S.C. Sections 101 et seq.

"Buydown Funds" are funds paid on the related Buydown Loans.

"Buydown Loans" are residential loans subject to temporary buydown plans. The monthly payments made by the borrower in the early years of the Buydown Loan will be less than the scheduled payments on the Buydown Loan. Generally, the borrower under a Buydown Loan will be eligible for a reduced interest rate on the loan.

"California Military Code" is the California Military and Veterans Code, as amended.

"Cash Flow Value" is the security principal balance of the securities of the related series which, based on certain assumptions, including the assumption that no defaults occur on the assets of the trust fund, can be supported by either:

(1) the future scheduled payments on the assets of the trust fund, with the interest on the assets adjusted to the Net Interest Rate;

(2) the proceeds of the prepayment of the assets of the trust fund, together with reinvestment earnings on the assets of the trust fund, if any, at the applicable Assumed Reinvestment Rate; or

(3) amounts available to be withdrawn from any Reserve Fund for the series, as further specified in the related prospectus supplement relating to a series of securities.

"CERCLA" is the Comprehensive Environmental Response, Compensation and Liability Act, as amended.

"Code" is the Internal Revenue Code of 1986, as amended.

"Collateral Value" is

(1) with respect to a residential property or cooperative unit, it is the lesser of:

(a) the appraised value determined in an appraisal obtained by the originator at origination of the loan; and

(b) the sales price of the property.

(2) with respect to residential property securing a Refinance Loan, it is the appraised value of the residential property determined at the time of the origination of the Refinance Loan.

"Conservation Act" is the Asset Conservation, Lender Liability and Deposit Insurance Act of 1996, as amended.

-188-

<Page>

"Cooperative" is a private cooperative housing corporation, the shares of which secure Cooperative Loans.

"Cooperative Loans" are loans secured primarily by shares in a Cooperative which with the related proprietary lease or occupancy agreement give the owners the right to occupy a particular dwelling unit in the Cooperative.

"Cut-Off Date" is the date specified in the related prospectus supplement which generally represents the first date after which payments on the residential loans in a pool will begin to be paid to the trust.

"Debt Securities" are securities which represent indebtedness of a Partnership Trust Fund for federal income tax purposes.

"Definitive Security" is a physical certificate representing a security issued in the name of the beneficial owner of the security rather than DTC.

"Deposit Period" is the period specified in the related prospectus supplement which is generally the period commencing on the day following the determination date immediately preceding the related determination date and ending on the related determination date.

"Due Period" is the period of time specified in the related prospectus supplement.

"Equity Certificates" are certificates, with respect to a series of notes where the issuer is an owner trust, issued under an owner trust agreement which evidence the equity ownership of the related trust.

"ERISA Plans" are retirement plans and other employee benefit plans and arrangements, including for this purpose individual retirement accounts and annuities and Keogh plans, which are subject to ERISA or Section 4975 of the Code, and bank collective investment funds and insurance company general and separate accounts holding assets of such plans, accounts or arrangements.

"Fannie Mae Certificates" are guaranteed mortgage pass-through securities issued by the Fannie Mae.

"FHA Insurance" is insurance issued by the FHA to insure residential loans as authorized under the United States Housing Act of 1934, as amended. The residential loans will be insured under various FHA programs including the standard FHA 203(b) program to finance the acquisition of one- to four-family housing units, the FHA 245 graduated payment mortgage program and the FHA Title I Program.

"Financial Intermediary" is an entity that maintains the Security Owner's account and records the Security Owner's ownership of securities on that account.

"Freddie Mac Certificates" are mortgage participation certificates issued by the Freddie Mac.

-189-

<Page>

"Garn-St. Germain Act" is the Garn-St. Germain Depository Institutions Act of 1982, enacted on October 15, 1982.

"GNMA Certificates" are fully modified pass-through mortgage-backed certificates guaranteed by the GNMA.

"Grantor Trust Securities" are securities which represent interests in a grantor trust as to which no REMIC election will be made.

"Home Equity Loans" are one- to four-family first or junior lien closed end home equity loans for property improvement, debt consolidation or home equity purposes.

"Home Improvement Contracts" are home improvement installment sales contracts and installment loan agreements which may be unsecured or secured by a lien on the related mortgaged property or a manufactured home. This lien may be subordinated to one or more senior liens on the related mortgaged property.

"Insurance Instrument" is any Primary Hazard Insurance Policy or Primary Credit Insurance Policy.

"Insurance Proceeds" are all proceeds of any Primary Credit Insurance Policy, any FHA Insurance, any VA Guarantee, any Bankruptcy Bond and any Pool Insurance Policy, minus proceeds that represent reimbursement of the master servicer's costs and expenses incurred in connection with presenting claims under the related insurance policies.

"Land Contracts" are Manufactured Housing Contracts that are secured by mortgages on the related mortgaged property.

"Liquidation Proceeds" are cash proceeds received by foreclosure, eminent domain, condemnation or otherwise, excluding any proceeds from any insurance policies along with the net proceeds on a monthly basis with respect to any properties acquired for the benefit of the security holders by deed in lieu of foreclosure or repossession.

"Loan-to-Value Ratio" is the ratio at a given time, expressed as a percentage of the then outstanding principal balance of the residential loan, plus, in the case of a mortgage loan secured by a junior lien, the outstanding principal balance of the related senior liens, to the Collateral Value of the related residential property.

"Lockout Period" is a period after the origination of certain residential loans during which prepayments are entirely prohibited or require payment of a prepayment penalty if a prepayment in full or in part occurs.

"Manufactured Housing Contracts" are manufactured housing conditional sales contracts and installment loan agreements which may be secured by a lien on:

(1) new or used manufactured homes;

-190-

<Page>

(2) the real property and any improvements on the real property which may include the related manufactured home if deemed to be part of the real property under applicable state law; or

(3) in certain cases, a new or used manufactured home which is not deemed to be a part of the related real property under applicable state law.

"Multifamily Loans" are mortgage loans secured by first or junior liens on multifamily residential properties consisting of five or more dwelling units.

"Net Interest Rate" with respect to any residential loan is the rate specified in the related prospectus supplement which is generally the interest rate on the residential loan minus the sum of the fee rate payable to the servicer and the trustee and Retained Interest Rate with respect to any mortgage loan.

"Non-Pro Rata Security" is a Regular Security on which principal is distributed in a single installment or by lots of specified principal amounts if requested by a holder of securities or by random lot.

"OID Regulations" are sections 1271-1273 and 1275 of the Code and the Treasury regulations issued under those sections that set forth the rules governing original issue discount.

"Participants" are participating organizations through which a Security Owner can hold its book-entry security.

"Partnership Securities" are securities which represent interests in a Partnership Trust Fund.

"Partnership Trust Fund" is a trust fund which is treated as a partnership or, if owned by a single beneficial owner, ignored for federal income tax purposes.

"Plans" are retirement plans and other employee benefit plans and arrangements, including for this purpose individual retirement accounts and annuities and Keogh plans, which are subject to ERISA, Section 4975 of the Code or Similar Law, and bank collective investment funds and insurance company general and separate accounts holding assets of such plans, accounts or arrangements.

"Pool Insurance Policy" is an insurance policy, which provides coverage in an amount equal to a percentage, specified in the related prospectus supplement, of the aggregate principal balance of the residential loans on the Cut-Off Date,

subject to any limitations specified in the related prospectus supplement.

    "Prepayment Assumption" is the assumed rate of prepayment of the mortgage loans as set forth in the related prospectus supplement.

-191-

<Page>

    "Prepayment Period" is a period that may be particularly specified in the related prospectus supplement which may commence on:

    (1) the first day of the preceding calendar month with respect to securities that have monthly distribution dates, or

    (2) the first day of the month in which the immediately preceding distribution date occurred with respect to securities with distribution dates that occur less frequently than monthly, or the first day of the month in which the Cut-Off Date occurred with respect to the first Prepayment Period;

and will end in both cases on the last day of the preceding calendar month.

    "Primary Credit Insurance Policy" is an insurance policy which covers losses on residential loans up to an amount equal to the excess of the outstanding principal balance of a defaulted residential loan, plus accrued and unpaid interest on the related defaulted residential loan and designated approved expenses, over a specified percentage of the Collateral Value of the related residential property.

    "Primary Hazard Insurance Policy" is an insurance policy which provides coverage on residential loans of the standard form of fire and hazard insurance policy with extended coverage customary in the state in which the residential property is located.

    "PTCE" is the Prohibited Transaction Class Exemption.

    "Qualified Insurer" is a private mortgage guaranty insurance company duly qualified under applicable laws and approved as an insurer by Freddie Mac, Fannie Mae, or any successor entity, which has a claims-paying ability acceptable to the rating agency or agencies.

    "Realized Loss" is the amount of loss realized on a defaulted residential loan that is finally liquidated. This amount generally equals the portion of the unpaid principal balance remaining after application of all principal amounts recovered, net of amounts reimbursable to the master servicer for related expenses. With respect to residential loans for which the principal balances were reduced in connection with bankruptcy proceedings, the amount of that reduction.

    "Refinance Loan" are loans made to refinance existing loans or loans made to a borrower who was a tenant in a building prior to its conversion to cooperative ownership.

    "Regular Securities" are securities which constitute one or more classes of regular interests with respect to each REMIC Pool.

    "Regular Securityholder" is a holder of a Regular Security.

    "Relief Act" is the Servicemembers Civil Relief Act.

    "REMIC Pool" is an entity or portion of an entity as to which a REMIC election will be made.

-192-

<Page>

    "REMIC Provisions" are Sections 860A through 860G of the Code and Treasury regulations issued pursuant to those sections.

    "REMIC Regulations" are the Treasury regulations issued under the REMIC Provisions.

    "REMIC Securities" are securities which represent interests in a trust fund, or a portion of a trust fund, that the trustee will elect to have treated as a REMIC under the REMIC Provisions of the Code.

    "Reserve Fund" is an account which includes a combination of specified amounts of cash, a combination of one or more irrevocable letters of credit, or one or more United States government securities and other high quality

investments, or any other instrument satisfactory to the rating agency or agencies, which will be applied and maintained in the manner and under the conditions specified in the prospectus supplement. In addition or in alternative, an account funded through application of a portion of the interest payment on each mortgage loan or of all or a portion of amounts otherwise payable on the subordinate securities.

"Residual Securities" are Securities which constitute one or more classes of residual interests with respect to each REMIC Pool.

"Restricted Group" consist of any underwriter, the depositor, the trustee, the master servicer, any subservicer, the obligor on credit support and any borrower with respect to assets of the trust fund constituting more than 5% of the aggregate unamortized principal balance of the assets of the trust fund as of the date of initial issuance of the certificates.

"Retained Interest" are interest payments relating to residential loans, including any mortgage securities, or agency securities included in the trust fund which are retained by the depositor, any of its affiliates or its predecessor in interest.

"Retained Interest Rate" is the rate at which interest payments relating to residential loans, including any mortgage securities or agency securities retained by the Depositor, any of it affiliates or its predecessor in interest, are calculated.

"Security Owner" is a person who has beneficial ownership interests in a security.

"Security Register" is a record where exchanges or transfers of securities are registered by the Security Registrar.

"Security Registrar" is one who registers exchanges or transfers of securities in the Security Register.

"Similar Law" is any applicable federal, state or local law materially similar to Title I of ERISA or Section 4975 of the Code.

"SMMEA" is the Secondary Mortgage Market Enhancement Act of 1984, as amended.

"Startup Day" is the date the REMIC securities are issued.

-193-

<Page>

"Stripped Agency Securities" are GNMA Certificates, Fannie Mae Certificates or Freddie Mac Certificates issued in the form of certificates which represent:

(1) undivided interests in all or part of either the principal distributions, but not the interest distributions, or the interest distributions, but not the principal distributions, of the certificates; or

(2) interests in some specified portion of the principal or interest distributions, but not all distributions, on an underlying pool of mortgage loans or other GNMA Certificates, Fannie Mae Certificates or Freddie Mac Certificates.

"Title V" is Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980, enacted in March 1980.

"Trust Accounts" are one or more accounts included in each trust fund established and maintained on behalf of the holders of securities into which the master servicer or the trustee will be required to, deposit all payments and collections received or advanced with respect to assets of the related trust fund. A Trust Account may be maintained as an interest bearing or a non-interest bearing account, or funds held in the Trust Account may be invested in certain short-term high-quality obligations

"Unaffiliated Sellers" are sellers of residential loans to the depositor that are not affiliated with the depositor.

"U.S. Person" is

(1) A citizen or resident of the United States,

(2) a corporation or partnership or other entity created or organized in or under the laws of the United States, any State of the United States or the District of Columbia, unless, in the case of a partnership, Treasury regulations are adopted that provide otherwise, including any entity treated as a corporation or partnership for federal income tax purposes,

(3) an estate that is subject to U.S. federal income tax regardless of the source of its income, or

(4) a trust if a court within the United States is able to exercise primary supervision over the administration of that trust, and one or more U.S. Persons have the authority to control all substantial decisions of that trust or, to the extent provided in applicable Treasury regulations, certain trusts in existence on August 20, 1996, which are eligible to elect to be treated as U.S. Persons.

"VA Guarantee" is a guarantee of residential loans by the VA under the Serviceman's Readjustment of 1944, as amended.

-194-

<Page>

YOU SHOULD RELY ON THE INFORMATION CONTAINED OR INCORPORATED BY REFERENCE IN THIS PROSPECTUS SUPPLEMENT AND THE ATTACHED PROSPECTUS. WE HAVE NOT AUTHORIZED ANYONE TO PROVIDE YOU WITH DIFFERENT INFORMATION.

WE ARE NOT OFFERING THESE CERTIFICATES IN ANY STATE WHERE THE OFFER IS NOT PERMITTED.

-------------------

TABLE OF CONTENTS

PROSPECTUS SUPPLEMENT

<Table>
<Caption>

| | PAGE |
|---|---|
| <S> | <C> |
| Summary................................... | S-7 |
| Risk Factors.............................. | S-19 |
| Forward-Looking Statements................ | S-29 |
| Defined Terms............................. | S-29 |
| Description of the Loans.................. | S-30 |
| The Master Servicer and the Servicers..... | S-34 |
| Description of the Offered Certificates.... | S-39 |
| Prepayment and Yield Considerations........ | S-67 |
| Assumed Loan Characteristics.............. | S-75 |
| The Pooling and Servicing Agreement....... | S-85 |
| Federal Income Tax Consequences........... | S-98 |
| State Taxes............................... | S-102 |
| ERISA Considerations...................... | S-102 |
| Legal Investment.......................... | S-104 |
| Use of Proceeds........................... | S-104 |
| Underwriting.............................. | S-105 |
| Ratings................................... | S-105 |
| Legal Matters............................. | S-106 |
| Glossary of Terms......................... | S-107 |
| Annex A: Mortgage Loan Statistical Information............................... | A-1 |

PROSPECTUS

<Caption>

| | PAGE |
|---|---|
| <S> | <C> |
| Summary of Terms. | 6 |
| Risk Factors.............................. | 17 |
| Defined Terms............................. | 27 |
| The Trust Funds........................... | 27 |
| Use of Proceeds........................... | 43 |
| Yield Considerations...................... | 43 |
| Maturity and Prepayment Considerations..... | 45 |
| The Depositor............................. | 48 |
| Residential Loans......................... | 49 |
| Description of the Securities............. | 51 |
| Description of Primary Insurance Coverage... | 88 |
| Description of Credit Support............. | 94 |
| Certain Legal Aspects of Residential Loans.. | 102 |
| Federal Income Tax Consequences........... | 128 |
| REMICs.................................... | 129 |
| State and Other Tax Consequences.......... | 174 |
| ERISA Considerations...................... | 175 |
| Legal Investment.......................... | 179 |
| Plans of Distribution..................... | 182 |
| Incorporation of Certain Information by Reference............................... | 184 |
| Legal Matters............................. | 184 |
| Financial Information..................... | 185 |
| Rating.................................... | 185 |
| Glossary of Terms......................... | 187 |

</Table>

DEALERS WILL BE REQUIRED TO DELIVER A PROSPECTUS SUPPLEMENT AND PROSPECTUS WHEN
ACTING AS UNDERWRITERS OF THESE CERTIFICATES AND WITH RESPECT TO THEIR UNSOLD
ALLOTMENTS OR SUBSCRIPTIONS. IN ADDITION, ALL DEALERS SELLING THESE CERTIFICATES
WILL DELIVER A PROSPECTUS SUPPLEMENT AND PROSPECTUS UNTIL 90 DAYS FOLLOWING THE
CLOSING DATE.

                        $724,468,034 (Approximate)

                              [MASTR LOGO]

                    MASTR Seasoned Securitization
                            Trust 2004-1
                              (Issuer)

                    Mortgage Asset Securitization
                        Transactions, Inc.
                           (Depositor)

                    UBS Real Estate Securities Inc.
                            (Transferor)

                      Wells Fargo Bank, N.A.
                        (Master Servicer)

                  Mortgage Pass-Through Certificates,
                          Series 2004-1

                  --------------------------------
                        PROSPECTUS SUPPLEMENT
                  --------------------------------

                    [UBS INVESTMENT BANK LOGO]
                            UNDERWRITER

                        SEPTEMBER 30, 2004

                        STATEMENT OF DIFFERENCES
                        ------------------------

The registered trademark symbol shall be expressed as................. 'r'
The section symbol shall be expressed as............................. 'SS'
The dagger symbol shall be expressed as.............................. 'D'
The double dagger symbol shall be expressed as....................... 'DD'

</TEXT>
</DOCUMENT>

# EXHIBIT 9

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Veronica A Gonzales

36 Rustic Way San Rafael, CA 94901

TELEPHONE NO.:                 FAX NO. *(Optional):*

E-MAIL ADDRESS *(Optional):*

ATTORNEY FOR *(Name):* In Pro Per

**FILED**

MAY 15 2014

Superior Court, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: E. Chais, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Marin

STREET ADDRESS: 3501 Civic Center Drive

MAILING ADDRESS: 3501 Civic Center Drive

CITY AND ZIP CODE: San Rafael, 94903

BRANCH NAME:

PLAINTIFF/PETITIONER: Veronica A Gonzales

DEFENDANT/RESPONDENT: Wells Fargo Home Mortgage, INC., et al.

| REQUEST FOR DISMISSAL | CASE NUMBER: 1401725 |
|---|---|

**A conformed copy will not be returned by the clerk unless a method of return is provided with the document.**

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1. TO THE CLERK: Please **dismiss** this action as follows:

  a. (1) [✓] With prejudice   (2) [ ] Without prejudice

  b. (1) [✓] Complaint   (2) [ ] Petition

    (3) [ ] Cross-complaint filed by *(name):*               on *(date):*

    (4) [ ] Cross-complaint filed by *(name):*               on *(date):*

    (5) [✓] Entire action of all parties and all causes of action

    (6) [ ] Other *(specify):**

2. *(Complete in all cases except family law cases.)*

  The court [ ] did [ ] did not waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*

Date:

Veronica A. Gonzales

(TYPE OR PRINT NAME OF [ ] ATTORNEY [✓] PARTY WITHOUT ATTORNEY)             (SIGNATURE)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:

[ ] Plaintiff/Petitioner      [ ] Defendant/Respondent

[ ] Cross-Complainant

3. **TO THE CLERK:** Consent to the above dismissal is hereby given.**

Date:

(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)             (SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:

[ ] Plaintiff/Petitioner      [ ] Defendant/Respondent

[ ] Cross-Complainant

*(To be completed by clerk)*

4. [✓] Dismissal entered as requested on *(date):* MAY 15 2014

5. [ ] Dismissal entered on *(date):*            as to only *(name):*

6. [ ] Dismissal **not entered** as requested for the following reasons *(specify):*

7. a. [ ] Attorney or party without attorney notified on *(date):*

  b. [ ] Attorney or party without attorney not notified. Filing party failed to provide

    [ ] a copy to be conformed   [ ] means to return conformed copy

Date: MAY 15 2014            Clerk, by KIM TURNER        E. CHAIS   , Deputy

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. Jan. 1, 2013]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.;
Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390
www.courts.ca.gov

Exhibit 11, Page 1 of 2

CIV-110

| PLAINTIFF/PETITIONER: Veronica A Gonzales | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Wells Fargo Home Mortgage, INC., et al. | 1401725 |

---

**COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS**

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

---

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name):*

2. The person named in item 1 is (*check one below*):
   a. ☐ not recovering anything of value by this action.
   b. ☐ recovering less than $10,000 in value by this action.
   c. ☐ recovering $10,000 or more in value by this action. (*If item 2c is checked, item 3 must be completed.*)

3. ☐ All court fees and court costs that were waived in this action have been paid to the court *(check one):*  ☐ Yes  ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: 5/15/14

_____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)

_____
(SIGNATURE)

---

**REQUEST FOR DISMISSAL**

# EXHIBIT 10

Armine Singh, Esq. (SBN 266694)
Dianna Ter- Vardanyan, Esq. (SBN 253636)
**Prime Law Group, APC**
101 N. Brand Blvd. PH1920
Glendale, CA 91203
Direct: 818-276-2464
E-Fax: 818-446-2162

Attorneys for Plaintiff,
VERONICA A. GONZALES

```
FILED
JUL 22 2014
KIM TURNER, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: J. Chen, Deputy
```

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF MARIN

| | |
|---|---|
| VERONICA A. GONZALES, *an individual*; | Case No. CIV **1402813** |
| | |
| Plaintiff, | **VERIFIED COMPLAINT:** |
| | |
| v. | **(1) VIOLATION OF *CIVIL CODE* SECTION 2923.5,**<br>**(2) VIOLATION OF *CIVIL CODE* SECTION 2924.17;**<br>**(3) VIOLATION OF *CIVIL CODE* SECTION 2923.55;**<br>**(4) VIOLATION OF CAL. *CIVIL CODE* SECTION 2923.6, 2923.7;**<br>**(5) DECLARATORY RELIEF PURSUANT TO CAL. *CIVIL CODE* SECTION 2924.12;**<br>**(6) VIOLATION OF CAL. *CIVIL CODE* SECTION 2934a, 2924b, 2924a;**<br>**(7) UNFAIR BUSINESS PRACTICES.** |
| WELLS FARGO BANK, N.A.;<br>NORTHWEST TRUSTEE SERVICES,<br>INC.; and DOES 1 through 20, inclusive, | |
| | |
| Defendants. | |

Plaintiff, VERONICA A. GONZALES, an individual, alleges as follows:

### PARTIES

1. Plaintiff VERONICA A. GONZALES (hereinafter referred to as "Plaintiff") is, and at all times relevant to the facts herein, were individuals residing in real property commonly known 36 Rustic Way San Rafael, CA 94901 (hereinafter referred to as "Subject Property") located in the County of MARIN, in the State of California.

2. Plaintiff is informed and believes and based thereon alleges that Defendant WELLS FARGO BANK, N.A. ("WELLS FARGO"), is and at all times relevant to the facts herein, was a national association, doing business in the County MARIN, State of California.

3. Plaintiff is informed and believes and based thereon alleges that Defendant NORTHWEST TRUSTEE SERVICES, INC. (" NORTHWEST") is and at all times relevant to the facts herein, was a California Corporation, registered in the State of California, bound by the laws of the state of California, doing business in the County MARIN, State of California.

4. The true names and capacities, whether individual, corporate, partnership, associate, or otherwise of Defendants DOES 1 through 20, are unknown to Plaintiff who sues each Defendant by such fictitious names is informed and believe and based thereon allege each of the Defendants designated herein as a fictitiously named Defendant is, and in some manner, was responsible for the events and happenings referred to herein, either contractually or tortuously. When Plaintiff ascertains the true names and capacities of DOES 1 through 20, they will amend this Complaint accordingly.

5. Plaintiff is informed and believes and based thereon alleges that Defendants and each of them, are, and at all times herein mentioned were, the agents, joint venturers, officers, members representatives, servants, consultants or employees of their co-defendants, and in committing the acts herein alleged, were acting within the scope of such affiliation with the knowledge, permission, consent or subsequent ratification of their co-defendants.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this matter as the Subject Property is located in the County of MARIN, California.

7. In addition, this Court has subject matter jurisdiction over the claims raised herein pursuant to *California Constitution* Article VI, section 10, which grants this Court "original jurisdiction in all causes except those given by statute to other trial courts."

8. Defendants herein purposefully directed their activities to the State of

1
VERIFIED COMPLAINT

California. As a result, Defendants caused an event or events to occur in California, and more particularly in the County of MARIN, out of which this action arises and which form the basis of this action.

9. Defendants either are entities duly licensed to do business in the State of California or are entities that regularly conduct business within this judicial district within California.

10. Venue is proper for this Court since the Subject Property (described below) is located in the County of MARIN and because the events or events out of which this action arises and which form the basis for this action arise in the County of MARIN.

## GENERAL FACTUAL ALLEGATIONS
### The Home Affordable Modification Program & "Dual Tracking"

11. Pursuant to the Emergency Economic Stabilization Act of 2008, the U.S. Department of Treasury implemented the Home Affordable Modification Program ("HAMP") as a program designed to provide affordable mortgage loan modifications and other alternatives to foreclosure for eligible borrowers. *See* Pub.L. No. 110–343, 122 Stat. 3765 (codified as amended at 12 U.S.C. §§ 5201–5253). The centerpiece of the statute was the Trouble Asset Relief Program ("TARP"), through which the Secretary of the Department of Treasury was delegated broad powers to mitigate the financial impact of the foreclosure crisis and preserve homeownership. 12 U.S.C. §§ 5201, 5211–5241. Acting under this authority, the Secretary of the Treasury announced the "Making Home Affordable Program" in February 2009. One sub-part of this program is the HAMP. The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.

12. Under HAMP, loan servicers are provided with at least $1,000 incentive payments from the government for each permanent mortgage loan modification completed. *See* *Bosque* 762 F.Supp.2d 342 (2011), at 347. Servicers must then use a two-step process for HAMP modification. Step one includes an eligibility criteria, which borrowers must meet in order to qualify for a Trial Period Plan ("TPP"). Step two involves providing the borrower with an Agreement that outlines the terms of the final modification. (SD 09–01 at 14.)

13.     However, lenders have misused the HAMP system, by engaging in what Attorney Generals call, "dual tracking," but for homeowners struggling to avoid foreclosure it may as well be called double-crossing. Dual tracking refers to what is now a common lender tactic, where while a borrower in default seeks an alternative loss mitigation strategy (e.g. a short sale or a loan modification), the lender quietly continues to pursue foreclosure at the same time. In the meanwhile, in order to drag out the process, the bank sends ongoing of requests to the borrower to send additional documentation (which is often documents the borrower has already provided). As the borrower is lulled into thinking that his or her home will not be taken away, and as the bank continues to send ongoing duplicative requests for more information, the trustee's sale date sneaks upon the borrower and on the sale date the bank immediately swoops in and conducts the trustee's sale in the midst of the loan modification process.

14.     As a result of the lender's misuse of the HAMP system as well as unsound banking practices, effective January 1, 2013, Attorney General Kamala D. Harris's Homeowner Bill of Rights protects homeowners and borrowers during the mortgage and foreclosure process. The Homeowner Bill of Rights prohibits a series of inherently unfair bank practices that have needlessly forced thousands of Californians, including Plaintiff into defaulting on their mortgages. The law restricts dual-track foreclosures, where a lender forecloses on a borrower despite being in discussions over a loan modification to save the home. It also guarantees struggling homeowners a single point of contact at their lender with knowledge of their loan and direct access to decision makers, and imposes civil penalties on fraudulently signed mortgage documents. In addition, homeowners may require loan servicers to document their right to foreclose.

15.     The Homeowner Bill of Rights builds upon and extends reforms first negotiated in the recent national mortgage settlement between 49 states and leading lenders. Attorney General Harris secured up to $18 billion for California homeowners in that agreement, and has also built a Mortgage Fraud Strike Force to investigate crime and fraud associated with mortgages and foreclosures. The Homeowner Bill of Rights consists of a series of related bills, including two identical bills that were passed on July 2, 2012 by the state Senate and Assembly: AB 278 (Eng, Feuer, Pérez, Mitchell) and SB 900 (Leno, Evans, Corbett, DeSaulnier, Pavley, Steinberg).

16.     On or about November 21, 2001, Plaintiff financed the Subject Property. As evidence of the loan, Plaintiff executed a promissory note ("Note"), and concurrently executed a Deed of Trust ("Deed of Trust") as security for the Note. The Deed of Trust for the Subject Property was recorded as Document Number 2001-0078369 in the Official Records of the MARIN County Recorder's Office. The named Lender in the Deed of Trust was "WELL FARGO." Attached hereto and incorporated herein by reference as "Exhibit A" is a true and correct copy of the Deed of Trust. Mortgage Electronic Registration Systems, Inc. ("MERS") was designated as a beneficiary and nominee under the Deed of Trust. The trustee in the Deed of Trust was "Fidelity National Title Insurance Company."

17.     On or about December 1, 2010, Defendants caused to be recorded a Notice of Default and Election to Sell Under Deed of Trust ("NOD") in the Official County Recorder's Office Records as Document No. 2010-0061857. The NOD contains a boilerplate declaration, which stated, the mortgagee has tried with due diligence to contact the borrower to discuss the borrower's financial situation and to explore options to avoid foreclosure as required by California Civil Code § 2923.5. This boilerplate paragraph was false as Plaintiff had not been contacted as required by Cal. Civil Code section 2923.5 prior to the recordation of the NOD.

18.     On or about May 9, 2013, Defendants caused to be recorded a Notice of Trustee's Sale in the Official County Recorder's Office Records as Document No. 2013-0032121. Attached hereto and incorporated herein by reference as "Exhibit B" is a true and correct copy of the Notice of Trustee's Sale.

19.     The Defendants, in breach of their promise to postpone the foreclosure sale as well as through substantive and procedural irregularities of the non-judicial foreclosure process, are undertaking a wrongful non-judicial foreclosure of the Subject Property pursuant to California *Civil Code* section 2924 *et seq*. Plaintiff now faces the loss of the Subject Property, as well as lost the opportunity to pursue other foreclosure prevention options that they would have pursued but for the Defendant's violations of California *Civil Code* section 2924 *et seq*.

## FIRST CAUSE OF ACTION
### (VIOLATION OF *CIVIL CODE* SECTION 2923.5)
### Against ALL Defendants & DOES 1-20

20.    By this reference, Plaintiff incorporates each and every fact alleged in paragraphs 1 through 19 above, as though fully set forth herein.

21.    On or about December 1, 2010, Defendants caused to be recorded a Notice of Default and Election to Sell Under Deed of Trust ("NOD") in the Official County Recorder's Office Records as Document No. 2010-0061857. The NOD contains a boilerplate declaration, which stated, the mortgagee has tried with due diligence to contact the borrower to discuss the borrower's financial situation and to explore options to avoid foreclosure as required by California Civil Code § 2923.5. This boilerplate paragraph was false as Plaintiff had not been contacted as required by Cal. Civil Code section 2923.5 prior to the recordation of the NOD.

22.    California *Civil Code* section 2923.5 provides that, prior to the recording of a Notice of Default, a beneficiary or authorized agent must contact the borrower via telephone or in person to access the borrower's financial situation and explore options for the borrower to avoid foreclosure. A beneficiary or authorized agent is excused from this requirement only if the failure to contact the borrower occurred despite the due diligence of the beneficiary or authorized agent. "Due diligence" means sending a letter by first class mail that includes a toll free number made available by HUD and thereafter three (3) attempts to contact the borrower by phone to the primary number on the file. A beneficiary or authorized agent satisfies the telephone contact requirements if it determines, after attempting to contact the borrower by telephone, that the primary and any secondary number have been disconnected. If the beneficiary or authorized agent does not receive a response from the borrower within two weeks after the telephone requirements have been met, the beneficiary or authorized agent must send a certified letter to the borrower, with return receipt requested.

23.    A beneficiary and authorized agent are excused from the requirements of California *Civil Code* section 2923.5 described in the previous paragraph if: (1) the borrower has voluntarily surrendered the property; (2) the borrower has contracted with an organization whose primary business is advising borrowers on how to extend the foreclosure process; or (3) the borrower is in bankruptcy.

24.    A beneficiary and authorized agents are required to refrain from recording a Notice of Default and proceeding with the foreclosure process until thirty (30) days has

passed from the time they made the contact with the borrower as described above or from the
time they satisfied the due diligence requirements as described above.

25.     None of the Defendants has contacted the borrower, or attempted to contact
the borrower as required under Cal. Civil Code section 2923.5, to discuss her financial
situation or options for avoiding foreclosure as required under California *Civil Code* section
2923.5. Indeed, the paragraph inserted into the NOD purporting to that the Defendants had
complied is false.     Plaintiff had not voluntarily surrendered the Subject Property, nor
contracted with an organization whose primary purpose is to delay foreclosure proceedings,
or filed for bankruptcy prior to the recordation of the NOD.

26.     In violation of California *Civil Code* section 2923.5 Defendants caused to be
executed and recorded the NOD even though the required contacts with Plaintiff had not
been made. The boilerplate declaration in the NOD that the requirements of California *Civil
Code* section 2923.5 were met is false. As a direct and foreseeable result of the Defendants'
violations under California *Civil Code* section 2923.5, Plaintiff has suffered and will
continue to suffer substantial irreparable harm, including but not limited to the potential loss
of the Subject Property, the opportunity to pursue foreclosure prevention alternatives they
would have qualified for had the Defendants contacted them to discuss alternatives to
foreclosure prior to recording the Notice of Default, the cost and expense of the instant
pending litigation, continuing emotional distress, and other actual and consequential damages
that will be proven on date of trial.


### SECOND CAUSE OF ACTION
### (VIOLATION OF *CIVIL CODE* SECTION 2924.17)
### Against ALL Defendants & DOES 1-20

31.     By this reference, Plaintiff incorporates each and every fact alleged in
paragraphs 1 through 30 above, as though fully set forth herein.

27.     Pursuant to California *Civil Code* section 2924.17, "A declaration recorded
pursuant to 2923.5... in connection with a foreclosure subject to the requirements of Section
2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall
be accurate and complete and supported by competent and reliable evidence." Because the

6
VERIFIED COMPLAINT

Defendants did not ensure that they had reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose after January 1, 2013, including the borrower's loan status and loan information, the Defendants violated California *Civil Code* section 2924.17. The Defendants have no ensured that they have reviewed competent and reliable evidence to substantiate the borrower's default and right to foreclose after January 1, 2013.

28.     Furthermore, pursuant to *Civil Code* section 2924.17 (b), before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information. Here, Defendants did not ensure that they had reviewed competent and reliable evidence to substantiate Plaintiff's default and their right to foreclosure, including the loan status, the loan information, and whether any attempts to discuss foreclosure prevention alternatives as mandated by California *Civil Code* section 2923.5 had been completed.

29.     Pursuant to California *Civil Code* section 2924.19 (a), any injunction shall remain in place and any trustee's sale shall be enjoined until the court determines that the mortgage servicer, mortgagee, beneficiary, or authorized agent has corrected and remedied the violation or violations giving rise to the action for injunctive relief. Furthermore, pursuant to California *Civil Code* section 2924.19 (h), the court may award a prevailing borrower reasonable attorney's fees and costs in an action brought pursuant to this section. A borrower shall be deemed to have prevailed for purposes of this subdivision if the borrower obtained injunctive relief or damages pursuant to this section.

30.     As a direct and foreseeable result of the Defendants' violations under California *Civil Code* section 2923.5, Plaintiff has suffered and will continue to suffer substantial irreparable harm, including but not limited to the potential loss of the Subject Property, the opportunity to pursue foreclosure prevention alternatives they would have qualified for had the Defendants contacted them to discuss alternatives to foreclosure prior to recording the Notice of Default, the cost and expense of the instant pending litigation,

continuing emotional distress, and other actual and consequential damages that will be proven on date of trial.

## THIRD CAUSE OF ACTION

### (VIOLATION OF *CIVIL CODE* SECTION 2923.55)

### Against ALL Defendants & DOES 1-20

31.     By this reference, Plaintiff incorporates each and every fact alleged in paragraphs 1 through 30 above, as though fully set forth herein.

32.     California *Civil Code* section 2923.55, provides the following: "a mortgage servicer shall send the following information in writing to the borrower…

(B) A statement that the borrower may request the following:

(i) A copy of the borrower's promissory note or other evidence of indebtedness.

(ii) A copy of the borrower's deed of trust or mortgage.

(iii) A copy of any assignment, if applicable, of the borrower's mortgage or deed of trust required to demonstrate the right of the mortgage servicer to foreclose.

(iv) A copy of the borrower's payment history since the borrower was last less than 60 days past due."

33.     Plaintiff has not received any of the documents listed in Cal. *Civil Code* section 2923.55 subsection (B), in violation of Cal. *Civil Code* section 2923.55, despite a request to furnish the aforementioned documents after January 1, 2013.

34.     Plaintiff has suffered and will continue to suffer substantial irreparable harm, including but not limited to the potential loss of the Subject Property, the cost and expense of the instant pending litigation, continuing emotional distress, and other actual and consequential damages that will be proven on date of trial. Furthermore, Plaintiff has been harmed in that Plaintiff was unable to exercise their rights to reinstate the loan under Cal. Civil Code section 2924c, as well as exercise her right to secure other alternatives to foreclosure.

/ / /

**FOURTH CAUSE OF ACTION**

**(VIOLATION OF CAL. *CIVIL CODE* SECTION 2923.6, 2923.7)**

**Against ALL Defendants & DOES 1-20**

35.     By this reference, Plaintiff incorporates each and every fact alleged in paragraphs 1 through 34 above, as though fully set forth herein.

36.     Pursuant to California *Civil Code* sections 2923.6, the mortgage servicer, trustee, beneficiary, or authorized agent shall not record a notice of default or notice of sale or conduct a trustee's sale until any of the following occurs:

> "(1) The mortgage servicer makes a written determination
>
> that the borrower is not eligible for a first lien loan modification,
>
> and any appeal period pursuant to subdivision (d) has expired."

37.     Defendants have not made a written determination that the Plaintiff is not eligible for a first lien loan modification, and are in violation of California *Civil Code* sections 2923.6, as Defendants have a duty to maximize the net present value under their pooling and servicing agreements, and a mortgage servicer acts in the best interests of all the parties to the loan pool or investors in the pooling and servicing agreement if it agrees to or implements a loan modification or workout plan.

38.     California *Civil Code* section 2923.7 further provides that upon the request of a foreclosure prevention alternative, the mortgage servicer "shall promptly establish a single point of contact and provide to the borrower one or more direct means of communication with the single point of contact." Plaintiff has not been provided with the name or information of their "Case manager".

39.     As a direct and foreseeable result of the Defendants' violations under California *Civil Code* section 2924 *et seq.*, Plaintiff has suffered and will continue to suffer substantial irreparable harm, including but not limited to the potential loss of the Subject Property, the cost and expense of the instant pending litigation, continuing emotional distress, and other actual and consequential damages that will be proven on date of trial. Furthermore, Plaintiff has been harmed in that Plaintiff was unable to exercise their rights to reinstate the loan under Cal. Civil Code section 2924c, as well as exercise their rights to secure other alternatives to foreclosure.

**FIFTH CAUSE OF ACTION**

**(DECLARATORY RELIEF PURSUANT TO CAL. *CIVIL CODE* SECTION 2924.12)**

**Against ALL Defendants & DOES 1-20**

40.     By this reference, each and every fact alleged in paragraphs 1 through 39 above are incorporated herein by reference, as though fully set forth herein.

41.     Pursuant to Cal. *Civil Code* section 2924.12 (a) (1), "If a trustee's deed upon sale has not been recorded, a borrower may bring an action for injunctive relief to enjoin a material violation of Section 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, or 2924.17."

42.     Defendants are in material violation of Cal. *Civil Code* section 2924.11, 2924.17, 2923.55, 2923.6, 2923.7 as alleged herein. Thus, Plaintiff, borrower of the subject loan, is able to bring an action for injunction relief to enjoin these violations.

43.     Pursuant to Cal. *Civil Code* section 2924.12 (a)(2), "Any injunction shall remain in place and any trustee's sale shall be enjoined until the court determines that the mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent has corrected and remedied the violation or violations giving rise to the action for injunctive relief."

44.     Pursuant to Cal. *Civil Code* section 2924.12 (i) A court may award a prevailing borrower reasonable attorney's fees and costs in an action brought pursuant to this section. A borrower shall be deemed to have prevailed for purposes of this subdivision if the borrower obtained injunctive relief or was awarded damages pursuant to this section.

**SIXTH CAUSE OF ACTION**

**(VIOLATION OF CAL. *CIVIL CODE* SECTION 2934a, 2924b, 2924a)**

**Against ALL Defendants & DOES 1-20**

45.     By this reference, Plaintiff incorporates each and every fact alleged in paragraphs 1 through 44 above, as though fully set forth herein.

46.     California *Civil Code* section 2934a provides the statutory guidelines on the procedure of substituting a trustee under a Deed of Trust, and the notice requirements that must be met thereafter.  Specifically, California *Civil Code* section 2934a subdivision (a) (1) allows a trustee to be substituted, "by the recording in the county in which the property is located of a substitution executed and acknowledged by: (A) all of the beneficiaries under the trust deed, or their successors in interest."

47.     No substitution of trustee has been recorded in the MARIN County recorder's office to duly substitute NORTHWEST as the rightful trustee under the Deed of Trust. To date, LSI is the rightful trustee duly appointed to give notice of and sell the Subject Property.

48.     Furthermore, Defendants needed to comply with the strict guidelines under California *Civil Code* section 2934a subdivision (b), which states the following:

> "If the substitution is executed, but not recorded, prior to the or concurrently with the recording of the notice of default, the beneficiary or beneficiaries or their authorized agents shall cause notice of the substitution to be mailed prior to or concurrently with the recording thereof, in the manner provided in Section 2924b, to all persons to whom a copy of the notice of default would be required to be mailed by the provisions of Section 2924b. An affidavit shall be attached to the substitution that notice has been given to those persons and in the manner required by this subdivision."

49.     Here, the Defendants or their authorized agents did not cause the notice of the substitution to be mailed prior to or concurrently with the recording thereof, in the manner provided in Section 2924b, to all persons to whom a copy of the notice of default would be required to be mailed by the provisions of Section 2924b. The Defendants have not even executed a property Substitution of Trustee.

50.     Furthermore, an affidavit, signed in the presence of a notary, is not attached to the substitution that notice has been given to those persons and in the manner required by Section 2934a subdivision (b).

51.     In fact, pursuant to subdivision (e), "any sale conducted by the substituted trustee is void," unless a new notice of trustee's sale is given pursuant to Cal. Civil Code section 2924f after a valid substitution of trustee is recorded. Indeed, pursuant to the requirements under California *Civil Code* section 2934a, the substituted must be executed and acknowledged by "**all** of the beneficiaries under the trust deed" (emphasis added).

52.     California *Civil Code* section 2924(a)(3) states that after the lapse of three months from the filing of the NOD, "the mortgagee, trustee, or other person authorized to take the sale shall give notice of the sale." On or about September 3, 2013, Defendants

11
VERIFIED COMPLAINT

1 | caused to be recorded a Notice of Trustee's Sale in the Official County Recorder's Office
2 | Records as Document No. 2013-296183. Attached hereto and incorporated herein by
3 | reference as "Exhibit C" is a true and correct copy of the Notice of Trustee's Sale. Because
4 | NORTHWEST is not the property trustee under the Deed of Trust, the Notice of Trustee's
5 | Sale is null and void.

6 | 53. As a direct and foreseeable result of the Defendants' violations under
7 | California *Civil Code* section 2924 *et seq.*, Plaintiff has suffered and will continue to suffer
8 | substantial irreparable harm, including but not limited to the potential loss of the Subject
9 | Property, the cost and expense of the instant pending litigation, continuing emotional
10 | distress, and other actual and consequential damages that will be proven on date of trial.

## SEVENTH CAUSE OF ACTION

### (UNFAIR BUSINESS PRACTICES)

#### Against ALL Defendants and DOES 1 through 20

14 | 54. By this reference, Plaintiffs incorporate each and every fact alleged in
15 | paragraphs 1 through 53 above, as though fully set forth herein.

16 | 55. The Unfair Competition Law defines unfair competition to include any "unfair,"
17 | "unlawful," or "fraudulent" business act or practice. California Business and Professions Code
18 | §17200, *et seq.* The Act also provides for injunctive relief and restitution for violations.

19 | 56. Defendants engaged in "unfair," "unlawful," and/or "fraudulent" business act
20 | or practice by failing to provide notice of a trustee's sale as required under California *Civil*
21 | *Code* sections 2923.55, 2923.6, 2923.7, 2934a as specifically alleged above, and
22 | incorporated herein by reference, yet continue to foreclose on the Subject Property.

23 | 57. Defendants engaged in "unfair," "unlawful," and/or "fraudulent" business act
24 | or practice by failing to contact the borrower, Plaintiffs, to discuss their financial situation or
25 | options for avoiding foreclosure as required under California *Civil Code* section 2923.5, yet
26 | fraudulently declaring in boilerplate language that they had fulfilled the requirements in the
27 | NOD. Furthermore, the boilerplate declaration attached to the NOD is void in and of itself as
28 | it does not comply with the requirements under 2923.5, in that the NOD was recorded less
than thirty (30) following the declaration's purported "due diligence contacts."

58. By virtue of the acts and omissions of the defendants, they have engaged in unfair competition within the meaning of California Business and Professions Code §17200, thereby entitling Plaintiff to injunctive and restitutionary relief as provided by California Business and Professions Code §17203.

59. The aforementioned acts were willful, oppressive, and malicious, in that the Defendants engaged in acts of unfair competition with the deliberate intent to injure Plaintiff. Plaintiff is therefore entitled to payment of damages in a sum sufficient to punish the Defendants and to set an example and deter such conduct in the future.

60. As a direct and foreseeable result of the Defendants' violation of Business and Professions Code §17200, Plaintiff has suffered and will continue to suffer substantial irreparable harm.

61. Plaintiff has been damaged from all causes alleged above in an amount exceeding the jurisdictional amount and is increasing each day. As a direct and foreseeable result of the Defendants' violations under California *Civil Code* section 2924 *et seq.*, Plaintiff has suffered and will continue to suffer substantial irreparable harm, including but not limited to the potential loss of the Subject Property, the cost and expense of the instant pending litigation, the opportunity to obtain foreclosure prevention alternatives, the back dues and interest Plaintiff would not have to date had they been assessed for alternatives prior to the recordation of the NOD, continuing emotional distress, and other actual and consequential damages that will be proven on date of trial. Furthermore, Plaintiff has been harmed in that Plaintiff was unable to exercise their rights to reinstate the loan under Cal. Civil Code section 2924c, as well as exercise their rights to secure other alternatives to foreclosure.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

## FIRST, SECOND, THIRD, FOURTH, FIFTH, & SIXTH CAUSES OF ACTION

(1) General damages in a sum according to proof against all Defendants in excess of $25,000;

(2) Compensatory damages provided by law including, not limited to California *Civil Code* § 3300;

(3)     For interest provided by law including, but not limited to California *Civil Code* § 3291 against all Defendants;

(4)     Consequential damages in an amount to be proven at trial;

(5)     Injunction prohibiting any further sale of Subject Property;

(6)     Equitable injunctive, and/or declaratory relief as the Court may deem just and proper.

## SEVENTH CAUSE OF ACTION

(1)     Restitution of profits that the defendants have unfairly obtained as a result of loss of income and interest;

(2)     Equitable injunctive, and/or declaratory relief as the Court may deem just and proper.

## ON ALL CAUSES OF ACTION

(1)     For costs and expenses incurred in this action;

(2)     For such other and further relief in law and equity that the Court deems just and proper.

DATED: July 21, 2014            **Prime Law Group, APC**

By: _____

Armine Singh, Esq.
Attorneys for Plaintiff,
VERONICA A. GONZALES

14
VERIFIED COMPLAINT

## VERIFICATION

I, VERONICA GONZALES, declare and state as follows:

1.      I am the Plaintiff in the instant action.   I make this declaration of my own personal knowledge, except as to facts which I am informed and believe are true. If called upon to testify, I could and would testify competently thereto as set forth below.

2.      I have read Plaintiff's             VERIFIED COMPLAINT in this action and know its contents.  The matters stated therein are true to my own knowledge except as to those matters which are therein alleged on my information and belief.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed on July 21, 2014.

7/21/14

_____
VERONICA GONZALES,
Plaintiff

# EXHIBIT A

Recorded at the request of:
First American Title Co.
Title Order 5-215970ab
Southland Title-Escrow #LM3579LB
Recording Requested By:

**WELLS FARGO HOME MORTGAGE, INC.**
**5000 S.W.MEADOWS RD. #190**
**LAKE OSWEGO, OR 97035**

Return To:
**WELLS FARGO HOME MORTGAGE, INC.**
**FINAL DOCUMENTS X4701-024**
**3601 MINNESOTA DRIVE**
**BLOOMINGTON, MN 55435-6284**
Prepared By:
**MICHELLE L. GOLDNER**
**WELLS FARGO HOME MORTGAGE, INC.**
**5000 S.W.MEADOWS RD. #190**
**LAKE OSWEGO, OR 97035**

**2001-0078369**

Recorded
Official Records
County Of
Marin
JOHN C. THAYER
Recorder

REC FEE     61.00

06:00AM 21-Nov-2001 | Jn
| Page 1 of 19

---------------------[Space Above This Line For Recording Data]---------------------

AP#010-I01-38          **DEED OF TRUST**

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **OCTOBER 26, 2001**
together with all Riders to this document.
**(B) "Borrower"** is
**VERONICA A. GONZALES, AN UNMARRIED WOMAN**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **WELLS FARGO HOME MORTGAGE, INC.**

Lender is a **Corporation**
organized and existing under the laws of **THE STATE OF CALIFORNIA**

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        FORM 3005    1/01

Page 1 of 18        Initials: _____        SCA01   Rev 11/09/00

Lender's address is
P. O. BOX 5137, DES MOINES, IA 50306-5137
Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is FIDELITY NATIONAL TITLE INSURANCE COMPANY

(E) "Note " means the promissory note signed by Borrower and dated OCTOBER 25, 2001 .
The Note states that Borrower owes Lender SIX HUNDRED THOUSAND AND NO/100

Dollars
(U.S. $ ......600,000.00...........) plus interest. Borrower has promised to pay the debt in regular
Periodic Payments and to pay the debt in full not later than   NOVEMBER 1, 2031
(F) "Property" means the property that is described below under the heading "Transfer of
Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges
and late charges due under the Note, and all sums due under this Security Instrument, plus
interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower.
The following Riders are to be executed by Borrower (check box as applicable):

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider ☐ Biweekly Payment Rider ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an
electronic terminal, telephonic instrument, computer, or magnetic tape so as to order,
instruct, or authorize a financial institution to debit or credit an account. Such term includes,
but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers
initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation
or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et
seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be
amended from time to time, or any additional or successor legislation or regulation that

SCA02   Rev 12/18/00          Page 2 of 19          Initials _____          FORM 3005   1/01

governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | MARIN |
|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

**LEGAL DESCRIPTION IS ATTACHED HERETO AS SCHEDULE "A" AND MADE A PART HEREOF.**

Parcel ID Number:                                          which currently has the address of
**36 RUSTIC WAY**                                                                         [Street]
**SAN RAFAEL**                                  [City]  , California       94901        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

SCA03   Rev 11/03/00                Page 2 of 18        Initials                FORM 3005   1/01

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

SCA04   Rev 11/09/00          Page 4 of 19          Initials:          FORM 3005   1/01

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be

SCA05   Rev 11/09/00                Page 5 of 18         Initials_____            FORM 3005   1/01

required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination

or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In

either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or

(c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

SCA09    Rev 11/12/00                        Page 9 of 18          Initials _____          FORM 3005   1/01

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

SCA10   Rev. 03/22/00                Page 10 of 18            Initials              FORM 3005   1/01

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by

SCA11   Rev 11/09/00                    Page 11 of 18          Initials          FORM 3005   1/01

this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.  **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15.  **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly

requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.

SCA14   Rev 12/27/00         Page 14 of 18                        FORM 3005   1/01

The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21; (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or

SCA15   Rev 10/13/00                    Page 15 of 16                    Initials:_____                    FORM 3005   1/01

before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____                          _____(Seal)
                                                  VERONICA A. GONZALES          Borrower

SCA17   Rev 12/27/00          Page 17 of 19          Initials: _____          FORM 3005   1/01

State of California,                                                ss:

County of  MARIN

On November 5,2001 before me, *Kelli Reid, Notary Public*
                                                        personally appeared

VERONICA A. GONZALES, AN UNMARRIED WOMAN

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal,

                              *Kelli Reid*                          (Seal)

OFFICIAL SEAL
KELLI REID
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1193916
SONOMA COUNTY
My Commission Exp. Jan. 16, 2003

SCA18   Rev 10/17/00          Page 18 of 18      Initials          FORM 3005    1/01

SCHEDULE "A"

# DESCRIPTION

All that certain real property situate in the City of San Rafael, County of Marin, State of California, described as follows:

## PARCEL ONE:

BEGINNING at a point on the Southeasterly line of the cul-de-sac, known as Rustic Way, as said cul-de-sac is described in the Deed to the City of San Rafael, recorded March 17, 1955 in Book 929 of Official Records, at Page 29, Marin County Records, said point being the Southwesterly corner of that certain parcel of land described in the Deed from Marin Title Guaranty Company, a corporation, to Gregory S. Lyon, et ux, recorded January 16, 1962 in Book 1533 of Official Records, at Page 354, Marin County Records, thence leaving said line of Rustic Way and running thence along the Southwesterly boundary line of said Lyon parcel South 54° 03' East 141.868 feet to the most Southerly corner thereof; thence leaving said Southwesterly boundary line and running South 58° 57' 40" West 144.827 feet; thence North 47° 45' West 118.56 feet to a point on the Easterly line of Rustic Way hereinabove referred to, thence along said line of Rustic Way on a curve to the left with a radius of 140 feet for a distance of 77.756 feet, thence North 29° 18' 40" East 12.14 feet, thence on a curve to the right with a radius of 20 feet for a distance of 18.158 feet, thence on a curve to the left with a radius of 45 feet a distance of 20.99 feet to the point of beginning.

## PARCEL TWO:

AN EASEMENT for driveway purposes over the following described parcel:

BEGINNING at a point on the Southwesterly line of the hereinabove described parcel, said point being distant thereon South 47° 45' East 10.00 feet from the most Westerly corner thereof; thence along said Southwesterly line North 47° 45' West 10.00 feet to the most Westerly corner of the hereinabove described parcel; thence Southwesterly along the Southeasterly line of Rustic Way 15.00 feet to a point, thence leaving said line of Rustic Way and running Easterly in a straight line to the point of beginning.

5k

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

2003-0127315

Recorded
Official Records      REC FEE    25.00
County Of
Marin
JOAN C. THAYER
Recorder
                                    jlf
12:13PM 16-Oct-2003    Page 1 of 8

Recording requested by and, when recorded
return to:

WASHINGTON MUTUAL BANK, FA
2150 CABOT BLVD. WEST

LANGHORNE, PA 19047
ATTN: GROUP 9, INC.

▨▨ **Washington Mutual**

## EQUITY LINE OF CREDIT
## DEED OF TRUST

████4125

THIS DEED OF TRUST (Security Instrument) is between:
VERONICA A. GONZALES

whose address is  36 RUSTIC WAY
SAN RAFAEL, CA 94901                                      ("Grantor"),
GROUP 9, INC,                                                    , a
PENNSYLVANIA                                corporation, the address of which is
2150 CABOT BLVD. WEST
LANGHORNE, PA 19047                     ("Trustee");  and
Washington Mutual Bank, FA, a federal association, which is organized and
existing under the laws of the United States of America, and whose address is
400 E. Main Street, Stockton, CA 95290 ("Beneficiary") and its successors or
assigns.

1.  **Granting Clause.** For the benefit of Beneficiary, Grantor hereby grants, bargains, sells and
conveys to Trustee in trust, with power of sale, the real property in _____MARIN_____
County, California, described below, and all rights and interest in it Grantor ever gets:
SHOWN ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF BY THIS REFERENCE

Tax Parcel Number: _____010-101-38_____ together with all

4360 204/12/02) W4.2                        BANK                        Page 1 of 8

4125

Insurance proceeds and condemnation proceeds related to: Income, rents and profits from it; all plumbing, lighting, air conditioning and heating apparatus and equipment and other improvements; and all fencing, blinds, drapes, floor coverings, built-in appliances, and other fixtures, at any time installed on or in or used in connection with such real property.

All of the property described above will be called the "Property". If any of the Property is personal property, this Deed of Trust is also a Security Agreement which grants Beneficiary, as secured party, a security interest in all such property. Despite any other provision of this Deed of Trust, however, Beneficiary is not granted, and will not have, a nonpurchase money security interest in household goods, to the extent such security interest would be prohibited by applicable law. As used herein, "State" shall refer to the state of California.

2. **Obligation Secured.** This Deed of Trust is given to secure performance of each promise of Grantor contained herein and is a Home Equity Line of Credit Agreement with Beneficiary of even date herewith, with a maximum credit limit of $350,000.00 (the "Credit Agreement"), including any extensions, renewals or modifications thereof, and repayment of all sums borrowed by Grantor under the Credit Agreement, with interest from the date of each advance until paid at the rates provided therein. The Credit Agreement provides for a variable rate of interest. Under the Credit Agreement, the Grantor may borrow, repay and re-borrow from time to time, up to the maximum credit limit stated above, and all such advances shall be secured by the lien of this Deed of Trust. This Deed of Trust also secures payment of certain fees and charges payable by Grantor under the Credit Agreement, certain fees and costs of Beneficiary as provided in Section 9 of this Deed of Trust, and repayment of money advanced by Beneficiary to protect the Property or Beneficiary's interest in the Property, including advances made pursuant to Section 6 below. The Credit Agreement provides that unless sooner repaid, all amounts due under the Credit Agreement are due and payable in full thirty (30) years from the date of this Deed of Trust (the "Maturity Date"). All amounts due under the Credit Agreement and this Deed of Trust are called the "Debt".

3. **Representations of Grantor.** Grantor represents that:
(a) Grantor is the owner of the Property, which is unencumbered except by: assessments, reservations, and restrictions of record not inconsistant with the intended use of the Property and any existing first mortgage or deed of trust given in good faith and for value, the existence of which has been disclosed in writing to Beneficiary; and
(b) The Property is not presently and will not during the term of this Deed of Trust be used for any agricultural purposes.

4. **Promises of Grantor.** Grantor promises:
(a) To keep the Property in good repair and not to remove, alter or demolish any of the improvements on the Property, without first obtaining Beneficiary's written consent;
(b) To allow representatives of Beneficiary to inspect the Property at any reasonable hour, and to comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the Property;
(c) To pay on time all lawful taxes and assessments on the Property;
(d) To perform on time all terms, covenants and conditions of any prior mortgage or deed of trust covering the Property or any part of it and pay all amounts due and owing thereunder in a timely manner;
(e) To see to it that this Deed of Trust remains a valid lien on the Property superior to all liens except those described in Section 3(a), and to keep the Property free of all encumbrances which may impair Beneficiary's security;
(f) To keep the improvements on the Property insured by a company satisfactory to Beneficiary against fire and extended coverage perils, and against such other risks as Beneficiary

4125

may reasonably require, in an amount equal to the full insurable value of the improvements, and to deliver evidence of such insurance coverage to Beneficiary. Subject to the rights of the holder of any lien described in 3(a), Beneficiary shall be named as the loss payee on all such policies pursuant to a standard lender's loss payable clause. The amount collected under any insurance policy shall be applied to the repair of such improvements, unless doing so would impair Beneficiary's security, in which event such proceeds may be applied upon any indebtedness hereby secured. In the event of foreclosure or sale of the Property pursuant to the Trustee's power of sale, all rights of the Grantor in insurance policies then in force shall pass to the purchaser at the Sheriff's or Trustee's sale.

(g) To sign all financing statements and other documents that Beneficiary may request from time to time to perfect, protect and continue Beneficiary's security interest in the Property, Grantor irrevocably appoints Beneficiary as Grantor's attorney-in-fact to execute, file and record any financing statements or similar documents in Grantor's name and to execute all documents necessary to transfer title if there is a default; and

(h) To advise Beneficiary immediately in writing of any change in Grantor's name, address or employment.

5. Sale, Transfer or Further Encumbrance of Property. Subject to applicable law, the entire Debt shall become immediately due and payable in full upon sale or other transfer of the Property or any interest therein by Grantor by contract of sale or otherwise including, without limit, any further encumbrance of the Property.

6. Curing of Defaults. If Grantor fails to comply with any of the covenants in Section 4, including all the terms of any prior mortgage or deed of trust, Beneficiary may take any action required to comply with any such covenants without waiving any other right or remedy it may have for Grantor's failure to comply. Repayment to Beneficiary of all the money spent by Beneficiary on behalf of Grantor shall be secured by this Deed of Trust; at Beneficiaries option, advance may be made against the Credit Agreement to pay amounts due hereunder; such shall not relieve Beneficiary from liability for failure to fulfill the covenants in Section 4. The amount spent shall bear interest at the rates from time to time applicable under the Credit Agreement and be repayable by Grantor on demand. Although Beneficiary may take action under this paragraph, Beneficiary is not obligated to do so.

7. Remedies For Default.

(a) Prompt performance under this Deed of Trust is essential. If Grantor does not pay any installment of the Debt or other amount due hereunder on time, or any other event occurs that entitles Beneficiary to declare the unpaid balance of the Debt due and payable in full under the Credit Agreement, or if Grantor fails to comply with any other term, condition, obligation or covenant contained in the Credit Agreement or this Deed of Trust or any rider thereto, or any other deed of trust, mortgage, trust indenture or security agreement or other instrument having priority over this Deed of Trust, or if any representation of Grantor herein was false or misleading, the Debt and any other money whose repayment is secured by this Deed of Trust shall immediately become due and payable in full, at the option of Beneficiary, and the total amount owed by Grantor shall thereafter bear interest at the rate(s) stated in the Credit Agreement. Beneficiary may then or thereafter advise Trustee of the default and of Beneficiary's election to have the Property sold pursuant to Trustee's power of sale in accordance with applicable law and deliver to Trustee any documentation as may be required by law. After giving any notices and the time required by applicable law, Trustee shall sell the Property, either in whole or in separate parcels or other part, and in such order as Trustee may choose, at public auction to the highest bidder for cash in lawful money of the United States which will be payable at the time of sale all in accordance with applicable law. Anything in the preceding sentence to the contrary notwithstanding, Beneficiary

4125

may apply the Debt towards any bid at any such sale. Trustee may postpone any such sale by providing such notice as may be required by law. Unless prohibited by law, any person, including the Grantor, Beneficiary or Trustee, may purchase at any such sale. Trustee shall apply the proceeds of the sale as follows: (i) to the expenses of the sale, including a reasonable trustee's fee and lawyer's fee; (ii) to the obligations secured by this Deed of Trust; and, (iii) the surplus, if any, shall go to the person(s) legally entitled thereto.

(b)  Trustee shall deliver to the purchaser at the sale its deed, without warranty, which shall convey to the purchaser the interest in the Property which Grantor had or had the power to convey at the time of execution of this Deed of Trust and any interest which Grantor subsequently acquired. The Trustee's deed shall recite the facts showing that the sale was conducted in compliance with all the requirements of law and of this Deed of Trust. This recital shall be prima facie evidence of such compliance and conclusive evidence of such compliance in favor of bona fide purchasers and encumbrancers for value.

(c)  To the extent permitted by law the power of sale conferred by this Deed of Trust is not an exclusive remedy. In connection with any portion of the Property which is personal property, Beneficiary shall further be entitled to exercise the rights of a secured party under the Uniform Commercial Code as then in effect in the state of California.

(d)  By accepting payment of any sum secured by this Deed of Trust after its due date, Beneficiary does not waive its right to require prompt payment when due of all other sums so secured or to declare default for failure to so pay.

8.  **Condemnation; Eminent Domain.** In the event any portion of the Property is taken or damaged in an eminent domain proceeding, the entire amount of the award, or such portion as may be necessary to fully satisfy the Debt, shall, except as required by applicable law, be paid to the Debt.

9.  **Fees and Costs.** Grantor shall pay Beneficiary's and Trustee's reasonable cost of searching records, other reasonable expenses as allowed by law, and reasonable attorney's fees, in any lawsuit or other proceeding to foreclose this Deed of Trust; in any lawsuit or proceeding which Beneficiary or Trustee prosecutes or defends to protect the lien of this Deed of Trust; and, in any other action taken by Beneficiary to collect the Debt, including without limitation any disposition of the Property under the State Uniform Commercial Code; and, any action taken in bankruptcy proceedings as well as any appellate proceedings.

10.  **Reconveyance.** Trustee shall reconvey the Property to the person entitled thereto, on written request of Beneficiary, or following satisfaction of the obligations secured hereby and Beneficiary and Trustee shall be entitled to charge Grantor a reconveyance fee together with fees for the recordation of the reconveyance documents unless prohibited by law. If your Credit Line is cancelled or terminated, subject to applicable law, we may delay the cancellation or reconveyance of your security instrument for a reasonable period of time to enable us to post to your Credit Line Account any advances that you have received.

11.  **Trustee; Successor Trustee.** Beneficiary may, unless prohibited by law, appoint a successor Trustee from time to time in the manner provided by law. The successor Trustee shall be vested with all powers of the original trustee. The Trustee is not obligated to notify any party hereto of a pending sale under any other deed of trust or of any action or proceeding in which Grantor, Trustee or Beneficiary shall be a party unless such action or proceeding is brought by the Trustee.

12.  **Savings Clause.** If a law, which applies to this Deed of Trust or the Credit Agreement and which sets maximum loan charges, is finally interpreted by a court having jurisdiction so that the interest or other loan charges collected or to be collected in connection with this Deed of Trust or

█████ 4125

the Credit Agreement exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from Grantor which exceeded permitted limits will be refunded to Grantor. Beneficiary may choose to make this refund by reducing the principal owed or by making a direct payment. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

13. **Miscellaneous.** This Deed of Trust shall benefit and obligate the heirs, devisees, legatees, administrators, executors, successors, and assigns of the parties hereto. The term "Beneficiary" shall mean the holder and owner of the Credit Agreement secured by this Deed of Trust, whether or not that person is named as Beneficiary herein. The words used in this Deed of Trust referring to one person shall be read to refer to more than one person if two or more have signed this Deed of Trust or become responsible for doing the things this Deed of Trust requires. This Deed of Trust shall be governed by and construed in accordance with federal law and, to the extent federal law doesn't apply, the laws of the state of California. If any provision of this Deed of Trust is determined to be invalid under law, the remaining provisions of this Deed of Trust shall nonetheless remain in full force and effect.

14. **Beneficiary and Similar Statements.** Beneficiary may collect a fee in the maximum amount allowed by law for furnishing any beneficiary statement, payoff demand statement or similar statement.

By signing below, Grantor accepts and agrees to the provisions of this Deed of Trust and any rider(s) executed by Grantor concurrently therewith.

DATED AT  San Rafael , California  this  1st  day of October , 2003 .

GRANTOR(S):

_Veronica A. Gonzales_
VERONICA A. GONZALES

4125

STATE OF _CA_ }
} SS
COUNTY OF _MARIN_ }

On _October 1, 03_, before me, _HAMID SIGAROUDINIA_,
a Notary Public in and for the State of California, personally appeared
~~VERONICA A. GONZALES~~ and ~~personally~~
~~known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal

[NOTARY SEAL: HAMID SIGAROUDINIA / Commission # 1366531 / Notary Public - California / Marin County / My Comm. Expires Jul 27, 2006]

Notary Public in and for the State of California.

My commission expires: _July 27, 2006_

### REQUEST FOR FULL RECONVEYANCE
**Do not record. To be used only when Grantor's
Indebtedness has been repaid and Credit Agreement cancelled.**

TO: TRUSTEE _____

The undersigned is Beneficiary of the within Deed of Trust, and the legal owner and holder of
the Home Equity Line of Credit Agreement secured thereby. Said Deed of Trust is hereby
surrendered to you for reconveyance and you are requested, upon payment of all sums owing to
you, to reconvey, without warranty, to the person(s) entitled thereto, the right, title and interest
now held by you thereunder.

WASHINGTON MUTUAL BANK, FA _____

By _____

Its _____

■■■4125

# EXHIBIT "A"
## ATTACHMENT TO SECURITY INSTRUMENT

LYING AND BEING LOCATED IN THE CITY OF SAN RAFAEL, COUNTY OF MARIN, STATE OF CALIFORNIA; ALL THAT CERTAIN PARCEL OR TRACT OF LAND KNOWN AS:

BEGINNING AT A POINT ON THE SOUTHEASTERLY LINE OF THE CUL-DE-SAC, KNOWN AS RUSTIC WAY, AS SAID CUL-DE-SAC IS DESCRIBED IN THE DEED TO THE CITY OF SAN RAFAEL, RECORDED MARCH 17, 1955 IN BOOK 929 OF OFFICIAL RECORDS AT PAGE 29, MARIN COUNTY RECORDS, SAID POINT BEING THE SOUTHWESTERLY CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN THE DEED FROM MARIN TITLE GUARANTY COMPANY, A CORPORATION, TO GREGORY S. LYON, ET UX, RECORDED JANUARY 16, 1962 IN BOOK 1533 OF OFFICIAL RECORDS AT PAGE 354, MARIN COUNTY RECORDS, THENCE LEAVING SAID LINE OF RUSTIC WAY AND RUNNING THENCE ALONG THE SOUTHWESTERLY BOUNDARY LINE OF SAID LYON PARCEL SOUTH 54 03' EAST 141.858 FEET TO THE MOST SOUTHERLY CORNER THEREOF; THENCE LEAVING SAID SOUTHWESTERLY BOUNDARY LINE AND RUNNING SOUTH 56 57' 40" WEST 144.627 FEET; THENCE NORTH 47 45' WEST 118.56 FEET TO A POINT ON THE EASTERLY LINE OF RUSTIC WAY HEREINABOVE REFERRED TO, THENCE ALONG SAID LINE OF RUSTIC WAY ON A CURVE TO THE LEFT WITH A RADIUS OF 140 FEET FOR A DISTANCE OF 77.756 FEET, THENCE
NORTH 29 18' 40" EAST 12.14 FEET, THENCE ON A CURVE TO THE RIGHT WITH A RADIUS OF 20 FEET FOR A DISTANCE OF 18.158 FEET, THENCE ON A CURVE TO THE LEFT WITH A RADIUS OF 45 FEET A DISTANCE OF 20.99 FEET TO THE POINT OF BEGINNING.

31578 (07/14/03) W4.3                    BANK

4125

# ILLEGIBLE NOTARY SEAL DECLARATION

## (Government Code 27361.7)

I declare under penalty of perjury that the notary seal on the document to
which this statement is attached, read as follows:

| | |
|---|---|
| NAME OF NOTARY PUBLIC: | HAMID SIGAROUDINIA |
| COMMISSION NUMBER: | 1366831 |
| NOTARY PUBLIC STATE: | CA |
| NOTARY PUBLIC COUNTY: | MARIN |
| MY COMM. EXPIRES: | 7/27/2006 |
| SIGNATURE OF DECLARANT: | |
| PRINT NAME OF DECLARANT: | Heather Owens |
| CITY & STATE OF EXECUTION: | SAN RAFAEL CA |
| DATE SIGNED: | 10/1/2003 |

THE ABOVE INFORMATION MUST BE LEGIBLE FOR SCANNING

**EXHIBIT B**

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
**2013-0032121**

Recorded
Official Records
County of
Marin
RICHARD N. BENSON
Assessor-Recorder
County Clerk

| REC FEE    21.00

10:18AM 09-May-2013 | Page 1 of 2

Recording requested by:

When recorded mail to:
NORTHWEST TRUSTEE SERVICES, INC.
1241 E. Dyer Road, Suite 250
Santa Ana, CA 92705

_____

Space above this line for recorder's use only.

File No.                    Title Order No.                    MIN No.
APN 010-101-38

## NOTICE OF TRUSTEE'S SALE

**ATTENTION RECORDER: THE FOLLOWING REFERENCE TO AN ATTACHED SUMMARY IS APPLICABLE TO THE NOTICE PROVIDED TO THE TRUSTOR ONLY.**

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED 10/26/01. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**
A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in §5102 to the Financial code and authorized to do business in this state, will be held by duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to satisfy the obligation secured by said Deed of Trust. The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein.

Trustor(s): Veronica A. Gonzales, an unmarried woman
Recorded: 11/21/01, as Instrument No. 2001-0076369,of Official Records of MARIN County, California.
Date of Sale:    06/31/13 at 3:00 PM
Place of Sale: At the Fifth Avenue entrance to the San Rafael City Hall, 1400 Fifth Avenue, San Rafael, CA
The purported property address is: 36 RUSTIC WAY, SAN RAFAEL, CA 94901
Assessors Parcel No. 010-101-38
The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is $655,856.88. If the sale is set aside for any reason, the purchaser at the sale shall be entitled only to a return of the deposit paid, plus interest. The purchaser shall have no further recourse against the beneficiary, the Trustor or the trustee.



**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and if applicable, the rescheduled time and date for the sale of this property, you may call 877-484-9942 or 800-280-2832 or visit this Internet Web site www.USA-Foreclosure.com or www.Auction.com using the file number assigned to this case 7023.90962. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

Date: May 8, 2013

NORTHWEST TRUSTEE SERVICES, INC., as Trustee

Melissa Myers, Authorized Signatory
1241 E. Dyer Road, Suite 250, Santa Ana, CA 92705
888-387-6812

Sale Info website: www.USA-Foreclosure.com or www.Auction.com
Automated Sales Line: 877-484-9942 or 800-280-2832
Reinstatement and Pay-Off Requests: 866-387-NWTS

THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE
USED FOR THAT PURPOSE

2

# EXHIBIT 11

1   **Kettner Law Corporation**
   Marc Applbaum (SBN 222511)
2   2150 W Washington Street, Suite 104
   San Diego, CA 92110
3   Tel: (619) 756-7300
   Fax: (619) 363-3944
4   marc@kettnerlawcorp.com

5

6   Attorney for Plaintiff, VERONICA GONZALES

7

8

9

10           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                 **COUNTY OF MARIN**

12                    CIV **1603668**

13   VERONICA GONZALES       |   Case No.

14

15          Plaintiff,     |   **COMPLAINT FOR:**

16   v.                    |   1. **VIOLATION OF CALIFORNIA HOMEOWNER BILL OF RIGHTS**

17   WELLS FARGO BANK, N.A.; U.S. BANK,   |   2. **STATUTORY UNFAIR COMPETITION – CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200 ET SEQ.**
18   N.A.; and DOES 1 through 50, inclusive,

19                      |   3. **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

20         Defendants.   |   4. **NEGLIGENCE**

21

22                               BY FAX

23                  JURY TRIAL DEMANDED

24

25

26

27      Plaintiff, VERONICA GONZALES, alleges, by and through her attorney, as follows:

28

- 1 -

**GONZALES v. WELLS FARGO BANK, N.A. – COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**PARTIES**

1.      Plaintiff, VERONICA GONZALES, ("Plaintiff") is, and at all times relevant to the facts herein was, an individual residing in real property commonly known as **36 Rustic Way, San Rafael, CA 94901** ("subject property") located in the County of Marin, in the State of California.

2.      Plaintiff is informed and believes and based thereon alleges that Defendant WELLS FARGO BANK, N.A. ("WELLS FARGO") is, and at all times relevant to the facts herein was, a national association registered in the state of California, doing business in the County of Marin, State of California as current loan servicer.

3.      Plaintiff is informed and believes and based thereon alleges that Defendant U.S. BANK, N.A. ("US BANK") is, and at all times relevant to the facts herein was, a national association registered in the state of California, doing business in the County of Marin, State of California as current loan investor and as successor Trustee to Wachovia Bank, National Association, as Trustee for MSSTR 2004-1.

4.      The true names and capacities, whether individual, corporate, partnership, associate, or otherwise of Defendants DOES 1 through 50, are unknown to Plaintiff who sues each Defendant by such fictitious names. Plaintiff is informed and believes and based thereon alleges each of the Defendants designated herein as a fictitiously named Defendant is, and in some manner, was responsible for events and happenings referred to herein, either contractually or tortuously. When Plaintiff ascertains the true names of capacities of DOES 1 through 50, she will amend this complaint accordingly.

5.      Plaintiff is informed and believes and based thereon alleges that Defendants and each of them, are, and at all times herein were, the agents, joint ventures, officers, members, representatives, servants, consultants or employees of their co-defendants, and in committing the acts herein allege, were acting within the scope of such affiliation with knowledge, permission, consent or subsequent ratification of their co-defendants.

GONZALES v. WELLS FARGO BANK, N.A. – COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this matter, as the Subject Property is located in the County of Marin, California.

7.      In addition, this Court has subject matter jurisdiction over the claims raised herein pursuant to *California Constitution* Article VI, section 10, which grants this Court "original jurisdiction in all causes except those given by statute to other trial courts."

8.      Defendants herein purposefully directed their activities to the State of California. As a result, Defendants caused an event or events to occur in California, and more particularly in the County of Marin, out of which this action arises and which form the basis of this action.

9.      Defendants either are entities duly licensed to do business in the State of California or are entities that regularly conduct business within this judicial district within California.

10.     Venue is proper for this Court since the Subject Property is located in the County of Marin and because events or events out of which this action arises and which form the basis for this action arise in the County of Marin.

**STATEMENT OF FACTS**

11.     On or about November 21, 2001, Plaintiff financed the Subject Property for $600,000.00.  As evidence of the loan, Plaintiff executed a promissory note ("Note"), and concurrently executed Deed of Trust ("Deed of Trust") as security for the Note. The Deed of Trust for the Subject Property was recorded as Document No. 2001-0078369 in the Official Records of the Marin County Recorder's Office. The named Lender in the Deed of Trust was Wells Fargo Home Mortgage, Inc. The named Trustee in the Deed of Trust was Fidelity National Title Insurance Company.

12.     The Subject Property is Plaintiff's principal residence and is owner-occupied.

13.     On or about March 21, 2011, an Assignment of Deed of Trust was executed, and by that Assignment, all rights, title and interest under the Deed of Trust were assigned to

- 3 -

1  Defendant US BANK. The Assignment of Deed of Trust was recorded as Document No. 2011-
2  0015555 in the Official Records of the Marin County Recorder's Office.

3      14.    During or around June 2013, Plaintiff began experiencing financial difficulties.
4  Plaintiff contacted WELLS FARGO, her loan servicer, for assistance.  WELLS FARGO advised
5  Plaintiff that she would qualify for a loan modification if Plaintiff fell, and remained, at least two
6  months behind on her mortgage payments.

7      15.    Plaintiff was hesitant about falling behind on her loan since she had been current
8  at the time, but WELLS FARGO advised Plaintiff she had no other alternative.  Additionally,
9  WELLS FARGO promised Plaintiff that no foreclosure proceedings would initiate while Plaintiff
10  was under active review for modification.

11      16.    Plaintiff followed all instructions asked of her by WELLS FARGO.  Plaintiff
12  withheld payment for the following two months and gathered and completed all necessary
13  documents for an application.  Plaintiff then submitted an application for loan modification into
14  WELLS FARGO for review.   WELLS FARGO informed Plaintiff they had received her
15  application for modification and promised they would notify Plaintiff of a decision within the
16  following thirty-days.

17      17.    Plaintiff spent the following months reaching out to WELLS FARGO for status
18  updates and assistance.  WELLS FARGO ignored Plaintiff's correspondence rather than answer
19  Plaintiff's questions or return her phone calls.

20      18.    After months of futile contact, WELLS FARGO sent Plaintiff a letter indicating
21  her application was incomplete for missing documents.  Plaintiff was furious that WELLS
22  FARGO was just then notifying her of missing documents after Plaintiff had received prior
23  assurances from multiple WELLS FARGO representatives that her application was complete and
24  in review.

25      19.    Plaintiff contends she submitted all required documents for a loan modification.
26  WELLS FARGO had either lost or misplaced Plaintiff's submitted documents.  Plaintiff suffered
27  great anxiety since the documents WELLS FARGO lost or misplaced contained highly sensitive

28

GONZALES v. WELLS FARGO BANK, N.A. – COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

and confidential information concerning Plaintiff's state of financial affairs. Nevertheless, Plaintiff resubmitted all requested documents into WELLS FARGO and continued to await a resolution.

20.     At that point, Plaintiff wanted to establish a single point of contact with WELLS FARGO to ensure she could speak to the same representative who was knowledgeable about Plaintiff's affairs thus far. Throughout Plaintiff's dealings with WELLS FARGO, her single point of contact changed on multiple occasions. Plaintiff rarely spoke with her assigned contact and, rather, was transferred from one representative to another all of whom gave conflicting answers to questions and inaccurate status updates.

21.     Plaintiff's voicemails consistently went unanswered. The only updates obtained were a result of Plaintiff's due diligence in consistently contacting WELLS FARGO, rather than vice-versa as required by the Homeowner Bill of Rights. An uncommunicative single point of contact does not satisfy the requirement under Cal. Civ. Code §2923.7.

22.     Plaintiff felt as though WELLS FARGO had failed to provide her meaningful assistance since they were ignoring Plaintiff's every request. WELLS FARGO greatly delayed Plaintiff's modification review and put Plaintiff in a position whereby if Plaintiff were not offered a modification she would not be able to reinstate her loan since she was withholding payment per WELLS FARGO's advice.

23.     Shortly thereafter, Plaintiff received notification that she had been denied a loan modification. Plaintiff asked WELLS FARGO if she could appeal the denial but the WELLS FARGO representative erroneously informed Plaintiff that an appeal was not possible.

24.     Plaintiff was left in an unrecoverable default by way of WELLS FARGO's substantial delay in processing her initial modification review. As such, Plaintiff asked WELLS FARGO for any recourse they could offer since their actions induced Plaintiff into default then subsequently left her without any option other than to proceed with foreclosure.

25.     WELLS FARGO indicated that Plaintiff should re-apply for another loan modification. Plaintiff asked if there were any other alternative since her initial review left her in

1    a worse position, but WELLS FARGO informed Plaintiff that another modification was her only

2    opportunity to avoid foreclosure.

3         26.     Plaintiff continued to follow all instructions asked of her by WELLS FARGO as

4    she again gathered and completed another application for loan modification into WELLS

5    FARGO.  Plaintiff quickly submitted another loan modification request into WELLS FARGO.

6    WELLS FARGO confirmed receipt of Plaintiff's modification and again informed Plaintiff that

7    she would receive a decision within the following thirty-days.  WELLS FARGO's assurances

8    meant little to Plaintiff after they had severely delayed her first modification review.

9         27.     As expected, Plaintiff went months without hearing from WELLS FARGO despite

10   constantly seeking status updates regarding her second application for loan modification.

11   WELLS FARGO again requested Plaintiff re-submit documents that Plaintiff contends were

12   included in her original submission.  At that point, Plaintiff realized WELLS FARGO used this

13   tactic as a measure to delay her modification review and push her closer to foreclosure.

14        28.     After another extreme delay with little communication between WELLS FARGO

15   and Plaintiff despite Plaintiff's repeated requests for status updates, WELLS FARGO informed

16   Plaintiff that she had again been denied a loan modification.

17        29.     Plaintiff asked why she had been denied after she had received multiple assurances

18   from numerous representatives that she would receive a modification.  WELLS FARGO failed to

19   tender a response to any of Plaintiff's questions.

20        30.     Plaintiff continued to seek any possible assistance she could find regarding

21   assistance in reinstating her loan.  WELLS FARGO refused to provide any further assistance

22   despite the fact they are the sole entity and reason that Plaintiff fell into an unrecoverable default.

23        31.     On or about May 06, 2016, Rebecca Hall, purporting to be an agent of Northwest

24   Trustee Services, Inc. ("Northwest"), and alleging to be the trustee under the Deed of Trust,

25   caused to be recorded a Notice of Default and Election to Sell under Deed of Trust ("NOD") in

26   the Official Marin County Recorder's Office Records as Document No. 2016-0019853.

27

28

32.     On or about August 19, 2016, Melissa Lopez, purporting to be an agent of Northwest, alleging to be the trustee under the Deed of Trust, caused to be recorded a Notice of Trustee's Sale ("NTS") in the Official Marin County Recorder's Office Records as Document No. 2016-0037365.

33.     Defendants failed to abide by Civil Code 2923.55 due to the fact that they did not review Plaintiff's financial situation and further did not advise her of all options available to avoid foreclosure.

34.     Defendants failed in their obligations to both offer assistance to Plaintiff prior to the Notice of Default and meeting communication requirements once Plaintiff was able to submit a request. Defendants did not offer Plaintiff a meaningful review as required by California law.

35.     Defendants are actively moving toward foreclosure of the home and took clear steps to satisfy this state's requirements toward a non-judicial foreclosure, including recording a Notice of Default and Notice of Trustee's Sale.

36.     Plaintiff now faces the loss of the Subject Property, as well as the lost opportunity to pursue foreclosure prevention options that she would have pursued but for the Defendants' violation of California Civil Code section 2924 et. seq. Defendants violated communication requirements under the California Homeowners Bill of Rights and failed to rescind the Notice of Default to remedy said violations.

37.     Consequently, Plaintiff is informed and believes and based thereon alleges that the negotiations were not in good faith, and were a mere "smoke screen" for use by defendant to lull Plaintiff into a state of complacency while her home is foreclosed on and taken from her.

38.     By way of this Complaint, Plaintiff seeks a temporary restraining order, followed by a preliminary injunction, enjoining Defendants from selling Plaintiff's property at auction. Plaintiff also seeks damages for Defendants blatant violation of the requirements of California Civil Codes §§ 2923.55, 2923.6, 2923.7, 2924.10, 2924.11, 2924.12.

//

//

- 7 -

**FIRST CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA HOMEOWNER BILL OF RIGHTS**

(Against ALL Defendants)

39.     Plaintiff hereby incorporates by this reference paragraphs 1 through 38, as though fully set forth herein.

40.     The Homeowner Bill of Rights ("HBOR") consists of a series of related bills including two identical bills that were passed on July 2, 2012 by the state Senate and Assembly: AB 278 (Eng, Feuer, Pérez, Mitchell) and SB 900 (Leno, Evans, Corbett, DeSaulnier, Pavley, Steinberg). Both of these bills ultimately give rights back to borrowers and create a system in which banks can be held accountable for pursuing their own interests above the borrowers.

41.     Lenders, such as WELLS FARGO, are now legally obligated to ensure a borrower receives a "meaningful" opportunity to be considered for any and all options available to avoid foreclosure. It also guarantees struggling homeowners a single point of contact at their lender with knowledge of their loan and direct access to decision makers, and imposes civil penalties on fraudulently signed mortgage documents.

42.     California Civil Code section 2923.7 provides that upon the request of a foreclosure prevention alternative, the mortgage servicer "shall promptly establish a single point of contact and provide the borrower one or more direct means of communication with the single point of contact." There is no requirement that the borrower must specifically request that a single point of contact be assigned. McFarland v. JPMorgan Chase, 2014 WL 4119399 at *11 (C.D. Cal. Aug. 21, 2014); See also Mungai v. Wells Fargo Bank, 2014 WL 2508090 (a plain reading of § 2923.7 required lender to assign a single point of contact when a borrower requested a foreclosure prevention alternative).

43.     This provision is intended to prevent borrowers from being given the runaround, being told one thing by one bank employee while something entirely different is being pursued by another." Lapper v. SunTrust Mortg., N.A., 2013 WL 2929377 at 2 (C.D. Cal. June 7, 2013).

44.     Cal. Civ. Code § 2923.7(b)(3) requires a contact to have access to current information and be able to timely, adequately, and accurately inform the borrower of the current status of her foreclosure prevention alternative. Plaintiff alleges that despite her request for assistance the multiple WELLS FARGO representatives they spoke with gave conflicting answers and inaccurate status updates in violation of § 2923.7(b)(3). Plaintiff would be assured by one representative that all documents had been received then later be told by a different representative that documents were missing.

45.     Defendants' failure to provide Plaintiff a single point of contact caused undue delays in the processing of her loan, which is a material violation of § 2923.7. Segura v. Wells Fargo Bank, N.A., 2014 WL 4798890 (C.D. Cal. Sept. 26, 2014). Had Plaintiff been able to obtain timely and accurate status updates they would have been able to submit any supposedly missing documents and/or obtain alternative means of assistance. Instead, Defendants kept Plaintiff in the dark and initiated foreclosure proceedings.

46.     California Civil Code section 2923.55 provides the following: "a mortgage servicer shall send the following information in writing to the borrower…

(B) A statement that the borrower may request the following:

(i) A copy of the borrower's promissory note or other evidence of indebtedness.

(ii) A copy of the borrower's deed of trust or mortgage.

(iii) A copy of any assignment, if applicable, of the borrower's mortgage or deed of trust required to demonstrate the right of the mortgage servicer to foreclose.

(iv) A copy of the borrower's payment history since the borrower was last less than 60 days past due."

47.     This civil code section imbues the mortgage servicer with a duty to provide these documents before recording a notice a default and a failure to do so is a material violation. See, e.g., Hestrin v. CitiMortgage, Inc., 2015 WL847132, at *3 (C.D. Cal. Feb. 25, 2015) (finding plaintiff stated a material violation by alleging that the defendant failed to comply with § 2923.55's notification requirements).

48.     Plaintiff has not received any of the documents listed in Cal. Civil Code section 2923.55 (B), including the statement itself, in material violation of Cal. Civil Code § 2923.55, despite a request to furnish the aforementioned documents.

49.     Plaintiff has suffered and will continue to suffer substantial irreparable harm, including but not limited to the potential loss of the Subject Property, the cost and expense of the instant pending litigation, continuing emotional distress, and other actual consequential damages that will be proven on date of trial. Furthermore, Plaintiff has been harmed in that she was unable to exercise her right to reinstate the loan under Cal. Civil Code section 2924c, as well as exercise her right to secure other alternatives to foreclosure.

## SECOND CAUSE OF ACTION

## STATUTORY UNFAIR COMPETITION – CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200 ET SEQ.

(Against ALL Defendants)

50.     Plaintiff hereby incorporates by this reference paragraphs 1 through 49, as though fully set forth herein.

51.     Defendants' conduct as alleged herein constitutes unlawful, unfair or fraudulent business act(s) or practice(s) within the meaning of California Business and Professions Code §17200 et seq.

52.     Specifically, Defendants are unlawfully and unfairly proceeding with foreclosure against California homeowners, including Plaintiff, in direct violation of California Civil Code foreclosure procedure statutes, including newly amended statutes implemented effective January 1, 2013 by way of AB 237 and SB 900.

53.     To bring a claim under the "fraudulent" prong of the UCL, borrowers must show that members of the public are likely to be deceived by servicer's actions. Here, WELLS FARGO's assurance that becoming delinquent would eventually lead to a modification coupled with the subsequent delay in processing applications and documentation resulted in increasing

GONZALES v. WELLS FARGO BANK, N.A. – COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  late fees and penalties. This practice should be construed as deceptive to the public. Pestana v.

2  Bank of America, N.A., 2014 WL 2616840 (Cal. Ct. App. June 12, 2014).

3      54.    The "unfair" prong of the UCL refers to practices that violate legislatively stated

4  public policy. The Homeowner Bills of Rights demonstrates the strong public policy in favor of

5  protecting homeowners from foreclosure, as evidenced by recently-enacted state and federal

6  regulations. See, e.g., Cal. Civil Code §2923.6 (encouraging the option of loan modification for

7  borrowers). Defendants' unlawful practices described above runs counter to California's stated

8  public policy and have given them an unfair advantage over their competitors. Perez v.

9  CitiMortgage, Inc., 2014 WL 2609656, at *8 (C.D. Cal. June 10, 2014) (finding servicer's

10  misrepresentations regarding borrower's application status led to a deliberately drawn-out and

11  unsuccessful modification process, resulting in harm to the borrower that outweighed the utility

12  of servicer's action). This is precisely what WELLS FARGO has done to Plaintiff. Defendants

13  misrepresented the status of Plaintiff's application, which unreasonably stalled the modification

14  process and led to the initiation of foreclosure on Plaintiff's home.

15      55.    Additionally, WELLS FARGO fraudulently induced Plaintiff into defaulting in

16  the first place by suggesting they should apply for a modification, promising they would receive

17  an answer within thirty days and promising no foreclosure proceedings would commence during

18  review. These kinds of false assurances resulted in increasing late fees and penalties for not only

19  Plaintiff but for thousands of other borrowers as well.

20      56.    Plaintiff has suffered injury in fact, including loss of equity in her home by

21  growing amounts of delinquent interest, declining property value and late fees, costs and expenses

22  related to protecting themselves, fees and costs, including but not limited to, attorney's fees and

23  costs and higher cost of obtaining credit due to the deterioration of her credit score.

24      57.    Plaintiff has additionally been damaged in the amount of foreclosure fees and costs

25  already charged to and added to Plaintiff's loan, in an amount to be proven at trial.

- 11 -

58.  The fees and costs charged by Defendants were charged without any legal authority to do so and in direct violation of the statutory mandate of California Civil Code §2923.55 and §2923.6.

59.  Defendants must be required to disgorge any profit or gain that they obtained as a result of their wrongful conduct as herein alleged.

60.  Plaintiff is entitled to equitable relief in the form of an order requiring Defendants to disgorge all profits or gain they have obtained from Plaintiff or at the expense of Plaintiff and members of the general public by reason of their unlawful, unfair or fraudulent business act(s) and practice(s) and an injunction enjoining Defendants from continuing said acts or practices.

## THIRD CAUSE OF ACTION

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

(Against ALL Defendants)

61.  Plaintiff hereby incorporates by this reference paragraphs 1 through 60, as though fully set forth herein.

62.  Defendants' conduct, as alleged, constitutes a breach of the covenant of good faith and fair dealing implied in every contract under California law.  This covenant creates an obligation in Defendants not to hinder or prevent Plaintiff's ability to perform under the contract or receive the benefit of the contract.

63.  On or about November 21, 2001, Plaintiff entered into a loan agreement, executing a Promissory Note and Deed of Trust in favor of Wells Fargo Home Mortgage, Inc., and subsequently Defendants.  Plaintiff alleges that Defendants breached the covenant of good faith and fair dealing and interfered with Plaintiff's ability to perform under the contract by refusing to provide Plaintiff any meaningful assistance and then impairing her ability to get current on her loan like she was trying desperately to do.

64.  For years, Plaintiff substantially performed under the loan agreement, making her full monthly payments on time every month.

- 12 -

GONZALES v. WELLS FARGO BANK, N.A. – COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

65.    Defendant's negligence in responding to Plaintiff's requests for assistance, coupled with prolonged review periods and major communication failures, forced Plaintiff into an unrecoverable default whereby if assistance was not offered, Plaintiff would have on other means to save her home.

66.    Therefore, because Defendants induced Plaintiff to not perform under the contract by failing to provide assistance as required by law, Plaintiff's performance was excused as set forth under Cal. Civ. Code § 1511, which states if a defendant does some act naturally tending to induce the plaintiff not to perform, the plaintiff's failure to perform is excused. When this occurs, according to Cal. Civ. Code § 1512, the plaintiff is entitled to all the benefits of the contract had it been performed by both parties. As such, no conditions existed that would interfere with Defendant performing under the contract, and all conditions necessary for Defendants to fulfill its obligations under the contract had occurred when Defendants coerced Plaintiff into missing payments by promising Plaintiff that she would not face foreclosure if she did so. In fact, this promise was designed to induce and coerce Plaintiff to miss payments and sit idly by during supposed review periods so that Defendants could foreclose on Plaintiff's loan.

67.    As a proximate result of Defendants' acts and practices, Plaintiff's credit has been detrimentally impacted, and Plaintiff now risks the loss of her home through foreclosure. Plaintiff has incurred contract damages, according to proof at trial, attorney's fees, costs to save the home, and loss of equity.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE

(Against ALL Defendants)

68.    Plaintiff hereby incorporates by this reference paragraphs 1 through 67, as though fully set forth herein.

69.    The elements of a cause of action for negligence are well established. They are (a) a legal duty to use due care; (b) a breach of such legal duty; (c) the breach as the proximate or

- 13 -

legal cause of the resulting injury. (Ladd v. County of San Mateo (1996) 12 Cal.4th 913, 917 [50Cal.Rptr.2d 309, 91 1 P.2d 496].)

70.     At all times relevant herein, Defendants, acting as Plaintiff's lenders and servicers, had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and to discharge and fulfill the other incidents attendant to the maintenance, accounting and servicing of loan records, including, but not limited to, disclosing to Plaintiff the real status of any foreclosure actions taken by it, refraining from taking any action against Plaintiff outside its legal authority, and providing all relevant information regarding Plaintiff's loan accounts with Defendants.

71.     In Alvarez v. BAC Home Loans Servicing, 228 Cal. App. 4th 941 (2014), the court found that, though a servicer is not obligated to initiate the modification process or to offer a modification, once it agrees to engage in the process with the borrower it owes a duty of care not to mishandle the application or negligently conduct the modification process. See also, Ware v. Bayview Loan Servicing, LLC, 2013 WT 6247236, at *9 (S.D. Cal. Oct. 29, 2013) [denying motion to dismiss borrower's negligence claim because servicer may owe a duty of care to maintain proper records and timely respond to modification applications].

72.     Accordingly, by engaging in protracted loan modification negotiations with Plaintiff, Defendants owed Plaintiff a duty to conduct honest, timely and accurate evaluations of Plaintiff's loan modification applications and to carefully handle Plaintiff's sensitive financial and personal information contained in those applications.

73.     It is true that some courts have held that in the standard lender/borrower relationship, a duty of care is not necessarily created. For instance, the court held in Nymark v. Heart Federal Savings & Loan Association, 231 Cal. App. 3d 1089, 1095 (1991) that "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money."

74.     However, the Nymark court simply found that a duty was not owed under the facts in that case after analyzing them pursuant to the six part test established in Biakanja v. Irving, 49 Cal2d 647, 122 P.2d 294, which looks to (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame, and (6) the policy of preventing future harm.

75.     In analyzing the first Biakanja factor, whether or not the transaction was intended to affect the plaintiff, courts have held that a defendant's conduct is found to affect the plaintiff if the defendant commits the conduct with knowledge of plaintiff's circumstances. See e.g., Jolley v. Chase Financial, LLC (2013) 213 Cal.App.4th 872, 900.

76.     Here, by stringing Plaintiff along for years in pursuit of a modification, Defendants undeniably intended to affect Plaintiff. Defendants knew that prolonging Plaintiff's review period would forever change her status regarding her mortgage for the worse.

77.     Defendants should have foreseen the harm being done to Plaintiff due to their knowledge and expertise in the financial industry as well as complete control over Plaintiff's loan and loan modification review process. Further, it only requires common sense to determine that (1) if a lender decides to foreclose on a borrower's home without first providing the borrower a written determination of the borrower's loan modification application, or advise her of her appeal rights, the ensuing foreclosure will ultimately harm the borrower; and (2) that a borrower's credit will be harmed and the borrower will owe more in arrears the longer a lender drags out stalls the loan modification process. Thus, foreseeability of harm is clear.

78.     The foreseeability of harm to Plaintiff was high because the failure to work with Plaintiff as promised, and the failure to provide a timely, accurate, and good faith loan modification review, has caused Plaintiff to be in real danger of losing her home and having her credit destroyed, not to mention limiting Plaintiff's options to those that will only benefit Defendants in the long run. Plaintiff has been injured because her credit has been destroyed, she

lost the ability to cure the delinquency on her loan and he faces the imminent danger of losing her home.

79.     In regard to the closeness of the connection between Defendants' conduct and Plaintiff's injury, Defendants' conduct was firmly and intimately tied to the harm because but for the actions and omissions of Defendants, Plaintiff would not be facing imminent foreclosure of her home. Because Defendants were in full control of the loan modification process, it is reasonably foreseeable that Plaintiff would rely on Defendants to conduct a good faith loan modification review and would not seek other alternatives to prevent foreclosure of the home or mitigate the debt owed.

80.     In regard to moral blame, Defendants' conduct was morally reprehensible as they acted without any regard for distressed homeowners, including the Plaintiff, who tried desperately to save the Property from foreclosure.  Defendants coerced Plaintiff into falling behind on her mortgage and then reneged on the promise to give a permanent modification.

81.     Furthermore, at the time Defendants made their representations and/or omissions to Plaintiff as alleged above, they knew, or had reason to know, that said representations and/or omissions were in fact false, and nevertheless made them with the intent to defraud Plaintiff and cause Plaintiff to believe her home would not be foreclosed upon. Had Plaintiff known the true facts, that Defendants never intended to offer a permanent modification, Plaintiff would have pursued other available legal remedies to protect her interests and would not have spent years making trial payments toward a home she was going to lose.

82.     In analyzing the final Biakanja factor, the policy of preventing future harms, it is undisputedly clear that public policy encourages lenders and borrowers to work together to prevent a borrower from defaulting on his or her loan. See Jolley, 213 Cal.App.4th at 903 (the ongoing financial crises has caused the federal government to adopt programs that encourage lenders and borrowers to work together to prevent a borrower from defaulting on their loan). Here, any assistance Defendants offered to Plaintiff was done in bad faith and without any controls or

GONZALES v. WELLS FARGO BANK, N.A. – COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

supervision to ensure that Plaintiff would not be left in a worse position as a result of the loan modification application process.

83.     Based on the foregoing, it is exceedingly clear that the Biakanja factors favor imposing a duty of care on Defendants, as their actions and conduct have gone beyond the role of a mere money lender.

84.     Defendants breached their duty of care owed to Plaintiff by partaking in the following unreasonable conduct that caused injury to Plaintiff:

    1)  Defendants negligently failed to provide Plaintiff a final determination of her application for modification prior to recording the NOD against the property;

    2)  Defendants failed to inform Plaintiff in writing that he may request the documents specified in Cal. Civ. Code § 2923.55;

    3)  Defendants failed to provide Plaintiff with a single point of contact who was familiar with Plaintiff's file and circumstances as required under Cal. Civ. Code §2923.7;

    4)  Defendants unfairly handled Plaintiff's loan modification applications by unreasonably delaying the review process and repeatedly requesting duplicative documents and supplemental information;

    5)  Defendants negligently pushed Plaintiff into default by advising her to stop making payments and then by refusing to honor its promise to provide a permanent modification; and

    6)  Defendants violated numerous statutes that serve as the underlying violations for liability under the doctrine of negligence per se, including Cal. Civil Code §§ 2923.55, 2923.6, 2923.7, and 2924.

85.     These statutes were enacted by the California legislature specifically to protect the rights of innocent homeowners suffering from financial hardships. These statutes were also enacted by the California legislature specifically to prevent the same injury that Plaintiff will

- 17 -

imminently suffer: wrongful foreclosure and subsequent eviction resulting from a wrongful foreclosure.

86.     The actions of Defendants summarily denied Plaintiff of any opportunity to utilize the avenues at her disposal to avoid the loss of her home. Defendants' actions are a substantial factor in Plaintiff's harm.

87.     Defendants' violations directly and proximately caused the injuries suffered by Plaintiff. But for WELLS FARGO promising Plaintiff a permanent modification, Plaintiff would not have spent so much time and resources working towards the modification. Additionally, had Defendants complied with the aforementioned laws to begin with, Plaintiff would not have suffered the very injuries that give rise to this Complaint because she would have been able to successfully pursue and obtain a non-foreclosure alternative and remain current on her loan.

88.     Due to Defendants' negligent conduct, Plaintiff suffered monetary loss, severe emotional stress at the impending loss of Plaintiff's home, loss of home equity, damaged credit, and more.

89.     Plaintiff demands damages in an amount to be proven at trial.


**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1.     A declaratory judgment and order of this Court that:

(A)     Defendants, and each of them, may not foreclose on the Property until they have honored and proven that all statutory requirements stemming from and relating to Plaintiff's options to avoid foreclosure have been met.

(B)     That Defendants failed to abide by their own guidelines in qualifying or reviewing Plaintiff for a loan modification in violation of Civil Code §2923.6.

(C)     That Defendants and each of them, failed to provide the required statutory notifications and undertake the required courses of action as mandated under California's Civil Code.

GONZALES v. WELLS FARGO BANK, N.A. – COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

2.   For a temporary restraining order, preliminary injunction and permanent injunction prohibiting Defendants from engaging in unlawful and deceptive acts and practices of foreclosing on property of California homeowners, including Plaintiffs, without considering them for within their guidelines, and when anticipated recovery through a modification or workout plan exceeds anticipated recovery through foreclosure on a net present value basis.

3.   For disgorgement of Defendants' illegal profits and gain, including but not limited to all foreclosure fees and costs charged California homeowners, including Plaintiffs.

4.   For an award of actual damages in an amount within the jurisdictional limits of this Court to be proven at trial.

5.   For general damages, according to proof.

6.   For special damages, according to proof.

7.   For consequential damages, and incidental damages, according to proof.

8.   For an award of reasonable attorney's fees pursuant to agreement of the parties, according to proof.

9.   For an award of interest, including prejudgment interest, as provided by law.

10.   For costs of suit; and

11.   For such other relief as the Court deems just and proper.

DATED: October 1, 2016                  KETTNER LAW CORPORATION

BY: _____
MARC APPLEBAUM
Attorney for Plaintiff

- 19 -
GONZALES v. WELLS FARGO BANK, N.A. – COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# EXHIBIT 12

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Marc Applbaum (SBN: 222511)- Kettner Law Corp<br>2150 W. Washington St., Suite 104, San Diego CA 92110<br>TELEPHONE NO.: 619-756-7300     FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* em@kettnerlaw.com<br>ATTORNEY FOR *(Name):* Veronica Gonzales | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Marin
 STREET ADDRESS: 3501 Civic Center Dr.
 MAILING ADDRESS:
 CITY AND ZIP CODE: San Rafael, CA 94903
 BRANCH NAME: Hall of Justice

PLAINTIFF/PETITIONER: Gonzales

DEFENDANT/RESPONDENT: Wells Fargo Bank N.A.

**FILED**

FEB - 2 2017

JAMES M. KIM, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: C. Lucchesi, Deputy

| REQUEST FOR DISMISSAL | CASE NUMBER: CIV1603668 |
|---|---|

A conformed copy will not be returned by the clerk unless a method of return is provided with the document.

This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) [✓] With prejudice    (2) [ ] Without prejudice
   b. (1) [✓] Complaint    (2) [ ] Petition
   (3) [ ] Cross-complaint filed by *(name):*                     on *(date):*
   (4) [ ] Cross-complaint filed by *(name):*                     on *(date):*
   (5) [✓] Entire action of all parties and all causes of action
   (6) [ ] Other *(specify):**

   BY FAX

2. *(Complete in all cases except family law cases.)*
   The court [ ] did [✓] did not waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*

Date: 01/31/2017

Marc Applbaum
(TYPE OR PRINT NAME OF [✓] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)                    ▶ *(signature)*

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
[✓] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross-Complainant

3. **TO THE CLERK:** Consent to the above dismissal is hereby given.**
   Date:
                                                              ▶
(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)                    *(signature)*

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross-Complainant

*(To be completed by clerk)*

4. [✓] Dismissal entered as requested on *(date):*    FEB - 2 2017

5. [ ] Dismissal entered on *(date):*                     as to only *(name):*

6. [ ] Dismissal **not entered** as requested for the following reasons *(specify):*

7. a. [ ] Attorney or party without attorney notified on *(date):*
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
      [ ] a copy to be conformed    [ ] means to return conformed copy

C. LUCCHESI

Date FEB - 2 2017    JAMES M. KIM    Clerk, by _____, Deputy

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. Jan. 1, 2013]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.;
Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390
www.courts.ca.gov

**CIV-110**

| | |
|---|---|
| PLAINTIFF/PETITIONER: Gonzales | CASE NUMBER: |
| DEFENDANT/RESPONDENT: Wells Fargo Bank N.A. | CIV1603668 |

## COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name):*

2. The person named in item 1 is *(check one below):*
   a. ☐ not recovering anything of value by this action.
   b. ☐ recovering less than $10,000 in value by this action.
   c. ☐ recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐ All court fees and court costs that were waived in this action have been paid to the court *(check one):* ☐ Yes ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

▶

_____                    _____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)                              (SIGNATURE)